

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA LONGORIA and MARIA | § | |
| IDALIA GUTIERREZ, Individually and | § | United States District Court |
| on behalf of the Estate of | § | Southern District of Texas |
| JUAN LONGORIA, Deceased, | § | **FILED** |
| Plaintiffs, | § | |
| | § | **DEC 0 4 2002** |
| | § | |
| | § | Michael N. Milby |
| VS. | § | Clerk of Court |
| | § | |
| CAMERON COUNTY, TEXAS, | § | CIVIL ACTION NO. B-01-062 |
| THE CITY OF BROWNSVILLE, TEXAS, | § | (JURY REQUESTED) |
| and JOHN DOES 1-10, | § | |
| Defendants. | § | |

---

## DEFENDANT THE CITY OF BROWNSVILLE'S
## MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES **THE CITY OF BROWNSVILLE, TEXAS**, one of the named Defendants

in the above-styled and numbered cause, and files this its Motion for Summary Judgment and in

support thereof, would respectfully show unto the court as follows:

### I.
### STATEMENT OF THE NATURE AND STATE OF THE PROCEEDINGS

This case is brought by the mother and the daughter of the deceased, Juan Longoria.

Longoria was arrested by Brownsville Police Department on April 10, 2001. He was first held in

Brownsville's municipal jail and then transferred to the Cameron County jail, where he later died.

The Plaintiffs brought suit on April 25, 2001 claiming that employees of the City of Brownsville or

Cameron County beat and/or choked Juan Longoria to death. Defendants allegedly violated Plaintiff

Juan Longoria's Fourth, Eighth, and Fourteenth Amendment rights under the United States

Constitution.  The Plaintiffs also brought suit under the Texas Tort Claims Act,  TEX. CIV. PRAC. & REM. CODE §101.001 *et seq*, claiming the Brownsville Police Department slammed the patrol car door on Juan Longoria's knee.  They seek actual damages of $5,000,000.00 and exemplary damages of  $5,000,000.00.    The parties have engaged in both written discovery and in depositions. Defendant the City of Brownsville now files this, its Motion for Summary Judgment.

II.
**STANDARD FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  By its very terms, the rule permits summary judgment even if the parties disagree as to some facts.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-48 (1986).  Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine.  *Id.* at 248.  Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment.  *Speaks v. Trikora Lloyd P.T.,* 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment.  Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Slaughter v. Allstate Ins. Co.,* 803 F.2d 857, 860 (5th Cir. 1986).  Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of

genuine issue of material fact). *See also Reese v. Anderson,* 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.,* 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson,* 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

### III.
### SUMMARY OF THE ARGUMENT

The Plaintiffs have brought suit alleging that employees of either the Defendant City of Brownsville or Co-Defendant Cameron County killed Juan Longoria. They additionally claim that the City falsely arrested Longoria for burglary and used excessive force by allegedly beating Longoria and slamming the door of a police car on his legs. Plaintiffs alternatively claim that the City was negligent by allegedly slamming the police car door on Longoria's legs.

In order to be held liable for any constitutional violations, the Plaintiffs have to establish the City had a policy, custom or practice that proximately caused Juan Longoria's death and that such policy, custom or practice was created with deliberate indifference to his constitutional rights. The competent summary judgment evidence demonstrates the City properly arrested and detained Longoria, and took no action whatsoever to injure Longoria or violate his rights. As a result, Defendant the City of Brownsville is entitled to summary judgment.

### IV.
### SUMMARY JUDGMENT EVIDENCE

A.  Plaintiffs' First Amended Complaint
B.  Brownsville Police Offense Report
C.  Sworn statement of Alfredo Najera
D.  Inter-Departmental Communication from Officer David Gutierrez
E.  Sworn statement of Mark Cheramie

F.      Inter-Departmental Communication from Victor Jackson
G.      Sworn statement of Martin Mendoza
H.      Excerpts of deposition transcript of Maria Longoria
I.      Sworn statement of Jesus Arias
J.      Sworn statement of Juan Cisneros
K.      Supplemental report prepared by Joe Salinas
L.      Affidavit of Commander Albert Rodriguez

## V.
## FACTS

1.      On April 10, 2001, Juan Antonio Longoria entered the Circle K convenience store located

        at 1124 International Boulevard in Brownsville, Texas.  (Ex. A, B, C.)

2.      Longoria was bleeding when he entered the store, and carried a bloody hammer.  (Ex. B, C,

        G.)

3.      Longoria asked the store's clerk where the restroom was. (Ex. C.)

4.      The clerk thought Longoria's request was strange as Longoria was a regular customer of that

        store and had used the store's restroom before.  Nevertheless, the clerk gave Longoria

        directions to the restroom. (Ex. C.)

5.       Instead of heading towards the restroom, Longoria entered the counter area where the clerk

        was working.  The clerk told him that he could not be in that area.  (Ex. C.)

6.      Longoria then proceeded to walk towards the store's office.  The store manager asked

        Longoria where he was going, to which Longoria replied that he was going to the bathroom.

        The manager told Longoria to head towards the other side of the store where the restroom

        was located.  (Ex. G.)

7.      Longoria instead used a back entryway and opened a door to enter the store's office. (Ex. B.)

8.      Longoria did not have permission to enter into the store's office, which is not open to the

        public. (Ex. B.)

9.      The store's employees heard Longoria ransacking the office.  They called the Brownsville

Police Department. (Ex. B, C.)

10.    Longoria barricaded himself inside the Circle K's store office.  Brownsville police officers
       attempted to open the door.  However, Longoria used his body and other large objects to
       block the doorway. (Ex. B.)

11.    When the door was finally opened, Longoria resisted arrest and refused to be handcuffed.
       (Ex. D.)

12.    Longoria was arrested on or about 3:58 p.m. on April 10, 2001.(Ex. B.)

13.    Brownsville police officers observed the store's office had been ransacked.  Longoria made
       indentations on the wall and damaged a computer.  (Ex. B, D.)

14.    Brownsville police officers carried Longoria to the police car as he refused to walk.
       (Ex. B, D.)

15.    Longoria's mother spoke with her son outside Circle K.  He did not tell her that anyone from
       the Brownsville Police Department had treated him wrongfully or hit him, nor did he say he
       was wrongfully arrested. ( Ex. H, pg. 78-79)

16.    Longoria's mother stated in her deposition that Brownsville Police officers had not beaten
       her son.  (Ex. H pg. 47-49, 86).

17.    Longoria told his mother that "they" were trying to kill him, but she testified "perhaps he
       was already bad of his head....because he wasn't beaten." (Ex. H, pg. 49.)

18.    The officers transported Longoria to the municipal jail. (Ex. B, E. )

19.    During the transport of Longoria to the municipal jail, Longoria was hallucinating and saying
       people were trying to kill him. (Ex. B. )

20.    An ambulance was called because Longoria was bleeding from a cut to his left knee and had
       swelling to his left elbow.  Longoria refused to go to the hospital and signed a waiver of
       medical treatment. (Ex. E.)

21.    The municipal jailers placed Longoria in a padded cell and kept him under close observation. (Ex. E.)

22.    When conducting a cell check, municipal jailers were unable to enter the padded cell as Longoria held the door shut. After they were able to enter, Longoria hid behind the door and appeared to be scared and nervous. Longoria was trembling and seeing things. (Ex. E.)

23.    Later that evening, the municipal jailers contacted their patrol shift supervisor who advised that they should take Longoria to the hospital. Before they left the municipal jail for Brownsville Medical Center, Longoria told the jailers that men were after him and wanted to kill him. (Ex. E. )

24.    While he was at the emergency room, Longoria continued to say that there were gunmen who where trying to kill him. He explained that earlier in the day, five men had gone to his house, slapped his mother and told him they would kill him and put him in a plastic bag. (Ex. E.)

25.    Longoria also said he had run away from these men who were trying to kill him. Longoria said he kept running until he reached Circle K, and while running he fell on loose gravel, causing him to hurt his knee and elbow. (Ex. E.)

26.    While at Brownsville Medical Center, Longoria was treated for his injured knee, his elbow was X-rayed and he was medically cleared and released. (Ex. E.)

27.    Longoria was evaluated at the hospital by an employee for Tropical Center for MHMR. The MHMR representative said that Longoria did not need to be committed. (Ex. E.)

28.    Longoria was then taken back to municipal jail and was again secured in the padded cell. (Ex. E.)

29.    Longoria continued to say that someone was trying to kill him. When asked who was trying to kill him, Longoria pointed to areas where no one was located (such as in an air

conditioning vent). (Ex. E, I, J.)

30.    The jailers checked on Longoria every fifteen minutes and  reassured him that nothing was going to happen to him.(Ex. I, J.)

31.    After Longoria was formally arraigned, the Brownsville Police Department turned custody of Longoria over to the Cameron County Jail. (Ex. K.)

32.     At that time, Longoria had no evidence of any injury, other than any injuries he may have had prior to his arrest.  (Ex. K.)

33.    After county employees asked each inmate being transported (including Longoria) whether they were sick or injured, the Brownsville police officers who had transferred these inmates were cleared and advised they could leave. (Ex. K.)

34.    The City of Brownsville had no further interaction with Longoria after approximately 10:00 a.m. on April 11, 2001.

35.    Longoria was under the custody of Cameron County from approximately 10:00 a.m. on April 11, 2001 until he was declared dead at 1:22 a.m. on April 12, 2001.

## VI.
## ARGUMENTS AND LAW

**A.    Summary Judgment Evidence Shows that Defendant City of Brownsville Not Liable under 42 U.S.C. § 1983.**

**1.    Plaintiffs' allegations.**

Plaintiffs allege that the City of Brownsville is liable under 42 U.S.C. § 1983.  Specifically, Plaintiffs allege that Defendant City of Brownsville is liable because its officers beat Longoria when they arrested him as a "direct result of inadequate training and supervision. . .which was so deficient that it amounted to conscious and deliberate indifference." (Ex. A at 4.18)  Plaintiffs claim this alleged inadequate training and supervision of Brownsville police officers constituted a policy, custom or practice by the City of Brownsville and resulted from "a culture of violence" within the

police department which is supposedly evidenced by other incidents of brutality. (Ex. A at 4.19-4.21.) Plaintiffs further allege "If Juan Longoria was killed by one or more officers of the Brownsville Police Department choking him, such conduct was the result of the city's failure to adequately train and supervise the officers, as well as the culture of violence present in the Brownsville Police Department." (Ex. A at 4.39.)

## 2.    Plaintiffs cannot show the City was deliberately indifferent.

Plaintiffs' allegation that the City of Brownsville is liable under 42 U.S.C. § 1983 because it failed to adequately train its police officers amounts to a claim of deliberate indifference. Municipal liability inures only when the execution of a municipality's policy or custom causes the injury, and does not arise vicariously through the acts of its employees. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). In order to hold a municipality liable under § 1983 for a policy of training, a plaintiff must show:

(1) the training procedures of the municipality's policymaker were inadequate;
(2) the municipality's policymaker was deliberately indifferent in adopting the training policy, and
(3) the inadequate training policy directly caused the plaintiff's injury.

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) (*citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 385-87 (1989) and *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992)). Deliberate indifference amounts to "subjective intent to cause harm." *Hare v. City of Corinth, MS*, 74 F.3d 633, 649 (5th Cir. 1996).

Plaintiffs make vague allegations, but provide no proof of how inadequate training caused Plaintiffs' alleged constitutional deprivations. Plaintiffs simply have no evidence showing how any of the alleged conduct affirmatively caused the constitutional deprivations. Moreover, the competent summary judgment evidence as discussed below clearly shows that the City took no action to violate

Longoria's rights.

### 3. Plaintiffs cannot show municipal liability based on policy, custom or practice.

Plaintiffs also allege that a policy custom or practice of Defendant City of Brownsville caused the constitutional deprivation of which they complain. (Ex. A at 4.19.) In such cases, "considerably more proof than [a] single incident will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (emphasis added). A "pattern of similar incidents" that is "general or widespread" must be shown. *Languirand v. Hayden*, 717 F.2d 220, 227-28 (5th Cir. 1983) *cert denied* 467 U.S. 1215, 104 S. Ct. 2656 (1984). Such a pattern is evident if there are "numerous prior incidents" showing a "systemic" violation of constitutional rights. *Hererra v. Valentine*, 653 F.2d 1220 (8th Cir. 1981); *see also Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) *cert denied* 472 U.S. 1016, 105 S. Ct. 3476 (1985) (en banc) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 & n. 39 (1970)).

In addition, it must be shown that this systemic and widespread pattern of numerous prior incidents must have affirmatively caused the complained of constitutional injury. *Reimer v. Smith*, 663 F.2d 1316 (5th Cir. 1981). Municipal liability under § 1983 cannot be derived from a single improvident incident, but only where it is shown that the injury alleged was actually caused by a policy, custom, or practice evidenced by numerous similar incidents showing a pattern of conduct. *Rodriguez v. Avita*, 871 F.2d 552 (5th Cir. 1989), *cert. denied* 493 U.S. 854, 110 S. Ct. 156 (1989) (upholding Judge Filemon Vela's dismissal under Rule 12(b)(6) of § 1983 claim against City of Brownsville); *see also Languirand v. Hayden*, 717 F.2d 220 (5th Cir. 1983).

Plaintiffs' allegations of policy, custom, or practice are conclusory and are not supported by competent summary judgment evidence. Specifically, Plaintiffs have no evidence showing that any

of the City's policies affirmatively caused Longoria's death. Aside from the conclusory allegations of constitutional deprivation, Plaintiffs' complaint against Defendant rests on nothing more than allegations of unspecified prior incidents that are not affirmatively linked to the constitutional deprivations of which the Plaintiffs complain. Plaintiffs' unsubstantiated allegations cannot create a genuine issue of fact material to their claims. Defendant City of Brownsville is therefore entitled to judgment as a matter of law.

### 4.    Defendant entitled to summary judgment as to excessive force claims

Plaintiffs claim that the City of Brownsville's police officers beat Longoria, on presumably three separate occasions when they arrested Longoria, when they allegedly shut the police car door on Longoria's leg, and/or at some unknown time when they allegedly placed him in a choke hold, breaking his hyoid bone. These claims are without merit and contrary to the competent summary judgment evidence.

The decedent Juan Longoria lived with his mother and performed odd jobs such as picking up litter or washing cars. (Ex. H, pg.18). He had been unable to work steadily after having multiple back surgeries. (Ex. H, pg. 34.) On April 10, 2001, Longoria had returned home from washing a car. His mother was using a hammer to tap down a small nail when Longoria became "perturbed," grabbed the hammer away from his mother, and ran down the nearby alley. (Ex. H, pg. 31). Longoria's mother called her niece to help her look for Longoria. When the niece arrived approximately fifteen minutes later, they headed towards Circle K as Longoria frequented that store. (Ex. H. at 74-75).

During this time, Longoria was at Circle K, in the process of being detained by Brownsville police officers. When the officers arrived, they could hear Longoria ransacking the office but were unable to enter the office as Longoria had barricaded himself inside. (Ex. B, D.) The officers were

finally able to push the office door open.  Although they repeatedly ordered Longoria to put his hands behind his back, Longoria refused to do so.  (Ex. D.)  It was necessary to strike Longoria once in the thigh with a baton in order to get Longoria to comply and submit himself to arrest.  (Ex. D, L.)  Longoria was then handcuffed and transported out of the office.  (Ex. B, D.)

Pre-trial detainees who allege they were injured outside jail must bring excessive force violations under the Fourth Amendment.  The claimant must prove a <u>significant</u> injury which resulted directly and only from the use of force that was clearly excessive to the need and the excessiveness was objectively unreasonable.  U.S. CONST. amend. IV; *U.S. v. Harris*, 293 F.3d 863 (5th Cir. 2002).  Plaintiffs are unable to meet this burden.  They cannot establish that the use of a single baton strike to the thigh was clearly excessive and unreasonable in order to get a subject who was resisting arrest to comply with being handcuffed.  (Ex. L.)  Moreover, Plaintiffs cannot point to any serious injury inflicted by this Defendant upon Longoria, nor is there any evidence that this Defendant used any excessive force Longoria.  (Ex. L.)  Plaintiff's lack of evidence that Defendant used excessive force is supported by Longoria's mother's deposed testimony.

Longoria's mother saw her son as he was being escorted out of Circle K store, and also had the opportunity to speak with him.  Longoria did not tell his mother that anyone from the Brownsville Police Department had treated him wrongfully or hit him.  (Ex. H, pg. 42, 78-79).  Moreover, Longoria's mother testified it was apparent that Brownsville Police officers had not beaten her son.  (Ex. H, pg. 47-49, 86).  She further testified that, although her son said "they" were trying to kill him, "perhaps he was already bad of his head....<u>because he wasn't beaten</u>" (Ex. H, pg. 49).  The officers then situated Longoria so that his body was entirely inside the police car and transported him to jail.  There is no competence evidence to support of Plaintiffs' allegations that this Defendant slammed the police car door on Longoria's leg (discussed *infra*) or placed Longoria

in a choke hold.  (Ex. L.)

There is competent evidence shows that this Defendant never used any force in such a way as would be violative of Longoria's constitutional rights. The City is thus entitled to summary judgment as a matter of law.

### E.    Defendant entitled to summary judgment as to false arrest claims

Plaintiffs bear the burden of proving each of the three elements for false imprisonment under Texas law- willful detention, lack of consent, and absence of authority. *Tovar v. U.S.*, 2000 WL 425170 (N.D.Tex.,2000)(citing *Villegas v. Griffin Industries*, 975 S.W.2d 745 (Tex.App.-Corpus Christi,1998)). While Plaintiffs may be able to establish the first two elements, they will be unable to establish that there was no authority for Longoria's arrest, as the police officers had probable cause to arrest Longoria.

Probable cause for an arrest exists when the facts and circumstances within the knowledge of the arresting officer, and of which he has reasonably trustworthy information, are sufficient in themselves to warrant in a person of reasonable caution the belief that a person has committed any offense. *Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); United States v. Woolery,* 670 F.2d 513, 515 (5th Cir.1982). A showing of probable cause requires less evidence than is necessary to support a conviction. *See United States v. Ashcroft,* 607 F.2d 1167, 1170 (5th Cir.1979).

The Brownsville police officers believed that Longoria had committed a crime based on their discussions with store employees and based upon Longoria's actions. (Ex. B.) These officers acted with probable cause in arresting Longoria.  (Ex. L.)  It can reasonably be inferred from Longoria's entry of the store with a hammer and his entry of two unauthorized portions of the store (the office

and behind the counter) that Longoria intended to commit a crime. Intent to commit a crime may be inferred from the defendant's conduct and surrounding circumstances. *Matter of A.S.,* 954 S.W.2d 855 (Tex. App. -- El Paso 1997); *Simmons v. State,* 590 S.W.2d 137, 138 (Tex.Crim.App.1979). This inference is strengthened when one considers that Longoria entered the store with the pretense of using the restroom; however he disregarded directions to the restroom in order to enter into prohibited areas of the store. (Ex. C, G.) Longoria was only able to enter into the office by using a back entrance way and opening a closed door. (Ex. B.) He knew that he was not headed towards the restroom or any area of the store that is open to the general public as store employees confronted him when he headed towards the office in plain sight. (Ex. C, G.)

Plaintiffs allege that Longoria was falsely arrested for burglary as they claim there was no unlawful entry or an intent to commit a burglary, theft or assault. (Ex. A at 4.26, 5.2.) This is insufficient to prove that this Defendant's officers lacked probable cause. In order to establish the lack of probable cause, Plaintiffs must prove that the legality of Longoria's conduct was clearly established. *Sorenson v. Ferrie,* 134 F.3d 325 (5th Cir. 1998). Plaintiffs cannot meet their burden of proving that the Brownsville police officers lacked probable cause, because they cannot show that the legality of Longoria's conduct in ransacking the Circle K office was clearly established.

Because this Defendant's officers had probable cause to arrest Longoria, his arrest was conducted pursuant to legal authority. Plaintiffs' claims for false arrest must therefore fail. The City is entitled to summary judgment as to the Plaintiffs' false arrest claims.

