**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

MAR 1 5 2004

Michael N. Milby
Clerk of Court

MARIA LONGORIA, and MARIA IDALIA:    :
GUTIERREZ, Individually and on behalf    :
of the Estate of JUAN LONGORIA,    :
Deceased    :
   :
   :
VS.    :     CIVIL ACTION NO. B-01-062
   :     **(JURY DEMANDED)**
   :
CAMERON COUNTY, TEXAS, THE    :
CITY OF BROWNSVILLE, TEXAS    :
XAVIER LEE HERNANDEZ, and    :
JOHN DOES 1-10    :

---

**DEFENDANT CAMERON COUNTY, TEXAS'
MOTION FOR SUMMARY JUDGMENT PURSUANT
TO RULE 56, FEDERAL RULES OF CIVIL PROCEDURE**

---

**CRAIG H. VITTITOE**
Federal Bar I.D. No. 18756
State Bar No. 20593900
**ROGER W. HUGHES**
Federal Bar I.D. No. 5950
State Bar No. 10229500
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
222 East Van Buren, West Tower
Harlingen, Texas 78551-1429
956-428-7495
956-428-2954 (Fax)

ATTORNEYS FOR DEFENDANT,
CAMERON COUNTY, TEXAS

TABLE OF CONTENTS

Page:

I. THE NATURE AND STAGE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ISSUES TO BE RESOLVED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. SUMMARY JUDGMENT EVIDENCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Plaintiffs' Alleged Claims Against Cameron County . . . . . . . . . . . . . . . . 4

    B.    Arrest and Incarceration by the City of Brownsville . . . . . . . . . . . . . . . . . 4

    C.    Incarceration at Cameron County Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    Autopsy Confirms Death Caused by Alcohol Related Disease . . . . . . . . . . 8

V. SUMMARY OF THE ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VI. ARGUMENTS AND AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Summary Judgment Standard of Review and Procedure  . . . . . . . . . . . . . 10

    B.    Summary Judgment Evidence Shows that Defendant Cameron County,
          Texas, Not Liable under 42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.    No evidence a Constitutional violation was caused by a *policy*
                adopted with deliberate indifference. . . . . . . . . . . . . . . . . . . . . . . . 12

          2.    No evidence a Constitutional violation was caused by a *custom*
                ratified with deliberate indifference.  . . . . . . . . . . . . . . . . . . . . . . . 14

          3.    No Evidence any policy or custom was *adopted* or *ratified* by a
                County policymaker.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4.    No Evidence a CCSD jailer knew of any risk of harm if
      Longoria did not receive medical attention or was
      deliberately indifferent to that risk. ....................... 17

5.    Defendant, Cameron County, Texas entitled to summary
      judgment as to excessive force claims ..................... 20

C.    Defendant, Cameron County, Texas Entitled to Summary
      Judgment on State Law Negligence Claim ........................ 20

D.    Federal and State Law Do No Permit Recovery of Punitive Damages ... 23

VII.  CONCLUSION ................................................... 23

TABLE OF AUTHORITIES

Page:

Cites:

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) .............................. 19

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................... 20

*Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996) .................................. 12

*Bell v. Wolfish*, 441 U.S. 520 (1979) ......................................... 17

*Benavides v. County of Wilson*, 955 F.2d 968 (5th Cir. 1992) .................... 19

*Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir. 1984) (en banc), *cert. denied*,
      472 U.S. 1016 (1985) .................................................. 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................. 11

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) and
      *Benavides v. County of Wilson*, 955 972 (5th Cir. 1992) ................... 12

*City of Newport v. Fact Concerts, Inc.*,
      453 U.S. 247 (1981) ................................................... 23

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .......................... 14

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .......................... 16

*Colle v. Brazos County*, 981 F.2d 237 (5th Cir. 2003) .......................... 16

*Conner v. Travis County*, 209 F.3d 794 (5th Cir. 2000) .................. 13, 15, 18

*Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273
      (5th Cir. 2002) ...................................................... 13-15

*Cupit v. Jones*, 835 F2d 82 (5th Cir. 1987) .................................... 17

*Dallas County Mental Health and Retardation v. Bossley*,
      968 SW2d 339 (Tex. 1998) ............................................ 21, 22

iv

*Daniels v. Williams,* 474 U.S. 327 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Farmer v. Brennan,* 511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Fickes v. Jefferson County,* 900 F.Supp. 84
   (E.D.Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Flores v. Cameron County,* 92 F3d 258 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gabriel v. City of Plano,* 202 F.3d 741 (5th Cir. 2000),
   *en banc reh. denied,* 211 F.3d 127 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hare v. City of Corinth, MS,* 74 F.3d 633 (5th Cir. 1996) . . . . . . . . . . . . . . . 13, 17-19

*Harris Co. v. Dillard,* 883 SW2d 166 (Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Herrera v. Valentine,* 653 F.2d 1220 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hill v. Bowles,* 1999 WL 7838 (N.D.Tex. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*International Ass'n of Machinists and Aerospace Workers No. 2504 v.
   International Mfg. Co.,* 812 F.2d 219 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 11

*Jones v. Diamond,* 636 F2d 1364 (5th Cir. 1981) (enbanc),
   *overruled on other grds.,* 790 F2d 1174 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kassen v. Hartley,* 887 SW2d 4 (Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Languirand v. Hayden,* 717 F.2d 220 (5th Cir. 1983), *cert. denied,*
   467 U.S. 1215 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Marroquin v. Life Management Center,* 927 SW2d 228
   (Tex. App.–El Paso 1996, writ dism'd w.o.v.) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Monell v. Department of Social Services,* 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . 12

*Piotrowski v. City of Houston,* 237 F.3d 567
   (5th Cir. 2001), *cert. denied,* 534 U.S. 820 (2002) . . . . . . . . . . . . . . 12, 13, 15, 16

*Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Reimer v. Smith*, 663 F.2d 1316 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Rodriguez v. Avita*, 871 F.2d 552 (5th Cir. 1989), *cert. denied*
    493 U.S. 854, 110 S.Ct. 156 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*S.S. v. McMullin*, 225 F.3d 960 (8th Cir. 2000)(en banc),
    *cert. denied*, 532 U.S. 904 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Slaughter v. Allstate Ins. Co.*, 803 F.2d 857 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 11

*Snyder v. Trepagnier*, 142 F.3d 791 (5th Cir. 1998),
    *cert. dism'd by agreement*, 526 U.S. 1083 (1999) . . . . . . . . . . . . . . . . . . . . . 12, 13

*Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 11

*Sutton v. Utah State School for Deaf and Blind*,
    173 F.3d 1226 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Texas Dept. of Public Safety v. Petta*,
    44 S.W.3d 575 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Turner v. Upton County*, 915 F.2d 133 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Univ. of Tex. Med. Branch v. York*,
    871 S.W.2d 175 (Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williams v. Kaufman County*, 352 F.3d 994
    (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Texas Civil Practice & Remedies Code:

Ch. 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

§ 101.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

§101.024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Federal Rules of Civil Procedure:

Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Federal Rules of Evidence:

Rule 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Rule 702(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rule 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Federal Statutes:

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Defendant **CAMERON COUNTY, TEXAS** and files its Motion for Summary Judgment , respectfully showing as follows:

## I. THE NATURE AND STAGE OF THE CASE

Plaintiffs sued Brownsville and Cameron County for Juan Longoria's death, alleging claims under (1) 42 U.S.C. §1983 for violations of the Fourth, Eighth, and Fourteen Amendments, and (2) state law tort claims under the Texas Tort Claims Act, Texas Civil Practice and Remedies Code chapter 101. Plaintiffs Third Amended "Complaint," Dkt # 54.

Discovery has closed. Dkt # 69. The pretrial order is due May 19, 2004 and a pretrial conference is set for June 3, 2004. Dkt # 69. The Plaintiffs settled with the City of Brownsville for Fifteen Thousand Dollars ($15,000.00). Dkt. # 71. Cameron County moves for summary judgement that Plaintiffs take nothing on all or any of their claims.

## II. ISSUES TO BE RESOLVED

Cameron County is entitled to summary judgment. There are no material fact questions on the material issues and it is entitled to a judgment that Plaintiffs take nothing on the federal and/or state law claims. The grounds/issues for summary judgment are:

1.    There is no evidence that a final policymaker for Cameron County adopted a policy with deliberate indifference to the risk of injury to a person in the place of Juan Longoria.

2.    There is no evidence that a final policymaker for Cameron County tolerated any custom or practice of subordinates with deliberate indifference to the risk of injury to

1

a person in the place of Juan Longoria.

3.    There is no evidence that Juan Longoria's death was the result of or caused by any policy or custom of Cameron County.

4.    There is no evidence that Cameron County employees or agents were deliberately indifferent to the medical needs or condition of Juan Longoria or acted with deliberate indifference towards him.

5.    There is no evidence that Cameron County employees or agents engaged in conscience shocking behavior.

6.    There is no evidence that Juan Longoria was choked or beat in the Cameron County Jail because the sole support for such allegation is incompetent, unreliable expert opinion that has been withdrawn by the expert witness who tentatively gave such opinion.

7.    There is no waiver of state law governmental/sovereign immunity regarding the state law tort claims because there is no evidence that Juan Longoria's death resulted from a use or condition of tangible property by County employees.

8.    Cameron County is not liable for punitive damages under federal or state law.

### III. SUMMARY JUDGMENT EVIDENCE

The Summary Judgment Evidence in support of this motion is as follows:

1.    Statement of Brownsville Police Officer Falcon Rivera, Jr.
2.    Statement of Brownsville Police Officer Mark Cheramie
3.    Tropical Texas Center for Mental Health and Mental Retardation Records
4.    Medical Release
5.    Commitment Order

6.    Sylvia Rivas Nursing Notes
7.    Deposition of Armando Trevino, Cameron County Detention Officers
8.    Statements from Cameron County Detention (Jailers) Officers
   A    Francisco Lerma, Jr.
   B    Felipe Silva
   C    Armando Tenorio
   D    Xavier Lee Hernandez
   E    Julian Garza
   F    Manuel Cortinas, Jr.
   G    Jerry Sanchez
   H    Jorge Ibarra
   I    Sylvia Ann Santillana
   J    Hugo Galicia
   K    Randy Dierlam
   L    Luis Alberto Mendieta
   M    Hector  Galicia
9.    Cameron County Sheriff's Department Jail Division Operation Plan
10.   The Health Services of the Cameron County Jail Protocols
11.   Felipe Esquivel Nurse statement
12.   Deposition of Larry Dahm, M.D., Pathologist
13.   Dahm Preliminary Findings
14.   Dahm Final Autopsy Report
15.   Harvey Resnick, M.D. - Plaintiff's Medical expert
16.   Robert Bux, M.D. - Movant's Forensic Pathology expert

## IV.  FACTUAL BACKGROUND

Juan Longoria's unfortunate death resulted from the natural progression of an alcohol related disease, i.e. *delirium tremons* ("DT's") caused by endstage cirrhosis of the liver. There was no beating or choking. At its heart, Plaintiffs' claim against Cameron County is that Mr. Longoria's condition went undetected and untreated during the 14 hours he was incarcerated in the county jail.

Such did not occur due to any lack of training or from any policy. Cameron County had sound policies in place. Exh. 9, 10. The problem was that Longoria's disease was not

3

obvious.  Longoria was arrested by the Brownsville Police Department ("BPD") for the

burglary of a Circle K store on April 10, 2001.  BPD took him to  Brownsville Medical

Center ("BMC") for medical evaluation.  After health care personnel diagnosed him as

malingering, he was returned to jail.  The next morning Longoria was arraigned and ordered

to be transferred to Cameron County jail where he died that evening. The jail staff cannot be

faulted for failing to appreciate his condition after third party health professionals found him

malingering and a judge ordered incarceration.

## A.    Plaintiffs' Alleged Claims Against Cameron County

Plaintiffs allege that Cameron County is liable because Cameron County Sheriff's

Department ("CCSD") officers either (1)"choked" Longoria, or (2) provided "negligent care

and medical attention." Complaint, ¶ 4.3; Dkt # 54. Plaintiffs allege that inadequate training

and supervision of its employees was "so deficient" that it amounted to negligence and

conscious and deliberate indifference.  Complaint, ¶¶ 5.19, 5.20; Dkt # 54.

## B.    Arrest and Incarceration by the City of Brownsville

On April 10, 2001, Juan Antonio Longoria entered a Brownsville, Texas,  Circle K

convenience store. Exh. 1, p. 1.  He was bleeding as he entered and carried a bloody

hammer. Exh. 1, p. 1. Longoria then walked into the manager's office without permission.

Exh. 1, p. 1.

Longoria then began ransacking the office. Exh. 1, p. 1. Store employees called the

Brownsville Police Department. Exh. 1, p. 1. Longoria barricaded himself inside the Circle

K store office. Exh. 1, p. 2. BPD officers attempted to open the door but Longoria used his

4

body to block the doorway. Exh. 1, p. 2. When the BPD Officers finally seized him, he resisted arrest and had to be carried to the police car. Exh. 1, p. 3-4. The officers transported him to the Brownsville Municipal jail. Exh. 1, p. 4. On the way, Longoria claimed people were trying to kill him. Exh. 1, p. 4.

Longoria initially refused to be taken to the hospital. Exh. 1, p. 5; Exh. 2, p. 1. BPD jailers placed Longoria in a cell. Exh. 2, p. 1. In conducting a cell check, the jailers were unable to enter the padded cell as Longoria held the door shut. Exh. 2, p. 1. After they were able to enter, Longoria hid behind the door and appeared to be scared and nervous. Exh. 2, p. 1, 2. Longoria was trembling and seeing things. Exh. 2, p. 2. Subsequently, municipal jailers contacted their patrol shift supervisor who advised that they should take Longoria to the hospital. Exh. 1, p. 6. Before leaving the Municipal jail for Brownsville Medical Center, Longoria told the jailers that men were after him and wanted to kill him. Exh. 1, p. 6.

Longoria was transported to Brownsville Medical Center and while at the emergency room, Longoria stated that men were chasing him and trying to kill him. Exh. 2, pp. 5, 7. Longoria was treated for an injured knee, his elbow x-rayed. Exh. 1, p. 7; Exh. 2, p. 7. He was also evaluated at the hospital emergency room by an employee of Tropical Texas for MHMR who determined that Longoria did not need to be committed because he was "malingering". Exh. 3, pp. 7-10. Longoria was medically cleared and released by the emergency room physician. Exh. 3. He was returned back to the BPD jail and secured in a padded cell. Exh. 1, p. 7; Exh. 2, p. 2.

The next day, the morning of April 11, 2001, after formal judicial arraignment, the

5

Brownsville Police Department turned custody of Longoria over to the Cameron County Jail pursuant to a commitment order. Exh. 5.

## C.    Incarceration at Cameron County Jail

That day, between 10:00 and 10:30 a.m., BPD delivered Longoria to the CCSD jail. At intake, BPD officer Salinas described Longoria to CCSD jail personnel as a "mentally ill" subject. Exh. 8A. The commitment order and the medical release from Brownsville Medical Center was provided. Exhs. 4, 5, 8A, 8B pp. 1-2.

As part of booking and classification procedure, Cameron County jail personnel observed that Longoria had minor bruises. Exhs. 8A, 8B p. 1-2, 10. A Cameron County Health Department nurse, Sylvia Rivas, examined Longoria and did not observed anything remarkable. Exh. 6, 8B p. 2, 10. CCSD Jail booking and classifications procedures were never completed regarding Longoria.

At times Longoria acted bizarre, for example, claiming that he had been shot and that the news the night before had reported it. Exh. 8A. Longoria was initially placed in a large holding cell and within an hour was moved to a nearby single (padded) cell for his protection. Exh. 8B p. 2. Before being moved, Longoria complained of the other inmates in the large holding cell; likewise, the other inmates complained of Longoria. Exhs. 8A, 8B p. 2, 8C, 8D.

The *written* jail policy requires periodic monitoring of inmates that placed in the single cell. Exh. 9, p. 25. It provides:

6

"CAMERON COUNTY SHERIFF'S DEPARTMENT JAIL OPERATION PLAN

HOUSING
"An inmate exhibiting suicidal behavior will be placed in general population, if possible. Suicidal inmates requiring separation, or inmates with mental difficulties displaying violent or irrational behavior, [emphasis added], will be housed in a single cell where he/she can be easily monitored by a correctional officer. . ."

SUPERVISION
"All suicidal, mentally disabled (emphasis added) inmates who are considered low risk will be checked at thirty (30) minute intervals. Moderate risk inmates will be checked at fifteen (15) minute intervals. And high risk inmates will receive continuous, or at least five (5) minute observation. . ." Exh. 9, p. 25.

Monitoring is undertaken by both the jail detention officers and jail medical (nursing) personnel.

The single (padded) cell is located in a high traffic area of the jail. Jail detention personnel repeatedly passed by the cell. Exhs. 8A-8M. The single cell has a glass window that allows jail detention personnel to view inside. Exh. 7, pp. 20-22. Longoria was observed on several occasions by jail detention personnel - - through the shifts. Exhs. 8A, 8B p. 2, 8C, 8D, 8E, 8F, 8G, 8I. Longoria continued to exhibit differing behavior, including yelling and tapping on the walls; at other times Longoria was quiet and either standing, sitting or laying down with the single cell. Exh. 8A, 8B(p. 2), 8C, 8D, 8E, 8F, 8G.

At about 11:30 p.m. on April 11, 2001, (about 14 hours after Longoria arrived at the CCSD jail) detention officers noticed that Longoria was not moving within the single cell. Exh. 8J. Upon entering and briefly examining Longoria, detention officers suspected that Longoria was "faking as being asleep". Exhs. 8H, 8J, 8K, 8L. The officers exited and locked

7

the cell and back-up officers were notified.  Upon re-entry and further inspection of Longoria, detention officers decided to call a jail nurse and the EMS. Exhs. 8H, 8L. Before arrival of EMS, Felipe Esquivel, a jail medical staff nurse, examined Longoria and determined that "the prisoner had no pulse and respiration". Exhs. 8L, 11. Detention Sgt. Medieta informed Esquivel that the prisoner had been placed in the single (padded) cell soon after arrival at the jail because Longoria was "violent and aggressive". Exhs. 8L, 11. Esquivel was also informed that a monitoring log had not been maintained and that the medical nursing staff had not been notified after Longoria was placed in the single cell. Exh. 11.

### D.   Autopsy Confirms Death Caused by Alcohol Related Disease

During a recent deposition, Plaintiffs stipulated three (3) times that Longoria did not die from a chokehold.  Exh. 12 pp. 103(l. 7-13), 104 (l.6-10), 128 (l. 10-11)-129(l. 1).  The reason they have recanted this claim is now clear.

Initially there was some confusion about the cause of Longoria's death.  In a *preliminary* autopsy report, pathologist Larry Dahm, M.D. [without the benefit of autopsy test data, slides and radiograph films] suspected that Longoria may have died from a chokehold. Exh. 12 pp. 123-125. ; Exh. 13.

Dr. Dahm subsequently ruled out strangulation based upon the test data information, slides and films. Exh. 12, pp. 102 (l. 8) - 103(l. 18); Exh. 14.  In his final autopsy report, Dr. Dahm opined that Longoria died from complications of the DT's and cirrhosis of the liver,

8

an endstage liver disease[1]. Exh. 12, pp. 73 (l. 5)-75(l. 20); Exh. 14. He conclusively ruled

out choking or strangulation as a cause of death because he did not find several physical

conditions that occur during choking. Exh. 12, pp. 124(l. 3)-129(l. 10). Neck tissues and the

hyoid bone were probably traumatized by the EMS personnel when they intubated Longoria

after he was found. Exh. 12, pp. 105(l. 1-10), 109(l. 3-19).

During the pendency of this suit, the Plaintiffs and Cameron County, separately

retained medical consultants to review the Longoria autopsy evidence. All medical experts

agree that Longoria died of natural causes relating to a long history of alcohol abuse. The

Plaintiffs' expert, Dr. Harvey Resnick, a family practioner, opined that Longoria died of

DT's and/or liver disease. Exh. 15. Robert Bux, M.D., a forensic pathologist retained by

Movant, opines that Longoria died of a stroke precipitated by the DTs associated with

alcohol abuse and cirrhosis. Exh. 16. Thus, the competent medical evidence determined

Longoria's death due to natural causes; and, in doing so ruled out a 'choke hold' death.

## V. SUMMARY OF THE ARGUMENT

In order to hold the County liable for under section 1983, Plaintiffs first must prove

that a County policymaker adopted a policy or ratified a custom with deliberate indifference

to the likelihood that a Constitutional violation would occur and that this policy or custom

caused Juan Longoria's death. There is no evidence that there was any policy or custom of

indifference to needs for medical attention or training/instruction of jail personnel. There is

---

[1] The cirrhosis was so advanced that Longoria had less than a week to live. Exh. 12, pp. 98 (l. 9-19), 110 (l. 6-22).

9

no evidence that a final policymaker for jail procedures (e.g., either the Cameron County or the Sheriff personally) knew of or approved any such policy or custom or of any need for training/instruction. There is no evidence of deliberate indifference.

Next, Plaintiffs must prove a violation of the Due Process Clause, i.e., that jail personnel knew Juan Longoria was in serious need of medical attention but responded with deliberate indifference. Of these facts, there is no evidence the jailers knew of any serious risk of medical harm; they were not deliberately indifferent to the situation as it presented itself.

With respect to the state law claims, Plaintiffs have failed to allege or prove any grounds to waive the County's governmental immunity against torts under state law. They must prove that the death was caused by the use or condition of tangible real or personal property by County employees. The jail cell itself was not a cause his death. Claims of lack of action, failure to train, failure to document, etc., are not a "use or condition" of property as a matter of law.

Finally, state and federal law do not permit recovery of punitive/exemplary damages against a county.

## VI. ARGUMENTS AND AUTHORITIES

### A.    Summary Judgment Standard of Review and Procedure

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). By its very terms, the rule

10

permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, Cameron County, Texas is entitled to summary judgment when the Plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the Plaintiff's case, and on which [the Plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

for that party. . .  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

**B.    Summary Judgment Evidence Shows that Defendant Cameron County, Texas, Not Liable under 42 U.S.C. § 1983.**

1.    No evidence a Constitutional violation was caused by a *policy* adopted with deliberate indifference.

Governmental liability does not arise vicariously through the acts of its employees. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  Plaintiff must show that a policy adopted by the governmental unit's policymaker with deliberate indifference to the likelihood of a constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578-80 (5th Cir. 2001), *cert. denied*, 534 U.S. 820 (2002).  In order to hold a governmental entity liable under § 1983 for a policy of training,  a Plaintiff must show:

(1)    the training procedures of the municipality's policymaker were inadequate;

(2)    the policymaker was deliberately indifferent in adopting the training policy; and

(3)    the inadequate training policy directly caused the Plaintiff's injury.

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) *citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 385-86 (1989) and *Benavides v. County of Wilson*, 955 972 (5th Cir. 1992).

Ordinary or heightened negligence will not meet the test of deliberate indifference. *Snyder v. Trepagnier*, 142 F.3d 791, 797-98 (5th Cir. 1998), *cert. dism'd by agreement*, 526 U.S. 1083 (1999).  The official must be aware of the facts in which an inference could be drawn that a substantial risk of harm exists and must actually draw the inference.  *Farmer*

*v. Brennan*, 511 U.S. 825, 837 (1994).  Deliberate indifference amounts to "subjective intent to cause harm."  *Hare v. City of Corinth, MS*, 74 F.3d 633, 649 (5th Cir. 1996)(en banc).

There is no claim that any alleged policy was facially unconstitutional.  Therefore, Plaintiffs must show that an otherwise neutral policy was adopted with deliberate indifference to the certainty that a constitutional deprivation will result.  *Piotrowski*, 237 F.3d at 579-81; *Snyder*, 142 F.3d at 795-96.  The policy's existence and deliberate indifference are two different issues; there is no liability if the policy was adopted or ratified without deliberate indifference.  *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 286-88 (5th Cir. 2002).

A claimant proves deliberate indifference by showing either (1) the County consciously chose to not train officers after being on notice that its current regimen had failed to prevent misconduct and injuries; or (2) a single incident with proof of the possibility of recurring situations that presents an obvious potential for violations of constitutional rights and the need for training.  *Conner v. Travis County*, 209 F.3d 794, 797 (5th Cir. 2000); *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000), *en banc reh. denied*, 211 F.3d 127 (5th Cir. 2000).  The Fifth Circuit has generally rejected proof of a single incident as a sufficient basis to hold a governmental unit liable.  *Cozzo*, 279 F.3d at 288; *Snyder*, 142 F.3d at 798-99.

CCSD's express policies are more than adequate.  Exhs. 9, 10.  Plaintiffs cannot claim that anyone could believe that following them would lead to probable injury, much less a constitutional violation. Prisoners showing violent or bizarre behavior are housed separately

and kept under observation. Exh. 9, p. 25. They are to be examined by the medical personnel. Exh. 9, pp. 19-20, 25. In short, there is nothing to show that complying with the express policies would cause injuries, much less in this particular case. There is no evidence that any express policy would foreseeably cause a constitutional deprivation or that the policy was adopted with deliberate indifference to such a risk.

While Plaintiffs make vague allegations of inadequate training, they offer no proof of and in what respect the training of the on-duty officers was deficient. There is no evidence that there had been prior incidents to inform of any need of more training, much less that the failure to implement more training would be deliberate indifference.

2.    No evidence a Constitutional violation was caused by a *custom* ratified with deliberate indifference.

Plaintiffs also allege that a policy, custom or practice of Defendant, Cameron County, Texas, caused the constitutional deprivation of which they complain. In such cases, "considerably more proof than [a] single incident will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (emphasis added). Plaintiff must prove a "pattern of similar incidents" that is "general or widespread" that it fairly represents the unit's policy. *Cozzo*, 279 F.3d at 289; *Languirand v. Hayden*, 717 F.2d 220, 227-28 (5th Cir. 1983), *cert. denied*, 467 U.S. 1215 (1984). Such a pattern is evident if there are "numerous prior incidents" showing a "systematic" violation of constitutional rights. *Herrera v. Valentine*, 653 F.2d 1220 (8th Cir. 1981); *see also Bennett*

14

*v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc), *cert. denied*, 472 U.S. 1016

(1985)(*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 n. 39 (1970)).   It must be

shown that the governmental unit's policymaker (1) knew or had constructive knowledge of

the practice and (2) tolerated with deliberate indifference. *Piotrowski*, 237 F.3d at 579-81.

It must be shown that the systematic and widespread pattern of numerous prior

incidents must have <u>affirmatively</u> caused the complained of constitutional injury. *Reimer v.

Smith*, 663 F.2d 1316 (5th Cir. 1981).   Liability under § 1983 cannot be derived from a single

improvement incident, but only where it is shown that the injury alleged was <u>actually caused</u>

by a custom, or practice evidenced by numerous similar incidents showing a pattern of

conduct. *Rodriguez v. Avita*, 871 F.2d 552 (5th Cir. 1989), *cert. denied*, 493 U.S. 854 (1989)

(upholding Judge Filemon Vela's dismissal under Rule 12(b)(6) of § 1983 claim against City

of Brownsville); *see also Languirand*, 717 F.2d at 220.

The fact that there are no other instances of harm undercuts the deliberate indifference

claim. *Cozzo*, 279 F.3d *at 288*; *Conner*, 209 F.3d at 797.

Plaintiffs' allegations of a custom, or practice are conclusory and are not supported

by competent summary judgment evidence.   Specifically, Plaintiffs have no evidence

showing either prior incidents or of any widespread disregard of the express CCSD policies.

Plaintiffs' unsubstantiated allegations cannot create a genuine issue of fact material to their

claims. Cameron County is therefore entitled to judgment as a matter of law.

      3.      No Evidence any policy or custom was *adopted* or *ratified* by a County
              <u>policymaker.</u>

The County is not liable unless a "policymaker" for the County either (1) made or

adopted a policy responsible for the injury, or (2) knew of a custom and ratified it. *Piotrowski*, 237 F.3d at 578-79. A "policymaker" is the person for that governmental unit that has final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). State law determines this issue. *Flores v. Cameron County*, 92 F3d 258, 263 (5th Cir. 1996).

Ordinarily, the Commissioners Court is the final policymaker for a Texas county. *Flores*, 92 F3d at 264. In the area of county law-enforcement and pre-trial detention within a county jail in Texas, the Fifth Circuit has found in same cases the Sheriff may be a final policymaker for the County. *Williams v. Kaufman County,* 352 F.3d 994, 1013-14 (5th Cir. 2003); *Colle v. Brazos County,* 981 F.2d 237, 245-46 (5th Cir. 2003); *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990). Assuming *arguendo* such is true for Cameron County, Cameron County is not liable unless Plaintiffs prove a policy or custom at fault that is attributable to the Cameron County Commissioner's Court or to the Sheriff personally (i.e., Sheriff Conrado Cantu). *Fickes v. Jefferson County,* 900 F.Supp. 84, 90 (E.D.Tex. 1995); *Hill v. Bowles,* 1999 WL 7838, *7 (N.D.Tex. 1999)[unpublished].

As argued above, the CCSD written policies are adequate and reasonable; they did not cause Longoria's death. There is no evidence the Cameron County Commissioner's Court or that Sheriff Cantu adopted any other express policy that would deny detainees medical care or attention. At their worst, Plaintiffs' claims insinuate a failure to follow the express CCSD policies. However, there is no evidence of widespread failure to follow express CCSD policies, much less of any "custom" or "practice" to disregard them. There

16

is no evidence that any such failure was known by and approved by either the Cameron County Commissioner's Court or Sheriff Cantu before Longoria's death.

    4.    No Evidence a CCSD jailer knew of any risk of harm if Longoria did not receive medical attention or was deliberately indifferent to that risk.

Plaintiffs claim their pleadings allegations state Fourth, Eighth, and Fourteenth Amendment violations. Complaint, ¶ 5.22; Dkt # 54. Their claims sound only under Fourteenth Amendment Due Process.

Longoria was a pretrial detainee, not a convict. The Eighth Amendment applies only to convicted prisoners. *Bell v. Wolfish,* 441 U.S. 520, 523 (1979). "We highlight the distinction between pretrial detainees and convicted prisoners because the due process clause of the Fourteenth Amendment accords pretrial detainees rights not enjoined by convicted inmates under the Eighth Amendment protection against cruel and unusual punishment." *Cupit v. Jones,* 835 F2d 82, 84 (5th Cir. 1987) *citing Jones v. Diamond,* 636 F2d 1364, 1368 (5th Cir. 1981) (enbanc), *overruled on other grds.,* 790 F2d 1174 (1986). The constitutional rights of pre-trial detainees flow from procedural and substantive due process. *Hare,* 74 F.3d at 639. Thus, the Due Process Clause controls both the failure to protect and the denial of medical care claims by pre-trial detainees.[2] *Id.* at 643. When the claim is based on an official's episodic act or omission, then plaintiff must prove that the official acted with deliberate indifference. *Id.* at 647-48. This is a subjective standard, one more stringent than gross negligence. *Id.* at 648-50. The jail official must have subjective knowledge of a

---

[2] For that reason there is no Fourth Amendment claim. Longoria had already been arrested and a state magistrate had ordered his incarceration.

substantial risk of serious medical harm but responded with deliberate indifference to that risk. *Id.* at 650; *Wagner v. Bay City,* 227 F.3d 316, 324 (5th Cir. 2000).

There is no evidence that jail detention officers were subjectively aware that Longoria had the DT's or liver disease or that he needed medical attention for it; they certainly did not act with deliberate indifference to whatever they did know. First, none of them knew of his medical condition. An ER doctor and an MHMR official had cleared Longoria to return to jail, indeed diagnosed him as *malingering*. Exh. 3, pp. "bates" 07, 08. A nurse examined him and did not see signs of DT; her notes show that he was alert and answered questions rationally. Exh. 6. Second, his behavior did not unequivocally demonstrate a need for medical attention; though differing, his actions suggested either he was malingering or had disordered thinking, not that he had a serious physical ailment. They were not advised he had a history of alcoholism, so there would be no reason to suspect either cirrhosis or the DT's for that matter.

Third, their response was not deliberately indifferent. He received a medical evaluation upon arrival. Exh. 6. When Longoria complained (or other inmates complained), he was segregated. He was put in a padded cell in an area where the officers would likely observe him frequently. The officers did look in on him. Exh. 8A-M. When he was observed lying still on the floor, the officers reasonably thought he could be either resting or faking and proceeded cautiously. Their behavior was understandable.

*See e.g., Conner,* 209 F.3d at 297-99 (no evidence that county jailers were deliberately indifferent to inmate who died of stroke, despite fact they knew he suffered a stroke one

18

month earlier and he requested medication when his symptoms appeared; jailers thought he was drunk or faking); *Benavides v. County of Wilson,* 955 F.2d 968, 972-74 (5th Cir. 1992)(arrestee for public intoxication suffered spinal fracture while banging his head and lay on floor for 18 hours before jailers summoned medical assistance because they thought he was drunk or faking it; held, no evidence of deliberate indifference in training or instruction).

Cameron County urges that any Due Process claim alleged here falls under Substantive Due Process rather than Procedural Due Process. In *Hare,* the Fifth Circuit did not specifically say whether the duty falls under substantive versus procedural due process, but several times it said the right flows from the "rights to basic needs such as medical care and safety" because of the State's affirmative action to deprive the detainee of his ability to care for himself. *Hare,* 74 F.3d at 639, 643, 647. Therefore, it would appear that for this case, the right sounds under Substantive Due Process.

A Substantive Due Process claim has a threshold requirement that the acts must shock the conscience. *Lewis,* 523 U.S. at 849; *S.S. v. McMullin,* 225 F.3d 960, 964 (8th Cir. 2000)(en banc), *cert. denied,* 532 U.S. 904 (2001). *Sutton v. Utah State School for Deaf and Blind,* 173 F.3d 1226, 1238 (10th Cir. 1999); *see also Lefall,* 28 F.3d at 531 (predicting that "shock the conscience" standard would apply to any "state created danger" exception to *DeShaney*). This standard requires conduct that is an abuse of governmental power or is so brutal and offensive that it cannot comport with traditional ideas of fair play and decency. *Lewis,* 523 U.S. at 846, 847. Deliberate indifference may shock the conscience depending on the level of indifference and opportunity for calm deliberation prior to action. *Id.* at 850.

However, negligence is not enough. *Daniels v. Williams*, 474 U.S. 327, 332 (1986); *S.S.,* 225 F.3d at 964. Gross negligence and recklessness do not meet even the test for "shock the conscience." *S.S.,* 225 F.3d at 964.

     5.    Defendant, Cameron County, Texas entitled to summary judgment as to <u>excessive force claims</u>

Plaintiffs claim that the City of Brownsville's police officers and/or Cameron County jail employees used excessive force by beating and "choking" Longoria to death. These claims are without merit and contrary to competent summary judgment evidence.

There is no other competent evidence that Longoria was struck, beaten or choked <u>by</u> <u>anyone</u> during or after his arrest and incarceration at the Cameron County Jail. Plaintiffs have stipulated to this fact; even had they not agreed, the sole evidence supporting this outrageous claim is the incompetent initial speculation of Dr. Dahm in his preliminary report, which he now concedes is wrong.

Expert opinion must be reliable, i.e., be based upon competent evidence. FED. R. EVID. 702, 703. It must be based on sufficient facts and data. FED. R. EVID. 702(1). The facts and data must be the type upon which experts in the field reasonably rely. FED. R. EVID. 703. Because the tentative conclusion "choking" was not based on sufficient data and now is deemed flat wrong by the person who gave it, it is inadmissible and not competent evidence.

**C.    Defendant, Cameron County, Texas Entitled to Summary Judgment on State Law Negligence Claim**

Plaintiffs make general "negligence" claims against Cameron County, Texas. Unless

Plaintiffs can show the application of the limited waiver of immunity set forth in the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN. ch. 101 (Vernon 1997), Cameron County, Texas is entitled to sovereign immunity. *Dallas County Mental Health and Retardation v. Bossley,* 968 SW2d 339, 341 (Tex. 1998). Specifically, Plaintiffs must show that Juan Longoria's death was caused by either (1) a Cameron County's employee's negligent use of a motor driven piece of equipment, or (2) a use or condition tangible personal or real property that would make the County liable were it a private person. TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon Supp. 1997).

The Complaint does not allege that Longoria was injured and died as a consequence of a motor driven piece of equipment, i.e., a motor vehicle accident. Nowhere do the Plaintiffs allege specifically that a defective attribute of the jail cell caused bodily injury, i.e., a premises defect. Instead, the Plaintiffs allege a claim that tangible personal property, i.e., "use of the jail cell" caused Longoria's injury and death in support of their Texas Tort Claims Act case. Complaint, ¶ 7.11r; Dkt # 54. They do not plead any facts of how the jailers used the jail cell to cause injury. Rather, the facts merely show that the jail cell was where Longoria died, but nothing about the cell or its "use" caused him to die.

The use of tangible property "does not cause injury if it does no more than furnish the condition that makes the injury possible." *Bossley,* 968 SW2d at 341 *citing Harris Co. v. Dillard,* 883 SW2d 166 (Tex. 1994). In *Bossley,* unlocked doors permitted an escape that led to a sequence of factual events resulting in death with the court concluding that "the use and condition of the [jail] doors were too attenuated from death to be said to have caused

21

it". 968 SW2d at 343.

Plaintiffs may argue that detention personnel are negligent because of the failure to monitor or observe Longoria for medical conditions and that such constitutes a "use of the jail cell". Such arguments have been rejected by Texas courts. "Use" of tangible property does not mean the "nonuse" of the same property. *See Kerrville State Hospital,* 923 SW2d 582, 585 (Tex. 1996)(failure to provide medication not actionable); *Kassen v. Hartley,* 887 SW2d 4, 14 (Tex. 1994)(failure to provide medication is nonuse of property and not actionable); *Marroquin v. Life Management Center,* 927 SW2d 228, 232 (Tex. App.–El Paso 1996, writ dism'd w.o.v.)(failure to use door locks was nonuse and not actionable). Properly understood, the Plaintiffs' claims are simply the failure to detect a medical condition and the resulting failure to administer treatment. Accordingly, such "nonuse" fails to state a waiver of immunity and thus, there is no actionable claim.

The failure to train allegations do not support a waiver of immunity. The use or failure to convey information is not a use of tangible property that waives immunity. *Univ. of Tex. Med. Branch v. York,* 871 S.W.2d 175, 179 (Tex. 1994). Therefore, an alleged failure to train or instruct does not fall within the waiver. *Texas Dept. of Public Safety v. Petta,* 44 S.W.3d 575, 580 (Tex. 2001). For the same reason that the failure to keep records claim fails. *York,* 871 S.W.2d at 178-79.

Accordingly, Cameron County, Texas is entitled to summary judgment on the state law claims.

22

**D.    Federal and State Law Do No Permit Recovery of Punitive Damages**

Plaintiffs allege a claim for punitive/exemplary damages. Complaint, ¶ 9.7; Dkt # 54. There is no waiver of governmental immunity under state law for punitive damages. TEX. CIV. PRAC. & REM. CODE ANN. § 101.024 (Vernons 1997). There is no liability under section 1983 for punitive damages against governmental entities. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981).

## VII. CONCLUSION

The Plaintiffs sued Cameron County, Texas, for constitutional violations and pendent state law claims. Cameron County, Texas is not legally responsible under 42 U.S.C. §1983 for Mr. Longoria's death and there is no evidence that the CCSD's jailers violated Longoria's rights. Plaintiffs have failed to prove any waiver of immunity against the state law claims. Cameron County is entitled to summary judgment regarding all of the Plaintiffs' claims.

WHEREFORE, PREMISES CONSIDERED, Defendant Cameron County, Texas requests that this court grant summary judgment that Plaintiffs take nothing on any and all claims against Cameron County, Texas, that all taxable costs of court be taxed against Plaintiffs, and for all other relief to which this Defendant may be justly entitled.

Respectfully submitted,



By:_____

**CRAIG H. VITTITOE**
Federal Bar I.D. No. 18756
State Bar No. 20593900
**ROGER W. HUGHES**
Federal Bar I.D. No. 5950
State Bar No. 10229500
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
222 East Van Buren, West Tower
Harlingen, Texas 78551-1429
956-428-7495
956-428-2954 (Fax)

ATTORNEYS FOR DEFENDANT,
CAMERON COUNTY, TEXAS

## <u>CERTIFICATE OF SERVICE</u>

*I HEREBY CERTIFY* that a true and correct copy of the above and foregoing

instrument was forwarded to the following attorneys of record, on this the 15th day of

March, 2004:

Mr. Alfred R. Valdez                              *CM/RRR # 7002 2410 0001 9643 4324*
**LIN & VALDEZ, L.L.P.**
6300 Hillcroft, Suite 200
Houston, TX 77081

Mr. Ricardo J. Navarro                           *Via Hand Delivery*
Mr. Rene Gonzalez
**DENTON, NAVARRO, ROCHA & BERNAL P.C.**
222 East Van Buren, Suite 405
Harlingen, TX 78550

_____
Craig H. Vittitoe

24

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

**TO:** Chief of Police Ben Reyna      **FROM:** Sr. Ptlmn. Falcon Rivera Jr.

**DATE:** _____04-20-01_____      **SUBJECT:** _____Investigation_____

### Page 1

Reporting Officer was dispatched to 1124 International Bvld., The Circle K Store, in reference to a disturbance there.  I arrived and made contact wi the complainanat, Martin Mendoza, who  explained that a latin male had entered the store and had a hammer in his hand.  The male walked towards the public restrooms, and Mr. Mendoza noticed the man to be bleeding  and also stated that the man appeared to have been involved in some type of previous altercation of some sort.  As the man walked to the restroom area, Mendoza thought nothing else of this as he thought he was going to use the facilities.

Mr. Mendoza' partner, Alfredo Najera, then heard noises coming from a wall that devides the cash register area and the office of the store.  Najera heard someone was ransacking or throwing things around inside the office and called Mr. Mendoza.  Mr. Mendoza  and Mr. Najera opened the door and saw the latin male who had walked into the store with  the hammer,  now inside the office, without the effective consent or permission of anyone from the store, and immediately called the Police.

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| **OFFICER** | *Falcon Rivera Jr* | 04-20-2001 |
| **SUPERVISOR** | | |
| **T/UNIT SUPERVISOR** | | |
| **DIVISION COMMANDER** | LT. | 4-20-01 |
| **CHIEF OF POLICE** | | |

IDC - 2 Rev. 693

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

**TO:** _____  **FROM:** _____

**DATE:** _____  **SUBJECT:** _____

### Page 2

Apparently what happened was that the male had found the door to the office closed, but unlocked, and went inside with intent to commit a theft, however, Mendoza and Najera foiled the plan and locked the latin male inside the office.

Reporting Officer, along with Officer David Guitierrez, #4478, arrived on scene and called through the door for the man to open the door. You could still hear noises coming from inside and when reporting officer tried to twist the door knob to open, the door would not because it was locked. Reporting Officer obtained a key to the door and again tried to open it but the door would not open. Both Officers pushed the door and it opened about an inch. Reporting Officer then saw that there was a large safe on the floor and behind the door, keeping the door from opening, and also the male was leaning into the door, making it more difficult to open. Finally, after forcing the door open, Both Gutierrez and myself managed to gain entry into the office.

Reporting Officer had drawn out the baton and ordered

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| **OFFICER** | *Falcon Lucia Jr.* | 4-20-2001 |
| **SUPERVISOR** | | |
| **T/UNIT SUPERVISOR** | | |
| **DIVISION COMMANDER** | *LT. H. Elucio* | 4-20-01 |
| **CHIEF OF POLICE** | | |

IDC-2 Rev. 6/93

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

TO: _____   FROM: _____

DATE: _____   SUBJECT: _____

### Page 3

the man down to the ground.  The man went to the ground and
made an attempt to get up and I struck him about  two or
three times to get him to comply, making contact in the lower
lower back and upper buttox area.  We had to attempt to
subdue this man in a very cramped area, as he lay on the
ground facing down.  Officer Gutierrez was having trouble
handcuffing him and I placed either both feet or one foot
on his buttox area, to see if this man would let himself
get handcuffed, but he would not cooperate at this time.
I remember that I yelled at him to give up or put his
hands behind his back or something to this effect, but
the man still would not let himself get handcuffed.  I
had put my baton away in the pouch and the man had place
his hands under his chest and was using his own strength
to hold them there.  I do not remember if this man was
saying anything while all this was going on or if he did
say anything I cannot recall what he said.  I do remember
getting very tired from trying to get him handcuffed and

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| OFFICER | Falcon Rivera Jr | 4-20-2001 |
| SUPERVISOR | | |
| UNIT SUPERVISOR | | |
| DIVISION COMMANDER | Lt. H. Ellis | 4-20-01 |
| CHIEF OF POLICE | | |

IDC-2 Rev. 6/93

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

**TO:** _____   **FROM:** _____

**DATE:** _____   **SUBJECT:** _____

Page 4

was breathing very fast.

Relying on my training, I did what I was trained to do and applied this training to this situation in order to gain control of the situation.

Subsequently, the man was handcuffed, and both Officer Gutierrez and this officer both grabbed the man from his upper arms and picked him up to take him out of the office, when suddenly, he let his entire body loose, and had to be carried out of the office,and through the store.  While we were carrying him on the way out of the store, we knocked down some items that were on display.  When we all got out of the store, we took him to the patrol car .  Officer Victor Jackson arrived on scene and assisted Officer Gutierrez in placing the man into the unit, as I confronted the man's family members, as they were getting too close to the prisoner, and were advised to get back, to which they complied.

Reporting Officer then got into the Police Unit and advised the dispatcher that I was going to activate my emergency lights in order to get through traffic, as the prisoner was getting

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| **OFFICER** | *[signature]* | 4-20-2001 |
| **SUPERVISOR** | | |
| **T/UNIT SUPERVISOR** | | |
| **DIVISION COMMANDER** | *[signature]* | 4-20-01 |
| **CHIEF OF POLICE** | | |

IDC-2 Rev. 693

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

**TO:** _____  **FROM:** _____

**DATE:** _____  **SUBJECT:** _____

### Page 5

getting restless and moving around alot in the back seat of the Police car.

Reporting Officer, when standing by the relatives, heard a lady which was presumed to be the man's mother say, "I had been taking care if him, but somehow he had gotten away from her."

I remember that the man kept saying that some men were after him and were trying to kill him.

Reporting Officer asked the dispatcher to advise the jailers to step out of the jail and assist in handling the prisoner as he was still restless. Detention Officers Mark Cheramie and Leo Mercado came out and got the prisoner out of the unit and walked him into the jail. Once inside the jail, the prisoner was patted down and searched as usual proceedure. Detention Cheramie noticed the man needed some medical attention and requested the ambulance be summoned to the jail to check out the man. The man was checked by E.M.S. attendants, but the man refused to be taken to the hospital, signing a waiver to this effect.

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| OFFICER | *Falcon Luvin Jr* | 4-20-2001 |
| SUPERVISOR | | |
| I/UNIT SUPERVISOR | | |
| DIVISION COMMANDER | *Lt. H Ethe* | 4-20-01 |
| CHIEF OF POLICE | | |

IDC - 2 Rev. 6/93

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

**TO:** _____  **FROM:** _____

**DATE:** _____  **SUBJECT:** _____

### Page 6

The man was identified as Juan Antonio Longoria, D.O.B. 10-07-59, of 1802 E. Jackson St. Brownsville, Texas. He was booked to the city jail for Burglary of Building.

Sometime later, Reporting Officer was dispatched to the city jail and told to transport Mr. Longoria to the Brownsville Medical Center, as he was very restless and was hallucinating and very paranoid. When this officer got to the city jail, Longoria was observed to be in a frieghtened state and looked very uneasy. He suddenly acted normal and then he was seeing things that only he could see.

As we arrived to Brownsville Medical Center, he was registered and they passed him into one of the emergency rooms for further evaluation. While he was talking with Detention Officer Cheramie, this officer heard him again say that some men were chasing him and that they were trying to kill him, however, nor this officer or Detention Officer Cheramie see any men around. During th e time that Longoria said to this officer, "Do you see the hand coming out of the light up there; the hand is holding a gun!"

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| **OFFICER** | *Falcon Rivera Jr.* | 4-20-2001 |
| **SUPERVISOR** | | |
| **S   I/UNIT SUPERVISOR** | | |
| **DIVISION COMMANDER** | *IZ. H* | 4-20-01 |
| **CHIEF OF POLICE** | | |

IDC-2 Rev. 693

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

**TO:**_____ **FROM:** _____

**DATE:** _____ **SUBJECT:**_____

Page 7

Both of us looked up but saw nothing but the light, and assured
Longoria that no harm was going to come to him.

The Emergency Room Doctor came and treated what I re-
member was a small wound to Longoria' left leg on the front
area and also noted that his left elbow was swollen and asked
that he be taken to have the elbow X-Rayed.   After this, the
E.R.  Doctor asked that someone from Tropical of Texas be
called to that Mr. Longoria be evaluated mentally, which was
done..Mr. Jose Schroeder arrived and spoke to Longoria, and
then spoke to the E.R. Doctor.  The E.R. Doctor then spoke
to this officer and stated that Mr. Longoria was going to be
released from the hospital and was now ready to be taken back
to the city jail, however, he had to be placed in a cell where
he could be watched closely.

The Medical release was given and Mr. Longoria was then
transported back to the city jail where he again was incarcer-
ated.

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| **OFFICER** | *Falcon Rivera Jr* | 4-20-2001 |
| **SUPERVISOR** | | |
| **T/UNIT SUPERVISOR** | | |
| **DIVISION COMMANDER** | *LT. A Fey* | 4-20-01 |
| **CHIEF OF POLICE** | | |

IDC-2 Rev. 693

# BROWNSVILLE POLICE DEPARTMENT
## INTER-DEPARTMENTAL COMMUNICATIONS

TO:_____ FROM: _____

DATE: _____ SUBJECT:_____

### Page 8

I wish to further state that Mr. Longoria, while in the hospital, asked that he either be brought a beer or something to this effect. He made this request more than 5 times.

I wish to further state that this is all that I remember of this incident with Mr. Longoria.

| | SIGNATURE | DATE REVIEWED |
|---|---|---|
| OFFICER | *Malcom Rivera Jr* | 4-20-2001 |
| SUPERVISOR | | |
| S/UNIT SUPERVISOR | | |
| DIVISION COMMANDER | *LT.* | 4-20-01 |
| CHIEF OF POLICE | | |

IDC-2 Rev. 6/93

BROWNSVILLE POLICE DEPARTMENT

CASE# 20013011710    DATE: JUNE 5,2001
TIME: 3:15PM

HE STATE OF TEXAS   I
COUNTY OF CAMERON   I
BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR THE SAID COUNTY AND
STATE, ON THIS THE 5    DAY OF JUNE       , A.D., 20 01   ,
PERSONALLY APPEARED MARK CHERAMIE                      , WHO AFTER
BEING DULY SWORN, DEPOSES AND SAYS:

MY NAME IS: MARK CHERAMIE

D.O.B: 7 23 1972

MY HOME ADDRESS IS: 333 GARDEN ST.

I AM PRESENTLY EMPLOYED WITH: CITY OF BROWNSVILLE

THE ADDRESS OF MY EMPLOYMENT IS: 600 E. JACKSON ST.

MY TELEPHONE NUMBER(S) ARE: HOME: 956 542 0343

                        WORK: 956 5487147


        I AM HERE AT THE BROWNSVILLE POLICE DEPARTMENT SPEAKING TO
DETECTIVE JUAN LOPEZ IN REFERENCE TO AN INMATE JUAN ANTONIO LONGORIA
WHO WAS BOOKED IN ON APRIL 10,2001.

        ON APRIL 10,2001 I WAS WORKING MY REGURLARLY SCHEDULED SHIFT AS
A DETENTION OFFICER FROM 3:00PM TO 11:00PM. I WAS WORKING WITH LEO
MERCARDO #4570 AND ROSIE MARTINEZ #4886. AT APPROXIMATELY 3:58PM
DISPATCH CALLED TO THE JAIL AND ASKED FOR A STEP OUT BECAUSE AN
AGGRESSIVE SUBJECT WAS BEING BROUGHT INTO CITY JAIL BY OFFICERS.
DETENTION OFFICER LEO MERCADO AND I STEPPED OUT AND WE MET OFFICERS
VICTOR JACKSON AND FALCON RIVERA OUTSIDE THE DOOR. OFFICER JACKSON
REMOVED THE PRISONER LATER IDENTIFIED AS JUAN LONGORIA LONGORIA FROM
THE POLICE UNIT. MERCADO AND I THEN ESCORTED LONGORIA INSIDE THE JAIL
AND WE PATTED HIM DOWN FOR OUR SAFETY. I THEN SAT LONGORIA DOWN ON A
CHAIR AND THATS WHEN I NOTICED THAT HE HAD BLOOD ON HIS ELBOW AND ON
HIS KNEE. I THEN REQUESTED FROM OFFICER JACKSON TO NOTIFY EMS SO THAT
LONGORIA COULD BE CHECKED FOR HIS INJURIES. EMS WAS NOTIFIED AND THEY
RESPONDED TO THE JAIL AND CHECKED LONGORIA. EMS ADVISED THAT HIS
VITAL SIGNS CHECKED OUT OK BUT HIS HEART RATE WAS A LITTLE
ACCELERATED, PROBABLY DUE TO THE CHASE. LONGORIA KEPT SAYING THAT
PEOPLE WERE CHASING HIM AND WANTED TO KILL HIM. LONGORIA REFUSED EMS
AND THEY LEFT. DETENTION OFFICER MERCADO AND I THEN PLACED LONGORIA
IN THE PADDED CELL FOR HIS SAFETY. HE DIDNT LOOK NORMAL AND APPEARED
BE SCARED. AFTER A WHILE I CHECKED ON LONGORIA AND I FOUND THAT HE
WEDGED HIMSELF BETWEEN THE DOOR AND THE WALL. I FORCED THE DOOR
OPEN AND I OBSERVED LONGORIA HIDING BEHIND THE DOOR, SAYING THAT THE NO# MP



JUAN MANUEL LOPEZ
Notary Public, State of Texas
My Commission Expires 7-09-2003

MEN WERE TRYING TO KILL HIM. HE EVEN TOLD ME THAT THE MEN WERE
ᴵSIDE THE DOOR WITH GUNS. LEO MERCARDO WAS BEHIND ME AND THERE WAS
ᴺᴼ ONE OUTSIDE THE DOOR WITH GUNS. I THEN GAVE HIM SOME WATER AND HE
WAS SHAKING AND LOOKED VERY SCARED. I CHECKED ON HIM TWO MORE TIMES
AND I COULD SEE THAT LONGORIA WAS GETTING WORSE AND ACTING ABNORMAL.
HE WAS TRYING TO HIDE INSIDE THE PADDED CELL AND APPEARED TO BE VERY
FRIGHTENED. I THEN CALLED DISPATCH AND NOTIFIED FOR OFFICER FALCON TO
COME BACK TO THE JAIL. I ALSO CALLED LT. RAMIRO RAMIREZ #197 AND I
ADVISED HIM OF LONGORIA. LT. RAMIREZ THEN ADVISED ME TO GO WITH
OFFICER FALCON RIVERA #218 TO BROWNSVILLE MEDICAL CENTER SO THAT
LONGORIA COULD BE CHECKED OUT. WE THEN WENT TO THE HOSPITAL AND WHILE
WE WERE WAITING LONGORIA TOLD ME WHAT HAD HAPPENED BEFORE HE WAS
ARRESTED. LONGORIA TOLD ME THAT WHILE HE WAS AT HOME FIVE GUYS WENT
TO HIS HOUSE AND KNOCKED ON THE DOOR. AS SOON AS HIS MOTHER OPENED
THE DOOR, ONE OF THE SUBJECTS SLAPPED HIS MOTHER AND FORCED THEIR WAY
INSIDE. LONGORIA TOLD ME THAT ONE OF THE GUYS HAD A PLASTIC BAG AND
THEY WERE GOING TO PUT HIM IN IT AFTER THEY KILLED HIM. LONGORIA TOLD
ME THAT HE HAD AN ALTERCATION WITH ONE OF THE SUBJECTS EARLIER AT A
TAXI STAND WHERE HE WASHES CARS. HE ALSO TOLD ME THAT HE RAN FROM THE
SUBJECTS AND WHILE DOING SO, HE SLIPPED ON SOME LOOSE GRAVEL AND HURT
HIS ELBOW AND KNEE. HE ALSO TOLD ME THAT HIS BACK WAS HURTING FROM AN
INJURY HE HAD SUSTAINED WORKING IN A PLASTIC FACTORY YEARS AGO.
LONGORIA ALSO MENTIONED THAT HE DID RUN INTO THE CIRCLE K WHERE HE
WAS EVENTUALLY ARRESTED. DURING THIS TIME I WAS TRYING TO KEEP HIM
CALM BECAUSE HE STILL SEEMED SCARED. LONGORIA WAS THEN CHECKED BY THE
DOCTOR AND HE RECEIVED XRAYS FOR HIS ELBOW. AFTERWARDS WE WERE
ᵂᴬITING FOR THE RESULTS AND LONGORIA TOLD ME THAT HE SAW A HAND WITH
ᴬ GUN POINTING AT HIM FROM ONE OF THE AC VENTS. HE WAS POINTING UP
WITH HIS FINGER. LONGORIA ALSO TOLD ME THAT HE WAS TAKING MEDICATION
THAT HE BOUGHT IN MATAMOROS FOR HIS NERVES. WE THEN WAITED IN THE
WAITING ROOM FOR THE DOCTOR AND HE CAME OUT AND TOLD US THAT LONGORIA
WAS OKAY BUT HE WANTED SOMEONE FROM TEXAS TROPICAL TO EVALUATE HIM.
WE THEN MOVED TO ANOTHER ROOM AND WAITED FOR SOMEONE FROM TEXAS
TROPICAL TO ARRIVE. DURING THIS TIME LONGORIA TOLD ME THAT HIS FATHER
HAD PASSED AWAY AND HE COULD HEAR HIM THROUGH THE TELEVISION. HE ALSO
TOLD ME THAT THERE WERE SPIRITS INSIDE HIS HOUSE. THE SCREENER FROM
TEXAS TROPICAL THEN ARRIVED AND HE ADVISED OFFICER RIVERA TO KEEP HIM
ALONE AND UNDER CLOSE OBSERVATION. HE ADVISED THAT HE DID NOT NEED TO
BE COMMITTED. LONGORIA THEN RECEIVED HIS MEDICAL CLEARANCE AND WE
RETURNED TO THE JAIL AND PLACED HIM BACK IN THE PADDED CELL FOR HIS
OWN PROTECTION AND TO KEEP HIM UNDER CLOSE OBSERVATION. I COULD SEE
THAT HE WAS STILL ACTING STRANGE AND TRYING TO HIDE BEHIND THE DOOR.
HE ALSO KEPT SAYING THAT THEY WERE COMING FOR HIM AND WERE GOING TO
KILL HIM. AT ABOUT 10:45PM MY RELIEF ARRIVED AND I ADVISED THEM ABOUT
LONGORIAS CONDITION. I DID EVERYTHING I COULD TO KEEP HIM CALM AND
SAFE FROM HURTING HIMSELF. THIS IS ALL THAT I REMEMBER OF THE
INCIDENT.

_VICTIM OR WITNESS SIGNATURE_

---------------------------------------------------------------

ᵂᴼRN AND SUBSCRIBED TO BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND
ᴸ ᴺ SAID COUNTY AND STATE, ON THIS THE __5__ DAY OF _____,
A.D., 20 _61_.

**JUAN MANUEL LOPEZ**
Notary Public, State of Texas
My Commission Expires 7-09-2003



NOTARY PUBLIC IN AND FOR CAMERON COUNTY,
STATE OF TEXAS.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

Maria Longoria, et al

:
:
:

vs.

:                CIVIL ACTION NO. B-014-062

:
:

Cameron County, Texas, et al

:

## DIRECT QUESTIONS TO BE PROPOUNDED TO THE WITNESS

Custodian of Records for:  **Tropical Texas Center for Mental Health and Mental Retardation**

Records Pertaining To:  **Juan Longoria**

Type of Records:  **Any and all medical and psychological records of Juan Longoria (SSN: 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), including counseling and testing records**

1.   Please state your full name, telephone number, occupation and official title.

Answer: Gloria leos 547-5408   HIM Clerk

2.   Have you been served with a subpoena duces tecum for the production of all records and other documents pertaining to Juan Longoria?

Answer: yes

3.   Do you understand the subpoena requests all the records and documents pertaining to Juan Longoria and is not limited to just records and documents related to what you believe forms the basis for this lawsuit nor is it limited in scope or time or as to the type of record or document?

Answer: yes

4.   Do you have knowledge that Juan Longoria  was treated or examined by Tropical Texas Center for Mental Health and Mental Retardation?

Answer: yes

5.   Are you among those who have possession, custody, control of or access to all the medical records pertaining to Juan Longoria?

Answer: yes

6.   Are you aware of any other hospital, clinic, sanitarium, physician, chiropractor, osteopath, counselor, or therapist that may have possession of records pertaining to Juan Longoria? If so, please state the name of such entity and describe briefly what records they possess.

Answer: no

7. . Has Tropical Texas Center for Mental Health and Mental Retardation made or caused to be made any memoranda, reports, records, or data compilations, in any form, of Juan Longoria?

Answer: _Yes_____

8. Was it in the regular course of business of Tropical Texas Center for Mental Health and Mental Retardation for nurses, doctors, and other employees with personal knowledge of the acts, events, conditions, courses of treatment, diagnoses and other information contained in such records you have furnished to the Officer taking this deposition to make such records or to transmit information pertaining thereto to be included in such records?

Answer: _yes_____

9. Were the records made by nurses, doctors and other employees or representatives made at or near the time when the acts, events, conditions, courses of treatment, diagnoses and other information contained therein occurred, were observed or rendered, or made reasonably soon thereafter?

Answer: _Yes_____

10. Are the originals of such medical records a permanent part of the records of this facility?

Answer: _Yes_____

11. Please hand exact duplicates of all documents pertaining to Juan Longoria or the originals thereof for attachment to this deposition (this should include, but is not limited to, all correspondence to and from the patient, all correspondence to and from any attorney for the patient, patient history forms, records of all telephone conversations and any handwritten notes which have not already been produced). Have you now provided all the records and documents pertaining to Juan Longoria? If not, identify for the Notary Public the records and documents you did not produce and explain why you did not produce them.

Answer: _Yes_____

12. Have you been requested, directed, or has it ever been suggested by any person (whether doctor, lawyer, patient, or anyone else) that any part of the records subject to this deposition be withheld or protected from discovery for any reason? If so, please state the name and address of the person who conveyed this information to you and when such event occurred.

Answer: _NO_____

13. Do you know whether or not, or do you have any reason to believe that the records subject to this deposition have in any manner been edited, purged, culled or in any other manner made different from the way such records existed when created? If so, please explain your knowledge or belief in that regard.

Answer: _NO_____

14. Are there any other locations where records or documents pertaining to Juan Longoria would be kept by Tropical Texas Center for Mental Health and Mental Retardation? If yes, please identify the name and address of that location if known.

Answer: _NO_____

15.  In the event that no records can be found, are there document archives (i.e. microfiche) or document retention policies which explain their absence?  If yes, please identify who has knowledge of those archives or policies for Tropical Texas Center for Mental Health and Mental Retardation.

Answer: _N/A_____

_____
WITNESS (Custodian of Records)

Before me, the undersigned authority, on this day personally appeared Gloria Leos , known to me to be the person whose name is subscribed to the foregoing instrument in the capacity therein stated, who being first duly sworn, stated upon his/her oath that the answers to the foregoing questions are true and correct. I further certify that the records attached hereto are exact duplicates of the original records.

SWORN TO AND SUBSCRIBED before me, this 26th day of June , 20 02 .

_____
NOTARY PUBLIC

My Commission Expires: 3/5/2006

MARIA M. RODRIGUEZ
Notary Public, State of Texas
My Commission Expires
March 05, 2006

IN THE UNITED STATES DISTRICT COURT
IN THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

Maria Longoria, et al :

vs. :     Civil Action No.  B-014-062

Cameron County, Texas, et al :

**COURT CERTIFICATION**

TO:                                              FROM:
    Clerk of the Court                           Prove-Up Legal Services, L.P.
                                                 4514 South McColl
                                                 Edinburg, TX 78539
                                                 (210) 472-2727   Fax (210) 696-8350

RE:  Juan Longoria

DEPOSITION BY WRITTEN QUESTION TO THE CUSTODIAN OF RECORDS FOR:

**Tropical Texas Center for Mental Health and Mental Retardation (Medical)**

The witness was duly sworn and the transcript attached is a true record of the testimony given by the witness.  The deposition was signed by the witness and returned on   06/26/02   .  Changes made by the witness, if any, in the transcript are attached or incorporated hereto.  The original deposition transcript, together with copies of all exhibits, were provided to the attorney or party who asked the first question appearing in the transcript, for safekeeping and use in trial in manner specified by F.R.C.P. 30(F).  The changes for preparation of the completed transcript and any copies of the exhibits are to be paid for by the attorney for the   Defendant, Roger W. Hughes, TBA # 10229500   and total $  241.80  .

Pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:

**Michael R. Cowen Attorney for Plaintiff**
**John Ventura Attorney for Plaintiff**
**Eileen M. Leeds Attorney for Defendant**

I certify that a true and correct copy of the foregoing instrument was mailed to the respective parties or attorneys of records, postage prepaid, or was hand delivered, or by telephonic transfer.

Sworn to and subscribed before me on this the  28  day of  June  , 20 02 .

Barbra J. Kelly
Notary Public, State of Texas
My Comm. Expires 09/28/04

Notary Public in and for the State of Texas

Order No.  05-15004-003

TROPICAL TEXAS
CENTER FOR MHM          CONSUMER DEMOGRAPH... ...RM          C O N F I D E N T I A L

Last Name : **Longoria**          First Name : **Juan**          MI:          CASE # **114804**

Mailing Address: **1802 E. Jackson**          Zip: **78523**          Physical Address: **Same**

% (Home) **5046703**    % (Work)          City: **Bro...**          State: **TX**

o CHECK HERE IF THIS IS AN ADDRESS CHANGE   Address Effective Date :

PROGRAM (To determine record set-up ):  ☑ MH    o MR    o ECI    o SA

SS = **4 4 9 . 5 1 . 8 5 0 6**          Dt. Moved to County: ___ / ___ / ___          Ethnicity: **H**

Sex **M** F   D.O.B. **10 . 7 . 59**   Marital Status: **S**   Employment Status: **U**   Sec. 8 Housing Certification? Yes No

Living Arrangement: **P**   Special Training (Optional): ___   Education: **5TH**   Primary Meth of Comm: **1**   Primary Language: **S**

COMPLETE ALL INFORMATION. If next of kin is entered, you must also enter relationship code. If there is no next of kin or next of kin is unknown, leave blank. If Legal Status is anything other than A, you must complete all information.

_____   Relationship: ___          (Address)          % ( ) ___ - ___
(Next of Kin Name)

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility ...a... ...cepted if it is made available to any other person. INCLUDING THE PATIENT. Tropical Texas Ctr. for MH/MR.

Legal Status : ___   Legally Responsible ...a...          % ( ) ___ - ___

Address (Resp. Person): ___          State: ___   Zip: ___

_____          (Address)          (City)   (ST)   (Zip)          % ( ) ___ - ___
(Personal Physician Name)

Referral Source: ___          FOR FUTURE USE: ___

ALLERGIES / SPECIAL PRECAUTIONS : **NKDA .**

o Pre-Registered   ☑ Registered (Non TxMHMR)   ☑ Admitted (TxMHMR)   o Update–Prev. Info   Eff. Date: **4 / 10 / 01**

THIS SECTION SHOULD ONLY BE COMPLETED FOR CONSUMERS RECEIVING YOUTH SERVICES (USE CMHP CODES ONLY)

Parent's Marital Status : ___   Legal Guardianship: ___   Child Living With: ___   Mother's Education: ___   Father's Education: ___

ED IN SPECIAL ED? ☐ Yes ☐ No   Receiving : AFDC? ☐ Yes ☐ No   WIC? ☐ Yes ☐ No   SSI ? ☐ Yes ☐ No   Other ☐ Yes ☐ No

SCHOOL ___          Medicaid? ☐ Yes ☐ No   Public Housing ? ☐ Yes ☐ No   Food Stamps? ☐ Yes ☐ No

IN SCHOOL ? ☐ Yes ☐ No   GRADE ___ ___   EARLY INTERVENTION (EI) ? ☐ Yes ☐ No

AT RISK OF PLACEMENT? ☐ Yes ☐ No   Placement Criteria Met? ☐ Yes ☐ No   FIRST TIME OFFENDER? ☐ Yes ☐ No

Family Size ___ ___   Estimated Annual Gross Family Income ___ ___ ___ , ___ ___ ___ . 00   Registration Effective Time ___ : ___ : ___

Primary Correspondent: ___          Address: ___          % ( ) ___ - ___

City: ___          State: ___          Zip: ___          Relationship ___ ___ - (Use CMHC Code)

| | | FAMILY PROBLEM HISTORY | | |
|---|---|---|---|---|
| | | Mother | Father | Other |
| ☐ Mental Health Treatment: ___ Number of Psychiatric Hospitalizations | ☐ Juvenile Court / Probation ___ Probation County No. | | | |
| ☐ Substance Abuse Treatment: ___ Number of Inpatient Admissions | ___ Probation Type 1 = Court Ordered | Mental Illness ☐ | ☐ | ☐ |
| ☐ Child Protective Services - Open Case Ever | 2 = Voluntary | Alcohol/Drugs ☐ | ☐ | ☐ |
| ☐ Adoption | ___ Offense Code (1-24) | | | |
| ☐ Out of Home Placements (Excluding Psych. hospital & substance abuse) ___ Number of placement | ☐ Commitments to TYC On Parole ☐ Yes ☐ No Comm. Placement ☐ Yes ☐ No | Criminal Activity ☐ | ☐ | ☐ |
| | | Family Violence | | |

**0000001**

TTC 1-1 REV. 12/29/97

RECEIVED APR 2 2001

(Signature)

## CONS    INFORMATION CODES

**ETHNICITY**
A = Asian
B = Black
H = Hispanic
I = Am. Indian
O = Other
U = Unknown
W = White

**LEGAL STATUS**
A - Adult - No Guardian (Emancipated Minor)
C - Minor With Conservator
D - Emergency Detention MH
E - Adult W/Guard. of Estate
G - Order for Long Term MR
H - Court Order  Extended 12mo MH
L - Adult with Limited Guard.
M - Minor
N - Emergency Detention MR
O - Order of Prot. Custody MH
P - Adult W/ Guard. of Person
R - Court Ord. Temp. MH 90
T - Adult W/ Temp Guardian
U - Order of Prot. Custody MR
V - Voluntary
W - Adult W/Guard Est.&Pers

**PRIMARY LANGUAGE**

E = English
L = Sign Language (American)
O = Other
S = Spanish
T = Taiwanese
V = Vietnamese
A = Laotian
U = Unknown

**MARITAL STATUS**
D = Divorced
M = Married
N = Never Married
S = Separated
W = Widowed

**LIVING ARRANGEMENTS**
B = Boarding Home
C = Personal Care Home
F = Foster Family
G = Marginal Homeless
H = Literal Homeless
I = Institution (includes Nursing Home)
L = Self
M= Community Residential
      (Includes ICF-MR & HCS)
N = Non-relative
O =Other Relative
P = Parent's Home
S = Spouse / Children
T = Transient

**PRIMARY METHOD OF COMMUNICATION**
N = No Disability
B = Braille
C = Communication Board
G = Gestures / Sounds
O = Oral Only
S = Sign Language
W = Written Only

**EMPLOYMENT STATUS**
F = Full-time Employment
H = Homemaker
L = Unemployed / Looking
U = Unemployed/ Not Looking
P = Part-time employment
R = Unemployed / Retired
S = Student ( age 18 & over)
W = Work Training Program
X = Child (age 0-17 years)

**EDUCATION( Consumer or Parents)**
0-12 = Grade in School
(Highest  Completed)
A = Associate
B = Bachelors
C = Day Care
D = Doctorate
E = Early Childhood Int.
G = GED
K = Kindergarten
M = Masters
S = Special Education

**REFERRAL SOURCE**
F = Family / Self
S = School
J = Juvenile Probation
T = TYC
C = CPS
W = Within Agency
H = Other MHMR
O = Other

**NEXT OF KIN**
A = Friend / Advocate    H = Husband          O = Other                    W = Wife
B = Brother               I = Father-in-law   P = Primary Correspondent   X = Mother-in-law
C = Child                 L = Legal Guardian  R = Foster Parent           Y = Step Mother
F = Father                M = Mother          S = Sister                  Z = Step Father
G = Grandparent           E = Self            U = Unknown

## OFFENSE  CODES FOR CMHP SERVICES WITH JUVENILE COURT / PROBATION & RELATIONSHIP CODES

| FELONY OFFENSES | CLASS A & B MISDEMEANOR | CHILD IN NEED OF SUPERVISION |
|---|---|---|
| 1 = Homicide | 10 = Weapons Violation | 17 = Truancy |
| 2 = All Sexual Assaults | 11 = Assault | 18 = Runaway |
| 3 = Robbery | 12 = Theft | 19 = Theft |
| 4 = Aggravated Assault | 13 = Drug Offenses | 20 = Disorderly Conduct |
| 5 = Burglary | 14 = Other | 21 = Inhalants |
| 6 = Theft-Except Motor Vehicle | 15 = Texas Family Code Violation | 22 = DWI and DUID |
| 7 = Motor Vehicle Theft | | 23 = Liquor Laws |
| 8 = Drug Offenses | | 24 = Other |
| 9 = Other felony | | |

**CMHP CHILD LIVING WITH**
1 =  Both  Parents            6 = Foster Family
2 = Mother                    7 = Group Home
3 = Parent & Step-Parent      8 = Independent
4 = Father                    9 = Other: _____
5 = Relative

**CHMP PARENTS MARITAL STATUS**
M = Now Married  S = Separated
W = Widowed      N = Never Married
D = Divorced

**CMHP  GUARDIAN**
1 - Both Parents
2 - Mother  Only
3 - Father Only
4 - Relative / Legal Guard.
5 - CPS
6 - Self
7 - Other: _____

**CMHP RELATIONSHIP CODES**
1 - Parent        10 - Sibling-in-law      19 - Legal Representative
2 - Child         11 - Foster parent       20 - Sponsor
3 - Spouse        12 - Aunt/uncle          21 - Friend
4 - Sibling       13 - Niece /nephew       22 - Parent-in-law
5 - Grandparent   14 - Cousin              23 - Other relation
6 - Step - child  15 - Guardian            24 - This component
7 - Step - parent 16 - Trustee             25 - Case manager
8 - Step - sibling 17 - Executor           26 - Unknown
9 - Child-in-law  18 - Attorney            27 - Self

NOTE – PLEASE WRITE OR PRINT LEGIBLY IN ORDER TO
ASSIST WITH  ACCURACY OF DATA ENTRY.

**0000002**

**CRISIS SCREENING, INTERVENTION, AND REFERRAL INSTRUMENT**

INSTRUCTIONS: PLEASE FILL OUT COMPLETELY, CLEARLY AND LEGIBLY. PRINT ALL
INFORMATION USING BLACK INK.

☐ 1901 S. 24ᵗʰ St.            ☐ 1242 N. 77 Sunshine Strip        ☑ 5 Boca Chica Blvd. Ste. 5
  Edinburg, TX 78539          Harlingen, TX 78550              Brownsville, TX 78520
  (956) 383-0121              (956) 423-8094                  (956) 546-2230

Date of Screening: __4-10-01__                    Time/Place of Screening: __21:00  BMC__
Service Coor: _____        Center Case #: _____

Clients' Name:    (Last) __LONGORIA__        (First) __Juan__        (M.I.) ____
  D.O.B. __10-7-59__    Age: __41__        S.S.N #: __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__
  Address: __1802  E. JACKSON  APTS__
  County of Residence: __CAMERON__    City/State/Zip __BRO, TX 78521__
  Telephone#: __956-504-6703__        Preferred Language: __English__

Contact Person: _____    Relationship: _____
  Address: _____    City/State: _____
  Telephone: _____

RECEIVED APR 11 2001

**CURRENT MEDICAL HISTORY AVAILABLE**

Primary Physician: __Dr Richardson ER__    TTC/Site: _____    [ ] Private/Loc: _____

**Diagnosis:**
Axis I:  (Primary) __Anxiety__ / (Secondary) _____
Axis II: ___deleted___
Axis III: ___deleted___
Axis IV:    [✓] Problems with primary support group: __Resides  with  mother__
_____
[ ] Problems related to the social environment: _____
_____
[✓] Educational Problems: __5th  grade__
_____
[✓] Occupational Problems: __not  worked  last  24 month__
__disable__
[ ] Housing Problems: _____
_____
[ ] Economic Problems: _____
_____
[ ] Problems with access to health care services: _____
_____
[✓] Problems related to interaction with the legal system/crime: __indu  arrest__
_____
[ ] Other psychosocial and environment problems: _____

Axis V:  G.A.F. current: _____    highest level in past year: _____

Medications: __N/A__

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person, INCLUDING THE PATIENT
Tropical Texas Ctr. for MH/MR

Allergies: __none.__

Client Name __Longoria__    __Juan__    Case# __114804__

**0000003**

MH-0037/1195 Revised/Approved 3/10/2000

## CRISIS SCREENING, INTERVENTION, AND REFERRAL INSTRUMENT

INSTRUCTIONS: PLEASE FILL OUT COMPLETELY, CLEARLY AND LEGIBLY. PRINT ALL
INFORMATION USING BLACK INK.

☐ 1901 S. 24th St.     ☐ 1242 N. 77 Sunshine Strip    ☑ 5 Boca Chica Blvd. Ste. 5
  Edinburg, TX 78539      Harlingen, TX 78550      Brownsville, TX 78520
  (956) 383-0121        (956) 423-8094       (956) 546-2230

**Date of Screening:** A-10-01    **Time/Place of Screening:** 21:00 BMC
**Service Coor:** _____   **Center Case #:** _____

**Clients' Name:** (Last) Longoria   (First) Juan   (M.I.)
**D.O.B.** 10-7-59  **Age:** 41   **S.S.N #:** 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
**Address:** 1903 E. Jackson Apts
**County of Residence:** Cameron   **City/State/Zip** BRO TX 7852?
**Telephone#:** 956-504-6703   **Preferred Language:** English

**Contact Person:** _____  **Relationship:** _____
           **Address:** _____  **City/State:** _____
           **Telephone:** _____

### CURRENT MEDICAL HISTORY AVAILABLE

**Primary Physician:** Dr. Belardino ER  **TTC/Site:** _____ [ ] Private/Loc: _____

**Diagnosis:**
**Axis I:** (Primary) Anxiety _____ (Secondary) _____
**Axis II:** deferred
**Axis III:** deferred
**Axis IV:** [✓] Problems with primary support group: Reside with mother
_____
    [ ] Problems related to the social environment: _____
_____
    [✓] Educational Problems: 5th grade
_____
    [✓] Occupational Problems: not worked last 24 month
    disable
    [ ] Housing Problems: _____
_____
    [ ] Economic Problems: _____
_____
    [ ] Problems with access to health care services: _____
_____
    [✓] Problems related to interaction with the legal system/crime: mdu arrest
_____
    [ ] Other psychosocial and environment problems: _____

**Axis V:  G.A.F. current:** _____  **highest level in past year:** _____

**Medications:** N/A

**Allergies:** none.

NOTE: This report is strictly confidential
and is for the information only of the person
to whom it is addressed. No responsibility
can be accepted if it is made available to any
other person. INCLUDING THE PATIENT
Tropical Texas Ctr. for MH/MR

**0000004**

Client Name Longoria   Juan  Case# 114804

MH-0037/1195 Revised/Approved 3/10/2000

**Other Drug Usage: (Non-prescribed):**

| Type | Amount | Frequency | Date of Last Use |
|---|---|---|---|
| Beer | 6-7 | ocassional | 4-6-01 |
| | | | |
| | | | |
| | | | |

**Psychiatric Hospitalizations within the past year:**

Dates: _none reliable information_   Location: _____   Duration: _____

PRESENTING PROBLEM: _Patient claims hearing voices_
_he is under arrest by B.P.D_
_____
_____
_____
_____

MEDICAL CONCERNS: _none_ RECEIVED APR 11 2001

_____

**MENTAL STATUS**

**Appearance:** [ ] neat [ ] clean [ ] good hygiene [✓] poor [ ] very poor

**Behavior:** [✓] calm [ ] cooperative [✓] verbal [ ] loud [✓] friendly [ ] attentive
[ ] limited attention span [ ] aggressive [ ] threatening [ ] offensive
[ ] hyperactive [ ] evasive [ ] withdrawn [ ] speechless [ ] Other:_____

**Mood/Affect:** [✓] angry [✓] depressed [ ] elated [ ] labile [✓] flat [ ] blunted [ ] anxious
[ ] hypersensitive [✓] appropriate [ ] inappropriate [ ] Other: _last 24 month_

**Sensorium:** [ ] person [ ] place [ ] time [✓] recent memory [✓] remote memory

**Intellectual functioning:** [ ] above average [ ] average [✓] below average

**Thought Process:** [ ] logical [ ] coherent [ ] pressured [✓] slow thought [ ] Other:_____

Hallucinations: [✓] auditory [✓] visual [ ] sensory [ ] denies
Delusions: [✓] persecutory [ ] grandiose [ ] Other:
Judgement: [ ] good [ ] fair [✓] poor
Insight: [ ] good [ ] fair [✓] poor
Suicidal Ideations: [✓] Yes [ ] No
As evidenced by: _____
Consumer states: _"Puede que si" "it could be"_
Homicidal: [✓] Yes [ ] No
As evidenced by: _____
Consumer states: _"Puede que si" "it could be"_

NOTE: this report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person. INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR

Client Name _Longoria Juan_   Case# _114804_  **0000005**

MH-0037/1195 Revised/Approved 3/10/2000

**Other Drug Usage: (Non-prescribed):**

| Type | Amount | Frequency | Date of Last Use |
|------|--------|-----------|------------------|
| Crak | 6-7 | occasional | 4-6-01 |
| | | | |
| | | | |
| | | | |

**Psychiatric Hospitalizations within the past year:**

Dates: _none reliable information_    Location: _____    Duration: _____

PRESENTING PROBLEM: _Patient claims hearing voice he is under arrest by B.P.D_

MEDICAL CONCERNS: _none_

## MENTAL STATUS

**Appearance:**    [ ] neat  [ ] clean  [ ] good hygiene  [✓] poor  [ ] very poor

**Behavior:**    [✓] calm  [ ] cooperative  [✓] verbal  [ ] loud  [✓] friendly  [ ] attentive

[ ] limited attention span  [ ] aggressive  [ ] threatening  [ ] offensive

[ ] hyperactive  [ ] evasive  [ ] withdrawn  [ ] speechless  [ ] Other:_____

**Mood/Affect:**    [✓] angry  [✓] depressed  [ ] elated  [ ] labile  [✓] flat  [ ] blunted  [ ] anxious

[ ] hypersensitive  [✓] appropriate  [ ] inappropriate  [ ] Other:_____

**Sensorium:**    [ ] person  [ ] place  [ ] time  [✓] recent memory  [✓] remote memory

**Intellectual functioning:**    [ ] above average  [ ] average  [✓] below average

**Thought Process:** [ ] logical  [ ] coherent  [ ] pressured  [✓] slow thought  [ ] Other:_____

Hallucinations:    [✓] auditory  [✓] visual  [ ] sensory  [ ] denies

Delusions:    [✓] persecutory  [ ] grandiose  [ ] Other:_____

Judgement:    [ ] good  [ ] fair  [✓] poor

Insight:    [ ] good  [ ] fair  [✓] poor

Suicidal Ideations:    [✓] Yes  [ ] No
As evidenced by:_____
Consumer states: _"Puede que si"  "it could be"_

Homicidal:    [✓] Yes  [ ] No
As evidenced by:_____
Consumer states: _"puede que si"  "iT could be"_

NOTE: This report is strictly confidential
and is for the information only of the person
to whom it is addressed. No responsibility
can be accepted if it is made available to any
other person. INCLUDING THE PATIENT
Tropical Texas Ctr. for MH/MR

Client Name _Longoria    Juan_    Case# _114804._    **0000006**
114804

MH-0037/1195 Revised/Approved 2/10/2000

## ASSESSMENT AND RECOMMENDATIONS

Level of Intervention Needed: _____ 7 _____ 4-0-01

[ ] No Services Recommended
[ ] Inpatient Services Facility: _____
Is inpatient treatment the least restrictive: environment? [ ] Yes   [ ] No
If Yes, Why? _____

Intervention: B.P.D. brought patient to E.R.
with charges of burglary of a build

## DISPOSITION

[✓] Referred for Outpatient Services: (Type) Tropical Texas
[✓] Other referral source: Council on Alcohol & Subst Abuse
[✓] Instructions Given To: [✓] Client [✓] Responsible Party [ ] Other i.e. – Hospital Staff

_____ RECEIVED APR 11 2001

[✓] Transportation needed by : [✓] LPD  [ ] Sheriff  [ ] Family  [ ] Other.
Name of Person: OFFICER FALCON RIVERA JR

Additional Comments/Collateral Information: Patient alledges hearing voices
when asked about suicidal or homicidal answers
very dontknow Patient. My impresion is
that patient is malingering for his own benefit
Called Dr Mario Gaza
physician on call for TTMHMR who
after familiarizing with the case concluded
patient could go back to jail and
kept under observation after receiving
medical clearence

Signature/Degree/Title : _____  Date: 4-10-01

NOTE: This report is strictly confidential
and is for the information only of the person
to whom it is addressed. No responsibility
can be accepted if it is made available to any
other person. INCLUDING THE PATIENT
Tropical Texas Ctr. for MH/MR

Follow-up/Outcome : (Completed by screener within one working day after event)
Called 4-11-01 8:15 talked to patient MR Cavazos
nurse informed patient slept all night long

Signature/Degree/Title: _____  Date: 4-11-01

Client Name Longoria  Juan  Case# 11480 **0000007**

_____ Approved 3/10/2000

## ASSESSMENT AND RECOMMENDATIONS

**Level of Intervention Needed:**

[ ] No Services Recommended
[ ] Inpatient Services Facility:_____
Is inpatient treatment the least restrictive: environment? [ ] Yes   [ ] No
If Yes, Why?_____

Intervention: _BPD brought patient to ER_
_with charge of burglary of a build_

### DISPOSITION

[✓] Referred for Outpatient Services: (Type) _Tropical Texas_
[✓] Other referral source: _Counsel of Alcohol & Subst abuse_
[ ] Instructions Given To:  [✓] Client  [ ] Responsible Party  [ ] Other i.e. — Hospital Staff

[✓] Transportation needed by: [✓] LPD  [ ] Sheriff  [ ] Family  [ ] Other
Name of Person: _OFFICER FALCON RIVERA JR_

Additional Comments/Collateral Information: _Patient alledges hearing voices_
_when asked about suicidal or homicidal answers_
_very doubtfull. Patient. My impression is_
_that patient is malingering for his own benefit_
_Called Dr Hari Gowa_
_physician on call for TTMHMR who_
_after familiarizing with the case concluded_
_patient could go back to jail and_
_kept under observation after receiving_
_medical clearance_

Signature/Degree/Title : _____   Date: _4-10-01_

NOTE: This report is strictly confidential
and is for the information only of the person
to whom it is addressed. No responsibility
can be accepted if it is made available to any
other person, INCLUDING THE PATIENT

Follow-up/Outcome : (Completed by screener within one working day after event) Tropical Texas Ctr. for MH/MR

_Called 4-11-01 8:15 talked to_
_jail RN Cavezo_
_who informed patient slept all night long_

Signature/Degree/Title: _____   Date: _4-11-01_

Client Name _Longoria       Juan_   Case # _81048_  **0000008**

RECEIVED APR 1 '08?

**CONTACT LOG AND PROGRESS NOTE FORM**
*TROPICAL TEXAS CENTER FOR MHMR*

CONFIDENTIAL

- **INSTRUCTIONS**
1. Registration Log Summary - All Services / Contacts.
2. Date - (1) Date of service / contact  (2) Date and Time Progress Note is written.
3. Progress Note - Summary of all contacts / sessions including number relating to Treatment plan and service type description
4. Sign your name, degree and title at the end of your progress note. Documentation is to be completed daily.

Case # 114804          Other Info (Contract Use Only)_____

| # | DATE | Server(s) ID# | Sub Unit 4 Digit Code | Service Code | Start Time | Stop Time | Prov to CFBOG | Prov at | Cont Type | Appt Type 1-6 | B Type | I n t e n | B r i e f | FORM # Assigned at Data Entry |
|---|------|------|------|-----|------|------|---|---|---|---|---|---|---|---|
| | 4/10/01 | 100856 | 6320 | 701 | 21:00 | 21:45 | C | I | F | 5 | A | Y | N | |
| | 4/10/01 | 100856 | 6320 | 701 | 22:45 | 22:55 | C | I | T | 5 | A | Y | N | |
| | 4/11/01 | 100856 | 6320 | 701 | 8:15 | 8:25 | C | I | T | 5 | A | N | N | |
| | / / | | | | : | : | | | | | | | N | |
| | / / | | | | : | : | | | | | | | N | |

PROVIDED TO
C= Consumer
F= Family Only
B= Family & Consumer
O= Other
G= Legal Guardian

PROVIDED AT
X=Extended Care Fac.
H=Home
I = Inpatient Hospital
O=Office/ Center Loc.
N=Nursing Facility
J = Jail
Z = Other Location

CONTACT TYPE
F=Face-to-Face
T=Telephone
O=Other

APPOINTMENT TYPE
1=Scheduled
2=Walk - In
3=Cancelled
4=NoShow
5=Other
6=Server Cancelled

BTYPE- BILLING TYPE
A = Allowable Service - 1 Server / Lead Server
I = Incidental to Doctor Service
S = Service not on Plan of Care
N = Non Covered Service

INTEN - INTENSITY
N = Routine Service
Y = Crisis Service

| DATE | # | TIME | PROB | PROGRESS NOTE (Include description of services provided) |
|------|---|------|------|------|
| 4-10-01 | 1 | 21:00 | 1 | Mr Juan Longoria is a Hispanic male 41 yrs of age resident of Brownsville. TX. Patient is alledgedly disable due to a work related accident hurting his back. Patient resides with mother and attended school up to 5th grade. Patient is under arrest for burglary and while in custody started making alegations of hearing voices. Patient Mental Status at time of screening: Appearence poor Behavior calm verbal. Mood affect anxious depressed flat approriate |

LONGORIA, JUAN
**CONSUMER NAME**
TTCMHMR 4-1 Revised 12/29/97

This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person. INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR

114804
**CONSUMER CASE #**

**0000009**

CONFIDENTIAL

| DATE | # | TIME | PROB | PROGRESS NOTE - Continued |
|------|---|------|------|---------------------------|
| | | | | Sensorium issues to recent + remote memory. |
| | | | | Intellectual functioning below average. Thought |
| | | | | process pressured, slow. Hallucination |
| | | | | auditory + visual. Delusions of persecution. |
| | | | | Poor judgement + insight. Suicidal |
| | | | | ideations + homicidal ideations |
| 4/10/01 | 2 | 21:45 | 2 | Called Dr Maria GARZA physician |
| | | | | on call for TTMHMR. shared with |
| | | | | him information about screening |
| | | | | and he concluded patient could |
| | | | | go back to jail under observa- |
| | | | | tion. [signature] MS 4-10-01 |
| 4-11-01 | 3 | 8:15 | 3 | Called Brownsville Police Dept. Jailer |
| | | | | Mr. Cavazos informed patient slept all night |
| | | | | long with no problems. |
| | | | | [signature] 4-11-01 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**0000010**

## CONTACT LOG AND PROGRESS NOTE FORM
### *TROPICAL TEXAS CENTER FOR MHMR*

*CONFIDENTIAL*

INSTRUCTIONS
1. Registration Log Summary - All Services / Contacts.
2. Date - (1) Date of service / contact (2) Date and Time Progress Note is written.
3. Progress Note - Summary of all contacts / sessions including number relating to Treatment plan and service type description
4. Sign your name, degree and title at the end of your progress note. Documentation is to be completed daily.

Case # 114804          Other Info (Contract Use Only) _____

| # | DATE | Server(s) ID# | Sub Unit 4 Digit Code | Service Code | Start Time | Stop Time | Prov to C F B O G | Prov at | Cont Typ e | Appt Typ e 1 - 6 | B T y p e | I n t e n | B r i e f | FORM # Assigned at Data Entry |
|---|------|---------------|----------------------|--------------|------------|-----------|-------------------|---------|------------|------------------|-----------|-----------|-----------|-------------------------------|
|   | / /  |               |                      |              | : | : |  |  |  |  |  |  | N |  |
|   | / /  |               |                      |              | : | : |  |  |  |  |  |  | N |  |
|   | / /  |               |                      |              | : | : |  |  |  |  |  |  | N |  |
|   | / /  |               |                      |              | : | : |  |  |  |  |  |  | N |  |
|   | / /  |               |                      |              | : | : |  |  |  |  |  |  | N |  |

PROVIDED TO
C= Consumer
F= Family Only
B= Family & Consumer
O= Other
G=Legal Guardian

PROVIDED AT
X=Extended Care Fac.
H=Home
I = Inpatient Hospital
O=Office/ Center Loc.
N=Nursing Facility
J = Jail
Z = Other Location

CONTACT TYPE
F=Face-to-Face
T=Telephone
O=Other

APPOINTMENT TYPE
1=Scheduled
2=Walk - In
3=Cancelled
4=NoShow
5=Other
6=Server Cancelled

BTYPE - BILLING TYPE
A = Allowable Service - 1 Server / Lead Server
I = Incidental to Doctor Service
S = Service not on Plan of Care
N = Non Covered Service

INTEN - INTENSITY
N = Routine Service
Y = Crisis Service

| DATE | # | TIME | PROB | PROGRESS NOTE (Include description of services provided) |
|------|---|------|------|----------------------------------------------------------|
| 5-14-00 | | | | Copy of entire medical record was faxed to Stacy Hernandez, in Edbg. main Center. @ Cisneros - NIH Sponsor. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person. INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR |

*Additional space on back if needed*

Juan Longoria.
CONSUMER NAME
TTCMHMR 4-1 Revised 12/29/97

114804
CONSUMER CASE #

**0000011**

# CONTACT LOG AND PROGRESS NOTE FORM
*TROPICAL TEXAS CENTER FOR MHMR*

*CONFIDENTIAL*

**INSTRUCTIONS**
1. Registration Log Summary - All Services / Contacts.
2. Date - (1) Date of service / contact  (2) Date and Time Progress Note is written.
3. Progress Note - Summary of all contacts / sessions including number relating to Treatment plan and service type description
4. Sign your name, degree and title at the end of your progress note. Documentation is to be completed daily.

Case # ___114804___       Other Info (Contract Use Only) _____

| # | DATE | Server(s) ID# | Sub Unit 4 Digit Code | Service Code | Start Time | Stop Time | Prov to C F B O G | Prov at | Cont Typ e | Appt Typ e 1 - 6 | B T y p e | I n t e n | B r i e f | FORM # Assigned at Data Entry |
|---|------|---------------|------------------------|--------------|------------|-----------|-------------------|---------|------------|------------------|-----------|-----------|-----------|------------------------------|
| | / / | | | | : | : | | | | | | | N | |
| | / / | | | | : | : | | | | | | | N | |
| | / / | | | | : | : | | | | | | | N | |
| | / / | | | | : | : | | | | | | | N | |
| | / / | | | | : | : | | | | | | | N | |

**PROVIDED TO**
C=Consumer
F=Family Only
B=Family & Consumer
O=Other
G=Legal Guardian

**PROVIDED AT**
X=Extended Care Fac.
H=Home
I=Inpatient Hospital
O=Office/ Center Loc.

N=Nursing Facility
J = Jail
Z = Other Location

**CONTACT TYPE**
F=Face-to-Face
T=Telephone
O=Other

**APPOINTMENT TYPE**
1=Scheduled
2=Walk - In
3=Cancelled
4=NoShow
5=Other
6=Server Cancelled

**BTYPE - BILLING TYPE**
A = Allowable Service - 1 Server / Lead Server
I = Incidental to Doctor Service
S = Service not on Plan of Care
N = Non Covered Service

**INTEN - INTENSITY**
N = Routine Service
Y = Crisis Service

| DATE | # | TIME | PROB | PROGRESS NOTE (Include description of services provided) |
|------|---|------|------|----------------------------------------------------------|
| 4-27-01 | | | | Copies of medical record requested were faxed to Jose Bustamante from Advocacy in McAllen. See letter & fax cover sheet. _Linda Rosales Clerk III-HIM_ |
| | | | | |
| | | | | NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person, INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR |

*Additional space on back if needed*

_Juan Longoria_
**CONSUMER NAME**

114802
**CONSUMER CASE #**

TTCMHMR 4-1 Revised 12-29-97

**0000012**

TROPICAL TEXAS                                    CO   DENTIAL
CENTER FOR MHMR          ASSIGNMENT FORM

Consumer: Longoria Juan                Case #: 114804        Form #: _____

| Effective Date | Action Code | SubUnit | Server ID | Closure Notification | Closure Reason | Disposition | Disposition Other Info. |
|---|---|---|---|---|---|---|---|
| 4 / 10 / 01 | A | 6320 | 100856 | ☐ Yes ☐ NA | | | |

Least Restrictive Environment? ☐ Yes ☐ No  If No, Explain _____

| Effective Date | Action Code | SubUnit | Server ID | Closure Notification | Closure Reason | Disposition | Disposition Other Info. |
|---|---|---|---|---|---|---|---|
| 4 / 11 / 01 | C | 6320 | 100856 | ☐ Yes ☐ NA | nn | 0 | |

Least Restrictive Environment? ☐ Yes ☐ No  If No, Explain _____

| Effective Date | Action Code | SubUnit | Server ID | Closure Notification | Closure Reason | Disposition | Disposition Other Info. |
|---|---|---|---|---|---|---|---|
| __ / __ / __ | | | | ☐ Yes ☐ NA | | | |

Least Restrictive Environment? ☐ Yes ☐ No  If No, Explain _____

| Effective Date | Action Code | SubUnit | Server ID | Closure Notification | Closure Reason | Disposition | Disposition Other Info. |
|---|---|---|---|---|---|---|---|
| __ / __ / __ | | | | ☐ Yes ☐ NA | | | |

Least Restrictive Environment? ☐ Yes ☐ No  If No, Explain _____

**ACTION CODES** -   **R** = Registration at this subunit    **A** = Admission at this subunit
**U** = Update                          **C** = Closure to this subunit

**CLOSURE NOTIFICATION** - If closure, was consumer notified of appeals process for denial / reduction / termination?  Y / NA

**CLOSURE REASON** -    **LA** = Left Area             **NP** = No Longer Priority Population
**RS** = Refused Services      **NN** = No Need for Further Services

**DISPOSITION** -   **0** = No Transfer / No Referral                    **(Disposition Other Info.)**
**1** = Transfer to Another Unit of Service    SUB UNIT ID: _____
**2** = Referral to TxMHMR Center/ Facility   Name: _____
**3** = Referral to Other Agency  Name: _____

**Note** – The selection of a consumer's Single Accountable Individual (SAI) flag is automatically determined by the unit priority.   If the Primary Server / Coordinator identified below is not flagged as the Primary(SAI), you must manually **correct** the Primary field at the time the data is entered.

**Name of Primary Server/Coordinator  For Consumer at Center**

— new case —                         ID#: _____

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted by it being made available to any other person, INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR

**Primary Server/Coordinator Notified?**  ☐ Yes __ / __ / __  ☐No

Staff Initiating Change: _____  ID #: 100856  Date: 4/10/01

Data Entered By: _____ (Initials)  ID# : 6363  Date ENTERED APR 1 1 2001

**0000013**

TTCMHMR 1-2 Revised 12/29/97

**INFORMATION**

To record assignment information about a consumer that will be entered into the computer system. This information will be used to record and track consumer assignments within units and subunits ( Assignments are not made if the individual's status is "Pre-Registered).

Registered - Generally a consumer who receive on-going services that are not funded by TxMHMR. Typically, these individuals are served under a specific contract such as TCADA, school district contracts, etc. Registered consumers should be assigned to a Unit/ Subunit (i.e. complete an Assignment Form). Registered consumer information is not sent to the TxMHMR Care system, so it is not appropriate to use Registered status for consumers who should be included in the various TxMHMR performance measures.

Admitted - Admitted consumers are generally those individuals who have been assessed and found to be eligible for TxMHMR-funded services. Admitted consumers should be assigned to specific service units/ subunits (i.e., complete an Assignment Form). Consumer information on admitted individuals is entered into the TxMHMR CARE System and is included in the various TxMHMR performance measures.

Note: Admitted assignments are only allowed for consumers in an admitted demographic status.

Update - There is a need to revise, correct or update a consumer's current Assignment Form.

Closure - To be used in order to close an individual assignment to a unit or subunit. Note: In order to close a case entirely from Center services, each assignment must be closed.

**Detailed Instructions:**    Direct Care staff are to complete the Assignment Form.

1.   Staff are to complete an Assignment form to reflect Registrations, Admissions, Closure's or Updates within Units or Subunits of service.

2.   Effective Date - The date that will be entered into the computer system to reflect the Registration, Admission, Closure or Update for an individual assignment.

3.   Action Code Used to reflect the desired action related to the assignment status. If the transferring case within same subunit, Use U for Update and circle Action Code.

     R = Registration at this subunit    A = Admission at this subunit
     U = Update                          C = Closure at this subunit

4.   Subunit - 4 digit Subunit number

5.   Server ID - 6 digit Identification number assigned to server.

6.   Closure Notification - If closure, was the consumer notified of the appeals process for denial/reduction/termination? Yes / NA (Not Applicable).

7.   Closure Reason - If closure, the reason for the closure must be completed.

     LA = Left Area   P = No Longer Priority Population   RS = Refused Services   NN = No Need for Further Services

8.   Disposition - If closure, the disposition of the case must be completed.

          0 = No Transfer / No Referral
          1 = Transfer to Another Unit of Service
          2 = Referral to TxMHMR Center / Facility
          3 = Referral to Other Agency

9.   Disposition Other Info - To be completed if Disposition Codes 1, 2 or 3 are chosen.

          If Disposition Code 1 - Sub Unit ID: _____
          If Disposition Code 2 - Name of Center / Facility : _____
          If Disposition Code 3 - Name of Agency consumer referred to: _____

10.  Name of Primary Server / Coordinator for Consumer at Center - In order to ensure coordination of assignments and services, the name, ID#, Subunit ID# of the consumers Primary Server or Case Coordinator should be placed on the assignment form. Additionally, staff should notify the Primary Server / Coordinator of any changes in assignment. Notification may be verbal or in writing.

     Note: Any changes in Primary Server / Case Coordinator require proper documentation and notification forms be completed. The consumer / legal guardian must also be notified.

11.  Staff Initiating Change - The name, ID# and Date the staff member initiating (completing) the changes must be recorded

12.  Data Entered by - To be completed at the time of data entry.

**0000014**



**VISION:** To lead in the innovative management of comprehensive behavioral healthcare resources for our local communities.

**MISSION:** We will efficiently provide quality behavioral healthcare to meet the unique needs of all people served.

### HARLINGEN MEDICAL RECORDS
1242 NORTH 77 SUNSHINE STRIP
HARLINGEN, TEXAS 78550
## TEL. (956) 423-8094
## FAX (956) 364-6554

DATE: _May 14, 2001_

TO: _Stacy Hernandez_

FROM: _Odilia Cisnoros_

SUBJECT: _____

**· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·**

Please deliver the following page (s) at your earliest convenience unless otherwise below:

✓ IMMEDIATELY        __ OTHER        _423-8094_

If you are unable to read any portion of this FAX Transmission, please call (956) ~~646-2230~~ Ext. ___

_6803_

Number of pages including this cover sheet _13_.

_Transmitter_

**CONFIDENTIALITY NOTICE:** Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in this facsimile message is MEDIAL RECORDS privileged and contains CONFIDENTIAL information intended for the use of the individual or entity named above. If the reader of this message is set the intended recipient, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by telephone and return the original message to Tropical Texas Center for MHMR at the above address via the U.S. Postal Service at our expense.

NOTE: This report is strictly confidential and/or the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other persons INCLUDING THE PATIENT Tropical Texas Ctr. for MHMR

0000015



**VISION:** To lead in the innovative management of comprehensive behavioral healthcare resources for our local communities.

**MISSION:** We will efficiently provide quality behavioral healthcare to meet the unique needs of all people served.

**HARLINGEN MEDICAL RECORDS**
**1242 NORTH 77 SUNSHINE STRIP**
**HARLINGEN, TEXAS 78550**
**TEL. (956) 423-8094**
**FAX (956) 364-6554**

DATE: _May 14, 2001_

TO: _Stacy Hernandez_

FROM: _Celia Garcia_

SUBJECT: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please deliver the following page (s) at your earliest convenience unless otherwise below:

✓ **IMMEDIATELY**      ___ OTHER      _423-8094_

If you are unable to read any portion of this FAX Transmission, please call (956)-___-____ ext.   _6503_

Number of pages including this cover sheet  _13_



_Transmitter_

**CONFIDENTIALITY NOTICE:** Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in this facsimile message is MEDICAL RECORDS privileged and contains CONFIDENTIAL information intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by telephone and return the original message to Tropical Texas Custer for MHMR at the above address via the U.S. Postal Service at our expense.

---

## TRANSMISSION REPORT

# THIS DOCUMENT WAS CONFIRMED
# (REDUCED SAMPLE ABOVE - SEE DETAILS BELOW)

## ** COUNT **
## TOTAL PAGES SCANNED : 8
## TOTAL PAGES CONFIRMED : 8

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person, INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR

*** SEND ***

| No. | REMOTE STATION | START TIME | DURATION | #PAGES | MODE | RESULTS |
|-----|---------------|------------|----------|--------|------|---------|
| 1 | 9562897128 | 5-14- 1  1:19PM | 2'35" | 8/  8 | EC | COMPLETED 14400 |
| | | TOTAL | 0:02'35" | 8 | | |

NOTE:
No.: OPERATION NUMBER    48 : 4800BPS SELECTED    EC : ERROR CORRECT    G2 : G2 COMMUNICATION
PD : POLLED BY REMOTE    SF : STORE & FORWARD    RI : RELAY INITIATE    RS : RELAY STATION
MB : SEND TO MAILBOX    PG : POLLING A REMOTE    MP : MULTI-POLLING    RM : RECEIVE TO MEMORY



TROPICAL TEXAS
CENTER

VISION: To lead in the innovative management of comprehensive behavioral
healthcare resources for our local communities.

MISSION: We will efficiently provide quality behavioral healthcare to meet the unique
needs of all people served.

**HARLINGEN MEDICAL RECORDS**
1242 NORTH 77 SUNSHINE STRIP
HARLINGEN, TEXAS 78550
TEL. (956) 423-8094
FAX (956) 364-6554

DATE: 4-27-01

TO: Jose Bustamante

FROM: HIM

SUBJECT: # 114874

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please deliver the following page (s) at your earliest convenience unless otherwise below:

☑ IMMEDIATELY        ☐ OTHER

If you are unable to read any portion of this FAX Transmission, please call (956) 546-2230 Ext. ____

Number of pages including this cover sheet ____4____

*Linda Rosales*
Transmitter

**CONFIDENTIALITY NOTICE:** Unless otherwise indicated or obvious from the nature
of the transmittal, the information contained in this facsimile message is MEDICAL
RECORDS privileged and contains CONFIDENTIAL information intended for the use
of the individual or entity named above. If the reader of this message is not the intended
recipient, or copying of this communication is strictly prohibited. If you have received
this communication in error, please notify the sender immediately by telephone and
return the original message to Tropical Texas Center for MH/MR at the above address
via the U.S. Postal Service at our expense.

---

## TRANSMISSION REPORT

# THIS DOCUMENT WAS CONFIRMED
# (REDUCED SAMPLE ABOVE – SEE DETAILS BELOW)

## ** COUNT **
## TOTAL PAGES SCANNED    :    4
## TOTAL PAGES CONFIRMED   :    4

*** SEND ***

| No. | REMOTE STATION | START TIME | DURATION | #PAGES | MODE | RESULTS |
|-----|---------------|------------|----------|--------|------|---------|
| 1 | 956 630 3445 | 4-27- 1  9:09AM | 2'49" | 4/  4 | | COMPLETED 9600 |

TOTAL    0:02'49"    4

NOTE:
No. : OPERATION NUMBER    48 : 4800BPS SELECTED    EC : ERROR CORRECT    G2 : G2 COMMUNICATION
PD : POLLED BY REMOTE    SF : STORE & FORWARD    RI : RELAY INITIATE    RS : RELAY STATION
MB : SEND TO MAILBOX    PG : POLLING A REMOTE    MR : MULTI ... RECEIVE TO MEMORY

...and is for the information only of the person
to whom it is addressed. No responsibility
can be accepted if it is made available to any
other person, INCLUDING THE PATIENT
Tropical Texas Ctr. for MH/MR

**0000017**



# TROPICAL TEXAS CENTER

**VISION:** To lead in the innovative management of comprehensive behavioral healthcare resources for our local communities.

**MISSION:** We will efficiently provide quality behavioral healthcare to meet the unique needs of all people served.

## HARLINGEN MEDICAL RECORDS
1242 NORTH 77 SUNSHINE STRIP
HARLINGEN, TEXAS 78550
### TEL. (956) 423-8094
### FAX (956) 364-6554

DATE: 4-27-01

TO: Jose Bustamante

FROM: HIM

SUBJECT: #114804

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Please deliver the following page (s) at your earliest convenience unless otherwise below:

___ IMMEDIATELY          ___ OTHER

If you are unable to read any portion of this FAX Transmission, please call (956) 546-2230 Ext. ____.

Number of pages including this cover sheet  4

Linda Rosales
**Transmitter**

**CONFIDENTIALITY NOTICE:** Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in this facsimile message is MEDIAL RECORDS privileged and contains CONFIDENTIAL information intended for the use of the individual or entity named above. If the reader of this message is set the intended recipient, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by telephone and return the original message to Tropical Texas Center for MHMR at the above address via the U.S. Postal Service at our expense.

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person. INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR

0000018

APR-26-01 11:50 AM   A    cacy  Inc.                    956  30 3445              P.01

# Advocacy, Inc.-South Texas

1418 Beech, Suite 113
McAllen, Texas 78501
(956) 630-3013
Fax: (956) 630-3445

# FAX COVER SHEET

FAX NUMBER TRANSMITTED TO: ( 956 ) 364-6554

To: Ms. Odelia Cisneros

Of: Topical TX Center for MHMR

From: Jose Bustamante

Client/Matter: Juan Antonio Longoria

Date: 4-26-01

| DOCUMENTS | NUMBER OF PAGES* (Including cover sheet) |
|---|---|
| *Letter requesting records* | 2 |

**CONFIDENTIAL:** The information contained in this communication is intended only for the use of the addressee and may be confidential, may be attorney-client privileged, and may constitute inside information. Unauthorized use, disclosure, or copying is STRICTLY PROHIBITED AND MAY BE UNLAWFUL. If you have received this communication in error, please notify us at (956) 630-3013 IMMEDIATELY.

COMMENTS:

NOTE: This report is strictly confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person. INCLUDING THE PATIENT Tropical Texas Ctr. for MH/MR

* NOT COUNTING COVER SHEET. IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (956) 630-3013.

**0000019**

HPR-26-01 11:56 HM   A⁀⁀cacy Inc.                    956 ̄30 3445                P.02



*Advocating the Legal Rights of Texans with Disabilities*
*Implementing the Client Assistance Program for Rehabilitation Clients*

**1418 Beech, Suite 113, McAllen, Texas 78501**
**(956) 630-3013 (Voice/TDD) • (956)-630-3445 (Fax)**
http://www.advocacyinc.org
EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER

REGIONAL OFFICE: 6800 Park Ten Blvd., Ste. 208-N, San Antonio, Texas 78213
(210) 737-0499 - (210) 737-2403 (fax) - 1-800-880-8401

Ms. Odelia Cisneros
Tropical TX Center for MHMR                    April 26, 2001
1242 N..77 Sunshine Strip
Harlingen, TX 78550

Subject: Records
Re: Mr. Juan Antonio Longoria (age 41)

Dear Ms. Cisneros:

Advocacy, Inc., has been informed that Mr. Juan Antonio Longoria was evaluated by TTCMHMR staff on April 10, 2001. Mr. Longoria is the person that died while in the custody of the Cameron County Detention Center on 4/12/01.

Advocacy, Inc. is the federally designated Protection & Advocacy System for Texans with mental illness. Pursuant to federal law, when we learn that an individual with mental illness has died and we determine that there is probable cause to believe the individual had been abused or neglected, we are entitled to access the individual's records promptly.

We request a copy of the Crisis Screening/Evaluation performed on Mr. Longoria on 4/10/01. We would be very grateful if you would fax it to our local office as soon as possible. Thank you very much for your attention to this request.

Sincerely,

Jose Bustamante
Community Specialist

xc: Rosa E. Torres, Attorney at Law

NOTE: This report is ...........al
and is for the information only of the person
to whom it is addressed. No responsibility
can be accepted if it is made available to any
other person. INCLUDING THE PATIENT
Tropical Texas Ctr. for MH/MR

**0000020**

**Brownsville Medical Center**
1040 W. Jefferson, Brownsville, Texas 78520
Phone (956) 544-1400

NAME _____ AGE _____

ADDRESS _____ DATE _____

R̽    May return to jail
but should be kept under
close observation

Refill _____ times

Directions in Spanish _____

_____
PRODUCT SELECTION PERMITTED

DISPENSE AS WRITTEN
_____

ADDRESS _____

DEA # _____    Date _____
❑ I request that this prescription not be dispensed in a
Child Resistant Container.

PHONE _____

Signature _____

BC023912 (11/00)

**FELONY**

CAUSE NO. _6/B-1583_

**THE STATE OF TEXAS**

**VS**

_Juan Antonio Longoria_

### ORDER FINDING PROBABLE CAUSE

The Court having fully completed the examination in this cause is of the opinion that probable cause does exist to bind the defendant over to await the action of the grand jury for the felony offense of _____

_____ _Burglary of Building_ .

Said offense being a bailable one, a reasonable bond in the amount of $ _5,000-00_ is set, and it is ordered that upon posting a bond for said amount, in the manner and form required by law, he be released from custody; but in default of such bond that the defendant be committed to the jail of Cameron County, Texas and there to be safely kept to answer for said offense.

Signed for entry this _17_ day of _April_ , _2001_

_____
**Magistrate**

HEALTH RECORD
**Progress Notes**

| DATE | PROBLEM | NOTES | SIGNATURE/TITLE |
|------|---------|-------|-----------------|
| 4/11/01 | | Approximately 10:45 I was showing CO's S. Chong mens bathroom, I was stopped by Sgt Cerna & Sgt Silva to look at I/m elbow. I/m showed me left elbow which was bruised & tender, full ROM, skin warm. Questioned him about pain level "well it's sore". Then I/m lifted pant leg & showed me an open area about 2-3cm c̄ 3 steri-strips in place, ∅ bleeding or drainage noted. I/M alert & cooperative, answered all questions asked. Denied any food or medication allergies. # Tylenol ES given PO. Instructed guard to give I/m ice pack for elbow. Notified Sgt leg wound would be cleaned at infirmary @ booking ——— Silva cvn | |

Inmate Name _Juan Antonio Longoria_

Inmate ID #_____

Inmate D.O.B._____



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA  ) (
IDALIA GUTIERREZ,         ) (
INDIVIDUALLY AND ON BEHALF) (
OF THE ESTATE OF JUAN     ) (
LONGORIA, DECEASED        ) (
    Plaintiffs         ) (
                       ) (
VS.                       ) (    CIVIL ACTION NO. B-01-062
                       ) (
CAMERON COUNTY, TEXAS,    ) (
THE CITY OF BROWNSVILLE,  ) (    JURY DEMANDED
TEXAS AND JOHN DOES 1-10  ) (
    Defendants          ) (

---

ORAL DEPOSITION OF
ARMANDO TENORIO
FEBRUARY 17, 2004



---

      ORAL DEPOSITION OF ARMANDO TENORIO, produced as a witness at the instance of the PLAINTIFFS, taken in the above styled and numbered cause on FEBRUARY 17, 2004, reported by DONNA McCOWN, Certified Court Reporter No. 6625, in and for the State of Texas, at the offices of Adams & Graham, L.L.P., 222 East Van Buren, West Tower, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure.

14:58:29 1     Q.   Were you able to hear -- did you hear him

14:58:31 2  yelling and screaming, yelling, or anything like that?

14:58:33 3     A.   No, sir.

14:58:35 4     Q.   He looked normal.

14:58:37 5     A.   Yes.

14:58:38 6     Q.   Okay.  He wasn't talking to himself?

14:58:40 7     A.   No.

14:58:42 8     Q.   You didn't see him bang his head against the

14:58:45 9  wall?

14:58:45 10    A.   No, sir.

14:58:47 11    Q.   Nobody told you that he was banging his head or

14:58:50 12  his body against the wall?

14:58:51 13    A.   No, sir.

14:58:53 14    Q.   Okay.  Is the inside of that metal cell door

14:58:58 15  padded also?

14:58:59 16    A.   Yes, sir.

14:58:59 17    Q.   Is that window padded?

14:59:01 18    A.   No, sir.

14:59:04 19    Q.   Is there any wire mesh in that window, or is it

14:59:07 20  just plain tempered glass?

14:59:10 21    A.   It's tempered glass.

14:59:11 22    Q.   Is the glass tinted or nontinted?

14:59:14 23    A.   No, sir.  It's clear.

14:59:17 24    Q.   When you -- each time that you said you went by

14:59:21 25  there and looked in there four or five times, did you

14:59:24  1  actually stop there and look in?

14:59:25  2       A.  Yes, sir.

14:59:27  3       Q.  How much of the cell could you see when you

14:59:31  4  stopped and looked in?  Could you see all of it?  Half

14:59:34  5  of it?  Two-thirds of it?  Any part of it was blind?

14:59:39  6       A.  The only part that's blind is the one down,

14:59:41  7  forward down.

14:59:42  8       Q.  You mean below the window?

14:59:44  9       A.  Below the window.

14:59:46 10       Q.  In front of the door.

14:59:47 11       A.  Yes, sir.

14:59:47 12       Q.  You can't see looking in --

14:59:49 13       A.  Straight down, you can't see straight down, but

14:59:51 14  you can see, basically, the whole cell.

14:59:54 15       Q.  How about to each side right next to the wall

14:59:56 16  of the window?

14:59:57 17       A.  Yeah.  Basically.  Most of it.  Not all of it

14:59:58 18  but most of it.

15:00:02 19       Q.  Okay.  If somebody was slumped on the floor

15:00:02 20  next to the window on each side, could you see it if

15:00:04 21  you looked in?

15:00:06 22       A.  Yeah.  You could see part of his body.

15:00:08 23       Q.  Part of it.

15:00:09 24       A.  Yeah.

15:00:09 25       Q.  You couldn't see all of it?

15:00:11 1          A.  You couldn't see all of it.

15:00:14 2          Q.  Is the -- the bed that was in there, was that

15:00:17 3  just opposite that glass window, or was the bed on one

15:00:21 4  side or the other?

15:00:22 5          A.  It's on one side.

15:00:23 6          Q.  Okay.  Which side was it as you looked in?

15:00:25 7          A.  I think it's the right side.

15:00:28 8          Q.  What was in there just opposite when you looked

15:00:39 9  in the window, assuming that the prisoner was not in

15:00:39 10  your face?

15:00:39 11          A.  Just the walls.

15:00:39 12          Q.  Just the wall?

15:00:39 13          A.  There's nothing else in there.

15:00:39 14          Q.  Where was the floor urinal, hole in the floor,

15:00:43 15  in relationship to the window?

15:00:45 16          A.  In the center.

15:00:46 17          Q.  In the center of the room?

15:00:47 18          A.  Uh-huh.

15:00:47 19          Q.  Is that "yes"?

15:00:48 20          A.  Yes, sir.

15:01:01 21          Q.  When you checked on the -- on Mr. Longoria in

15:01:05 22  the padded cell No. 1, what was he doing four or five

15:01:09 23  times?

15:01:11 24          A.  Sometimes he was just standing there, sitting

15:01:13 25  down, or laying down.

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 17 DAY OF April, 2001, DID APPEAR: Francisco Lerma Jr., WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Francisco Lerma Jr.. I am 28 years old. My date of birth is 9/25/1972. I reside at 6720 Mobile Home Blvd. Brownsville, Texas 78520. I can be reached (956) 838-5229.

On Wednesday April 11,2001 I started my shift at 6:45am. Sgt Luis Mendieta gave us the briefing at that time. At around 10:00 through 10:30am. Joe Salinas from Brownsville Police Department arrived at the jail. Roy Roar was padding down one of the prisoner that Brownsville police had brought in. Roy was having problems with the prisoner. The booking officer notified me that Roy Rora was having trouble with the prisoner. I then walked towards the jails entrance door. I made contact with Brownsville police officer Salinas. I noticed that the prisoner had bruises on his left elbow. I asked the officer what had happen to him. He told me that he had medically cleared from Brownsville medical center. I patted the inmate down. I also asked him what had happened to him. The inmate stated that he had been shot the night before. Officer Salinas said' He's 96". 96 mean mentally ill subject. Officer Salinas then continued to state that the inmate "anda loco o anda trampado" meaning that the inmate was possible high on something. Since he was medically cleared. I told officer Rora to take both inmates to the back of the laundry area. In that area is where the inmates are dressed into county clothing. When he was taken back into the laundry area Sgt Silva stopped me and asked me "who had accepted the inmates and if they had medical clearance. I told him that I was the officer that had accepted the inmates and they had medical clearance from Brownsville Medical center. At that time the inmates were changing while I was still talking to Sgt. Silva the county jail nurse Sylvia Rivas approached us. I advised her of the inmate's bruises on his body. We advised her that he had medical clearance and if she could check him out. The inmate stepped out of the laundry room area. Silva asked the inmate in Spanish "que es lo que le paso" meaning what seam to be wrong. The inmate replied in Spanish "me balasiaron" meaning I have been shot. The inmate picked up his left pant leg. He showed her a bruise that he had on his knee. She also looked at the bruise that he had on his elbow. She said they are minor bruises they can be cleaned up later. Officer Roro and I then escorted the two inmates and placed them in the large holding cell. The inmate stated several time in Spanish " no biero las noticias anoche, me balaciaro' meaning that if we hadn't seen the news last night claiming that he was shot. After that I continued my regular duties.

About an hour later, I saw that Sgt Silva was standing by the padded cell with the door open. I walked up to the Sgt. Silva and asked him what was going on. Sgt. Silva told me that the inmate was claiming that the other inmates in the large holding cell were telling him that they had a gun and they were going to shoot at him. I noticed that the inmate was standing by the inside of the padded cell door. This inmate was originally the one that Brownsville police brought in. I asked the inmate that if he was a gang member? The inmate replied "no" he continued stating that the other inmates were going to shot him. Sgt. Silva then closed the door to the padded cell.



I didn't know the inmates name. I only overheard some one mentioned. I continued my duties.

SIGN: _____

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS __17__ DAY OF _April_ A.D. __2001__

_____
NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

THE STATE OF TEXAS          §



COUNTY OF CAMERON    §


. BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS ON THIS THE 1ˢᵗ. DAY OF May, 2001, A.D., DID PERSONALLY APPEAR: Felipe Silva
DEPOSE AND SAY:

My name is Felipe Silva. I am currently employed at the Cameron County Jail as a Sgt. Correctional Officer assigned to the County Jail in Brownsville, Texas. If I am needed I can be contacted at my residence and the address is 743 Florence Lane, Brownsville, Texas and my telephone number is 956-534-6488. I can also be contacted at the County Jail and the telephone number is 956-5440865.

On April 11, 2001 at 6:44 a.m., I reported for duty. I made contact with Sgt. Luis Mendieta who briefed me on pending activities. Sgt. Mendieta was relived of all his duties and I continued. Due to the fact that Sgt. Mendieta did not leave the facility he escorted me to the third floor to Cell 3bl and 3br, this cells hold 13 (thirteen) inmates in each cells. We went to these cells to check on one of the inmate who had a question. When we finished Sgt. Mendieta and I went back to the booking area. When we got to the booking area, Sgt. Mendieta left the facility. By this time shift officers including guard Rora had reported for duty and were assigned to different post. I assigned Officer Rora as a runner since he was a new employee. I advised Officer Rora to station himself close to the booking area to assist the booking officers.

At 7:45 a.m., Lt Joe Villarreal arrived for duty.

At 7:58 a.m., ten (10) federal inmates were released to USDM for Federal Court by USDM Agent Contreras.

At 8:00 a.m., Female Inmate Ana Olguin was taken to Doctor appointment.

At 8:00 a.m., Lt. Able Garcia arrived for duty.

At 8:35 a.m., Officer Hilda Trevino called in sick.

At 8:38 a.m., I escorted the trustee to throw out the trash.

At 9:32 a.m., I made around to 3cl and 3cr due to problems in the cells.

At 9:36 a.m., 1 (one) state female was brought in by Hall of Justice.

At 9:58 a.m., 1 (one) inmate brought in by County Sheriff Deputy Trevino.

At 10:06 a.m., Border Patrol Agent Flores picked up inmate Cuevas, Domingo Moy.

At this point I left the booking area to follow-up on 3cl and 3er. An inmate asked me about his personal belongings and I told him that I would check up on it with the Laundry Officer.

At 10:37 a.m., I came back to the first floor to the booking area. I remember about the inmate's request, so I went to the laundry room. Once at the laundry room, I saw officer Gregorio Escamilla, Officer Rora and inmate Longoria, Juan Antonio. Inmate Longoria was changing into an inmate uniform. I looked towards Inmate Longoria and I noticed an injury to his left elbow. This injury was red in color and swollen. I asked inmate Longoria if that was the only injury on his body. Inmate Longoria showed me another injury, which was on his left lower part of his leg. This injury was approximately two to four inches below his left kneecap. After seeing these injuries we went to the briefing area, and I called Assistant Sergeant Frank Lerma. I asked Officer Lerma what agency had brought Inmate Longoria into our facility. I also asked

FS

page 2 of 3
Felipe Silva Jr.

Officer Lerma if Inmate Longoria had a medical clearance.  Officer Lerma responded that Brownsville Police Department Officer Salinas had brought inmate Longoria and that he was medically cleared.   As we were still in the briefing area, I saw nurse Sylvia Rivas passing by, so I called her to come and observer the bruising.  I also saw that inmate Longoria was a little slow when answering questions, but nothing thing that alarmed me that I didn't to bring it to the attention of the nurse. These bruises were swollen and red and blue in color.  The nurse asked inmate Longoria if he had any other bruising, the inmate pulled up his left leg and show her a bruise that he had in his left knee, which was red in color and swollen.  Nurse Rivas told me that the bruises were minor and would be looked closer during medical clearance by her staff.  Inmate Longoria was assigned to the large holding cell that is located to the right side of the booking area
At 10: 46 a.m., I was at the booking area, two inmate brought in by County Sheriff Deputy Juan Hinojosa.

At 10:52 a.m., Infirmary Inmate Miguel Vela was transferred to Detention II for special visit.

At 10:56 a.m., Brownsville Police Department Officer Salinas brought in one male inmate.

At 11:15 a.m., while still in the booking area when I heard inmate Longoria arguing with several other inmates in the holding cell and I immediately went over to see what was the problem. I asked Inmate Longoria what was the problem and he said that several inmates wanted beat him up.  I then decided to remove Inmate Longoria from the cell to avoid further problems.  At that time Lt. Alfredo Gutierrez was passing by and asked me what was the problem.  I told him that inmate Longoria was arguing with several inmates and to avoid further problems I was removing him from that cell.  Lt. told me to put inmate in the small holding cell.  I told Lt. Gutierrez that due to fact that we already had the limit of inmates in the small holding cell, we couldn't place him there.  Lt. Gutierrez agreed and advised me to put him in the single cell # 1 (padded cell).  At this time I advised him that we already had one inmate in this cell.  Lt. Gutierrez asked me if the inmate in the single cell was giving anyone any problems.  I said, "no".  Lt. Gutierrez told me to remove the inmate that was in the single cell and place Inmate Longoria in the single cell.  After I did what Lt. Gutierrez advised me, I went on with my duties.  I then advised Officer Rora and Officer Lerma to check on inmate Longoria during the shift.

At 11:45 a.m., one inmate is released at this time.

At 12:00 p.m. 2 (two) new federal males and 5 (five) males recommitted.

At 12:55 p.m., Lt. Able Garcia advised me to advise the officer on duty to remove vehicles on the south side.

At 1:22 p.m., 5 (five) inmates were removed from 2 AL/2AR to cells in the third floor.

At 1:53 p.m.,  1 (one) federal male was brought in by Wackenhunt.

At 2:16 P.M., 3 (three) Federal Inmates were released to Wackenhunt Officer.

At 2:30 p.m., incoming shift started to arrive.

At 2:55 p.m., I briefed the incoming shift of the activities that occurred in the morning shift.  I told them that inmate Longoria was brought in by Brownsville Police Department and due to an incident that occurred during the shift between inmate Longoria and other inmates, Inmate Longoria was placed in the single cell #1 (one) and per Lt. Gutierrez.  I also advised them that inmate Longoria had an injury to his left knee area and elbow and had also been seen by Nurse Rivas and she stated that he would be checked when classified.  I then went back to booking, I saw Inmate Longoria standing by his cell door window looking out not saying anything.

I further want to state that our briefing ended at 3:12 p.m., and as I was heading toward the booking area I saw Inmate Longoria standing by the door. This was the last time I saw him alive.  I did not have any other encounter with him other then what I already mentioned in this statement.   I did see him during the shift, but I did not log it anywhere in the logs.


_Felipe Silva_
(Signature of person giving statement)


SWORN AND SUBSCRIBED TO BEFORE ME, ON THIS THE 1st DAY OF May, 2001____, A.D.

_Mary Ann Flore_
NOTARY PUBLIC IN AND FOR CAMERON COUNTY, TEXAS

MARY ANN FLORES
Notary Public, State of Texas
My Commission Expires
April 5, 2003

NAME  (PRINT OR TYPE)   COMMISSION EXPIRES


Statement taken at the Ruben Torres Detention Center
By Inv. Mary Ann Flores.

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 17 DAY OF April 2001, DID APPEAR: Armando Tenorio, WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Armando tenorio. I am 34 years old. My date of birth is 1.12.67. I reside at 1944 Cordova Dr. Brownsville, Texas 78521. I can be reached (956) 546-3421. I am employed with the Cameron County Sheriff's Department located on 954 E Harrison St. Brownsville, Texas 78520. I am currently a Sgt with the Jail Division..

On April 11,2001 I Came in to work at the Cameron County Jail at 2:45pm. At that time we were brief by Sgt. Felipe Silva. Sgt. Silva told us that we had an inmate Longoria in a padded cell. This inmate was brought in by Brownsville Police Department. The inmate was kind of aggressive and causing problems with other inmates in the large holding cell. We finished the briefing. I recall checking on this inmate about four to five time from the time frame 2:45pm and 645pm. at around 635pm I was in the classification office. This office is located almost across the hallway from the padded cell where inmate Longoria was in. The infirmary officer then came into the classifications office. Manuel Cortinas told me that he opened the door to the padded cell where inmate Longoria was. Officer Cortinas opened the door checking to see if it was the inmate that he was looking for. I then continued my shift and checking on inmate Longoria. At 10:45pm I was going to give the briefing to the oncoming shift. I then noticed Officer Javier Hernandez looking into the window to the padded cell where Longoria was in. Right before I was going to finish the briefing Officer Hector Galicia. We were there for a little while and waited for the paper work. At around 11:05 I walked over to the booking area with the paper work. I was walking back to the booking from the briefing area that by the laundry room. As I was walking by the padded cell where inmate Longoria was. I looked into the window. I noticed that inmate Longoria was walking inside the cell. Officer Hector Galicia asked me who was in the padded cell. I told him that it was and a 95. 95 being a person in custody. About a minute later Officer Galicia looked into the padded cell. We then started talking by the booking area. Hugo Galicia then walked towards the booking area. We then went outside to smoke a cigarette. I then went home after that.

SIGN: 

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 17 DAY OF APr. A.D. 2001.



NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

EXHIBIT
C

COUNTY OF CAMERON )(

BEFORE ME the undersigned authority on this <u>18</u> day of <u>April, 2001</u>

personally appeared <u>Xavier Lee Hernandez</u> who after being by me

duly sworn did depose and say:

My name is Xavier Lee Hernandez. I am 35 years old. My date of birth is 9/20/65. I reside at 5663 Boca Chica Brwonsville,Texas 78521. I can reached at (956). I am currenty Assistant Sargent(dentention officer) with the Cameron County Sheriff's department. I am currently assigned to the 2:45pm to 11:00pm shift.

On Wednsday April 11,2001, I arrived at work at around 2:45pm. We were briefed by Sgt. Felipe Silva. Sgt. Silva stated at around 10:25am inmate Longoria was brought in by Brwonsville Police Department with a medical clearance. The inmate was taken to the laundry area and changed into a county issued uniform. After he was changed he was taken to the large holding cell.The inmate started having problems with other inmates as per Sgt. Silva. In order to prevent problems and for the inmates own safety, he was placed in the single cell.While the briefing was going on , Inmate Longoria was yelling names such as "Jose". He continued yelling saying "quitate de ayi""dejame solo""me ban a matar". This meaning "leave me alone", "they are going to kill me" At that time I continued my shift.
At about 3:05pm after the briefing was over,I walked towards the booking area. As I was walking the inmate was yelling, so I looked into single cell through the window. The inmate was standing to the left of the room facing the wall towards the door. I kept going towards the booking area. I continued checking on him through out my shift. I would say that I checked up on him about eight times or more.
At around 10:45pm I was walking towards the briefing area. I looked inside the window and I observed the inmate slumpt over leaning against the right side of the wall facing the opposite way. He was mumbling away words that I could not understand what he was saying, He had his hands on his stomach. He was moving his hand and feet like in a nervous motion. I then continued to the briefing area.That was the last time that I observed the inmate.This inmate was yelling and tapping on the wall through out my shift. I then ended my shift and Left the facilty.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.



SUBSCRIBED AND SWORN TO AND BEFORE ME THIS <u>18</u> DAY OF <u>April</u>
A. D. <u>2001</u>.



NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

EXHIBIT
D

THE STATE OF TEX
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 18 DAY OF April, 2001, DID APPEAR: Julian Garza, WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Julian Garza. I am 29 years old. My date of birth is 3/30/72. I reside at Rt 8 Box 676-B (Military highway) Brwonsville, Texas 78520. I can be reached (956) 551-2183. I am currently a detention officer with the Cameron County Sheriff's Department. I am currently assigned to the 2:45pm to 11:00pm shift.

On Wednsday April 11,2001, I arrived at work at around 2:45pm. The briefing was given by Sgt. Felipe Silva by the laundry room. Sgt. Silva advised us that Brownsville Police Department had brought an inmate by the name of Longoria. He stated that they in large holding cell. The inmate became aggressive and started creating problems with other inmates. The briefing was over. I then looked at the logs to see where I was going to be assigned to; I noticed that I was assigned to be a runner. Runner duties are to assist booking officers and other officer in their duties. I then went to the booking area and I started my duties.
At about 5:05pm I passed through single cell number one, that's where inmate Longoria was. I looked into the cell and saw that inmate Longoria was sitting down. He was talking to himself. I saw that he was ok, so I continued my duties.
At around 7:15pm I had just finished doing the head count. I passed through single cell number one again. I looked into the cell through the window. Inmate Longoria was standing outside the little window. I again continued my duties.
At bout 10:25pm I was almost finishing the head count. At that time I passed through the single cell. I again looked into the single cell. I noticed that inmate Longoria was seating down talking to himself. I then proceeded to the briefing area. Sgt. Armando Tenorio was in the classification office. After the briefing, I ended my shift and went home. I don't recall the time but during the shift officer Manuel Cortina told me that he was at infirmary, He was looking for an inmate. He thought that the inmate was in single cell number one. He continued to tell me that he had opened the cell door. Inmate Longoria started walking and he pushed him back inside the cell. He then locked it back up.

SIGN:

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 18 DAY OF April A.D. 2001

NOTARY PUBLIC IN AND FOR CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005



EXHIBIT
E

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 17 DAY OF April, 2001, DID APPEAR: Manuel Cortinas Jr., WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Manuel Cortinas Jr.. I am 29 years old. My date of birth is 7/18/71. I reside at 1204 west Fronton Brownsville, Texas 78520. I can be reached (956) 554-9397. I am currently a detention officer with the Cameron County Sheriff's Department. I am currently assigned to the 2:45pm to 11:00pm shift.

On Wednesday April 11,2001 I went in to work at 2:45pm. Our shift was briefed Sgt. Felipe Silva in the laundry room area. I didn't hear much of the briefing being that there were two briefings at the same time.  I then went to relieve officer Guerrero in the infirmary. Two inmates were being seen at the infirmary by medical staff. I was given a list of two individual that needed to be brought down for x-rays. Officer Garza took the two guys that were being seen by the medical staff. I then went to the dorm section. I asked the inmates in the dorms, if they wanted to shower? The inmates were then shower.

At about 6:00pm the x-ray tech came in and told me that he needed two individual for x-ray. He showed me his file with the two names. I got on the radio with Officer Garza. I asked him if he could locate the two inmates that needed x-rayed. I waited till officer Garza called me back. Officer Garza showed up with one of the two inmates. Officer Garza then left. The tech then took the inmate's x-rays. He then told me that he needed the other inmate. After the first inmate was seen he was taken back to his cell. I don't remember who was the officer who took him back. I then went to go look for the second inmate being Bautista Flores. I went to the booking area. I asked the officer in booking if they knew were inmate Bautista was at. They didn't know where this inmate was. I was looking at the inmate's name in the computer to get a picture of their inmate. I then went to the drunk tank and called out his name. I opened the door and check but he wasn't there. I then proceeded to the large and the small holding cell. I check to see if he was there. I couldn't locate him there. I went over to single cell #1. I looked through the window. I saw a figure but I couldn't tell who it was being that the inmate had his back towards the door. I then proceeded to open the door to get a cleared visual of the inmate. As I opened the door the inmate started to walk out. I then put my open right hand to the inmate's mid chest area in order to stop him from getting out of the cell. I then walked him back into the cell. I then closed the cell door. I then left and continued my shift.

SIGN 

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS __12__ DAY OF __Apr.__ A.D. __2001__.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

EXHIBIT
F

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 17 DAY OF April, 2001, DID APPEAR: Jerry Sanchez, WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Jerry Sanchez. I am 23 years old. My date of birth is 1/21/78. I reside at 605 Parades Line Brownsville, Texas 78521. I can be reached (9560 548-1062. I am currently a booking officer with the Cameron County Sheriff's Department.

On Wednesday April 11,2001, I came into work at around 2:45pm. I advised my supervisor Kevin Crossely that I was there. I then proceeded to the booking area and made contact with Joe Morales. He told me that he had pending thirteen inmates to process. Joe then too out some paper and told me that it was then inmate that was in the padded cell. He then gave me the briefing.

At around 6:00pm I noticed that officer Manuel Cortinas. He was headed towards the padded cell. He told me that he was going to check on the inmate that was in the padded cell. The inmate that was in the padded cell was Juan Longoria. Officer Cortinas opened the door to the padded cell. Officer Cortinas yelled at the inmate and then closed the door to the cell. He walked back towards the booking area. As he was passing by he told that the inmate had charged at him. He stated that he had just pushed him back.

At around 7:00pm I started doing a head count. I then asked Sgt. Xavier Hernandez if he wanted me to book inmate Longoria. Sgt. Hernandez told me that he didn't have enough personal that he was going to let the incoming shift process the inmate. I then got out of the booking area and went towards the padded cell to check up on inmate Longoria. I looked through the window and noticed that inmate Longoria was standing up looking at the left wall. Inmate Longoria was mumbling. I then went back to the booking area. That was the last time that I saw inmate Longoria.

SIGN:

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 17 DAY OF April A.D. 2001



NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

EXHIBIT
G

THE STATE OF TEXAS )(
COUNTY OF CAMERON )(

BEFORE ME the undersigned authority on this <u>18</u> day of <u>April, 2001</u>

personally appeared <u>Jorge Ibarra</u> who after being by me

duly sworn did depose and say:

My Name is Jorge Ibarra. I am 28 years old. My date of birth is 9/17/72. I reside at 3573 Rey Enrique Brwonsville, Texas 78521. I can be reached at (9560 838-6020. I am currently a detention officer with the Cameron County Sgeriff's department. I am currently assigned to the 11:00pm to 7:00am.

On Wednsday April 11,2001, I arrived at work at around 10:45pm. We were briefed by one of the sergents. I don't recall which sergent it was possible Sgt. Tenorio. We were advised that we had an inmate that was being uncoopertive. We were advised that this inmate was in the padded cell. They advised us that as soon as the inmate calmed down he would be booked in. The briefing was finished. I then reported to my station being the infirmary room.

At around 12:15am Sgt. Mendieta advised me to report to second floor to the woman's ward to assist officer Randy Dierlam. I then went over to the second floor.Fifteen minutes past by and Sgt. Mendieta advised us to report down stairs on the floor.We went over to the first floor and made contact with Sgt. Mendieta and officer Hugo Galicia. Sgt. Medieta told us to put on some gloves being that the inmate was an uncooperative person. Sgt. Mendieta told us to assist him because the inmate on the padded cell was not responding. We walked to the padded cell. I don't remember who opened the door to the padded cell. Once the door was open ,I went in first. I noticed that the inmate's body was lying flat on the floor with his head leaning against the wall. The inmate's chin was touching part of his chest. Officer Santillana came in after me. I kneeled down and touched the inmate's right wrist area. I was checking for a pulse. I felt no pulse on the inmate. I then placed my left open hand on the inmate's chest. At that time, I felt that the inmate was cold.I then tought that we had to get medical attention for the inmate. I told Sgt. Mendieta that I didn't feel a pulse. Sgt. Mendieta told me not move the inmate.We then closed the door to the cell. I then went back to my station at the infirmary.About ten minutes later I returned back to the padded cell and Felipe Esquivel(County Jail Nurse) was working on the inmate. I assisted the nurse by holding the breather that placed on the inmate's mouth. The nurse was pumping the chest . at that time EMS arrived at location. Sgt. Mendieta then told me to go back to my station.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.

*[signature: Jorge Ibarra]*

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS <u>18</u> DAY OF <u>April</u> A. D. <u>2001</u>.

_____
NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

EXHIBIT
H

BEFORE ME the undersigned authority on this <u>18th</u> day of <u>April, 2001</u>

personally appeared <u>Sylvia Ann Santillana</u> who after being by

me duly sworn did depose and say:

    My name is Sylvia Ann Santillana. I am 47 years of age. My date of birth is on September 11, 1953. I reside at 4301 Hale Avenue #3 in Harlingen TX. My phone number is 412-6957. I am employed with the Cameron County Sheriff Department. I began on January 18, 2001. I may be contacted at work at 544-0865. I am assigned as a Booking Officer.
    On April 12, 2001 at around 12:30 a.m. I saw Sgt.Mendietta and Randy and Galicia checking on inmate Longoria. I could see this because my view is toward the direction of the single cell being the padded cell area. They opened the door. In my view I could see the inmate leaning near the door way resting his head on the wall towards an angle. Mendieta then told me to get a hold of the nurse. Mendieta then contacted dispatch. I continue with my work and I see on the monitors that the ambulance had arrived and I let them in. I also kept a log at the request of Sgt.Mendieta. That was all that happened.
    I was briefed by Jerry Sanchez from the previous shift. He told me that inmate Longoria was pending to be booked. He also told me not to worry about booking him because the inmate was violent. He further told me that it would be better to book him in the morning.

    I would like to state that my statement has been given voluntarily. I have not been forced nor threatened in any way for my statement and I have not been promised anything in return for my statement.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.



SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 18 DAY OF April
A. D. 2001.



NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

JAVIER REYNA
Notary Public, State of Texas
My Commission Expires
03-31-2004

EXHIBIT
I

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 18 DAY OF April, 2001, DID APPEAR: Hugo Galicia, WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Hugo Galicia. I am 33 years old. My date of birth is 1/8/68. I reside at 605 Paredes Line Rd #131 Brownsville, Texas. I can be reached (956) 544-3191. I am employed with the Cameron County Sheriff's Department. I am currently a detention officer (Assistant Sgt) assigned to the 10:45pm to 7:00am. .

On Wednesday April 11,2001, I arrived at work at around 10:43pm. I went into the booking area. I greeted the officers in the booking area. I then went into the briefing area located by the laundry area. I started working on the schedule. I waited for the immediate supervisor Armando Tenorio to come in and brief our shift. Sgt Tenorio came into the briefing area. He started briefing us. Sgt Tenorio stated that they had one 95. 95 meaning an inmate in custody. He then said that the Brownsville Police Department had brought the inmate in. He said that this inmate had been violent. He finished the briefing. I was working on my paperwork and talking to Sgt. Tenorio. My brother Hector Galicia was also there. After that everybody took off towards the booking area. I stayed behind finishing up on the paper. At around 11:08pm I was headed back towards the booking area, I was going through the hall, where padded cell is located. I looked in through the door window of the padded cell to check on the inmate. All I could see were the inmate's legs. I then started my regular shift.

At about 12:30am I was in the booking area. I was going to clean up my locker. Sgt Luis Mendieta told me look into the padded cell to check up on the inmate. I went to the padded cell. I looked through the door window of the padded cell, Again All I could see were the inmate's legs. I called Sgt. Mendieta. I told him lets check up on the inmate in the padded cell. We were going to start a visual log on the inmate that was in the padded cell being that We felt that a visual log needed to be started on said inmate. Sgt. Mendieta came over to the padded cell door. I then opened the cell door. We looked at the inmate. The inmate's body was lying still on the floor and the inmate's head was leaning on the eastside of the cell wall next to the cell door. Sgt Mendieta squaded down and tapped the inmate on his right shoulder. He asked the inmate if he was all right. At that time the inmate did not respond; I told Sgt. Mendieta that the inmate didn't appear to breathing. At which time Sgt Mendieta told me to secure the door to the padded cell. Sgt. Mendieta went to page the other two guards that were on the second floor. He did this to assist us. After that the two runners came down being Randy Dierlam and Jorge Ibarra. We went and opened up the padded cell again. I entered the cell and went towards the back. Sgt. Medieta and Officer Ibarra were asking the inmate if he was all right. Again no response from the inmate. At that time I believed that the inmate was dead being that the inmate was not responsive. After that Sgt. Mendieta told us to secure the cell. Sgt. Mendieta went and notified dispatch. The cell door was then closed . We then waited for the county jail nurse that was on call to arrive. The nurse being Felipe Esquivel.

Nurse Felipe Esquivel then showed. He asked, where is the inmate? I told him that he was in the padded cell. He told me to open it up. I then opened the door to the padded cell. He began to check the inmate. He came out and he said, "The inmate is not responding, I need to get to the infirmary".



EXHIBIT

J

We then went to the infirmary. He got the oxygen tank and what appeared to be an oxygen mask. We headed back to the padded cell. He started working on the inmate. After that the EMS arrived at location. They told him that he needed to come out so they could start checking up on the inmate. The EMS took over . They took the body inmate's body on a stretcher. We then secured the cell door.

SIGN: _____

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS ___ DAY OF ___ A.D. ____



NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

THE STATE OF TEX
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 18 DAY OF April, 2001, DID APPEAR: Randy Dierlam, WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Randy Dierlam. I am 20 years old. My date of birth is 7/18/80. I reside at 5125 Donna Dr. Brownsville, Texas 78521. I can be reached (956) 831-3503. I am currently a detention officer with the Cameron county Sheriff's Department. I am assigned to the 10:45pm to 7:00am..

On Wednesday April 11,2001, I arrived at work 10:20am. I waited for the rest of the shift to arrive. At 10:45pm the briefing was started. The briefing took place by the laundry room. Sgt. Armando Tenorio gave the briefing. He told us that the morning shift had received an inmate. The inmate was aggressive. I then went up to the third to make such that everyone is set up for the night.

At about 12:28am I was fixing the women's clothes rack. Officer Mason advised me that Sgt. Mendieta needed us down on the first floor. I then proceeded to the first floor. Once I was on the first floor. Sgt Mendieta advised that we were going to open the padded door cell. He stated that we were there for backup. I opened the door to the padded cell. Officer Hugo Galicia went in the cell. Sgt. Mendieta and Officer Ibarra proceeded to go in the cell. I stayed by the inmate's head was by the door. I noticed that the body was lying on the floor with the head towards the wall that's by the door. The Sgt. Mendieta started asking the inmate questions. The inmate was not responding. Sgt. Mendieta advised us to secure the cell. I went into the booking area and looked up the telephone number for the nurse on call. I gave the number to the booking officer Sylvia Santillana. Sgt. Mendieta called dispatch and advised them to contact EMS. At that time Felipe Esquivel arrived. Officer Galicia opened up the cell door for him. I was in the booking area waiting for the EMS. EMS then arrived at the jail. I stayed at the entrance by the sally port area.
I then noticed that EMS was taking the body on a stretcher. Sgt. Mendieta advised that I was going escort the inmate to the hospital. I went in the front passenger seat of the ambulance. We then took off to the hospital.

On arrival at the hospital the several doctor were looking at him. One of the doctors came up to me and told me that the body was rigor mortis. He also said that he had seen the inmate the day before. I was told to step out of the room. I then called my Sgt. Mendieta and advised that the doctor told me that the judge was coming. Sgt. Mendieta then sent a van to pick me up.

SIGN: 

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 18 DAY OF April A.D. 2001.



NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

EXHIBIT
K

COUNTY OF CAMERON )(

**BEFORE ME** the undersigned authority on this <u>18th</u> day of <u>April, 2001</u>

personally appeared <u>Luis Alberto Mendieta</u> who after being by

me duly sworn did depose and say:

My name is Luis Alberto Mendieta. I am 27 years of age. My date of birth is on February 24, 1974. I reside at 2447 Carnesi Apartment "D", in Brownsville TX. My home phone number is 982-1057. I am employed with the Cameron County Sheriff Department assigned to the County Jail as Detention Sergeant. I have been a Sergeant for 2 and a 1/2 years. I have been employed for the County for 5 years. I may be contacted at work at 544-0865.

On April 11, 2001 my shift came in from 11:00 p.m. to 7:00 a.m. My shift was briefed by Sergeant Tenorio. Tenorio brought up the fact that there was somebody inside the single cell #1 which is known to be the padded cell. No name was given just the fact that there was an inmate inside. Tenorio left after 11:00 p.m. and at no time did I see Sergeant Tenorio look inside the padded cell to check on the inmate.

After the previous shift completely left I proceeded to check the county jail doors for a security check. From there I proceeded to the booking area and talked to Sylvia Santillana, my booking officer, to see what we had pending. I then started getting my paper work set together. I then learned from Santillana that two inmates would be leaving out on what we call "state chain" early that morning. I did what I had to do in regards to that. The head count was then conducted at around 11:30 p.m around there and everything was ok. The inmates that were leaving were brought in that were leaving on State Chain. Me and my Asst. Sergeant, Galicia then decided to clean out my locker. During that time Galicia stopped at the single cell #1 when he told me that we should check out the inmate inside. I started hitting the door to see if the inmate would move. He would not move. I could only see his legs. I could not see his head. There was no response nor movement from the inmate. I then advised Galicia, with caution, to open up the single cell #1. The door was slowly opened because we thought he was laying by or on the door. The door was opened and we noticed that the guy was laying face up. I hoaler, "hay sir wake up" while on a kneeling position. It was to no avail and we got no response. My instinct and thought was that the inmate was faking of being asleep so my instinct was to call for back-up. We then called Officers Randy Dierlam and Jorge Ibarra. They arrived and I briefed the guys of what was going on and to be cautious upon going in there because the inmate might be faking it. We opened the door. Galicia was the first one to go and got by the inmates feet. Jorge Ibarra went after Galicia near his leg area and then myself and Randy was after me. I went back in a kneeling position and I started tapping inmate Longoria to wake up as well as Galicia telling Longoria in both English and Spanish to wake up. At no time did anyone move the body of Longoria. I only tapped him a couple of times to see if he would awaken. It was to no avail. I then grabbed him with my right hand on to his right wrist because I noticed his eyes were half way open and he would not blink. I grabbed his wrist so that I could visuallly see if he was awake or asleep so I could see his pupils. At that time I noticed that his eyes were rolled up and I could only see the white portion of his eye. I noticed that on his right eye. From there I told the guys to get out and not to move anything nor touch anything. We secured the door and I went to the booking area and advised Santillana to get me the nurse on call as soon as possible on the line. I then used extention 331 for dispatch and I told the dispatcher to send an ambulance to the county jail because I had an inmate not responding to us. Dispatch stated ok and that they would contact EMS. I then received a call from the nurse. It was Felipe Esquivel. I told him what was going on and he immediately arrived minutes later. I had also contacted Lt.Frank Gonzalez I told Santillana to write down who comes in and out of the county jail from that point on. Esquivel arrived and about two minutes later, EMS arrived. They worked on the inmate and later took him out on the ambulance. Randy Dierlam was directed by me to supervise the inmate in the ambulance on the way to the hospital. Minutes later, Leuitenants began to arrive as well as the Captain Elizardi.

At around 1:20 a.m. I got a call from a Doctor Richardson from Brownsville Medical Center. He told me that the body of the inmate had Rigor Mortis. He also asked what I knew about the inmate. I told him the inmate was incarcerated and I told him that I had just begun my shift. I also told him that the only thing I knew was that the inmate had been cleared by Brownsville Medical Center earlier during that day. The doctor said he would check up on that. I said o.k. That was basically all that happened. *Luis Mendieta*



EXHIBIT

L

I would like to ___ that my statement has been given voluntarily. I have not been forced nor threaten ___ n any way for my statement and I hav___ t been promised anything in return for my statement.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS _18_ DAY OF _April_ A. D. _2001_.

NOTARY PUBLIC IN AND FOR CAMERON COUNTY, TEXAS

JAVIER REYNA
Notary Public, State of Texas
My Commission Expires
03-31-2004

THE STATE OF TEXAS

COUNTY OF CAMERON  )(

BEFORE ME the undersigned authority on this <u>18th</u> day of <u>April, 2001</u>

personally appeared <u>Hector Galicia</u> who after being by

me duly sworn did depose and say:

My name is Hector Galicia. I am 33 years of age. My date of birth is on January 8, 1968. I reside at 4976 La Entrada Drive in Brownsville TX. My home phone number is 504-6901. I am employed with the Cameron County Sheriff Department assigned to the Jail Division as Assistant Sergeant. I have been employed for the past 5 years and 2 months at the Cameron County Jail.

On April last week from April 18, 2001 I do not remember the exact date but it was the night that a prisoner had died because I had been called in. I was on duty that day from 3-11p.m. I was working at the Detention Center #1. I got out a little bit early at around 10:55 p.m. I decided to go to the County Jail and talk to my brother about the upcoming Easter Holiday. I arrived at the Jail at around that time and I talked to him. They had just finished getting briefed. I also saw Sgt. Tenorio in the briefing area. I remember seeing XL. Hernandez. As I preceeded over to the booking area I saw Officer Cortinas and I said hello to him. I then saw Tenorio checking inside the padded cell through the window and I asked him if there was an inmate in there and he said yes. I then glanced in there myself and I saw an inmate inside. It looked as if he was wearing a blue uniform (paper suit) and I saw the inmate sitting at the end of the bed like bunk sitting down looking downward. The inmate looked ok to me. I only glanced at him for maybe give or take 1 or 2 seconds. I then left and went home. Later on that night I was notified to report to the main County Jail. This was due because of the incident involving the inmate in question.

I would like to state that my statement has been given voluntarily. I have not been forced nor threatened in any way for my statement and I have not been promised anything in return for my statement.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS _____ DAY OF _April_
A. D. _2001_ .

NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

JAVIER REYNA
Notary Public, State of Texas
My Commission Expires
03-31-2004

EXHIBIT
M

## STATEMENT OF ACCOUNT

MY NAME IS ABEL G. GARCIA , I AM FIFTY ONE YEARS OLD . I HAVE BEEN EMPLOYED WITH CAMERON COUNTY

SHERIFF'S JAIL DIVISION SINCE NINETEEN SEVENTY NINE , AND PRESENTLY HOLD THE RANK OF SENIOR

LIEUTENANT . I DO NOT , OR HAVE EVER HELD THE AUTHORIZATION TO SET JAIL POLICY . TO THE BEST OF MY

KNOWLEDGE , THE SINGLE CELLS WERE USED BY THE PREVIOUS ADMINISTRATION TO HOUSE VIOLENT OR

AGGRESSIVE BEHAVIORAL INMATES WHOM COULD  CAUSE INJURY OR  HARM TO THEMSELVES

OR OTHERS . THE INMATE WOULD BE DRESSED IN A JAIL PAPER SUIT AND A VISUAL OBSERVATION MONITOR LOG

WOULD IMMEDIATELY BE INITITATED AT FIFTEEN OR THIRTY MINUTE INTERVALS TO INSURE THE SAFETY AND

WELL BEING OF THE INMATE.


JUAN ANTONIO LONGORIA , DECEASED

I.D. # N/A

SINGLE CELL , FIRST FLOOR

    ON APRIL 12, 2001 AT APPROXIMATELY TWELVE FIFTY-FIVE IN THE MORNING SENIOR LIEUTENANT FRANCISCO

GONZALEZ CALLED MY RESIDENCE TO ADVISE ME THAT THE COUNTY JAIL HAD JUST CALLED HIM ABOUT A

POSSIBLE DEAD INMATE FOUND IN A SINGLE CELL . LIEUTENANT GONZALEZ PICKED ME UP AT MY RESIDENCE

AND WE ARRIVED AT THE COUNTY JAIL AT APPROXIMATELY ONE THIRTY IN THE MORNING. JAIL ADMINISTRATOR ,

CAPTAIN JOE ELIZARDI AND LIEUTENANT JOE VILLARREAL WERE ALREADY IN THE COUNTY JAIL. LIEUTENANT

GONZALEZ AND I MET WIITH CAPTAIN ELIZARDI AND STARTED CALLING IN ALL SHIFT SUPERVISORS AND OFFICERS

WHOM HAD WORKED THE FIRST FLOOR FROM THE TWO PREVIOUS SHIFTS , SO REPORTS COULD BE DONE FOR

INVESTIGATIVE PURPOSES. THE SINGLE CELL WHERE SAID INMATE HAD BEEN HOUSED WAS LOCKED TO

PROTECT AND SECURE EVIDENCE.


ABEL G. GARCIA , LIEUTENANT

# Cameron County
## Sheriff's Department



# JAIL DIVISION
# OPERATION PLAN

(As required by Texas Commission on Jail Standards)

1. Approved: August 07, 1995
2. Approved: August 19, 1996
3. Approved: August 31, 1997



EXHIBIT NO. 2
Bryant & Stingley, Inc.

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Life Safety Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 263** . . 4

Admission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 265** . . 9

Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 267** . . 14

Records and Procedures . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 269** . . 15

Classification and Segregation of Inmates . . . . . . . . **TCJS Chapter 271** . . 16

Health Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 273** . . 19

Supervision of Inmates . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 275** . . 27

Clothing, Personal Hygiene, and Bedding . . . . . . . . **TCJS Chapter 277** . . 28

Sanitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 279** . . 29

Food Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 281** . . 31

Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 283** . . 32

Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 283** . . 38

Recreation and Exercise . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 285** . . 41

Education and Rehabilitation Programs . . . . . . . . . **TCJS Chapter 287** . . 42

Work Assignments . . . . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 289** . . 44

Services and Activities . . . . . . . . . . . . . . . . . . . . . . . **TCJS Chapter 291** . . 45

General Rules and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# INTRODUCTION

This Policy and Procedure Manual is designed to act as a guideline for all Detention Officers employed with the Cameron County Sheriff's Department - Jail Division. Procedures within this manual encompass foremost on the Safety and Security of the Facility, Staff, and Inmates. This handbook will explain procedures and address stipulations concerning Inmate Rules, Rights, and Privileges as set forth by Texas Commission on Jail Standards.

3

Chapter 263
**LIFE SAFETY RULES**

OBJECTIVE
The objective of the Cameron County Jail Emergency Plan is to give procedures dealing with fires, riots or rebellions, assaults, escapes, and civil disasters.

GENERAL
    A. All new personnel will attend a mandatory course covering the use of fire safety equipment and procedures for emergencies. There will be at least one fire drill per month conducted by each shift. Continuous in-service training should be provided to each shift. All shift supervisors will maintain a training log of all fire drills conducted on his/her shift. Copies of all fire drill reports will be turned into the facility administrator.

    B. The Brownsville Fire Department will be called in to perform a fire hazard inspection on a quarterly basis. The results of this inspection will be kept on file at the facility administration office.

    C. All emergency exits should be clearly marked and a daily inspection of all exits and hazardous areas will be performed by the shift supervisor.

    D. The shift supervisor is responsible for key control in all facility emergencies. The facility keys will be stored in a secured key locker area. A second set should be stored in another secured area. The facility supervisor will maintain inventory of all facility keys.

    E. In case of an actual emergency, all officers should standby until the emergency is resolved. All necessary reports, documents, photographs, etc., need to be submitted before any person can be dismissed from the jail facility. All officers are subject to be called in to work if an actual emergency should occur.

    F. First Aid equipment should be located at each cell area and shift supervisor's office; the nurse on call will be notified; and the shift supervisor will call the Emergency Medical Service (EMS) in the event medical treatment is needed.

I. FIRE EVACUATIONS - Removal of Occupants
*The following plan was developed with the assistance of the Brownsville Fire Department.*

    A. Exits from the floors and the building should be clearly marked according to the local fire code. Should evacuation be necessary, the safety of inmates and staff members will be the primary concern. However, sufficient personnel should be on hand to secure all points along the evacuation route and the evacuation area. REMEMBER, only partial evacuation may be required. Only inmates in the affected areas will be evacuated. The shift supervisor will advise the floor officer if evacuation is imminent.

4

The floor officer will immediately notify the booking area of the floor or cell location where the fire exists. The floor officer responding will call a "Code 12", when reporting the fire. The booking officer will rebut by announcing a "Code 12" over the intercom system. At this time, backup and support personnel will respond to the location.

C. The floor officer will immediately put on the air pack, if necessary, and attempt to extinguish the fire. Backup and support personnel will operate the fire hose until relieved by the fire department or evacuation is impending.

D. If cell evacuation is necessary, the floor officer, along with backup assistance, will begin by securing the evacuation route. The inmates will then be escorted to their designated evacuation area.

E. The shift supervisor will check the cell area to insure that the evacuation is complete. The responding floor officer will accompany the inmates to the evacuation area and take a head count of all inmates upon arrival. Inmates will be kept quiet and moved in an orderly manner toward the exits.

F. The shift supervisor, or his or her assistant, will direct fire fighting personnel to the fire location.

G. Armed deputies will be on hand at all exits to prevent an escape during an evacuation.

H. All officers involved will submit a written incident report prior to the conclusion of duty.

## DORM EVACUATIONS

In an emergency, where dorm evacuation is apparent, the following should be followed.

A. At the Detention Center I dorms B (Bravo), C (Charlie), D (Delta), and Detention Center II dorms E (Echo) and F (Fox), inmates will be evacuated through the dorms into the recreation courtyard directly beside their respective dorm area.

B. Trusties working in the kitchen and laundry area will be escorted out to the recreation area or to the trustys' dorm. The floor officer assigned to the supervision of trusties will be responsible for their movement.

## CELL EVACUATIONS

At the main jail facility, the following plan should be followed.

A. Trusty inmates working in the first floor kitchen, laundry, and cleanup detail, will be evacuated to the sally port area. Inmates in the jail infirmary, drunk tank, and holding cells, will also be escorted to the sally port area.

B. Inmates on the second floor will vacate to the outside recreation area. Female inmates will be evacuated to the female recreation area.

5

evacuation space is needed, the 2nd floor courthouse tunnel will be used.

D. Elevators should not be used if there is a fire. All movement will be carried out via the fire escape stairs.

E. The facility booking officer on duty will be responsible for all jail records (booking cards). The shift supervisor will assign an officer to help the booking officer in securing the booking area and maintain the control room.

ESCAPE
The subsequent method will initiate upon noticing an escape.

1. IMMEDIATELY notify the shift supervisor by phone or radio.
2. Begin lockdown procedures and take an immediate headcount.
3. Obtain essential information concerning the escape
4. Retrieve the escapee's booking card and ID #
5. Escapee's property will be seized and secured.
6. The shift supervisor will follow notification process.
7. The CCSD Criminal Investigation Division will be informed and incident reports written.

Essential information should include:

1. Floor and Cell block
2. Inmate(s) name
3. How many escaped
4. Escape routes

After securing the facility and Sheriff's office notified, an investigation into the circumstances of the escape will be made. Witnesses will be questioned, statements will be taken, and evidence sought and secured. The District Attorney's Office will be consulted as to appropriate charges.

ASSAULTS
Any assault committed by inmate(s) on inmate(s), will be reported to the shift supervisor. The shift supervisor will determine the scope of the situation and notify the appropriate persons. Medical treatment will begin when possible. The facility supervisor will contact the CCSD CID for necessary action and possible criminal charges.

RIOTS AND REBELLIONS/HOSTAGE SITUATION
1. Floor officers will not attempt to enter the disturbance area without immediate assistance. The floor officer on duty will try, through persuasion, to calm the activities of the inmate(s).

2. The floor officer will notify the booking area for backup if the situation is deemed out of control. The shift supervisor will respond to the situation.

shift supervisor will direct inmates that are not involved to go directly to their assigned bunk. The shift supervisor will determine:

   a. hostages
   b. inmates involved
   c. dimension of activities

4. The shift supervisor will follow the Jail Administrator and the Sheriff. All jail activities will cease and facility composure will be enforced.

5. All visitors will be evacuated.

6. The perimeter of the facility will be kept clear by the Brownsville Police Department and the Texas Department of Public Safety.

7. The Sheriff, or his designee, will establish contact with the rioters and attempt to calm the activities through reason.

8. If hostages are involved, the Federal Bureau of Investigations will be brought in for consultation and advice.

9. Should all peaceful efforts fail, the Sheriff may order appropriate force to tranquilize the situation and secure the safety of the hostage(s). Once the riot is subdued, inmates will be medically examined and treated, if needed.

10. At conclusion of the predicament, all officers involved will submit a written report to the shift supervisor prior to leaving his or her assignment.

11. All incident reports and pertinent information will be forwarded to the appropriate departments for investigation. The Jail Administrator will review their findings for possible corrective measures.

NOTIFICATION PROCEDURES

The intention of the notification plan is to inform officers assigned to the Cameron County Jail Facilities the procedures to follow in case of an actual emergency.

A. The responding booking officer will announce the emergency code over the intercom system. Backup floor officers and support personnel will respond to that location.

B. The facility supervisor (lieutenant) or the shift supervisor (sergeant) on duty, will initiate the notification process.
   1. Call the Brownsville Fire Department, if necessary.     (911)
   2. Call Sheriff's Dispatch for deputies on duty, if necessary     (544-0860)
   3. Dispatch will notify the Jail Administrator and Sheriff.
   4. Call the Brownsville Police Department, if necessary.     (911)
   5. Call the Texas Department of Public Safety Officers.     (541-6721)
   6. Call Emergency Medical Services, if needed.     (911)
   7. Call the U.S. Marshall Service, if needed.     (548-2519)
   8. Call the FBI, if necessary.     (546-6922)

A complete list of the above telephone numbers should be found at the booking station of each facility.

The Emergency Medical Service will be called to help in the care and transportation of the injured. The Brownsville and the Valley Regional Medical Centers emergency rooms will be alerted for possible medical treatment.

C. The facility supervisor will maintain key control throughout the emergency.

Texas Commission on Jail Standards
Chapter 265
**ADMISSIONS**

PROCEDURE
   A. RECEIVING PRISONERS

All prisoners accepted into custody of the Sheriff shall be accompanied by a properly prepared and appropriately executed commitment document. All Sheriff's personnel who function as admissions officer shall be familiar with the types of legal commitment document(s). The Admissions Officer shall refuse to accept any person into custody of the Sheriff in the absence of a valid commitment document.

The receiving officer will request to see the delivering officer's identification card which contains his/her photograph, identifying data, badge number, and signature of the agency department head. If the delivering officer cannot, or will not, produce such identification, or his/her identification does not conform to his/her person, his/her prisoner(s) shall not be accepted into custody of the Sheriff.

B. SEARCH

   1. STRIP SEARCHES
      A. PURPOSE
         It is the purpose of this policy to provide correction officers with guidelines for determining if, and under what circumstances, the use of strip searches are legally permissible and to establish regulations for the appropriate conduct of such searches.

      B. POLICY
         This department recognizes that the use of strip searches may, under certain conditions, be necessary to protect the safety of officers, civilians, and other prisoners; to detect and secure evidence of criminal activity and to safeguard the security, safety, an related interests of this agency's prisoner detention and holding facilities. Recognizing the intrusiveness of these searches on individual privacy, however, it is the policy of this department that such searches be conducted only with proper authority and justification, with due recognition and deference for the human dignity of those being searched and such searches as set forth in this policy.

      C. DEFINITIONS
         1. Strip Search - any search of an individual requiring the removal or rearrangement of some, or all clothing to permit the visual inspection of any, or all skin surfaces including genital areas.

         2. Body Cavity Search - any search involving not only physical examination of body cavities and, in some instances, organs such as the stomach cavity.

9

D.  PROCEDURES

A.  Individual shall not be subject to strip searches unless the corrections officer has articulable, reasonable suspicion to believe that the person is concealing contraband or weapons. Reasonable suspicion may be based upon, but is not limited to, one or more of the following criteria:

1. the nature of the offense charged (violent offenses involving weapons or violation of the Controlled Dangerous Substance Act);

2. the arrestee's appearance and/or demeanor;

3. circumstances surrounding the arrest;

4. arrestee's criminal record for past crimes of violence or of the Controlled Dangerous Substance Act (a criminal record alone is not sufficient, but must be evaluated along with other relevant factors such as;

   a.  age of conviction

   b.  lack of intervening arrests

   c.  seriousness and nature of prior offense(s)

   d.  whether the prior conviction was expunged

5. any other factors or circumstances that indicate the arrestee is, or is not, a security risk.

B.  Field strip searches of prisoners shall be conducted only in the rarest cases under exigent circumstances where the life of officers, or others, may be placed at risk, and only with the explicit approval of supervisory officer.

C.  Where articulable, reasonable suspicion exists to conduct a strip search, the correction officer shall make a <u>written</u> request for such action to the facility supervisor, or other designated authority, that clearly defines the basis for suspicion.

D.  When authorized by appropriate supervisors, strip searches may be conducted only:

   a.  by trained and designated jail personnel;
   b.  in conformance with approved hygiene procedures and professional practices;
   c.  in specifically designated jail areas utilized for this purpose;
   d.  by the least number of personnel necessary and only by those of the same sex; and
   e.  under conditions that provide privacy from all but those authorized to conduct the search.

10

E. Following a strip search, the correction officer performing the search shall submit a written r    rt to the supervisory authority that de      at minimum, the following:

    a. date, time, and place of search
    b. identifying officer conducting the search
    c. identifying individual(s) searched
    d. witnesses to the search
    e. detailed description as to the nature and extent of said search
    f. any weapons, evidence, or contraband found during the search

## 2. BODY CAVITY SEARCHES

Should visual examination of a suspect during a strip search and/or other information lead an officer to believe that the suspect is concealing a weapon, evidence, or contraband, within a body cavity, the following procedures shall be followed:

A. The officer shall consult with his/her immediate supervisor to determine whether probable cause exists to seek a search warrant for a body cavity search. The decision to seek a search warrant shall recognize that a body cavity search is highly invasive of personal privacy and reasonable only where the suspected offense is of a serious nature and/or possess a threat to the safety of officers or others, and/or the security of the department's detention operations.

B. If probable cause exists for a body cavity search, an affidavit for search warrant shall be prepared that clearly defines the nature of the alleged offense and the basis for the officer's probable cause.

C. On the basis of a search warrant, a body cavity search shall be performed only an authorized agency physician, or by other medically trained personnel at the physician's direction.

D. For safety and security reasons, the search shall be conveyed at the department's facility, or other authorized facility, and in the area designated for this purpose.

E. Body cavity searches shall be performed with due recognition of privacy and hygienic concerns.

F. The authorized individual conducting the search shall file a report with the requesting law enforcement agency. The witnessing law enforcement officer shall co-sign that report.

## C. OBSERVATION

Inmates who have been placed in holding or detoxification cells are to be observed by a corrections officer at intervals not to exceed thirty (30) minutes.

Appropriate entries in the daily jail log shall be recorded promptly for each inmate accepted into custody. The admissions officer is to initiate a booking card by entering the following information:

1. Name of inmate with aliases
2. Description
3. Sex
4. Marital status
5. Address
6. Date of birth
7. Offense(s) charged
8. Date of commitment
9. Previous criminal record
10. Record of injuries
11. Inmate property inventory
12. Disabilities warranting special accessibility consideration
13. Name, address, and phone number of person to be contacted in event of emergency
14. Name of delivering officer and arresting agency
15. Documents that claim to legally authorize the inmate's commitment

At this time, a medical file should also be established and kept in a separate file.

E. HEALTH TAGS

Inmates needing special medical attention shall be properly identified and brought to the immediate attention of health personnel and/or supervisor on duty.

F. IDENTIFICATION

Inmates awaiting the identification process are to be removed from the holding cell at such intervals and in such number as they may be processed by identification personnel.

The inmate's ID, aliases, and right index print should be appropriately recorded on the booking card. Two (2) mug shots of the inmate are to be taken. One for the booking card and the second for the inmate housing card. Should the inmate wear prescription glasses, two (2) extra mug shots should be taken. The first set with glasses and second without.

G. TELEPHONE USE

A telephone and telephone directory shall be made available for inmates' use within the processing area. Inmate's constitutional telephone calls will be made according to the Telephone Plan (TCJ Chapter 291).

H. CONTACTING ATTORNEY

Inmates are to be advised that they will be allowed to contact any attorney upon reasonable request.

12

I. BONDING

All inmates shall be allotted the opportunity to secure their release utilizing the bonding procedures available in Cameron County or district.

J. PROPERTY CHECK

The admissions officer is to take all personal possessions and monies from the prisoner and list all items (with accurate, concise description of each item) on the inmate's property receipt. The only exception are bench warrant inmates from TDC who are allowed to keep their stationary items, stamps, and all personal hygiene articles.

All items, except money, should be placed in a property envelope. Should an item be too large for an envelope, it is to be listed on the property receipt and tagged with the inmate's ID number and name and stored separately.

A receipt signed by the receiving officer and inmate shall be maintained in the inmate's file. In the event an inmate refuses to sign the property receipt, the receiving officer, with a witness present, shall note the refusal and sign the receipt.

K. SHOWER

All prisoners being admitted to the Cameron County Jail should have access to a shower prior to being placed in general population. Should a bruise, cut, scar, tattoos, or other identifying marks become evident during showering, it is to be noted on the jail classification profile form.

Showers shall be supervised by a corrections officer of the same gender.

L. COMMUNICABLE DISEASE

An inmate suspected of having any of type of disease will be isolated and immediate arrangements made for the inmate's transfer to a facility equipped to handle the suspected disease, unless the admitting facility can safely and effectively segregate and maintain a medically prescribed course of treatment.

M. NON-DISCRIMINATORY PRACTICES

Cameron County's Jail Personnel shall not discriminate against inmates because of race, religion, national origin, sex, age, or disabilities.

13

**RELEASE**

A. The releasing officer shall properly identify an inmate, by photograph and/or fingerprints, before discharging or releasing. Verification by booking card should also be done.

B. The releasing officer shall be certain the proper authorized release forms are accurately executed and presented at the time of discharge or release.

C. Before being released to the custody of the releasing agency, any and all inmates are to be correctly executed and presented at the time of discharge or release.

D. A record shall be kept of the release order and time of discharge.

E. All property that was inventoried at the time of booking shall be returned to the inmate at time of discharge or release. The inmate shall sign a receipt to acknowledge the return. In the event an inmate refuses to sign the property receipt return, the releasing officer, with a witness present, shall note the refusal and sign the property receipt.

F. Before releasing or discharging an inmate, the right index finger is to be fingerprinted at time of release. Once all procedures are completed and property received and signed for, the inmate is to be escorted out of the facility by the floor officer.

Texas Commission on Jail Standards
· Chapter 269
**RECORDS AND PROCEDURES**

1. The booking/classification officer shall maintain the following records
   A. A daily record of the number of inmates in each facility;

   B. A record on each inmate including:
      a. intake
      b. identification
      c. classification
      d. property
      e. discipline
      f. grievance
      g. commissary
      h. medical
      i. incidents or unusual occurrences
      j. release
      k. documentation relating to the continued custody of inmates
      l. receipts and expenditures of inmate accounts.

   C. All Inmate Incident Reports will be kept on file for each prisoner of all three (3) facilities. These reports will include the names of the persons involved, a description of the incident, actions taken, if any, and the date and time of occurrence.

2. Each Sheriff or Jail Administrator will maintain fiscal records which clearly indicate the costs for the facilities. Such records should include feeding and clothing outlay and other program costs.

3. Weapons and ammunition shall not be permitted beyond the security perimeter. All officers entering the jail facilities will secure their weapon and ammunition in the gun lockers provided. The officer locks compartment doors, removes key, and keeps it in his/her possession until he/she recovers his/her weapon upon leaving the facility.

15

Chapter 271

## CLASSIFICATION AND SEGREGATION OF INMATES

I.   OBJECTIVE

The Classification Sergeant will develop and implement this classification plan that includes principles, procedures, instruments and explanations for classification assessments, housing assignments, reassessments, and inmates' needs.

Inmates will be classified and housed in the least restrictive housing available without endangering staff, inmates, or the public.

II.   PROCEDURES

The classification officer will complete the initial custody assessment form using the following criteria:

(1) current offense or conviction
(2) offense history
(3) escape history
(4) institutional disciplinary history
(5) prior convictions
(6) alcohol and/or drug use
(7) stability factors

The Severity of Offense Scale (see Form A) is listed at the end of this section. This scale will be used for classification purposes.

*NOTE: All assessments performed will not include race, ethnicity, or religious preference.*

III. CUSTODY LEVELS AND SPECIAL HOUSING NEEDS

Custody levels and special housing needs will include minimum, medium, and maximum custody levels. These three levels will be utilized for assignment to general population or special segregation cells such as protective custody, segregation, and/or medical/mental health housing.

(1) Maximum and minimum custody level inmates will be housed separately.

(2) Material witnesses will be completely separated from general population.

(3) No juvenile (under the age of 17) will, at any time, be housed within the Cameron County Jail System, unless certified as an adult by the appropriate court.

(4) Female inmates will be separated from sight and sound of male inmates. At no time are female and male inmates to interact.

16

(5) Inmates assigned to a detoxification cell will be transferred to a housing area as soon as they are able    care for themselves.

(6) The status of people confined to a violent cell shall be reassessed and documented at least every 24 hours for continuance of status.

(7) Inmates who require protection, or those separated to protect the safety and security of the facility, may be housed in administrative segregation.

*NOTE:*    The status of inmates placed in administrative segregation will be reviewed and documented at least every 30 days for continuance of status.

*All inmates housed in administrative segregation will retain access to services and activities unless the extent of the services and activities would antagonize the safety and security of the facility, staff, and/or public.*

(8) Single cells will be utilized for disciplinary or administrative segregation only. Inmates assigned to single cells will retain access to a shower and day room for at least one hour each day.

IV.    CLASSIFICATION PROCESS    *(forms will be found at the end of this section)

A. An Inmate Classification Profile *(see Form B), along with an Initial Custody Assessment Form *(see form C), will be completely performed on each inmate booked into the Cameron County Jail, within a period not to exceed seventy-two (72) hours, for the purpose of identifying any medical or mental health needs, or other special requirements that dictate placing an inmate in special housing units. The Senior Sergeant shall review all custody assessment forms for correctness and override approval if necessary.

B. A Custody Reassessment *(see Form D) will be performed within 30 - 90 days of the Inmate Classification Profile and Initial Custody Assessment immediately upon any change in custody level and prior to any changes in housing assignments. The Senior Sergeant shall review all custody assessment forms for correctness and override approval if necessary.

V.    HOUSING SCHEME

All inmates, after the initial custody assessment, shall be placed accordingly designating the construction security level (minimum, medium, maximum) of each facility.

| | | |
|---|---|---|
| **Minimum Security** | - | **Detention Center I** |
| **Medium Security** | - | **Detention Center II** |
| **Maximum Security** | - | **County Jail** |

**NOTE:**    *Custody level assignments shall not exceed the construction security level.*

17

VI.  TRAINING

All correctional staff, whose duties include classification, shall undergo at least four (4) hours of training every six (6) months on the principles, procedures and forms for classifying, housing assignments, reassessments, and inmate needs. Permanent records will be obtained for guards that attend classification training.

VII.  APPEALS

Should an inmate have a complaint as to his/her assessment, reassessment, custody level, and/or housing assignment, he/she may appeal, in writing, their specific complaint to the Jail Administrator. If the Jail Administrator denies their specific appeals request, they can appeal directly to the Sheriff. All determinations by the Sheriff on appeals are final.

VIII.  RECORDS

All records regarding assessment, cell assignments, reassessment, housing assignments, program assignments, and/or appeals, shall be maintained in each inmate's file.

IX.  AUDITING

A committee consisting of the Jail Administrator, Senior Sergeant, 1st Lieutenant, and three (3) facility lieutenants shall conduct a systematic audit of the assessment system on April of every new year. A record will be maintained of each audit.

The committee will assure that records are audited in a random and orderly fashion, such as every tenth file, and must represent both inmates currently incarcerated and those previous detained.

The committee will ensure that the assessment process:

1. is completed within 72 hours after inmate's arrival,
2. is completed accordingly for proper housing assignments agreeing with custody level,
3. is overridden acceptably
4. is completed in an accurate and timely manner.

Based on facility capacity, the following number of records, per category, must be audited:
30 Maximum custody records
30 Medium custody records
30 Minimum custody records
30 Disciplinary custody records
30 Administrative custody records
30 Overrides
    15 records indicating a higher custody level
    15 records indicating a lower custody level
30 Reassessments
    10 records indicating a higher custody level
    10 records indicating a lower custody level
    10 records indicating no change in custody level

**Texas Commission on Jail Standards**
**Chapter 273**
**HEALTH SERVICES**

SUBJECT:    TREATMENT PHILOSOPHY

Purpose:  To assure health care will be provided with consideration of patient's dignity and feelings.

Policy:

1. During female examinations, only the physician, female nurse, and matron, should be present in the examination room.

2. Proper procedure will be maintained for pelvic and breast examinations with gown, gloves, and lubrication.

3. A body orifice check will not be done.  Exceptions are court ordered and will only be performed by professional medical personnel.

4. Verbal consent will be obtained from the patient before rectal or pelvic examinations are performed.

5. Identified chemical dependent patients will be provided a protocol and monitored closely until detoxed.

6. Inmates with existing, or previous, mental health concerns will be seen by a physician who will then determine whether further psychiatric intervention is required.

7. The physically disabled and convalescent patients will be closely observed per individualized treatment plans by providing physician.

8. In the event an inmate refuses any medical treatment, the attending physician, along with a witness, will note the refusal and sign the medical treatment waiver.  This waiver will be permanently placed in the inmate's medical file.

SUBJECT:    SCREENING OF RECEIVING INMATES

Policy:  Screening is to be performed by medically trained or qualified health care personnel on all inmates (including transferees) when possible, but no later than forty-eight (48) hours.

Procedures:

1. The health personnel on duty will screen all inmates.

2. All findings will be recorded in the Cameron County Jail Receive Screening Form and signed and dated by the medical personnel performing the service.

3. Review carefully a patient Hx of chemical abuse, suicide, and withdrawal potential, and pay particular attention to trauma.

19

those inmates/patients that, in the opinion of medical staff, are in need of emergency services will be sent to the appropriate facility with the arresting agency and will be accepted only with proper written medical clearance.

5. All persons detected, at intake, as having a communicable disease, or other serious medical problem, will be isolated and referred to the local hospital or other medical institution for treatment.

6. Voluntary TB screening will be offered upon admission and inmate/patients are encouraged to have a test completed. Any refusal by an inmate will be documented for further review.

SUBJECT:    24-HOUR EMERGENCY TREATMENT

Purpose:    To provide care for an acute illness or an unexpected health need that cannot be deferred until the next scheduled sick call or clinic.

Policy:    The Cameron County Jail will provide emergency medical and dental care.

Procedures:

1. All medical emergencies will be taken to the local hospital emergency room.

2. Correctional personnel will provide vehicular transport and appropriate security personnel.

3. If in the opinion of the shift supervisor an ambulance is required for transport, 911 will be called and all appropriate information will be given by the shift supervisor. Medical personnel will be promptly advised.

4. The name, addresses, and telephone number of emergency facilities and ambulance services will be left in infirmary and booking areas.

5. Dental emergencies will be evaluated by medical personnel and routed to either the local emergency room or referred to a dentist, if warranted.

SUBJECT:    SICK CALL PROCEDURES

Purpose:    To provide a mechanism that enables all inmates (including those in segregation) an opportunity to have their sick call requests evaluated by health care professional within a reasonable time.

Procedure:

Sick call will be conducted a minimum of five (5) days per week by a physician and/or other qualified health personnel in a clinical setting.

Policy:

1. All inmates will be advised of sick call procedures at time of medical screening as well as orientation.

20

2. Inmates will be supplied with an ample supply of sick call request forms.

3. Inmates will be seen within a 24-hour period during weekdays. 72 hours over a weekend.

4. When necessary, an inmate will see a physician within one week of original complaint.

5. Medical personnel will refer to a physician whenever patient does not respond within reasonable amount of time to previous therapy.

SUBJECT:   MEDICAL RECORDS
Policy:   At a minimum, the medical records will contain the following:

1.   Illness or ailment
2.   Type of screening received
3.   Diagnosis
4.   Treatments and dispositions
5.   Prescribed medication list
6.   X-ray reports
7.   Laboratory
8.   Diagnostic studies
9.   Progress notes
10.   Dental reports
11.   Psychiatric referrals
12.   Special treatment plan
13.   Time of medical encounters
14.   Signature and title of each documenter

All medical records will be confidential and in no way affiliated with the booking record. Transfer of medical records will be done according to written policy and defined procedures.

Procedures:

1.   Medical records will be kept for all inmates housed in the Cameron County Jail and its' facilities.

2.   Records will be kept under lock and key located in the Infirmary Department of the Jail and its' facilities.

3.   Records will not be released without the appropriate consent forms being duly executed.

4.   All medical information is private. The only exception being that any and all contagious diseases will be reported to the Cameron County Health Department at physicians request.

5.   Copies of medical records or summation of contents, will be done prior to, or at the time, an inmate is to be transferred to another institution.

6. Written authorization is required when records are to be sent outside of the correctional system.

7. Inactive files will be kept for five (5) years and application for destruction sought at the end of that tenure.

SUBJECT:    SPECIAL NEEDS, TREATMENT, AND PLANNING PROCEDURES
Purpose:    To provide a guide for the care of inmates with special needs, requiring close medical observation, including chronic and convalescent care.

Policy:

1. The Cameron County Jail Division will provide procedures to floor officers guiding the care of inmates with special needs requiring close medical supervision, including chronic and convalescent care.

2. All identified AIDS cases will be followed up by the Valley AIDS Council, and their orders followed closely.

3. All identified diabetics will have special dietary needs provided by the jail's kitchen and blood work will be done per glucometer test to monitor blood sugar.

4. Hypertensive patients will have blood pressure monitored weekly or as ordered by a physician.

5. Epileptics on medication will have blood drawn monthly and sent to a lab to monitor therapeutic levels.

SUBJECT:    PHARMACY PROCEDURE
Purpose:    To provide a guide to see that the Jail complies with all state and federal regulations regarding the prescribing, dispensing, administration, storage, disposal, and procuring of pharmaceuticals.

Policy:

1. The Cameron County Jail Infirmary Department will have a formulary.

2. Procedures are in effect for the procurement, dispensing, distribution, accounting, administration, and disposal of pharmaceuticals.

3. Maintenance of records as necessary to ensure adequate control and accountability for all drugs.

4. Maximum security storage will be provided for all DEA-controlled substances, needle syringes, and other abusable items.

5. Notification of responsible practitioner of impending expiration of drug order.

6. Automatic drug stop orders and review of psychotropic drug follow-ups done by previously attending medical doctor for continuance.

22

7.  Drug administration will be done only through the orders of a physician, dentist, or others with designated privileges.

8.  All medications are under the control of appropriate staff members. Inmates will not prepare, dispense, or administer medication.

9.  Stored drugs and medications are devoid of drugs that are outdated, discontinued, or recalled.

Procedures:

1.  All medications are to be ordered by a physician per written standing or direct order and signed by that physician.

2.  All prescriptions will be dispensed as written and filled by the Cameron County Jail Infirmary personnel.

3.  Medication stop orders will be reflected by a stop date on the medication card.

4.  All needles and syringes will be counted and a log maintained for accountability. The storage door with key entry only will be kept locked at all times.

5.  Used needles and blood containments will be placed in Sharps Containers. A contract is kept for biohazard waste disposal.

6.  Psychotropic medications will not be administered for disciplinary reasons.

7.  Expiration dates will be monitored and stock medication will be rotated.

8.  At no time, shall inmates have access to medications, needles, or syringes.

SUBJECT:    TUBERCULOSIS SCREENING (See Letter 1 at the end of this book)
Policy:     Any persons confined to the Cameron County Jail for more than seventy-two (72) hours, will be screened for tuberculosis.

Procedures:

1.  Upon arrival, an attempt should be made to classify all inmates as soon as possible, as well as administering a tuberculin skin test with a reading within seventy-two (72) hours. If an inmate refuses to be tested, a refusal notice will be signed and witnessed and kept on file for future reference. The inmate will be sent for chest x-rays regardless.

2.  If an inmate claims to be a positive reactor, they should be questioned as to when and where they were found to be positive reactors so information and results may be released. If inmate was previously treated at the Cameron County Jail, their medical record will be obtained and a note made so that follow chest x-ray can be performed.

3.  All chest x-rays will be performed in discretion and with respect to the inmate. Only a qualified technician is allowed to administer the exam.

23

If any inmate complains of symptoms of TB, then inmate will immediately be screened by medical personnel on duty. If warranted, they will be placed in isolation and a stat chest x-ray performed.

5. When an inmate is a suspect for TB:
   a. his/her weight should be recorded on a timely basis .
   b. he/she should be placed at the Detention Center I facility. There is a negative air pressure unit located in the Delta Control section.
   c. he/she will wear a required mask. Not jail personnel.
   d. only disposable dishes will be made accessible. Plastic trash bags will be kept in inmate's cell area. That bag will be sealed then placed in another bag for disposable.
   e. he/she should be admitted to one of the state chest hospitals. Every attempt will be made to have inmate released from jail custody as soon as possible. If inmate cannot post bond, or is denied, treatment will begin at their respective facility. Personnel from the Cameron County Health Department will assist the medical staff in administering medication to inmates while confined in Cameron County. If inmate is released during time of treatment, they will be advised to follow-up with their local health department.
   f. a warning letter will be signed when it is found that they are to be placed on medication. **Note: Only when it is an active case.**

*NOTE:* *ALL CAMERON COUNTY JAIL AND DETENTION CENTER PERSONNEL WILL BE SCREENED FOR TB PRIOR TO EMPLOYMENT AND/OR SIX (6) MONTHS TO ONE (1) YEAR THEREAFTER, DEPENDING ON WORK AREA AND FREQUENCY OF INMATE CONTACT.*

SUBJECT: MENTAL DISABILITIES / SUICIDE PREVENTION PLAN
Objective: The objective of this plan is to assist in flagging those inmats who are potentially suicidal or who have severe mental disabilities and to provide appropriate care for those inmates internally and through other available agencies. The following plan has been coordinated with the Cameron County Jail Medical Department.

TRAINING
Upon employment, **all** correctional officers will receive four (4) hours training from the Classification Supervisor, which will include recognition, supervision, documentation, and handling of inmates who are mentally disabled and potentially suicidal. The training will be provided through oral and written orientation guided by procedures set forth by Texas Commission on Jail Standards.

All staff presently employed, will receive the aforementioned training prior to implementation of this plan and will receive four (4) hours of training bi-annually.

All staff members should be certified in CPR and First Aid on an annual basis.

IDENTIFICATION
All inmates will be screened at booking, utilizing the approved Mental Disabilities/Suicide Intake Screening Form. Any known, or declared previous attempts of suicide will place the inmate at high risk. If an inmate refuses to answer the questions or is unable to respond, he/she will be closely monitored until he/she can be properly screened.

Any inmate responding inappropriately on the intake screening form, or who has attempted suicide, will be repo__d immediately to Medical Staff on d__y, for additional evaluation, hospitilization, or oth__ appropriate action.

## COMMUNICATION

Each shift shall advise appropriate oncoming staff of inmates requiring special attnetion and/or incidents which have occurred. An observation log will be maintained of check made on those inmates requiring frequent observation. Pertinent information will be maintained in the inmate file and medical file, as appropriate.

All medical logs will be kept with Medical Department for proper filing and future reference.

## HOUSING

Any inmate exhibiting suicidal behavior will be placed in general population, if possible. Suicidal inmates requiring separation, or inmate with mental disabilities displaying violent or irrational behavior, will be housed in a single cell where he/she can be easily monitored by a correctional officer.

If necessary, for the safety of the inmate, clothing and bedding will be removed until the inmate is stabilized. Paper gowns will be provided for these inmates. If restraints are necessary, padded restraints will be used and checked regularly. Only the Sheriff, or his designee, can authorize the removal of clothing, bedding, or use of restraints.

Passive inmates, who are mentally retarded, will be housed to ensure their protection as appropriate.

## SUPERVISION

All suicidal/mentally disabled inmates who are considered low risk will be checked at thirty (30) minute intervals. Moderate risk inmates will be checked at fifteen (15) minute intervals and high risk inmates will receive continuous, or at least five (5) minute observation.

The correction officer will speak to the inmate at each check, examine the inmate and his/her cell closely, and document observations as appropriate.

## INTERVENTION

If a suicide attempt is in progress, the correction officer will notify their Shift Sergeant IMMEDIATELY by portable radio. The correctional officer will enter the cell and attempt appropriate life-saving techniques.

The Shift Sergeant will then proceed to call the Medical Staff on duty to assist. At this time, 911 should be called by any available personnel on duty.

If an inmate with mental disabilities becomes violent, the correctional officer will notify the Shift Sergeant on duty and the Sheriff or his designee. Upon direction by the Sheriff or his designee, precautions shall be taken, such as separation from the general population, removal of clothing or bedding, and/or use of restraints if necessary for the safety of the inmate.

Mental health services shall be requested as soon as possible.

if necessary, for the protection of the inmate, he/she will be transferred to a facility better equipped to manage with severe mental disabilities.

## REPORTING

The correctional officer will notify the Sheriff or his designee of any completed suicide. The Sheriff shall ensure that a custodial death report is filed with the Attorney General's Office within twenty (20) working days.

The Sheriff or his designee will be responsible for notification of the family and responding to the media.

The involved officers shall be responsible for filing detailed reports, while the Sheriff or his designee shall obtain other pertinent statements.

## FOLLOW-UP

The Cameron County Criminal Investigative Division will be notified to conduct an investigation of all completed suicides. Following any completed or attempted suicide, the Sheriff shall review all policies to determine the need for revisions.

If a member of this department requires counseling as a result of a suicide, they will be referred to the Cameron County Personnel Department for referral to a licensed psychologist.

## SUPERVISION OF INMATES

A. All Cameron County Jail facilities will have a corrections officer available 24 hours a day. A face-to-face observation of all inmates will be performed at 6:00am, 7:00pm, 10:00pm, and 4:00am. Inmates that are known to be assaultive, suicidal, or mentally ill, will be watched at intervals not to exceed thirty (30) minutes.

B. Closed circuit television may be used, but **is not** to be substituted for personal observation.

C. All Detention Officers shall be licensed as per the requirements of the Texas Commission on Law Enforcement Officer Standards and Education under the provisions of the Texas Administrative Code, Title 37.

D. Inmates will be supervised by an ample amount of corrections officer. One (1) corrections officer will be provided on each floor where ten (10) or more inmates are housed, with no less than one (1) corrections officer per forty-eight (48) inmates.

E. Inmates will be physically counted by a corrections officer at frequent yet irregular intervals, no less than once per day. Headcounts should be done irregularly so as not to let inmates get accustomed to certain timely headcounts.

F. Frisk searches will be done on any individual and any items entering the security perimeter of the jail. Inmates who leave the security perimeter, and before re-entering, will be thoroughly searched.

G. Cell searches for contraband of the entire facility area will be conducted at irregular times so that inmates cannot anticipate such searches. Such searches will be noted in a permanent facility record.

H. Except in an emergency, a female detention officer shall be present at the admission, booking, and classification process of any female inmates. A female detention officer is to be present at the Woman's Ward dorm at all times.

I. Use of force and restraint of an inmate shall only be used in accordance to the type of force necessary to quell the situation. Batons and other similar weapons are not authorized for use by detention officers. Chemical irritants are authorized for use only by trained and duly certified detention officers and only when authorized by the shift supervisor.

> **NOTE:** *The least amount of force needed to obtain the desired response by the inmate to maintain the safety and security of the officer, inmate, any third person(s) involved, and the facility is expected. Improper or excessive use of force may subject the officer to civil and/or criminal liability.*

27

Texas Commission on Jail Standards
Chapter 277

## CLOTHING, PERSONAL HYGIENE, AND BEDDING

A. A Cameron County Jail uniform will be issued to all inmates being held over 72 hours.

B. Change of clothing will be furnished once a week unless work, climatic conditions, illness, or other factors make it necessary for more frequent exchange to insure cleanliness.

C. Inmate's personal clothing will be confiscated, upon admission, to insure that contraband does not enter with them. Personal clothing shall also be cleaned or sprayed with a disinfectant and properly stored.

D. Inmates held over 72 hours will be furnished the following items:

   (1) toothbrush
   (2) toothpaste or tooth powder
   (3) soap
   (4) comb
   (5) shaving items
   (6) sanitary napkins (female inmates)
   (7) toilet paper

E. Each inmate will shower at least every other day or more often, if possible. Inmates on work assignments or scheduled for court appearance will shower daily. A mandatory shower can be compelled by the Sheriff for health or sanitary reasons to inmate's not complying with regulations.

F. On arrival at assigned housing floor, the floor officer will issue the following:

   a. (1) mattress
   b. (1) mattress cover
   c. (1) towel
   d. (1) blanket, or more, depending upon climatic conditions

G. Sheets, towels, blankets, and mattress covers will be replaced for clean ones once a week, or more often, if necessary.

H. All mattresses will be swept, aired, and sprayed with non-toxic disinfectant before reissuing.

Texas Commission on Jail Standards
Chapter 279
**SANITATION**

DAILY WORK SCHEDULE

Each inmate will be responsible for general housekeeping of their particular area. Inmates will be directly supervised by the floor officer assigned. Each shift supervisor will be responsible for the inspection of the cleanliness of the facility prior to assuming responsibility of his/her shift. Each cell area has a supply closet containing the following:

| | |
|---|---|
| 1 | Comet bottle |
| 1 | Bottle of disinfectant |
| 1 | Toilet bowl brush |
| 1 | Scrub brush |
| 1 | Package of powdered soap |
| 1 | Gallon of bleach |
| 2 | Brooms |
| 1 | Mop and bucket |

If an item is missing or needs to be replaced or refilled, notify the shift supervisor. Mops are to be hung out to dry in a well-ventilated area when not in use. Inmates will be responsible for the cleanliness of their cell areas to include:

Toilets
Wash Basins
Shower Area
Floors
Bunks

A trusty will be supervised by a floor officer at all times when cleaning the following areas:

All holding areas
Laundry and classification areas
Infirmary and first floor corridors
Booking area and restrooms
Kitchen and dining areas
Sally port and court tunnel

A daily maintenance inspection will be performed by a floor officer and report any discrepancies that may need maintenance. The floor officer will inspect toilets, washbasins, sinks, and all other equipment throughout the facility to ensure that all equipment is in clean condition and good repair.

The Cameron County Maintenance department is responsible for all repairs needed in the facility. All jail facilities are part of the Public Utilities Board (PUB) and therefore PUB is responsible for the water and sewage system.

The food preparation area is to be inspected by the Brownsville Health Department every six months, or as needed. The food service director will insure that the kitchen area counters, shelves, tables, utensils, and all equipment used to prepare food or drinks, will be kept clean and sanitized. All brushes, dishcloths, and hand aids used in dish washing will be used for no other purpose.

The food service director will contact the Brownsville Health Department to perform an annual inspection. The food service director will maintain a record of all reports issued by the health department. Periodical inspections will also be performed as needed. Any discrepancies will be forwarded to the Jail Administrator and corrected as soon as possible. A file of all reports will be made available in the facility administration office.

Should a maintenance problem occur after hours or on the weekend, the shift supervisor will notify the maintenance person on call.

Texas Commission on Jail Standards
Chapter 281
# FOOD SERVICE

A. All inmates will be served no less than three (3) times a day within any twenty-four (24) hour period. No more than fourteen (14) hours will pass between meals without supplemental food being served.

B. For disaster situations, the frequency and regularity of meals will not lessen, but yet inmates will still be provided with dry goods that constitute nutritional value as directed by a certified dietician.

C. All meals will be served in the inmate dining rooms or day areas at each prospective cell area. Inmates will not be allowed to store excess food in cell areas or day rooms as this will cause vermin to infest and other unsanitary situations.

D. Written menus will be reviewed and approved annually for compliance with nationally recognized allowances for basic nutrition by a certified dietician of the state of Texas. All diets prescribed by a certified physician will be served as directed.

E. All food will be prepared under the strict guidance of the cook supervisor and will be served only by strict supervision of staff members. Care will be taken that hot foods be served reasonably hot and cold foods be served reasonably cold.

Texas Commission on Jail Standards
Chapter 283
**DISCIPLINE AND GRIEVANCES**

It is Departmental Policy to maintain a fair and impartial inmate disciplinary system which ensures administrative due process and guidelines for fair disposition of alleged inmate misconduct. This Policy constitutes a written plan containing provisions consistent with the requirements of the Texas Commission on Jail Standards (283.00).

The rules of conduct are posted in each unit of the facility in English and Spanish.

The rules of the facility are also explained to the inmates during orientation in English or Spanish and shall be read to illiterate inmates in a language he/she understands.

DISCIPLINARY DUE PROCESS

Inmates accused of violating the rules of conduct shall be written up on a *Notice of Rules Violation* form and on an *Incident Report*. The incident report shall document the incident and must be completed before leaving his/her shift of duty. These reports shall be forwarded to the shift supervisor for initial action. The shift supervisor will determine if the infraction merits a warning to the inmate or if the incident report will be forwarded to the Disciplinary Committee. In either case, the appropriate recommendation must be indicated on the incident report and a copy maintained for the inmate's permanent file.

Inmates written up with the recommendation for the incident to be taken before the Disciplinary Committee must be served with a notice of the rules violation and a copy of the incident report within twenty-four (24) hours of the proposed hearing. The inmate shall be allowed to sign the notice of the rules violation and it shall be witnessed by the officer who serves him. If the inmate is illiterate the entire disciplinary process will be conducted and explained orally. Each inmate shall be made aware of the nature of the charges and administrative proceedings that shall take place. The inmate has the right to present the case either by self representation or through a lay person.

The inmate may seek the aid of another inmate or a staff member if the inmate is illiterate or where the complexity of the issue makes it unlikely that the inmate will be able to collect and present evidence necessary for an adequate comprehension of the case. The Board Chairperson shall ensure compliance with all rights entitled the inmate during Disciplinary Board proceedings.

PROCEDURE:

1.  Inmates shall be given a (24) twenty-four hour notice, in writing of the claimed violation or charges against him/her prior to the hearing.

2.  A disciplinary committee consisting of three persons not involved with the initial incident will hear testimony from the inmate accused of the infraction. Disciplinary Boards are scheduled at times most conducive to the operations of the facility.

3.  An inmate may be allowed to call in witnesses and present documentary evidence in their defense if in permitting them to do so, will not jeopardize institutional safety or correctional goals.

32

4. The inmate may require disclosure of evidence that the board has against him/her. However, confidential information shall be protected.

5. The committee shall document the hearing process by audio or video tape. If a recorder is not available a written transcript shall be documented. The committee shall also document any refusal to allow the presentation of witnesses or evidence. Any guilty finding shall be predicated upon a substantial reason to believe that the inmate is guilty of the alleged charge.

6. A written report of the board's findings shall be made and the inmate will receive the decision within (24) twenty-four hours of the hearing. Written summary by the board will include evidence relied upon and reasons for the disciplinary action taken.

7. In no case may the sanctions imposed by the committee be increased. All inmates shall be afforded the right to appeal the board's decision to the Sheriff or his designee in writing, within thirty (30) days of the Boards decision.

8. The Sheriff or his designee will review all pertinent facts and either uphold, reduce or overturn the committee decision.

The disciplinary committee shall impose sanctions as fairly and impartially as possible. No inmate shall be placed in lock-up with-out privileges, pending a hearing unless staff, the security of the facility or other inmate(s) are at risk.

## REMOVAL OF AN INMATE FROM GENERAL POPULATION:

In certain situations, an incident requires removal of the inmate from his/her general population to administrative segregation in a pre-disciplinary status.

If the action that caused the charge is perceived by the detention officer as a threat to the safety and security of the officer, facility, or other inmates, the shift supervisor will be contacted and request to remove the inmate to another area designated by the classification office.

Charges that generally are considered justification for immediate removal of the inmate from general population include:

A. Arson
B. Assault
C. Fighting
D. Major property destruction /damage/defacement
E. An escape attempt

These conditions must be thoroughly documented so that the written report clearly document that the inmate requires immediate removal from general population for the safety and security of individuals and to maintain facility security. If the incident also involves a criminal offense, the Shift Supervisor must be notified and will ensure CID is called to prepare a case report and charge the inmate.

A major rules violation does not make movement from general population mandatory unless the inmate poses a security or safety threat, as described above.

33

## PROHIBITED FORMS / SANCTIONS:

Prohibited forms of sanctions include any of the following or a combination thereof:

A. Deviation from normal feeding procedures;

B. Corporal punishment;

C. Administration of disciplinary action or supervision by inmates;

D. Deprivation of clothing or bedding; inmates who destroy bedding or clothing may be deprived of such items. This shall be reviewed and documented every (24) hours;

E. Use of a violent cell;

F. Deprivation of items necessary to maintain an acceptable level of personal hygiene;

G. Deprivation of correspondence privileges when the offense is unrelated to a violation of the institutional rules and regulations regarding correspondence. In no case shall privileged correspondence be suspended; and

H. Deprivation of physical recreation or exercise unless such activity would create an unsafe condition.

### *INFRACTIONS*

The maintenance of safety and order at the Cameron County Jail depends on firm, fair and consistent application of the rules and regulations. For purposes of inmate discipline, violations of institutional rules and regulations shall be divided into two categories; Major Infractions and Minor Infractions.

| *Major Rule Violations* | *SEVERITY SCALE* |
|---|---|
| 1. Acts classified as Offenses under State Law: | Highest |
| 2. Acts classified as Offenses under Federal Law: | Highest |
| 3. Inciting Riotous Behavior: | Highest |
| 4. Fighting: | Highest |
| 5. Inciting a Fight: | High |
| 6. Threatening: | High |
| 7. Coercion | High |
| 8. Setting of Fires: | Highest |
| 9. Sexual Abuse: | Highest |
| 10. Sexual Solicitation: | High |
| 11. Nudity: | Moderate |
| 12. Indecent Exposure: | High |
| 13. Possession of Stolen Property: | Highest |
| 14. Trafficking: | Highest |
| 15. Impeding Inmate Headcount: | Moderate |
| 16. Impeding the Security of Housing Units: | Moderate |
| 17. Falsely Reporting an Emergency: | High |
| 18. Bribery: | High |
| 19. Recklessness: | High |
| 20. Tampering: | Highest |
| 21. Destruction of Property: | Highest |
| 22. Mutilation: | Highest |
| 23. Possession of Tattoo Paraphernalia: | High |
| 24. Possession of Altered Items: | Moderate |

34

25. Possession or Manufacture of Weapons:      Highest
26. Possession or Manufacture of Escape Device:      Highest
27. Possession or Manufacture of Distilling/Brewing Alcohol:      Highest
28. Possession or Manufacture of Inhalants:      Highest
29. Possession or Manufacture of Chemical Agents:      Highest
30. Possession or Manufacture of Unauthorized Drugs or Medication:      Highest
31. Possession or Manufacture of Narcotics/Narcotic Paraphernalia:      Highest
32. Hoarding Medication:      Highest
33. Feigning Injury or Illness:      High
34. Excessive Noise:      Moderate
35. Throwing or Propelling Objects or Substances:      Highest
36. Interference with Court Related Proceedings:      Highest
37. Interference with Official Communications or Devices:      Highest
38. Interference with Security Operations:      Highest
39. Disruption of any Institutional Activity:      High
40. Violation of Feeding Procedures:      Moderate
41. Violation of Mail Procedures:      Moderate
42. Violation of Visitation Procedures:      Moderate
43. Violation of Program Procedures:      Moderate
44. Violation of Recreation Procedures:      Moderate
45. Violation of Commissary Procedures:      Moderate
46. Violation of Medication Consumption Procedures:      Moderate
47. Violation of Work Assignments Procedures:      Moderate
48. Violation of Treatment Program/GED/Procedures:      Moderate
49. Unauthorized Communications W/Persons outside the Facility:      Moderate
50:      Refusal to Follow Written or Oral Directives:      Moderate
51. Disrespect to Staff:      Moderate

Violation of any of the above offenses may result in any or a combination of the following sanctions:

1. Lock-up for a period up to thirty (30) days.
2. Loss of Good Conduct Credit.
3. Loss of Privileges up to 30 days and
4. Removal from Work Detail or Programs.

*Minor Rule Violations*                    *SEVERITY SCALE*

52. Gambling:      Moderate
53. Abuse of Intercom System:      Moderate
54. Present in an Unauthorized Area:      Moderate
55. Entering or Exiting an Area without Permission:      Moderate
56. Unauthorized Equipment Use:      Moderate
57. Unauthorized Taking of Items into or out of Cell Area:      Moderate
58. Malingering:      Low
59. Smoking:      Moderate
60. Unauthorized Changing of Bunk Assignments:      Low
61. False Self-Identification:      Moderate
62. Failure to Respond to Staff Questions:      Moderate

| | |
|---|---|
| 63. Possession of Unauthorized clothing or bedding: | Low |
| 64. Possession of Contraband: | Moderate |
| 65. Defacing Property: | Moderate |
| 66. Unauthorized Contact: | Moderate |
| 67. Unauthorized Passing of Items: | Moderate |
| 68. Horseplay: | Low |
| 69. Disrespect to other Inmates: | Low |
| 70. Lying to or about other Inmates: | Low |
| 71. Yelling at other Inmates: | Low |
| 72. Disorderly Cell or Bunk Area: | Low |
| 73. Inadequate or Partial Uniform: | Low |
| 74. Violation of a Written or Posted Rule: | Low |
| 75. Obstruction of View: | Low |
| 76. Covering of Light Fixtures: | Low |

Discipline should be immediate and positive to be effective. Consequently, situations may exist where a rule has been violated, but circumstances dictate that immediate, informal handling of the situation will best serve the facility staff and the inmate. Informal minor disciplinary sanctions are available for those situations. Informal resolutions of minor rules violations are designed to reduce paperwork and encourage prompt and fair dispositions of minor offenses.

The Shift Supervisor may assign the inmate an immediate supervisory action rather than a formal Disciplinary Board Hearing. The Supervising officer or the Facility Supervisor are the only person (s) authorized to assign immediate supervisory sanctions. The Shift Supervisor may offer the inmate a waiver of formal hearing and assign sanctions. The Supervisor shall explain the waiver process to the inmate and have the waiver acknowledged by the inmate's signature. The inmate's signature is required or the matter is referred to the Disciplinary Board.

1. To Accomplish informal resolutions of a minor rule violation, advise the inmate of the infraction he/she has committed that is in violation of the rules.

2. Advise inmate of the sanction recommended. Sanctions are limited to one or more of the following:
   a. Verbal Counseling, warning or reprimand.
   b. Written reprimand.
   c. Temporary restriction to cells not to exceed (23) twenty-three hours.
   d. Loss of Privileges for a period not to exceed (7) seven days.
   e. Facility probation.

3. The inmate may waive his/her right to a formal hearing by the Discipline Board and accept the sanctions recommended.

4. If the inmate chooses to accept the waiver, he / she should acknowledge the waiver section of the *Notice of Major / Minor Rule(s) Violation* (see Form A ) form by signing his / her name. The Facility Supervisor will assign the sanctions and forward the paperwork to the

36

appropriate departments.

5. If the inmate does not accept the waiver, he / she is entitled to the Due Process of the Administrative Disciplinary Board (see Form B) Hearing and notice shall be given.

NOTE:    Both "Notice of Major/Minor Rule Violation Hearing Waiver" and "Disciplinary Board Hearing Judgement" are provided in English and Spanish.  In the case that an inmate is illiterate, either form, in the language the inmate understands, will be read to the inmate in its entirety.

37

Texas Commission on Jail Standards
Chapter 283
**GRIEVANCE**

OBJECTIVE
The objective of the grievance plan is to provide inmates an opportunity and a procedure to file a grievance while confined in the Cameron County Jail.

I.     GENERAL
       Inmates will be informed of the availability of the grievance procedure in the INMATE HANDBOOK, provided to each inmate when admitted into the facility. Handbooks are to be provided in both English and Spanish. Any illiterate inmate shall have the handbook read to them in its entirety.

       Staff members are encouraged to resolve grievance complaints, if possible, thereby eliminating the need for filing a formal grievance complaint.

II.    PROCEDURE
       The grievance will be filed as a written statement promptly following the incident, sealed in an unstamped envelope, or forwarded through the regular mail collection system to the facility supervisor. Such letter will be transmitted to the grievance officer promptly and without interference.

       Materials will be provided to file a grievance, to include paper, envelope, pencil, and/or pens.

       The grievance will state fully the right or privilege allegedly violated, persons involved, witnesses, if any, time, date, and any other relevant details.

III.   GRIEVANCE OFFICER
       The Sheriff will designate an officer to handle all grievances within the Cameron County Jail. In the absence of the grievance officer, the facility supervisor will process the grievance. The Sheriff is the final appeal authority and should not be on the grievance boards or the grievance review board.

IV.    PROCEDURE
       Upon receipt of the grievance, the grievance officer will review the grievance to determine:

   1.  the grievance is an emergency (where delay could subject the inmate to personal injuries or other damages),

   2.  if the grievance is a prohibited act by a staff member,

   3.  if the grievance is a civil rights violation,

   4.  if the grievance is an abridgement of inmate privileges, as cited in the facility rules, regulations, and plan,

   5.  if the grievance is a criminal act.

Situations requiring emergency action will be redressed immediately on receipt of the grievance and appropriate action taken.

Upon determining the category of the grievance other than emergency, the grievance officer will investigate fully the grievance allegations. Appropriate action to redress the grievance will be taken.

A written response from the grievance officer will be submitted to the inmate, to include the findings and actions taken. The grievance officer will submit a response when possible but not to exceed fifteen (15) working days. An inmate may appeal this decision to the Grievance Review Board.

Previously denied privileges, good time credit earned, or change in classification will be reinstated upon receipt of a substantial grievance.

Any staff member who subjects an inmate to harassment, curtailment of privileges, or any type of punishment because of a grievance report, or has attempted to prevent or interfere with the reporting of a grievance, will be subject to immediate dismissal from employment.

V.    GRIEVANCE REVIEW

Any inmate may request a hearing before the grievance review boards if the findings and action taken by the grievance officer are disputed.

The Grievance Review Board will consist of the following:
1. A facility supervisor
2. A shift supervisor
3. A chairperson (designated by the Jail Administrator)

Upon receipt of the grievance hearing request, the Grievance Review Board will convene when possible, but not to exceed fifteen (15) working days for a hearing.

The board's decision will be made by a majority vote and the written report delivered to the inmate to include:

1. Names of board members
2. Witnesses appearing
3. Review of evidence and testimony
4. Recommendations/reasons for corrective action

Inmates may present evidence, written documents, and call witnesses to establish the validity of the complaint (if this process does not jeopardize the security of the facility).

VI.   APPEAL
If the decision made by the Grievance Officer, or the Grievance Review Board, is unacceptable to the inmate, they may appeal the verdict to the Sheriff.

Upon receipt of the appeal request, the Sheriff will review the findings and action taken by the Grievance Officer and the Grievance Review Board.

The Sheriff will notify the inmate in writing of his decision when possible, but not to exceed fifteen (15) working days.

The Sheriff's decision is final.

VII.    RECORDS

Records will be maintained of all hearings, reviews, and actions taken.

A copy of inmate notification letter will be placed in the inmate file.

No information regarding any grievance proceeding will be released unless approved by the Sheriff or his designees.

Texas Commission on Jail Standards
Chapter 285

# RECREATION AND EXERCISE

A. Each inmate will be offered a minimum of one (1) hour of physical exercise or physical recreation three (3) times a week. Inmates that are in Administrative Segregation will be taken out to recreation with the trusties or alone.

B. Each inmate will receive a minimum of one (1) hour of sunlight per week.

C. Weather permitting, all inmates will be taken to the outside recreation area. Outside recreation activities include basketball, volleyball, and jogging.

D. In the case of inclement weather, inmates will be afforded the opportunity to participate in calisthenics and/or aerobics in the day room area. Indoor recreation activities include dominoes, checkers, chess, listening to music, and/or playing cards.

E. The recreation officer will maintain a log of all recreation activity. This officer will also issue, collect, and control all recreation equipment.

F. The recreation officer will schedule and supervise all exercise and activities.

Texas Commission on Jail Standards
Chapter 287
# EDUCATION AND REHABILITATION PROGRAMS

**ELIGIBILITY:**   Normally, access to any educational program will be restricted to anyone incarcerated thirty (30) days or more. However, any inmate who believes they may profit from exposure to the educational program may request to participate.

All inmates are eligible to participate in any rehabilitating program available.

Continued participation in either programs is dependent upon the inmate's behavior. This privilege may be restricted for infraction of facility rules.

## EDUCATION

General education classes are offered to all inmates, on voluntary basis, and are conducted as follows:

|           | County Jail          | DC I   | DC II  |
|-----------|----------------------|--------|--------|
| Males:    | Friday               | Friday | Friday |
| Females:  | Monday and Wednesday |        |        |

All classes are directed by a volunteer certified instructor with the Brownsville Independent School District and held at each respective facility library.

Materials made available for study are as follows:
1. Adult Basic Education (Reading and Writing Skills)

Study materials are obtained from:
1. Brownsville Independent School District (BISD)
2. State and County Community Resources

Any eligible inmate may take any approved correspondence course desired, if the inmate has fund available and is first approved by the Sheriff or his designee.

## REHABILITATION AND TESTING

Alcohol and drug abuse, HIV and Syphilis testing, and AIDS counseling are also offered to inmates on a voluntary basis and conducted as follows:

|           | County Jail          | DC I                | DC II                 |
|-----------|----------------------|---------------------|-----------------------|
| Males:    | Tuesday (1pm - 2pm)  | Thursday (1pm - 2pm) | Wednesday (1pm- 2pm) |
| Females:  | Friday (1pm - 2pm)   |                     |                       |

All classes are directed by a certified volunteer counselor of the Valley AIDS Council and held at each respective facility library.

The jail facility library is made available to all inmates confined to the Cameron County Jail. All inmates who wish to use the library may submit a request to use the library facility. The inmates will be taken to the library on a weekly basis.

Library books available are received through donations from community resources and/or purchased by the department. Types of material available to all inmates are legal reference material, paperback books, and foreign language material.

Inmates who wish to check out books from the library will notify the library officer. Inmates will be responsible for the condition of the book(s) while checked out. Also, the destruction or mutilation of any book may result in loss of library privileges. Inmates may keep the book(s) they check out for a period of seven (7) days. Every attempt will be made to satisfy foreign language reading material or specific legal material.

43

Texas Commission on Jail Standards
· Chapter 289
**WORK ASSIGNMENTS**

A.   All inmates work will be assigned by the Jail staff. At no time will inmates supervise other inmates. Access to records, monies, commissary accounts, maintenance of locking systems and other security devices, will not be attainable by inmates.

B.   Pre-trial detainees and inmates waiting to transfer to TDC may volunteer to participate in any work program operated by the Sheriff that uses the labor of convicted misdemeanant. Inmates will not work more than forty-eight (48) hours per week, except in emergencies. Only low-risk inmates should be assigned to work outside the security perimeter and supervised by a correction officer. Inmates that have not been sentenced will not be required to work, however, they will be expected to maintain a clean living area.

## Texas Commission on Jail Standards
### Chapter 291
### SERVICES AND ACTIVITIES

TELEPHONE PLAN

A.    Each inmate will be permitted to complete two (2) telephone calls immediately after booking but no later than four (4) hours after arrival, to anyone desired. All telephone calls will be made collect. In cases where the party being called cannot receive collect calls, the inmate will be given two (2) completed free phone calls.

B.    Correctional staff will assist inmates in placing their constitutional telephone calls.

C.    Any inmate is permitted to make outgoing telephone calls at reasonable times. Telephones are located in each of the cell areas and in the booking intake area. The hours of operation are 7:00am thru 11:00pm, seven (7) days of week.

D.    Shift supervisors may temporarily suspend phone call privileges if the security of the facility or the safety of personnel is in jeopardy. Any inmate found abusing the telephone privilege is subject to referral to the disciplinary board.

E.    Incoming telephone calls are strictly prohibited, unless in an extreme emergency, clergy, or attorney. The Shift Supervisor will arrange for the inmate to return the call.

CORRESPONDENCE PLAN

A.    Inmate mail is collected and distributed Monday thru Friday, excluding holidays. The mail is disbursed in the evening hours by the Shift Supervisor or Assistant Supervisor. The officer enters the cell area and announces mail call. The officer calls the inmate by name, verifies ID, and inspects the privileged and non-privileged correspondence for contraband in the presence of the inmate.

    1.    Privileged mail is opened and inspected only (not read) for contraband in the presence of the inmate. Whenever probable cause to suspect incoming privileged mail contains plans of escape or violation of state and federal laws, a search warrant shall be obtained prior to reading.

        Privileged mail is:
        a.  Federal, state, and/or locals courts
        b.  Federal officials and officers
        c.  State officials and officers
        d.  Letters to bonafide news media
        e.  Inmate's attorney
        f.  Members of Pardons and Parole Board

B.    All mail received, and not listed above, is considered non-privileged mail and is subject to being opened (for contraband) and read prior to delivery.

C.    Periodicals and paperback books may be ordered from the publisher at inmate's expense.

D.   Any publications containing information regarding:
1.   manufacture of weapons, explosives, or drugs;
2.   communication designed to achieve the break down of jails through inmate disruption such as strikes or riots; and
3.   deviant criminal sexual behavior that is detrimental to inmates' rehabilitation is strictly prohibited and will be confiscated and considered contraband.

E.   Indigent inmates are provided writing material and postage for privileged and non-privileged mail. Indigent inmates are provided writing materials and postage when corresponding with privileged recipients. The Cameron County Jail will allow up to three (3) letters weekly to be posted for non-privileged recipients.

F.   There is no limitation placed on how much correspondence an inmate can send or receive.

G.   All outgoing correspondence is to be placed between the cell bars and picked up Monday through Friday, except holidays. Processed outgoing correspondence is delivered to the U.S. Post Office Monday thru Friday, except holidays.

H.   Inmates are allowed to send a sealed unstamped letter to the Sheriff or Chief Jailer. Such letter are delivered to the person addressed without delay.

I.   Inmate to inmate correspondence is strictly prohibited, unless approved by the Sheriff or Chief Jailer, where legitimate penological interest exists.

J.   Correspondence may be censored, provided a legitimate penological interest exists.

K.   All non-privileged correspondence will be logged and opened, in the presence of the inmate, for contraband prior to disbursement.

## COMMISSARY PLAN

Commissary services are available to all inmates, unless revoked by a disciplinary hearing, on the following days:

| 1. Request days for purchase | 2. Distribution days |
|---|---|
| Mondays | Tuesday |
| Wednesdays | Fridays |

A list of commissary items are made available to inmates prior to each commissary day. Inmates requesting commissary service will list items wanted and present it to the Commissary Officer or Clerk. At the time of request, the inmate's fund account will be reviewed. If there is not enough money to cover the items requested, only those items that will paid will be delivered. If the inmate does not wish to receive an incomplete order, inmate can refuse and wait until funds have accumulated.

Surplus commissary items are not permitted in the inmate living area. Excess items cause vermin to infest, create fire and security hazards, and encourage gambling.

The Cameron County Auditor's Office will conduct a quarterly audit of the inmate's commissary proceeds in accordance with Local Government Code, Section 351.0415

## VISITATION PLAN

A.    Visitation privileges will be extended to all inmates, unless revoked by a disciplinary hearing. The regular visitation schedule is as follows:

*Male Inmates*
Thursday------------------------------------------------------------8:00 - 10:40am / 1:00 - 3:40pm
Sunday------------------------------------------------------------8:00 - 10:40am / 1:00 - 3:40pm

*Female Inmates*
Wednesday------------------------------------------------------8:00 - 10:40am / 1:00 - 3:40pm
Saturday------------------------------------------------------8:00 - 10:40am / 1:00 - 3:40pm

*Visitation days and times are determined by the Sheriff and are subject to change at his discretion. All changes will be posted.*

Pre-trial detainees may be permitted additional visitation other than regular visitation to help secure a release on bond or to counsel with inmate employment or family status.

Visitation time is twenty (20) minutes each visitor and per visit period.

B.    Attorneys may visit an inmate seven (7) days a week from the hours of 8:00am until 8:00pm. Attorneys are required to stop by the booking area and secure an attorney card. All attorneys are required to present their state bar ID card. Prior to adjourning visitation, both inmate and attorney shall sign the attorney card to acknowledge said visit was held.

Clergy persons can visit inmates daily from 8:00am - 5pm. All clergy persons must be registered through the Sheriff's Department. Registration is made available by the Jail Administrator.

Emergency visits are available upon approval by the Jail Administrator.

C.    Visitors, 18 years of age or over, must present a state official identification care, i.e., Texas Drivers Licence, Texas DPS ID Card, etc.

Visitors under 18 years of age, must be accompanied by an appropriately identified adult visitor and must remain under their control at all times during the visit. Failure to do so may result in the expulsion of the inmate's visitor.

D.    Visitors are to be appropriately dressed for public appearance. Shorts, skorts, halter tops, mini skirts, and handbags are strictly prohibited.

E.    Introduction or possession of alcohol, weapons, drugs, or drug paraphernalia by any visitor will constitute a major infraction of facility rules and will result in the termination of visitation privileges along with federal prosecution against the visitor involved.

F.    Upon being booked into the Cameron County Jail, the inmate will be required to fill out a visitor authorization card. The inmate will be allowed to have five (5) adults on their visitor card. Inmates are allowed to make changes to their list at the end of each month. Changes or substitutions cannot be made during the month.

G.  Any visitor who ___ been incarcerated six (6) months pri ___ visiting a Cameron County Inmate, will be refused visitation.

H.  If an inmate refuses to fill out a visitation card, they will not receive any visitors other than their attorney or clergy.

I.  Visitors are not allowed to hand anything to the inmates and will conduct themselves in an orderly manner. Any abusive or profane language toward other visitors or officers will result in expulsion from the facility.

## RELIGIOUS SERVICE PLAN

A.  All inmates are eligible to attend group religious services. These services will be non-denominational in character and will be permitted on Saturdays and Sundays, depending upon the availability of clergy.

B.  Inmates can request private religious counseling from a clergyman of their faith or choosing. Such request will be made to the Jail Administrator. The Jail Administrator will make every attempt to satisfy the specific request, if in accordance with security regulations and availability of staff.

C.  Group religious services will be conducted in the guard corridor and is scheduled as follows:

    Saturday---------------------------------------------------8:00 - 11:00am / 1:00 - 4:00pm
    Sunday-----------------------------------------------------8:00 - 11:00am / 1:00 - 4:00pm

    Individual counseling will be held in the attorney's room or guard corridor area.

D.  Any inmate desiring to attend any scheduled religious service, or receive individual counseling will need to notify the clergyman of their faith and the Jail Administrator in writing.

E.  No inmate will be required to attend any religious service, or receive counseling if they do not wish to do so.

F.  Upon reasonable request, religious materials will be made available to any inmate.

# GENERAL RULES AND REGULATIONS

## STATEMENT OF PURPOSE
It is the duty of all jail personnel to maintain the security of the jail facilities and the safety of all inmates. To maximize security and safety, the following general measures are to be observed.

## SECURITY
A.     Weapons or ammunition are strictly prohibited to be worn, or carried into, any portion of the jail facility that is accessible to inmates or beyond the security perimeter.

B.     Any jail keys that are on a correction officer are to be secured to the person, or clothing, and carried in an inconspicuous and secure manner. *An inmate is strictly forbidden to handle, or afforded an opportunity to duplicate, any keys.*

C.     There will be at least one (1) physical inmate headcount per shift and one (1) physical inmate headcount at the evening lockup. The headcount is not to be interrupted and will be performed by trained correctional staff. Inmates are not authorized to move about the facility during the headcount.

## TYPES OF HEADCOUNT
1.  Regular count (6:00am, 7:00pm, 10:00pm, 4:00am)
2.  Informal count occurs at irregular, frequent intervals
3.  Extraordinary count to verify any discrepancies from the previous count.

Headcounts will be conducted after:
1.  a riot or disturbance.
2.  any time an inmate is reported missing.
3.  receiving a group of inmates returning from court, hospital, or work detail.
4.  a correctional officer, or superior, feels that a count is in order.

## CELL SEARCHES
Thorough searches will be conducted of all living quarters and other areas to which inmates have access. Searches will be unannounced and irregularly timed. They will be conducted with minimal disturbances to inmate's possessions. A thorough search will also be made of each cell prior to occupancy by a new inmate. All cell searches will be documented by Shift Supervisor.

## SURVEILLANCE OF INMATE LIVING AREA
It will be the duty of each officer to conduct a visual tour of the inmate cell area to which he or she is assigned. The officer will make his/her rounds at least once every fifteen (15) minutes. Such tours should be made at irregular intervals.



# THE HEALTH SERVICES
# OF THE
# CAMERON COUNTY JAIL

# PROTOCOLS

Elizarde

EXHIBIT NO. 1

Bryant & Stingley, Inc.

*"Premum Non Nocere"*

## by Paul A. Lenz M.D.

# THE HEALTH SERVICES
## OF THE
## CAMERON COUNTY JAIL

## SECTION 2

# PROTOCOLS

*"Premum Non Nocere"*

## by **Paul A. Lenz M.D.**

Copy Serial # 199083101

**Notice:**      The author has made every effort to ensure the completeness and reliability of the recommendations regarding evaluation and treatment of inmates and the use of drugs. Since medical knowledge and circumstances surrounding the operation of the jail often changes, regular review and amendment of these protocols is required. The author disavows any responsibility for failure to diagnose and treat and for outcomes to inmates to whom these protocols are applied.

Copyright ©1999, Paul A. Lenz M.D.
All rights reserved. No part of this book may be reproduced in any form by electronic or mechanical means. including information storage and retrieval systems, without prior written permission of the author, except as follows:
        The protocol format for use by the duly authorized user to develop more protocols.
        Patient instruction sheets provided each photocopy contains the proper copyright notice.

Copy Serial # 199083101

# Table Of Contents

# Part I - Presenting Symptoms

### A.    CARDIORESPIRATORY
Man Down ........................................................................ I - 2
Bleeding/Hemorrhage ............................................................ I - 3
Chest Pain ...................................................................... I - 4
Anaphylactic Reaction ........................................................... I - 5
Fainting/Shock/ Low Blood Pressure ............................................. I - 6
Airway Obstruction/Respiratory Arrest .......................................... I - 7
Dyspnea ......................................................................... I - 8
Elevated Blood Pressure ......................................................... I - 9
Chest Wall Trauma ............................................................... I - 10

### B.    GASTROINTESTINAL
Abdominal Pain - Non Traumatic (Stomach Pain) .................................. I - 11
Abdominal Pain - Traumatic ...................................................... I - 12
Stomach Upset (Indigestion) ..................................................... I - 13
Constipation .................................................................... I - 14
Diarrhea ........................................................................ I - 15
Vomiting ........................................................................ I - 16
Blood in Stool/Rectal Bleeding .................................................. I - 17

### C.    OPHTHALMIC
Red Eye (Inflamed Eye) .......................................................... I - 18
Foreign Body in Eye ............................................................. I - 19
Abrasion to Eye ................................................................. I - 20
Blunt Trauma to Eye ............................................................. I - 21
Eye Pain ........................................................................ I - 22

### D.    OTOLOGIC
Foreign Body in ear or Blocked Ear Canal ........................................ I - 23
Punctured/Ruptured Eardrum ...................................................... I - 24
Ear Pain ........................................................................ I - 25
Bleeding Ear .................................................................... I - 26

### E.    NOSE
Foreign Body in Nose ............................................................ I - 27
Epistaxis (Bloody Nose) ......................................................... I - 28

### F.    NEUROLOGIC
Headache ........................................................................ I - 29
Head Injury ..................................................................... I - 30
Seizure ......................................................................... I - 31

### G.    PSYCHIATRIC
Insomnia ........................................................................ I - 32
Aggressive Behavior ............................................................. I - 33
Depression ...................................................................... I - 34
Suicidal Ideation ............................................................... I - 35
Stress/Anxiety Reaction ......................................................... I - 36
Delirium, Acute Altered Mental Status ........................................... I - 37
Alcoholic Withdrawal ............................................................ I - 38
Substance Abuse not otherwise listed ............................................ I - 39

iii

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial # 199093101

### H.    COUGH COLD FLU

Fever .......................................................................... I - 40
Nasal/Sinus Congestion ....................................................... I - 41
Flu Symptoms ................................................................ I - 42
Cough ........................................................................ I - 43

### I.    UROLOGIC

Blood in Urine ................................................................ I - 44
Painful Urination ............................................................. I - 45
Blood in Sperm .............................................................. I - 46
Testicular Trauma ............................................................ I - 47

### J.    GYNECOLOGIC

Precipitous Delivery .......................................................... I - 48
Pregnancy .................................................................... I - 49
Vaginal Bleeding ............................................................. I - 50

### K.    DERMATOLOGIC

Rash localized ............................................................... I - 51
Contusion .................................................................... I - 52
Wounds (lacerations and abrasions) ........................................... I - 53
Burns - Thermal & UV ........................................................ I - 54
Insect Bite ................................................................... I - 55
Human Bite .................................................................. I - 56
Puncture Wound (possible foreign body) ....................................... I - 57

### L.    MUSCULOSKELETAL

Amputations Full & Partial .................................................... I - 58
Fractures .................................................................... I - 59
Falls ........................................................................ I - 60
Muscle/Skeletal Pain ......................................................... I - 61
Sprain/Strain ................................................................ I - 62

### M.    METABOLIC

Edema ....................................................................... I - 63
Hyperglycemia ............................................................... I - 64
Hypoglycemia ................................................................ I - 65

### N.    MISCELLANEOUS

Multi-System Trauma (Fights) ................................................. I - 66
Sexual Assault ............................................................... I - 67

# Part II - Medical Conditions & Programs

### O.    MEDICAL CONDITIONS

Depression/Other Psychiatric Disorders ........................................ II - 1
Epilepsy ..................................................................... II - 2
Diabetes ..................................................................... II - 3
Hypertension ................................................................. II - 4
Asthma/Chronic Obstructive Pulmonary Disease ................................ II - 5
Heart Disease ................................................................ II - 6
Pregnancy ................................................................... II - 7

### P.    PROGRAMS

Suicide Prevention ........................................................... II - 7
Sexually Transmitted Disease ................................................. II - 8
Hepatitis .................................................................... II - 9
Human Immunodeficiency Virus (HIV)/Acquired Immunodeficiency Syndrom (AIDS) .... II - 10
Tuberculosis Elimination ..................................................... II - 11
Vital Signs .................................................................. II - 12

Copyright 1998, Paul A. Lenz M.D.
Copy Serial # 199083101

iv

# Introduction

This collection of protocols was designed to be useful for Licensed Vocational Nurses (LVN), and Medical Assistants (MA) working in an institutional environment where standing orders are possible for predefined conditions. Since a diagnosis must be made to provide medical treatment, the evaluation of an inmate breaks down into two broad categories; those with a known illness having a diagnosis and those presenting with new symptoms. **These are not Nurse Practitioner (NP) protocols. NP protocols are in a separate document.**

When an inmate has a diagnosis made by those duly licensed to make such diagnosis, the treatment protocol for such a situation may be executed by those LVNs MAs to whom such a responsibility has been delegated. An LVN or MA is not licensed to make a diagnosis or initiate a treatment on a previously undiagnosed problem.   Therefore, these protocols provide for an approach to the evaluation an management of inmates presenting with a new symptom for which a diagnosis has not been made. Eventually, a diagnosis will be required to provide definitive treatment. Support measures in the Policy and Procedures Manual provide for access to support staff such as a Physician or NP so that further diagnosis and treatment may be affected.

Inmates presenting in triage may describe a previous diagnosis. Since it is the inmate that is being treated and it is the inmate that is providing the information, the diagnosis may be accepted if provided for in the protocols. Such an inmate should be considered to have a diagnosis made by a licensed practitioner and may continue his previous treatment without having to resort to another evaluation by a Physician or NP.

Inmates may present with a new onset illness which they have had in the past and identify this to the LVN or MA. Symptomatic treatment may be provided as per the protocols if the appropriate measure have been taken to ensure warning signs do not exist where the Physician or NP should be called.  Examples of these situations would be an upper respiratory tract infection or diarrhea which can be treated symptomatically. This is basically the treatment of symptoms with "over the counter"(OTC) medications which would be commonly available if the inmate were at large.

The second category of protocols addressed herein are those for inmates with a diagnosis.  This would include diabetic, hypertensive, epileptic care as well as tuberculosis elimination, suicide prevention and an approach to infectious disease. This is done to ensure consistency of care for a given diagnosis so that care is easily affect by more than one practitioner.   Additionally, following the disease process becomes standardized and the workload of this effort is ultimately reduced.

If an emergency situation presents where CPR training dictates action, it is considered that those trained in CPR are duly capable of determining when CPR should be instituted. Starting CPR on an inmate does not constitute the practice of medicine and is therefore an acceptable intervention.

The most important aspect of these protocols is that caution should be exercised in every case. If there is uncertainty about a given approach to a patient's problem, the Physician or NP should be called for assistance. Finally, if for any reason these support staff cannot be reached, the inmate should be referred to the Emergency Room for diagnosis and treatment.

Copyright ··1993  Paul A. Lenz M.D.
Copy Seri.: #  199983101

# Part I
# Presenting Symptoms

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial # 199063101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - A. CARDIORESPIRATORY*

# Man Down

## EMERGENCY

**IMMEDIATE ACTION:  Get your history later, BEGIN CPR process !**

### Objective:

A.    *IS THE AIRWAY OBSTRUCTED?*
B.    *ARE THERE RESPIRATIONS?*
C.    *IS THERE A PULSE?*

### Plan / Management:

A.    *BEGIN CPR PROCESS - 2 RESCUER*
        If breathing and has pulse, give $O_2$ @ 3L/min, obtain vitals.
B.    *SUMMON EMS - 911*
C.    *CONTACT PHYSICIAN*
D.    *IF  BREATHING  AND  HAS  PULSE,  BEGIN  OTHER  APPROPRIATE
        PROTOCOLS.*

### Further Evaluations

If there is a possibility of trauma, especially neck or spinal injury, try to minimize movement.
Take blood sugar and give glucose if less than 60.

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial # 199083101

I - 2

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - A. CARDIORESPIRATORY*

# Bleeding/Hemorrhage

## EMERGENCY

**IMMEDIATE ACTION:** **Apply pressure to the bleed site** **- except over the mouth and nose**
**Call for assistance**

### Subjective:

Location:          Where is the site of the bleed.
Character:         Oozing, Pumping, or leaking? Will it stop with pressure applied?
Onset:  How long have they been bleeding?  Time of onset?
Other symptoms: short of breath; nausea or vomiting; sweating; weakness or restlessness.
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - bilateral BP, apical pulse, temperature, respiration rate
Orientation and level of consciousness
Breathing difficulties - rate, rhythm, depth
Skin - color, temperature, diaphoresis
Agitation/restlessness
Estimated blood loss - amount of bandages soaked, blood on floor or in toilet.

### Assessment:

Potential for cardiopulmonary collapse

### Plan / Management:

Activate EMS if:       level of consciousness decreased or
                       pulse high (>120) or
                       BP low (systolic <100)
Contact Physician - Activate EMS or send to ER if directed to do so.
Continue applying Pressure to bleed site.  If the bandage "bleeds through" apply more bandage, do not keep
looking to see if the bleed has stopped
**If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.**

Copyright ©1999. Paul A. Lenz M.D.
Copy Serial # 199083101

**I - 3**

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - A. CARDIORESPIRATORY*

# Fainting/Shock/Low Blood Pressure     EMERGENCY

### Subjective:

Is the Patient Conscious?
If No      - START MAN DOWN PROTOCOL
If yes
Did they lose consciousness totally? Did they urinate themselves? Were there witnesses?
Onset:   Activity when the situation occurred?  Gradual or sudden?  Time of onset?
Other symptoms present: chest pain; nausea or vomiting; sweating; weakness or restlessness.
Previous Respiratory/Cardiac/Epileptic history: heart attack, angina, asthma, COPD, seizures
If recent admission to Jail: possible drug/alcohol withdrawal.
Any other medical problems currently being treated? Medications?

### Objective:

Breathing assessment - rate, rhythm, depth;
Complete vital signs - bilateral BP, apical pulse, temperature
Orientation and level of consciousness, able to talk? slurred speech, other abnormal behavior.
Skin - color. temperature, diaphoresis.
Agitation/restlessness.

### Assessment:

Potential for recurrence (seizure).
Potential for cardiopulmonary collapse (MI).

### Plan / Management:

Give $O_2$ @ 3L/min
Lay Patient on Floor - Elevate legs
Activate EMS if level of consciousness is decreased or systolic < 100.
Contact Physician - Activate EMS if directed to do so
**If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.**

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 0008101

I - 6

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - A. CARDIORESPIRATORY*

# Dyspnea

## EMERGENCY

### Subjective:

Onset:  Activity when the shortness of breath occurred?  Gradual or sudden?  Time of onset?
Duration:   Intermittent or continuous?
Other symptoms present: chest pain; nausea or vomiting; sweating; weakness or restlessness.
What helps or increases the discomfort?
Previous Respiratory/Cardiac history: asthma, COPD, MI, angina.
Any other medical problems currently being treated? Medications?

### Objective:

Breathing assessment - rate, rhythm, depth;
Able to talk?
Complete vital signs - bilateral BP, apical pulse
Orientation and level of consciousness
Skin - color, temperature, diaphoresis
Agitation/restlessness

### Assessment:

Potential for respiratory collapse
Potential for cardiac collapse
Alteration in comfort
Degree of anxiety

### Plan / Management:

Give $O_2$ @ 3L/min
**Activate EMS**
**Contact Physician**
**If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.**

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 199083101

I - 8

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - A. CARDIORESPIRATORY*

# Chest Wall Trauma

### Potential EMERGENCY

### Subjective:

Onset:  How did this occur? When did this occur?
Other symptoms present: dyspnea, nausea or vomiting; sweating; weakness or restlessness.
What helps or increases the discomfort? Pain with breathing?
Previous Respiratory/Cardiac history: asthma, COPD, MI, angina.
Any other medical problems currently being treated? Medications?

### Objective:

Breathing assessment - rate, rhythm, depth
Able to talk? Able to move and breath normally?
Complete vital signs - bilateral BP, pulse, temperature
Orientation and level of consciousness
Skin - color, temperature, diaphoresis
Agitation/restlessness

### Assessment:

Potential for respiratory collapse - lung contusion or collapse.
Potential for cardiac contusion or pericardial contusion

### Plan / Management:

Do EKG. U/A
Call Physician if:        Dyspnea (short of breath),
                          broken bones suspected,
                          level of consciousness is altered,
                          vital signs are not within normal limits
Put on next available sick call list
If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.

I - I0

Copyright ©1999, Paul A. Lenz M D
Copy Serial #  199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - B. GASTROINTESTINAL*

# Abdominal Pain - Traumatic

## Potential EMERGENCY

### Subjective:

Onset:        How did this occur? When did this occur?
Duration:     Intermittent or continuous?
Date of Last Normal Menstrual Period?
Other symptoms present: chest pain; nausea or vomiting; sweating; weakness or restlessness.
Previous history of:     abdominal problems; heart problems?
Any other medical problems currently being treated? Medications?

### Objective:

Breathing assessment - rate, rhythm, depth
Complete vital signs - bilateral BP, pulse, temperature
Orientation and level of consciousness
Skin - color, temperature, diaphoresis
Other associated trauma

### Assessment:

Potential for internal hemorrhage

### Plan / Management:

Call Physician
If other associated trauma, review protocols relevant to those systems and take the safest path.
If Systolic BP    > 100 mmHg reassess q 30 minutes for 2 hours
                  < 100 mmHg Send to Emergency Room for assessment
Also
If Pulse          < 100 reassess q 30 minutes for 2 hours
                  > 100 Send to Emergency Room for assessment
Put on next available sick call list
**If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.**

Copyright ©1999, Paul A. Lenz M.D
Copy Serial # 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - B. GASTROINTESTINAL*

# Constipation

## Potential EMERGENCY

### Subjective:

Onset/Duration: Date of last bowel movement?
Character:        Hard/Soft; liquid; frequent; different color?
Symptoms present:        abdominal pain/cramping; nausea or vomiting; fever or diarrhea
Previous history of:        abdominal problems; heart problems; recurrent constipation; blood in stool?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, temp, pulse, respiration rate
Abdominal tenderness; bowel sounds;

### Assessment:

Patient comfort
Potential abdominal pain by another cause - see Abdominal pain - Non traumatic

### Plan / Management:

If no significant abdominal pain present and  patient vitals are within normal limits,
1) Put on next available sick call list
2) Give Colace 100 mg po qd
3) Encourage more fluid intake
4) Start Metamucil 2 tsp BID

I - 14

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial #: 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - B. GASTROINTESTINAL*

# Vomiting

## Potential EMERGENCY

### Subjective:

Onset/Duration:
Symptoms present:                constipation, abdominal pain/cramping; nausea or diarrhea; fever or chills?
Date of Last Normal Menstrual Period?
Other symptoms present:        shortness of breath; sweating; weakness or restlessness?
Dietary history - intake in last 24 hours; Trauma history - physical activities, fights?
Previous gastrointestinal history? Recurrent constipation/diarrhea?  Blood in stool?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, temp, pulse, respiration rate
Orientation and level of consciousness
Skin - color, temperature, diaphoresis
Agitation /restlessness
Abdominal tenderness; bowel sounds

### Assessment:

Patient comfort
Potential abdominal pain by another cause - see Abdominal pain - Non traumatic
Concern for electrolyte disturbance
If accompanied by vomiting, then deal with gastroenteritis.

### Plan / Management:

If vital signs not within normal limits:
      1) Call Physician
      2) Put on next available sick call list
If no significant abdominal pain present and  patient vitals are within normal limits,
      1) Put on next available sick call list
      2) Give Phenergan 25mg Q.I.D. (except if allergic)
      3) Encourage more fluid intake
      4) Instruct to limit diet to clear fluids and NO MILK OR MILK PRODUCTS
If other symptoms are present see appropriate protocol
If clinical picture is confusing, Call Physician.

Copyright ©1999, Paul A. Lenz M.D
Copy Serial # 199983191

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - C. OPHTHALMIC*

# Red Eye (inflamed eye)

## Potential EMERGENCY

### Subjective:

Onset:          When were the symptoms first noticed?
Duration:       Intermittent or continuous?
Other symptoms present:      pus in eyes in a.m., itchy eyes, blurred vision, eye pain, fever chills; nausea or vomiting?
Previous history:      of eye disease, allergy, glaucoma, contact lenses, other inmates with red eye, personal history of rheumatic diseases?

### Objective:

Visual acuity for both eyes
Complete vital signs - BP, pulse, temperature
Purulent drainage from eye
Periorbital redness
Edema of the eyelids
Clarity of the cornea
Photophobia

### Assessment:

Potential for blindness if glaucoma, iritis, corneal infection
Potential for sepsis and loss of eye if periorbital redness or swelling

### Plan / Management:

**Call Physician if:**      Severe pain, nausea; photophobia, unclear cornea, foreign body visible, visual loss, deformed eye; **any vital signs are not in the normal range**

Minimal Pain with no photophobia = conjunctivitis
          start Sodium Sulamyd 10% 2 gtt Q.I.D. (if no Sulpha allergy!)

Put on next available sick call list

Copyright ©1998, Paul A. Lenz M D
Copy Serial # 199083101

I - 18

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - C. OPHTHALMIC*

# Abrasion to Eye

### Subjective:

Onset:          When were the symptoms first noticed?  How did it happen?
Other symptoms present:          pus in eyes in a.m., itchy eyes, blurred vision, eye pain, fever chills; nausea
                                                  or vomiting?
Previous history of:          eye disease, allergy, glaucoma, contact lenses?

### Objective:

Visual acuity for both eyes
Complete vital signs - BP, pulse, temperature
Purulent drainage from eye
Periorbital redness
Edema of the eyelids
Clarity of the cornea, foreign body visible?
Shape of globe normal?
Photophobia

### Assessment:

Potential for blindness low if globe not deformed
Potential for eye infection

### Plan / Management:

**Call Physician if:**          Severe pain, nausea; photophobia, unclear cornea, foreign body visible, visual loss,
                                          deformed eye; **any vital signs are not in the normal range**
If no foreign body visible, patch eye, reassess in 12 hours.
Minimal Pain with no photophobia = conjunctivitis
                    start Sodium Sulamyd 10% 2 gtts Q.I.D. (if no Sulpha allergy!)
Put on next available sick call list

Copyright ©1998, Paul A. Lenz M D
Copy Serial # 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - C. OPHTHALMIC*

# Eye Pain

## Potential EMERGENCY

### Subjective:

Onset:         When were the symptoms first noticed?
Duration:      Intermittent or continuous?
Other symptoms present:    pus in eyes in a.m., itchy eyes, blurred vision, eye pain, ever chills; nausea
                           or vomiting;
Previous history of:    eye disease, allergy, glaucoma, contact lenses, Migraines, personal history of
                        rheumatic diseases.

### Objective:

Visual acuity for both eyes
Complete vital signs - BP, pulse, temperature, respiration rate
Purulent drainage from eye
Periorbital redness
Edema of the eyelids
Clarity of the cornea
Photophobia

### Assessment:

Potential for blindness if glaucoma, iritis, corneal infection
Potential for sepsis and loss of eye if periorbital redness or swelling

### Plan / Management:

**Call Physician if:**    Severe pain, nausea; photophobia, unclear cornea, foreign body visible, visual loss,
                          deformed eye; blood level behind cornea; seeing "stars" or flashes of light;
                          **any vital signs are not in the normal range**
If no foreign body visible, and no visual loss, and Minimal Pain, patch eye, reassess in 12 hours.
Put on next available sick call list

Copyright © 1999, Paul A. Lenz M D
Copy Serial # 199063101

I - 22

# Punctured/Ruptured Eardrum

### Subjective:

| | |
|---|---|
| Onset | When did this occur? |
| Other symptoms present: | pus or drainage from ears, fever chills; nausea or vomiting; pain? |
| Previous history of: | wax build up; sinusitis; ear problems? |

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Visual inspection of outer ears, and mouth
Otoscope inspection of BOTH ear canals and eardrums

### Assessment:

Alteration in comfort

### Plan / Management:

**Contact physician if:** pus or drainage from ears, fever chills; nausea or vomiting; or sever pain; **any vital signs are not in the normal range?**
Give Acetominophen 500 mg 2 tabs Q.I.D. PRN if painful.
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 199083101

I - 24

# Bleeding Ear

### Subjective:

| | |
|---|---|
| Onset | Gradual or sudden?  Time of onset? |
| Duration: | Intermittent or continuous? |
| Other symptoms present: | pus or drainage from ears, fever chills; nausea or vomiting; pain? |
| Previous history of: | wax build up; sinusitis; ear problems? |

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Visual inspection of outer ears, and mouth
Otoscope inspection of BOTH ear canals and eardrums

### Assessment:

Alteration in comfort

### Plan / Management:

Contact physician if:    pus or drainage from ears, fever chills; nausea or vomiting; or sever pain; **any vital
signs are not in the normal range?**
Give Acetominophen 500 mg 2 tabs Q.I.D. PRN if painful.
If any other systemic symptoms are present, follow the appropriate protocol!
Put on next available sick call list

Copyright ©1998, Paul A. Lenz M.D.
Copy Serial # 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - E. NOSE*

# Epistaxis (bloody nose)

## Potential EMERGENCY

### Subjective:

Onset:                           When did it happen? How did it happen?
Other symptoms present:          pus or drainage from nose, fever chills; nausea or vomiting; pain?
Previous history of:             sinusitis; nose problems; epistaxis?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Visual inspection of nose, ears, and mouth.
Otoscope inspection of BOTH ear canals and eardrums.
Otoscope inspection of BOTH nares.

### Assessment:

Alteration in comfort
Risk of continued bleeding

### Plan / Management:

Place patient in quiet room in a sitting position, leaning forward.  Apply ice to forehead and bridge of nose.
Put basin in front of patient to collect blood to estimate blood loss.  Observe universal precautions.
**Contact physician if:**    fever chills; nausea or vomiting; or severe pain?
                             Bleeding is profuse
                             Bleeding does not stop in 30 minutes.
                             Bleeding recurs
                             **any vital signs are not in the normal range?**
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M.D
Copy Serial # 199083101

I - 28

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - F. NEUROLOGIC*

# Head Injury

## Potential EMERGENCY

### Subjective:

| | |
|---|---|
| Onset: | Activity when the injury occurred? |
| Location: | Frontal; bi-temporal, occipital, unilateral? |
| Radiation: | down the back, into the eye etc.? |
| Character: | Sharp or dull, pressure, pulsating? Intermittent or continuous? |
| Other symptoms: | short of breath; nausea or vomiting; sweating; weakness or restlessness; photophobia; associated laceration? |
| Previous history of: | migraines, hypertension, stroke? |

Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Orientation and level of consciousness
Neuro Vitals:    Pupils – Size, equal & reactive to light.
                      Bilateral strength and sensation
Breathing difficulties - rate, rhythm, depth
Skin - color, temperature, diaphoresis
Agitation/restlessness
Tender to touch any location of head
Loss of function of any limb or organ?

### Assessment:

Potential for intra-cranial problem - low probability, high mortality
Alteration in comfort

### Plan / Management:

Give Acetominophen 500 mg 2 tabs Q.I.D. PRN if painful.
Evaluate for compromise of organ function:      eyes, ears, motor movements of limbs; sensation of limbs;
If any other systemic symptoms are present, follow the appropriate protocol!
Put on 24 hour watch, have guards wake inmate q1h for 24 h.
**Contact Physician if:**   Acetominophen gives no relief; abnormal vital signs; loss of function occurs.
Put on next available sick call list

Copyright © 1949, Paul A. Lenz M.D.
Copy Serial # 08083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - G. PSYCHIATRIC*

# Insomnia

### Subjective:

Onset:            New or old problem?
Duration:          Intermittent or continuous?
Character:         Gets to sleep but can't stay asleep? Sleeps but doesn't rest?
Other symptoms:    obesity; cardiac problems, psychiatric problems?
Previous history of insomnia?  Sleeps during the day?
Any other current medical problems being treated? List medications esp. Any with side effects of insomnia?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Breathing difficulties - rate, rhythm, depth
Any psychiatric symptoms? Depression? anxiety?

### Assessment:

Alteration in comfort
Possible anxiety

### Plan / Management:

Give Benadryl 25 mg 1 - 2 tabs qhs
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M.D
Copy Serial # 199085101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - G. PSYCHIATRIC*

# Depression

### Subjective:

Onset:          when the problem occur?  Gradual or sudden?  Time of onset?
Duration:       Intermittent or continuous?
Other symptoms: anxiety, insomnia, restless, loss of appetite, loss of weight?
Previous medical or psychiatric history?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Breathing difficulties - rate, rhythm, depth
Orientation and level of consciousness
Delusions (can read minds), hallucinations.
Ask if suicidal.  Any plans?
Skin - color, temperature, diaphoresis
Agitation or restlessness, aggressive behavior

### Assessment:

Potential for suicide
Possible anxiety

### Plan / Management:

**Contact Physician if:**   suicidal, homicidal, has delusions or hallucinations
Place on suicide watch.
Guards to fill in *Cameron County Mental Disability/Suicide Intake Screening"* form.
Refer to Psychologist.
Put on next available sick call list.

I - 34

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial # 199983101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - G. PSYCHIATRIC*

# Stress\Anxiety  Reaction

### Subjective:

Onset:          when the problem occur?  Gradual or sudden?  Time of onset?
Duration:        Intermittent or continuous?
Other symptoms: depression, insomnia, restless, loss of appetite, loss of weight?
Previous medical or psychiatric history?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Breathing difficulties - rate, rhythm, depth
Orientation and level of consciousness
Delusions (can read minds), hallucinations.
Skin - color, temperature, diaphoresis
Agitation or restlessness, aggressive behavior

### Assessment:

Is fear or anxiety realistic?
Potential for suicide

### Plan / Management:

Isolate and put on q 2 hour watch
Follow other protocols if other symptoms present
Give Benadryl 25 mg q 4 h
**Contact Physician if:  Suicidal ideation present**
                            **Delusions or hallucinations present**
                            **Patient appears unwell**
Guards to fill in *Cameron County Mental Disability/Suicide Intake Screening"* form.
Refer to Psychologist.
Put on next available sick call list

I - 36

Copyright ©1999. Paul A. Lenz M.D.
Copy Serial # 199085101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - G. PSYCHIATRIC*

# Alcohol Withdrawal
# (delirium tremens)

## Potential EMERGENCY

### Subjective:

Onset:          when was the last intake of alcohol?  When did this problem start?  Gradual or sudden?
Duration:       Intermittent or continuous?
Other symptoms: depression, insomnia, restless?
Previous medical or psychiatric history?
Oral intake in last 24 hours?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Breathing difficulties - rate, rhythm, depth
Orientation and level of consciousness
Delusions, hallucinations.
Skin - color, temperature, diaphoresis
Agitation or restlessness, aggressive behavior

### Assessment:

Potential for delirium due to other cause - be certain of recent alcohol consumption (last 2 weeks)
Potential for intra cranial problem (life threatening)
Possible poisoning

### Plan / Management:

Isolate and put on hourly watch
Push fluids
Lab work:       CBC, CMP, TSH, ammonia level, U/A, urine drug screen (10 panel)
Give Librium 50 mg QID for 7 days
Contact Physician if:   **Any vital signs are not in the normal range,**
                        **Severe pain,**
                        **Nausea;**
                        **Suicidal ideation present**
                        **Delusions or hallucinations present**
                        **Patient appears unwell**
Put on next available sick call list
**If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.**

Copyright ©1999, Paul A. Lenz M.D
Copy Serial # 199083101

# Cough

### Subjective:

Onset:          When did it begin?  Gradual or sudden?
Duration:       Intermittent or continuous?
Character:      Loose or tight chest? Producing phlegm or Blood or not? Worse at night or other specific
                time? Night Sweats? Weight Loss?
Other symptoms: short of breath; fever; nausea or vomiting; weakness or restlessness.
Previous Medical, Cardiac or respiratory history?  Any History of TB?  Contact with TB?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Orientation and level of consciousness
Breathing difficulties - rate, rhythm, depth
Skin - color, temperature, diaphoresis
Agitation/restlessness

### Assessment:

**Potential for Tuberculosis!**
Potential for Pneumonia? Think of HIV!
Potential for severe asthmatic episode.

### Plan / Management:

Obtain Chest X-ray always
Evaluate for chest pain or gastric pain.

Contact physician if:  **Any vital signs are not in the normal range?**
                       **Respiration rate > 30 breaths per minute or unable to talk**
                       **Fever chills; nausea or vomiting; chest pain or severe pain;**
                       **Weight Loss or night sweats;**

If respirations > 30 / min:     **Give O$_2$ @ 3L/min by nasal cannula;**
                                **Give albuterol unit dose by nebulizer;**
                                **Reassess in one hour**
                                **Put on hourly watch**
If respirations < 30 / min; and no fever; and no history of asthma;
                                **Give    pseudophed 30 mg T.I.D. PRN and**
                                **Acetominophen 500 mg 2 tabs q 4 h PRN and**
                                **Cough syrup 2 tsp T.I.D. PRN**

Put on next available sick call list
**If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.**

Copyright ©1998. Paul A  Lenz M D
Copy Serial #  199083101

I - 40

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - H. COUGH, COLDS & FLU*

# Flu Symptoms

### Subjective:

Onset:          When did it begin?  Gradual or sudden?
Duration:       Intermittent or continuous?
Character:      Loose or tight chest; producing phlegm or not; worse at night or other specific time
Other symptoms: short of breath; fever; nausea or vomiting; sweating; weakness or restlessness.
Previous Medical, Cardiac or Respiratory history?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Orientation and level of consciousness
Breathing difficulties - rate, rhythm, depth
Skin - color, temperature, diaphoresis
Agitation/restlessness

### Assessment:

Potential for sepsis and septic shock if bacterial infection
Alteration in comfort
Possible denial and anxiety

### Plan / Management:

Contact physician if:  **any vital signs are not in the normal range?**
                       **Respiration rate > 28 breaths per minute or unable to talk**
                       nausea or vomiting; chest pain or severe pain;

If respirations > 30 / min:        give O$_2$ @ 3L/min by nasal cannula;
                                   give albuterol unit dose by nebulizer;
                                   Reassess in one hour
                                   Put on hourly watch

If respirations < 30 / min; and no fever; and no history of asthma;
        Give     pseudophed 30 mg T.I.D. PRN and
                 Acetominophen 500 mg 2 tabs q 4 h PRN and
                 Cough syrup 2 tsp T.I.D. PRN

Put on next available sick call list

Copyright ©1999, Paul A. Lenz M.D
Copy Serial # 19908.3101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - I. UROLOGIC*

# Blood in Urine

### Subjective:

Onset:          When did the symptoms occur?  Gradual or sudden?  Time of onset?
Duration:       Intermittent or continuous?
Other symptoms:      pain in genitalia, back pain; short of breath; nausea or vomiting; sweating; weakness or restlessness.
What helps or increases the discomfort?  Pain with movement or breathing?
Previous medical and  urologic history?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Breathing difficulties - rate, rhythm, depth
Skin - color, temperature, diaphoresis
Agitation/restlessness
Tender epididymis

### Assessment:

Potential for kidney stone, nephritis
Possible denial and anxiety

### Plan / Management:

Do a urine dipstick
Contact physician if:   any vital signs are not in the normal range?
                        **Profuse bleeding**
                        **severe pain; nausea or vomiting;**
                        **pus in urine**

Put on next available sick call list

Copyright ©1999, Paul A. Lenz M.D
Copy Serial #  199085101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - I. UROLOGIC*

# Blood in Sperm

### Subjective:

Onset:          When did the symptoms occur?  Gradual or sudden?  Time of onset?
Duration:       Intermittent or continuous?
Other symptoms:       pain in genitalia, back pain; short of breath; nausea or vomiting; sweating; weakness or restlessness.
Previous medical and  urologic history?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Breathing difficulties - rate, rhythm, depth
Tender epididymis

### Assessment:

Potential for kidney stone, nephritis, UTI
Possible denial and anxiety
Generally if there are no systemic findings, this is a non-issue and does not require treatment.  A UTI should be ruled out and further follow up is indicated.

### Plan / Management:

Do a urine dipstick
        If positive for blood, pus (leukocytes) or leukocyte esterase,
                Give Septra DS BID (if not allergic)
Contact physician if:   any vital signs are not in the normal range?
                profuse bleeding
                severe pain; nausea or vomiting;
                pus in urine
Push fluids
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 199063101

I - 46

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - J. GYNECOLOGIC*

# Precipitous Delivery

## Potential EMERGENCY

**IMMEDIATE ACTION:  Call EMS, Get guard to call physician !**

### Subjective:

Onset:              When did the contractions start? Activity when the contractions started?
Other symptoms:     Was there bleeding? Was there a leak of fluid prior to contractions?
                    short of breath; nausea or vomiting; sweating; weakness or restlessness;
Previous Pregnancy history.
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Is the head visible?
Is the head palpable?

### Assessment:

Potential for harm to mother and/or baby
You will need clean dry towels - many.
**You will need scissors, two (2) hemostats, oxygen, a clean tray.**

### Plan / Management:

**If head is visible, allow labor to proceed.  You will need two (2) people!**
**Once the baby face is visible, wipe with clean towels and continue delivery.**
**When baby is delivered from mother:**
                    **Clamp the umbilical cord halfway with both hemostats**
                    **Cut the cord between the hemostats**
**Baby attendant**
                    **Wrap the baby in clean towels and ensure proper breathing**
                    **Appy O$_2$ by mask to baby - insitiute CPR measures if necessary.**

**Mother attendant**
                    **Complete delivery of the placenta.**
                    **Place placenta in clean tray**
                    **Massage lower abdomen to encourage complete contraction of the uterus**
                    **If significant vaginal bleeding, apply pressure**

I - 48

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial # 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - J. GYNECOLOGIC*

# Vaginal Bleeding

## Potential EMERGENCY

### Subjective:

| | |
|---|---|
| Onset: | When did bleeding start? Date of Last Normal Menstrual Period (LNMP). Count from today's date backward to the date of the LNMP to arrive at the number of weeks of pregnancy. |
| Character: | Constant or intermittent? Bright red or dark? How many tampons or pads per day are used? Are they soaked? |
| Other symptoms: | short of breath; nausea or vomiting; sweating; weakness or restlessness; associated laceration? |

Previous urologic/gynecologic history.
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Breathing difficulties - rate, rhythm, depth

### Assessment:

Potential for exsanguination.
Possible pregnancy/miscarriage

### Plan / Management:

**Contact Physician if:  More than 3 soaked pads per day or**
**Bleeding more than two days or**
**Abnormal vital signs or**
**Pain is present or**
**Possible pregnant**

Put on next available sick call list

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial #: 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - K. DERMATOLOGIC*

# Contusion / bruise

### Subjective:

Onset:  Caused by trauma (Y/N)? Activity when occurred or was noticed?  Gradual or sudden?  Time of onset?

Other systemic symptoms: nausea, fever, sweats, headaches or any other symptom

Previous bleeding history?

Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate

Location:        near a vital organ such as eye (Y/N)?

Vision affected? Can they read the eye chart?

Description:    Color, raised/flat, size, confluent or in individual populations

Character:       raised, painful, tender to touch, hot, numb,

Other systemic symptoms (Y/N)?

### Assessment:

If no other systemic symptoms and vitals normal, and not near vital organ then not high risk.

Potential to represent bleeding problem or danger to an organ

### Plan / Management:

Apply ice.

**Contact Physician if:   fever**
**headache**
**patient appears unwell**
**or if near a vital organ.**

Put on next available sick call list

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 199063101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - K. DERMATOLOGIC*

# Burns - Thermal & UV

### Subjective:

Onset:  Sunburn or other burn? Activity when noticed?  Time of onset?
Other systemic symptoms:      nausea, fever, sweats, headaches or any other symptom
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate.
Location:        near a vital organ such as eye (Y/N)?
Description:     Size,
stage:  1) superficial:          Skin red, no raised tissue, painful
        2) partial thickness:   Skin distorted or raised vesicle with fluid or drainage, painful
        3) full thickness:      Skin absent and underlying tissue apparent, NOT PAINFUL
Other systemic symptoms (Y/N)?  Such as nausea, fever, sweats, headaches.

### Assessment:

If no other systemic symptoms, vitals normal, not near vital organ, and size small; low risk.
Potential for sever disfigurement, loss of function, electrolyte disturbance if large fluid loss

### Plan / Management:

Contact Physician if:   **partial thickness or full thickness burn**
                        **near a vital organ**
                        **other systemic symptoms present.**

Apply ice if swollen.
Ensure tetanus status up to date - if not, give Tetanus Toxoid 0.5 ml IM
Give acetominophen 500 mg po q4h PRN for mild to moderate pain.
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - K. DERMATOLOGIC*

# Human Bite

## Potential EMERGENCY

### Subjective:

Onset:  Time of occurrence?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Location:      near a vital organ such as eye (Y/N)?
Description:     puncture of skin? bruising present?
Other systemic symptoms (Y/N)?

### Assessment:

Potential to represent bleeding problem or danger to an organ.
Human bites cause very serious infections.  Also be aware of HIV?

### Plan / Management:

Contact Physician if:  **fever or patient appears unwell**
                       **near a vital organ.**
                       **skin is broken**

Ensure tetanus status up to date - if not, give tetanus toxoid 0.5 ml IM
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS - L. MUSCULOSKELETAL*

# Fractures

## Potential EMERGENCY

### Subjective:

Onset:  Caused by trauma (Y/N)? Activity when occurred or was noticed?  Time of onset?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Location:
Description:            Deformity, loss of function
Other symptoms:     loss of pulse or feeling, swelling

### Assessment:

Potential to represent bleeding problem, neurologic problem or danger fracture area.

### Plan / Management:

**Contact Physician**

Apply ice if swollen.
Put on next available sick call list.

Copyright ©1999, Paul A. Lenz M.D
Copy Serial # 199083101

# Muscle/Skeletal Pain

### Subjective:

Onset:  Trauma induced(Y/N)? Activity when occurred or was noticed?  Gradual or sudden?  Time of onset?
Other systemic symptoms:      nausea, fever, sweats, headaches or any other symptom
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Description:     sharp/dull, pulsating, aching, joint swelling?
Location:         legs, arms, torso, neck
Other systemic symptoms (Y/N)?         Rash, fever etc.

### Assessment:

If no other systemic symptoms and vitals normal probable low risk
Potential to represent systemic illness.

### Plan / Management:

Contact Physician if:  sever pain
                                fever
                                or patient appears unwell

Ice to back.
Give acetominophen 500 mg po q4h PRN for mild to moderate pain.
Put on next available sick call list

Copyright © 1999, Paul A. Lenz M D
Copy Serial # 199083101

# Edema

### Subjective:

Onset:  Activity when occurred or was noticed?  Gradual or sudden?  Time of onset?
Other systemic symptoms: nausea, fever, sweats, headaches, short of breath or any other symptom
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - BP, pulse, temperature, respiration rate
Location:        what part is edematous.
Character:       dependant part has pulses, not cold, able to use
Other systemic symptoms (Y/N)?

### Assessment:

Potential to represent heart problem if ankles or feet.
Potential to represent impaired circulation to dependant part.
Potential to represent allergic reaction

### Plan / Management:

Contact Physician if:  **pain in dependant part**
                       **fever**
                       **headache**
                       **short of breath**
                       **any other system symptoms or patient appears unwell**

Elevate affect limb
Put on next available sick call list

I - 62

Copyright ©1999. Paul A. Lenz M D.
Copy Serial #  199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - M. METABOLIC*

# Hypoglycemia                          **EMERGENCY**

### Subjective:

Discovery:      why was the blood sugar measured?
Onset:          Activity when occurred?  Gradual or sudden? Time of onset?
Duration:       Has this occurred before?
Other symptoms: short of breath; nausea or vomiting; sweating; weakness or restlessness.
Dietary history - intake in last 24 hours
Previous Medical/Cardiac or diabetic history?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - bilateral BP, apical pulse, temperature
Breathing difficulties - rate, rhythm, depth
Orientation and level of consciousness
Skin - color, temperature, diaphoresis
Agitation/restlessness

### Assessment:

Potential for cardiopulmonary collapse
Potential for diabetic insulin shock
Possible denial and anxiety

### Plan / Management:

If Blood Sugar < 60

        Give glucose (1 cup of Orange Juice)
        Contact Physician
        Activate EMS if so directed by physician.
        **If Loss of consciousness occurs, follow MAN DOWN PROTOCOL.**

If Blood Sugar > 60

        Give glucose (1 cup of Orange Juice)

Recheck blood sugar q2h X 2
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M D
Copy Serial # 199083101

*PRISON PROTOCOLS PART I - PRESENTING SYMPTOMS  - N. MISCELLANEOUS*

# Sexual Assault

## Potential EMERGENCY

### Subjective:

Description:    Describe what happened? Anal intercourse? Oral sex?
Onset:          Time of occurrence?
Other additional types of assault punched, kicked, etc?
Previous Medical/Cardiac history?
Any other medical problems currently being treated? Medications?

### Objective:

Complete vital signs - bilateral BP, apical pulse, temperature.
Breathing difficulties - rate, rhythm, depth
Orientation and level of consciousness
Neuro Vitals:    Pupils ⇨ Size, equal & reactive to light.
                 Bilateral strength and sensation
Skin - color, temperature, diaphoresis
Agitation/restlessness
Tender to touch any body parts.
Assess degree of psychological distress, crying, suicidal expressions etc.

### Assessment:

Potential for serious psychological trauma.  Suicidal risk?
Possible denial.
Potential for Sexually Transmitted Disease.

### Plan / Management:

Guad to contact medical personnel at the time of the incident.
Refer to BMC for forensic evaluation
Give Xanax 0.25 mg TID pm for agitation
Refer to psychologist.
Put on next available sick call list

Copyright ©1999, Paul A. Lenz M.D.
Copy Serial # 199093101

I - 66

THE STATE OF TEXAS     §
COUNTY OF CAMERON     §

       BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 17th day of April, 2001, A.D., did personally appear: Felipe Esquivel,,_who after being by me duly sworn, did depose and say: My name is Felipe Esquivel. I am 27 years of age. My date of birth is on October 5, 1973. I reside at 735 W.Levee in Brownsville TX. My phone number is 544-6689. I am with the Health Department with Cameron County as a Licenced Vocational Nurse. I have been a nurse for one year and two months.

       On April 12, 2001 at around 12:42 a.m. I was called by Sgt. Mendietta of the Cameron County Jail in reference to an inmate without respiration. Mendietta further told me that EMS was already en route. I then headed out to the County Jail myself. I live close by. I got to the jail before EMS. When I walked in the jail I was lead by Galicia and Sgt.Mendieta to the padded cell. They unlocked the door and the prisoner was laying on the floor. The prisoner was sitting down with his legs extended leaning against the wall. The prisoner was on the actual floor not on the part that looks like a bed. The first thing I did was check his pulse and respiration. I also checked his skin tone. I immediately knew that the prisoner had no pulse and respiration. I noticed that rigor mortis was already setting in. I felt his skin rough and he was already cold. I then ran to the infirmary and got the necessary supplies which were Oxygen, ambu bag and a blood pressure cuff and a stethoscope and a oxygen line and some gloves. I then went back to the prisoner and began CPR and first aid. This is part of my procedure even though I knew he was already dead. Minutes later was when EMS arrived and they then took over.

       When I was relieved by EMS I asked Sgt.Mendietta what had happened. He told me that the prisoner was beaten up at Brownsville P.D. He further said that when the prisoner arrived he was violent and aggressive. That was the reason the Sergeant stated he was placed in the padded cell. I also asked the Sergeant if he notified the medical staff and if they had started a log on him every fifteen minutes and he stated no that there was no log on him and that they did not notify the medical staff. Mendieta further stated that the outgoing shift told him that there was a guy in the padded cell. That was all he told me. I then finished my notes and I later left.

       I have read my statement and find my statement true and correct. I have also given my statement voluntarily. I have not been forced nor threatened nor promised anything in return for my statement.

                              _____

Sworn and subscribed to before me on this the __ day of _____, 2001, A.D.

                                 _____
                                 Notary Public for Cameron County, Texas

JAVIER REYNA
Notary Public, State of Texas
My Commission Expires
03-31-2004

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA  ) (
IDALIA GUTIERREZ,         ) (
INDIVIDUALLY AND ON BEHALF) (
OF THE ESTATE OF JUAN     ) (
LONGORIA, DECEASED        ) (
    Plaintiffs         ) (
                       ) (
VS.                       ) (   CIVIL ACTION NO. B-01-062
                       ) (
CAMERON COUNTY, TEXAS,    ) (
THE CITY OF BROWNSVILLE,  ) (   JURY DEMANDED
TEXAS AND JOHN DOES 1-10  ) (
    Defendants          ) (

---

ORAL DEPOSITION OF
LAWRENCE J. DAHM, M.D.
FEBRUARY 17, 2004



---

    ORAL DEPOSITION OF LAWRENCE J. DAHM, M.D.,
produced as a witness at the instance of the
PLAINTIFFS, taken in the above styled and numbered
cause on FEBRUARY 17, 2004, reported by DONNA McCOWN,
Certified Court Reporter No. 6625, in and for the State
of Texas, at the offices of Adams & Graham, L.L.P., 222
East Van Buren, West Tower, Harlingen, Texas, pursuant
to the Federal Rules of Civil Procedure.

```
 1              LAWRENCE J. DAHM, M.D.,

 2    having been duly sworn, testified as follows:

 3                      EXAMINATION

 4    BY MR. BERGER:

 5         Q.   Please state your name for the record, sir.

 6         A.   Lawrence John Dahm.

 7         Q.   Are you a medical physician?

 8         A.   Yes, sir.

 9         Q.   Where you do you practice, sir?

10         A.   I practice principally at the Valley Baptist

11    Medical Center in Harlingen.

12         Q.   Okay.  And is your specialty pathology?

13         A.   Yes, sir.

14         Q.   Where did you go to medical school?

15         A.   University of Texas Southwestern Medical School

16    in Dallas.

17         Q.   And when did you graduate?

18         A.   May of 1976.

19         Q.   From medical school?

20         A.   Correct.

21         Q.   Okay.  And did you do an internship and

22    residency thereafter?

23         A.   Yes.  I did my internship and residency in

24    anatomic and clinical pathology at the University of

25    Texas Southwestern Medical School affiliated
```

16:29:14  4
16:29:15  5
16:29:16  6
16:29:18  7
16:29:21  8
16:29:21  9
16:29:23 10
16:29:27 11
16:29:31 12
16:29:32 13
16:29:33 14
16:29:35 15
16:29:38 16
16:29:38 17
16:29:41 18
16:29:44 19
16:29:45 20
16:29:46 21
16:29:48 22
16:29:50 23
16:29:54 24
16:29:56 25

17:52:27  1    toxicology.  In other words, we look for alcohol and

17:52:29  2    drugs.  The other diagnosis we make primarily by the

17:52:33  3    combination of the gross or naked eye inspection and

17:52:37  4    the microscopic examination.

17:52:39  5        Q.  Okay.  You did not make that initial

17:52:41  6    determination, based upon your initial autopsy, until

17:52:44  7    you had confirmation of this from Dr. DiMaio; is that

17:52:51  8    correct?

17:52:52  9        A.  I consulted Dr. DiMaio.  Yes, sir, I did.

17:52:55 10        Q.  Okay.  And he gave you oral consultation, and

17:52:56 11    you asked the questions that were in -- of him.

17:53:00 12        A.  Yes, I asked those questions in that letter.

17:53:07 13        Q.  Okay.  And you put "and/or delirium tremens" in

17:53:07 14    your letter.

17:53:11 15        A.  Yes.

17:53:11 16        Q.  Okay.  And what was his opinion?

17:53:14 17        A.  Well, his opinion was that this man died of

17:53:18 18    end-stage severe chronic liver damage brought on by

17:53:22 19    alcohol.

17:53:24 20        Q.  And how about "and/or delirium tremens or

17:53:27 21    alcohol withdrawal"?

17:53:28 22        A.  Well, yes.  I'm sure he mentioned that as

17:53:30 23    being --

17:53:31 24        Q.  A contributory cause?

17:53:32 25        A.  -- a contributory factor.  And I think it was.

17:53:34 1    I mean, I don't think there's any question about that.

17:53:37 2        Q.  Okay.  But "and/or" here, are you trying to get

17:53:40 3    him to tell you whether or not he feels that the death

17:53:46 4    was caused primarily by end-stage liver disease or by

17:53:51 5    the delirium tremens?

17:53:55 6        A.  What I'm trying to do is get his opinion and

17:53:57 7    his perspective on this case.

17:53:57 8        Q.  Yeah.

17:54:01 9        A.  And people don't normally die of delirium

17:54:06 10   tremens by itself.  They can recover from delirium

17:54:06 11   tremens.

17:54:09 12            The disease from which he could not

17:54:11 13   recover in this case, because the liver was scarred

17:54:14 14   beyond any functionality, any ability to function, was

17:54:20 15   the alcoholic liver disease.  That is what he died of

17:54:23 16   now.

17:54:23 17       Q.  Okay.  Well, he had some --

17:54:25 18       A.  The delirium tremens, you know, undoubtedly

17:54:27 19   helped him along, but if he had still had a normal

17:54:29 20   liver, he could have recovered from the delirium

17:54:34 21   tremens.  That was a treatable disease.  The end-stage

17:54:34 22   liver disease is not.

17:54:36 23       Q.  Okay.  I understand that.  But if he was given

17:54:39 24   timely care for his delirium tremens.

17:54:49 25       A.  He would have died anyway.

17:54:49 1      Q.  At the same time?

17:54:49 2      A.  They might have been able to keep him alive for

17:54:51 3   another three or four days in a coma.

17:54:52 4      Q.  In a coma?

17:54:53 5      A.  In a coma.

17:54:54 6      Q.  Okay.

17:54:54 7      A.  He had no more meaningful life left.  You know,

17:54:58 8   he died of the alcoholic liver disease with a possible

17:55:01 9   contribution from the delirium tremens.  In other

17:55:05 10  words, that might have speeded it up a little bit, but

17:55:07 11  he was going to die, if not that day, the next day or

17:55:10 12  the day after.

17:55:11 13          And even if they had rushed him to the

17:55:13 14  hospital at the first sign of DTs and gotten him in and

17:55:17 15  rehydrated him and so on, he might have lived another

17:55:21 16  three or four days, maybe even a week in a coma.

17:55:23 17          He was never going to recover

17:55:24 18  consciousness.  He was never going to have a meaningful

17:55:29 19  existence again because he did not have a liver to live

17:55:33 20  on.

17:55:33 21     Q.  Well, Doctor, when did he lose consciousness?

17:55:37 22     A.  Well, I don't know exactly, but it sounded like

17:55:39 23  it was in the last hours of his life.

17:55:44 24     Q.  From what you understand, was he conscious up

17:55:47 25  to the last hour of his life?

18:19:15  1    emergency room, requesting beer?

18:19:18  2        A.  Yeah.  I'm not aware of that, but I guess that

18:19:20  3    wouldn't surprise me, but I'm not aware of it.

18:19:25  4        Q.  Based on your experience as a medical doctor,

18:19:28  5    is it protocol to assess for alcohol-related issues as

18:19:34  6    part of the differential diagnosis?

18:19:37  7        A.  Yes, sir.

18:19:37  8        Q.  Do you know whether that was done in this

18:19:39  9    particular case?

18:19:42 10        A.  I don't specifically know, but I rather

18:19:44 11    strongly suspect that that was high on their list when

18:19:47 12    they brought him in.

18:19:51 13        Q.  Okay.

18:19:52 14            MR. BERGER:  Object to the response.  It

18:19:53 15    calls for speculation.

18:19:55 16        Q.  If -- what is the protocol for a medical doctor

18:19:58 17    if they diagnose delirium tremens?  What is the medical

18:20:03 18    protocol?

18:20:04 19        A.  I think if delirium tremens is actually

18:20:07 20    diagnosed, I think that's when they're generally

18:20:09 21    admitted to the hospital setting.

18:20:12 22        Q.  And that's where they're prescribed the

18:20:16 23    sedative to settle down the brain?

18:20:17 24        A.  Correct.  Sedative and rehydration.

18:20:21 25        Q.  A sedative such as Valium or Lithium?

18:20:24  1      A.  Yes, sir.

18:20:24  2      Q.  And then they're rehydrated, you're talking

18:20:26  3  about intravenous fluids are applied?

18:20:29  4      A.  Fluids.

18:20:29  5      Q.  And they're actually incarcerated in a hospital

18:20:31  6  for medical treatment.

18:20:32  7      A.  Yes.  And frequently restrained to prevent

18:20:36  8  self-injury.

18:20:37  9      Q.  Okay.  Now, assume with me that Dr. Richardson

18:20:42 10  had admitted this -- had diagnosed delirium tremens and

18:20:48 11  had placed Mr. Longoria in the hospital, which is the

18:21:01 12  medical protocol for treatment of delirium tremens,

18:21:01 13  based on reasonable medical probability, what was the

18:21:01 14  life expectancy of this gentleman in light of the

18:21:02 15  autopsy report?

18:21:03 16      A.  Less than a week.

18:21:05 17      Q.  And that's because of the end-stage liver

18:21:07 18  disease?

18:21:08 19      A.  That's correct.

18:21:09 20          MR. BERGER:  Objection, leading.

18:21:09 21      Q.  In your medical opinion, what's the reason for

18:21:12 22  the fact that his life expectancy would not have been

18:21:15 23  any longer than a week even had he received treatment

18:21:19 24  for delirium tremens by a medical doctor?

18:21:23 25      A.  His end-stage alcoholic liver disease would

18:23:51  1    the lungs and the pericardial membranes around the

18:23:56  2    heart and so on.  And so the death is basically -- the

18:24:00  3    findings are basically similar to those in a

18:24:00  4    strangulation.

18:24:04  5        Q.  So is a choke hold death -- is it a

18:24:07  6    strangulation death?

18:24:10  7        A.  Yes, sir.

18:24:10  8        Q.  Okay.  So a choke hold death equates to

18:24:13  9    strangulation death which to a layman indicates the

18:24:21 10    lack of air to the lungs.

18:24:26 11        A.  Yes, sir.

18:24:26 12        Q.  Among other things, correct?

18:24:28 13        A.  Yeah.  More than that.  It's the cutoff of the

18:24:30 14    return of the circulation from the brain.  It's the

18:24:32 15    stoppage of the circulation into the brain is, you

18:24:35 16    know, what a person dies of.

18:24:38 17        Q.  Okay.  At any rate, you wanted to rule that

18:24:41 18    out.

18:24:41 19        A.  Yes, sir.

18:24:41 20        Q.  And that's why you requested this additional

18:24:44 21    testing?

18:24:44 22        A.  Yes, sir.

18:24:45 23        Q.  And that's why you consulted with Dr. DiMaio;

18:24:50 24    am I correct?

18:24:51 25              MR. BERGER:  Objection, leading.

18:24:52  1          THE WITNESS:  That is why I consulted with

18:24:54  2     Dr. DiMaio.

18:24:56  3          Q.  Is Dr. DiMaio a denoted forensic pathologist?

18:24:59  4          A.  Yes, sir.

18:24:59  5          Q.  Have you periodically consulted with him from

18:25:01  6     time to time on occasion?

18:25:02  7          A.  Yes, sir, I have.

18:25:04  8          Q.  Now, Doctor, after getting back this test data,

18:25:09  9     this test information, would you tell us what you got

18:25:13 10     and what you would have -- would have received had you

18:25:16 11     had a choke hold death?

18:25:21 12          A.  All right.  What we would have had if this had

18:25:26 13     been a choke hold death, we would have seen the

18:25:28 14     petechial hemorrhages in the eyelids and on the

18:25:29 15     surfaces of the eyeballs.  We would have seen petechial

18:25:32 16     hemorrhages in the outer linings of the lung,

18:25:35 17     pleural --

18:25:36 18          Q.  Through the slides?  Is that what you're

18:25:38 19     saying?  Through the microscopic --

18:25:38 20          A.  Well, we would have seen them with the naked

18:25:40 21     eye examination too.

18:25:41 22          Q.  And didn't see that.

18:25:42 23          MR. BERGER:  Objection, leading.

18:25:43 24          THE WITNESS:  We did not.  And we would

18:25:47 25     have seen much -- a much greater degree of bruising in

18:25:51  1    the neck.  And we would have seen, more likely than

18:25:56  2    not, true fracturing of the hyoid bone as opposed to a

18:25:59  3    slight sprain of one of the intrahyoid ligaments.

18:26:05  4                   And so, you know, the minimal nature of

18:26:10  5    the neck injuries is not compatible with something as

18:26:13  6    violent as a choke hold death.

18:26:16  7                   MR. BERGER:  Counsel, we'll stipulate that

18:26:16  8    he didn't die of a choke hold to minimize this, the

18:26:20  9    doctor's time, if that's --

18:26:23 10                   MR. VITTITOE:  I appreciate that.  It's

18:26:24 11    been alleged in the lawsuit.

18:26:26 12                   MR. BERGER:  Well, we'll stipulate he did

18:26:27 13    not die of a choke hold.

18:26:29 14                   MR. VITTITOE:  Okay.

18:26:30 15       Q.  But at any rate, you wanted to rule that out.

18:26:32 16       A.  Yes, sir.

18:26:33 17       Q.  And you did rule that out by the test data?

18:26:36 18       A.  Yes, sir.

18:26:36 19                   MR. BERGER:  Objection, leading.

18:26:39 20                   THE WITNESS:  I ruled it out with a

18:26:41 21    combination of the test data.

18:26:41 22                   MR. BERGER:  I've already stipulated.  You

18:26:42 23    want to keep asking about it?

18:26:43 24                   MR. VITTITOE:  Yes, sir.

18:26:44 25                   MR. BERGER:  Okay.  Well, then, that's

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

18:26:45 1    your privilege, but I'm going to still object to your

18:26:51 2    leading.

18:26:51 3            MR. VITTITOE:  I think I do because you

18:26:52 4    asked about it so much, and it's alleged in the

18:26:53 5    lawsuit.

18:26:54 6            MR. BERGER:  Well, I know it, but we

18:26:55 7    stipulate now that he did not die of a choke hold.

18:27:01 8    Okay?  Now, I mean, if you want to go into it

18:27:17 9    further -- the doctor already give his opinion on my

18:27:17 10   examination of him that he didn't die of a choke hold.

18:27:17 11      Q.   Now, further, Dr. Dahm, my understanding is

18:27:20 12   your findings, based on the test data, the microscopic

18:27:26 13   slides ruled out any break to the hyoid bone.

18:27:28 14      A.   Yes, sir.

18:27:29 15      Q.   Although there was a tear to the ligamentous

18:27:32 16   tissue in relation to --

18:27:34 17      A.   Connected to it, yes, sir.

18:27:36 18            MR. BERGER:  Objection; asked and

18:27:37 19   answered, leading.

18:27:39 20      Q.   -- to the hyoid bone.

18:27:41 21            And the hyoid bone is typically broken in

18:27:42 22   a choke hold; am I correct?

18:27:44 23      A.   Yes, sir.

18:27:45 24      Q.   All right.

18:27:46 25            MR. BERGER:  Objection, leading.

18:27:47  1      Q.  Now, earlier you indicated that -- on direct

18:27:54  2  examination, that it is possible and likely, in many

18:27:59  3  circumstances, that the hyoid bone and/or the throat

18:28:03  4  tissues may be aggravated in the placement of the ETT

18:28:07  5  tube; am I correct?

18:28:08  6          MR. BERGER:  Objection, asked and answered

18:28:09  7  and leading.

18:28:10  8      Q.  Is that true?

18:28:11  9      A.  Yes, sir.

18:28:11 10          MR. VITTITOE:  All right.  Let me ask the

18:28:15 11  court reporter to mark as Exhibit -- Dahm -- Defense

18:28:19 12  Exhibit 6, the statement of Felipe Esquivel.

18:28:27 13          And while we're at it, mark as Defense

18:28:31 14  Exhibit 7 to the Dahm deposition the statement of Jesus

18:28:37 15  Eduardo Perez, who was the EMT technician.

18:30:17 16      Q.  Dr. Dahm, I'll hand you Exhibit 6 and 7 and ask

18:30:21 17  if you would first look at Exhibit 6.

18:31:42 18      A.  Okay.

18:31:43 19      Q.  First of all, Exhibit 6 is the affidavit of

18:31:48 20  Felipe Esquivel, who is a Cameron County Health

18:31:51 21  Department nurse that responded to this situation at

18:31:55 22  the jail.

18:31:56 23      A.  I gathered that from reading this.

18:31:58 24      Q.  And the time, is at about 12:42 a.m.  Do you

18:32:02 25  see that?

18:32:03  1          A.   Yes.

18:32:03  2          Q.   On the 12th.

18:32:04  3               Now, he commented that, in his opinion,

18:32:10  4    rigor mortis was already setting in, the skin was rough

18:32:14  5    and cold, and that he went back to the prisoner and

18:32:21  6    began CPR and first aid.

18:32:24  7          A.   Yes.

18:32:25  8          Q.   And minutes later, EMS arrived and then they

18:32:28  9    took over.

18:32:29 10               So I guess it would be -- in viewing this

18:32:33 11    statement, would it be your impression that Nurse

18:32:37 12    Esquivel was performing CPR compressions?

18:32:42 13          A.   Yes.  I mean, that's what that implies,

18:32:44 14    although he doesn't specifically state it.

18:32:47 15          Q.   And what are CPR compressions?

18:32:51 16          A.   Well, that's where people usually with two

18:32:54 17    hands, they lean on the chest and pump in and out on

18:32:57 18    the chest of somebody lying on their back trying to get

18:32:59 19    heart action, blood circulation.

18:33:01 20          Q.   And if we could, if you'd look at Exhibit 7,

18:33:04 21    which is a shorter statement, but it's from the EMT who

18:33:08 22    arrived on the scene at about 1:10 a.m.

18:33:35 23          A.   All right.

18:33:38 24          Q.   And in reading the Perez statement, the EMT,

18:33:43 25    the ambulance attendant notes that when -- upon his

18:33:48 1    arrival at 1:10 a.m., the nurse and a man were

18:33:53 2    performing CPR compressions on the chest of the

18:33:57 3    prisoner.

18:33:57 4        A.  Yes.

18:33:58 5        Q.  And further, he says that it was his opinion,

18:34:04 6    after examining this individual, the individual was

18:34:07 7    already dead, correct?

18:34:08 8        A.  Yes.

18:34:09 9        Q.  But he commented that he continued the CPR; am

18:34:13 10   I correct?

18:34:14 11       A.  Yes.

18:34:15 12       Q.  So even though he -- in his opinion, this

18:34:19 13   gentleman was dead and had been dead about two hours --

18:34:23 14   that's what he says --

18:34:25 15       A.  Yeah.

18:34:25 16       Q.  -- he continued CPR.

18:34:27 17       A.  Well, they always give them the benefit of the

18:34:28 18   doubt.  I mean, you know, they --

18:34:29 19       Q.  Is that part of their training?

18:34:31 20       A.  Yea.  Part of their training.

18:34:32 21       Q.  He also comments that he placed the ET tube

18:34:35 22   into the prisoner's airway.

18:34:37 23       A.  Yes.

18:34:38 24       Q.  And then the prisoner was transported to

18:34:40 25   Brownsville Medical Center.

18:34:42 1      A.  Yes.  And I'm sure he was doing this in a

18:34:44 2  hurry.

18:34:45 3      Q.  Okay.  So based on your autopsy, your test

18:34:48 4  data, and in your professional opinion in looking at

18:34:53 5  these -- both Exhibit 6 and 7, Longoria was dead when

18:34:58 6  CPR was applied.

18:35:00 7      A.  Correct.

18:35:01 8      Q.  Compressions were given.

18:35:03 9      A.  Correct.

18:35:05 10      Q.  In other words, CPR was given on this dead man.

18:35:08 11      A.  Yes.  Or attempted, I think would be a better

18:35:10 12  way of describing it, but --

18:35:12 13      Q.  And a tube -- intubation tube was --

18:35:15 14      A.  Yes.

18:35:17 15      Q.  -- placed in his --

18:35:17 16            MR. BERGER:  Objection, leading.

18:35:19 17            THE WITNESS:  Well, all those things were

18:35:21 18  done.  I mean, they say it in so many words in here,

18:35:22 19  so --

18:35:22 20      Q.  All right.  Now, would you tell the jury or the

18:35:25 21  judge what an ETT tube is?

18:35:29 22      A.  Endotracheal tube.

18:35:31 23      Q.  What is that?

18:35:31 24      A.  Well, it's a plastic tube with a plastic cuff,

18:35:34 25  inflatable cuff near its end that's, you know, inserted

18:35:39  1    through the throat, through the larynx and into the

18:35:41  2    windpipe for the purpose of artificial respiration.

18:35:46  3        Q.   Would it -- can you -- based on your experience

18:35:51  4    and understanding, can trauma be induced in placing an

18:35:56  5    ETT tube?

18:35:59  6                MR. BERGER:  Objection, asked and

18:36:00  7    answered.

18:36:03  8                THE WITNESS:  Yes.

18:36:03  9        Q.   How about on somebody that's dead?

18:36:04 10                MR. BERGER:  Objection, asked and

18:36:04 11    answered.

18:36:08 12                THE WITNESS:  Yeah.  I mean, you know, you

18:36:11 13    can see injuries.

18:36:12 14        Q.   And placing the tube into the throat at that

18:36:18 15    time, 1:10 in the morning or there and about, could

18:36:21 16    cause irritation to the throat, tears to the hyoid bone

18:36:25 17    possibly?

18:36:26 18                MR. BERGER:  Objection; compound, leading,

18:36:30 19    and asked and answered.

18:36:32 20                THE WITNESS:  Yes.

18:36:39 21        Q.   Okay.  Dr. Dahm, in your medical opinion, do

18:36:43 22    you have any -- strike that question.

18:36:49 23                Dr. Dahm, in all reasonable medical

18:36:51 24    probability, did Mr. Longoria die at the Cameron County

18:36:55 25    Jail as a result of a severe beating?

18:36:58  1      A.  No, he did not.

18:36:59  2      Q.  In your opinion, Dr. Dahm, based on reasonable

18:37:03  3  medical probability, did Mr. Longoria die as a

18:37:07  4  consequence of suffocation of a choke hold?

18:37:10  5      A.  He did not.

18:37:10  6      Q.  In your opinion, Dr. Dahm, based on reasonable

18:37:13  7  medical probability, did Mr. Longoria die as a

18:37:26  8  consequence of end-stage liver disease?

18:37:26  9      A.  Yes, sir, he did.

18:37:26 10      Q.  In your opinion, Dr. Dahm, based on reasonable

18:37:26 11  medical probability, whether or not Mr. Longoria was

18:37:39 12  incarcerated in Cameron County Jail or the Brownsville

18:37:43 13  City Jail for that matter, for whatever he was -- based

18:37:46 14  on his condition in life, how long, based on reasonable

18:37:51 15  medical probability, did he have to live because of the

18:37:53 16  end-stage liver disease?

18:37:55 17          MR. BERGER:  Objection; compound, no

18:37:56 18  foundation.

18:37:57 19          Go ahead.

18:37:58 20          THE WITNESS:  Based on the condition of

18:37:59 21  that liver, as I said previously, his life expectancy

18:38:03 22  was less than a week.

18:38:06 23          MR. VITTITOE:  Thank you, Doctor.

18:38:07 24          Pass the witness.

18:38:07 25

18:52:14  1       Q.   And you were wrong.

18:52:15  2       A.   No question.  And I was wrong.  There can be no

18:52:17  3   question about that either.

18:52:18  4       Q.   And you could be wrong about whether he had

18:52:20  5   late stage or end-stage liver disease.  It was only --

18:52:24  6       A.   I could be, but I'm not.

18:52:26  7       Q.   Okay.  And you --

18:52:27  8       A.   Okay.

18:52:27  9       Q.   -- could be wrong also that he was going to

18:52:29 10   live about a week after this incident --

18:52:31 11       A.   I could be wrong on that too, but I'm not.

18:52:34 12       Q.   Well, you were wrong about this, sir, and you

18:52:35 13   based that on reasonable medical probability about the

18:52:40 14   statement, preliminary statement -- death is probably

18:52:43 15   homicide, most likely asphyxia from a choke hold.  And

18:52:47 16   then you didn't change your opinion until after you

18:52:50 17   talked to Dr. -- the doctor in San Antonio; is that

18:52:50 18   correct?

18:52:56 19       A.   That's correct.

18:52:58 20       Q.   Okay.  And after you got more information from

18:53:01 21   the sheriff's department and things like that -- what

18:53:04 22   went on in the history of Mr. Longoria over the

18:53:07 23   previous three days; is that correct?

18:53:10 24       A.   No, we did not base this on information from

18:53:12 25   the sheriff's department.  We based this on --

18:53:14  1      Q.   And the only --

18:53:14  2      A.   -- medical expertise and further testing.

18:53:17  3      Q.   And the only further testing you did was the

18:53:19  4  toxicology tests, which were negative for stomach

18:53:25  5  contents, drugs, alcohol or anything else.  Is that

18:53:25  6  correct?

18:53:29  7      A.   No.  We did further examination, extensive

18:53:31  8  examination --

18:53:32  9      Q.   That's one of the things --

18:53:33 10      A.   -- of the hyoid bone.

18:53:34 11      Q.   Okay.  You examined microscopically the hyoid

18:53:36 12  bone.

18:53:37 13      A.   That's correct.  We x-rayed the hyoid bone too.

18:53:40 14      Q.   Okay.  And you x-rayed.

18:53:41 15           And that's the only other test that you

18:53:42 16  did before you changed your tune?

18:53:45 17      A.   And we sought additional medical opinion.

18:53:47 18      Q.   And you sought additional medical opinion.

18:53:47 19           But that's the only additional test --

18:53:50 20      A.   No.  We did microscopic examinations on the

18:53:51 21  other tissues also.

18:53:53 22      Q.   What other tissues?

18:53:55 23      A.   Things like the heart, the lung, the liver, the

18:53:56 24  brain, the spleen, the pancreas, the kidney, the

18:54:00 25  adrenal, the thyroid.

18:54:01 1    Q.  Okay.  But you didn't need -- that didn't

18:54:04 2  change your opinion as to the condition of his liver,

18:54:05 3  did it, the microscopic examination?

18:54:09 4    A.  It showed the microscopic examination of the

18:54:10 5  liver was probably even more severe then maybe our

18:54:12 6  gross impression gave.

18:54:14 7    Q.  Well, is that stated in your report?

18:54:15 8    A.  Yes, it is.

18:54:16 9    Q.  That it's more severe?

18:54:18 10   A.  Well, I mean, we decided that it was the

18:54:20 11 end-stage liver disease and not the, you know, possible

18:54:24 12 handling of the neck that did this.  So we -- you know,

18:54:26 13 we went to effort to rule out the homicide choke hold.

18:54:28 14   Q.  Yeah.  You went out an effort to rule out the

18:54:30 15 homicide from a choke hold, but -- and what you were

18:54:34 16 mistaken about in your initial impression, even though

18:54:37 17 you had a complete autopsy --

18:54:40 18   A.  Well, that's what it is was an initial

18:54:41 19 impression.  You know, it's not always the final

18:54:41 20 impression.

18:54:44 21   Q.  Well, you said probable, sir.

18:54:45 22   A.  Well, you know, probable doesn't mean absolute

18:54:48 23 certainly.

18:54:48 24   Q.  I know it, sir, but are you absolutely certain

18:54:50 25 now that that's what -- he didn't die of -- he died of

18:54:54  1    end-stage liver disease?

18:54:54  2        A.  I'm absolutely certain that he died of

18:54:56  3    end-stage liver disease.  There is no question about

18:54:58  4    what happened here.

18:54:59  5        Q.  Just as there was no question when you wrote

18:55:00  6    this preliminary report; is that correct?

18:55:03  7        A.  Well, I think the preliminary report says

18:55:04  8    "preliminary" and "probable" and other qualifiers.

18:55:07  9        Q.  Oh, well, probable, sir, is sufficient enough

18:55:10 10    to give a cause of death, I think, so I have no

18:55:14 11    further --

18:55:15 12        A.  Well, what you think and what I think may be

18:55:16 13    two different things, but that's okay.

18:55:18 14        Q.  Have you issued --

18:55:20 15        A.  I have issued a final opinion.  What I've

18:55:22 16    written before, I've written, and what I've written

18:55:24 17    now -- later I wrote, and I stand by it.

18:55:26 18        Q.  Okay.  Who else did you discuss that final

18:55:28 19    besides the doctor from San Antonio?

18:55:32 20        A.  Well, from a medical point of view, he's the

18:55:34 21    only one.

18:55:35 22        Q.  Okay.  From any point of view.

18:55:37 23        A.  I mean, I did not discuss it with other

18:55:40 24    attorneys.  I have not discussed it with sheriff's

18:55:42 25    deputies until we've issued a report.  I mean, you

18:56:41 1   of how he died; is that correct?

18:56:43 2     A.  No, sir.

18:56:45 3         MR. BERGER:  Okay.  No further questions.

18:56:45 4                   EXAMINATION

18:56:46 5   BY MR. VITTITOE:

18:56:46 6     Q.  Doctor, just to clarify something for the

18:56:49 7   record.  The additional testing information that you

18:56:52 8   obtained, that ruled out the choke hold death.

18:56:58 9     A.  Yes.

18:56:59 10         MR. BERGER:  We stipulate that.  That's no

18:57:01 11   question about it.

18:57:02 12         MR. VITTITOE:  Would you be quiet and let

18:57:04 13   me do my examination?

18:57:05 14         MR. BERGER:  No.  I mean, we already

18:57:05 15   stipulated to it.  Why should you sit there and waste

18:57:07 16   time, especially when we're paying for it?

18:57:11 17         THE WITNESS:  My meter is running here.

18:57:22 18         MR. BERGER:  I know it.  We stipulated to

18:57:22 19   it, and there's no question about it.  Now, why waste

18:57:22 20   time?

18:57:22 21         MR. VITTITOE:  The only time we're wasting

18:57:22 22   is you talking while I'm not asking the questions.

18:57:24 23         MR. BERGER:  That's because I'm objecting

18:57:25 24   to the questions because it's already asked and

18:57:27 25   answered, and it's been asked and answered, and we

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

18:57:30 1    stipulated to it.

18:57:32 2              MR. VITTITOE:  You just hold on.  You go

18:57:33 3    ahead and make your objection, but I don't want you

18:57:34 4    taking up any more time.

18:57:36 5              MR. BERGER:  I don't want you taking up

18:57:38 6    any more time.

18:57:43 7        Q.  Dr. Dahm, the additional testing data that you

18:57:49 8    received after your preliminary autopsy report of April

18:57:53 9    16th, did that rule out the choke hold death?

18:57:57 10       A.  Yes, sir.

18:57:58 11       Q.  Is that true whether or not you had the

18:58:01 12   additional consult with Dr. DiMaio?

18:58:06 13       A.  Yes, sir.

18:58:11 14       Q.  In your initial -- or your initial autopsy

18:58:16 15   report or your preliminary autopsy report of April

18:58:20 16   16th, did you make findings of advanced liver disease?

18:58:23 17       A.  Yes, I did.

18:58:27 18       Q.  And as I understand your testimony --

18:58:30 19             MR. BERGER:  Asked and answered.

18:58:34 20       Q.  My understanding is, your testimony is that

18:58:37 21   advanced and end-stage in your mind are the same thing.

18:58:39 22       A.  Yes, sir.

18:58:40 23       Q.  All right.

18:58:42 24             MR. BERGER:  Objection.  Asked and

18:58:42 25   answered.

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         BROWNSVILLE DIVISION

 3    MARIA LONGORIA AND MARIA    ) (
      IDALIA GUTIERREZ,           ) (
 4    INDIVIDUALLY AND ON BEHALF) (
      OF THE ESTATE OF JUAN       ) (
 5    LONGORIA, DECEASED          ) (
              Plaintiffs          ) (
 6                                ) (
      VS.                         ) (   CIVIL ACTION NO. B-01-062
 7                                ) (
      CAMERON COUNTY, TEXAS,      ) (
 8    THE CITY OF BROWNSVILLE,    ) (   JURY DEMANDED
      TEXAS AND JOHN DOES 1-10    ) (
 9            Defendants          ) (

10                     REPORTER'S CERTIFICATE
          I, Donna McCown, Certified Court Reporter, certify
11    that the witness, LAWRENCE J. DAHM, M.D., was duly
      sworn by me, and that the deposition is a true and
12    correct record of the testimony given by the witness on
      FEBRUARY 17, 2004; that the deposition was reported by
13    me in stenograph and was subsequently transcribed under
      my supervision.
14
          I FURTHER CERTIFY that I am not a relative,
15    employee, attorney or counsel of any of the parties,
      nor a relative or employee of such attorney or counsel,
16    nor am I financially interested in the action.

17                     WITNESS MY HAND on this the 1st day of
      March              , 2004.
18

19                          _____
                            DONNA McCOWN, CSR NO. 6625
20                          Expiration Date: 12/31/05
                            Bryant & Stingley, Inc., CRN No. 41
21                          2010 East Harrison
                            Harlingen, Texas  78550
22                          (956) 428-0755

23

24

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

PATHOLOGY
P.O. Drawer 2588
Harlingen, Texas 78551


Lawrence J. Dahm, M.D.                     DeWitt S. Davenport, M.D.
Margie W. Cornwell, M.D.                    Wm. Eddy,HT,CT(ASCP)CT(IAC)

April 16, 2001

OA-01-0092                                  Date of Autopsy: 04/12/2001
LONGORIA,JUAN                               Time of Autopsy: 8:30 a.m.
D.O.B. 7 October 1959, Age 41               Performed by: Dr. L. Dahm
Authorized by: Justice of the Peace         Assisted by: A. Argullin
              Tony Torres                   Witnessed by: Sheriff's
                                            Investigator Jose Zamorano
======================================================================

PRELIMINARY PRINCIPAL FINDINGS:

1.  Recent fractures (2) of left side of hyoid-bone, in neck, with minimal
    surrounding intestinal soft tissue bleeding.

2.  Widespread contusions and ecchymoses of extremities, greatest about
    the knees, left calf and elbows; small truncal ecchymoses; small,
    bandaged superficial laceration of the left calf.

3.  Small abrasions and contusions around ankles in ankle-cuff or shackle
    application pattern.

OTHER FINDINGS:

1.  Micronodular cirrhosis with marked fatty degeneration, consistent with
    advanced alcoholic liver disease.

2.  End-stage chronic pancreatitis with pancreatic ductal lithiasis,
    fibrosis, and atrophy.

3.  Surgical scar of midline low lumbar back.

4.  Anomalous origin of circumflex coronary artery, from just above right
    coronary cusp of aortic valve.

5.  Numerous tattoos.

PRELIMINARY SUMMARY:  This 41-year-old man died in custody, while in the
Cameron County Jail.  He had severe liver disease, likely alcoholic in
origin, but also had evidence of extremity bruising and neck trauma - the
latter suggesting a choke-hold at the time he died.  No alcohol or common
drugs of abuse were found in his urine.  Further drug testing and other
studies are in progress. Manner of death is probably homicide, most
likely asphyxia from a choke hold.

LJD/mlr                                     Lawrence J. Dahm, M.D.
04/16/01                                    Pathologist

PATHOLOGY
P.O. Drawer 2588
Harlingen, Texas 78551


Lawrence J. Dahm, M.D.                    DeWitt S. Davenport, M.D.
Margie W. Cornwell, M.D.                  Wm. Eddy,HT,CT(ASCP)CT(IAC)


July 25, 2001


OA-01-0092                               Date of Autopsy: 04/12/2001
LONGORIA,JUAN                            Time of Autopsy: 8:30 a.m.
D.O.B. 7 October 1959, Age 41            Performed by: Dr. L. Dahm
Authorized by: Justice of the Peace      Assisted by: A. Argullin
          Tony Torres                    Witnessed by: Sheriff's
                                         Investigator Jose Zamorano
========================================================================

FINAL PRINCIPAL FINDINGS:

1.  Micronodular cirrhosis with marked fatty degeneration, consistent with
    advanced alcoholic liver disease.

2.  End-stage chronic pancreatitis with pancreatic ductal lithiasis,
    fibrosis, and atrophy.

OTHER FINDINGS:

1.  Recent ligamental fracture of left side of hyoid-bone (in neck),
    with minimal surrounding interstitial soft tissue bleeding.

2.  Widespread contusions and ecchymoses of extremities, greatest about
    the knees, left calf and elbows; small truncal ecchymoses; small,
    bandaged superficial laceration of the left calf.

3.  Small abrasions and contusions around ankles in ankle-cuff or shackle
    application pattern.

4.  Surgical scar of midline low lumbar back.

5.  Anomalous origin of circumflex coronary artery, from just above right
    coronary cusp of aortic valve.

6.  Numerous tattoos.


(continued on next page)                            00007

FINAL SUMMARY:

This 41-year-old man died while in custody, in the Cameron County
Jail.  He died of severe alcoholic liver disease, and had widespread
superficial soft tissue bleeding from slight extremity trauma and handling
(the liver disease is a cause of such easy soft-tissue bleeding).  A hyoid
ligamental tear (similar to a sprain) and minimal bleeding were found in
soft tissues around the larynx and hyoid bone in the neck.  No additional
findings, or more serious neck injuries to support the possibility of
strangulation or lethal choke-holding could be found.  The slight neck
injuries could have occurred during handling of this inmate before death
or perhaps during resuscitation, but were not sufficient to have caused
circulatory or airway blockage, or death.  No alcohol or drugs of abuse
were found in his blood.  Further studies including microscopic
examination and radiographic studies confirm that this is a death of
natural causes - namely alcoholic liver disease, perhaps with alcohol
withdrawal as a contributory factor.


LJD/mlr/bpc                          Lawrence J. Dahm, M.D.
07/25/01                                  Pathologist

(continued on next page)

00008

OA-01-0092 LONGORIA. JR 'R (continued)                                    PAGE 3

## HISTORICAL INFORMATION

This 41-year-old man was arrested during a burglary attempt at a
store in Brownsville at approximately 4:00 p.m. by the Brownsville City
Police Department. He became agitated, and strongly resisted arrest,
requiring officers to subdue him. This was thought to lead to multiple
bruises to the limbs. The police thought he was delusional and he was
taken to the Brownsville City Police Department and from the city lockup
to the Brownsville Medical Center Emergency Room for evaluation for
potential committing to the Cameron County Jail. He was screened in the
Emergency Room and examined by Tropical Texas MHMR personnel. He was
cleared for admission to the Cameron County Jail, but he was transferred
for the night back to the Brownsville City lockup. He was transferred to
the County jail the following morning, April 11, at approximately 10:25
a.m. He was put in a holding cell of the County jail, but he became very
agitated, voicing fears of being shot or otherwise injured by other
inmates. He was then transferred to a solitary cell in the early
afternoon of April 11, 2001. He was last seen alive at approximately
10:30 p.m. and then was found dead in the solitary cell at 11:05 p.m. on
April 11, 2001. He was dead on arrival at the Brownsville Medical Center,
where rigor mortis is already said to have started setting in. The
Emergency Room physician noted new onset of bruises, not identified the
previous afternoon. The patient is said to have lived in a flop-house
apartment complex, The Jackson Apartments, in Brownsville. The
Brownsville Medical Center Emergency Room physician was Ian Richardson,
M.D.

This information was supplied by Sheriff's Investigator Romualdo
Rodriguez and by Brownsville Medical Center Emergency Room nurse John
Blair, and Dr Richardson.

## GROSS DESCRIPTION:

## EXTERNAL EXAMINATION:

Received is the nude body of an approximately 5 foot, 7 inch tall,
130 pound, middle-aged Latin American man with light brown eyes and dark
brown, straight 3 to 8 cm long thick groomed hair. An oral tracheal tube
is in place. There is a black mustache over the upper lip. An IV enters
the right antecubital fossa.
Distinguishing marks include a low lumbar, midline surgical scar
about 6 cm long, and numerous tattoos. Over the right upper chest is a
black outlined, high quality tattoo depicting a woman's face and head,
above a rose with a bird perched in it. Tattooed over the upper left
chest is the name Longoria in large black script letters. Over the left
anterolateral neck is a small black tattoo of a circle with perhaps the
number 6 on one side and a number 9 on the other. Tattooed on the right
lateral upper arm is the word Texas and below this a heart with dagger
through it with a banner over it, bearing the name Idalia. On the right

(continued on next page)

00009

anterior forearm is a crude black tattoo of an eagle with a snake. On the
left upper arm is a small tattoo of the head Jesus with a crown of thorns
and on the lateral upper left forearm is tattooed a snake with black
outlines and some red and green shading. There is also tattooed the side
view of a woman on the anterolateral distal left forearm. Over the
anterolateral wrist on the thumb side is tattooed the head of a wolf.
These are all black outlined tattoos. On the left mid calf are tattooed
the letters AYR with a curved line beneath them. On the anteromedial mid
right calf is tattooed a cross.

    Scattered over the body are also numerous ecchymotic discolorations
of the skin. The largest is around and below the left knee, and in the
center is a small Steri-Strip bandage just below the knee covering a
superficial abrasion and a shallow laceration. There is a small contusion
around the right medial knee. The left pretibial soft tissues have
extensive interstitial hemorrhage. There are also two broad rather oval
shaped zones of ecchymosis over the ischial tuberosities on both anterior
hips. There are more or less symmetrical positions. There is another
moderately large ecchymosis of the posterior surface of the left elbow
and scattered ecchymosis over the left anterior and posterior forearm.
There is some small ecchymoses over the right leading edge of the rib
cage and some small ecchymoses over the posterior surfaces of the right
forearm. No ecchymoses are found on the face or the neck. There is a
small ecchymosis and slight abrasion of the upper mid-back below the base
of the neck measuring about 4 x 3 cm. Scattered over the upper chest and
upper abdomen are multiple 3 to 5 mm zones of mild cutaneous erythema
which do not appear to be ecchymoses. There is a scattering of ecchymoses
both ankles, in a pattern suggesting handcuff application. No
identifiable handcuff injuries are found around the wrists. No ecchymoses
are found in the neck.

    Livor mortis is posterior and rigor mortis is full. The body is
previously circumcised. The scrotum has numerous superficial subepidermal
cysts filled with pasty to creamy slightly yellowish-white material. These
are consistent with epidermal cysts. No additional traumatic injury is
found to the body surfaces. The fingernails are intact and free of foreign
material.

<u>HEAD AND NECK:</u>

    There is no identifiable evidence for facial petechiae or trauma.
The conjunctivae are free of hemorrhages or petechiae. There is no
evidence of nasal fracture or trauma to the earlobes. No facial grip or
ligature marks are found and there is no evidence of scalp trauma. The
teeth are intact. There is minimal contusion of the lateral upper left
lip. There is an oral tracheal tube in place. The underlying tongue is
intact.

    The scalp is reflected in the usual fashion and is free of petechiae
or  contusions. The skull is free of fractures. There is no evidence of
epi- or subdural hemorrhage and there is no evidence of subarachnoid
hemorrhage. The brain weighs 1440 gm. The external surfaces are

(continued on next page)                                              00010

unremarkable except for slight cerebral congestion. The vessels around the
base of the brain are normal. The cut surfaces of the cerebral hemispheres
reveal normal size lateral ventricles and the cortex and white matter to
be normal and without focal lesions. Likewise, the cerebellum and
brainstem reveal no identifiable lesions on their cut surfaces. No blood
is found around the proximal spinal cord.
     The neck organs are dissected after cranial content and truncal
visceral content removal. No evidence of soft tissue hemorrhage is found
in the neck except to a slight degree around the anteromedial left side
of the hyoid bone and the left extension of the thyroid cartilage. The
left part of the hyoid bone is easily movable in two places. One is near
the left posterior tip about 5 mm from the tip and this is associated
with a minimal degree of underlying soft tissue hemorrhage just beneath
the fracture zone. In addition, the left lateral third is fractured
through the ligament from the remaining two-thirds and again, there is
slight interstitial hemorrhage of the surrounding soft tissues. No
fractures of the thyroid cartilage, however, are found and no evidence of
traumatic injury to the laryngeal mucosa, epiglottis or tongue can be
seen. Likewise, there is no evidence of cervical fracture or soft tissue
hemorrhage of the posterior pharynx. No foreign material is found in the
mouth or the throat. The endotracheal tube is properly placed.

INTERNAL EXAMINATION:

     The trunk is opened in the usual fashion. There is slight rib
cartilage calcification. No evidence of truncal injury is found except
for a minimal zone of ecchymosis in the deep soft tissues around the
xyphoid. The area involved is very small measuring only about 2 x 1 x
0.5 cm. No hematomas are found. No rib fractures, sternal fractures or
other bony fractures are found. The fat pad is free of traumatic injury
and the abdominal fat pad measures about 2 cm thick. No evidence of
visceral organ trauma is found and no hemorrhages in the visceral organs
are identifiable. All serous membranes are smooth and glistening, without
petechiae, and no effusions are found in any body cavity. The liver is
somewhat enlarged, pale yellowish, and firm. There is extensive fibrous
adhesion around the liver hilum and common bile duct region. No organs
are missing and the rest of the organs have normal and expected size,
shape and anatomic relationships to each other.

CARDIOVASCULAR SYSTEM:

     The heart weighs 370 gm. The myocardium is uniform, firm, dark red-
pink without focal abnormalities. The coronary arteries are without
arteriosclerosis, but the left circumflex artery originates from the right
coronary artery cusp immediately adjacent to the right coronary artery,
where it proceeds laterally and posteriorly behind the aorta to the
posterior left ventricular myocardium. The right coronary artery is

(continued on next page)

                                                              00011

predominant and traces a normal course, as does the left descending
coronary artery. The valves are normal and the great vessels enter and
leave the appropriate chambers. The great vessels trace normal courses
except that there are two equally sized left renal arteries originating
from the aorta.

RESPIRATORY TRACT:

The right lung weighs 325 gm and the left lung 290 gm.  Both are
uniform, fluffy, light reddish-pink and without focal lesions. The
bronchi are free of foreign material and there are no focal lesions. The
pulmonary vessels are normal.

GASTROINTESTINAL TRACT:

The esophagus is normal. The stomach has a normal rugose, reddish-
pink mucosa and it contains about 50 cc of thin, dark reddish blood
stained fluid. No pills or foreign substances are found therein. There are
no odors of alcohol or food particles seen. The small and large bowels are
unremarkable. The pancreas is much smaller than normal and is firm and
pale tan-white and fibrotic. The pancreatic ducts are dilated and have
numerous small calculi measuring from 0.5 to 8 mm across. The head of the
pancreas is surrounded by considerable fibrosis. The common bile duct,
however, has a normal caliber and proceeds normally to the ampulla. The
gallbladder has dark green mucinous bile, has a thin wall, and a normal
mucosa.
The liver weighs 2355 gm. It is relatively enlarged, but has a normal
shape. It is diffusely firm, with a very finely nodular uniform pattern.
There are tiny nodules of bright yellow parenchyma surrounded by thin
sunken grayish fibrous septa measuring up to 0.1 to 2 mm across. The
nodules measure about 1 mm across. No focal abnormalities are found on
the liver.

HEMIC-LYMPHATIC SYSTEM:

The spleen weighs 300 gm, and is a uniform, mushy, dark red-purple.
The lymph nodes throughout the body are unremarkable, but perhaps have
slightly increased prominence in the peribiliary region and in the neck.
The thymus is still grossly visible, but is mostly fatty. The bone marrow
is a uniform, dark purple-red and without focal lesions of the spinal
column.

ENDOCRINE SYSTEM:

The thyroid gland is of normal size and is translucent orangish-brown.
The adrenal glands are unremarkable, but have slight lipid depletion.

GENITOURINARY TRACT:

The right kidney weighs 160 gm and the left kidney weighs 170 gm.
They have normal architecture on their cut surfaces and normal size and
shape. They have a somewhat congested parenchyma. Each gives rise to a

(continued on next page)                                    00012

single normal ureter that descends to a urinary bladder that contains
about 2 cc of cloudy, light reddish-pink urine. The prostate is
unremarkable and the testes are in the scrotum.

MUSCULOSKELETAL SYSTEM AND SKIN:

    See external and internal examinations.
LJD:bpc

MICROSCOPIC EXAMINATION:

    Sections of lungs, brain, liver, myocardium, kidney, spleen, thyroid,
adrenal, pancreas, and bone marrow are examined.
    Also, sections of left and right hyoid bone, thyroid cartilage are
examined after decalcification and radiographic examination of the hyoid
bone.
    Sections of the liver show division of the parenchyma into uniform
small nodules of hepatocytes, separated by narrow fibrous proliferative
septa.  Bile ductule proliferation is present to a generally slight
degree.  Almost all the hepatocytes are distended by large sharp-edged
lipid vacuoles.  Inflammation is minimal to absent.
    Sections of the pancreas show near-total loss of the acinar
parenchyma, with only the islets remaining.  The parenchyma is replaced by
dense fibrosis.  Calcospherites of varying size are found in the ducts.
    Sections of the left hyoid bone, and thyroid cartilage show no bony
or cartilaginous fracture, but only minimal interstitial red-cell
extravasation.  No edema or inflammation is present, nor are other
subacute or reparative reactive changes seen.
    Sections of the other organs are noncontributory, save revealing
vascular congestion.

RADIOGRAPHIC EXAMINATION (Made April 23, 2001):

    Radiographs of the hyoid bone reveal a small sesamoid bone located off
the left posterior tip, and no bony fractures in the hyperflexile area
found on the left side.

LJD:mlr/bpc

00013

**Harvey Resnick, M.D.**
201 Oak Drive South, Suite 107
Lake Jackson, Texas 77566
(979) 297-0023
(979) 297-0504 Fax

27 May 2003

Lin & Valdez, L.L.P.
Attorneys at Law
Mr. Alfred R. Valdez
7400 Harwin, Suite 320
Houston, Texas 77036

fax: (713) 339-4299

Re:     Juan Longoria matter.

Dear Mr. Valdez:

Per your request, I have reviewed the E.R. records and the autopsy records as well as the various witness statements of individuals with the City of Brownsville Police Department and the Cameron County jail. The symptoms that Mr. Longoria was exhibiting during the two day period prior to his death are compatible with delirium tremens and/or hepatic encephalopathy. Generally speaking, the course of treatment for these conditions are to keep the patient sedated, give the patient I.V. fluids, and provide supportive care to maintain the chemical imbalance these conditions cause.

If you have any further questions, please feel free to contact me.

Sincerely,

Harvey Resnick, M.D.

## CURRICULUM VITAE

**HARVEY RESNICK, M.D.**
SSN - 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
3214 N. Pemberton Circle Dr.
Houston, TX 77025
(713) 432-9772

### PERSONAL

Date and Place of Birth:

Winnipeg, Manitoba, Canada
May 12, 1940

Citizenship:

United States

Marital Status:

Married, Marcia Resnick, R.N.
Office Administrator,
Dr. Harvey Resnick, Associates

Children:

Carl, Jodie, Joey

Military Status:

LTC, United States Army Reserve
Reactivated during Desert Storm
Ft. Hood Army Hospital
Emergency Room Department

### EDUCATIONAL BACKGROUND:

University of Manitoba, Winnipeg
1957-1960

University of Manitoba, Winnipeg
M.D. B.S. (Medicine) 1961

### POSTGRADUATE TRAINING:

Kings County Hospital
Brooklyn, New York
1964-1966, Rotating Internship

### CERTIFICATION:

State Boards, New York- 1964
American Board of Family Practice
Certification - 1975
Recertification, 1980-1987 & 1987-
1994 & 1994-2001 & 2001-2007
MRO Certification 1998

Harvey Resnick, M.D.
Page two


**LICENSURE:**                          Texas, #D2957, issued 1/22/66
                                        Expiration date 8/31/2002
                                        Inactive licenses in:
                                        California
                                        Nevada
                                        New York


**PRACTICE EXPERIENCE:**                Private Practice, FP
Address:                                Brazosport, Texas
201 Oak Dr. S. Ste. 107                         Serving community of 70,000
Lake Jackson, TX  77566                         Approximately 40-50 patients
                                                per day
                                        December 1966 - present

                                        BASF Plant Physician
                                        1 day/week
                                        November 96 - present

                                        Medical Director
                                        R/D Research, Inc.
                                        (Private Clinical
                                        Research Company)
                                        1996 - present

                                        Consulting Physician
                                        Houston Amateur Hockey Assoc.
                                        1977-1982

                                        Consulting Physician
                                        United States Olympic Team
                                        Bobsled Competition
                                        Lake Placid, New York
                                        1980

                                        Consulting Physician
                                        Department of Corrections
                                        Clemens Unit
                                        1974-1984

Harvey Resnick, M.D.
Page three

PRACTICE EXPERIENCE CONT.:    Emergency Room Physician
Brooklyn Hospital & Greenspoint
Brooklyn, New York
July 1966 - December 1966

HOSPITAL PRIVILEGES:    Brazosport Memorial Hospital
(100 bed)
Lake Jackson, Texas
1966 - present

PROFESSIONAL SOCIETIES:    American College of Sports Medicine
Texas Medical Society
Brazoria County Medical Society
American Academy Family Practice

COMMITTEES AND COMMUNITY SERVICES:

Team Physician, Brazoswood
Local class 5-A High School
1979 - present

Brazosport Independent School
District School Board -
Elected position 1980 - 1992

Appointed to Board of Trustees
Brazosport Memorial Hospital
May 1992 - 1998

Emergency Room Committee
1976 -1982 & 1992 - 1999

BUSINESS ADRRESS AND PHONE:    201 Oak Drive South,
Suite 107
Lake Jackson, TX 77566
(979) 297-0028
(979) 297-0504 Fax

1060 Skylight View
Colorado Springs, CO
80906

29 July 2003

Mr. Craig H. Vittitoe
ADAMS & GRAHAM
222 E. Van Buren, West Tower
P.O. Drawer 1429
Harlingen, TX
78551

Re: Juan Longoria

Dear Mr. Vittitoe:

Thank you for sending me the case of Juan Longoria for my review. I have reviewed the Plaintiff's First Amended Complaint, the Brownsville Police Department Records, the Circle K employee statement, the Brownsville Police Department inter-department communications, the Brownsville Police Officers' statements, the Brownsville Police Department inmate security check, the Cameron County Employee Statements, the Cameron County Jail health records of Mr. Longoria, the inmate statements, the EMS statement, the statement of Cameron County Sheriff's Lieutenant Rumaldo Rodriguez, the autopsy file of Dr. Dahm including notes, autopsy report, toxicology report, and photographs and the autopsy microscopic slides. These documents as well as my training and experience as a board certified anatomical, clinical and forensic pathologist form the basis of my opinions.

Mr. Juan Longoria was a 41-year-old male who entered the Circle K store in Brownsville during the early afternoon of April 10, 2001. According to Circle K personnel Mr. Longoria appeared to have been in some type of previous struggle prior to entering the Circle K, as he appeared to be bleeding. A short while later noises were heard coming from the office and Mr. Longoria was observed in the office throwing items around. The Brownsville Police Department was contacted. On arrival of the police, Mr. Longoria was noted to be barricaded in the office. After forcing entry into the office, Mr. Longoria was arrested but resisted. Because he was bleeding and because he was "seeing things" he was taken to the Brownsville Medical Center for evaluation. He was screened by the MHMR personnel and released back into police custody. He was booked into the city jail and observed to be incoherent and became violent and was restrained. The next morning he was taken for arraignment and then sent to the Cameron County Jail. There he was noted to be agitated and complaining that "they were going to kill him". He was placed in a single man cell. At around 11p.m. he was noted to be awake and breathing during guard rounds. At 0043 hrs on April 12th 2001 he was noted

to be sitting and leaning against the wall without vital signs. CPR was begun and EMS was summoned. He was transported to the Emergency room of the Brownsville Medical Center and was dead on arrival.

An autopsy was performed. Principal findings included micronodular cirrhosis of the liver with marked fatty degeneration, consistent with advanced alcoholic liver disease and chronic pancreatitis. Toxicology testing revealed only the presence of atropine. Other findings included abrasions and contusions to the extremities and a recent ligamental fracture of the hyoid bone with minimal surrounding interstitial soft tissue bleeding. No swelling of the upper airway was noted in the autopsy protocol.

In my medical opinion Mr. Juan Longoria died as a result of an acute alcohol withdrawal syndrome, most likely due to seizures. This was a direct consequence of his long-standing chronic ethanol abuse which was also manifested by micronodular cirrhosis of the liver and chronic pancreatittis with fibrosis. Most of the contusions noted at autopsy appear to have occurred after he was placed in confinement but did not in any way contribute to his death. These contusions are also not in a pattern that would suggest that they were inflicted during an assault. Likewise, the hyoid fracture was not a contributory factor in his death because there was no history of abnormal voice or noisy respirations, the intubation of the airway was without incident and no edema or swelling around the fracture was noted that could have obstructed his airway. The fracture of the hyoid bone could have occurred prior to Mr. Longoria arriving at the Circle K store, during restraint by the Brownsville Police Officers or self inflicted by the deceased during his episodes of agitation and violent behavior while in custody. It is further my opinion based on reasonable medical probability that Mr. Longoria did not die as a result of being "choked" by the police nor is there any evidence that he was "beaten by the police" as alleged by the plaintiffs.

As more information becomes available, additional opinions may be offered or existing opinions modified.

Thank you for sending this case for my review.

Robert C. Bux, MD

# CURRICULUM VITAE

**Robert C. Bux, MD**
El Paso County Coroner's Office
2743 East Las Vegas Street
Colorado Springs, Colorado 80906

Born:  May 22, 1948
Columbus, Kansas

February 3, 2003

## Education

| | |
|---|---|
| College: | University of Washington, Seattle, WA<br>Bachelor of Science in Zoology<br>1966 - 1970 |
| Medical School: | Universidad Autonoma de Guadalajara<br>Guadalajara, Jalisco, Mexico<br>1970 - 1974 |
| Rotating Internship: | The Moncton Hospital, Moncton<br>New Brunswick, Canada<br>July 1974 - June 1975 |
| Residency in Pathology:<br>San Antonio, Texas | Brooke Army Medical Center<br><br>Anatomic and Clinical Pathology<br>July 1978 – June 1982 |
| Fellowship: | Bexar County Forensic Science Center<br>San Antonio, Texas<br>Forensic Pathology<br>August 1984 – August 1985 |

## Board Certification

| | |
|---|---|
| American Board of Pathology | ANATOMICAL PATHOLOGY, 1982 |
| American Board of Pathology | CLINICAL PATHOLOGY, 1982 |
| American Board of Pathology | FORENSIC PATHOLOGY, 1985 |

## Licensure and Certifications

| | |
|---|---|
| Licensure | New Mexico - 1976 to present<br>Texas -1978 to present<br>California – 1980 to present<br>Colorado - 1982 to present |

## Present Position

Associate Coroner

El Paso County Coroner/Medical Examiner's
Office, Colorado Springs, CO
July 2002 to present

## Past Positions

Deputy Chief Medical Examiner

Bexar County Forensic Science Center
San Antonio, TX
June 1992 – December 2002

Staff Medical Examiner

Bexar County Forensic Science Center
San Antonio, TX
August 1985 – May 1992

Chief Dept. of Pathology

U.S. Army Hospital
Fort Carson, CO
March 1984 – September 1984

Assistant Chief Dept. of Pathology

U.S. Army Hospital
Fort Carson, CO
July 1982 – March 1984

Part-Time Emergency Room Physician

EPA and TEXEM
October 1978 – January 1991

## Military Service and Awards

Major, Medical Corps, United States Army Reserve, October 1971 – June 2002

United States Army Commendation Medal, Fort Ord, CA – 1978; Fort Carson, CO – 1984

Meritorious Service Medal, Fort Carson, CO – 1984

## Medical Society Memberships

Bexar County Medical Society, San Antonio, Texas, 1980 – 2002

Texas Medical Association, 1981 – 2002

American Medical Association, 1982 – present

College of American Pathologists, 1980- present (Fellow – 1983)

National Association of Medical Examiners – 1985 to present

American Academy of Forensic Sciences 1989 – present (Fellow – 1998)

## Other Professional Offices and Appointments

Board of Directors, San Antonio Chapter, National Sudden Infant Death Foundation 1987 – 1997, Advisor – 1997 through 2002

Instructor in Intubation of EMS Paramedics 1988 – 1998

Faculty, Southwest Symposium on Forensic Dentistry, 1986, 1988, 1990, 1992, 1994, 1996, 1998, 2000, 2002.  University of Texas Health Science Center School of Dentistry, San Antonio, Texas

Member, Texas Multidisciplinary Task Force on Children's Justice 1993 – 1995

Member, Child Fatality Death Review for Bexar County – Through December 2002

Member, Child Fatality Death Review for State of Texas – Original member 1994 and helped write Legislation in 1994 which was adopted by the State Legislature in 1995

Board of Editors, The American Journal of Forensic Medicine and Pathology – 1997 to present

Clinical Assistant Professor of Pathology UTHSC San Antonio, Texas – 1998 to present

## International Professional Activities

United Nations International War Crimes Tribunal for the former Yugoslavia, Participated in exhumation of mass graves, September 21 – October 5, 1996 near Tuzla, Bosnia under the direction of Physicians for Human Rights

Guest Lecturer – Forensic Science Conference " Forensics for the 21st Century" Sponsored by Procuraduria General de Justicia del Distrito Federal, Mexico, DF – August 4-7, 1997

Organization of American States Court of Inter-American Human Rights, San Jose, Costa Rica – Testified for the Inter-American Commission on Human Rights of the Organization of American States in the case of "Panel Blanca", the case of Elizabeth Panniagua, et al, vs Guatemala

Participant in exhumation of Archbishop Juan Jose Gerardi, appointed Forensic Medical Expert for the Archdiocese of Guatemala in Guatemala City, Guatemala, September 16-18, 1998

Organization of American States Court of Inter-American Human Rights, San Jose Costa Rica – January 20-29, 1999 – Testified as Forensic Expert appointed by the Court of Inter-American Rights in the case of Villagran Morales, et al, vs Guatemala (11-383)

Exhumation of Julian Cho, Mayan Cultural Leader in Punta Gorda, Belize for Physicians for Human Rights – January 31 – February 2, 1999

3

Exhumation and identification of 14 guerillas of the Tupac Amaru who were responsible for the takeover of the Japanese embassy in Lima Peru and sequestration of 72 VIP hostages on the 17th of December 1996, and subsequent hostage rescue and embassy liberation of special forces of the Peruvian army of April 22, 1997, all work occurred in 2001.

Consultant for the Attorney General (Procurduria Gengeral de la Republica) in the case of Guillermo Velez Mendoza who died in custody of the AFI (Agents of the Federal Investigation) in Mexico City. Reviewed entire case file participated in the exhumation and gave a legal declaration under oath, all work occurred in 2002.

## Publications

1.   DiMaio, V.J.M., Dana, S.E. and Bux, R.C. "Deaths Caused by Restraint Vest", JAMA 255:905, 1986.

2.   Bick, D., Curry, C.J., McGill, J.R., Schordent, D.F., Bux, R.C. and Moore, C., "Male Infant with Ichthyosis, Kallman Syndrome Chondrodysplasia Punctata, and an X, Chromosome Deletion" AM.J.Med.Genet 33(1): 100-7, May 1989.

3.   DiMaio, V.J.M., Dana, S.E., and Bux, R.C., "Sudden Cardiac Death" (Letter), NEJM 322:271. January 1990.

4.   Taylor, R., Bux, R.C., and Kirk, D., Forensic Pathology in Homicide Cases, 40 AM Jur Trials, 501-627, 1990.

5.   Taylor, R., Bux, R.C., and Kirk, D., Self Defense in Homicide Cases, 42 Am Jur Trials, 151-312, 1991.

6.   Bux, R.C., and McDowell, J., "Death Due To Attack From Chow Dog", AM J. of Forensic Med and Path, 13(4): 305-8, December 1992.

7.   Rulon, J., Cho, C.G., Guerra, L., Bux, R.C., and Gulley, M., "Activated Protein C Resistance Is Uncommon in Sudden Death Due to Pulmonary Embolism", Journal of Forensic Sciences 44(6): 1111-1113, November 1999.

8.   Kohlmeir, R., Cho, C.G., Bux, R.C., Guerra, L., Rulon, J., Selby, D.M., and Gulley, M., "Prothrombin Gene Mutation Uncommon in Pulmonary Embolism", Southern Medical Journal 93(11) 1073-7, November 2000.