## C.    Defendant Entitled to Summary Judgment on State Law Claims of Negligence

Plaintiffs claim that police officers employed by the City of Brownsville intentionally or negligently shut the police door on Longoria, thereby injuring his legs. Defendant City of Brownsville is entitled to governmental immunity unless Plaintiffs can show application of the

limited waiver of immunity set forth in the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN. ch. 101 (Vernon's 2000). Specifically, Plaintiffs must show that they suffered damages as a result of a City of Brownsville employee's negligent use of a motor driven piece of equipment or tangible personal or real property. TEX. CIV. PRAC. & REM. CODE § 101.021. The waiver of governmental immunity does not apply to intentional torts, such as intentionally slamming the police door on Longoria's leg. TEX. CIV. PRAC. & REM. CODE § 101.057.

The competent summary judgment evidence shows that City employees never slammed the police car door on Longoria's legs. Rather, the competent summary judgment evidence establishes that Longoria injured himself and tore the legs of his blue jeans, when he tripped and fell as a result of his paranoid belief that several men were trying to kill him. (Ex. E.) Longoria's accident occurred prior to his entry of the Circle K convenience store, where City employees first encountered him.

Circle K employees recall that Longoria entered the store bleeding and out of breath. (Ex. C, G.) The legs of his jeans were also torn. (Ex. F.) Longoria also later stated that he slipped and fell onto gravel before he went to Circle K as he was trying to run away from people who were trying to kill him, and that was how he injured his knee. (Ex. E.) Plaintiffs' claims that Brownsville police officers shut the police car door on Longoria's legs are without merit. (Ex. L.) Longoria was carried to the police car because he would not walk on his own. (Ex. C, D.) One police officer ensured that Longoria was entirely within the interior of the car before shutting the doors. (Ex. F.) Plaintiffs have no other testimony to support their claims, not even from the autopsy reports.

The competent summary judgment evidence establishes that Brownsville police officers did not shut a car door on Longoria's legs. As a result, Defendant City of Brownsville is entitled to summary judgment on the state law claim of negligence brought by Plaintiffs.

## CONCLUSION

The Plaintiffs have brought suit against Defendant City of Brownsville for constitutional violations and state law claims. The competent summary judgment evidence establishes that the City did not violate any of Longoria's constitutional rights or injure Longoria in any way. Defendants therefore are entitled to summary judgment on all of Plaintiffs' claims.

WHEREFORE, PREMISES CONSIDERED, Defendant City of Brownsville requests this court grant summary judgment in favor of this Defendant on all claims asserted by Plaintiffs, that Plaintiffs take nothing by this suit, that all taxable costs of court be taxed against Plaintiffs, and for all other relief to which this defendant may be justly entitled.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: _Eileen Leeds_

Eileen M. Leeds
State Bar No. 00791093
Fed ID. No. 16799
Attorney in charge

Amy Lawler Gonzales
State Bar No. 24029579
USDC Adm. No. 28489

**Attorneys for City of Brownsville**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 4th day of December, 2002, a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record as noted hereunder.

**VIA CM/RRR # 7002 0460 0000 6635 3954**
Mr. Alfred R. Valdez
Law Office of Alfred R. Valdez
6300 Hillcroft, Suite 200
Houston, TX 77081
*Plaintiff attorney*

**VIA REGULAR MAIL**
Mr. Roger Hughes
Mr. Craig Vittitoe
Adams & Graham, L.L.P.
222 E. Van Buren, West Tower
P.O. Drawer 1429
Harlingen, Texas  78551
*Attorney for Cameron County*

**VIA REGULAR MAIL**
Mr. Ricardo J. Navarro
Denton, Navarro & Bernal, P.C.
Bank of America Building
222 E. Van Buren, Suite 405
Harlingen, Texas 78550-6804
*Attorney for Xavier Lee Hernandez*


Eileen M. Leeds


## CERTIFICATE OF CONFERENCE

The local rules do not require a certificate of conference for this motion.


Eileen M. Leeds

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA LONGORIA and MARIA IDALIA GUTIERREZ, Individually and on behalf of the Estate of JUAN LONGORIA, Deceased,     Plaintiffs, | § § § § § § § | |
| VS. | § § § | CIVIL ACTION NO. B-01-062 (JURY REQUESTED) |
| CAMERON COUNTY, TEXAS, THE CITY OF BROWNSVILLE, TEXAS, and JOHN DOES 1-10,     Defendants. | § § § § § | |

## ORDER GRANTING DEFENDANT THE CITY OF BROWNSVILLE'S MOTION FOR SUMMARY JUDGMENT

Be it remembered on the _____ day of _____, 2002, came on to be heard Defendant the City of Brownsville's Motion for Summary Judgment and the court after considering said motion determines that it should in all things be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant the City of Brownsville's Motion for Summary Judgment is GRANTED, that Plaintiff take nothing as against Defendant, The City of Brownsville and that all claims against Defendant, The City of Brownsville, be and are DISMISSED with prejudice.

All relief requested and not expressly granted is hereby denied.

ENTERED on this the _____ day of _____, 2002.

_____
JUDGE PRESIDING

xc:
Eileen M Leeds, Willette & Guerra, L.L.P., International Plaza, Ste. 460, 3505 Boca Chica Blvd., Brownsville, TX 78521
Roger Hughes; Law Office of Adams & Graham; P.O. Drawer 1429;Harlingen, TX 78551
Alfred R. Valdez, Law Office of Alfred R. Valdez, 6300 Hillcroft, Suite 200, Houston, TX 77081
Ricardo J. Navarro, Denton, Navarro & Bernal, P.C.,Bank of America Building,222 E. Van Buren, Suite 405, Harlingen, TX 78550

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA LONGORIA and MARIA | § | |
| IDALIA GUTIERREZ, Individually and | § | |
| on behalf of the Estate of | § | |
| JUAN LONGORIA, Deceased, | § | |
|     Plaintiffs, | § | |
| | § | |
| | § | |
| | § | CIVIL ACTION NO. B-01-062 |
| VS. | § | (JURY REQUESTED) |
| | § | |
| CAMERON COUNTY, TEXAS, | § | |
| THE CITY OF BROWNSVILLE, TEXAS, | § | |
| and JOHN DOES 1-10, | § | |
|     Defendants. | § | |

## ORDER SETTING HEARING ON DEFENDANT THE CITY OF BROWNSVILLE'S MOTION FOR SUMMARY JUDGMENT

On this the _____ day of _____, 2002 came on for consideration Defendant the City of Brownsville's Motion for Summary Judgment. The court, having reviewed said motion together with the papers on file, is of the opinion that a hearing shall be held thereon.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Defendant the City of Brownsville's Motion for Summary Judgment is hereby set for hearing on the _____ day of _____, 2002 at _____ o'clock in the U.S. District Court for the Southern District of Texas, Brownsville Division.

Signed for entry on this _____ day of _____, 2002.

_____
JUDGE PRESIDING

xc:

Eileen M Leeds, Willette & Guerra, L.L.P., International Plaza, Ste. 460, 3505 Boca Chica Blvd., Brownsville, TX 78521
Roger Hughes; Law Office of Adams & Graham; P.O. Drawer 1429;Harlingen, TX 78551
Alfred R. Valdez, Law Office of Alfred R. Valdez, 6300 Hillcroft, Suite 200, Houston, TX 77081
Ricardo J. Navarro, Denton, Navarro & Bernal, P.C.,Bank of America Building,222 E. Van Buren, Suite 405, Harlingen, TX 78550

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA LONGORIA, and MARIA | } | |
| IDALIA GUTIERREZ, Individually and | } | |
| on behalf of the Estate of | } | CIVIL ACTION NO. __B-01-062__ |
| JUAN LONGORIA, Deceased | } | |
| | } | |
| VS. | } | |
| | } | |
| CAMERON COUNTY, TEXAS, | } | JURY DEMANDED |
| THE CITY OF BROWNSVILLE, | } | |
| TEXAS, XAVIER LEE | } | |
| HERNANDEZ, and JOHN DOES 1-10 | } | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Maria Longoria and Maria Idalia Gutierrez, Individually and on behalf of the Estate of Juan Longoria, Deceased bring this lawsuit against Cameron County, Texas, the City of Brownsville, Xavier Lee Hernandez, and John Does 1-10. This lawsuit arises out of the beating, choking, and death of Juan Longoria at the hands of the Brownsville Police Department and/or Cameron County Sheriff's Department.

### PARTIES

1.1    Plaintiff Maria Longoria is an individual residing in Cameron County, Texas. She is the mother of Juan Longoria, Deceased.

1.2    Plaintiff Maria Idalia Gutierrez is an individual residing in Cameron County, Texas. She is the daughter of Juan Longoria, Deceased. She brings this action both on her own behalf and on behalf of the Estate of Juan Longoria, Deceased.

1.3    Defendant Cameron County, Texas ("Cameron County" hereinafter) is a political subdivision of the State of Texas. It may be served by serving the County Judge, Hon. Gilberto Hinojosa, at 1713 Boca Chica Boulevard, Brownsville, Texas


EXHIBIT
A

78520.

1.4    Defendant The City of Brownsville, Texas ("Brownsville" hereinafter) is a political subdivision of the State of Texas.  It may be served by serving the City Secretary, Sarah M. Reed, at City Hall.

1.5    John Does 1-10 are, upon information and belief, individuals residing in Cameron County, Texas.  They are unknown police officers employed by the Brownsville Police Department and the Cameron County Sheriff's Department who beat and choked Juan Longoria.

1.6    Defendant Xavier Lee Hernandez is an individual residing in Cameron County, Texas.  He may be served at his residence, 5663 Boca Chica Boulevard, Brownsville, Texas 78521, or at his place of employment, the Cameron County, Jail.

## JURISDICTION

2.1    This Court possesses Federal Question jurisdiction because Plaintiff is bringing claims under 42 U.S.C. § 1983.

## VENUE

3.1    Venue is proper in the Southern District of Texas because the acts giving rise to Plaintiff's cause of action occurred in the Southern District of Texas.

3.2    Venue is proper in the Southern District of Texas because Defendants Cameron County and Brownsville are located in the Southern District of Texas.

## FACTS

4.1    This case arises out of the beating, choking, and death of Juan Longoria, which occurred on or about April 10-11, 2001.

4.2    Plaintiffs do not yet possess knowledge of all of the relevant facts giving rise to this lawsuit. Defendants have given conflicting versions of the facts to Plaintiffs, their family, and the media. Plaintiffs believe that they will only learn the whole truth of what happened to Juan Longoria through the discovery process in this lawsuit.

4.3    Plaintiffs are pleading in the alternative, as permitted by the Federal Rules of Civil Procedure, as to who actually caused the death of Juan Longoria. In their initial investigation, Plaintiffs have received conflicting information: some evidence seems to indicate that Juan Longoria died as a result of being choked by a Brownsville police officer, and other information indicates that he was choked to death by an employee of the Cameron County Sheriff's Department. Plaintiffs hope to learn more facts regarding who killed Juan Longoria during discovery and will seek leave to amend this Complaint when more facts are discovered.

4.4    On April 10, 2001, Juan Longoria was an individual residing in Brownsville, Texas.

4.5    Juan Longoria had a loving family, including his mother, Maria Longoria, his daughter, Maria Idalia Gutierrez, and his brother.

4.6    On April 10, 2001, Juan Longoria went to a Circle K store in Brownsville, Texas.

4.7    Upon information and belief, and based upon the preliminary autopsy findings, Juan Longoria was not under the effects of alcohol or drugs at the time.

4.8    For reasons currently unknown to Plaintiffs (but which will hopefully be discovered), Juan Longoria locked himself in an office in the Circle K.

4.9    The office did not have a "Do Not Enter" or "Employees Only" sign, or any other

sign that would indicate that the public could not enter the office.

4.10    Upon information and belief, Juan Longoria locked himself in the office because he believed that someone was going to kill or injure him.

4.11    An employee of the Circle K store called the Brownsville Police Department, complaining that Juan Longoria would not leave the office.

4.12    Juan Longoria was not injured, bruised, or bleeding when the John Does 1-3, unknown officers of the Brownsville Police Department, arrived at the Circle K.

4.13    Upon information and belief, when the police officers arrived, Juan Longoria thought they were there to help him. He opened the door.

4.14    The police officers proceeded to arrest Juan Longoria.

4.15    Upon information and belief, Juan Longoria was confused when the police officers began to arrest him. As a result, he may not have been cooperative.

4.16    The police officers, acting under color of law, beat Juan Longoria, injuring him.

4.17    This beating was unnecessary, excessive, and unwarranted.

4.18    This beating was the direct result of inadequate training and supervision of Brownsville police officers, which was so deficient that it amounted to conscious and deliberate indifference of the rights of the citizens of Brownsville.

4.19    The inadequate training and supervision referenced in paragraph 4.18 constituted a policy, practice, and/or custom of Brownsville.

4.20    This beating was also the direct result of a culture of violence within the Brownsville Police Department.

4.21    This culture of violence is evidenced by numerous other incidents of police brutality during the last 10 years.

4.22    Pursuant to Federal Rule of Evidence 404(b), Plaintiffs hereby give notice that they intend to offer evidence of these other incidents of police brutality in evidence in the trial of this case.

4.23    After arresting Juan Longoria, the unknown Brownsville Police Department officers roughly placed him in the back of a police car.

4.24    After they placed Juan Longoria in the police car, one of the officers consciously and deliberately, or in the alternative, negligently, slammed the car door on his leg, further injuring him.

4.25    This slamming of the car door on Juan Longoria's leg was also the result of the inadequate training and supervision, as well as the culture of violence, referenced in paragraphs 4.18 to 4.22 above.

4.26    Juan Longoria was arrested for burglary; however, the facts presented to the Brownsville Police Department and John Does 1-3 in no way justified burglary charges. Burglary requires both an unlawful entry (which was not present in this case), and an intent to commit a burglary, theft, or assault. There was no evidence of such intent.

4.27    Juan Longoria was eventually taken to the Cameron County jail.

4.28    Due to Defendants' conflicting stories given to the media and to Plaintiffs and their family, Plaintiffs are unable to plead the events that took place between the time the Brownsville Police Department arrested Juan Longoria and the time that he was placed in the Cameron County jail.

4.29    Juan Longoria was placed in a single cell in the Cameron County jail.

4.30    Juan Longoria was improperly classified; based on the psychological symptoms

that, upon information and belief, he was exhibiting, as well as the injuries that the Brownsville Police Department and John Does 1-3 inflicted upon him, he should have been placed in the infirmary or hospitalized.

4.31    This improper classification was, upon information and belief, the result of the lack of training and/or supervision of the Cameron County Sheriff Department personnel who decided to detain Juan Longoria in a single cell. This lack of training and/or supervision constituted conscious and deliberate indifference, which resulted in harm to Juan Longoria.

4.32    Upon information and belief, at approximately 12:15 a.m. on April 12, 2001, Juan Longoria was found dead in his single cell in the Cameron County jail.

4.33    According to the preliminary autopsy findings, Juan Longoria had 2 recent fractures of the left side of the hyoid bone, which is in the neck.

4.34    According to the preliminary autopsy findings, Juan Longoria's body "had evidence of extremity bruising and neck trauma - the latter suggesting a choke-hold at the time he died."

4.35    According to the preliminary autopsy findings, the "[m]anner of death is probably homicide, most likely asphyxia from a choke hold."

4.36    Juan Longoria's death, and the fracture to his hyoid bone, was not self-inflicted.

4.37    He was alone in the cell, so no other detainee or inmate could have injured or killed him.

4.38    Based on the preliminary autopsy findings, there are only two possible ways that Juan Longoria could have been killed: (a) an employee of the Cameron County Sheriff's Department could have entered his cell, put him in a choke hold, and

killed him; or (b) one or more officers of the Brownsville Police Department could have placed him in a choke hold, broken his hyoid bone, and he died from the effects of the hyoid fracture while in the Cameron County Jail.

4.39    If Juan Longoria was killed by one or more officers of the Brownsville Police Department choking him, such conduct was the result of the city's failure to adequately train and supervise the officers, as well as the culture of violence present in the Brownsville Police Department.

4.40    If Juan Longoria was killed as a result of injuries inflicted upon him by one or more officers of the Brownsville Police Department, the Cameron County Sheriff's Department, and/or one or more of its employees, was consciously and deliberately indifferent to Juan Longoria's medical needs by allowing him to suffocate in his cell rather than having him treated for his injuries.

4.41    If Juan Longoria was killed by an employee of the Cameron County Sheriff's Department, such conduct was the result of the failure of Cameron County to adequately train or supervise its employees. This training and supervision was so deficient that it amounted to conscious and deliberate indifference of the rights of the citizens of Cameron County.

4.42    The death of Juan Longoria has caused his family, including Plaintiffs, to suffer great grief and mental anguish.

4.43    Juan Longoria experienced great conscious pain and suffering while he was killed.

4.44    The Longoria family has filed this lawsuit because they believe that the Federal Courts offer the only forum in which they can discover the truth about what happened to Juan Longoria, and in which they can hold those responsible for his

killing accountable.

4.45    Upon information and belief, based upon the investigation conducted thus far, Plaintiffs allege that Defendant Xavier Lee Hernandez killed Juan Longoria by putting him in a chokehold.

## FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983

5.1    The conduct of Defendants, as set forth above, violated Juan Longoria's civil and constitutional rights.

5.2    Defendant City of Brownsville and/or one or more unknown employees of the City of Brownsville violated Juan Longoria's civil rights by arresting him for, and charging him with, burglary, when there was no basis for charging him with burglary.

5.3    Defendant City of Brownsville and/or one or more unknown employees of the City of Brownsville violated Juan Longoria's civil rights by using excessive and unnecessary force in beating him, and in slamming the car door on his legs.

5.4    Employees of either the City of Brownsville or Cameron County (including Defendant Xavier Lee Hernandez) violated Juan Longoria's civil rights by choking him, resulting in his death.

5.5    Pleading in the alternative, if Juan Longoria died as a result of injuries to his hyoid bone inflicted upon him by one or more employees of the City of Brownsville, one or more unknown employees of Cameron County and/or Cameron County violated his civil rights by failing to properly monitor him and to provide proper and timely medical care.  This failure proximately caused his

death.

5.6    Each of the above-described civil rights violations were the direct result of policies, customs, or practices of Defendants, as detailed in the Facts section of this Complaint.

5.7    Each of the above-described civil rights violations proximately caused damages and/or death to Juan Longoria and to Plaintiffs.

5.8    Defendants, and their employees, are not entitled to qualified immunity for the above-described civil rights violations. The actions giving rise to these violations were in bad faith, and violated Juan Trevino's clearly established Constitutional rights, including the Fourth Amendment, the Eight Amendment, Due Process and the right to be free from excessive force.

## SECOND CAUSE OF ACTION

## NEGLIGENCE

6.1    One or more employees of Defendant Brownsville were negligent in slamming the door of the patrol car onto Juan Trevino's leg. As a direct and proximate result of this negligence, Juan Trevino suffered damages.

6.2    Under the Texas Tort Claims Act, Defendant Brownsville is liable for this negligence.

6.3    Plaintiffs have delivered notice to Defendant Brownsville as required by the Texas Tort Claims Act.

## DAMAGES

7.1    As a direct and proximate result of Defendants' tortious and illegal conduct, as set forth above, Juan Longoria suffered conscious pain, suffering, and mental anguish

prior to his death.  His estate also incurred funeral expenses.  Therefore, Plaintiff Maria Idalia Gutierrez, on behalf of the Estate of Juan Longoria, seeks to recover for these items of damage.

7.2    As a direct and proximate result of the death of Juan Trevino, which was brought about by the tortious and illegal conduct of one or more Defendants, Plaintiffs have suffered damages, including loss of parental captainship, instruction, and guidance, as well as mental pain and suffering.

7.3    Plaintiffs also seek to recovery attorney's fees and expert fees under 42 U.S.C. §1988.

7.4    Plaintiffs also seek to recover prejudgment interest, post judgment interest, and costs of court.

7.5    Plaintiffs also seek to recover exemplary and punitive damages.

7.6    Plaintiffs seek actual damages in the amount of $5,000,000.00, and exemplary damages in the amount of $5,000,000.00.

**JURY DEMAND**

8.1    Plaintiffs demand a jury trial.

RESPECTFULLY SUBMITTED,

MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____

      Michael R. Cowen
      S.D. Tex. ID No. 19967
      Texas Bar No. 00795306

John Ventura
S.D. Tex. ID No. 1646
Texas Bar No. 20545700
Contrad Bodden
S.D. Tex. ID No. 21003
Texas Bar No. 00796220
LAW OFFICES OF
JOHN VENTURA, P.C.
62 E. Price Road
Brownsville, Texas 78521
Telephone (956) 546-9398
Facsimile (956) 542-1478

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

On this 22nd day of January, 2002, a true and correct copy of the above and foregoing document was went to opposing counsel as indicated below:

Ms. Eileen Leeds                          **Via Fax No. 541-1893**
WILLETTE & GUERRA, L.L.P.                  **and Regular U.S. Mail**
International Plaza, Suite 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521


Mr. Richard Burst                         **Via Fax No. 550-1348**
Civil Legal Department                    **and Regular U.S. Mail**
Commissioners' Court
964 E. Harrison
Brownsville, Texas 78520


Michael R. Cowen

# BROWNSVILLE POLICE DEPARTMENT

600 East Jackson Street
Brownsville, Texas 78520
(956) 548-7000 - 911 Emergency

☑ OFFENSE Report TSD Number: Date: 4-10-200_
☐ INCIDENT Report Disposition: ARRESTED
CHARGE(S): Burglary of Building

## OFFENSE / INCIDENT

Family Violence? ☐ Yes ☒ No

Earliest Date Occurred: 4-10-200_ Time: 3:58 am/pm Latest Date Occurred: Time: am/pm Time Dispatched: am/pm

Location of Occurrence (Specific location type—Jewelry Store, Apartment, Public Street, etc.):

| Address Number | NSEW | Street Name | St/Av/Rd | Apt/Ste | City | County | State | Zip Code |
|---|---|---|---|---|---|---|---|---|
| 1124 | | International | Blvd | | Brownsville | Cameron | TX | 7852_ |

Investigating Officer (PRINT): Falcon Rivera Jr. Employee No. 218 CID Assigned: Employee No. Date Assigned:

☒ Victim
☐ Complainant
☐ Witness
Last Name or Name of Business: Circle K Store
First Name:
Middle Name:
Jr/Sr/Etc.

| Address Number | NSEW | Street Name | St/Av/Rd | Apt/Ste | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| 1124 | | International | Blvd. | | Brownsville | TX | 7852_ |

Race ☐ Male ☐ Female | Date of Birth | Age | ☐ Married ☐ Divorced ☐ Single ☐ Widowed | Relationship to Suspect | Injured? ☐ Yes ☐ No | Describe injury and weapon used FINANCIAL

Home Telephone: 550-8013 Business Telephone: Place of Employment: Occupation:

☐ Victim
☒ Complainant
☐ Witness
Last Name or Name of Business: Mendoza
First Name: Martin
Middle Name:
Jr/Sr/Etc.

| Address Number | NSEW | Street Name | St/Av/Rd | Apt/Ste | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| 1124 | | International | Blvd. | | Brownsville | TX | 7852_ |

Race W ☒ Male ☐ Female | Date of Birth 022367 | Age | ☐ Married ☐ Divorced ☐ Single ☐ Widowed | Relationship to Suspect NONE | Injured? ☐ Yes ☒ No | Describe injury and weapon used

Home Telephone: Business Telephone: 550 8073 Place of Employment: Circle K Store Occupation: Manager

☐ Victim
☒ Complainant
☒ Witness
Last Name or Name of Business: Najera
First Name: Alfredo
Middle Name:
Jr/Sr/Etc.

| Address Number | NSEW | Street Name | St/Av/Rd | Apt/Ste | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| 1124 | | International | Blvd. | | Brownsville | TX | 78520 |

Race W ☒ Male ☐ Female | Date of Birth 030674 | Age | ☒ Married ☐ Divorced ☐ Single ☐ Widowed | Relationship to Suspect NONE | Injured? ☐ Yes ☒ No | Describe injury and weapon used

Home Telephone: Business Telephone: 550 8073 Place of Employment: Circle K Store Occupation: Clerk

☐ Suspect
☐ Missing
☐ Runaway
Last Name or Name of Business:
First Name:
Middle Name:
Jr/Sr/Etc.

| Address Number | NSEW | Street Name | St/Av/Rd | Apt/Ste | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Home Telephone: ☐ DL ☐ ID State Number ☐ Married ☐ Divorced ☐ Single ☐ Widowed Place of Birth Aliases

Race ☐ Male ☐ Female | Date of Birth | Age | Height | Weight | Hair | Eyes | Complexion ☐ English Only ☐ Spanish Only ☐ Bilingual | Describe any injuries

Clothing Description: Scars, Marks, Tattoos, Etc.

☒ Suspect
☐ Missing
☐ Runaway
Last Name or Name of Business: Longoria
First Name: Juan
Middle Name: Antonio
Jr/Sr/Etc.

| Address Number | NSEW | Street Name | St/Av/Rd | Apt/Ste | City | State | Zip Code |
|---|---|---|---|---|---|---|---|
| 1802 | | Jackson | St. | | Brownsville | TX | 78520 |

Home Telephone: ☐ DL ☐ ID State Number ☐ Married ☒ Divorced ☒ Single ☐ Widowed Place of Birth TX. Aliases

Race L ☒ Male ☐ Female | Date of Birth 10-07-59 | Age 41 | Height 5-6 | Weight 185 | Hair blk | Eyes bro | Complexion MED ☐ English Only ☐ Spanish Only ☐ Bilingual | Describe any injuries

Clothing Description: Scars, Marks, Tattoos, Etc.

FOR MORE THAN TWO SUSPECTS, ATTACH ADDITIONAL OFFENSE REPORT(S).

Continued on other side>>>

Rev. 10/97

DEFENDANT'S EXHIBIT

**Vehicle Information**  ☐ Suspect  ☐ Victims'/Complainants'  ☐ Stolen  ☐ Burglarized  ☐ Recovered  ☐ Damaged  ☐ Improperly Park

☐ Repossessed  ☐ Impounded  ☐ Other: _____ AUTO THEFT INSURANCE? ☐ Yes ☐ N

ANTI-THEFT DEVICE? ☐ Yes ☐ No  TYPE. ☐ Alarm  ☐ Steering Wheel Bar  ☐ Other: _____

Owner: _____ Address: _____

City: _____ State: _____ Zip Code: _____ Telephone: _____

| ☐ Passenger Car ☐ Truck ☐ Trailer | Make | Model | Year | Operator's Name | License Plate | State | Year |
|---|---|---|---|---|---|---|---|
| Style (2dr, 4dr, etc) | Vehicle Identification Number | | Color (top) | Color (center) | Color (bottom) | Special Features | |

**Vehicle Information**  ☐ Suspect  ☐ Victims'/Complainants'  ☐ Stolen  ☐ Burglarized  ☐ Recovered  ☐ Damaged  ☐ Improperly Park

☐ Repossessed  ☐ Impounded  ☐ Other: _____ AUTO THEFT INSURANCE? ☐ Yes ☐ No

ANTI-THEFT DEVICE? ☐ Yes ☐ No  TYPE. ☐ Alarm  ☐ Steering Wheel Bar  ☐ Other: _____

Owner: _____ Address: _____

City: _____ State: _____ Zip Code: _____ Telephone: _____

| ☐ Passenger Car ☐ Truck ☐ Trailer | Make | Model | Year | Operator's Name | License Plate | State | Year |
|---|---|---|---|---|---|---|---|
| Style (2dr, 4dr, etc) | Vehicle Identification Number | | Color (top) | Color (center) | Color (bottom) | Special Features | |

**PROPERTY CODES:** S=Stolen R=Recovered L=Lost F=Found D=Damaged E=Evidence O=Other:

| Code | Quantity | Item Brand Name (Make and Model) | Description (Color, size, etc.) | Serial Number | Value | Recovered Value |
|---|---|---|---|---|---|---|
| S | 1 | Tasken Handheld Computer | | | $300.00 | |
| D | 1 | (Wall) | | | UNK. | |

Summary of Incident

*Juan Antonio Longoria, D.O.B. 10-07-59, was arrested for Burglary of a building.*

DO NOT RELEASE

| Reporting Officer | Employee No. | Supervisor | Employee No | Date Approved |
|---|---|---|---|---|
| Falcon Tircia A | 218 | | | |

The information I have provided is true and correct to the best of my knowledge. I ☐ DID ☑ DID NOT give anyone permission to commit this/these offenses against me and/or property in my control.

Furthermore, I ☑ DO ☐ DO NOT want criminal charges to be filed against anyone found to be involved in this incident.

Victim/Complainant Signature: _____  Date: 04 10 01

☐ Victim/Complainant refused to sign report.

BROWNSVILLE POLICE DEPARTMENT                                Personal History and Arrest Record

| 1-30 Last Name | First | Middle | 43-58 Alias or Nickname | Jail Number | 31-36 BPD Numb |
|---|---|---|---|---|---|
| Longoria | Juan | Antonio | | | |

| 64-93 Address | 94-123 City | State | Zip | Telephone | Date & Time Rec. |
|---|---|---|---|---|---|
| 1802 E. Jackson St. | Brownsville, Tx | | | | |

| Race | 124 Ethnicity | 126-127 Age | 125 Sex | 128-133 DOB | Height | Weight | Hair | Eyes | Complexion | 197-204 Drivers Lic. No. | 205-206 State Issu– |
|---|---|---|---|---|---|---|---|---|---|---|---|
| L | H | 41 | M | 10-09-59 | 5-6 | 185 | BK | BRO | Mex | | |

| Place of Birth | U.S. Citizen | Social Security Number | Marital Status | 136 Occupation | 10-29 |
|---|---|---|---|---|---|
| Tx. | ☐ Yes ☐ No | 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 | — | — | CCH ☐ |

| Arrestee ILL or Injured? | Medical Aid Required? | 263-271 Place of Arrest | 282 Day |
|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No | 1124 International Bvld. | Tues. |

| 272-279 Date of Arrest | 280-281 Time of Arrest | Warning Given ☐ Yes ☐ No Date Time ☐ AM ☐ PM By: | Inmate Arraigned Date Time ☐ A– ☐ P– |
|---|---|---|---|
| 4-10-2001 | 3:58 ☐ AM ☒ PM | | |

| 259-262 CHARGE(S) | Bond Set ☐ Yes ☐ No | Bond Amount $ | 283-286 Arresting Officer No. 1 |
|---|---|---|---|
| 1. Burglary of Building | | | Falcon Rivera Jr. #218 |
| 2 | ☐ Yes ☐ No | $ | 287-290 Arresting Officer No. 2 |

| Name of Agency Arrestee was received from | Name of Booking Officer | Agency Transferred To? | Date of Commitment |
|---|---|---|---|

| 207-246 Vehicle   Model   Make   Type | 247-257 Registration: State   Year   Number | Location of arrestee vehicle | Time Booked ☐ AM ☐ PM |
|---|---|---|---|

| | Hold For | Authority | 258 Authority for Arrest |
|---|---|---|---|
| | Call | | ☒ On Call |
| | 59-61 Reporting Area | | ☒ On Sight |
| | Date Released   Time Released   Releasing Officer | | ☐ Other____ ☐ Came to Station |

| Extent of Illness or Injury (Describe) | 137-196 Place of Employment City, State, Zip | Previous Arrest this Agency ☒ YES ☐ NO |
|---|---|---|

☐ Arrested and/or   ☐ Known Associates
1.                                              2.

Scars, Marks, Tattoos, and Deformities

If Applicable Name of   ☐ Parent   ☐ Guardian   ☐ Next of Kin - Notified (Include Address, Telephone Number, Date, Time & Notifying Officer

(ELEMENTS OF CHARGES) On call to 1124 International Bvld. the
Circle K Store, in reference to some type of disturbance
there. Upon arrival, spoke to Martin Mendoza, who ex-
plained that he saw above named subject WALK into the
Store. Longoria appeared to have been in a previous
altercation of some sort as he was bleeding.
Longoria WALKed into the Store and headed towards
the public Restrooms, so Mr. Mendoza thought ---

| ☐ Cash Bond | Bond Amount | Court Date | PHOTOGRAPHED? ☒ Yes ☐ No | FINGERPRINTED? ☒ Yes ☐ No | |
|---|---|---|---|---|---|
| ☐ Surety Bond | | | | | ☐ Not Placed in Jail |
| ☐ Personal Bond | $ | 19 | 134-135 Police Disposition City Jail | | |

| Released on Bond By: | Case Assigned To: | Court Disposition: ☐ Guilty ☐ Dismissed ☐ Not Guilty ☐ Other: |
|---|---|---|

| 37-42 Related Case Number | 291-298 Offense Date | 299-302 Time | Report Made By: | Supervisor |
|---|---|---|---|---|
| | 04-10-01 | 3:58 p. | F. Rivera #218 | |

Brownsville Police Departmen
600 E. Jackson Street
Brownsville, Texas 78520
(956) 548-7000 - 911 Emergency

**Supplemental Report**

☒ Continuation    Call Number: _____    Date: 4-10-2001
☐ Follow Up    Disposition: _____  ARRESTED

☒ Offense  ☒ Arrest    CHARGE(S): Burglary of A
☐ Incident  ☐ Accident    Building
☐ Other: _____    Family Violence ☐ Yes ☒ No

☒ Victim
☐ Complainant
☐ Witness
☐ Suspect

Last Name or Name of Business: Circle K
First Name:
Middle Name:
Jr/Sr/Etc.:

he was going to use the facilities, then
thought no more of this. Mr. Mendoza's partner,
Alfredo Najera, then heard noises coming from
a wall that divides the cash register area
from the office. Najera heard someone was
ransacking or throwing things around inside
the office and called Mr. Mendoza. Mr.
Mendoza and Mr. Najera opened the door to
the office and found Longoria inside without
anyone's permission, and called the police.
Apparently, what happened was Longoria found the
back door to the office closed but not locked
and entered with intent to commit theft,
however, Mendoza and Najera foiled the
plan and locked Longoria in the office.
Reporting Officer along with Officer David
Gutierrez #4478 arrived on scene and
called for Longoria to open the office door,
to which he refused. Reporting Officer obtained
the key to the front door, opened it. There
was a real heavy "safe" behind the door. It
had been placed there by Longoria. Longoria
was also holding the door close and was re-
fusing to allow officers to come into the office.
Officers had to use the force necessary to push
the door open and finally gained entry. - - - -

☞ Continued on other side >>>

Reporting Officer: Falcon Zuvia Jr.    Employee No.: 1218    Supervisor:    Employee No.:    Date Approved:

Longoria was then ordered to lay on the floor face down, to which he complied. However, when he was told to place his hands behind so as to handcuff him, he resisted. After struggling with Longoria for a short while, he was advised he was under arrest for Burglary of a building, handcuffed, transported, and booked to city jail.

Reporting Officer was then advised to take Longoria to the Brownsville Medical Center because he started seeing things and said some people were trying to kill him. He was treated for the abrasions on his body. Jose Schroeder of Tropical Texas Center came and spoke to Longoria. Later the E.R. Doctor said Longoria could be taken back to jail under supervision.

BROWNSVILLE POLICE DEPARTMENT

CASE# 20013011710     DATE: APRIL 21,2001
TIME: 4:15PM

HE STATE OF TEXAS   I
COUNTY OF CAMERON    I
BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR THE SAID COUNTY AND
STATE, ON THIS THE 21     DAY OF APRIL     , A.D., 20 01   ,
PERSONALLY APPEARED ALFREDO NAJERA                    , WHO AFTER
BEING DULY SWORN, DEPOSES AND SAYS:

MY NAME IS: ALFREDO NAJERA

D.O.B:03 26 1968

MY HOME ADDRESS IS: 485 AVENIDA DEL SOL

I AM PRESENTLY EMPLOYED WITH: CIRCLE K

THE ADDRESS OF MY EMPLOYMENT IS: 1124 INTERNATIONAL

MY TELEPHONE NUMBER(S) ARE: HOME: 956 3502226

WORK: 956 550 8073

      I AM HERE AT THE BROWNSVILLE POLICE DEPARTMENT SPEAKING TO
DETECTIVE JUAN LOPEZ IN REFERENCE TO A INCIDENT THAT OCCURRED AT THE
PLACE OF MY EMPLOYMENT, THE CIRCLE K.

      ON APRIL 10,2001 I WAS WORKING THE REGISTER AT THE CIRCLE K
LOCATED AT 1124 INTERNATIONAL BLVD. I WAS WORKING THE 3 TO 11 SHIFT.
BETWEEN 3:30PM AND 4:00PM I NOTICED A MALE CUSTOMER WALK INTO THE
STORE. I RECOGNIZED HIM BECAUSE HE IS A REGULAR CUSTOMER. HE DIDN'T
LOOK HIS NORMAL SELF BECAUSE HE WAS BREATHING HEAVY, LIKE HE WAS
TRYING TO CATCH HIS BREATH. HE SEEMED STARTLED AND SCARED. I
ACKNOWLEDGED HIM AND I NOTICED THAT HE WAS CARRYING A HAMMER IN HIS
RIGHT HAND. HE ASKED ME WHERE THE BATHROOM WAS AND I TOLD HIM IT WAS
RIGHT AROUND THE CORNER. I THOUGHT IT WAS STRANGE BECAUSE HE HAS USED
THE BATHROOM IN THE STORE BEFORE. HE INSTEAD WALKED INTO THE COUNTER
AREA WHERE I WAS STANDING. HE JUST STOOD THERE AND WAS STARING. I
TOLD HIM THAT HE COULD NOT BE BACK HERE AND HE TOLD ME "DAME
QUIEVRADA". HE HAD PLACED THE HAMMER ON THE COUNTER NEXT TO THE
COMPUTER SO I WAS NOT CONCERNED. A FEW CUSTOMERS CAME IN SO I BECAME
BUSY. I DID NOTICE HIM WALK TOWARDS THE BATHROOM, BUT I DID NOT SEE
HIM GO IN. ABOUT FIVE TO TEN MINUTES PASSED AND JENNY RODRIGUEZ A NEW
EMPLOYEE ASKED ME WHAT TIME SHE WAS GOING TO GET OUT. I TOLD HER THAT
I WOULD GO ASK MARTIN, THE MANAGER, SO I WALKED TO THE OFFICE. I
TRIED TO OPEN THE OFFICE DOOR BUT IT WAS SLAMMED SHUT VERY QUICKLY. I
THEN HEARD A MALE SUBJECT SCREAMING AND HE WAS SAYING "GIVE ME A
BREAK" AND BANGING THINGS IN THE OFFICE. AT THIS TIME I REALIZED IT
WAS THE MALE SUBJECT WHO HAD ASKED TO USE THE BATHROOM. I THEN WENT



TO LOOK FOR MARTIN AND I TOLD HIM THAT SOMEONE HAD HOLD THEMSELVES UP
IN THE STORE OFFICE AND IT SOUNDED LIKE HE WAS DESTROYING IT.   MY
BOSS THEN TRIED TO OPEN THE DOOR WITH THE KEY BUT HE COULDN'T. THE
MALE SUBJECT INSIDE WAS YELLING AND BANGING ON THE WALLS AND IT
APPEARED HE WAS BLOCKING THE DOOR. MARTIN TRIED TO CALL THE POLICE
FROM THE PHONE INSIDE THE STORE, BUT IT DID NOT WORK. HE THEN WENT
OUTSIDE AND HE CALLED THE POLICE. I TOOK ALL THE CUSTOMERS OUT OF THE
STORE AND I STAYED OUTSIDE.   THE POLICE THEN ARRIVED AND MARTIN TOOK
THEM TO THE OFFICE. HE THEN UNLOCKED THE DOOR AND THE TWO OFFICERS
FORCED OPEN THE OFFICE DOOR. THEY THEN HANDCUFFED THE MALE SUBJECT
AND CARRIED HIM OUT OF THE STORE. DURING THIS TIME THE MALE SUBJECTS
MOTHER SHOWED UP AT THE STORE AND SHE SAID THAT HE HAD BEEN SICK IN
BED FOR FOUR DAYS. I DIDN'T KNOW SHE WAS HIS MOTHER UNTIL SHE SAID
SHE WAS. I WOULD ALSO LIKE TO SAY THAT DURING THE TIME THE MALE
SUBJECT WAS LOCKED IN THE OFFICE I NOTICED THAT THERE WAS DRY BLOOD
ON THE HANDLE OF THE HAMMER HE HAD BROUGHT IN. I ALSO NOTICED DRY
BLOOD ON THE FRONT DOOR OF THE STORE, WHICH WAS LEFT BY THE MALE
SUBJECT, WHEN HE WALKED IN. ONE OF THE OFFICERS TOOK THE HAMMER WITH
HIM. THIS IS ALL THAT I CAN REMEMBER OF THE INCIDENT.
     I HAVE READ THE ABOVE STATEMENT AND FIND IT TO BE TRUE AND
CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION.

                              _____
                              VICTIM OR WITNESS SIGNATURE
------------------------------------------------------------------

SWORN AND SUBSCRIBED TO BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND
FOR SAID COUNTY AND STATE, ON THIS THE _21_ DAY OF _Apr._ ,
A.D., 20 _01_ .


                              _____
                              NOTARY PUBLIC IN AND FOR CAMERON COUNTY,
                              STATE OF TEXAS.

JUAN MANUEL LOPEZ
Notary Public, State of Texas
My Commission Expires 7-09-2003

BROWNSVILLE POLICE DEPARTMENT
INTER-DEPARTMENTAL COMMUNICATIONS

To: CHIEF OF POLICE                          Date:04-20-2001

From: OFFICER DAVID GUTIERREZ JR.          Subject: REQUESTED IDC


DEAR SIR,


ON 04202001 REPORTING OFFICER MADE CONTACT WITH LT. ETHERIDGE AND
WAS ADVISED TO WRITE AN IDC IN REFERENCE TO THE EXTENT OF MY CONTACT
WITH A BURGLARY SUSPECT BY THE NAME OF JUAN ANTONIO LONGORIA 100759.
ON 04102001 REPORTING OFFICER WAS DISPATCHED TO 1124
INTERNATIONAL BLVD. (CIRCLE K STORE) TO BACK UP OFFICER F. RIVERA IN
REFERENCE TO A DISTURBANCE. UPON ARRIVAL REPORTING OFFICER WAS ADVISED
BY OFFICER RIVER THAT A MALE SUBJECT, LATER IDENTIFIED AS JUAN ANTONIO
LONGORIA 100759, HAD LOCKED HIMSELF IN THE STORE OFFICE AFTER BEING
DISCOVERED BY THE STORE MANAGER. OFFICER RIVER THEN CALLED TO THE MR.
LONGORIA TO OPEN THE OFFICE DOOR, BUT HE REFUSED. REPORTING OFFICER AT
THIS TIME HEARD MR. LONGORIA YELLING INCOHERENTLY. REPORTING OFFICER
ALSO HEARD OBJECTS BEING THROWN AROUND INSIDE THE OFFICE. OFFICER RIVER
WAS THEN GIVEN A KEY TO THE OFFICE BY THE STORE MANAGER MARTIN MENDOZA.
OFFICER RIVER THEN UNLOCKED THE DOOR, BUT WAS UNABLE TO PUSH THE DOOR
OPEN. REPORTING OFFICER THEN ASSISTED OFFICER RIVER IN PUSHING THE DOOR
UNTIL IT WAS ONLY PARTIALLY OPENED DO TO OBJECTS BEHIND THE DOOR NO
ALLOWING IT TO BE COMPLETELY OPENED. AT THIS POINT REPORTING OFFICER WAS
ABLE TO SEE MR. LONGORIA STANDING INSIDE THE OFFICE AND STILL YELLING
INCOHERENTLY. OFFICER RIVER PROCEEDED TO TAKE OUT HIS EXPANDABLE BATON
AND ORDERED MR. LONGORIA TO GET DOWN ON THE GROUND. MR. LONGORIA AT
FIRST REFUSED AND THEN GOT DOWN ON HIS KNEES AND PLACED HIS HANDS ON THE
GROUND. MR LONGORIA THEN WENT DOWN ON TO THE FLOOR, BUT LANDED BETWEEN
THE DOOR AND THE WALL WITH HIS HANDS TO HIS SIDES NOT ALLOWING ROOM FOR
OFFICER RIVER TO ENTER THE OFFICE. OFFICER RIVER THEN ATTEMPTED TO WALK
OVER MR. LONGORIA TO ENTER THE OFFICE AND DID INADVERTENTLY STEP ON MR.
LONGORIA'S LOWER BACK WHEN ENTERING THE OFFICER. REPORTING OFFICER WAS
THEN ABLE TO GRAB A HOLD OF MR. LONGORIA'S LEFT HAND, PULL IT BACK AND
PLACED A HANDCUFF ON IT. MR. LONGORIA THEN STARTED TO RESIST BY TYING
TO  PULL HIS LEFT HAND TO THE SIDE AND REFUSING TO PLACE HIS RIGHT HAND
BEHIND HIS BACK WHEN ORDERED TO DO SO BY REPORTING OFFICER. OFFICER
RIVER AGAIN ORDERED MR. LONGORIA TO PUT HIS HAND BACK, BUT MR. LONGORIA
AGAIN REFUSED. OFFICER RIVER THEN STRUCK MR. LONGORIA ONCE ON THE RIGHT
THIGH WITH HIS BATON AND MR. LONGORIA THEN STOPPED RESISTING. REPORTING
OFFICER WAS THEN ABLE TO GRAB MR. LONGORIA'S RIGHT HAND AND PACED THE
HANDCUFF ON. MR. LONGORIA WAS THEN PICKED UP BY OFFICER RIVER AND
REPORTING OFFICER. MR. LONGORIA WAS THEN ESCORTED OUT OF THE STORE AND
PLACED IN OFFICER RIVERA'S UNIT #128. OFFICER RIVERA THEN TRANSPORTED
MR. LONGORIA TO CITY JAIL AND WAS FOLLOWED IN BY OFFICER JACKSON, WHO
ARRIVED AT THE SCENE WHEN MR. LONGORIA WAS BEING ESCORTED OUT OF THE
STORE.

EXHIBIT
D

ONCE OUTSIDE THE STORE REPORTING OFFICER WAS APPROACHED BY A FEMALE, WHO STATED THAT SHE WAS MR. LONGORIA'S MOTHER. FEMALE WAS ADVISED THAT MR. LONGORIA HAD BEEN PLACED UNDER ARREST FOR BURGLARY AND WAS BEING TRANSPORTED TO CITY JAIL. FEMALE ADVISED THIS OFFICER THAT MR. LONGORIA HAD NOT BEEN OUT OF HER RESIDENCE FOR ONE WEEK AND ON THIS DATE HE LEFT THE RESIDENCE WITHOUT HER KNOWING.

REPORTING OFFICER THEN WALKED BACK INTO THE STORE AND MADE CONTACT WITH ALFREDO NAJERA Ø32674 (STORE CLERK). REPORTING OFFICER, WHILE WALKING BACK INSIDE THE STORE, NOTICED BLOOD ON THE OUTSIDE FRONT DOOR HANDLE OF THE STORE. MR. NAJERA ADVISED THIS OFFICER THAT WHEN HE OBSERVED MR. LONGORIA ENTER THE STORE HE NOTICED THAT MR. LONGORIA WAS CARRYING A HAMMER. MR. NAJERA PROCEEDED TO TURN OVER ONE HAMMER AND ONE BASEBALL CAP, WHICH HE CLAIMED BELONGED TO MR. LONGORIA, TO REPORTING OFFICER. THE HAMMER AND THE CAP WERE LATER BOOKED INTO PROPERTY AND EVIDENCE LOCKER BY REPORTING OFFICER.

REPORTING OFFICER THEN MADE CONTACT WITH STORE MANAGER MARTIN MENDOZA Ø22367, WHO WAS PRESENT AT THE TIME THE ARREST WAS INITIATED. MR. MENDOZA ADVISED THAT THE SUBJECT HAD DAMAGED A HAND HELD COMPUTER AND THE WALL NEXT TO THE OFFICE DOOR. REPORTING OFFICER OBSERVED INDENTATIONS ON THE OFFICE WALL POSSIBLY MADE BY A COFFEE CUP, WHICH LAYING ON THE OFFICE FLOOR SHATTERED. REPORTING OFFICER ALSO NOTICED BLOOD STAINS ON THE WALL. REPORTING OFFICER ALSO OBSERVED THAT THE OFFICE HAD BEEN RANSACKED. MR. MENDOZA ADVISED THAT THE STORE COMPUTER MAY HAVE BEEN DAMAGED AS THE KEYBOARD WAS FOUND ON THE FLOOR AND THE COMPUTER WAS NOT TURNING ON. REPORTING OFFICER NOTICED THAT THE KEYBOARD ALSO HAD BLOOD STAINS ON IT. NO FURTHER INFORMATION WAS GIVEN BY MR. MENDOZA, AT THE TIME, OTHER THEN HE WISHED TO FILE CRIMINAL CHARGES AGAINST MR. LONGORIA.

REPORTING OFFICER RELAYED THE INFORMATION OF THE DAMAGES TO OFFICER RIVERA. NO FURTHER ACTION TAKEN BY THIS OFFICER.

Officer Signature: _____   Date Re'vd: 0420 01

Sergeant's Signature: _____   Date Re'vd: 04 20-01

Lieutenant's Signature: _____   Date Re'vd: 4-20-01

Commander's Signature: _____   Date Re'vd: _____

Chief of Police: _____   Date Re'vd: _____

BROWNSVILLE POLICE DEPARTMENT

CASE#  20013011710     DATE: JUNE 5,2001
TIME: 3:15PM

HE STATE OF TEXAS    I
COUNTY OF CAMERON    I
BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR THE SAID COUNTY AND
STATE, ON THIS THE 5      DAY OF JUNE      , A.D., 20 01   ,
PERSONALLY APPEARED MARK CHERAMIE                       , WHO AFTER
BEING DULY SWORN, DEPOSES AND SAYS:

MY NAME IS: MARK CHERAMIE

D.O.B:7 23 1972

MY HOME ADDRESS IS: 333 GARDEN ST.

I AM PRESENTLY EMPLOYED WITH: CITY OF BROWNSVILLE

THE ADDRESS OF MY EMPLOYMENT IS: 600 E. JACKSON ST.

MY TELEPHONE NUMBER(S) ARE: HOME: 956 542 0343

WORK: 956 5487147


     I AM HERE AT THE BROWNSVILLE POLICE DEPARTMENT SPEAKING TO
DETECTIVE JUAN LOPEZ IN REFERENCE TO AN INMATE JUAN ANTONIO LONGORIA
WHO WAS BOOKED IN ON APRIL 10,2001.

     ON APRIL 10,2001 I WAS WORKING MY REGURLARLY SCHEDULED SHIFT AS
A DETENTION OFFICER FROM 3:00PM TO 11:00PM. I WAS WORKING WITH LEO
MERCARDO #4570 AND ROSIE MARTINEZ #4886. AT APPROXIMATELY 3:58PM
DISPATCH CALLED TO THE JAIL AND ASKED FOR A STEP OUT BECAUSE AN
AGGRESSIVE SUBJECT WAS BEING BROUGHT INTO CITY JAIL BY OFFICERS.
DETENTION OFFICER LEO MERCADO AND I STEPPED OUT AND WE MET OFFICERS
VICTOR JACKSON AND FALCON RIVERA OUTSIDE THE DOOR. OFFICER JACKSON
REMOVED THE PRISONER LATER IDENTIFIED AS JUAN LONGORIA LONGORIA FROM
THE POLICE UNIT. MERCADO AND I THEN ESCORTED LONGORIA INSIDE THE JAIL
AND WE PATTED HIM DOWN FOR OUR SAFETY. I THEN SAT LONGORIA DOWN ON A
CHAIR AND THATS WHEN I NOTICED THAT HE HAD BLOOD ON HIS ELBOW AND ON
HIS KNEE. I THEN REQUESTED FROM OFFICER JACKSON TO NOTIFY EMS SO THAT
LONGORIA COULD BE CHECKED FOR HIS INJURIES. EMS WAS NOTIFIED AND THEY
RESPONDED TO THE JAIL AND CHECKED LONGORIA. EMS ADVISED THAT HIS
VITAL SIGNS CHECKED OUT OK BUT HIS HEART RATE WAS A LITTLE
ACCELERATED, PROBABLY DUE TO THE CHASE. LONGORIA KEPT SAYING THAT
PEOPLE WERE CHASING HIM AND WANTED TO KILL HIM. LONGORIA REFUSED EMS
AND THEY LEFT. DETENTION OFFICER MERCADO AND I THEN PLACED LONGORIA
IN THE PADDED CELL FOR HIS SAFETY. HE DIDNT LOOK NORMAL AND APPEARED
TO BE SCARED. AFTER A WHILE I CHECKED ON LONGORIA AND I FOUND THAT HE
HAD WEDGED HIMSELF BETWEEN THE DOOR AND THE WALL. I FORCED THE DOOR
OPEN AND I OBSERVED LONGORIA HIDING BEHIND THE DOOR, SAYING THAT THE




JUAN MANUEL LOPEZ
Notary Public, State of Texas
My Commission Expires 7-09-2003

MEN WERE TRYING TO KILL HIM. HE EVEN TOLD ME THAT THE MEN WERE
OUTSIDE THE DOOR WITH GUNS. LEO MERCADO WAS BEHIND ME AND THERE WAS
NO ONE OUTSIDE THE DOOR WITH GUNS. I THEN GAVE HIM SOME WATER AND HE
WAS SHAKING AND LOOKED VERY SCARED. I CHECKED ON HIM TWO MORE TIMES
AND I COULD SEE THAT LONGORIA WAS GETTING WORSE AND ACTING ABNORMAL.
HE WAS TRYING TO HIDE INSIDE THE PADDED CELL AND APPEARED TO BE VERY
FRIGHTENED. I THEN CALLED DISPATCH AND NOTIFIED FOR OFFICER FALCON TO
COME BACK TO THE JAIL. I ALSO CALLED LT. RAMIRO RAMIREZ #197 AND I
ADVISED HIM OF LONGORIA. LT. RAMIREZ THEN ADVISED ME TO GO WITH
OFFICER FALCON RIVERA #218 TO BROWNSVILLE MEDICAL CENTER SO THAT
LONGORIA COULD BE CHECKED OUT. WE THEN WENT TO THE HOSPITAL AND WHILE
WE WERE WAITING LONGORIA TOLD ME WHAT HAD HAPPENED BEFORE HE WAS
ARRESTED. LONGORIA TOLD ME THAT WHILE HE WAS AT HOME FIVE GUYS WENT
TO HIS HOUSE AND KNOCKED ON THE DOOR. AS SOON AS HIS MOTHER OPENED
THE DOOR, ONE OF THE SUBJECTS SLAPPED HIS MOTHER AND FORCED THEIR WAY
INSIDE. LONGORIA TOLD ME THAT ONE OF THE GUYS HAD A PLASTIC BAG AND
THEY WERE GOING TO PUT HIM IN IT AFTER THEY KILLED HIM. LONGORIA TOLD
ME THAT HE HAD AN ALTERCATION WITH ONE OF THE SUBJECTS EARLIER AT A
TAXI STAND WHERE HE WASHES CARS. HE ALSO TOLD ME THAT HE RAN FROM THE
SUBJECTS AND WHILE DOING SO, HE SLIPPED ON SOME LOOSE GRAVEL AND HURT
HIS ELBOW AND KNEE. HE ALSO TOLD ME THAT HIS BACK WAS HURTING FROM AN
INJURY HE HAD SUSTAINED WORKING IN A PLASTIC FACTORY YEARS AGO.
LONGORIA ALSO MENTIONED THAT HE DID RUN INTO THE CIRCLE K WHERE HE
WAS EVENTUALLY ARRESTED. DURING THIS TIME I WAS TRYING TO KEEP HIM
CALM BECAUSE HE STILL SEEMED SCARED. LONGORIA WAS THEN CHECKED BY THE
DOCTOR AND HE RECEIVED XRAYS FOR HIS ELBOW. AFTERWARDS WE WERE
WAITING FOR THE RESULTS AND LONGORIA TOLD ME THAT HE SAW A HAND WITH
A GUN POINTING AT HIM FROM ONE OF THE AC VENTS. HE WAS POINTING UP
WITH HIS FINGER. LONGORIA ALSO TOLD ME THAT HE WAS TAKING MEDICATION
THAT HE BOUGHT IN MATAMOROS FOR HIS NERVES. WE THEN WAITED IN THE
WAITING ROOM FOR THE DOCTOR AND HE CAME OUT AND TOLD US THAT LONGORIA
WAS OKAY BUT HE WANTED SOMEONE FROM TEXAS TROPICAL TO EVALUATE HIM.
WE THEN MOVED TO ANOTHER ROOM AND WAITED FOR SOMEONE FROM TEXAS
TROPICAL TO ARRIVE. DURING THIS TIME LONGORIA TOLD ME THAT HIS FATHER
HAD PASSED AWAY AND HE COULD HEAR HIM THROUGH THE TELEVISION. HE ALSO
TOLD ME THAT THERE WERE SPIRITS INSIDE HIS HOUSE. THE SCREENER FROM
TEXAS TROPICAL THEN ARRIVED AND HE ADVISED OFFICER RIVERA TO KEEP HIM
ALONE AND UNDER CLOSE OBSERVATION. HE ADVISED THAT HE DID NOT NEED TO
BE COMMITTED. LONGORIA THEN RECEIVED HIS MEDICAL CLEARANCE AND WE
RETURNED TO THE JAIL AND PLACED HIM BACK IN THE PADDED CELL FOR HIS
OWN PROTECTION AND TO KEEP HIM UNDER CLOSE OBSERVATION. I COULD SEE
THAT HE WAS STILL ACTING STRANGE AND TRYING TO HIDE BEHIND THE DOOR.
HE ALSO KEPT SAYING THAT THEY WERE COMING FOR HIM AND WERE GOING TO
KILL HIM. AT ABOUT 10:45PM MY RELIEF ARRIVED AND I ADVISED THEM ABOUT
LONGORIAS CONDITION. I DID EVERYTHING I COULD TO KEEP HIM CALM AND
SAFE FROM HURTING HIMSELF. THIS IS ALL THAT I REMEMBER OF THE
INCIDENT.

_____
VICTIM OR WITNESS SIGNATURE

-------------------------------------------------------------------
SWORN AND SUBSCRIBED TO BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND
FOR SAID COUNTY AND STATE, ON THIS THE ___5___ DAY OF ___June___,
A.D., 20 _GL_.

JUAN MANUEL LOPEZ
Notary Public, State of Texas
My Commission Expires 7-09-2003



NOTARY PUBLIC IN AND FOR CAMERON COUNTY,
STATE OF TEXAS.

BROWNSVILLE POLICE DEPARTMENT
INTER-DEPARTMENTAL COMMUNICATIONS

To: CHIEF OF POLICE                    Date:Ø423 2ØØ1

From:VICTOR JACKSON                    Subject:ARREST OF MR.LONRORIA

DEAR SIR,

    ON Ø41Ø2ØØ1 AT ABOUT 3:45PM I WAS JUST GOING BACK IN SERVICE AFTER
MAKING A CALL WHEN I HEARD OFFICER FALCON RIVERA ASK FOR A 1Ø-3 ON THE
RADIO ON CHANNEL 2.I ASKED THE DISPATCHER WHERE OFFICER RIVERA WAS AND I
WAS ADVISED THAT HE WAS AT A CIRLCE K STORE ON INTERNATIONAL BLVD AND
JACKSON STREET.I PROCEEDED TO THE LOCATION AND AS I WAS PULLING INTO THE
PARKING LOT OF THE STORE I SAW OFFICERS RIVERA AND DAVID GUTIERREZ
DRAGGING A HANDCUFFED SUSPECT OUT THE FRONT DOOR OF THE STORE.THE SUSPECT
WAS NAMED JUAN LONGORIA AND HE WAS HANDCUFFED WITH HIS HANDS BEHIND HIS
BACK.I DID NOT KNOW WHAT HAD OCCURRED IN THE STORE AND ONLY KNEW THAT THE
TWO OFFICERS WERE HAVING TO DRAG HIM OUT.I OPENED THE BACK RIGHT SIDE DOOR
OF OFFICR RIVERAS UNIT SO THAT THEY COULD PUT THE MAN IN THE UNIT.HE WAS
PUT IN THE BACK SEAT LAYING DOWN BUT HIS FEET WERE STILL OUT OF THE UNIT
AND THE MAN COLD NOT GET IN COMPLETELY.I OPENED THE LEFT SIDE OF THE BACK
DOOR AND I GOT IN AND I GRABBED THE MAN UNDERNEATH HIS ARM PITS TO PULL
HIM IN THE UNIT SO THAT RIVERA AND GUTIERREZ COULD CLOSE THE DOOR. I THEN
FOLLOWED OFFICER RIVERA TO THE CITY JAIL WHERE THE MAN WALKED INTO THE
JAIL AND SAT ON A CHAIR. I NOTICED THAT THE MAN HAD A CUT TO HIS LEFT KNEE
BECAUSE HIS BLUE JEANS WERE TORN IN THAT AREA AND HE WAS BLEEDING. HE WAS
ALSO COMPLAINING THAT HIS BACK AND HIS SIDE HURT.I THEN ADVISED OFFICER
RIVERA THAT HE NEEDED TO CALL EMS.I THEN LEFT THE JAIL AND CONTINUED ON
PATROL.AS I WAS LEAVING THE PARKING LOT I CALLED LT.RAMIRO RODRIGUEZ FROM
MY CELL PHONE. LT. RODRIGUEZ WAS IN THE SGT"S OFFICE AND I ADVISED HIM
THAT MR. LONGORIA WAS HURT AND THAT HE NEEDED TO TALK TO OFFICER RIVERA IN
THE CITY JAIL.THIS IS MY INVOLVEMENT IN THIS AS BEST AS I CAN REMEMBER.
OFFICERS Signature: _____ Date Re'vd: 9 23-01

Sergeant's Signature: _____ Date Re'vd: 4/23/01

Lieutenant's Signature: _____ Date Re'vd: 4-25-01

Commander's Signature: _____ Date Re'vd: _____

Chief of Police: _____ Date Re'vd: _____



BROWNSVILLE POLICE DEPARTMENT

CASE# 20013011710    DATE: APRIL 12,2001
TIME: 5:15PM

HE STATE OF TEXAS    I
COUNTY OF CAMERON    I
BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR THE SAID COUNTY AND
STATE, ON THIS THE 12    DAY OF APRIL    , A.D., 20 01 ,
PERSONALLY APPEARED MARTIN MENDOZA    , WHO AFTER
BEING DULY SWORN, DEPOSES AND SAYS:

MY NAME IS: MARTIN MENDOZA

D.O.B: 02 26 67

MY HOME ADDRESS IS: 914 E. MONROE ST.

I AM PRESENTLY EMPLOYED WITH: CIRCLE K

THE ADDRESS OF MY EMPLOYMENT IS: 1124 INTERNATIONAL

MY TELEPHONE NUMBER(S) ARE: HOME: 956 5508073

WORK: 956 5508073


        I AM HERE AT THE BROWNSVILLE POLICE DEPARTMENT SPEAKING TO
DETECTIVE JUAN LOPEZ IN REFERENCE TO AN INCIDENT IN WHICH A MALE
SUBJECT ENTERED THE STORE AND LOCKED HIMSELF IN THE STORE OFFICE.

        ON APRIL 10,2001 BETWEEN 3:30PM AND 3:45PM A MALE SUBJECT
WEARING A BLUE CAP, WHITE T SHIRT, AND BLUEJEANS ENTERED THE STORE. I
RECOGNIZED HIM BECAUSE HE IS A REGULAR CUSTOMER. I DID NOTICE WHEN HE
WAS STANDING IN THE STORE THAT HE WAS NERVOUS. I WAS WORKING ON SOME
PAPERWORK AND THE MALE SUBJECT STARTING WALKING TOWARDS THE OFFICE. I
ASKED HIM WHERE HE WAS GOING AND HE TOLD ME, TO THE BATHROOM. I TOLD
HIM THE BATHROOM WAS TOWARDS THE OTHER END OF THE STORE, SO HE TURNED
AROUND WENT TO THE MENS ROOM. I THEN WENT TO DO SOME WORK IN THE
FREEZER AND MY CLERK ALFREDO NAJERA STAYED AT THE COUNTER. NAJERA
THEN CALLED ME AND TOLD ME THAT SOMEONE HAD ENTERED THE OFFICE. HE
TOLD ME THAT AT FIRST HE THOUGHT IT WAS ME BUT WHEN HE TRIED TO OPEN
THE DOOR SOMEONE YELLED AND SLAMMED THE DOOR SHUT. I THEN WALKED TO
THE OFFICE AND TRIED TO OPEN THE DOOR. SOMEONE ON THE OTHERSIDE
SLAMMED THE DOOR AND YELLED. I THEN WENT TO THE COUNTER AND TRIED TO
CALL THE POLICE ON THE PHONE. I PICKED UP THE PHONE BUT APPARENTLY
THE MALE SUBJECT IN THE OFFICE HAD KNOCKED THE PHONE OFF THE RINGER
AND I COULD HEAR HIM YELLING. I THEN GOT 35CENTS AND WENT OUTSIDE TO
CALL THE POLICE. I HOWEVER DIALED 911 AND TOLD THEM THAT SOMEONE WAS
IN THE STORE OFFICE. THE POLICE THEN SHOWED UP AND THE WENT TO THE
OFFICE. I STAYED INSIDE THE STORE BY THE FRONT AND ALFREDO NAJERA
STAYED OUTSIDE TO KEEP ANY CUSTOMERS FROM COMING INSIDE. I THEN HEARD
THE POLICE TELLING THE SUBJECT INSIDE THE STORE OFFICE THAT THEY WERE

DEFENDANT'S
EXHIBIT

THE POLICE AND TO OPEN THE DOOR. I DIDNT HEAR THE SUBJECT RESPOND. I
HEARD THE POLICE PUSHING THE DOOR AND WHEN THEY FINALLY GOT IN, I
HEARD THEM TELL THE SUBJECT TO PUT HIS HANDS UP. THEY TOLD HIM THIS
SEVERAL TIMES. I BELIEVE IT TOOK THE POLICE A FEW MINUTES TO GET INTO
THE OFFICE BECAUSE HE HAD PLACED A CABINET IN FRONT OF THE DOOR, TO
BLOCK IT. A SHORT TIME LATER THE POLICE CAME OUT WITH THE SAME
SUBJECT I HAD TOLD TO GO TO THE BATHROOM AT THE OTHER END OF THE
STORE. HE WAS HANDCUFFED AND THEY TOOK HIM OUTSIDE. I DO NOT KNOW THE
SUBJECTS NAME BUT HE IS A REGULAR CUSTOMER. I THEN CHECKED THE OFFICE
FOR DAMAGES AND I FOUND BLOOD STAINS ON THE OFFICE DOOR, WALL, PHONE
AND COMPUTER KEY PAD. I ALSO REMEMBER SEEING BLOOD ON THE FRONT DOOR
TO THE BUSINESS WHEN I WALKED OUT TO CALL THE POLICE. IT WAS FRESH
AND I KNOW IT WAS LEFT THERE BY THE MALE SUBJECT WHO ENTERED THE
STORE OFFICE. I BELIEVE HE WAS BLEEDING FROM SOMEWHERE WHEN HE
ENTERED THE STORE. AFTER THE POLICE TOOK HIM AWAY HIS MOTHER WHO WAS
WAITING OUTSIDE TOLD THEM THAT HE HAD BEEN SICK AND NOT TO TAKE HIM
AWAY. SHE SAID THAT HE HAD BEEN SICK IN BED FOR FOUR DAYS. I DID NOT
KNOW THE FEMALE WAS HIS MOTHER UNTIL SHE YELLED AT POLICE THAT HE WAS
HER SON. ALSO THE MALE SUBJECT LEFT A HAMMER ON THE FRONT COUNTER AND
THE POLICE TOOK IT WITH THEM. THIS IS ALL THAT I CAN REMEMBER OF THE
INCIDENT. I HAVE READ THE ABOVE STATEMENT AND IT IS TRUE AND CORRECT
TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION.

                              _____
                              VICTIM OR WITNESS SIGNATURE
--------------------------------------------------------------------
SWORN AND SUBSCRIBED TO BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND
FOR SAID COUNTY AND STATE, ON THIS THE _12_ DAY OF _April_,
A.D., 20 _01_.


                              _____
                              NOTARY PUBLIC IN AND FOR CAMERON COUNTY,
                              STATE OF TEXAS.

JUAN MANUEL LOPEZ
Notary Public, State of Texas
My Commission Expires 7-09-2003

1

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
                          BROWNSVILLE DIVISION


     MARIA LONGORIA, and MARIA  ) (
     IDALIA GUTIERREZ,          ) (
     Individually and on behalf ) (
     of the Estate of JUAN      ) (
     LONGORIA, Deceased         ) (
              Plaintiffs        ) (
                                ) (
     VS.                        ) ( CIVIL ACTION NO. B-01-062
                                ) (      (JURY DEMANDED)
     CAMERON COUNTY, TEXAS, THE ) (
     CITY OF BROWNSVILLE, TEXAS,) (
     XAVIER LEE HERNANDEZ, and  ) (
     JOHN DOES 1-10             ) (
              Defendants        ) (

     _____


                         ORAL DEPOSITION OF
                          MARIA LONGORIA
                         SEPTEMBER 10, 2002


     _____


         ORAL DEPOSITION OF MARIA LONGORIA, produced as

     a witness at the instance of the DEFENDANT CAMERON

     COUNTY, TEXAS, taken in the above styled and numbered

     cause on SEPTEMBER 10, 2002, reported by DONNA McCOWN,

     Certified Court Reporter No. 6625, in and for the State

     of Texas, at the offices of Bryant & Stingley, Inc.,

     2010 East Harrison, Harlingen, Texas, pursuant to the

     Federal Rules of Civil Procedure.




DEFENDANT'S
EXHIBIT
H

17:04:24  1    know what the name was.

17:04:25  2        Q.  So you rented that apartment for seven years?

17:04:30  3        A.  Yes.

17:04:30  4        Q.  Did you pay rent every month?

17:04:35  5        A.  Yes.  I had to because I lived there.  I paid.

17:04:39  6        Q.  How much did you pay a month?

17:04:48  7        A.  225 I believe I paid.

17:04:54  8        Q.  225 a month?

17:04:59  9        A.  It was just a little room.  It wasn't large.

17:05:02 10    It wasn't a large apartment.

17:05:04 11        Q.  Was it a one-bedroom?

17:05:07 12        A.  Just one room for the kitchen and everything.

17:05:13 13        Q.  Okay.

17:05:13 14        A.  And the rooms are still there.

17:05:17 15        Q.  Thank you, ma'am.  Did Juan Antonio help you

17:05:24 16    with the rent?

17:05:28 17        A.  He would buy, you know, like some groceries or

17:05:33 18    whatever I needed.  That's how he helped me out,

17:05:38 19    because he couldn't work.

17:05:40 20                He would wash cars.  He would gather trash

17:05:46 21    around there and would throw it away, and people would

17:05:50 22    pay him for that.

17:05:51 23        Q.  Did you pay your rent by check or by cash?

17:05:57 24        A.  With cash.

17:05:59 25        Q.  Okay.  My understanding is you always paid the

17:26:35  1   when he crossed the street, and he washed the car.

17:26:42  2         He rinsed the rag really well and cleaned

17:26:45  3   it all, and then he came right back as if he became

17:26:52  4   perturbed, because he -- I was nailing down a nail, a

17:27:00  5   little nail, and he grabbed the hammer, and he put it

17:27:04  6   like right here.

17:27:06  7         And then he ran.  It's not a street.  It's

17:27:09  8   like an alleyway.  And that's when he heard -- when I

17:27:15  9   couldn't find my son, and I called my niece, and then

17:27:23 10   she came over and gave me some help.

17:27:27 11         When we left from the alleyway like that,

17:27:30 12   we saw a patrol car, and then when we left, she said,

17:27:37 13   "Look, Auntie, there's a patrol car there."

17:27:39 14         When we went, another one was just

17:27:42 15   arriving.  And then when we got -- we asked the owner,

17:27:51 16   because he was standing like this at the door, and I

17:27:56 17   asked, "What's going on?"

17:27:58 18         And he said, "Well, somebody got in there,

17:28:04 19   but nothing happened," he said.  And at that moment,

17:28:07 20   the door opened, and the policeman was -- had him like

17:28:11 21   this, and the other one was lifting him from up here.

17:28:15 22         And then he called me, but he was already

17:28:22 23   perturbed, you see, and told me, "Mom, they want to

17:28:26 24   kill me," he said.  And then, well, he's my son, you

17:28:31 25   see?

17:31:48 1    A.  I told you.  There in Arlington, he had to --

17:31:54 2  because of work, twice he was operated on his back.

17:32:00 3    Q.  Juan Antonio was operated on his back?

17:32:03 4    A.  Twice.

17:32:12 5    Q.  And was that because of injuries on the job?

17:32:18 6    A.  Yes.

17:32:19 7    Q.  And that was --

17:32:22 8    A.  Except they even closed down the factory

17:32:25 9  already.

17:32:26 10    Q.  Okay.  Did he hurt his back while at work?

17:32:32 11    A.  Yes.  This is why they operated on him twice.

17:32:39 12    Q.  Did he make a workers' compensation claim?

17:32:50 13    A.  Well, no.  I don't believe so, because they

17:32:55 14  didn't help him out there, and he hired an attorney,

17:33:00 15  but he never -- well, they never wanted to help him

17:33:04 16  out.

17:33:05 17    Q.  Did he get any money because of his injuries to

17:33:07 18  his back?

17:33:12 19    A.  At the beginning, yes.

17:33:14 20    Q.  He got some money?

17:33:17 21    A.  Yes.

17:33:19 22    Q.  How much money?

17:33:21 23    A.  No.  I'm not able to tell you that.

17:33:23 24    Q.  Do you know the name of his attorney?

17:33:27 25    A.  No.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

17:45:22 1    with any of the deputy sheriffs?

17:45:31 2        A.  Neither.  I never knew anything about that.  I

17:45:35 3    told you he would get in there because he was drunk,

17:45:38 4    and then he would be let out the following day.  He

17:45:41 5    would never stay there any --

17:45:46 6        Q.  Did your son ever talk about Deputy Sheriff

17:45:50 7    Hernandez?

17:45:59 8        A.  No.

17:46:00 9        Q.  Did he ever talk about any of the deputy

17:46:02 10   sheriffs?

17:46:09 11       A.  He never told me the name of anyone.

17:46:12 12       Q.  Did he ever say that any of the deputy sheriffs

17:46:18 13   were doing bad or improper things to him?

17:46:25 14       A.  No, never.

17:46:27 15       Q.  Did he ever say that any police officer with

17:46:30 16   the Brownsville Police Department was doing anything

17:46:32 17   improper to him?

17:46:43 18       A.  No.

17:46:44 19       Q.  And you saw him every day other than when he

17:46:47 20   was in jail?

17:46:52 21       A.  Well, they wouldn't let me.  I never saw him,

17:46:58 22   and the day they told me to go to see him, my niece and

17:47:07 23   I went, and then I left my handbag, because I was in

17:47:11 24   line.

17:47:12 25              I got there, and I asked the young lady

17:54:11 1    upset?

17:54:16 2        A.   No, not at all.

17:54:17 3        Q.   He didn't look unusual?

17:54:22 4        A.   Kind of like a little bit like pale or

17:54:25 5    something like that.  But as far as saying bad things

17:54:29 6    or talking things, no.

17:54:31 7        Q.   Did you see him when he was being arrested?

17:54:36 8        A.   No.

17:54:38 9        Q.   I thought you told us earlier you saw him being

17:54:41 10   arrested.

17:54:42 11       A.   No.  They were inside, and they closed the

17:54:44 12   door, and they were locked up in there.  I saw him when

17:54:47 13   he was brought out.

17:54:49 14       Q.   So you saw him when he was being brought out of

17:54:52 15   the store?

17:54:53 16       A.   But he wasn't beaten.  He wasn't beaten because

17:54:56 17   he walked by me like about this close from me.

17:54:59 18       Q.   Let me ask you this:  Did you see him as he was

17:55:03 19   being taken from the store by the police officers?

17:55:10 20       A.   Yes.  My niece was right there.  I was here,

17:55:15 21   and her son was on the other side of her, like this, in

17:55:19 22   line, and they went by like this far away from us, but

17:55:23 23   he wasn't hurt.

17:55:24 24       Q.   Did you see him being put in the patrol car?

17:55:28 25       A.   Yes.  That, I did see, but they stood him right

17:55:35 1  by the edge, and then they threw him in.  They didn't

17:55:39 2  sit him down.  They threw him in there.

17:55:41 3          Q.  Was he handcuffed?

17:55:43 4          A.  Yes.

17:55:43 5          Q.  Were the cuffs behind his back?

17:55:47 6          A.  In the back here.

17:55:48 7          Q.  Had you ever seen him handcuffed before?

17:55:52 8          A.  No.

17:55:54 9          Q.  Okay.  When you saw him as he's being taken out

17:55:59 10 of the store, did he act unusual?

17:56:06 11         A.  No, not at all.  He just told me -- that's all

17:56:10 12 he told me, "Mom, they want to kill me."  But that's

17:56:13 13 all he said to me.

17:56:15 14         Q.  Did you get the impression that he knew who you

17:56:18 15 were?

17:56:22 16         A.  Well, he said "Mom."

17:56:25 17         Q.  Did he look scared?

17:56:28 18         A.  Well, I wasn't the only one who heard him.  My

17:56:31 19 niece and her son who was next to her.

17:56:32 20         Q.  Did he look scared?

17:56:36 21         A.  Well, no.  Just like this, kind of like he just

17:56:40 22 saw me like this when he went by and looked towards me,

17:56:44 23 and he said, "Mom, they want to kill me."  That's all

17:56:47 24 he said to me.

17:56:48 25         Q.  Okay.  But he did not appear to be beaten?

17:56:53 1    A.  No, he was not.

17:56:54 2    Q.  Did you see any blood?

17:56:56 3    A.  No.

17:56:58 4    Q.  Did he act frightened?

17:57:03 5    A.  Well, no.  I was nervous myself.  I had never

17:57:08 6  seen him handcuffed like that.

17:57:11 7    Q.  My question to you is, as you saw him, did he

17:57:15 8  appear to be nervous?  Upset?

17:57:23 9    A.  No.  That's what he said to me.  That's all he

17:57:26 10  said to me.

17:57:27 11   Q.  He didn't look scared?

17:57:30 12   A.  No.

17:57:30 13   Q.  But he told you they were going to try to kill

17:57:33 14  him?

17:57:37 15   A.  Well, yes, but perhaps he was already bad of

17:57:42 16  his head, you see, because he wasn't beaten.  How could

17:57:47 17  I tell you that he was beaten being that he was not.

17:57:50 18   Q.  In other words, at the time you saw him last,

17:57:52 19  he was being taken, put in the car by the Brownsville

17:58:01 20  police officers.

17:58:05 21   A.  One of them did that, because it was two patrol

17:58:09 22  cars.  The one was ahead and the other one was over

17:58:13 23  here.  Then he stood and opened the door and threw him

17:58:20 24  in.

17:58:21 25   Q.  You did not see him any time thereafter?

74

18:38:43  1    Matamoros saying that they were his girlfriend?

18:38:51  2        A.   No.

18:38:52  3        Q.   Do you know if he would ever go to Matamoros to

18:38:55  4    see anybody?

18:39:02  5        A.   Not that I know of.  Perhaps there in

18:39:07  6    Brownsville he might have had some woman, because he

18:39:10  7    was a man, but he wouldn't tell me that.

18:39:13  8        Q.   No.  I'm just asking if you knew.

18:39:16  9        A.   No, I don't know anything.

18:39:21 10        Q.   Okay.

18:39:21 11        A.   As I told you before, a man is a man, and as a

18:39:27 12    mother, you know, a male son is not going to come to

18:39:30 13    you and say, "Mother, I'm around with this woman," or

18:39:33 14    anything, you know.  That's not --

18:39:35 15        Q.   Okay.  Did you ever know if your son had --

18:39:38 16    strike that.

18:39:47 17             How did you find out that something was

18:39:49 18    happening with your son at the Circle K?

18:39:57 19        A.   Where?

18:40:00 20        Q.   Where the incident happened.

18:40:02 21        A.   When he was taken away?

18:40:05 22        Q.   Yes.

18:40:07 23        A.   Because I saw him running.  He was in the

18:40:13 24    alleyway.  There's an alleyway.  And I called him and

18:40:18 25    called him, and he never minded me.  He never paid

18:40:22  1    attention.

18:40:23  2         He kept going.  And since I knew that he

18:40:25  3    would frequent that place, well, I didn't know which

18:40:29  4    way to go, so I called my niece, and she came over

18:40:32  5    right away.

18:40:33  6    Q.  What niece did you call?

18:40:38  7    A.  Her name is Francisca Franco.

18:40:41  8    Q.  And who is she the daughter of?

18:40:46  9    A.  She's a daughter of a brother of mine, except

18:40:53 10    she lives kind of far away.

18:40:55 11    Q.  From you?

18:40:57 12    A.  Yes.

18:40:57 13    Q.  How long did it take her to get to -- did she

18:41:00 14    come to your house?

18:41:04 15    A.  She came over, and we left right away, because

18:41:10 16    as we were coming out on the alleyway, she said, "Look,

18:41:13 17    there's a patrol car over there."

18:41:15 18         And then another one was just arriving.

18:41:19 19    And then we went over there, and we asked the owner of

18:41:23 20    the place there what was going on.

18:41:25 21    Q.  How long -- I'm sorry.

18:41:27 22    A.  And then he told us that it was him, because he

18:41:31 23    knew him.  And when we were there, they brought him

18:41:44 24    out.  They opened the doors, and he came out.

18:41:44 25    Q.  How --

18:44:01 1    Q.  Okay.  Did you hear your son say anything else
18:44:03 2  other than, "Mama, me quieren matar"?
18:44:08 3    A.  Yes.  And not only I heard it.  My niece heard
18:44:13 4  it, and her son heard it too.
18:44:15 5    Q.  Okay.  I'm going to ask you the question, and
18:44:16 6  I'm going to say it in Spanish, but you wait until he
18:44:19 7  asks you.
18:44:26 8           Did you hear your son say anything else
18:44:29 9  other than, "Mama, me quieren matar"?
18:44:37 10    A.  No.
18:44:38 11    Q.  That's the only words you heard out of his
18:44:42 12  mouth?
18:44:45 13    A.  Not only I heard it, but my niece and her son.
18:44:48 14    Q.  No.  I understand more people heard it.
18:44:51 15    A.  Yes.
18:44:52 16    Q.  What I'm trying to establish is, you didn't
18:44:54 17  hear him say anything else?
18:44:58 18    A.  No.
18:44:59 19    Q.  He didn't say, "Mom, they hit me"?
18:45:10 20    A.  No.  "Mom, they want to kill me."  That's what
18:45:12 21  he said to me.
18:45:13 22    Q.  He didn't say, "Mom, they hurt me"?
18:45:16 23    A.  No, no.
18:45:17 24    Q.  He didn't say, "Mom, I don't know why they're
18:45:20 25  arresting me"?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

18:45:22 1    A.  No.

18:45:22 2    Q.  He didn't say, "Mom, I didn't do anything

18:45:25 3  wrong"?

18:45:27 4    A.  No.

18:45:29 5    Q.  Okay.  What did the -- you said you talked to

18:45:31 6  the owner.

18:45:35 7    A.  Who?

18:45:36 8    Q.  You.

18:45:37 9    A.  No.

18:45:38 10    Q.  Who did you talk to when you got there?

18:45:46 11    A.  Well, with no one, because it was close, and

18:45:50 12  they just brought my son out.  They took him to the

18:45:53 13  patrol car, and I went behind them because he pushed

18:45:57 14  him.

18:45:57 15    Q.  Okay.

18:45:58 16    A.  The policeman did and closed the door on him.

18:46:00 17    Q.  Did you talk to anybody at the scene of the

18:46:04 18  this incident?

18:46:10 19    A.  No, no.  They didn't let anybody in.

18:46:15 20    Q.  No.  I didn't say inside.  Outside.

18:46:17 21    A.  Outside?  There was no one there.

18:46:19 22    Q.  Okay.  Did you ever talk to anybody?  Did you

18:46:22 23  talk to anybody at all, a police officer, the owner,

18:46:27 24  the guys that work in the store, did you talk to

18:46:30 25  anybody other than, of course, your niece?

18:55:16  1     Q.  Okay.  During that next day, did you go see him
18:55:19  2  at the county?
18:55:25  3     A.  Yes.
18:55:26  4     Q.  What time did you go then?
18:55:30  5     A.  Well, I went in the morning at about 11:00, and
18:55:36  6  they told me to go the following day, and then the
18:55:39  7  following day, they told me to go to see him at 11:00.
18:55:46  8     Q.  So you went one day at 11:00, and then you went
18:55:49  9  again the next day at 11:00?
18:55:53 10     A.  Yes.
18:55:53 11     Q.  And it was the second day that you found out
18:55:55 12  that he had passed away?
18:56:00 13     A.  Yes.
18:56:02 14     Q.  Okay.  Now, you made mention several times that
18:56:07 15  when you saw him when they were putting him in the car
18:56:10 16  he had not been beaten.
18:56:17 17     A.  I didn't see him being beaten.  I couldn't say
18:56:20 18  something that I didn't see.
18:56:21 19     Q.  Did you ever see that he had been beaten?
18:56:30 20     A.  When he came out of the place, no.
18:56:32 21     Q.  And any time after that?
18:56:34 22     A.  No.
18:56:35 23     Q.  Okay.  So you're telling us that when you last
18:56:37 24  saw him, he did not look like he had been beaten?
18:56:46 25     A.  No.  He came out of there.  He was brought out,

BROWNSVILLE POLICE DEPARTMENT

CASE#_____    DATE: _April 20,2001_____

TIME:_____11:30p.m._____

THE STATE OF TEXAS    I
COUNTY OF CAMERON    I
BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR THE SAID COUNTY AND
STATE, ON THIS THE 20TH  DAY OF APRIL____, A.D., 20 01__,
PERSONALLY APPEARED JESUS MARTIN ARIAS_____, WHO AFTER
BEING DULY SWORN, DEPOSES AND SAYS:

MY NAME IS: JESUS MARTIN ARIAS_____

D.O.B: 04/20/70____

MY HOME ADDRESS IS: 1768 CARTHRAGE COURT_____

I AM PRESENTLY EMPLOYED WITH: CITY OF BROWNSVILLE POLICE DEPT.___

THE ADDRESS OF MY EMPLOYMENT IS: 600 E. JACKSON STREET_____

MY TELEPHONE NUMBER(S) ARE: HOME: (956) 541-3413_____

WORK: (956) 548-7147____

     I AM SPEAKING TO DETECTIVE ROMAN PINEDA IN REGARDS TO A
PRISONER JUAN ANTONIO LONGORIA WHICH WAS BOOKED INTO CITY JAIL ON
APRIL 10, 2001.

     ON APRIL 10, 2001 I CAME TO WORK MY 10:45P.M. TO 6:45A.M. SHIFT
AT THE CITY JAIL. UPON ARRIVING AT CITY JAIL, I WAS BRIEFED BY
DETENTION OFFICER MARK CHERAMINE ABOUT AN INMATE BY THE NAME OF JUAN
LONGORIA WHOM AT THE TIME WAS INSIDE CELL # 114 (A PADDED CELL). MARK
CHERAMINE TOLD ME THAT INMATE LONGORIA HAD BEEN TRANSPORTED TO THE
HOSPITAL BECAUSE HE WAS ACTING STRANGE AND HALLUCINATING. HE ALSO
TOLD THAT WE SHOULD KEEP A CLOSE EYE ON HIM BECAUSE HE STILL SEEMED
TO BE HALLUCINATING AND ACTING STRANGE.
I THEN WENT OVER TO THE CELL TO SEE HOW INMATE LONGORIA WAS DOING. I
OBSERVED LONGORIA WALKING BACK AND FORTH INSIDE THE CELL. AS I BEGAN
TO SPEAK TO MR. LONGORIA, HE BEGAN TELLING ME THAT THERE WAS SOMEONE
STANDING BEHIND ME WITH A GUN POINTED AT HIM.HE ALSO BEGAN SAYING
SUCH AS "I'M NOT GOING TO LET YOU KILL ME, CAUSE I'M GOING TO DO IT
BEFORE YOU DO". I ALSO OBSERVED LONGORIA SWEATING AS HE APPEARED TO
BE STILL HALLUCINATING AND ACTING VERY NERVOUS.

     WHEN I GOT BACK TO THE BOOKING AREA THE REST OF DETENTION
OFFICERS HAD ARRIVED. THE OTHER DETENTION OFFICERS THAT WERE ON DUTY
WERE JEANIE SEPULVEDA AND JAVIER ORTEGA. I BEGAN TO TELL THEM THAT WE
NEEDED TO KEEP A CLOSE EYE ON INMATE LONGORIA BECAUSE HE WAS STILL
ACTING VERY STRANGE AND COULD POSSIBLY HURT HIMSELF. DURING THE SHIFT
WE BEGAN TO CHECK ON HIM ABOUT EVERY FIFTEEN MINUTES. WHEN WE MADE
OUR CHECKS WE WOULD GO TO HIS CELL AND DO A VISUAL INSPECTION AND ASK



HIM HOW HE WAS DOING, SOMETIMES INMATE LONGORIA WOULD MAKE COMMENTS
AND SOMETIMES HE WOULD NOT SAY ANYTHING AT ALL.

AT ABOUT 1:45A.M., LONGORIA WAS OBSERVED RUNNING FROM ONE SIDE
OF THE CELL TO THE OTHER, PURPOSELY CRASHING HIS BODY AGAINST THE
WALLS. LONGORIA WAS ALSO OBSERVED POUNDING HIS HEAD AGAINST THE WALLS
AND DOOR OF CELL #114. WHILE LONGORIA WAS DOING THIS WE WERE IN THE
PROCESS OF BOOKING IN A PRISONER. WE HAD JUST FINISHED THE BOOKING
PROCEDURE AND I WAS ESCORTING THE PRISONER TO HIS CELL, WHEN I SAW
DETENTION OFFICER ORTEGA AND OFFICER REMES WHO'S PRISONER WE HAD JUST
PROCESSED GOING INTO CELL #114. DETENTION OFFICER ORTEGA
HAD CARRYING SHACKLES AND HANDCUFFS. I PROCEEDED TO PLACE MY PRISONER
IN THE CELL AND WENT TO ASSIST THE OFFICER. WHEN I GOT TO THE CELL
BOTH OFFICERS WERE GIVING VERBAL COMMANDS TO INMATE LONGORIA TO GET
ON THE FLOOR. LONGORIA APPEARED NOT TO RESPOND TO THE COMMANDS BUT
THEN AFTER REPEATED DEMANDS HE GOT ON HIS KNEES AND LAID ON THE
FLOOR. DETENTION OFFICER ORTEGA THEN PROCEEDED TO HANDCUFF LONGORIA.
AS ORTEGA WAS ATTEMPTING TO HANDCUFF HIM HE BEGAN TO WIGGLE
AND PULL HIS ARMS AWAY TO AVOID BEING HANDCUFFED. BOTH OFFICERS THEN
MANAGED TO GET LONGORIA HANDCUFFED AND SHACKLED WITH OUT ANY PROBLEMS
OR INJURIES TO EITHER THE OFFICERS OR THE PRISONER. INMATE LONGORIA
THEN REMAINED RESTRAINED UNTIL APPROXIMATELY 2:40A.M. AT THIS TIME,
LONGORIA SEEMED CALM ENOUGH TO BE UNRESTRAINED. WE TALKED TO HIM AND
ASKED HIM THAT IF HE REMAINED CALM WE WOULD TAKE THE RESTRAINTS OFF.
LONGORIA TOLD US IN SPANISH THAT HE WOULD CALM DOWN AND WE BEGAN TO
REMOVE THE CUFFS.
AFTER REMOVING THE CUFFS WE ASKED LONGORIA IF HE WOULD LIKE A CUP OF
WATER AND HE REPLIED THAT HE WOULD.

LONGORIA REMAINED IN CELL #114 SITTING DOWN ON THE FLOOR. AT
ABOUT 6:10A.M. LONGORIA AGAIN BEGAN RUNNING BACK AND FORTH CRASHING
HIS BODY AGAINST THE WALLS. HE WAS ALSO DIVING ONTO THE FLOOR OF THE
CELL LANDING ON HIS BACK A COUPLE OF TIMES. AT THIS POINT ORTEGA AND
I ENTERED THE CELL AND ASKED HIM VERBALLY TO CALM DOWN. LONGORIA
SEEMED AGITATED AND IRATE. WE THEN GAVE LONGORIA VERBAL COMMANDS TO
GET AGAINST THE WALL WHILE WE PLACED THE HANDCUFFS ON HIM. LONGORIA
APPEARED AS IF HE WAS NOT GOING TO COMPLY BUT AS WE PROCEEDED TOWARDS
HIM HE GOT AGAINST THE WALL AND HE WAS HANDCUFFED WITHOUT INCIDENT.
WE THEN ORDERED LONGORIA TO GET ON HIS KNEES AND HE COMPLIED. THE
SHACKLES WERE ONCE AGAIN PLACED ON LONGORIA. WE THEN EXITED THE CELL
AND AS WE GOT BACK INTO THE BOOKING AREA WE NOTICED THAT LONGORIA WAS
SLIDING HIS BODY TOWARDS THE METAL URINAL GRILL THAT IS ON THE
GROUND. ONCE HE WAS BY THE SCREEN, HE BEGAN HITTING HIS HEAD
FORCEFULLY AGAINST THE GRILL. AS WE WENT BACK INTO THE CELL, LONGORIA
BEGAN SAYING " YOU CAN'T KEEP ME FROM GOING TO HEAVEN".

WE THEN DECIDED TO PLACE A MATTRESS INSIDE THE CELL IN ORDER
TO KEEP HIM FROM HURTING HIMSELF. ONCE THE MATTRESS WAS PLACED INSIDE
THE CELL, INMATE LONGORIA WAS PLACED ON TOP OF THE MATTRESS ON HIS
BACK WITHOUT INCIDENT. WE THEN PLACED THREE RESTRAINING STRAPS AROUND
LONGORIA. ONE STRAP WAS PLACED IN THE MIDDLE OF HIS UPPER TORSO, THE
SECOND WAS PLACED AROUND HIS WAIST AND THE THIRD WAS PLACED ABOVE THE
KNEE. THE STRAPS WERE NOT PLACED VERY TIGHT AND HE MANAGED TO MOVE ON
HIS SIDE. LONGORIA KEPT TRYING TO HIT HIS HEAD ON THE GROUND BUT HE

WAS UNSUCCESSFUL. THE DOOR TO CELL #114 WAS LEFT OPENED FOR BETTER
OBSERVATION. DURING THE TIME HE WAS ON THE MATTRESS, DETENTION
OFFICER ORTEGA AND I TOOK TURNS WATCHING LONGORIA AND ATTEMPTING TO
TALK TO HIM IN ORDER TO CALM HIM DOWN UNTIL SHIFT CHANGE AT 6:45A.M.
WHEN THE NEW DETENTION OFFICERS (JUAN CISNEROS AND EDGAR LOPEZ)
ARRIVED WE BRIEFED THEM OF THE SITUATION BEFORE ENDING OUR SHIFT.

THE FOLLOWING DAY ABOUT 2:00A.M. WE GOT A CALL AT CITY JAIL
FROM A LIEUTENANT FROM THE SHERIFFS OFFICE TELLING US THAT LONGORIA
HAD DIED WHILE IN THEIR CUSTODY.

I HAVE READ THE ABOVE STATEMENT AND FIND IT TO BE TRUE AND
CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION.

ROMAN PINEDA III
Notary Public, State of Texas
My Commission Expires 09-04-02

_____
VICTIM OR WITNESS SIGNATURE

SWORN AND SUBSCRIBED TO BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND
FOR SAID COUNTY AND STATE, ON THIS THE _20TH_ DAY OF _April_,
A.D., 20 _01_.

_____
NOTARY PUBLIC IN AND FOR CAMERON COUNTY,
STATE OF TEXAS. 09/02

BROWNSVILLE POLICE DEPARTMENT

CASE#_____   DATE: 04 20 2001_____
TIME: 9:39 P.M._____

HE STATE OF TEXAS    I
COUNTY OF CAMERON    I
BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR THE SAID COUNTY AND
STATE, ON THIS THE 20TH___ DAY OF APRIL_____, A.D., 20 01__,
PERSONALLY APPEARED JUAN FRANCISCO CISNEROS_____, WHO AFTER
BEING DULY SWORN, DEPOSES AND SAYS:

MY NAME IS: JUAN FRANCISCO CISNEROS_____

D.O.B: 02 08 1973_____

MY HOME ADDRESS IS: 3385 MCALLEN ROAD #4602_____

I AM PRESENTLY EMPLOYED WITH: CITY OF BROWNSVILLE DETENTION
OFFICER

THE ADDRESS OF MY EMPLOYMENT IS: 600 E. JACKSON ST._____

MY TELEPHONE NUMBER(S) ARE: HOME: 350 3821_____

WORK: _____

    TODAY, DET. FLORES OF THE BROWNSVILLE POLICE DEPARTMENT ASKED
ME TO COME AND SPEAK WITH HIM CONCERNING A PRISONER BY THE NAME OF
JUAN ANTONIO LONGORIA WHICH WAS BOOKED IN TO CITY JAIL ON 04 10 2001.

    ON 04 11 2001, I CAME IN TO WORK MY 6:45 A.M. TO 2:45 P.M. SHIFT
AT THE CITY JAIL WHERE I HAVE BEEN EMPLOYED SINCE NOVEMBER OF 1997.
AS I CAME IN TO THE JAIL, I ASKED JESSE ARIAS AND JAVIER ORTEGA AS TO
WHAT WE HAD PENDING FROM THE PREVIOUS NIGHT. WE USUALLY ASK THE
PREVIOUS SHIFT WHAT TYPE OF INMATES ARE BOOKED IN SO WE COULD KNOW TO
SEPARATE THEM IN CASE THEY COULD NOT BE TOGETHER OR ANY SPECIAL
CIRCUMSTANCE (VIOLENT, UNCOOPERATIVE, ETC. ETC.). AS I WAS ASKING
THIS, I OBSERVED THE VIDEO MONITOR IN CELL #114 SHOWING AN INMATE
RESTRAINED TO A PADDED MAT. I KNEW THAT THE PRISONERS WHO USUALLY
HURT THEMSELVES ARE RESTRAINED TO THE MAT IN ORDER FOR THEM NOT TO
HURT THEMSELVES ANY FURTHER. I ASKED DETENTION OFFICER JAVIER
ORTEGA AS TO WHY HE HAD BEEN RESTRAINED. HE SAID THAT THE INMATE
HAD BEEN HITTING HIMSELF ON THE ELBOW BY BANGING THE DOOR, RUNNING
INTO THE WALL AND HITTING HIMSELF ON THE HEAD AGAINST THE DOOR.

    I THEN OPENED THE DOOR TO THE CELL THAT JUAN LONGORIA WAS IN AND
I BEGAN TO SPEAK WITH HIM IN SPANISH. I ASKED HIM "PORQUE ESTAS
AQUI" (WHY ARE YOU HERE). HE ANSWERED "NO SE, ME QUIEREN MATAR" (I
DON'T KNOW, THEY WANT TO KILL ME). I ASKED HIM "QUIEN" (WHO) AND HE
WOULD LOOK AT THE WALL AND SAY "ESE" (HIM). THERE WAS NOBODY ELSE IN
THE CELL BUT HIM AND ME. I THEN ASKED HIM "QUIERES QUE TO QUITE LAS
ESPOSAS" (DO YOU WANT ME TO RELEASE YOU) AND HE SAID IN SPANISH "SI"
(YES). I THEN TOLD HIM SPANISH "CALMATE Y YA NO TE GOLPEES Y TE



SUELTO" (CALM DOWN AND DON'T HURT YOURSELF ANYMORE AND I WILL RELEASE YOU). HE THEN SAID "ESTA BIEN" (O.K.).

I THEN CALLED EDGAR LOPEZ AND I ASKED HIM TO HELP ME RELEASE MR. LONGORIA FROM THE MAT. THERE WERE THREE STRAPS ACROSS HIS BODY TWO WHICH WERE VELCRO (LOOSE) AND ONE LEATHER. THE LEATHER STRAP WAS CROSSING HIS MIDSECTION AND THE VELCRO STRAPS WERE ON TOP BY HIS CHEST AND SHINS. IT TOOK US LESS THAN A MINUTE TO RELEASE HIM AND I TOLD HIM TO SIT DOWN. I THEN NOTICED THAT HE HAD REDNESS TO ONE OF HIS ELBOWS. I ASKED HIM IF HE WAS O.K. AND HE KEPT ON REPEATING "ME VAN A MATAR" (THEY ARE GOING TO KILL ME). I ASKED HIM WHO HE WAS TALKING ABOUT AND HE WOULD SAY "HIM" AND POINT TO THE WALL BUT NO ONE WAS THERE.

AT THAT TIME, I TOLD DETENTION OFFICER LOPEZ THAT WE WERE GOING TO KEEP INMATE LONGORIA IN CELL #114. I WENT BACK TO THE BOOKING AREA AND I SAW LONGORIA ON THE VIDEO MONITOR AND HE WAS SITTING DOWN. THE VIDEO CAMERA IN CELL #114 WAS STILL (CONTINUOUS) SINCE I GOT THERE AND IT CONTINUED TO BE THAT WAY. WHENEVER WE HAVE SOMEONE IN CELL #114, WE HAVE TO REMOVE THE RANDOM ROTATION ON THE CAMERAS IN ORDER TO KEEP CLOSE OBSERVATION ON THE INMATE. THERE WAS FOUR DETENTION OFFICERS WORKING THIS SHIFT ON THIS DATE. THEY WERE SUSANA REYNA, MARIA GUADALUPE GARCIA, EDGAR LOPEZ AND MYSELF. WE ALL WERE AWARE OF THE PRISONER IN CELL #114.

WE THEN GOT A JAIL TRUSTEE TO DISTRIBUTE SWEET BREAD AND COFFEE FOR ALL INMATES WHILE WE SEPARATE THEM ACCORDING TO THEIR BOOKING OFFENSE. I RECALL TELLING THE TRUSTEE TO GIVE THE PRISONER IN CELL #144 BREAD AND COFFEE TOO. I DO NOT KNOW IF MR. LONGORIA TOOK THE ITEMS WE WERE GIVING FOR BREAKFAST.

THE MUNICIPAL COURT ARRAIGNMENTS BEGAN AND THEY ASKED FOR THE HIGHER OFFENSES TO BE TAKEN TO THE COURT. I ASKED MR. LONGORIA TO GET INTO A LINE THAT WE WERE FORMING INSIDE THE JAIL IN ORDER TO TAKE THEM TO THE COURT TO SEE THE JUDGE. HE STOOD UP AND GOT INTO THE LINE WITH THE REST OF THE INMATES. HE WAS BEING CHARGED WITH BURGLARY OF A BUILDING (FELONY) SO HE WAS ONE OF THE FIRST ONES TO SEE THE JUDGE THAT MORNING.

AT THIS POINT, I PLACED LEG IRONS ON ALL FELONY INMATES INCLUDING LONGORIA. THEN OFFICER JOSE SALINAS (BAILIFF) ARRIVED AND WALKED ABOUT ELEVEN INMATES TO THE COURT. WHILE AT THE COURTROOM, I OBSERVED MR. LONGORIA SPEAKING IN A VERY LOW VOICE TO HIMSELF AS HE WOULD LOOK TO BOTH SIDES. IT APPEARED TO ME THAT MR. LONGORIA WAS A BIT CRAZY AND OFFICER SALINAS OBSERVED HIM ALSO SO HE ASKED ME TO TAKE HIM BACK TO THE JAIL WHERE HE WOULD LATER BE ARRAIGNED. AS I WAS WALKING MR. LONGORIA BACK FROM THE COURT TO THE JAIL, HE STOPPED AT THE ANGLE OF THE HALLWAY AND PEEKED DOWN THE HALL AND SAID IN SPANISH "ME VAN A MATAR, ME VAN A MATAR" (THEY ARE GOING TO KILL ME, THEY ARE GOING TO KILL ME). I ASKED IN SPANISH WHO AND HE POINTED TO THE GATE LEADING INTO THE JAIL (BARS). ONCE AGAIN, I LOOKED AND THERE WAS NOBODY STANDING THERE. ALL THE OTHER PRISONERS (CLASS C MISDEMEANORS) WERE STILL LOCKED UP.

I TOLD DETENTION OFFICER EDGAR LOPEZ THAT I NOTICED MR. LONGORIA WAS BEING STRANGE SO I TOLD HIM THAT WE WERE GOING TO PLACE HIM IN CELL #114 AGAIN FOR HIS SAFETY.  I THEN LED HIM TO CELL #114 AND I REMOVED THE LEG IRONS.  HE WAS THEN PLACED BACK INTO THE CELL WHERE HE WAS BEING MONITORED.

A WHILE LATER, OFFICER SALINAS AND EDGAR LOPEZ TRANSPORTED MR. JUAN ANTONIO LONGORIA TO COUNTY JAIL WITH A MEDICAL CLEARANCE.

I HEARD THE FOLLOWING DAY THAT MR. LONGORIA HAD DIED AT CAMERON COUNTY JAIL.  AT NO TIME DID I, EDGAR, SUSANA OR MARIA G. GARCIA HANDLE MR. LONGORIA IN ANY MANNER WHICH MIGHT HAVE CAUSED HIM ANY BODILY INJURY.

I HAVE READ THIS STATEMENT WHICH WAS TAKEN BY DETECTIVE ANTONIO FLORES AND FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.



_____
VICTIM OR WITNESS SIGNATURE

--------------------------------------------------------------
SWORN AND SUBSCRIBED TO BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR SAID COUNTY AND STATE, ON THIS THE 20th DAY OF April, A.D., 20 01 .

ANTONIO FLORES
Notary Public
State of Texas
My Comm. Exp. 11-03-2002

_____
NOTARY PUBLIC IN AND FOR CAMERON COUNTY, STATE OF TEXAS.

**Brownsville Police Department**
**600 E. Jackson Street**
**Brownsville, Texas 78520**
**(956) 548-7000 - 911 Emergency**

## Supplemental Report

☐ Continuation    Call Number: 2001 3011710    Date: 4-30-2001
☒ Follow Up    Disposition: ARRESTED

☒ Offense    ☒ Arrest    CHARGE(S): BURGLARY OF BUILDING
☐ Incident    ☐ Accident
☐ Other: _____    Family Violence ☐ Yes ☐ No

| ☐ Victim ☒ Complainant ☐ Witness ☐ Suspect | Last Name or Name of Business: SALINAS | First Name: JOE | Middle Name | Jr/Sr/Etc. |

ON APRIL 11,2001 AT APPROXIMATELY 8:00AM THIS OFFICER TOOK THE PRISONERS TO MUNICIPAL COURT FOR ARRAIGNMENTS, DURING THE ARRAIGNMENTS, A PRISONER IDENTIFIED AS JUAN LONGORIA WAS MUMBLING SOME WORDS AND THIS OFFICER ADVISED THE PRISONER TO KEEP QUIET. THE PRISONER COMPLIED AND THE JUDGE READ ALL THE DEFENDANTS THEIR RIGHTS AND ADVISED EACH PRISONER OF THEIR RANGE OF PUNISHMENTS IF THEY WOULD BE FOUND GUILTY ON A LATER PROCEEDINGS. THE PRISONER JUAN LONGORIA AGAIN WOULD MUMBLE SOME WORDS, WHICH THIS OFFICER WAS NOT ABLE TO UNDERSTAND AT WHICH TIME THIS OFFICER ESCORTED THE PRISONER AND A DETENTION OFFICER TOOK CUSTODY AND ESCORTED THE PRISONER TO HIS CELL. THIS OFFICER CONTINUED THE MUNICIPAL ARRAIGNMENTS AND FINISHED ARRAIGNMENTS.  THIS OFFICER FINISHED ARRAIGNMENTS AND ADVISED THE DETENTION OFFICER EDGAR LOPEZ TO GET THE PRISONERS READY FOR TRANSPORT TO COUNTY JAIL AND DETENTION OFFICER ADVISED THAT THEY WERE READY.  JUDGE KIP VAN HODGE SET THE BONDS OM MR. LONGORIA AND THIS OFFICER DID NOT SEE ANY VISIBLE INJURIES ON MR . LONGORIA.  THIS OFFICER AND DETENTION OFFICER EDGAR LOPEZ TRANSPORTED ABOVE PRISONER AND OTHER PRISONERS FROM CITY JAIL TO COUNTY JAIL, AND PRISONERS WERE CALM AND NOT COMBATIVE. THIS OFFICER AND DETENTION OFFICER ARRIVED AT COUNTY JAIL WHERE WE WERE MET BY COUNTY DETENTION OFFICERS AND THEY ASKED THE PRISONERS IF THEY WERE INJURED OR HAD ANY MEDICAL PROBLEMS AND COUNTY DETENTION  OFFICER ADVISED THIS OFFICER AND DETENTION OFFICER EDGAR LOPEZ THAT THE ABOVE PRISONERS WERE CLEARED AND THAT MYSELF AND OFFICER EDGAR LOPEZ COULD LEAVE. NO FURTHER ACTION TAKEN BY THIS OFFICER.

☐ Continued on other side >>>

Reporting Officer: _____

Employee No.: 3574

DEFENDANT'S EXHIBIT

Employee No.: _____    Date Approved: _____

## CIVIL ACTION NO. B-01-062

| | | |
|---|---|---|
| **MARIA LONGORIA, and MARIA IDALIA** | § | **IN THE UNITED STATES** |
| **GUTIERREZ, Individually and on behalf** | § | |
| **of the Estate of JUAN LONGORIA,** | § | **DISTRICT COURT FOR** |
| **Deceased** | § | |
| **_VS._** | § | **SOUTHERN DISTRICT OF TEXAS** |
| **CAMERON COUNTY, TEXAS,** | § | |
| **THE CITY OF BROWNSVILLE, TEXAS** | § | **BROWNSVILLE DIVISION** |
| **XAVIER LEE HERNANDEZ, AND** | § | |
| **JOHN DOES 1-10** | § | **BROWNSVILLE, TEXAS** |

## AFFIDAVIT OF ALBERT RODRIGUEZ

| | |
|---|---|
| **THE STATE OF TEXAS** | § |
| | § |
| **COUNTY OF TRAVIS** | § |

1.   Before me, the undersigned authority in and for the State of Texas, on this day personally appeared Albert Rodriguez, personally known to me, who after being by me duly sworn, deposes and says:

2.   "My name is Albert Rodriguez.  I am over the age of 21, of sound mind, and I am in all respects legally competent and duly authorized to make this Affidavit.  I have personal knowledge of the facts contained herein:

3.   I am presently employed as the Commander of the Training Academy for the Texas Department of Public Safety.  I was employed by the Texas Department of Public Safety (DPS) as a patrol officer in 1977, and was a Highway Patrol Trooper for approximately five (5) years. In 1982, I was promoted to the rank of Training Officer at the Training Academy.  I served in

1



that position for two (2) years. I was then promoted to Staff Development Specialist I and served in that capacity until 1989. In 1989, I was promoted to the rank of Lieutenant in the Training Academy. In March of 1993, I was promoted to Commander of the DPS Training Academy in Austin, Texas and presently hold that position. I have been employed by the DPS as a law enforcement officer for over twenty-five (25) years. I am a licensed Texas Peace Officer and have met all of the standards for licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education.

4. After being hired by the DPS and prior to being commissioned as a peace officer, I attended an eighteen- (18) week law enforcement course at the DPS Training Academy. After graduating from the academy, I was assigned to work in the Highway Patrol Service. I worked with a senior DPS trooper for one (1) year as additional training. Every two (2) years, each member of the DPS returns to the academy for an additional forty (40) hour refresher course that includes training in new legislation, policies, and procedures. I have followed this course of training. I hold a Bachelors Degree in Education from Texas A&M University in Kingsville, Texas. I also hold Advanced, Instructors', and Masters' certifications from the Texas Commission on Law Enforcement Officer Standards and Education. I have been certified for over sixteen (16) years as a defensive tactics instructor, firearms instructor and an as Emergency Medical Technician. I am also certified as an instructor by the Federal Bureau of Investigation (FBI) in use of force and defensive tactics. I have attended over six thousand (6,000) hours of various law enforcement seminars and schools throughout the United States. In my career with the DPS, I have studied and attended seminars on the issues of policies and procedures, use force, use of deadly force, probable cause, police supervision, law enforcement training, patrol procedures, counter terrorism, and officer safety. I have also instructed classes in the areas of patrol procedures, defensive tactics, officer safety, arrest procedures, use of force, use of deadly force, law enforcement policies and procedures, firearms, police supervision, first aid and many other subjects. I have previously been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force, use of deadly force, policies and procedures, probable cause, arrest procedures, driving procedures, police supervision, firearms, officer safety, Texas criminal laws, Texas traffic laws, law enforcement training, and police investigations.

**ADDITIONAL QUALIFICATIONS AND MEMBERSHIPS**

5. I am a member of the FBI National Academy Graduates Association, Texas Police Association, Wound Ballistics Association, Texas Department of Public Safety Officer's Association, Texas Sheriff's Association, and the American Society of Law Enforcement Trainer's Association. I also serve on the Southwest Texas State University Criminal Justice Advisory Board, Texas Alcoholic Beverage Commission Advisory Board and the Austin Community College Law Enforcement Advisory Board. I have instructed at the FBI Academy in Quantico, Virginia; Northwest University in Jacksonville, Florida; Texas Attorney General's Annual Law Enforcement Conferences in Austin, Texas; and various other locations throughout the United States and Mexico. The attached resume contains a more complete listing of my training and qualifications and is provided for reference of my experience and skills.

**RESEARCH AND ASSESSMENT**

6. My opinions in this affidavit are based on having personally interviewed Officer Falcon Rivera, Officer Victor Jackson, Officer Joe Salinas, Detention Officer Jesus Martin Arias, Detention Officer Javier Leroy Ortega, Detention Officer Mark Cheramie, and Detention Officer Maria Garcia, and having reviewed and researched the following materials and documents: 1) Plaintiff's First Amended Complaint, 2) Defendant The City of Brownsville, Texas' Answers and Objections to Plaintiff's First Set of Interrogatories, 3) Defendant The City of Brownsville, Texas's Responses and Objections to Plaintiff's First Request for Production, 4) Mug shot of Juan Antonio Longoria, 5) Memorandum from Lieutenant Henry Etheridge to Ben Reyna, 6) Memorandum from Jeanie Sepulveda to the Chief of Police, 7) Memorandum from Juan Cisneros to the Chief of Police, 8) Memorandum from Maria G. Garcia to the Chief of Police, 9) Memorandum from Detention Guard Susana Reyna to the Chief of Police, 10) Memorandum from Edgar Lopez to the Chief of Police, 11) Memorandum from Patrolman Joe Salinas to the Chief of Police, 12) Statement of Circle K employee Alfredo Najera, 13) Supplemental Report of Joe Salinas, 14) Statement of Javier Leroy Ortega, 14) Statement of Edgar Lopez, 15) Statement of Jeanie Marie Sepulveda, 16) Statement of Mark Cheramie, 17) Statement of Jesus Martin Arias, 18) Statement of Leo Mercado, 19) Statement of Rosie Martinez, 20) Memorandum from Jesus Arias to the Chief of Police, 21) Memorandum from

3

Manual Remes to the Chief of Police, 22) Memorandum from Javier Ortega to the Chief of Police, 23) Memorandum from Leo Mercado to the Chief of Police, 24) Memorandum from Mark Cheramie to the Chief of Police, 25) Memorandum from Victor Jackson to the Chief of Police, 26) Memorandum from David Gutierrez to the Chief of Police, 27) Memorandum from Falcon Rivera to the Chief of Police, 28) Memorandum from Eli Rios to the Chief of Police, 29) Statement of Susana Reyna, 30) Statement of Alfredo Najera, 31) Statement of Martin Mendoza, 31) Statement of Juan Francisco Cisneros, 32) Offense Report of Officer Falcon Rivera, 33) Arrest Booking Record of Juan Antonio Longoria 34) Brownsville Municipal Jail Inmate Security Check Record, 35) Supplemental Report of Officer Falcon Rivera, 36) Brownsville Police Department Municipal Jail Prisoner/Arrest Log Sheet, 37) Criminal History of Juan Antonio Longoria, 38) Narrative of Detective Juan Lopez, 39) Narrative of David Gutierrez, 40) Property/Evidence Report of Juan A. Longoria, 41) Offense Report of David Garcia, 42) Previous Offense Reports regarding Juan A. Longoria, 43) Defendant Cameron County's Response to Plaintiff's First Set of Interrogatories and First Set of Requests for Production, 44) Autopsy Report of Juan Longoria produced by Lawrence J. Dahm, M.D., 45) Toxicology Report of Juan A. Longoria, 46) Valley Baptist Medical Records of Juan A. Longoria, 47) Photographs of Juan A. Longoria (deceased), 48) City of Brownsville EMS Ambulance Activity Report of Juan A. Longoria, 49) Texas Commission on Law Enforcement Officer Standards and Education Basic Peace Officer Training Curriculum, 50) Texas Commission on Law Enforcement Officer Standards and Education Intermediate Use of Force Training Curriculum, 51) Texas Penal Code, and 52) the Texas Code of Criminal Procedure.

**SUMMARY OF RELEVANT FACTS**

7. On April 30, 2001, Circle K Manager Martin Mendoza made a 911 call as a result of Juan Antonio Longoria walking into the store with a hammer in his hand and subsequently entering an office within the store and ransacking the office, which was off limits to the general public. Manager Mendoza and Circle K employee Alfredo Najera recognized Longoria as a regular customer but observed that he was acting in an unusual manner. Furthermore, Mendoza and Najera noticed that Longoria was bleeding.

8.  Brownsville Police Officer Falcon Rivera and David Gutierrez responded to the 911 call at the Circle K convenience store located at 1124 International Boulevard in Brownsville, Texas.

9.  Upon arriving at the store, Officer Rivera was briefed of the situation by the Circle K employees.  Officers Gutierrez and Rivera approached the office and overheard noises within the office as if to indicate that someone was ransacking the office.  Officers Rivera and Gutierrez asked Juan A. Longoria to open the office door and there was no response.  The officers continued to hear the noises coming from within the office.  Officer Rivera attempted to open the door but the door appeared to be locked.  A key to the door was obtained and an attempt to unlock it was made.  The door would still not open.  Officers Gutierrez and Rivera pushed on the door and were able to partially open it.  Officer Rivera observed that a large safe had been placed behind the door in an attempt to prevent the door from being opened.  Officer Rivera also observed Longoria leaning against the door as to prevent the door from opening.

10.  Officers Gutierrez and Rivera forcefully pushed the door open and were able to gain access to the office.  They observed Longoria in the office and also noticed that Longoria was yelling incoherently.  Officer Rivera looked for the hammer that had been reported as being in Longoria's possession but was unable to see it.  Fearing that Longoria might be in possession of the hammer and recognizing the situation as high risk, Officer Rivera drew his issued police baton and ordered Longoria to the floor in a position to reduce the risk.  Longoria complied by lying between the door and the wall, not allowing Officer Rivera enough space to enter the office.  Officer Gutierrez initiated the handcuffing procedures even though there was limited space.  During the initiation of the handcuffing procedures Longoria resisted by pushing up in a "push up" manner and pulled his hand back and refused to place his hand behind his back for handcuffing.  Officers Rivera and Gutierrez continued to order Longoria to place his hands behind his back and Longoria would not comply.  Officer Rivera struck Longoria in the lower torso with the baton to keep Longoria from standing up and escalating the situation.  Officers Rivera and Gutierrez grabbed Longoria's hands and Longoria was ultimately handcuffed.

11.  Longoria was assisted up from the floor by the officers.  Upon being assisted up, Longoria appeared to intentionally allow his whole body to go limp resulting in the officers having to physically pick him up and semi-carry him to the police car.

12.  Officer Victor Jackson arrived at the scene and assisted Officers Gutierrez and Rivera in placing Longoria in the police car.  Officers Rivera and Gutierrez sat Longoria on one side of the rear seat of the patrol car.  Officer Jackson went to the opposite side of the patrol car and assisted Longoria onto the rear seat by pulling him from under the armpit area and onto the rear seat.  Once inside the patrol car, Longoria continued to act in a bizarre manner resulting in Officer Rivera activating the patrol car's overhead lights on in order to get him to the Brownsville jail facility as soon as reasonably possible.  During the transport, Longoria continued to state that numerous men were after him and were trying to kill.  Officer Rivera perceived Longoria as being "spaced out."  Officer Jackson followed Officer Rivera in his patrol car.

13.  While in enroute to the Brownsville Jail Facility, Officer Rivera called the dispatcher and requested assistance upon his arrival at the station because of Longoria's previous resistance and bizarre behavior.  Detention Officers Mark Cheramie and Leo Mercado assisted Officer Rivera when he arrived with Longoria at the Brownsville Jail facility sally port area. Longoria offered no resistance and was walked into the jail facility.  Detention Officer Cheramie noticed that Longoria had a small cut on his knee and his elbow appeared to be swollen. Emergency Medical services were summoned to the jail facility.  E.M.S. responded and checked on Longoria.  Longoria was asked if he wanted to be transported to the hospital upon which he refused and signed a waiver to that effect.

14.  The Detention officers were briefed of Longoria's bizarre behavior and also noticed that Longoria was continuing to act extremely nervous and bizarre.  Longoria was placed in a padded cell in the jail facility and was kept under close observation through personal cell checks and the camera cell monitoring system.

15.  Shortly thereafter, Longoria was observed wedging himself between the cell door through the camera cell monitoring system.  Detention Officers Leo Mercado and Mark Cheramie decided to personally check on Longoria's status.  Officer Mercado and Cheramie could not get into the cell due to the Longoria holding the cell door closed.  The officers

6

ultimately gained entry into the cell. Longoria hid behind the cell door. The officers interviewed Longoria and concluded that Longoria's bizarre behavior was getting worse in that Longoria indicated that he was seeing things that were not present, looked extremely scared, was trembling in what appeared to be as a result of fear, and appeared extremely nervous.

16. Shift supervisor Lieutenant Ramiro Ramirez was contacted regarding the situation. Lieutenant Ramirez asked Officers Cheramie and Rivera to transport Longoria to the Brownsville Medical Center. Officers Falcon Rivera and Mark Cheramie transported Longoria.

17. Upon arrival at the Brownsville Medical Center, Officers Rivera and Cheramie obtained a wheel chair and wheeled Longoria in. While waiting to be seen by a doctor Longoria informed Officer Cheramie what had occurred before he got arrested. Longoria stated that while he was at home, five guys went to his house and knocked on the door. He stated that as soon as his mother opened the door, one of the subjects slapped his mother and forced their way inside the house. Longoria stated that one of the intruders had a plastic bag and that they were going to put it on him after they killed him. Longoria continued by stating that he had had an altercation with one of the subjects earlier at the taxi stand where he washed cars. He stated that he ran from the subjects and while doing so, he slipped on some loose gravel and hurt his elbow and knee.

18. Longoria was then seen by a doctor. Longoria's cut was cleaned and his elbow was x-rayed. The doctor further recommended that someone from Texas Tropical be called to perform a mental evaluation on Longoria. While waiting for the Texas Tropical mental screener, Longoria continued to act extremely nervous and scared. Officer Rivera asked a nurse for some juice and/or water for Longoria. The nurse gave Officer Rivera some apple juice for Longoria and in turn, Officer Rivera gave it to Longoria.

19. Jose Schroeder from Texas Tropical arrived and after evaluating Longoria, he informed Officers Rivera and Cheramie that Longoria did not need to be committed but to keep him alone and under close supervision. Longoria was transported back to the Brownsville Jail facility.

20. Upon arrival at the jail facility Longoria was again placed in a padded cell for his safety and close observation. Longoria was observed rolling around in the cell, striking the walls with his elbows, striking his head and face against the walls, running and striking the cell

7

walls, laying down, and holding the door with his feet in what appeared to be an attempt to keep the door from opening. Longoria continued to speak about people wanting to kill him.

21. Detention Officers Jesus M. Arias, Javier Ortega and Officer Remes went into the cell and handcuffed and placed leg restraints on Longoria to keep him from hurting himself. Longoria was restrained for approximately an hour and then was unrestrained.

22. Approximately three and half hours later, Longoria was again observed running and striking the cell walls and jumping up in the air and landing on his back. Longoria again was restrained for his own safety. Shortly thereafter, Longoria was observed sliding on the floor towards a metal urinal grill where he hit his head forcefully against it. Due to the danger that Longoria presented to himself, Longoria was placed on top of a mattress with restraining straps around him that were loose enough to where he could still move around and turn sideways, in fact he was observed turning sideways after he was restrained in that manner. There were three straps utilized; one strap was placed in the area between the ankles and knees; a second strap was placed in the waistband area; and a third strap was placed in the chest area. Longoria continued to try to strike the floor with his head and was unsuccessful. The cell door was left open for better observation. Detention officers took turns watching and conversing with Longoria in an attempt to calm his down.

23. Approximately forty-five minutes after being placed on the mattress Officers Juan Cisneros and Edgar Lopez spoke to Longoria. The restraints that were securing him to the mattress were removed. Longoria continued to see things that were not present and continued to say that someone was going to kill him.

24. Longoria was taken to the municipal court for arraignment by Officers Juan Cisneros and Joe Salinas. During the arraignment process Longoria continued to mumble and act strange. Officers Cisneros and Salinas took Longoria back to jail. At the jail, Jail Matron Susana Reyna contacted Lieutenant Henry Etheridge who was in charge of the City Jail. Jail Matron Reyna informed Lieutenant Etheridge that Longoria had not been arraigned and should be arraigned in order for him to be transported to Cameron County Jail. Lieutenant Etheridge contacted municipal court personnel who informed him that Longoria had been arraigned and that they would bring the commitment documentation to the city jail so that he could be transported to the Cameron County Jail.

8

25.   Lieutenant Etheridge arrived at the city jail and personally observed Longoria. Officers Edgar Lopez and Joe Salinas transported Longoria along with other prisoners to the Cameron County Jail.  Longoria was turned over to the custody of the Cameron County Jail.

26. Juan A. Longoria died while in the custody of Cameron County Jail, over twelve (12) hours after being released from Brownsville Police Department's custody.

## CONCLUSIONS AND OPINIONS

27. After careful review and analysis of the aforementioned documents, materials, and interviews, I have arrived at the following conclusions and opinions.

### *Officers Falcon Rivera, David Gutierrez, and Victor Jackson*

28. It is my professional opinion that any reasonable and well-trained law enforcement officer could have taken the same or similar actions that Officers Falcon Rivera, David Gutierrez, and Victor Jackson took on April 10, 2001, when presented with the same or similar circumstances.   The aforementioned Brownsville Police Department Officers' actions were objectively reasonable, discretionary, within the course and scope of their law enforcement authority, and conducted in good faith.

### *COURSE AND SCOPE*

29.   April 10, 2001, Officers Rivera, Gutierrez, and Jackson were employed by the Brownsville Police Department as police officers.   The officers were wearing regulation Brownsville Police Department uniforms that clearly identified them as police officers and were working assigned shifts.  Officers Rivera, Gutierrez, and Jackson responded to the 911 call that the Circle K manager Martin Mendoza made as a result of Juan A. Longoria entering the store with a hammer in his hand and locking himself in a store office.  Law enforcement officers throughout the United States are trained to respond to 911 calls and are trained to understand that responding to such calls is part of their duties and responsibilities as Texas Peace Officers and more specifically the duties and responsibilities of a Brownsville Police Officer.

30.   Upon arriving and being briefed on the situation, Officers Rivera and Gutierrez reasonably believed that probable cause existed to arrest Juan A. Longoria for **BURGLARY**; *Texas Penal Code, §30.02. "(a) A person commits an offense if, without effective consent of the owner, the person: (1) enters a habitation, or a building (or any portion of a*

9

*building) not then open to the public, with intent to commit a felony, theft, or an assault."*

31.  It is my professional opinion that Officers Rivera, Gutierrez, and Jackson's response to the 911 call and reasonably believing that Juan Longoria had committed an offense was within the course and scope of their law enforcement authority, pursuant to the **Texas Code of Criminal Procedure, Art. 2.13. Duties and Powers.** *"(a) It is the duty of every peace officer to preserve the peace within the officer's jurisdiction.  To affect this purpose, the officer shall use all lawful means.  (b) The officer shall: (1) in every case authorized by the provisions of this Code, interfere without a warrant to prevent and suppress crime."*

32.  It is my professional opinion that Officer Falcon Rivera's use of force when he struck Juan Longoria in the lower torso area with his issued police baton to effect Longoria's arrest was within the course and scope of his law enforcement authority pursuant to the **Texas Penal Code, Subchapter E. Law Enforcement, §9.51. Arrest and Search;** *"A peace officer or a person acting in a peace officer's presence and at his direction, is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or search, or to prevent or assist in preventing escape after arrest if: (1) the actor reasonably believe the arrest or search is lawful or, it the arrest or search is made under a warrant, he reasonably believes the warrant is valid,; and (2) before using force, the actor manifest his purpose of the arrest or search and identifies himself as peace officer or as one acting at a peace officer's direction, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested."* Furthermore, it is my professional opinion that Officer Rivera's use of force was within the course and scope of his law enforcement authority pursuant to the **Texas Code of Criminal Procedure, 15.24, What Force May Be Used.** *"In making an arrest, all reasonable means are permitted to be used to affect it.  No greater force, however, shall be resorted to than is necessary to secure the arrest and detention of the accused."*

33.  There is no objective evidence that Officers David Gutierrez or Victor Jackson used any type of force to effect the arrest Juan Longoria besides handcuffing him and placing him in the patrol car.

10

### *OFFICERS RIVERA, GUTIERREZ, AND JACKSON'S ACTIONS WERE DISCRETIONARY*

34. It is my professional opinion that Officers Rivera, Gutierrez, and Jackson's actions were discretionary. In the law enforcement profession, similar to other professions, there are various procedures, tactics, and tools that may be used in any given law enforcement situation. The involved officers in this case had been trained in a variety of force options commonly referred to as the Use of Force Continuum. Officer Rivera, Gutierrez, and Jackson had been trained in the Use of Force Continuum pursuant to the state training standards. The Use of Force Continuum outlined by the state training standards consists of the following:

1. Professional Presence
2. Verbal Communication
3. Weaponless Control
4. Intermediate Weapons
5. Deadly Force

35. Law enforcement officers are trained to evaluate the totality of the circumstances as viewed from their vantage point and to use reasonable procedures, tactics, and tools as outlined in the Use of Force Continuum in attempting to control situations where resistance is encountered. Due to the fact that in the law enforcement profession there is not a step-by-step outline on what a law enforcement officer, in any one given situation, is mandated to do, law enforcement officers must use their judgment and discretion. The objective evidence clearly indicates that Officers Rivera, Gutierrez, and Jackson were required to use their judgment and discretion in handling the situation that Longoria had created.

36. It is my professional opinion that Officer Rivera and Gutierrez **did not** have discretion on whether or not to attempt to prevent and suppress crime. The officers were obligated to respond to the 911 call and to resolve the situation that Longoria had created. Pursuant to law enforcement training, the Brownsville Police Officers were obligated to attempt to prevent and suppress crime by responding to the call, prevent Longoria from injuring the public and/or himself, and arresting him.

11

### *OFFICERS RIVERA, GUTIERREZ, AND JACKSON'S ACTIONS WERE OBJECTIVELY REASONABLE AND CONDUCTED IN GOOD FAITH*

37.   It is my professional opinion that Officers Rivera, Gutierrez, and Jackson's actions were objectively reasonable and conducted in good faith in light of the totality of the circumstances that existed on April 10, 2001.   The Brownsville Police Officers responded to the 911 call placed by the Circle K Manager Martin Mendoza.   They responded as any reasonable and conscientious law enforcement officer would have responded.

38.  Upon responding to the 911 call, the officers were confronted with a situation that was dangerous, tense, uncertain, and rapidly evolving.    The officers were informed that Longoria entered the store with a hammer in his hand, that he was bleeding, that he entered an office without the consent of the Circle K's personnel, and the officers personally heard loud ransacking type noises coming from within the office.

39. The objective evidence indicates that Officers Rivera and Gutierrez used Command Presence and Verbal Directions in an attempt to get Longoria to open the door.   Longoria refused.   The objective evidence further indicates that when the handcuffing procedures were initiated, Longoria resisted by attempting to push off the floor in a "push up" type of manner and refused to allow the officers to handcuff him.   Officer Rivera reasonably perceived that Longoria was attempting to get up and escalate the situation and maybe even produce the hammer that the Circle K employees had reported as being in his possession.   Allowing Longoria to get up would have escalated the situation and if Longoria would have produced and/or reached for the hammer and/or some other object, the situation could have escalated to a Deadly Force type of situation.   Officer Rivera merely struck Longoria in the lower torso of the body pursuant to his law enforcement training.   The situation was de-escalated and controlled without the need of a greater level of force having to be utilized by the officers.

40.   Officer Rivera's use of force was objectively reasonable, legal, necessary, and justified pursuant to **Texas Penal Code, Subchapter E. Law Enforcement, §9.51. Arrest and Search** (previously quoted in paragraph 31.) The objective evidence indicates that Officer Rivera had a reasonable belief that the use of force was immediately necessary to effect Juan Longoria's arrest.   In my professional opinion, Officer Rivera used the minimum amount of reasonable force to effect Longoria's arrest.

41.  There is no objective evidence to indicate that Officer Gutierrez or Officer Jackson used impact type force on Longoria.  The evidence indicates that Officer Gutierrez assisted with the handcuffing of Longoria and that Officer Jackson merely assisted with placing Longoria in the patrol car.

42.  There is no objective evidence to indicate that Officers Rivera, Gutierrez, and/or Jackson placed what is commonly referred to as a "choke hold" and/or any other type of neck restraint.  There has not been any physical evidence produced and/or witness to indicate that a "choke hold" or a "Lateral Vascular Neck Restraint" (as commonly referred to in the law enforcement community) was placed on Juan Longoria in arresting him or transporting him.  It is important to note that autopsy report submitted by Doctor Lawrence J. Dahm states, "There is no identifiable evidence for facial trauma" thus contradicting the allegation of excessive force.

43. After careful analysis of the aforementioned arrest procedures that Officers Rivera, Gutierrez, and Jackson employed, it is my professional opinion, that there is nothing illegal, unreasonable, malicious, and/or unconstitutional related to the tactics and procedures used by the officers.  Any reasonable and well-trained law enforcement officer could have taken the same or similar actions when presented with the same or similar circumstances.  The arrest procedures utilized by the Brownsville Police Officers are evidence of their good faith and reasonableness of their actions.  They followed their law enforcement training as it pertains to the Texas Penal Code, Texas Code of Criminal Procedure, United States Constitution, and the Texas Commission on Law Enforcement Officer Standards and Education Training Curriculums.

### *Training*

44. The objective evidence indicates that Officers Rivera, Gutierrez, and Jackson were well-trained law enforcement officers on April 10, 2001.  The Brownsville Police Department Officers had been trained pursuant to the Texas Commission on Law Enforcement Officer Standards and Education.  The Texas Commission on Law Enforcement Officer Standards and Education establishes the state training standards for the state of Texas.   The Brownsville Police had met state training standards, which are legislatively mandated.  In my twenty-five (25) years of law enforcement experience there has never been an issue related to the Texas

13

Commission on Law Enforcement Officer Standards and Education state training standards as being unreasonable, illegal, and/or designed to violate individuals' constitutional rights. The evidence regarding Officers Rivera, Gutierrez, and Jackson law enforcement training is clear in that on April 10, 2002, Officer Rivera, Gutierrez, and Jackson were licensed Texas Peace Officers and had met the State Training Standards to include the legislatively required continuing education training.

### Brownsville Police Department/City of Brownsville

45. It is my professional opinion that there is no objective evidence that indicates that the Brownsville Police Department has a custom and/or practice of using excessive force. Furthermore, there is no objective evidence that the Brownsville Police Department has a custom or practice of violating citizens' constitutional rights. There is nothing that has been produced that is indicative of a pattern of using excessive force by the officers of the Brownsville Police Department. The only evidence presented in this case indicates that the officers of the Brownsville Police Department guide their actions by the United States Constitution, Texas Penal Code, Texas Code of Criminal Procedure, and the Texas Commission on Law enforcement Officer Standards and Educations Training Curriculums.

46. In my professional opinion there is no objective evidence that the Brownsville Police Department fails to properly train and/or supervise its officers. To the contrary, the evidence indicates that the officers of the Brownsville Police Department met the state training standards that are legislatively mandated through the Texas Commission on Law Enforcement Officer Standards and Education. Furthermore, the evidence indicates that Brownsville Police Deparment's supervisors were readily available when contacted and got involved in the decision-making aspects of this case. Brownsville Police Department Supervisors, Lieutenant Etheridge and Lieutenant Ramiro Ramirez, were both involved the handling of Juan Longoria. The evidence indicates that not only did they assist in handling the situation but also monitored the actions of the employees of the Brownsville Police Department.

### BROWNSVILLE POLICE DEPARTMENT'S DETENTION OFFICERS

47. It is my professional opinion that the Brownsville Police Department's Detention Officers' actions were discretionary, objectively reasonable, conducted in good faith, and within the course and scope of their authority. The objective evidence indicates that the Detention

14

Officers' actions were all designed to be protective of Juan Longoria. The Detention Officers' actions consisted of:

1. When Longoria arrived at the Brownsville Jail Facility the Detention Officers summoned the Emergency Medical Services to have Longoria's abrasion at the knee and swollen elbow evaluated.

2. The Detention Officers' asked Longoria if he desired to be transported by E.M.S. to the hospital; Longoria refused to be transported.

3. After being checked by E.M.S. the Detention Officers placed Longoria in a padded cell where he could be monitored and the cell provide protection against himself

4. Upon observing that Longoria was a danger to himself by running into the cell walls, striking his body and head against the wall they restrained Longoria with handcuffs and leg restraints

5. Upon observing that Longoria had slid up against the metal urinal grill and struck his head the Detention Officers placed a mattress around the back part of his body with three straps to keep him from injuring himself.

6. The Detention Officers contacted shift supervisor Lieutenant Ramiro Ramirez regarding Longoria's continued attempts to hurt himself and Lieutenant Ramirez ultimately ordered that Longoria be taken to the Brownsville Medical Center.

7. Upon Longoria returning from the Brownsville Medical Center, again the Detention Officers placed him in the padded cell for added protection against himself and where the detention officers could closely monitor him for his safety.

48. The aforementioned actions taken by the Detention Officers of the Brownsville Police Department are indicative of the reasonableness of their actions and their good faith efforts to keep Juan Longoria from injuring himself.

49. There is no objective evidence that has been produced and/or that indicates that the Detention Officers of the Brownsville Police Department punched, kicked, and/or beat Juan Longoria. Furthermore, there is no evidence to indicate that the Detention Officers of the Brownsville Police Department placed any type of neck restraint on Longoria.

50. In conclusion, there is no evidence of wrongdoing by the personnel employed by the City of Brownsville. The evidence clearly indicates that the employees of the Brownsville

15

Police Department guided their actions by the United States Constitution, the Texas Penal Code, the Texas Code of Criminal Procedure, and the Texas Commission on Law Enforcement Officer Standards and Education Training Curriculums.

51. It is of major significance to note that Juan Longoria died while in the custody of the Cameron County Sheriff's Department over twelve (12) hours after Brownsville Police Department had turned Longoria over to the Cameron County Sheriff's Department. Furthermore, it is noteworthy that prior to the Brownsville Police Department turning Longoria over to the Cameron County Sheriff's Department, Longoria was examined by Brownsville E.M.S., a doctor at Brownsville Medical Center, Jose Schroeder, a mental screener, of the Texas Tropical, and upon being released to the Cameron County Sheriff's Department Longoria was checked again.  There is no evidence that Juan Longoria was injured in any manner during his arrest or while in custody of the Brownsville Police Department.

"I have personal knowledge of the facts stated herein, and all stated facts are true and correct."

FURTHER AFFIANT SAYETH NOT

_____
ALBERT RODRIGUEZ

SUBSCRIBED TO BEFORE ME, THE UNDERSIGNED AUTHORITY ON THIS THE 29th OF OCTOBER, 2002.

_____ NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

COMMISSION EXPIRES: 1-24-05



CHRIS R. ROBERTSON
MY COMMISSION EXPIRES
January 24, 2005