# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| MARIA LONGORIA, and MARIA IDALIA GUTIERREZ, Individually and on behalf of the Estate of JUAN LONGORIA, Deceased | } } } } |
| | } |
| VS. | } } |
| | } |
| CAMERON COUNTY, TEXAS, THE CITY OF BROWNSVILLE, TEXAS, and JOHN DOES 1-10 | } } } } |

CIVIL ACTION NO. B-01-062

JURY DEMANDED

## PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT

Alfred R. Valdez
   Federal ID 6389
   State Bar No. 20426200
   7520 Hillcroft
   Houston, Texas 77081
   (713) 271-0719
   (713) 270-8134 fax

Attorney for the Plaintiffs

VOLUME ___1___ OF ___3___

# TABLE OF CONTENTS

**Page:**

1.  **THE NATURE OF THE CASE.** .......................................................................... 1

2.  **ISSUES TO BE RESOLVED.** .......................................................................... 2

3.  **SUMMARY JUDGMENT EVIDENCE.** ............................................................ 3

4.  **FACTUAL BACKGROUND.** .......................................................................... 4

5.  **SUMMARY OF THE ARGUMENT.** .............................................................. 16

6.  **ARGUMENT AND AUTHORITIES.** ............................................................. 17

A.   **Summary Judgment Evidence Shows that the Defendant Cameron County, Texas, is liable under 42 U.S.C. section 1983.** ............................................................ 17

B.   **Defendant, Cameron County, Texas is not entitled to Summary Judgment on the Texas law negligence claim.** ........................................................................... 23

7.   **CONCLUSION.** ............................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page:**

*Austin v. Johnson*, 328 F. 3d 204 (5th Cir. 2003) .................................................................... 22

*Dallas County Mental Health and Retardation v. Bossley*, 968 SW2d 339 (Texas. 1998) ... 23

*Texas Department of Public Safety v. Petta*, 44 S.W.3d 575 (Tex. 2001) ............................. 24

42 U.S.C. section 1983 ................................................................................................................... 17

37 Tex. Admin. Code, Part 9, Chapter 273 (Texas Commission on Jail Standards,
Health Services) ........................................................................................................................... 24

TEX. CIV. PRAC. & REM. CODE ANN. section 101.021 (Vernon Supp. 1997) ............. 23

Texas Code of Criminal Procedure, Article 16.21 ............................................................... 24

Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN.
ch. 101 (Vernon 1997) ........................................................................................................... 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA, and MARIA
IDALIA GUTIERREZ, Individually and      }
on behalf of the Estate of             }      CIVIL ACTION NO. B-01-062
JUAN LONGORIA, Deceased                }
                                       }
VS.                                    }
                                       }
CAMERON COUNTY, TEXAS,                 }      JURY DEMANDED
THE CITY OF BROWNSVILLE,               }
TEXAS, and JOHN DOES 1-10              }

PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS'
MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Plaintiffs MARIA LONGORIA, and MARIA IDALIA GUTIERREZ,

Individually and on behalf of the Estate of JUAN LONGORIA, deceased, and file this their

response to Defendant CAMERON COUNTY, TEXAS' motion for summary judgment, and

respectfully request that the Court deny the motion for summary judgment.

1.  **THE NATURE OF THE CASE.**

The Plaintiffs assert claims against Cameron County, Texas for Constitutional violations

and Texas State tort law claims.

2.  **ISSUES TO BE RESOLVED.**

The Plaintiffs assert that the Defendant CAMERON COUNTY, TEXAS is not entitled to

a summary judgment.   The Plaintiffs assert that there are genuine issues of material fact on

both the federal and Texas law claims.   The Defendant asserts eight (8) issues that are to be

addressed, and said issues are noted as follows:

a.    The Defendant asserts that there is no evidence that a final policy maker for Cameron County adopted a policy with deliberate indifference to the risk of injury to a person in the place of Juan Longoria.

b.    The Defendant asserts that there is no evidence that a final policy maker for Cameron County tolerated any custom or practice of subordinates with deliberate indifference to the risk or injury to a person in the place of Juan Longoria.

c.    The Defendant asserts that there is no evidence that Juan Longoria's death was the result of or caused by any policy or custom of Cameron County.

d.    The Defendant asserts that there is no evidence that Cameron County employees or agents were deliberately indifferent to the medical needs or condition of Juan Longoria or acted with deliberate indifference towards him.

e.    The Defendant asserts that there is no evidence that Cameron County employees or agents engaged in conscience shocking behavior.

f.    The Defendant asserts that there is no evidence that Juan Longoria was choked or beat in the Cameron County jail because the sole support for such allegation is incompetent, unreliable expert opinion that has been withdrawn by the expert witness who tentatively gave such opinion.

g.    The Defendant asserts that there is no waiver of state law governmental/sovereign immunity regarding the state law tort claims because there is no evidence that Juan Longoria's death resulted from a use or condition of tangible property by County employees.

2

h.     The Defendant asserts that Cameron County is not liable for punitive

damages under federal or state law.

3.     <u>SUMMARY JUDGMENT EVIDENCE.</u>

In addition to the summary judgment evidence presented by the Defendant, the Plaintiffs

are requesting that the Court take into consideration the following additional evidence:

1.   Deposition of George Garcia

2.   Deposition of  Joe Elizarde

3.   Deposition of Robert Lopez

4.   Deposition of Sylvia Rivas

5.   Defendant Cameron County, Texas response to request for production

concerning *Shift Activities Log* and *Medical Log (Observation Checklist for Crisis*

*Management, Psychological Observation, Seclusion, Restraint or Medical).*

6.   Statement of Armando Guerrero

7.   Statement of Anthony Edward Cipollaro

8.   Deposition of Felipe Silva, Jr.

9.   Deposition of Jose Morales

10.   Deposition of Armando Tenorio

11.   Deposition of Xavier Lee Hernandez

12.   Statement of Michael Gene Baskin

13.   Deposition of Luis Alberto Mendieta

14.    Statement of Jorge Ibarra

15.    Statement of Felipe Esquivel

3

16.    Statement of Jesus Eduardo Perez

17.    Deposition of Lawrence J. Dahm, M.D.

18.    Report of Alvin Cohn.


4.    <u>FACTUAL BACKGROUND.</u>

Juan Longoria's death at the Cameron County, Texas jail facility resulted from the lack of proper medical attention and the failure of Cameron County, Texas employees to follow a doctor's order to keep Juan Longoria under close observation; see Defendant's Motion for Summary Judgment, Exhibit 4, which is the doctor's order to keep Juan Longoria under close observation.   According to expert witnesses Harvey Resnick, M.D. (Plaintiff's expert) and Robert C. Bux, M.D. (Defendant's expert), Juan Longoria suffered from delirium tremens ("DT's"); see Defendant's Motion for Summary Judgment, Exhibits 15 and 16.

On the morning of 11 April 2001, between 10:00 and 10:30 a.m., the Brownsville Police Department delivered Juan Longoria to the Cameron County Sheriff's Department jail.  At the time of delivery, the commitment order and the medical release from Brownsville Medical Center was provided;  see Defendant's Motion for Summary Judgment, page 6, and its Exhibits 4 and 5.   A Cameron County Health Department nurse, Sylvia Rivas,  initially saw Juan Longoria for some minor cuts and bruises, but there is no mention in her notes that she received the doctor's order to keep Juan Longoria under close observation; Defendant's Motion for Summary Judgment, Exhibit 6.

1.    Deposition of George Garcia.

At the time of the deposition (29 August 2003), George Garcia was employed with the

4

Cameron County Sheriff's department for 22 years.  In April of 2001, Mr. Garcia was a lieutenant at the Cameron County jail, and his job duties included being responsible for DC-I and making sure that procedures were followed.  He states that he was familiar with the procedures that were to be followed at the Cameron County jail concerning booking, classification, and the moving of prisoners to the various cell levels. George Garcia, pp. 4-6. Mr. Garcia states that if an inmate has a doctor's order to be kept under close observation, there should have been an activity log maintained by the detention officers and the medical staff should be notified.  Mr. Garcia states that the inmate should be checked every 15 minutes. George Garcia, pp. 12-14.  George Garcia further states that this process or procedure concerning the maintaining of a log was to be done in April of 2001. George Garcia, p. 17. When someone is placed in the padded cell, the medical staff at the jail is to be notified and a log is to be maintained by the detention officers.  Also, the log is kept by the door of the cell so that a detention officer can make notations.  George Garcia, pp. 19-20.

George Garcia says that Juan Longoria should have been classified; however, he was never classified. Also, there should have been a log maintained on Mr. Longoria, but that was not done. George Garcia, pp. 21-24.  On pages 29 and 30 of the deposition, Mr. Garcia states that the detention officers should have maintained 2 logs;  one log would show fluid intake and the other log would show behavior activity.  Furthermore, the nursing staff needs to monitor the inmate in the padded cell. George Garcia, p. 30.

George Garcia says that the Cameron County jail is in compliance with Texas law.  Mr. Garcia also states that it was customary for logs to be maintained,  inmates to be classified, and nurses to be notified when someone is placed in the padded cell.  Mr. Garcia says that the failure of these things to be done on Juan Longoria was a failure of procedures by Cameron

County employees.   George Garcia, pp. 31-34.

As to Juan Longoria, George Garcia acknowledges that the Cameron County jail facility failed to book, classify, obtain a medical assessment, maintain a log when placed in the padded cell, and notify the nurse when he was placed in the padded cell.  George Garcia, pp. 39-41.

George Garcia acknowledges that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell,  is for the safety and well-being of an inmate.   George Garcia also acknowledges that the failure to do any of these procedures could lead to serious consequences concerning the inmate in the way of injury and death. George Garcia, pp. 41-43.

2.   Deposition of Joe Elizarde.

Joe Elizarde held a detention officer's certificate for 18 years, and he was employed at the Cameron County Jail in April 2001.  Elizarde, p. 7.  The Cameron County jail had an infirmary. Elizarde, p. 14.   Mr. Elizarde describes the padded cell in which Juan Longoria was housed as being approximately 6 feet wide and 8 feet long; the cell had a solid metal door with a 6 inch by 12 inch (maybe six by eight) viewing window and a food tray.  Elizarde, pp. 24-25, p. 28.   Mr. Elizarde states that a log pertaining to someone in the padded cell would be kept on the wall next to the cell door.  Elizarde, p. 31.   When a detention officer receives a doctor's order that states that the inmate is to be kept under close observation, the detention officer is to call a nurse.  Elizarde, p. 37-39.    Mr. Elizarde states that detention officers were not medically trained. Elizarde, pp. 41-42.   Mr. Elizarde testifies that Sheriff Cantu did not have any policies or procedures in place to make sure that the detention officers were familiar

6

with the information that is noted in the *Cameron County Sheriff's Department Jail Division Operation Plan* shown as Elizarde Exhibit No. 2.    Elizarde, p. 50.   Mr. Elizarde testifies that from what he was told, Juan Longoria was delusional and irrational while he was at the Cameron County jail. Elizarde, pp. 53-55.   While Juan Longoria was in the padded cell, a log should have been kept; however, no log was maintained by the detention officers.   Elizarde, pp. 55-59.  Mr. Elizarde states that detention officers receive training at the academy, as well as on the job instruction and training of someone being in medical distress.   Elizarde, pp. 63-65. Mr. Elizarde acknowledges that Juan Longoria was not classified per jail procedures.   Mr. Elizarde acknowledges that Juan Longoria was not seen by a nurse per the jail procedures. Mr. Elizarde acknowledges that no activity log was maintained by the detention officers per the jail procedures.   Elizarde, pp. 76-78.   At the time that Juan Longoria was an inmate at the Cameron County jail in April 2001, the county jail was shorthanded in detention officers and this condition had existed for several years.  Elizarde, p. 80.   Looking at page 25 of Elizarde Exhibit 2 (*Cameron County Sheriff's Department Jail Division Operation Plan*), the detention officers failed to follow the provisions pertaining to supervision as noted on that page. Elizarde, p. 81.

3.   Deposition of Robert Lopez.

Robert Lopez was an employee of the Cameron County Sheriff's Department in April 2001;  his deposition is submitted primarily due to the exhibits that were attached to his deposition and the reference of those exhibits in other depositions.

4.   Deposition of Sylvia Rivas.

Sylvia Rivas was a Licensed Vocational Nurse with the Health Department of Cameron

7

County, and she was working at the Cameron County jail in April of 2001.  Sylvia Rivas states that whenever the medical staff at the Cameron County jail receives a doctor's order that states that the inmate is to be kept under close observation such as the one noted in Defendant's Motion for Summary Judgment Exhibit 4, the  medical staff is to begin an activity log and the detention officers would also keep a log concerning the inmate.  Sylvia Rivas pp. 19-33.  Sylvia Rivas states that there should have been a medical assessment done on Juan Longoria, and she does not have an explanation as to why a medical assessment on Juan Longoria was never performed.  Sylvia Rivas pp. 36-37.  This witness states that vital signs would have taken of Juan Longoria, and that the nurses at the Cameron County jail were experienced in noting an individual suffering from alcohol withdrawal.  Sylvia Rivas pp. 37-39.   Ms. Rivas also states that whenever an individual is placed in the padded cell, the detention officers are to immediately notify the medical staff at the Cameron County jail.   At that time, the medical staff would make an assessment and take vital signs.   Additionally, the medical staff and the detention officers would begin their own logs.   Sylvia Rivas pp. 39-42.


5.    Defendant Cameron County, Texas response to request for production concerning *Shift Activities Log* and *Medical Log (Observation Checklist for Crisis Management, Psychological Observation, Seclusion, Restraint or Medical)*.


These  documents are discussed in Sylvia Rivas' deposition and reflect the type of information that was to be noted by the nurses and the type of sheet that the detention officers were to note their observations.

6.    **Statement of Armando Guerrero.**

Armando Guerrero was an inmate at the Cameron County, Texas jail, and he was in a small holding cell in front of the booking area.   He states he heard an inmate in the large holding cell.  Mr. Guerrero says that the inmate was yelling that someone was beating on him, and when Mr. Guerrero looked at him, no one was beating on him nor touching the inmate. Mr. Guerrero then states that two jailers eventually placed the inmate in a padded cell located right behind the small holding cell.   Mr. Guerrero did not see anybody beat on the inmate. According to Mr. Guerrero, the inmate continued to kick the door, and the inmate continued to yell for the next four to five hours, and nobody checked on the inmate.

7.    **Statement of Anthony Edward Cipollaro.**

Anthony Cipollaro was an inmate at the Cameron County jail, and he was passing the food trays to the other inmates during the noon hour.  He states that the guard opened the door of the padded cell and gave the inmate in the padded cell two sandwiches.  He states that the inmate did not appear to have an interest in food, and Mr. Cipollaro also stated that the inmate appeared scared.

8.    **Deposition of Felipe Silva, Jr.**

In April of 2001, Felipe Silva, Jr. was a detention officer sergeant with the Cameron County Sheriff's Department jail facility.  At the time of the incident, Mr. Silva was a booking officer.  Felipe Silva states that the infirmary had an open dorm with beds, and it also had six individual cells.  Additionally, the individual cells were open to view so that a nurse or an officer could see the inmates in the cells.   Silva, pp. 41-45.  In contrary to the padded cell in

which Mr. Longoria was housed, if a detention officer just walked by the padded cell and glanced in, the detention officer could not see the bottom portion of the padded cell. Silva, pp. 85-87.

9. Deposition of Jose Morales.

Jose Morales was a booking officer with the Cameron County Sheriff's Department jail section from May 1999 to October 2001. He states that he had no medical training. Morales, p. 12. On 11 April 2001, Mr. Morales was working the 7 a.m. to 3 p.m. shift. Morales, p. 15. The doctor's order similar to Exhibit 2 would be attached to the commitment papers, and these papers would be given to the sergeant. Morales, pp. 27-28. Mr. Morales states that a log was suppose to be placed on the wall next to the cell door when someone is placed in the padded cell, and in Mr. Longoria's case, a log was not done. He states that he does not know whether a nurse was suppose to be called when someone is placed in the padded cell. Additionally, he does not know whether a medical log was suppose to begin. Morales, pp. 32-33. Before 11 April 2001, he was aware that a log was to be placed on the door of a padded cell. Mr. Morales states that he does not know how often Longoria was supposed to be checked. Morales, pp. 33-34. Jose Morales states that if Mr. Longoria was not booked, then he would not be classified. Morales, p. 37. After classification, the inmate would be seen by the medical staff. If a person does not get booked or classified, then the inmate may not see the medical staff. Morales, pp. 41-42.

10. Deposition of Armando Tenorio.

Mr. Tenorio was a detention officer employed at the Cameron County jail on 11 April 2001. Tenorio, p. 6. In April of 2001, the old jailhouse had approximately 6 beds in the

10

infirmary. Tenorio, pp. 8, 26-28.  Mr. Tenorio states that there is not as clear a view of someone in the padded cell as compared to the holding cell. Tenorio, p. 29.  Mr. Tenorio acknowledges that if someone was going through alcohol withdrawal, a person would be able to see what was going on better in an open cell situation as opposed to a closed padded cell. Tenorio, p. 45.

11.   Deposition of Xavier Lee Hernandez.

On April 11, 2001, Mr. Hernandez was a detention officer at the Cameron County jail from 1989 until the date of the deposition (29 August 2003).  Hernandez, p. 5.  He was on the 3 p.m. to 11 p.m. shift.  No log was kept while Juan Longoria was in the padded cell. A log was required to be kept and placed on the cell door or the wall next to the cell door.  Hernandez, pp. 18-19.   The cell door of the padded cell  where Juan Longoria stayed had a small window that was approximately 8 inches by 8 inches.  Hernandez, p. 19.  Mr. Hernandez states that Juan Longoria was yelling for almost his entire shift.   While in the padded cell, Juan Longoria was yelling: "Leave me alone.  They're going to kill me. Jose, you know, tell them to leave me alone."  Hernandez, pp. 19-21.   Additionally, Juan Longoria was pounding on the cell wall throughout the 3 to 11 shift.  Hernandez, pp. 33-34.   Mr. Hernandez acknowledges that all officers present would be responsible for the safety of Juan Longoria.  Hernandez, p. 22.   Mr. Hernandez states that he has no medical training.  Hernandez, pp. 43-44.   He states that he knew that a log was supposed to be maintained on Juan Longoria.  Hernandez, p. 48.   Mr. Hernandez was aware of jail procedures and he was certified as a detention officer. Hernandez, pp. 53-55. Mr. Hernandez states that Juan Longoria was not monitored according to jail procedures and that a log was not maintained according to jail procedures.  Hernandez,

11

pp. 58-60.

12.    Statement of Michael Gene Baskin.

Michael Gene Baskin was an inmate in the Cameron County jail, and he states the following:

I think it was Wednesday night on April 11, 2001. I remember seeing a guy in the padded cell. I do not know his name. At around 5:30 p.m. that day I looked in the padded cell. I seen this man look as if he was swimming. He was in the prone position on his stomach with his arms stretched out over his head. His feet apart going back and forth sort of like doing jumping jacks. The reason I saw this inmate was because I was handing out the food to the inmates and I was going to give the inmate in the padded cell food. I tried to call him but he would not respond. I then told the guard. He is a big guy by the name of XL. He is the assistant sergeant who was on duty that day on the 3-11 p.m. shift. XL then told me that the inmate was doing it for attention. XL then opened the cell door because the inmate would not get up to take his food. I then placed the plate on the small cement slab in the padded cell. XL closed the door. I then left and I came back later because I had to give out some sugar with water to a guy in the small holding cell and I looked inside again in the padded cell and the inmate was in the same position and looked as if he was like a fish out of water. His body was like quivering. to me it looked like if he was having a seizure. I then told XL again that the inmate in the padded cell was still having the fit, which is what I referred to it as. XL then told me that the inmate would get tired of it. This was at around 5:45 p.m. The inmate would not get his water. XL then opened the door and I went inside and set the water down and he shut the door. I told XL again and XL said that he would get tired of it. XL then shut the door.

At around 8:30 p.m. I went back to attend to an inmates needs for a sugar drink in the holding cell. I then peeked inside the padded cell. I saw the inmate

12

in the same position face down.   The inmate was still quivering.   The man never changed positions.   I then told another guard but I do not know his name that the inmate in the padded cell was having a fit.   That officer did not say nothing when I told him.   I then went back to the kitchen and they then locked us down at around 8:45 p.m. for the night.

The next morning I heard somebody had died.   I made a comment to Ozzy who is an inmate and I told him that I would bet it was the guy in the padded cell.

### 13.   Deposition of Luis Alberto Mendieta.

According to the affidavit of Luis Mendieta which is attached to Defendant's Motion for Summary Judgment, in April of 2001, Luis Alberto Mendieta was employed with the Cameron County Sheriff's Department, and he was assigned to the county jail as a detention sergeant. On 11 April 2001, Mr. Mendieta was on the 11:00 p.m. to 7:00 a.m. shift.   According to Luis Mendieta, Sergeant Galicia told him that they should check out the inmate in the single cell. Mr. Mendieta states that he started hitting the door to see if Juan Longoria would move.  Juan Longoria did not move.  Mr. Mendieta states that he could only see Mr. Longoria's legs, but he could not see Mr. Longoria's head.   Luis Mendieta continues to state that there was no response from the inmate, so Mendieta decided to open the cell door.   Defendant Exhibit 8L. In the deposition taken of Mr. Mendieta, he describes the configuration of the padded cell and the visibility by looking through the cell door window.  Mendieta, pp. 45-53.   In his deposition, Mr. Mendieta discusses the infirmary in the county jail and the beds that are available in the infirmary.  Mendieta, pp. 76-77.

### 14.    Statement of Jorge Ibarra.

On April 11, 2001, Mr.  Ibarra was a detention officer with the Cameron County Sheriff's

13

Department, and he arrived at work at 10:45 p.m.  When he arrived, Mr. Ibarra was informed that an inmate was being uncooperative, and that he was in the padded cell.  He was further informed that as soon as the inmate calmed down, he would be booked.  When the briefing was completed, Mr. Ibarra reported to his station at the infirmary room.  At around 12:15 a.m., Sgt. Mendieta instructed Mr. Ibarra to report to the second floor to assist officer Randy Dierlam.  About 15 minutes passed and Sergeant Mendieta advised Randy Dierham and Jorge Ibarra to report downstairs on the first floor.  When Jorge Ibarra arrived on the first floor, Sergeant Mendieta stated that the inmate in the padded cell was  uncooperative and was not responding.  Jorge Ibarra went in the cell first and checked  for a pulse on Juan Longoria's right wrist;  he did not feel a pulse.  Jorge Ibarra also noticed that Juan Longoria felt cold. At that time Jorge Ibarra believed that the detention officers needed to get medical attention for Mr. Longoria.  Felipe Esquivel, the County Jail nurse, eventually arrived about 10 minutes later and he began working on the inmate.

15.    Statement of Felipe Esquivel.

Mr. Esquivel was a licensed vocational nurse with the Health Department of Cameron County. On April 12, 2001, at approximately 12:42 a.m., Felipe Esquivel received a telephone call from Sergeant Mendietta of the Cameron County Jail.  Mr. Esquivel was informed that an inmate was not breathing.  Mr. Esquivel states that he arrived at the jail before EMS. When he saw Juan Longoria, Mr. Longoria was laying on the floor of the cell.  Mr. Esquivel checked Juan Longoria and noticed that there was no pulse nor respiration.  Additionally, Mr. Esquivel noticed that rigor mortis was already setting in.  Mr. Esquivel asked Sgt. Mendietta what had happened, and Sgt. Mendietta responded that Juan Longoria was placed in the

14

padded cell due to being violent and aggressive.  Mr. Esquivel also stated the following: "I also asked the Sergeant if he notified the medical staff and if they had started a log on him every 15 minutes and he stated no that there was no log him and that they did not notify the medical staff."

16.    Statement of Jesus Eduardo Perez.

On April 12, 2001, Jesus Eduardo Perez was employed with the City of Brownsville as an EMT Intermediate.   At around 1:10 a.m. on 12 April 2001, he was responding to the Cameron County jail in regards to a cardiac arrest.  We he arrived, he saw a nurse doing CPR compressions on the chest of a prisoner.  When he took over, the prisoner was dead, and in the opinion of Jesus Perez, the prisoner had been dead for at least 2 hours.  According to Mr. Perez, "the prisoner was cyanotic from his chest area up to his face.  That means there was lack of oxygen and his pupils were fully dilated and non-reactive which means there is no brain activity."

17.    Deposition of Lawrence J. Dahm, M.D.

Doctor Dahm states that Mr. Longoria was in the process of alcohol withdrawal at the time he died.  Dahm, pp. 54, 67.  Doctor Dahm states that at least the last 24 hours of Mr. Longoria's life, he was mentally disoriented.  Doctor Dahm continues by stating that a person who suffers from DTs would normally receive a treatment of IV fluids to rehydrate them, tranquilizers to minimize and prevent seizures and minimize the agitation, and placed in a quiet space.  Dahm, pp.70-71.  The doctor states that contributory factors to Juan Longoria's death were delirium tremens or alcohol withdrawal.  Dahm, pp. 73-74. Doctor Dahm states that witness statements indicating that Mr. Longoria was acting normal the last few hours of

15

his life is not consistent with a person having end-stage liver disease. Dahm, pp. 73-81. Doctor Dahm states that a person can die from lack of care for alcohol withdrawal. Dahm, pp. 86-87.

18. Report of Alvin W. Cohn.

Mr. Cohn is a correctional facility expert, and he rendered an opinion Cameron County's failure to respond to Longoria's obvious distress and mental illness and the failure to communicate to health authorities what was known about his symptoms was a proximate cause of his death. Cohn, p. 5.

5. **SUMMARY OF THE ARGUMENT.**

As stated above, the Plaintiffs assert that the Defendant CAMERON COUNTY, TEXAS is not entitled to a summary judgment. The Plaintiffs assert that there are genuine issues of material fact on both the federal and Texas law claims. Of the eight points that the Defendant asserts are grounds for summary judgment, the Plaintiffs contend that the following matters still have genuine issues of material fact, and consequently, the Defendant CAMERON COUNTY, TEXAS is not entitled to a summary judgment:

> i.      The Defendant asserts that there is no evidence that Cameron County employees or agents were deliberately indifferent to the medical needs or condition of Juan Longoria or acted with deliberate indifference towards him.

> ii.     The Defendant asserts that there is no evidence that Cameron County employees or agents engaged in conscience shocking behavior.

> iii.    The Defendant asserts that there is no waiver of state law governmental/sovereign immunity regarding the state law tort claims because there is no evidence that Juan Longoria's death resulted from a use or condition of tangible property by County employees.

16

6. **ARGUMENT AND AUTHORITIES.**

A.    **Summary Judgment Evidence Shows that the Defendant Cameron County, Texas, is liable under 42 U.S.C. section 1983.**

A summary of the evidence is as follows:

1.    Juan Longoria is dead, and he died while in custody with the Cameron County jail.

2.    For a period of approximately 24 hours prior to his death, Juan Longoria suffered from alcohol withdrawal.

3.    At the time of Juan Longoria's arrival to the Cameron County jail, the Cameron County detention officers were aware that he was mentally impaired. The statement of Francisco Lerma, Jr. indicates that Joe Salinas of the Brownsville Police Department upon tendering Juan Longoria to the detention officers informed them that Mr. Longoria was a "96" or mentally ill. Defendant Exhibit 8A.

4.   Attached to the commitment papers transferring Juan Longoria from the City of Brownsville jail to the Cameron County jail was a doctor's order stating that Juan Longoria "may return to jail but should be kept under close observation." Defendant Exhibit 4.

5. .   Prior to 11 April 2001, the detention officers at the Cameron County jail had the necessary certifications and they have attended various seminars concerning the housing of prisoners. Through the testimony of the detention officers at the Cameron County jail, these officers have held themselves out as being familiar with the policies and procedures that are noted in the *Cameron County Sheriff's Department Jail Division Operation Plan* (Defendant Exhibit 9); the familiarity with this information was prior to 11 April 2001.

6.    According to George Garcia, a lieutenant at the Cameron County jail, if an inmate has a doctor's order to be kept under close observation, there should

17

have been an activity log maintained by the detention officers and the medical staff should be notified. Mr. Garcia states that the inmate should be checked every 15 minutes. Additionally, when someone is placed in the padded cell, the medical staff at the jail is to be notified and a log is to be maintained by the detention officers. Also, the log is kept by the door of the cell so that a detention officer can make notations. Mr. Garcia states that it was customary for logs to be maintained, inmates to be classified, and nurses to be notified when someone is placed in the padded cell. Mr. Garcia says that the failure of these things to be done on Juan Longoria was a failure of procedures by Cameron County employees. As to Juan Longoria, George Garcia acknowledges that the Cameron County jail facility failed to book, classify, obtain a medical assessment, maintain a log when placed in the padded cell, and notify the nurse when he was placed in the padded cell. George Garcia acknowledges that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell, is for the safety and well-being of an inmate. George Garcia also acknowledges that the failure to do any of these procedures could lead to serious consequences concerning the inmate in the way of injury and death.

7. Per Joe Elizarde, who held a detention officer's certificate for 18 years, and was employed at the Cameron County Jail in April 2001, detention officers were not medically trained at the Cameron County jail. Mr. Elizarde testifies that from what he was told, Juan Longoria was delusional and irrational while he was at the Cameron County jail. Mr. Elizarde states that detention officers receive training at the academy, as well as on the job instruction and training of someone being in medical distress. Mr. Elizarde acknowledges that Juan Longoria was not classified per jail procedures. Mr. Elizarde acknowledges that Juan Longoria was not seen by a nurse per the jail procedures. Mr. Elizarde acknowledges that no activity log was maintained by the detention officers per the jail procedures. At the time that Juan Longoria was an inmate at the

Cameron County jail in April 2001, the county jail was shorthanded in detention officers and this condition had existed for several years.

8.      As noted above, Sylvia Rivas was a Licensed Vocational Nurse with the Health Department of Cameron County, and she was working at the Cameron County jail in April of 2001. Sylvia Rivas states that whenever the medical staff at the Cameron County jail receives a doctor's order that states that the inmate is to be kept under close observation such as the one noted in Defendant's Motion for Summary Judgment Exhibit 4, the medical staff is to begin an activity log and the detention officers would also keep a log concerning the inmate. Sylvia Rivas states that there should have been a medical assessment done on Juan Longoria, and she does not have an explanation as to why a medical assessment on Juan Longoria was never performed. This witness states that vital signs would have taken of Juan Longoria, and that the nurses at the Cameron County jail were experienced in noting an individual suffering from alcohol withdrawal. Ms. Rivas also states that whenever an individual is placed in the padded cell, the detention officers are to immediately notify the medical staff at the Cameron County jail. At that time, the medical staff would make an assessment and take vital signs. Additionally, the medical staff and the detention officers would begin their own logs.

9.   In April of 2001, Felipe Silva, Jr. was a detention officer sergeant with the Cameron County Sheriff's Department jail facility. At the time of the incident, Mr. Silva was a booking officer. Felipe Silva states that the infirmary had an open dorm with beds, and it also had six individual cells. Additionally, the individual cells were open to view so that a nurse or an officer could see the inmates in the cells. In contrary to the padded cell in which Mr. Longoria was housed, if a detention officer just walked by the padded cell and glanced in, the detention officer could not see the bottom portion of the padded cell.

19

10.   Mr. Tenorio was a detention officer employed at the Cameron County jail on 11 April 2001.   In April of 2001, the old jailhouse had approximately 6 beds in the infirmary. Mr. Tenorio states that there is not as clear a view of someone in the padded cell as compared to the holding cell. Mr. Tenorio acknowledges that if someone was going through alcohol withdrawal, a person would be able to see what was going on better in an open cell situation as opposed to a closed padded cell.

11.   As stated earlier in this response, on April 11, 2001, Mr. Xavier Lee Hernandez was a detention officer at the Cameron County jail from 1989 until the date of the deposition (29 August 2003).   He was on the 3 p.m. to 11 p.m. shift.   No log was kept while Juan Longoria was in the padded cell. A log was required to be kept and placed on the cell door or the wall next to the cell door. The cell door of the padded cell  where Juan Longoria stayed had a small window that was approximately 8 inches by 8 inches.   Mr. Hernandez states that Juan Longoria was yelling for almost his entire shift.   While in the padded cell, Juan Longoria was yelling: "Leave me alone.   They're going to kill me. Jose, you know, tell them to leave me alone."   Additionally, Juan Longoria was pounding on the cell wall throughout the 3 to 11 shift.   He states that he knew that a log was supposed to be maintained on Juan Longoria. Mr. Hernandez was aware of jail procedures and he was certified as a detention officer.     Mr. Hernandez states that Juan Longoria was not monitored according to jail procedures and that a log was not maintained according to jail procedures.

12.   According to Michael Gene Baskin, who was an inmate in the Cameron County jail,  he states that he saw Juan Longoria in the padded cell.  He states that he informed two detention officers that Juan Longoria did not appear well. Mr. Baskin says that Juan Longoria's  body was like quivering and he appeared to be having a seizure; Mr. Baskin told a detention officer about what he had seen.  Mr. Baskin states that the detention officers did not assist Mr. Longoria

20

to Juan Longoria's condition?    The staff of three shifts at the Cameron County jail facility failed to book, classify, obtain a medical assessment, maintain a log when he was placed in the padded cell, and notify the nurse when he was placed in the padded cell.    These certified detention officers knew that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell,  is for the safety and well-being of an inmate. The Plaintiffs assert that there is evidence of deliberate indifference by Cameron County, Texas.

**B.    Defendant, Cameron County, Texas is not entitled to Summary Judgment on the Texas law negligence claim.**

1.    The Plaintiffs have asserted a claim under the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN. ch. 101 (Vernon 1997).  The Defendant contend that the mere use of the jail cell does not raise to the level contemplated under the law as to tangible personal or real property that would make Cameron County, Texas liable were it a private person.  TEX. CIV. PRAC. & REM. CODE ANN. section 101.021 (Vernon Supp. 1997).  The Defendant cites *Dallas County Mental Health and Retardation v. Bossley*, 968 SW2d 339 (Texas. 1998),  for the position that the use of the jail cell did no more than furnish the condition that made the injury possible.  In *Bossley*,  the unlocked doors permitted an escape that led to a series of events resulting in the death of a patient.  The Court stated that the unlocked doors were too removed from the incident that brought about the actual death of Roger Bossley. 968 SW2d at 343.  In the present case there is  testimony that the cell door had a small window that restricted the view of the detention officers from seeing the entire cell in which Juan Longoria was housed. It is the position of the Plaintiffs that the placing of Juan Longoria in the padded cell was a proximate cause of the death of Mr. Longoria because the restricted vision of the detention officers prevented the proper monitoring of Juan Longoria.   Additionally, the Cameron County jail had an infirmary with beds for the inmates.  The infirmary also had cell doors that were more open to view, and consequently, would allow better monitoring of inmates requiring medical attention.

23

2.    In *Texas Department of Public Safety v. Petta*, 44 S.W.3d 575 (Tex. 2001), the Texas Supreme Court states that "the Tort Claims Act waives sovereign immunity from suit for claims that an officer negligently implemented policy." *Petta*, 44 S.W.3d 575, 580.    The Plaintiffs' Third Amended Original Complaint at pages 30 through 35, sets out various failures by Cameron County as to handling of Juan Longoria, including the failure of the Cameron County Sheriff's Department to follow its health services plan.    Plaintiffs' Third Amended Original Complaint, 7.11 subpart i.    The evidence clearly shows that the Cameron County detention officers on three shifts fail to follow policy.

3.    Article 16.21 of the Texas Code of Criminal Procedure provides that "every sheriff shall keep safely a person committed to his custody."    The evidence presented before this Court shows that the Defendant failed to keep Juan Longoria safely in its custody.

4.    In 1975 the Texas Legislature created the Jail Standards Commission.    The Texas Commission on Jail Standards is required to establish rules and regulations governing, among other things, medical care in jails.    See 37 Tex. Admin. Code, section 273.1 (Texas Commission on Jail Standards, Health Services).    Under rule 273.1, the County "shall provide medical, mental, and dental services in accordance with the approved health services plan.    These services may include, but shall not be limited to, the services of a licensed physician, professional and allied health personnel, hospital, or similar services."    Under Rule 273.2 of the Jail Standards, the County is required to put into force a written plan, approved by the Commission on Jail Standards, for inmate medical, mental, and dental services. See 37 Tex. Admin. Code, Part 9, Chapter 273, Rule section 273.2 (Texas Commission on Jail Standards, Health Services).    Under Rule 273.3 of the Jail Standards, "all medical instructions of designated physicians shall be followed." See 37 Tex. Admin. Code, Part 9, Chapter 273, Rule section 273.3 (Texas Commission on Jail Standards, Health Services, Health Instructions).    Under  Texas Local Government Code Annotated, section 351.001, the commissioners' court shall provide safe and suitable jails for the county. Tex.Loc.Gov't Code Ann. section 351.001.    Under Texas Local Government Code Annotated, section 351.001, "each county jail must comply with the minimum standards and rules and procedures of the Commission on Jail

24

Standards." The evidence shows that the Defendant Cameron County, Texas failed to follow the doctors order to keep Juan Longoria under close observation. The evidence shows that Juan Longoria was not booked per jail procedures. The evidence shows that Juan Longoria was not classified per jail procedures. The evidence shows that Juan Longoria was not seen by a nurse per the jail procedures. The evidence shows that no activity log was maintained by the detention officers per the jail procedures. The evidence shows that medical staff were not notified when Longoria was placed in a padded cell per jail procedures. The evidence shows that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell, is for the safety and well-being of an inmate. The evidence shows that the failure to do any of these procedures could lead to serious consequences concerning the inmate in the way of injury and death.

7.    **CONCLUSION.**

The Plaintiffs assert that there is evidence to support their claims against Cameron County, Texas for Constitutional violations and Texas State law claims. Therefore, the Plaintiffs are requesting that the Court deny the Defendant Cameron County, Texas' motion for summary judgment. The Plaintiffs request any additional relief that they are justly entitled to receive.

Respectfully submitted,

By: _____

Alfred R. Valdez
    Federal ID 6389
    State Bar No. 20426200
    7520 Hillcroft
    Houston, Texas 77081
    (713) 271-0719
    (713) 270-8134 fax
    Attorney for the Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a true copy of the above was served on the opposing party on

-ARV ~~15 March~~ 2004.
5 APRIL

Alfred R. Valdez

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA, and MARIA
IDALIA GUTIERREZ, Individually and
on behalf of the Estate of
JUAN LONGORIA, Deceased

}
}
}
}

CIVIL ACTION NO. B-01-062

VS.

}
}
}

CAMERON COUNTY, TEXAS,
THE CITY OF BROWNSVILLE,
TEXAS, and JOHN DOES 1-10

}
}
}
}

JURY DEMANDED

## PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT

## AFFIDAVIT OF ALFRED R. VALDEZ

On this day, Alfred R. Valdez appeared before me, the undersigned notary public. After I administered an oath to him, upon his oath, he said that the facts stated in it are within his personal knowledge and are true and correct. The exhibits attached hereto are true and accurate copies of the discovery that was brought forth in the above captioned matter.

_A. R. Valdez_
**Affiant**

Sworn to and subscribed before me by Alfred R. Valdez on _April 5th 2004_.

_[signature]_

Notary Public in and for the State of Texas



SONIA FLORES
Notary Public, State of Texas
My Commission Expires
May 24, 2005

1

1    IN THE UNITED STATES DISTRICT COURT?
     FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION

3   MARIA LONGORIA AND MARIA        ) (
    IDALIA GUTIERREZ,               ) (
4   INDIVIDUALLY AND ON             ) (
    BEHALF OF THE ESTATE OF         ) (   CIVIL ACTION NO.
5   JUAN LONGORIA, DECEASED,        ) (   B-01-062
              Plaintiffs            ) (
6                                   ) (
    VS.                             ) (
7                                   ) (   JURY DEMANDED
    CAMERON COUNTY, TEXAS,          ) (
8   THE CITY OF BROWNSVILLE,        ) (
    TEXAS, AND JOHN DOES 1-10,      ) (
9             Defendants            ) (

10  ─────────────────────────────────────────────

11             ORAL DEPOSITION OF
                GEORGE GARCIA
12             AUGUST 29, 2003

    ─────────────────────────────────────────────

13       ORAL DEPOSITION OF GEORGE GARCIA, produced as a

14   witness at the instance of the PLAINTIFFS, taken in the

15   above styled and numbered cause on AUGUST 29, 2003,

16   reported by ELIZABETH F. TORRES, Certified Court

17   Reporter No. 5516, in and for the State of Texas, at

18   the law offices of Adams & Graham, L.L.P., 222 E. Van

19   Buren, West Tower, Harlingen, Texas, pursuant to the

20   Federal Rules of Civil Procedure.

21

22

23

24

25                                          **COPY**

2

1        <u>APPEARANCES</u>

2   COUNSEL FOR PLAINTIFFS:

3            ALFRED R. VALDEZ
            LIN & VALDEZ, L.L.P.
4            7520 Hillcroft
            Houston, Texas   77081
5
    COUNSEL FOR DEFENDANTS:
6
            CRAIG VITTITOE
7            ADAMS & GRAHAM, L.L.P.
            P.O. Drawer 1429
8            222 East Van Buren, West Tower
            Harlingen, Texas  78551-1429
9

10                <u>INDEX</u>
                                       <u>PAGE</u>
11   Appearances................................ 2

12   <u>GEORGE GARCIA</u>:

13   Examination by Mr. Valdez................... 3
    Examination by Mr. Vittitoe................ 26
14   Examination by Mr. Valdez.................. 41

15   Errata Sheet/Signature Page................ 45
    Reporter's Certificate..................... 47
16   Attached to the end of the transcript:   Stipulations

17

18

19            (NO EXHIBITS MARKED.)

20

21

22

23

24

25

            BRYANT & STINGLEY, INC.
    McAllen        Harlingen        Brownsville
    (956)618-2366   (956)428-0755   (956)542-1020

3

**GEORGE GARCIA,**

having been duly sworn, testified as follows:

EXAMINATION

BY MR. VALDEZ:

Q.  Sir, would you state your full name?

A.  My name is George Luis Garcia.

Q.  And date of birth, Mr. Garcia?

A.  11-9-60.

Q.  And what year did you finish high school?

A.  You started with a hard question there, Buddy.

Q.  I'm not going to ask you if you're married or
not.

A.  '79, '80.  I think it's '80.  Go ahead.

Q.  Sometimes you ask a question, "Are you
married," and they think for a moment.

A.  That's a hard one there.  That's why I told you
that.

Q.  I've had some responses like, "I'm not, but she
is."

A.  There you go.

Q.  Okay.

A.  I broke the ice there.

Q.  You did.  Give me some of your work history
from the time you left high school to the present time,
if would you, please.

15:19  1      A.   History I had, I used to work for Parra

15:19  2  Furniture.  I used to, at that time, take care of all

15:19  3  mattresses, carrying them and loading.  After that, I

15:19  4  started working at Montgomery Wards.  Okay.  I was a

15:19  5  tire specialist, and then became a battery specialist.

15:19  6  And then right away, I went back to the jail.  Worked

15:20  7  at the Cameron County jail in 1981, February the 1st.

15:20  8      Q.   And so you've been with the Cameron County jail

15:20  9  all 22 years?

15:20 10      A.   22 years, going for 23 on February the 1st,

15:20 11  sir.

15:20 12                  MR. VITTITOE:   Wow.

15:20 13      Q.   And what position do you presently hold at the

15:20 14  Cameron County jail?

15:20 15      A.   Right now, I hold sergeant.

15:20 16      Q.   And what position did you hold in April of

15:20 17  2001?

15:20 18      A.   I held lieutenant.

15:20 19      Q.   Okay.  And when did you move from lieutenant to

15:20 20  sergeant, approximate time frame?

15:20 21      A.   On April of this year.

15:20 22      Q.   April of 2003?

15:20 23      A.   Correct.  This year.

15:20 24      Q.   How long were you a lieutenant for?

15:21 25      A.   Close to about 10 years, sir.

15:21 1    Q.  Okay.  Can you give me an explanation as to why

15:21 2    you moved from lieutenant to sergeant?

15:21 3              THE WITNESS:  Can I answer that?

15:21 4              MR. VITTITOE:  Let's go off the record.

15:21 5              (Off record.)

15:22 6    Q.  Mr. Garcia, when -- I already asked you when

15:22 7    you made the move.  The next question was, why did you

15:22 8    make the move from being a lieutenant to a sergeant, if

15:22 9    you can give us an explanation, please.

15:22 10    A.  From a lieutenant to a sergeant?

15:22 11    Q.  Yes, sir.

15:22 12    A.  It's political, sir.

15:22 13    Q.  Okay.  Now, in April of 2001, you were a

15:22 14    lieutenant for the Cameron County Sheriff's Department

15:22 15    and you were in the detention center?

15:22 16    A.  I was in the detention, correct, sir.

15:22 17    Q.  And were you responsible for all three units?

15:22 18    Or you were responsible for what we call the old county

15:22 19    jail?

15:22 20    A.  I was responsible for DC-I, sir, Ruben Torres.

15:23 21    But sometimes, the lieutenants are on call, so they

15:23 22    become responsible on the -- when they're on call.

15:23 23    Okay?  When they're on call, on beepers or telephone

15:23 24    calls, okay, on the weekends.

15:23 25    Q.  Did you provide any type of a written statement

15:23  1    concerning the matter of Juan Longoria?

15:23  2        A.  No, sir.

15:23  3        Q.  Did you have anything to do with an

15:23  4    investigation of Juan Longoria and why he died?

15:23  5        A.  No, sir.

15:23  6        Q.  Back in April of 2001, what were your job

15:23  7    duties?

15:23  8        A.  April 2001, I was a lieutenant at DC-I, sir,

15:23  9    taking care of the facility, Ruben Torres, considered a

15:23  10   DC-I, and taking care of the facility, making sure all

15:23  11   the procedures and everything was followed there at

15:23  12   that jail.

15:23  13       Q.  Okay.  Is it fair to say that you're familiar

15:24  14   with the procedures that were to be followed at the

15:24  15   Cameron County jail concerning booking, classification,

15:24  16   and the moving of prisoners to the various cell levels?

15:24  17       A.  Yes, sir.

15:24  18       Q.  Okay.  Do you even know who Juan Longoria is?

15:24  19       A.  Yes, sir.

15:24  20       Q.  What's your understanding as to who Juan

15:24  21   Longoria is?

15:24  22       A.  My understanding, usually -- a fellow like me,

15:24  23   I've seen him there before, okay.  I knew who he was.

15:24  24   And when you go back to the record checks and do clas-

15:24  25   -- I did a lot of classification at that time.  I used

15:24 1 to be -- I was a classification officer. Okay? So I'm

15:24 2 familiar with a lot of faces. I'm good on faces, not

15:24 3 on names. Okay.

15:24 4     Q. Okay. So had Juan Longoria, before April of

15:25 5 2001, been in the Cameron County jail for public

15:25 6 intoxication? Or do you recall?

15:25 7     A. I need to check, sir, but I'm not sure.

15:25 8     Q. Okay.

15:25 9     A. I'm not sure of the charges itself, why was he

15:25 10 there for. I don't know.

15:25 11     Q. Okay. You indicated to me that you have been a

15:25 12 classifications officer at the Cameron County jail

15:25 13 facility; is that correct?

15:25 14     A. Correct, sir.

15:25 15     Q. Okay. When did you hold that position

15:25 16 approximately?

15:25 17     A. Between Alex Perez's term and Lucio's term.

15:25 18 That sounds good enough.

15:25 19     Q. Approximate years?

15:25 20     A. Oh, man. I'm going to give it a shot. Between

15:25 21 1990 to -- '86 to about '90, '93.

15:25 22     Q. Okay. Do you -- are you aware of what the

15:26 23 classification procedures were back in April of 2001?

15:26 24     A. Yes, sir.

15:26 25     Q. Okay. When you have someone, such as Juan

15:26 1    Longoria in this particular case that was transferred

15:26 2    from the City of Brownsville jail over to the Cameron

15:26 3    County jail, as a classification officer, would you

15:26 4    check to see what his prior criminal history was?

15:26 5        A.   At that time, no, sir.  Depends on the

15:26 6    situation when the inmate is coming in and what he's

15:26 7    bringing in and what type of charges.

15:26 8        Q.   Okay.  So why do you say at that time you would

15:26 9    not check the past criminal history?

15:26 10       A.   Well, depends on the situation.  If the inmate

15:26 11   is coming in, any other inmate, what they do, the

15:26 12   booking officer takes over, and the sergeant on duty

15:26 13   who is in charge takes over, asks questions, anything

15:26 14   they've got to do.  The classification picture comes as

15:26 15   soon as they're being processed and booked, that's when

15:26 16   the classification comes in and takes care and

15:26 17   classifies the inmate himself.  Okay?

15:27 18       Q.   Okay.  So I want to ask you, for example, if

15:27 19   I've been arrested and I'm sitting over in the City of

15:27 20   Brownsville jail, am I right, and I'm being transferred

15:27 21   over to the Cameron County jail, and this is back in

15:27 22   April of 2001, what's the process of procedure?  What

15:27 23   would I go through?

15:27 24       A.   What would you go through?

15:27 25       Q.   Yes, sir.

15:27 1        A.   Let's say you're an inmate, just a regular

2    inmate coming from the Brownsville PD.   As soon as you

15:27 3    came through that door, the first thing we'd do is pat

15:27 4    you down.   Okay?   There's no contraband coming with you

15:27 5    or you have any type of contraband.   Second thing I

15:27 6    would do is check the paperwork of the City to see if

15:27 7    all the paperwork is completed and done correctly,

15:27 8    okay, if there is a probable cause to be arrested.

15:27 9    Okay?   When we take care of the paperwork --

15:27 10        Q.   That's what we call the commitment papers?

15:27 11        A.   Yes, sir, commitment papers.

12        Q.   Okay.

15:28 13        A.   You've got to have probable cause to arrest the

14    individual.

15        Q.   All right.

15:28 16        A.   Okay.   We check the paperwork.   The same time

15:28 17    we start checking paperwork, we take them back there to

15:28 18    get them dressed.   Same time you're getting them

15:28 19    dressed, you're checking them for any type of

15:28 20    contraband that comes in.   They bring them to the

15:28 21    booking area, and they go ahead and book them,

15:28 22    depending how many people they have.   If they have too

15:28 23    many people, they will put them in a small holding cell

15:28 24    or the large holding cell until they get ready to be

15:28 25    processed, depending on how many people come in.   If

15:28 1   you're coming by yourself, there's nothing to do, they

15:28 2   will automatically book you right there and then.

15:28 3      Q.  Okay.  And then when is it the opportunity for

15:28 4   doing the classification?

15:28 5      A.  It depends on the time the individual comes in.

15:28 6   Okay.  Let's say he comes in the morning.

15:28 7      Q.  Yes, sir.

15:28 8      A.  That's good enough.  As soon as they book them,

15:28 9   right in the computer, I'll pick them up right away.

15:28 10   It's a fast process.  It takes about -- between -- as

15:28 11   soon as the booking officer books them in, it takes

15:28 12   about 45 minutes to an hour, no longer than that to be

15:29 13   processed.

15:29 14      Q.  In discussing -- discussing this process with

15:29 15   one or two other individuals, I was told there are --

15:29 16   there's an assessment process, which I'm going to

15:29 17   assume is the classification process?

18      A.  Correct.

15:29 19      Q.  And there's a process called premedical

15:29 20   assessment.

15:29 21      A.  That's correct, sir.

15:29 22      Q.  Okay.  Tell me what your understanding is of

15:29 23   premedical assessment.  What's done at that point in

15:29 24   time?

15:29 25      A.  The premedical assessment is done two ways.

15:29 1    Number one, when the individual comes in, the officer

15:29 2    himself asks if there are any type of injuries, any

15:29 3    type of medication or any health problems before we

15:29 4    receive the inmate.  Second of all, the way we do it in

15:29 5    the computer, as you're talking about right now, when

15:29 6    he's being processed, the computer automatically goes

15:29 7    all the way to the booking officer.  It's the question

15:29 8    that they answered right there and then to book them,

15:29 9    any type of medication he's taking, any type of bad

15:29 10   history of medical.  And that's when they put it in the

15:29 11   computer right there and check it off on the list.

15:29 12   That's part of classification on the list and the

15:30 13   assessment of the classification of Jail Standards, and

15:30 14   that was being approved -- if I can remember, I

15:30 15   remember doing that, and that was in Alex Perez's term

15:30 16   when we got classified to approve the classification to

15:30 17   be done at the Cameron County.

15:30 18        Q.   Okay.  Now, if we have someone who has

15:30 19   accompanying with them what's called a medical

15:30 20   clearance document, correct, what happens then?

15:30 21        A.   What do you mean by a medical clearance

15:30 22   document?

15:30 23        Q.   Well -- fair enough.  I'm going to hand you

15:30 24   what has been marked as Lopez Exhibit No. 4.  And what

15:30 25   does that look like to you?

15:30 1     A.   Okay.   This is -- it looks as if an inmate is

15:30 2 coming in, and just by seeing -- because it depends.

15:30 3 It could be a state trooper, it could be Brownsville

15:30 4 PD, or a constable.  Okay?  They're bringing an inmate

15:30 5 in with medical clearance from the hospital.  Okay.

15:30 6 That's what this paper is all about right here.

15:31 7     Q.   All right.

15:31 8     A.   Saying that this individual is cleared to

15:31 9 receive -- for the jail to receive him.  He's already

15:31 10 been in the hospital.  He's been checked, whatever

15:31 11 complaints he was having, and he's been checked and

15:31 12 cleared by the hospital.  He can go back to jail.

15:31 13 Okay?

15:31 14     Q.   All right.  In this particular case, it says,

15:31 15 "Okay to return to jail, but keep under close

15:31 16 observation."

15:31 17     A.   Okay.

15:31 18     Q.   Do you see that?

15:31 19     A.   Yes, sir.

15:31 20     Q.   That's a doctor's order.

15:31 21     A.   Correct.

15:31 22     Q.   All right.  When the classification officer

15:31 23 gets such a document, as noted in Exhibit No. 4, what

15:31 24 is that classification officer supposed to do?

15:31 25     A.   Okay.  I can answer what I would do right away.

15:31 1   Number one thing is, when I receive this inmate, he's

15:31 2   processed, he would be placed in a small holding cell

15:31 3   so that he would be closely watched.  At the same time,

15:31 4   we would notify the medical staff that we have an

15:31 5   inmate.

15:31 6       Q.   Okay.

15:31 7       A.   And the logs would be automatically done.  Let

15:32 8   me get the right word.  The log would be started to see

15:32 9   what type of activity this inmate is doing and a fluid

15:32 10  log would automatically be done for this inmate.

15:32 11      Q.   Okay.  So we have -- is it two logs or one log

15:32 12  that has this information on it?

15:32 13      A.   It should be two logs.  Okay.  There's two

15:32 14  different logs.  One it shows you -- the log shows you

15:32 15  the activity how the guy is doing.  And the other one

15:32 16  is the intake of food and drinks that has been given.

15:32 17      Q.   Okay.  Is that separate and apart as to what

15:32 18  the medical personnel would be doing, as well?

15:32 19      A.   No.  It would be the same thing.  The medical

15:32 20  should follow and see that there.  They would see those

15:32 21  papers.  You know, it helps them to see if he's taking

15:32 22  the fluids or eating correctly.  Okay?

15:32 23      Q.   Okay.  And when someone is to be kept under

15:32 24  close observation, how often are things supposed to be

15:32 25  noted in the log?  Every 30 minutes?  Every 15 minutes?

15:32 1    Every five minutes?

15:32 2        A.   The way it should be done, it should be every

15:32 3    15 minutes, but it doesn't mean you're going to be

15:32 4    checking them every 15 minutes.  You can do it 15

15:32 5    minutes, 10 minutes, nine minutes.  You can pass by 20

15:33 6    minutes.  It's not a pattern that you can see it, but

15:33 7    it's about 15 minutes, approximately.

15:33 8        Q.   Okay.  All right.  So from what you've

15:33 9    described to me is, we have two logs that are going to

15:33 10   be kept by the detention officers; is that correct?

15:33 11       A.   Correct, sir.

15:33 12       Q.   Okay.  And then whatever the medical people do,

15:33 13   they're doing their own thing.  They may or may not

15:33 14   keep their own journals.  But you know, as a detention

15:33 15   officer, there's going to be two logs concerning

15:33 16   someone who comes in with a document, such as Lopez

15:33 17   Exhibit No. 4?

15:33 18       A.   Correct.  That's our responsibility, sir.

15:33 19       Q.   Okay.  All right.  And that should be done

15:33 20   right at the moment he's being processed through with

15:33 21   the classification officer?

15:33 22       A.   As soon as he's booked, sir.

15:33 23       Q.   Okay.  That log, where does that go?  Does that

15:34 24   go with him to the cell block?  Or does that stay

15:34 25   there?

15:34  1      A.   No, sir.   That paperwork goes to his -- what

15:34  2   you call a file.   Every inmate that comes in gets a

15:34  3   file.   He'd be classified.   In the classification, he

15:34  4   has a file.   Those files, those papers, we give a copy

15:34  5   to the nurse.   Okay?   And we keep a file in our records

15:34  6   for Jail Standards.   Okay?   We keep it until we see the

15:34  7   inmate's already -- the nurse gives us a clearance

15:34  8   saying he's already released, no more logs, then we

15:34  9   stop the logs.   Okay?   All those logs go to his file.

15:34 10   Okay?

15:34 11      Q.   Okay.   If we have a doctor's order that says to

15:34 12   maintain under close observation, then are you telling

15:34 13   me you would do it until the nurse tells you otherwise

15:34 14   to stop keeping the journal?

15:34 15      A.   Yes, sir.

15:34 16      Q.   Okay.   Assuming that the nurse doesn't tell you

15:34 17   to stop keeping a journal, the nurse says you must

15:35 18   continue keeping a journal, then what happens with that

15:35 19   paperwork?   Does it go with him, that particular

15:35 20   prisoner to a specific cell area?

15:35 21      A.   No, sir.   They would not go over there.   What

15:35 22   happens is, let's say it continues, the paperwork.

15:35 23   First thing in the morning when the shift change comes,

15:35 24   they'll pick up -- the lieutenants will pick up that

15:35 25   paperwork, what you call the officer's logs.   And that

BRYANT & STINGLEY, INC.
McAllen       Harlingen       Brownsville
(956) 618-2366     (956) 428-0755     (956) 542-1020

15:35  1    will go inside the log of the officer or sergeant and

15:35  2    night shift.  But you show all three shifts doing that

15:35  3    log, and all those papers when it's finished will go to

15:35  4    his file.  Okay?  It can go to the log's file or go to

15:35  5    his file.  But usually it goes to the file of the

15:35  6    inmate.  So we keep a close eye of what's going on.

15:35  7    And if anyone asks for that paperwork, it should be in

15:35  8    his file.

15:35  9         Q.   Okay.  When the prisoner or inmate is

15:35 10    transferred then to a specific cell area or cell block,

15:35 11    are the detention officers in that particular cell

15:36 12    block then starting their own log and continuing, as

15:36 13    you've just described, basically two journals

15:36 14    concerning food intake, and the other one -- and

15:36 15    fluids, and the other one concerning behavior if

15:36 16    there's instructions to continue with the

15:36 17    documentation?

15:36 18         A.   If I understand correctly your question, sir --

15:36 19    let's say there's an individual that's going upstairs,

15:36 20    and there's a log to be -- yes, sir, the officer

15:36 21    upstairs that's doing the rounds upstairs will continue

15:36 22    that log.

15:36 23         Q.   Okay.  They're supposed to anyway.

15:36 24         A.   Yes.

15:36 25         Q.   All right.  Okay.  And once again, I guess, the

15:36  1    log would be kept every 15 minutes approximately?

15:36  2    A.   Correct, sir.

15:36  3    Q.   Okay.

15:36  4    A.   There's -- so you can know when you talk about

15:37  5    15 minutes, there are different type of logs.  It

15:37  6    depends what the nurse is asking for.  Okay?  There

15:37  7    could be a log of 15 minutes, 30 minutes or 45 minutes.

15:37  8    It depends what is the situation.  They want to know if

15:37  9    the guy is sleeping or not sleeping.  So it depends on

15:37  10   the situation.  Okay.

15:37  11   Q.   Okay.  All right.  But I would assume it's up

15:37  12   to the -- the nurse or the medical personnel to tell

15:37  13   the detention officers what -- how often the prisoner

15:37  14   is supposed to be seen?

15:37  15   A.   Correct.

15:37  16   Q.   And this was a process or procedure that was to

15:37  17   have been done back in April of 2001, is that a fair

15:37  18   statement, concerning these logs and journals?

15:37  19   A.   Yes, sir, should have been done, correct.

15:37  20   Q.   Okay.  As sergeant, what is your present job

15:38  21   description or duties?  What are you doing right now?

15:38  22   A.   Right now, I'm a sergeant back in DC-I, with

15:38  23   the federal inmates, sir.  I'm taking care of one

15:38  24   shift.  And the shift I'm taking care of right now is

15:38  25   the morning shift, sir.

Q.   With the federal inmates?

A.   Federal inmates in DC-I, Ruben Torres.

Q.   And why is the county taking care of federal inmates?

MR. VITTITOE:   Contract.

A.   Contract, sir.

Q.   Okay.  All right.  Have you, in your career as a detention officer, seen anyone who was suffering from alcohol withdrawal?

A.   Yes, sir.

Q.   Okay.  What have -- what -- what is your observation when you've noticed someone suffering from alcohol withdrawal?  What are the signs or symptoms that you would typically see?

A.   The signs and symptoms is -- what you see, number one, is the shakiness.  Okay?  Everybody is different.  Okay?  You see the shakiness.  Some people sweat, believe it or not.  Okay?  And some people just act weird.  You don't know they're on which of the two drugs -- but you've got to consider both.  Okay?  They act weird, they act violent verbally, or they say things out of the ordinary that you're not ready for. And usually what you see, a lot of sleepiness.  They're very tired, some of them.  They just want to sleep. Okay?  And that's when you bring it to the attention of

15:39 1    the nurse right away.

15:39 2        Q.   Okay.  That's what you should do?

15:39 3        A.   Yes, sir.

15:39 4        Q.   All right.  Have you ever had a situation where

15:39 5    you've had to place someone in the -- I guess what I

15:39 6    would call the violent cell or the padded cell?

15:39 7        A.   Correct, sir.  Yes, sir.

15:39 8        Q.   Okay.  When that happens, are there any

15:40 9    requirements for you to contact the medical personnel

15:40 10   when you -- when you find yourself having to place

15:40 11   someone in a padded cell?

15:40 12       A.   What needs to be done, yes, sir.  What needs to

15:40 13   be done right away when you put someone in a padded

15:40 14   cell -- it depends on the situation.  If you put them

15:40 15   in a padded cell, the first thing you need to do is

15:40 16   notify the nurse that you have someone in the padded

15:40 17   cell.  Okay?  That's the number one procedure.  Number

15:40 18   two, you automatically hook the logs right on the door

15:40 19   so you can see them, so any officer who passes by can

15:40 20   see him if he's been drinking and eating food and

15:40 21   checking the inmate himself.  So the log should be hung

15:40 22   on the door right away.

15:40 23       Q.   So there's a journal that is going to be kept

15:40 24   on that piece of paper or pad that's kept next to the

15:40 25   door?

A.   Correct.   Until he gets out of that padded cell, sir.

Q.   And if someone is in the padded cell, how often is that individual supposed to be checked?

A.   Should be checked every 15 -- every 15 to 30 minutes, depends on the situation itself.

Q.   Okay.   And when you say, "Checked," are we actually going inside the cell to check?   Or are we actually just looking through the window to check?

A.   Looking through the window.

Q.   Okay.   And does the nurse also come up to do their own checking, as well?   Or do you know?

A.   They should.   The answer is yes, they should.

Q.   Are you aware of any deaths that have occurred in Cameron County jail before April of 2001?

A.   Yes, sir.

Q.   Okay.   Tell me about those.

          MR. VITTITOE:   Let me just ask you to --
Counsel, let me just object as overbroad.   Can you confine it to a facility and a period of time?

          MR. VALDEZ:   Prior five years.

          MR. VITTITOE:   Okay.   Five years before April or five years before today?

          MR. VALDEZ:   Five years before April of 2001.

15:41  1          MR. VITTITOE:  Go ahead, sir.

15:42  2     A.   The one I could remember -- first place, I've

15:42  3  got to say, we've been real lucky in Cameron County

15:42  4  with that.  I've been there a long time and I've been

15:42  5  lucky.  The last one I can remember was in DC-II, a man

15:42  6  having heart problems on the second floor.  Okay?  We

15:42  7  got him.  They did a great job, the nurses there.  We

15:42  8  got him out of the cell and everything.  They did the

15:42  9  CPR and everything.  When he arrived -- when he arrived

15:42  10  to the hospital, he was considered dead over there at

15:42  11  the hospital when he got there.  Okay.  That's the one

15:42  12  -- from five years, that's the one that we're talking

15:42  13  about.

15:42  14     Q.   Okay.  Is there a certain procedure or protocol

15:42  15  when someone is found dead in the jail?  Is there a

15:42  16  procedure?

15:42  17     A.   Depends what you're talking about, procedures.

15:42  18  There's a code.  Okay?  I ended up putting a code there

15:42  19  on radio, what you call "Code red."  Code red could be

15:42  20  an emergency, could be an officer down, officer getting

15:42  21  beat up or some big emergency.  Everybody needs to

15:43  22  respond on a code red automatically.  Okay?

15:43  23     Q.   All right.  As far as certifications, what

15:43  24  certifications do you hold?

15:43  25     A.   I hold a certification for jail standards, sir,

15:43 1    Jail Commission Jail Standards from -- we follow the

15:43 2    Jail Standards book. Okay? Those are the procedures

15:43 3    we follow. And I have a lot of education on that. I

15:43 4    follow a lot of that. I went to a lot of courses on

15:43 5    that. And the course that we -- all jailers go, they

15:43 6    go to school. Okay? When they get hired, they've got

15:43 7    a year to pass a test. Okay? They go two weeks for

15:43 8    school, and they have one year to pass it, three

15:43 9    chances to pass that test. After three chances they

15:44 10    don't pass it, they're terminated, sir. Okay. And

15:44 11    then from there on, you need your -- every two years

15:44 12    get credit hours to still have your license to go on

15:44 13    for jailer, sir.

15:44 14        Q.  Okay. In Mr. Longoria's case, were you aware

15:44 15    that he was not classified, in Juan Longoria's case?

15:44 16    Were you aware of that?

15:44 17        A.  At the time everything happened, no, sir. But

15:44 18    after that, yes, sir.

15:44 19        Q.  Okay. What would be the explanation, if any,

15:44 20    as to why he was never classified?

15:44 21        A.  I really cannot give you an answer, sir. I

15:44 22    don't know.

15:44 23        Q.  That should never have happened?

15:44 24        A.  Correct.

15:44 25        Q.  Okay. Also he was not given a medical

15:45 1    assessment.  Were you aware of that, as well, while at

15:45 2    the Cameron County jail?

15:45 3        A.  But he was -- I didn't know about that one, no,

15:45 4    sir.

15:45 5        Q.  Okay.  Were you aware that there was no log

15:45 6    maintained on him while he was in the padded cell?

15:45 7        A.  Now, yes, sir.

15:45 8        Q.  Okay.  And I guess that's a "no, no," too,

15:45 9    correct?

15:45 10        A.  Correct, sir.

15:45 11        Q.  There should have been a log maintained?

15:45 12        A.  Correct.

15:45 13        Q.  Now, this log, can you describe it for me as to

15:45 14    what would have typically been kept while he was in a

15:45 15    padded cell?

15:45 16        A.  We changed the log, but this log is a log that

15:45 17    the officers write in every 15 minutes.  Depending on

15:45 18    the minutes they have there, they see him.  They log,

15:45 19    and there's a checklist now to see if the guy's

15:45 20    sleeping, he's active.  It has a lot of things.  Oh,

15:46 21    "other," meaning if he's doing something weird, we'll

15:46 22    write it down, sir.  And these logs that we have is to

15:46 23    see the activity of the inmate, how he's doing.  Okay?

15:46 24    And the other one, like I told you, the other log is

15:46 25    the fluid sheet.  Are we giving him water?  Is he

15:46 1    eating?  Okay.  Are we feeding him three meals a day?

15:46 2    All that kind of stuff, that needs to go in there, too,

15:46 3    sir.

15:46 4        Q.  Okay.  So the log that would typically be on

15:46 5    the door next to the padded cell, as we've been talking

15:46 6    about, would it be the two note pads or two pads, one

15:46 7    for fluids and meals and eats and the other one for

15:46 8    other activities?

15:46 9        A.  Correct, sir.

15:46 10       Q.  Okay.  All right.  Is that the same procedure

15:46 11   that was in place in April of 2001, the --

15:46 12       A.  Yes, sir.

15:46 13       Q.  -- the two sheets of paper?

15:46 14       A.  Yes, sir.

15:46 15       Q.  Now, you indicated to me that there's been a

15:47 16   change in the form or the log the way it's laid out,

15:47 17   correct?

15:47 18       A.  Correct.

15:47 19       Q.  When was that done?

15:47 20       A.  I did that -- just taking a wild guess.

15:47 21   Between 2002, I'm thinking.

15:47 22       Q.  Okay.

15:47 23       A.  Okay.  The only thing that has changed -- it's

15:47 24   almost the same thing.  The only thing is, it's more

15:47 25   easier to handle.  It's mainly a checklist, okay, on

15:47 1   the times and has the signature on the guards taking

15:47 2   care of the inmate himself, okay, the initials of the

15:47 3   guards.

15:47 4       Q.   All right.  And do have you an explanation as

15:47 5   to why it was changed, the old form to a newer form?

6       A.   Usually the way it changed -- when I see --

15:47 7   when I have an inspection by Jail Standards, they come

15:47 8   with good paperwork.  If I see it is good for us, I

15:47 9   will go ahead and change it and have it approved by

15:48 10  Jail Standards.

15:48 11      Q.   So you're the one responsible for making sure

15:48 12  the forms are all updated or that the county meets its

15:48 13  jail standards?

15:48 14      A.   We'll meet it, but it needs to be approved.  We

15:48 15  give it to the chief administrator, whoever is the

15:48 16  chief administrator at that time and we show them what

15:48 17  we have, and they go ahead and change it or not, but we

15:48 18  show them what we have.  Jail Standard has a way to

15:48 19  come with paperwork that all of the jails are using,

15:48 20  they're easier, they're better, and that's what we look

15:48 21  at.  Okay?

15:48 22      Q.   And you're referring to Jail Standards, the

15:48 23  Texas Commission on Jail Standards?

15:48 24      A.   Correct, sir.

15:48 25           MR. VALDEZ:   Okay.  All right.  Do you

```
15:48   1   have any questions, Craig?
15:48   2                   MR. VITTITOE:  Just a few.
15:48   3                   MR. VALDEZ:  Let me pass the witness, and
15:48   4   go ahead and ask yours.
        5                           EXAMINATION
        6   BY MR. VITTITOE:
15:48   7       Q.  Mr. Garcia, you told us that you started with
15:48   8   the Cameron County Sheriff's Office Detention
15:48   9   Department in 1981, as I recall, correct?
15:48  10       A.  '81.
15:48  11       Q.  Yes.
15:48  12       A.  I started at the county jail, sir, in 1981.
15:48  13       Q.  In other words, you've been an employee of the
15:48  14   Cameron County Sheriff's Office at the jail since 1981?
15:48  15       A.  Correct, sir.
15:48  16       Q.  And you've worked over there ever since?
15:49  17       A.  Correct, sir.
15:49  18       Q.  You've been a full-time employee all these
15:49  19   years, correct?
15:49  20       A.  Yes, sir.
15:49  21       Q.  And you've been there, what, twenty- --
15:49  22       A.  22 years going on 23, sir.
15:49  23       Q.  Congratulations.
15:49  24       A.  Thank you, sir.
15:49  25       Q.  And you've been a licensed detention officer
```

15:49  1   since what?  Since 1981?

15:49  2       A.  I passed my license -- it came to me less than

15:49  3   six months in 1981, in that same year.

15:49  4       Q.  Now, the licensing requirements of detention

15:49  5   officers in and for the State of Texas are regulated by

15:49  6   TCLEOSE and Jail Standards; am I correct?

15:49  7       A.  You're correct, sir.

15:49  8       Q.  What is TCLEOSE?  Will you tell the jury that's

15:49  9   going to try this case what TCLEOSE is?

15:49 10       A.  TCLEOSE, to me, is the ones that check all our

15:49 11   standards.  First place, they check our records to see

15:49 12   if we have any criminal records.  They check our

15:49 13   fingerprints and then do all the background

15:49 14   investigation.  And TCLEOSE is the one that makes sure

15:49 15   that we're following the Jail Standard procedures.

15:49 16       Q.  Okay.  TCLEOSE has its main office in Austin,

15:49 17   as I understand it, correct?

15:49 18       A.  You're correct, sir.

15:50 19       Q.  And they actually provide course material for

15:50 20   training jailers, don't they?

15:50 21       A.  Yes, sir.

15:50 22       Q.  And they actually certify seminars and testing

15:50 23   for jailers; am I correct?

15:50 24       A.  You're correct, sir.

15:50 25       Q.  And would it be fair to say that you attended a

number of TCLEOSE sponsored seminars throughout the years?

A. Too many, sir.

Q. Do you typically attend seminars every year?

A. About, yes, sir.

Q. Could you give us an example of the type of training that you have received that are TCLEOSE certified or sponsored?

A. The important ones that we go on and I like to go is the management. That's one. And they have classification. They even have suicidals. And they have lawsuits and everything, you know, lawsuit abuse and all that stuff, showing us what's going on and everything. It's a lot of information.

Q. Would you -- throughout the years, have you received TCLEOSE sponsored training in classifying inmates?

A. Yes, sir.

Q. Have you received TCLEOSE training and similar training in suicide and mental health care and prevention?

A. Yes, sir.

Q. Have you received TCLEOSE sponsored training on searching inmates?

A. Yes, sir.

15:51 1    Q.  Have you received TCLEOSE training -- and is it

15:51 2    customary to see these sorts of training for the jail

15:51 3    detention officers in the area of common first aid and

15:51 4    maybe CPR training?

15:51 5    A.  First aid, yes, sir.  And CPR training, it

15:51 6    depends if they take it or not, sir.

15:51 7    Q.  Have you -- is it -- have you received TCLEOSE

15:51 8    training on culture diversity on how to handle inmates

15:51 9    from different cultures?

15:51 10   A.  That's every two years, sir.  We must take it,

15:51 11   sir.

12         Q.  Is that --

13         A.  To keep our license, sir.

15:51 14   Q.  Is that a Jail Standard requirement?

15:51 15   A.  Yes, sir.

15:51 16   Q.  Now, concerning the -- the medical staff at the

15:52 17   Cameron County jail facilities, those personnel are

15:52 18   nurses that are actually employees of the health

15:52 19   department; am I correct?

15:52 20   A.  Correct, sir.

15:52 21   Q.  And I take it what you're telling us is that

15:52 22   any time someone comes into the jail that is put in a

15:52 23   padded cell, there must be two logs started by the

15:52 24   detention officer, correct?

15:52 25   A.  Correct, sir.

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755     (956)542-1020

15:52  1    Q.  And those are logs to, number one, show fluid

15:52  2  intake, and number two, to show behavior activity.

15:52  3    A.  Correct, sir.

15:52  4    Q.  Is it your understanding that immediately the

15:52  5  nursing staff is to be notified that the inmate is

15:52  6  placed in a padded cell?

15:52  7    A.  Correct, sir.

15:52  8    Q.  And is it your understanding that the nursing

15:52  9  staff, then, does what it needs to do to monitor that

15:52 10  inmate in that padded cell?

15:52 11    A.  Yes, sir.

15:52 12    Q.  Has that been the procedure that has been

15:52 13  undertaken at Cameron County jail for the last many

15:52 14  years?

15:52 15    A.  Yes, sir.

15:53 16         MR. VALDEZ:  Objection.  Leading the

15:53 17  witness.

15:53 18    Q.  Was that the procedure in place in April of

15:53 19  2001 --

15:53 20    A.  Yes, sir.

15:53 21    Q.  -- at the Cameron County jail, also now known

15:53 22  as the old Cameron County jail?

15:53 23    A.  Correct, sir.

15:53 24    Q.  Okay.  There is an exhibit that Counsel has

15:53 25  marked earlier as the Cameron County Jail Division

15:53 1    Operation Plan.  Have you ever seen this type of

15:53 2    document before?

15:53 3       A.  Yes, sir.

15:53 4       Q.  Have you -- would you have seen this kind of

15:53 5    document before April of 2001?

15:53 6       A.  Yes, sir.

15:53 7       Q.  My understanding is this is a practical

15:53 8    procedure on how the Cameron County jail facility

15:53 9    should be operated.  Is that your understanding?

15:53 10       A.  Correct.

15:53 11       Q.  Is it your understanding that these are

15:53 12    procedures that are encouraged and promulgated and

15:53 13    promoted by the Jail Standards?

15:53 14       A.  Yes, sir.

15:53 15       Q.  In fact, on the face of this document, it says

15:53 16    it's required by the Texas Commission on Jail

15:54 17    Standards.

15:54 18       A.  Correct.

15:54 19       Q.  Is it your understanding as an experienced

15:54 20    detention officer, having 22 years of experience, that

15:54 21    the State of Texas through the Texas Commission on Jail

15:54 22    Standards promulgates rules and regulations and

15:54 23    procedures that it attempts to uniformly apply

15:54 24    throughout the state?

15:54 25       A.  Yes, sir.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

15:54 1    Q.   In other words, they have some established

15:54 2  rules and procedures that they require to be

15:54 3  administered in the county jails throughout Texas?

15:54 4    A.   Yes, sir.  We need to follow them or we don't

15:54 5  pass.

15:54 6    Q.   And, in fact, isn't it true that Jail Standards

15:54 7  periodically checks on the -- on the Cameron County

15:54 8  jail to see whether or not its in compliance with state

15:54 9  regulations?

15:54 10   A.   Every year.

15:54 11   Q.   Every year.

     12    A.   Yes, sir.

15:54 13   Q.   Goes through a review process every year?

15:54 14   A.   Correct.

15:54 15   Q.   Did I understand you to say that you're pretty

15:54 16  much in charge of making sure that procedures are

15:54 17  correctly followed at your particular facility?

15:55 18   A.   I'm not in charge.  What I do, as I explained

15:55 19  to him earlier, there's some things, changes when they

15:55 20  come with inspections and I see things and I think it's

15:55 21  good, I bring it to the attention to see if we can get

15:55 22  it okayed.

15:55 23   Q.   So what I'm hearing you say is policy and

15:55 24  procedure is set by state law --

     25    A.   Correct.

15:55 1    Q.  -- through the Texas Commission on Jail

15:55 2    Standards?

15:55 3    A.  Correct.

15:55 4    Q.  And in addition, as far as any deviation from

15:55 5    policy, is the sheriff the only one that has that

15:55 6    authority to deviate from policy?

15:55 7    A.  Correct, sir.

15:55 8    Q.  And I'm talking about whoever the elected

15:55 9    sheriff is at that time.

15:55 10   A.  Correct.  I understand.

15:55 11   Q.  Back in April of 2001, to your knowledge, was

15:55 12   it typical and customary that jail logs would be

15:55 13   started and maintained when an inmate was placed in a

15:55 14   padded cell?

15:55 15   A.  Yes, sir.

15:55 16   Q.  Was it customary and typical and part of policy

15:55 17   for inmates to be classified in the Cameron County jail

15:55 18   back in April of 2001?

15:56 19   A.  Yes, sir.

15:56 20   Q.  Was it typical and customary for the nursing

15:56 21   staff to be informed immediately at or about the time

15:56 22   that an inmate was placed in a padded cell, in

15:56 23   particular, padded cell #1 at the old Cameron County

15:56 24   jail?

15:56 25   A.  Yes, sir.

15:56 1    Q.   That was the practice?

15:56 2    A.   It was practice.

15:56 3    Q.   In fact, that was the procedure?

15:56 4    A.   That's the practice we've always had.

15:56 5    Q.   But assume with me that Juan Longoria was not

15:56 6    classified, and assume further with me that he was --

15:56 7    activity logs were not started by the detention

15:56 8    officers.  And further assume with me that Juan

15:56 9    Longoria was not assessed by the medical staff nursing

15:56 10   -- nurses at the jail.  Would you agree that that was a

15:56 11   failure of procedure?

15:56 12   A.   Yes, sir.

15:56 13   Q.   That should not have happened?

15:56 14   A.   Correct.

15:56 15   Q.   In fact, we have -- the Cameron County jail has

15:56 16   policies and procedures that require the log, correct?

15:57 17   A.   Correct, sir.

15:57 18   Q.   Require the notification of the nursing staff

15:57 19   and would require a nurse assessment; am I correct?

15:57 20   A.   Correct.

15:57 21   Q.   Concerning your seminar requirements and your

15:57 22   compliance with state laws of a detention officer,

15:57 23   would it be fair to say that TCLEOSE is the agency that

15:57 24   has that information?

15:57 25   A.   For the policy, you mean?

BRYANT & STINGLEY, INC.
McAllen          Harlingen         Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

15:57 1    Q.  No.  I'm talking about -- let me ask it this

15:57 2    way.  In other words, TCLEOSE, you've told us, sponsors

15:58 3    courses, educational courses?

15:58 4    A.  Correct.

15:58 5    Q.  They -- they also sponsor and promote and

15:58 6    require standards for detention officers?

15:58 7    A.  Correct.

15:58 8    Q.  It's my understanding that when you complete a

15:58 9    seminar or course of instruction, that that information

15:58 10   is maintained by TCLEOSE to show that you're in

15:58 11   compliance with state law.

15:58 12   A.  Yes, sir.

15:58 13   Q.  Is that your understanding?

15:58 14   A.  Yes, sir.

15:58 15   Q.  So if the sheriff's department or you or anyone

15:58 16   wanted to check on what courses, including yourself,

15:58 17   that you've attended throughout the years, that

15:58 18   information should be available through TCLEOSE; am I

15:58 19   correct?

15:58 20   A.  Correct, sir.

15:58 21   Q.  And as we sit here today, you've had courses

15:58 22   over the last 22 years that you probably can't even

15:58 23   remember that you've attended, right?

15:58 24   A.  There's a lot of them.  I kept all my

15:58 25   certifications, sir, and everything.

15:58 1     Q.  You have all that information in your own file?

15:59 2     A.  Yes, sir.  It might not be a hundred percent,

15:59 3 but I have a lot.

15:59 4     Q.  There's no doubt that you've attended lots of

15:59 5 seminars.

15:59 6     A.  Correct, sir.

15:59 7     Q.  And there's no doubt that you keep up with the

15:59 8 jail policies and procedures, requirements of the

15:59 9 Cameron County jail as promulgated by, not only the

15:59 10 sheriff, but by and through the Texas Commission on

15:59 11 Jail Standards, correct?

15:59 12          MR. VALDEZ:  Objection.  Leading the

15:59 13 witness.

15:59 14     A.  But that's correct, sir.  There's no question

15:59 15 on that one.  We have to.

15:59 16          MR. VALDEZ:  I had to throw one in.

15:59 17     Q.  My understanding, Officer, is that the jail

15:59 18 facilities, that they're overlapping shifts; is that

15:59 19 true?

15:59 20     A.  Overlapping shifts?  What do you mean?  I

15:59 21 understand what you mean, but I want to be sure.

15:59 22     Q.  They're -- my understanding, there's three main

15:59 23 shifts at each facility; is that true?

16:00 24     A.  Right now, we're running in four shifts, sir.

16:00 25 Okay.  It's a rotation of three shifts.  And one stays

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

16:00 1    in the morning.

16:00 2        Q.  How do the shifts -- let me ask you, back in

16:00 3    April -- April of 2001, did you have -- how many shifts

16:00 4    were in place at that time?

16:00 5        A.  In April, at that time, 2001, there were three

16:00 6    shifts, sir, running eight hour shifts.

16:00 7        Q.  And they would be what?

16:00 8        A.  At that time -- and I'm going to say should

16:00 9    have been -- if we changed the hours, should have been

16:00 10   six o'clock in the morning to, let's see, 6:00 to 2:00,

16:00 11   2:00 to 11:00 -- I mean, 2:00 to 10:00, and 10:00 to

16:00 12   all the way to six o'clock in the morning, sir.

16:00 13       Q.  Okay.  Could it be possible that maybe the

16:00 14   shifts vary an hour or so?

16:00 15       A.  They vary about half an hour, sir, every time.

16:00 16       Q.  Do you know what the shifts were for the

16:00 17   nursing staff back then?

16:00 18       A.  If I'm not mistaken, the shifts with the nurse

16:00 19   -- I think the nurse would stay all the way to 7 p.m.

16:00 20   there, if I'm not mistaken, sir.

16:00 21       Q.  Now, at 7 p.m., the nurse leaves the facility,

16:01 22   am I correct, typically and customarily?

16:01 23       A.  Correct, sir.

16:01 24       Q.  And having knowledge of the procedures.  When

16:01 25   an inmate would arrive at the jail upon either a

16:01  1    commitment order or release -- commitment order or an

16:01  2    arrest warrant --

16:01  3        A.    Okay.

16:01  4        Q.    -- showing probable cause after 7 p.m., and

16:01  5    after the nurse has left with injuries or illness or

16:01  6    whatever, would you tell me what the protocol was at

16:01  7    that time?

16:01  8        A.    The protocol is when -- that's when the

16:01  9    sergeant comes into the picture.

10         Q.    Okay.

16:01  11       A.    It was his call.  He'd call the nurse if he

16:01  12   needed to call the nurse, or he would not receive the

16:01  13   inmate.  He would refuse the inmate -- to take him to

16:01  14   get a clearance from the hospital, sir.

16:01  15       Q.    Okay.  So if somebody came to the jail when the

16:01  16   nurse wasn't there during the evening hours with

16:01  17   physical injuries, the shift sergeant would either call

16:02  18   the nurse or refuse the inmate for a medical clearance

16:02  19   from the hospital?

16:02  20       A.    Correct.

16:02  21       Q.    And clearly what I understand when the nurse

16:02  22   was there and an inmate came in, ultimately, that

16:02  23   inmate was supposed to be assessed by a nurse --

16:02  24       A.    Correct.

16:02  25       Q.    -- whether or not that inmate came in with a

16:02 1    medical release or not, correct?

16:02 2        A.   Correct, sir.

16:02 3        Q.   And as I understand it, from what you're

16:02 4    telling me, is the booking officer, as part of the

16:02 5    classification process, would do a premedical

16:02 6    assessment, correct?

16:02 7        A.   Correct.

16:02 8        Q.   Back in 2001, were there computerized questions

16:02 9    that were asked to -- to assess the medical and

16:02 10   psychiatric or psychological condition?

16:02 11       A.   Psychological.  Uh-huh.

16:02 12       Q.   And that would be done by the booking officer?

16:02 13       A.   Correct, sir.

16:02 14       Q.   But in addition to that premedical assessment,

16:02 15   that inmate would also be assessed by an actual visit

16:03 16   by a nurse at some point in time?

16:03 17       A.   Yes, sir.

16:03 18       Q.   Could happen within a matter of hours or -- or

16:03 19   just whatever, depending on how busy you were, correct?

16:03 20       A.   Yes, sir.  Could be right away.  It could be

16:03 21   hours.

16:03 22       Q.   One of the things that has become clear in this

16:03 23   particular case is that Juan Longoria arrived at the

16:03 24   Cameron County jail on April the 11th, 2001 about one-

16:03 25   -- excuse me, 10:15 to 10:30 a.m. with a commitment

16:03 1    order from the judge and with this particular medical

16:03 2    release, which is Lopez No. 4.  And based on your

16:03 3    knowledge, training and experience, Officer Garcia or

16:03 4    Detention Officer Garcia, Mr. Longoria should have been

16:04 5    booked and classified, correct?

16:04 6        A.   Correct, sir.

16:04 7        Q.   And Mr. Longoria should have been assessed by a

16:04 8    nurse without a doubt?

16:04 9        A.   Correct, sir.

16:04 10       Q.   And, furthermore, once he was placed in the

16:04 11   padded cell for his own protection, an activity log

16:04 12   should have been started by the jail personnel.

16:04 13       A.   Correct, sir.

16:04 14       Q.   And the nurse should have been notified so she

16:04 15   could do her assessment for medical reasons, correct?

16:04 16       A.   That's correct.

16:04 17       Q.   And if any of those things were not done, you

16:04 18   just don't know why they weren't done.

16:04 19       A.   Don't know why.  No, sir.

16:04 20       Q.   But that was not the practice, was it?

16:04 21       A.   No, sir.

16:04 22       Q.   Would it be your educated -- based on your --

16:04 23   based on your experience and based on your knowledge of

16:04 24   procedure at the Cameron County jail back at that time,

16:05 25   would you be -- your assessment that somehow he just

16:05 1   fell through the cracks?

16:05 2      A.  Possibility.

16:05 3      Q.  Is there any other logical explanation?

16:05 4      A.  The only thing is -- no, I cannot give you an

16:05 5   answer.  I wasn't there, sir.  I don't know.

16:05 6           MR. VITTITOE:  Thank you.  Pass the

16:05 7   witness.

8                      EXAMINATION

9   BY MR. VALDEZ:

16:05 10      Q.  Mr. Garcia, is it fair to say that the

16:05 11   classification process is -- is in place in order to

16:05 12   ensure the safety of an inmate?

16:05 13      A.  Yes, sir, that is why it's there for.

16:05 14      Q.  And is it also fair to say that the premedical

16:05 15   assessment is in place for the purposes to ensure the

16:06 16   safety of a particular inmate?

16:06 17      A.  Correct, sir.

16:06 18      Q.  Okay.  And is it also fair to say that the

16:06 19   medical assessment by a nurse is in place to ensure the

16:06 20   safety of a particular inmate?

16:06 21      A.  Yes, sir.

16:06 22      Q.  And I guess we could also go on to say it's

16:06 23   fair to say that the log or journal that is supposed to

16:06 24   be conducted by the booking or classification officer

16:06 25   is in place in order to ensure the safety of the

BRYANT & STINGLEY, INC.
McAllen     Harlingen     Brownsville
(956) 618-2366  (956) 428-0755  (956) 542-1020

16:06 1  inmate, correct?

16:06 2      A.  Is that correct.

16:06 3      Q.  And then the log or journal that's supposed to

16:06 4  be done while an inmate is in the padded cell is in

16:06 5  place and also to protect the safety and well-being of

16:06 6  the inmate, correct?

16:06 7      A.  That is correct, sir.

16:06 8      Q.  Okay.  And also you talked about this procedure

16:07 9  that when someone is placed in a padded cell, that the

16:07 10  medical staff is supposed to be notified so they can do

16:07 11  their assessment.  That procedure is in place in order

16:07 12  to ensure the safety of the prisoner, as well, correct?

16:07 13      A.  That's correct, sir.

16:07 14      Q.  And the failure to do any of these procedures

16:07 15  could lead to serious consequences concerning the

16:07 16  prisoner in the way of injury or death.  Would that

16:07 17  also be a fair statement?

16:07 18          MR. VITTITOE:  Let me just object.

16:07 19  Overbroad and speculation.  Go ahead and answer noting

16:07 20  that objection.

16:07 21      A.  Yes, sir.

16:07 22      Q.  Okay.  And these are the things that happened

16:07 23  as to Juan Longoria, correct, that there was no

16:07 24  assessment done, there was no classification done, he

16:07 25  was not seen by any medical personnel, and there's no

16:08 1    logs or journals kept on him.  Is that also true?

16:08 2        A.   What I know right now, yes, sir.

16:08 3        Q.   Okay.  And we know right now that he's dead,

16:08 4    correct?

16:08 5        A.   Correct.

16:08 6             MR. VITTITOE:  Yeah, he's dead.

16:08 7        Q.   And we know that he died in the Cameron County

16:08 8    jail, correct?

16:08 9        A.   That, I cannot answer.

16:08 10       Q.   You don't know whether he died in the Cameron

16:08 11   County jail?

16:08 12       A.   I don't know if it was in the hospital, Cameron

16:08 13   County.  I'm not sure.

16:08 14       Q.   All right.

16:08 15            MR. VITTITOE:  He's trying to drag this

16:08 16   out so he can get to go eat supper.

16:08 17            THE WITNESS:  I thought he was going to

16:08 18   buy supper.

16:08 19            MR. VALDEZ:  Buying supper might be good,

16:08 20   too.  It might be good, too.  Probably pitch in for

16:08 21   that.

16:08 22            THE WITNESS:  Now you got him thinking.

16:09 23            MR. VALDEZ:  I might hurry it up now.  Oh,

24   goodness.

16:09 25            THE WITNESS:  I think he's thinking of

16:09  1    Asados right here.  That's the best place to go right

2    now.

3              MR. VITTITOE:  That's where he went.

4              THE WITNESS:  Oh, has he went?

5              MR. VALDEZ:  Yeah, that's a good place.

6    That was good.

7                   (Off-the-record discussions.)

16:11  8              MR. VALDEZ:  That's all the questions I

16:11  9    have.

10                   (Deposition concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GEORGE GARCIA - ERRATA SHEET

Reasons for changes:  (1)  Clarify the record
                      (2)  Conform to the facts
                      (3)  Correct transcription errors

PAGE LINE  CHANGE FROM/CHANGE TO              REASON

<u>SIGNATURE OF GEORGE GARCIA</u>

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on AUGUST 29, 2003, except as to any corrections I have listed on Page 45 herein.

_____
GEORGE GARCIA

THE STATE OF TEXAS

COUNTY OF _____

          ·SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the _____ day of _____, 2003.

_____
Notary Public in and for
The State of Texas

My commission expires:

_____

```
 1                  IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       BROWNSVILLE DIVISION

 3     MARIA LONGORIA AND MARIA     ) (
       IDALIA GUTIERREZ,            ) (
 4     INDIVIDUALLY AND ON          ) (
       BEHALF OF THE ESTATE OF      ) (   CIVIL ACTION NO.
 5     JUAN LONGORIA, DECEASED,     ) (   B-01-062
                 Plaintiffs         ) (
 6                                  ) (
       VS.                          ) (
 7                                  ) (   JURY DEMANDED
       CAMERON COUNTY, TEXAS,       ) (
 8     THE CITY OF BROWNSVILLE,     ) (
       TEXAS, AND JOHN DOES 1-10,   ) (
 9                 Defendants       ) (

10                   REPORTER'S CERTIFICATE
                    ORAL DEPOSITION OF
11                      GEORGE GARCIA
                     AUGUST 29, 2003

12

13          I, ELIZABETH TORRES, Certified Court Reporter,
       certify that the witness, GEORGE GARCIA, was duly sworn
14     by me, and that the deposition is a true and correct
       record of the testimony given by the witness on AUGUST
15     29, 2003; that the deposition was reported by me in
       stenograph and was subsequently transcribed under my
16     supervision.
            I FURTHER CERTIFY that I am not a relative,
17     employee, attorney or counsel of the parties, nor a
       relative or employee of such attorney or counsel, nor
18     am I financially interested in the action.

19     WITNESS MY HAND on this  8th    day of

20     September , 2003.

21

22         Elizabeth Torres

23     ELIZABETH TORRES, Texas CSR 5516
       Expiration Date: 12-31-04
       Bryant & Stingley, Inc.
24     4900 North 10th, Building A, Suite 3
       McAllen, Texas  78504
25     (956) 618-2366
```

**STIPULATIONS**

Deposition(s) of: ① Robert Lopez ② Joe Elizarde ③ Rumaldo Rodriguez

Cause No.: B-01-062    Style: Maria Longoria, et al.

Date: 8-28-03  Trial Date: Jan.    vs. Cameron County, Texas, et al.

8-29-03  ④ Xavier Lee Hernandez  ⑤ Sylvia Rivas  ⑥ George Garcia

1. This deposition is taken pursuant to:

   ✓ A. Notice                           ___ C. Agreement

   ___ B. Notice and Subpoena            ___ D. Court Order

2. Objections:

   ✓ A. Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.

   ___ B. All objections are reserved.

   ___ C. All objections will be made at the time of taking the deposition.

3. Signature and Delivery:

   ✓ A. The original transcript will be sent to _Alfred R. Valdez_,
   the Custodial Attorney, and the original signature page, along with a copy of the
   transcript(s), will be submitted to _____ the witness or _✓_ the witness' Craig Vittitoe
   attorney, who will return the executed signature page, including any changes, to 1,2,3,4,5,6
   Bryant & Stingley, Inc., within _20_ days of transmittal.

   ___ B. Signature is waived and the reporter will deliver the original transcript and
   exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1. Copy of Transcript: Yes _X_ No _____   Video: (If Applicable) Yes _____ No _____
   (*ASCII Disk and Condensed Transcript included*)

   8/28
   8/29
   e-mail  Yes _____  No _____   e-mail address _____

   Signature: _A. L. Valdez_    Representing: _____

2. Copy of Transcript: Yes _✓_ No _____   Video: (If Applicable) Yes _____ No _____
   (*ASCII Disk and Condensed Transcript included*)

   8/28
   8/29
   e-mail  Yes _✓_ No _____   e-mail address _CHVittitoe@Adamsgraham.com_

   Signature: _CHV_    Representing: _Cameron Cty_

3. Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
   (*ASCII Disk and Condensed Transcript included*)

   e-mail  Yes _____  No _____   e-mail address _____

   Signature: _____    Representing: _____

4. Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
   (*ASCII Disk and Condensed Transcript included*)

   e-mail  Yes _____  No _____   e-mail address _____

   Signature: _____    Representing: _____

1

12:14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA    ) (
IDALIA GUTIERREZ,           ) (
INDIVIDUALLY AND ON         ) (
BEHALF OF THE ESTATE OF     ) (    CIVIL ACTION NO.
JUAN LONGORIA, DECEASED,    ) (    B-01-062
          Plaintiffs        ) (
                            ) (
VS.                         ) (
                            ) (    JURY DEMANDED
CAMERON COUNTY, TEXAS,      ) (
THE CITY OF BROWNSVILLE,    ) (
TEXAS, AND JOHN DOES 1-10,  ) (
          Defendants        ) (

---

ORAL DEPOSITION OF
JOE ELIZARDE
AUGUST 28, 2003

---

ORAL DEPOSITION OF JOE ELIZARDE, produced as a

witness at the instance of the PLAINTIFFS, taken in the

above styled and numbered cause on AUGUST 28, 2003,

reported by ELIZABETH F. TORRES, Certified Court

Reporter No. 5516, in and for the State of Texas, at

the law offices of Adams & Graham, L.L.P., 222 E. Van

Buren, West Tower, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure.

COPY

1                              APPEARANCES

2    COUNSEL FOR PLAINTIFFS:

3                    ALFRED R. VALDEZ
                     LIN & VALDEZ, L.L.P.
4                    7520 Hillcroft
                     Houston, Texas   77081
5
     COUNSEL FOR DEFENDANTS:
6
                     CRAIG VITTITOE
7                    ADAMS & GRAHAM, L.L.P.
                     P.O. Drawer 1429
8                    222 East Van Buren, West Tower
                     Harlingen, Texas   78551-1429
9
                     JOHN A. OLSON
10                   LITIGATION ATTORNEY
                     LEGAL DIVISION COMMISSIONERS COURT
11                   CAMERON COUNTY COURTHOUSE
                     964 E. Harrison Street
12                   Brownsville, Texas   78520

13                              INDEX
                                                    PAGE
14   Appearances................................. 2

15   JOE ELIZARDE:
     Examination by Mr. Valdez................... 3
16   Examination by Mr. Vittitoe................ 62
     Examination by Mr. Valdez.................. 80
17
     Errata Sheet/Signature Page................ 82
18   Reporter's Certificate..................... 84
     Attached to the end of the transcript:   Stipulations
19
                              EXHIBITS
20                                                  PAGE
                                                    MARKED
21   NUMBER        DESCRIPTION

22   1             The Health Services of the
                   Cameron County Jail
23                 Protocols..................... 45

24   2             Cameron County Sheriff's
                   Department Jail Division
25                 Operation Plan................ 46

| | | |
|---|---|---|
| | 1 | **JOE ELIZARDE,** |
| | 2 | having been duly sworn, testified as follows: |
| | 3 | EXAMINATION |
| | 4 | BY MR. VALDEZ: |
| 12:14 | 5 | Q.  Mr. Elizarde, would you please state your full |
| 12:14 | 6 | name? |
| 12:14 | 7 | A.  My name is Jose Eduardo Elizarde. |
| 12:14 | 8 | Q.  And Mr. Elizarde, could you please provide us |
| 12:14 | 9 | with your home address? |
| 12:15 | 10 | A.  (Testimony is agreed to be redacted by both |
| 12:15 | 11 | parties.) |
| 12:15 | 12 | Q.  Could you please spell the street name for us, |
| 12:15 | 13 | please? |
| 12:15 | 14 | A.  (Testimony is agreed to be redacted by both |
| 12:15 | 15 | parties.) |
| 12:15 | 16 | MR. VITTITOE:  Let me ask you -- can we go |
| 12:15 | 17 | off the record?  I just thought of something.  Is that |
| 12:15 | 18 | all right? |
| 12:15 | 19 | MR. VALDEZ:  Sure. |
| 12:15 | 20 | (Off record.) |
| 12:20 | 21 | Q.  Okay.  Mr. Elizarde, I guess I can ask you date |
| 12:20 | 22 | of birth.  Date of birth.  Okay. |
| 12:20 | 23 | A.  12-19-62. |
| 12:20 | 24 | Q.  All right.  Okay.  Where did you go to high |
| 12:20 | 25 | school? |

12:20  1      A.    In Brownsville.  Homer Hanna High School.

12:20  2      Q.    Okay.  Did you graduate from high school?

12:21  3      A.    Yes, sir.

12:21  4      Q.    As far as formal education beyond high school,

12:21  5  did you go to college?

12:21  6      A.    I have a few hours in college, and then I took

12:21  7  some technical training.

12:21  8      Q.    What was the technical training in?

12:21  9      A.    In law enforcement.

12:21 10      Q.    Do you have any military experience?

12:21 11      A.    No, sir.

12:21 12      Q.    Okay.  And when did you begin your career in

12:21 13  law enforcement?

12:21 14      A.    In 1985.

12:21 15      Q.    And how old were you at that time,

12:21 16  approximately?  What was your age?

12:21 17              MR. VITTITOE:  About two years old.

12:21 18      A.    No.  About 20 -- I think I was about 20.

12:21 19      Q.    And where did you begin your law enforcement

      20  career?

12:21 21      A.    With the Cameron County Sheriff's Office Jail

12:21 22  Division.

12:22 23      Q.    1985.  All right.  And what position did you

12:22 24  hold when you first began working for the Cameron

12:22 25  County Sheriff's Division?

A.   Detention officer.

Q.   And as a detention officer, what were your job duties?

A.   Oversee the safety of the prisoners, make sure that they complied with the facility rules, regulations, dis- -- back then, we would disburse medications.

Q.   Not anymore?

A.   No, not anymore.  No.  Things have changed quite a bit since then.

Q.   Okay.  And what else were your job duties back in 1985?

A.   Pretty much that -- that pretty much does it, I mean, as far as detention officer duties.

Q.   All right.  Where are you working right now?

A.   I presently work for the Cameron County Sheriff's Office in the training division.

Q.   And what do you train?

A.   I train law enforcement officers, all the sheriff's deputies, the Cameron County constables, any county law enforcement officers attend our training or my training.

Q.   Okay.  And so you're providing training beyond just those job descriptions for a detention officer; is that correct?

12:23  1    A.   Yes, sir.

12:23  2    Q.   Okay.  How long have you been doing that for?

12:23  3    A.   About two years.

12:23  4    Q.   As a training officer for the past two years,

12:23  5  are you also training jail detention officers?

12:23  6    A.   Yes, sir.

12:23  7    Q.   Now, is your -- are you the sole instructor?

12:23  8  Are you the head instructor at the present time or --

12:23  9    A.   I'm the training coordinator and, at this

12:23 10  present time, the sole instructor.

12:23 11    Q.   Okay.  What certifications do you presently

12:24 12  hold?

12:24 13    A.   I hold an advanced peace officer's license.

12:24 14    Q.   What does that mean?

12:24 15    A.   The peace officer license goes in stages, from

12:24 16  basic, intermediate to advanced, depending on your

12:24 17  training hours and years of experience is how you

12:24 18  achieve each one.  The advanced, you obtain -- obtain

12:24 19  over -- you have to have over 1,200 hours of training

12:24 20  and I believe it's over 15 years of experience, I

12:24 21  believe.

12:24 22    Q.   Okay.  What other certifications do you have?

12:24 23    A.   I have an instructor -- instructor's license.

12:24 24    Q.   And when you say an instructor's license, once

12:24 25  again, to --

12:24  1    A.   Instructor's license, you must have two or more
12:24  2  years of experience teaching or in law enforcement,
12:25  3  plus you must meet the state criteria, go over a 40
12:25  4  hour course and meet the criteria set out by the state
12:25  5  so you can achieve that license.
12:25  6    Q.   What else do you have as far as certification?
12:25  7    A.   It's a special investigator's license.  Same
12:25  8  thing, set up by the state.  It's through a course on
12:25  9  sexual assault and family violence.  And that's about
12:25 10  it.  Oh, I'm sorry.  Firearms instructor.  Same thing
12:25 11  set out.  Firearms instructor is a course that's put on
12:25 12  by the state.  You have some requirements set out to
12:25 13  achieve your license.
12:25 14    Q.   Okay.  Is there a jail certification --
12:25 15    A.   Yes, sir, there's -- there's a detention
12:25 16  officer's certification, which I also possess.  I
12:26 17  forgot about that.
12:26 18    Q.   How long have you held the detention officer's
12:26 19  certification, certificate?
12:26 20    A.   For 18 years.
12:26 21    Q.   All right.  Back in April of 2001, what was
12:26 22  your job title with the Cameron County Sheriff's
12:26 23  Division?
12:26 24    A.   I was a captain for the sheriff's office in
12:26 25  charge of the jail division.

12:28  1  of patrol.  Prior to that, a transportation officer.  A

12:28  2  -- I'm going backwards.  A court liaison officer.  A

12:28  3  booking officer.  And then a detention officer when I

12:28  4  started.

12:28  5      Q.  Okay.  So when you first began, you were a

12:28  6  detention officer.  And a detention officer, we've

12:28  7  already talked about what you did back in 1985.  How

12:28  8  long were you a detention officer for initially?

12:29  9      A.  Approximately, I believe about four-and-a-half

12:29  10  years or close to five.

12:29  11      Q.  Okay.  So that would maybe bring us up to maybe

12:29  12  1990?

12:29  13      A.  About, yes, sir.

12:29  14      Q.  And then thereafter, you became a booking

12:29  15  officer?

12:29  16      A.  Through that -- I was a detention officer for

12:29  17  about a year.  I became a booking officer and court

12:29  18  liaison officer until about ninety- -- about those four

12:29  19  years, four-and-a-half years, which was about '89, '90.

12:29  20      Q.  Okay.  And then after that, after '89 or '90,

12:29  21  you were --

12:29  22      A.  I was a patrolman, also, for about a year,

12:29  23  maybe a year and a half.  Become an investigator -- I

12:29  24  forgot that.  I'm sorry.  Became an investigator for

12:29  25  another couple of years, and then got promoted to

12:31 1    arrange -- you know, make sure transportation was done.

12:31 2    Same thing with transportation from medical

12:31 3    appointments.  Basically just day-to-day operations.

12:31 4    That consisted of everything.

12:31 5        Q.  During that time frame, who were your

12:31 6    assistants?

12:31 7        A.  I had no assistants.

12:31 8        Q.  Okay.  Your job title was that of a captain; is

12:31 9    that correct?

12:31 10        A.  Yes, sir.

12:31 11        Q.  Okay.  Did you have any lieutenants underneath

12:31 12    you?

12:31 13        A.  Yes, sir, there was lieutenants.

12:31 14        Q.  And who were they?

12:31 15        A.  Lieutenant Abel Garcia, Lieutenant Frank

12:32 16    Gonzalez, Lieutenant George Garcia.

12:32 17        Q.  Anyone else?

12:32 18        A.  No, sir.  Those were the only lieutenants.

12:32 19        Q.  Okay.  These three lieutenants that we

12:32 20    mentioned, the Garcia, Gonzalez and Garcia, were they

12:32 21    immediately beneath you, as far as rank and people that

12:32 22    needed to report to you?

12:32 23        A.  Yes, sir.

12:32 24        Q.  Okay.  Were these three lieutenants responsible

12:32 25    for three different shifts?

12:32  1        A.   Actually, three facilities.

12:32  2        Q.   Three facilities?

12:32  3        A.   Yes, sir.

12:32  4        Q.   Okay.  The first Garcia that you mentioned,

12:33  5   what was his first name?

12:33  6        A.   Abel Garcia.

12:33  7        Q.   Abel.  Okay.  Back in April of 2001, what

12:33  8   facility was he in charge of, if you remember?

12:33  9        A.   He was assisting me at the old county jail.

12:33 10   They weren't actually at one facility.  We all kind of

12:33 11   -- everybody kind of rotated and everybody did a little

12:33 12   bit of everything at every facility.  I had them more

12:33 13   to do work -- like Abel Garcia did work for me like at

12:33 14   the old county jail.  Frank Gonzalez would handle

12:33 15   Detention Center No. II, and George Garcia would handle

12:33 16   DC-No. I.

12:33 17        Q.   Okay.  Where was Mr. Juan Longoria being held

12:33 18   in April of 2001?  Do you know what detention center?

12:33 19        A.   Yes.  At the old county jail.

12:33 20        Q.   And where is the old county jail located at?

12:34 21        A.   It's adjacent to the sheriff's office.  It's

12:34 22   the courthouse complex.  It's one big building.

12:34 23        Q.   Okay.  Who was Abel Garcia's -- or the person

12:34 24   below Abel Garcia, if you know, back in April of 2001?

12:34 25        A.   That would be the sergeants -- shift sergeants,

12:34 1    but I don't recall exactly who was on at the time.

12:34 2       Q.  Okay.  The shift sergeants.  As far as you can

12:34 3    recall, was Mr. Juan Longoria always being held at the

12:34 4    old county jail?

12:34 5       A.  Yes, sir.

12:35 6       Q.  Now, tell me a little bit about the training

12:35 7    that you received in order to get your certification as

12:35 .8   a detention officer.

12:35 9       A.  The training was done -- I believe it was an

12:35 10   in-house training back in 1985.  It covered the aspects

12:35 11   of jail standards and dealing with inmates -- sort of

12:35 12   like interpersonal communication, problem solving, that

12:35 13   type of -- of training.

12:35 14      Q.  Okay.  Back in April of 2001, was there any

12:35 15   type of continuing education that a detention officer

12:36 16   had to take in order to maintain their certification?

12:36 17      A.  I don't recall if -- if there was anything in

12:36 18   place at that time.  Personally, I would not know at

12:36 19   that time.

12:36 20      Q.  Okay.  Well, from your personal knowledge, did

12:36 21   you have to go through so many hours of continuing

12:36 22   education in order to maintain your certification as a

12:36 23   detention officer?

12:36 24      A.  No, sir.

12:36 25      Q.  Back in April of 2001, was there any in-house

continuing education programs within the jail facility that y'all would have training programs for your various detention officers?

A. There was a couple of courses that were taught, which, I believe, I don't -- I know for sure one was cultural diversity, which was from the state. It was a state course that was ordered. And I don't recall what the other one was at the time right now.

Q. Okay. Back in April of 2001, did the Cameron County jail have an infirmary?

A. Yes, sir.

Q. Okay. Tell me, if you can recall, how many nurses were there at the infirmary.

A. I believe there might have been two, maybe three assigned to that facility.

Q. Okay. Oh, just strictly at -- would it be strictly assigned to the old county jail or --

A. Yes. I believe total at the time that -- in that time frame that you're talking about, the medical staff was being run by the county health department, which we had no control over or say-so as to where they would go. There was a -- I guess a physician's assistant, Ms. Peatree, and her assistant, Fidel -- I don't remember. I want to say it's Calvillo, I believe, the assistant. And they would kind of do the

12:38  1   assignments as to where people were at.  But usually in

12:38  2   the norm, there were two per facility.  And sometimes,

12:38  3   depending on where they were at, there would be three

12:38  4   at our facility.

12:38  5      Q.  Okay.

12:38  6      A.  So there was a total of about like seven.  I

12:38  7   want to say about seven people assigned to the

12:38  8   infirmary.

12:38  9      Q.  Okay.  Did each of the facilities that we've

12:38  10  been talking about, the old county jail facility, the

12:39  11  Detention Center I and Detention Center II, did each of

12:39  12  these facilities have their own infirmaries?

12:39  13     A.  Yes, sir.

12:39  14     Q.  All right.  And for the benefit of the jury,

12:39  15  what we're talking about when we're speaking about an

12:39  16  infirmary, are we talking about like hospital beds?

12:39  17     A.  No.  No.

12:39  18     Q.  What are you talking about?

12:39  19     A.  It's a name that -- well, since I've been in

12:39  20  the system, it's an area where the nursing staff is at,

12:39  21  the medical staff is at.  And, for example, the one at

12:39  22  the county jail consisted of an examining room, a

12:39  23  waiting room, which are very small areas.  And then the

12:39  24  examining room, they had a desk where they had all

12:39  25  their paperwork in their filing cabinets.  So it wasn't

12:39 1    the norm "infirmary." That's what we called it, the

12:39 2    infirmary. I guess like you could say the nurses

12:39 3    station or first aid station, something like that.

12:39 4        Q. Okay. So was there any form of a bed at all

12:39 5    for a prisoner that might have to, you know, have

12:40 6    special attention or special observation?

12:40 7        A. No. They had, I believe, a -- I'm thinking at

12:40 8    the old -- at the old county jail. The other ones, I'm

12:40 9    not too sure. Yes, I believe -- your standard doctor's

12:40 10   bed -- like when you go to an office visit, they have

12:40 11   the standard --

12:40 12            MR. VITTITOE: Examining table.

12:40 13       A. Yeah. There you go. They had that, I believe.

12:40 14       Q. An examining table?

12:40 15       A. An examining table, yeah.

12:40 16       Q. Okay. The nurses that were associated with the

12:40 17   old county jail back in April of 2001, were these

12:40 18   nurses that stood eight hour shifts or 10 hour shifts

12:40 19   at those facilities? Like they would always be there,

12:41 20   there would always be a nurse on duty?

12:41 21       A. No. No. I think the latest there would be a

12:41 22   nurse was 6:00, 7 p.m., maybe. I believe. They had --

12:41 23   they pretty much came and went, you know. We had no

12:41 24   control over their -- their time or when they were

12:41 25   there. When they would leave, they would advise the

12:41 1    booking office, "I'm the last one here.  I'm leaving.

12:41 2    If you need anything, page us."  They had a pager.

12:41 3        Q.  In April of 2001, approximately how many

12:41 4    prisoners or individuals were being held or detained in

12:41 5    the Cameron County jail?

12:41 6        A.  I couldn't even begin to tell you, sir.  I

12:41 7    would have no idea at this point.

12:41 8        Q.  Well, in April of 2001, what was the maximum

12:41 9    capacity for the Cameron County jail?

12:41 10       A.  I know it's a little bit over 200.  I want to

12:42 11   say 229, maybe is the capacity.  I don't recall.  But I

12:42 12   know it's a little bit over 200.

12:42 13       Q.  Well, maybe we'll try to break it down.  As

12:42 14   best as you can recall in April of 2001, approximately

12:42 15   how many prisoners could the old county jail hold?

12:42 16       A.  That's the one I'm talking about.  About 200 --

12:42 17   I think it was 229.

12:42 18       Q.  I see.

12:42 19       A.  Every facility had a different number.  I

12:42 20   believe DC-No. II was 280 and DC-No. III was like 190,

21         194, something like that.

12:42 22       Q.  I see.  So when you give a number like 229 --

12:42 23       A.  That would be just the old county jail.

12:42 24       Q.  All right.  Thank you.

12:42 25              Now, tell me back in April of 2001, or

12:42 1    specifically on April the 11th of 2001, if a prisoner

12:43 2    is being transferred from the City of Brownsville jail

12:43 3    facility over to the Cameron County jail, tell me what

12:43 4    procedure or process that that individual would find

12:43 5    himself going through?

12:43 6        A.  If the PD arrived with an inmate, they'd come

12:43 7    into the prior receiving area, a guard would pat them

12:43 8    down, make an initial pat down, make sure there was no

12:43 9    weapons or any contraband on them.  Once they were

12:43 10   patted down, they would be placed in a cell, either a

12:43 11   large holding cell or small holding cell, pending --

12:43 12   pending booking until it was their turn to be brought

12:43 13   up and booked.

12:43 14       Q.  Okay.  And tell me what you mean by "booking."

12:43 15   What happens there?

12:43 16       A.  In the booking process, it's a process which

12:44 17   the inmate is asked for his name, date of birth,

12:44 18   social, all his relevant information.  At that time,

12:44 19   the charges are put into the computer.  If there's any

12:44 20   bond set, there's also -- the -- the assessment is

12:44 21   done.  There's -- I believe there's two assessments

12:44 22   done.

12:44 23       Q.  When you say, "Assessments," what do you mean

12:44 24   by assessments?

12:44 25       A.  Observations.  In other words, how did the

12:44 1  inmate come in, you know, who brought them in, what --

12:44 2  how did he come in?  What was he dressed in?  Did he

12:44 3  have any valuables on him?  If so, they take those

12:44 4  valuables, put them -- make them a receipt, put them in

12:44 5  a bag, have the inmate sign for the receipt, give them

12:44 6  a copy, and they're put away.  And then I believe

12:44 7  there's also a premedical, which is done by the guards,

12:44 8  not by -- not by the medical staff.

12:44 9      Q.  Okay.  So there's a premedical assessment?

12:45 10     A.  Yes, sir.

12:45 11     Q.  Okay.  So what we have initially, a prisoner

12:45 12  comes in, he's put in a cell and -- to -- to await his

12:45 13  or her turn to begin the processing, correct?

12:45 14     A.  Yes.  Unless there's nobody before him, then he

12:45 15  goes straight to the processing area.  But if there's

12:45 16  somebody before him, yeah, definitely.

12:45 17     Q.  Next he goes to booking.  And booking, we've

12:45 18  already talked about that.  And then the next step is

12:45 19  there's two assessments, correct?

12:45 20     A.  Yes, sir.

12:45 21     Q.  And one, it sounds like to take an inventory of

12:45 22  what personal property that individual may have?

12:45 23     A.  Yes.

12:45 24     Q.  Okay.  And that's, I assume, done -- is that

12:45 25  also done by a booking officer?  What title would that

12:45 1   person --

12:45 2       A.   Same thing.  It would be detention -- detention

12:45 3   officer is doing everything on the outside of the

12:46 4   counter while the booking officer is entering

12:46 5   everything on the computer.

12:46 6       Q.   Okay.

12:46 7       A.   That's done by the detention officer.

8       Q.   So an assessment is done by a detention

12:46 9   officer.

12:46 10      A.   Yes.

12:46 11      Q.   Okay.  Is a booking officer also considered to

12:46 12  be a detention officer?

12:46 13      A.   Yes, sir.  Yes.  It's just that they do

12:46 14  strictly booking.

12:46 15      Q.   And then we have another individual --

12:46 16      A.   No.  Same -- the same guard that's processing

12:46 17  the inmate at that time when he finishes with the

12:46 18  inventory --

12:46 19      Q.   Okay.

12:46 20      A.   -- begins the premed --

12:46 21      Q.   Assessment.

12:46 22      A.   Assessment.

12:46 23      Q.   You used the word "Premedical assessment."

12:46 24  Okay.  And I guess "premedical" is just to determine

12:46 25  whether or not that individual would require medical

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

12:46 1    treatment.  Is that what we're saying or not?

12:46 2        A.  Yes.  Well, they ask him questions, you know,

12:46 3    "Do you feel all right?  Are you hurt?  Is there

12:46 4    anything you need?  Do you take medications?"  Stuff

12:46 5    like that so that can be forwarded to the medical

12:46 6    department.

12:46 7        Q.  Okay.  And after we have the medical

12:46 8    assessment, then what happens?

12:46 9        A.  After that, they get taken to the laundry room

12:47 10   where they're issued their jail clothing and their

12:47 11   bedding.

12:47 12       Q.  Okay.

12:47 13       A.  While that is being done, a classification is

12:47 14   being done on the inmate, also.

12:47 15       Q.  Okay.

12:47 16       A.  The classification is based upon his answers to

12:47 17   the premed, his answers to the booking at the time, as

12:47 18   far as, you know, like, "Do you know where you're at,"

12:47 19   stuff like that, the common questions.  And then --

12:47 20   then the classification officer takes all of the

12:47 21   factors considered and gives them a cell assignment.

12:47 22       Q.  The process for the classification, are we

12:47 23   talking about something that's done within a few

12:47 24   minutes?  Within a few hours?  Within a day?

12:47 25       A.  The whole booking process, let's say, from

12:47 1   start to the end, should take no more than probably 30

12:48 2   minutes.

12:48 3       Q.   That includes classification, as well?

12:48 4       A.   Yes, sir.

12:48 5       Q.   Can you envision a situation where it would

12:48 6   take longer than 30 minutes?

12:48 7       A.   Yes.

12:48 8       Q.   And what would that be?

12:48 9       A.   Excessive inmates.  I mean, sometimes

12:48 10  Brownsville PD doesn't just come in with one, they come

12:48 11  in with 13, 15.  And then you've got the U. S. Marshals

12:48 12  that come up with another van load.  I mean, you could

12:48 13  have up to 25 prisoners in the cell, you know, at one

12:48 14  time and you've only got one booking officer.  At the

12:48 15  time at the county jail, you only had one booking

12:48 16  officer or one computer going.

12:48 17      Q.   That was back in April of 2001?

12:48 18      A.   Yes.  Back at the old county jail.

12:48 19      Q.   At the time that Juan Longoria came to the

12:49 20  Harris County -- not Harris County -- the Cameron

12:49 21  County jail facility, do you know approximately how

12:49 22  many other individuals accompanied him?

12:49 23      A.   No, sir.

12:49 24      Q.   Okay.  Assuming that we had 30 individuals

12:49 25  arriving at the same time as Mr. Longoria,

12:49 1 approximately how long would that process take?  Three,

12:49 2 four hours?

12:49 3     A.  If not longer.  Maybe almost six hours,

12:49 4 depending again on how smooth things -- things are

12:49 5 rolling, plus you've also got to take into

12:49 6 consideration, inmates are returning from court, okay,

12:49 7 or inmates that may be going to court.  I mean, there's

12:49 8 a lot of things that can happen.  I mean, an inmate can

12:49 9 arrive, let's say, at 10 a.m. and not be processed

12:49 10 until maybe 5 p.m., 6:00, depending, again, on how much

12:49 11 work there was for the day.

12:49 12     Q.  Okay.  Back in April of 2001, what time did the

12:50 13 City of Brownsville Police Department typically bring

12:50 14 over their prisoners?  Or was there any set time?

12:50 15     A.  Usually on the norm, it was in the morning.  So

12:50 16 I believe ten o'clock.  About -- usually about ten

12:50 17 o'clock.

12:50 18     Q.  Okay.

12:50 19     A.  10:30.

12:50 20     Q.  Would it be fair to say, at least in April of

12:50 21 2001, if there was a heavy load, the booking process

12:50 22 should be completed at least by 5:00 or 6 p.m.,

12:50 23 assuming that they started out in the morning there?

12:50 24     A.  I guess it would be fair to say.  Again, it

12:50 25 would all depend on the work.

12:50 1    Q.  But if things are running smoothly, then the

12:50 2    booking process would take -- approximately takes 30

12:50 3    minutes --

12:50 4    A.  Yes, sir.

12:50 5    Q.  -- per person?

12:51 6    A.  Again -- let's say your norm, that the prisoner

12:51 7    arrives, pats down and goes straight into the

12:51 8    process --

12:51 9    Q.  Okay.

12:51 10   A.  -- it would take about 30 -- maybe -- depending

12:51 11   on how slow you are.  Then, again, you do have some

12:51 12   slow officers that could take a little bit longer,

12:51 13   okay?

12:51 14   Q.  Can you envision any situation where an

12:51 15   individual is not classified for some reason and is

12:51 16   taken to a cell?

12:51 17   A.  The only reason they wouldn't classify him is

12:51 18   if he hadn't been processed yet.  Other than that, most

12:51 19   inmates are classified.  That's how you find out where

12:51 20   their housing is at.

12:51 21   Q.  Okay.  Back in April of 2001, did y'all have

12:52 22   what's called a padded cell?

12:52 23   A.  A violent cell, yes.  Well, in the old days, we

12:52 24   used to call it a padded cell, but it was reclassified

12:52 25   as a violent cell.

Q.  Okay.

A.  Or the politically correct word, I guess, was a violent cell.

Q.  Okay.  How did a violent cell look like back in April of 2001?

A.  I don't recall the measurements.  I want to say it was maybe like six feet wide, maybe eight feet long. Pink, bright pink in color.  It had about a four to five inch slab that was covered in -- I don't know exactly what the material would be, but like a thick material, a padded material that would serve as a bed. And it was just a one cell -- had a metal door with a viewing window and a food tray, standard jail door.

Q.  Okay.  Where -- in April of 2001, where was that cell located that was situated in the old county jail?

A.  Yes, sir, at the old county jail.

Q.  Okay.  Is that the only padded jail that was available at all the three facilities?

A.  Yes, sir.

Q.  There was just one?

A.  Yes, sir.  There was two, but one right next to each other.

Q.  Okay.

A.  But one, I believe, they started using for

12:53  1    storage.  I know there was something in it.

12:53  2        Q.  It was a storage room?

12:53  3        A.  I believe so.

12:53  4        Q.  Okay.  Did the padded cell or the violent cell

12:53  5    in April 2001, did it have a video camera in it to

12:53  6    observe the prisoner?

12:53  7        A.  Not that I recall, no, sir.

12:53  8        Q.  Okay.  What were the procedures that detention

12:53  9    officers were supposed to do in the way of documenting

12:54 10    if you had an individual in a padded cell?

12:54 11        A.  It would depend on why the inmate was there,

12:54 12    but the majority of the time, it was inmates that were

12:54 13    aggravated -- arrived aggravated or violent or possibly

12:54 14    a danger to themselves.  As long as they were observed,

12:54 15    you know -- I guess depending on the degree, the

12:54 16    sergeant would make the determination.  Or if a

12:54 17    lieutenant was present, he would make a determination

12:54 18    as to, you know, how often they would be looked --

12:54 19    looked in.  But the cell was right in the hallway,

12:54 20    which is a main thoroughfare for everybody to travel,

12:54 21    so, I mean, you can see the inmate through the window

12:54 22    there.

12:54 23        Q.  Okay.  But as far as written documentation, you

12:54 24    don't know how often there was supposed to be some type

12:54 25    of log being noted?

12:54 1      A.   Again, depending on the condition of the

12:54 2   inmate, that's -- that's how the determination was

12:54 3   made.

12:55 4      Q.   Yes, sir.  But was it -- like was there a

12:55 5   minimum of every 30 minutes you're supposed --

12:55 6      A.   There's -- now, if you're asking me the levels,

12:55 7   there's three levels.

12:55 8      Q.   Okay.

12:55 9      A.   There was a continuous, a 15 minute and a 30

12:55 10  minute.

12:55 11     Q.   Okay.  So when we're talking about levels, what

12:55 12  do you mean by that?  You said there was three levels,

12:55 13  and then you gave me 15 and 30.  What's the other one?

12:55 14     A.   Continuous.

12:55 15     Q.   Oh, okay.

12:55 16     A.   I mean, where you've got direct -- direct --

12:55 17  you're observing this guy directly.

12:55 18     Q.   What do you have, a detention officer with a

12:55 19  chair there sitting there watching?

12:55 20     A.   No.  Usually for that, if -- and then, again,

12:55 21  that was for like -- that was used for more like for

12:55 22  suicidal people where you don't want them to do

12:55 23  something right in front of you, there was a small

12:55 24  holding cell right in front of the booking office which

12:55 25  was maybe like from here from where you're at.  And the

12:55  1    booking officer was there, the guards were there.

12:55  2    Again, that's right at the main entrance, so it's

12:56  3    continually -- continually being observed.

12:56  4        Q.  But -- okay.  This jail cell door that we've

12:56  5    been talking about, is it a solid door?

12:56  6        A.  A solid door with a tray door with a flip --

12:56  7    it's a small area or door that flips open so you can

12:56  8    pass a tray, and then it's also got a window, a small

12:56  9    window.

12:56  10       Q.  Okay.  What's the size of the window?  12

12:56  11   inches by 12 inches?

12:56  12       A.  No.  Maybe six by 12, six by eight, something

12:56  13   like that.

12:56  14       Q.  Okay.

12:56  15            MR. VITTITOE:  It's a viewing window.

12:56  16       A.  It's a viewing window.

12:56  17       Q.  All right.  So in order for a detention officer

12:56  18   to see what's going on, would they have to basically

12:56  19   press their nose up against the viewing window in order

12:56  20   to see inside?

12:56  21       A.  No.  They could pass inside and look through

12:56  22   the window, I mean, unless somebody was up against the

12:57  23   walls.  Naturally you'd have to kind of see if you

12:57  24   could see to the side, but other than that, you just

12:57  25   look in and see if you can see the whole -- it's a

12:57 1  small area.

12:57 2      Q.  Okay.  Well, we have a situation where a

12:57 3  prisoner is supposed to be checked every 30 minutes.

12:57 4  What gives rise to that situation?

12:57 5      A.  Again, usually they were inmates that were a

12:57 6  danger to themselves or had already stated that they

12:57 7  wanted to commit suicide or, again, hurt themselves,

12:57 8  you know.  That -- that's what would give rise to being

12:57 9  watched.

12:57 10     Q.  I was just trying to make a distinction as to

12:57 11 how do you determine whether someone is watched

12:57 12 continuously, how to determine someone should be

12:57 13 watched every 15 minutes and then --

14     A.  Actually, believe it or not --

15     Q.  -- 30 minutes.

12:57 16     A.  Prior to -- prior to being seen by the medical

12:57 17 department --

12:57 18     Q.  Right.

12:57 19     A.  -- that responsibility fell on the sergeant or

12:57 20 the supervisor on duty.  Just based on what he would

12:57 21 feel is like, you know, "This guy needs -- this guy

12:57 22 needs to be watched or this guy could be put over

12:58 23 here," right?  Now, when you're dealing with medical,

12:58 24 they would tell you, "This guy needs to be put on a 15

12:58 25 minute watch.  This guy needs to be on a 30 minute.  Or

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

12:58 1   this guy is on a suicidal day and night watch."  Okay?

12:58 2   Q.  Okay.  Now, when there was a requirement to

12:58 3   have someone watched, say, every 15 minutes, is there a

12:58 4   written log or a journal that's made --

12:58 5   A.  There was a log that was kept, yes.

12:58 6   Q.  Okay.  And I would imagine, was there -- would

12:58 7   there be a log or journal kept if it was also

12:58 8   continuous watch, as well?  I would assume so.

12:58 9   A.  Yes.  I know they kept some -- what they did

12:58 10  was an activity log which was done by the floor guard

12:58 11  there, you know, and they would just note it down.  The

12:58 12  sergeant would note it down, you know.

12:58 13  Q.  Okay.  When you have such a requirement when

12:58 14  someone has to be watched every 15 minutes or

12:58 15  continuous or every 30 minutes, who was responsible for

12:58 16  making sure that written notations were placed in the

12:59 17  journal?

12:59 18  A.  The duty sergeant.

12:59 19  Q.  Okay.  Would the duty sergeant actually do it

12:59 20  himself or herself?  Or would someone -- one of that

12:59 21  person's assistants do it?

12:59 22  A.  Actually, depending on where the inmate was or

12:59 23  the prisoner was at, it could be the sergeant, it could

12:59 24  be the runner or the floor guard, what they call a

12:59 25  floor guard.  They would go by, check on them.  If

12:59 1 everything was okay, they'd initial it and put the

12:59 2 time.

12:59 3    Q.  Okay.  Where was this journal or log kept, in

12:59 4 the sense, was it kept -- did y'all have an office for

12:59 5 it?  Where was it kept?

12:59 6    A.  No.  The journal for the shift would start and

12:59 7 they would put it on the door, tape it up to the door

12:59 8 or on the wall right next to the door where you make

12:59 9 your observations and right -- right then and there

13:00 10 logged on your observations.

13:00 11    Q.  Okay.  All right.  It's my understanding -- and

13:00 12 I'm getting educated in this case -- that when an

13:00 13 individual is transferred from the City of Brownsville

13:00 14 Police Department over to the Cameron County jail, that

13:00 15 they have accompanying with them commitment papers.

13:00 16    A.  Yes, sir.

13:00 17    Q.  Okay.  Could you please tell me what is meant

13:00 18 by commitment papers?

13:00 19    A.  A commitment paper is basically an order issued

13:00 20 by the magistrate or by a judge, you know, any

13:00 21 magistrate commanding the sheriff to take custody of

13:00 22 the prisoner and keep him safe until he has to appear

13:00 23 before a court.

13:00 24    Q.  Okay.  As part of those commitment papers, is

13:00 25 there also some booking sheet that comes along with it

from the City of Brownsville?

A.   I'm not too sure if there's other paperwork that accompanies.  I know that the commitment papers will state the bond, the charges and stuff like that, but I don't think -- I'm not sure, honestly, if there's any other paperwork that accompanies the commitment papers.

Q.   Okay.  How about if someone has previously been to a hospital or seen a doctor?  How does the Cameron County jail personnel know that when a prisoner is being transferred?

A.   Well, for example, if a prisoner comes in, let's say, bandaged or has some type of a dressing or during the process they ask him, "Hey, you know, are you okay?  Have you" -- they'll ask him, "Have you been to a doctor or a hospital?"  If they say yes, then they don't let the officer leave until this guy is questioned.  And then if the officer says, "Yeah, well, he was in the hospital," well, we need a medical release.  The majority of the time, the Brownsville PD knows this, so they already come prepared.  They bring a medical release with the inmate.  Then in that case, the paper would accompany the commitment.

Q.   Okay.  When you're talking about a medical release, what do you envision being a medical release?

13:02 1  What is a medical release?

13:02 2      A.  What we require is they be taken to a hospital,

13:02 3  be checked for whatever injuries they may have.  Once

13:02 4  they've been checked and treated, the doctor signs a

13:02 5  release stating that they're able to be put into jail,

13:02 6  and that's all we need.

13:02 7      Q.  Okay.  What happens if you're informed at the

13:02 8  time of booking that an individual is what's called a

13:02 9  96?

13:02 10     A.  Okay.  What happens?

13:02 11     Q.  Yeah.  You've got -- here you've got a police

13:03 12  officer from the --

13:03 13     A.  From the city?

13:03 14     Q.  From the city bringing along the prisoner.

13:03 15  He's got a medical release.  The booking officer asks,

13:03 16  "Well, what's wrong with him?  Has he been cleared?"

13:03 17  They say, "Yes, but he's a 96."  What do y'all do with

13:03 18  that?

13:03 19     A.  Depending on how their -- their behavior is,

13:03 20  they're -- they're treated just like any other prisoner

13:03 21  at the time, unless something changes, then you deal

13:03 22  with that situation.

13:03 23     Q.  Is there a policy or procedure that if someone

13:03 24  is classified as a 96, that they -- that y'all have a

13:03 25  nurse take a look at them?

13:03 1    A.  Eventually, they're looked at.  But if there's

13:03 2  no nurse on duty -- like let's say during the afternoon

13:03 3  hours if there was no nurse available, you, again,

13:03 4  treat them like every other prisoner until something

13:03 5  happens or he does something that may injure him or

13:03 6  injure somebody else.  You deal with him.  But, I mean,

13:04 7  during the day, let's say if somebody came in and says,

13:04 8  "Hey, we've got a 96," they would probably have the

13:04 9  nurse look at him and then classify him to a different

13:04 10  facility where he could be put in a single cell.

13:04 11    Q.  Back in April of 2001, did Cameron County --

13:04 12  County jail have a policy or procedure of calling up

13:04 13  the folks at the city jail to request additional

13:04 14  medical information if you have some types of medical

13:04 15  papers accompanying the prisoner?

13:04 16    A.  I don't believe so.  I believe once a prisoner

13:05 17  would arrive and if he had a medical release from the

13:05 18  hospital, that was pretty much -- that would pretty

13:05 19  much cover the necessity to eliminate any -- I guess

13:05 20  the county was looking more at liability, you know.

13:05 21  This way he was being cleared by a doctor and he was

13:05 22  safe to go to jail, so that's pretty much all they

13:05 23  required.  I don't think they ever called the city back

13:05 24  and asked them anything.

13:05 25    Q.  What you have in front of you right now are

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

13:05  1   four pieces of paper, and they are marked as Mr. Lopez

13:05  2   Exhibits 1, 2, 3 and 4.  And I'm going to ask you to

13:05  3   take a look at those papers, and then I'm going to ask

13:05  4   you some questions from that, if you would, please,

13:06  5   sir.

13:06  6        A.   Okay.

13:06  7        Q.   All right.  Looking at Mr. Lopez Exhibit Nc. 1,

13:06  8   do you know what that is?

13:06  9        A.   It appears to be a booking sheet from

13:06 10   Brownsville PD.

13:06 11        Q.   And then No. 2, what's that one, sir?

13:06 12        A.   A property voucher from Brownsville PD.

13:07 13        Q.   And No. 3 is?

13:07 14        A.   The arrest narrative also from Brownsville PD.

13:07 15        Q.   And No. 4 is?

13:07 16        A.   It appears to be a copy of the Brownsville

13:07 17   Medical Center, a release, a medical release.

13:07 18        Q.   Okay.  What is marked as Mr. Lopez Exhibit No.

13:07 19   4, is that a type of medical release that you've been

13:07 20   discussing?

13:07 21        A.   Yes, sir.  Just something from the hospital

13:07 22   that stated that they were able to go to jail or be put

13:07 23   in jail.

13:07 24        Q.   As far as the commitment papers that would

13:07 25   accompany an individual from the City of Brownsville

13:07 1    over to the Cameron County jail, would those documents

13:07 2    typically accompany the individual --

13:07 3                    MR. VITTITOE:  Let me just object as

13:07 4    speculation.

13:07 5    Q.   -- back in April of 2001?

13:07 6                    MR. VITTITOE:  Let me just object.  When

13:08 7    you say "typically" -- now, my objection is the

13:08 8    question is overbroad.

13:08 9    Q.   You can still answer the question.

13:08 10                   MR. VITTITOE:  You can answer the

13:08 11   question.

13:08 12   A.   Okay.  That, I couldn't answer.  I can't tell

13:08 13   you if it was typical, because I -- I wasn't at the

13:08 14   booking area at that time.  So as far as I can recall,

13:08 15   no, it wasn't typical that they give you this with

13:08 16   every -- every inmate that was brought in.

13:08 17   Q.   Okay.

13:08 18   A.   As far as I recall.  Unless somebody at the

13:08 19   booking office would request that, I don't think they

13:08 20   would send it.

13:08 21   Q.   Okay.  How about Mr. Lopez Exhibit No. 3?

13:08 22   Would that accompany the commitment papers?

13:08 23                   MR. VITTITOE:  You're talking about the

24         narrative?

13:09 25                   MR. VALDEZ:  Yes, sir.

13:09 1    A.   The narrative?  Typically on all -- on all

13:09 2  arrests from Brownsville PD, I have no knowledge that

13:09 3  they would receive this.

13:09 4    Q.   Okay.

13:09 5         MR. VITTITOE:  Stressing Exhibit 3.

13:09 6    A.   Stressing Exhibit 3, no, narratives were not

13:09 7  customarily attached to the commitment papers.

13:09 8    Q.   Okay.  There's a hand note at the bottom there.

13:09 9  Do you see that, sir, on Exhibit No. 3?

13:09 10   A.   Yes, sir.

13:09 11   Q.   And I believe it's a signature of an

13:09 12  individual.  Do you see who signed that?

13:09 13   A.   It says "4-11," I guess, "01."

13:09 14   Q.   Yes, sir.

13:09 15   A.   And then it says "R" -- "R" something.  "10:20

13:09 16  a.m.  To CCJ-Joe Salinas."  And then I guess his

13:09 17  initials or "RR," or something like that.

13:09 18   Q.   Do you know who Joe Salinas is?

13:09 19   A.   I believe he's a transportation officer,

13:09 20  Brownsville PD officer that transports prisoners to our

13:10 21  facility.

13:10 22   Q.   Okay.  Exhibit No. 4, Lopez Exhibit No. 4,

13:10 23  would that typically accompany the commitment papers

13:10 24  back in April of 2001?

13:10 25         MR. VITTITOE:  Counsel, could we assume in

13:12 1    A.   No.

13:13 2    Q.   -- if that was required?

13:13 3    A.   No, it wouldn't be a problem.

13:13 4    Q.   Okay.  Now, if we have a nurse that says this

13:13 5    -- this guy here needs close observation like every 15

13:13 6    minutes or so, back in April of 2001, did the Cameron

13:13 7    County jail facility have adequate staff to be watching

13:13 8    someone every 15 minutes?

13:14 9    A.   No.  We're probably understaffed.

13:14 10   Q.   So if the nurse indeed makes a comment,

13:14 11   "Listen, Man, y'all have to watch this man every 15

13:14 12   minutes," and y'all say -- you're basically saying

13:14 13   you're understaffed, what would happen to that prisoner

13:14 14   then, what would y'all be able to do?

13:14 15   A.   You had to do it.  You'd have to give up

13:14 16   something else in order to comply with this.  You'd

13:14 17   have to prioritize things, in other words.

13:14 18            MR. VITTITOE:  Could we go off the record

13:14 19   for just a second?

20            MR. VALDEZ:  Sure.

13:14 21            (Off record.)

13:16 22   Q.   From your earlier testimony, sir, you've --

13:16 23   you've told me that at least in April of 2001, excuse

13:16 24   me, there is no, I guess, infirmary in the sense of

13:16 25   with hospital beds there at the jail.

13:16 1    A.  No.

13:17 2    Q.  Okay.  And that is not at any of the various

13:17 3    detention centers, whether it be the old county jail,

13:17 4    the DC-No. II or the DC-No. I?

13:17 5    A.  No, sir.

13:17 6    Q.  Okay.  How about today?  Is there -- under the

13:17 7    new jail building, what's the situation now?

13:17 8    A.  I believe now they do have -- they have a lot

13:17 9    better facility.  I believe they not only have

13:17 10   examining rooms, but if I'm not mistaken, they have

13:17 11   hospital beds.  I can't honestly say.  This is just

13:17 12   bits and pieces, because I'm no longer there.

13:17 13            MR. VITTITOE:  Let me just, for the record

13:17 14   object, responsiveness, and further the answer

13:17 15   speculates.

13:17 16   Q.  Okay.  You think there are, but you're not

13:17 17   sure?

13:17 18   A.  Yeah, I'm not sure.

13:17 19   Q.  Okay.

13:17 20   A.  I'd be lying to you if I told you yes, there

13:17 21   was.  I don't know.

13:17 22   Q.  Okay.  All right.  Back in April of 2001, were

13:18 23   any of the detention officers at the Cameron County

13:18 24   jail medically trained?

13:18 25   A.  What do you mean by "medically trained?"

13:18  1      Q.   Comparable to say like a nurse.

13:18  2      A.   No.

13:18  3      Q.   And, actually, that's a fair comment you made,

13:18  4  so that's going to lead me to another question.  Okay.

13:18  5  Back in April of 2001 at the Cameron County jail

13:18  6  facility, what medical training, if any, did the

13:18  7  detention officers have?

13:18  8      A.   None.

13:18  9      Q.   What medical training, if any, did detention

13:19  10  officers have in the way of maybe like first aid

13:19  11  treatment?  Did y'all even have a course in that?

13:19  12      A.   I believe just what's taught at the basic

13:19  13  academy which is minor first aid, you know, something

13:19  14  like -- you know, put pressure on a bleeding wound and

13:19  15  stuff like that.  But basic, nothing in detail, as far

13:19  16  as hands-on or bandaging, nothing like that.  Just real

13:19  17  basic CPR -- real basic first aid, I'm sorry.  Real

13:19  18  basic first aid.

13:19  19      Q.   Okay.  Back in April of 2001, did the Cameron

13:19  20  County jail personnel have any training even in CPR?

13:19  21      A.   No, sir.

13:19  22      Q.   As part of a certification as a detention

13:20  23  officer, was there any type of medical training at all?

13:20  24      A.   No, sir.

13:20  25      Q.   Back in April of 2001 at the Cameron County

13:20 1    jail facility, did y'all handle a lot of drunks?

13:20 2        A.   Yes.

13:20 3        Q.   Yes?

13:20 4        A.   Yes.

13:20 5        Q.   Okay.  Did y'all handle a lot of people that

13:20 6    were alcoholics in April of 2001?

13:20 7        A.   That I wouldn't know.

13:20 8        Q.   Okay.  Back in April of 2001, did the personnel

13:20 9    at the Cameron County detention center have any

13:20 10   training in people that were suffering from alcohol

13:20 11   withdrawal?

13:20 12       A.   No, sir.

13:21 13       Q.   Do you know what the signs or symptoms are of

13:21 14   an individual that's suffering from alcohol withdrawal?

13:21 15       A.   Personally?

13:21 16       Q.   Yes, sir.

13:21 17       A.   A few of them.  They -- the shakes, they're

13:21 18   cold.  Some are nauseated.  That's about it.

13:21 19       Q.   Now, back in April of 2001, I would imagine the

13:21 20   Cameron County Sheriff's Department had some type of a

13:21 21   manual or a book concerning jail procedures.  Is that

13:21 22   true?  I'm guessing.  Is that a fair statement?  Or do

13:22 23   you know?

13:22 24       A.   I don't believe they're -- give me the date

13:22 25   again.

13:22  1     Q.   Yeah.   In April of 2001, did the Cameron County

13:22  2   Sheriff's Department have a manual concerning jail

13:22  3   procedures?

13:22  4            MR. VITTITOE:   You're talking about

13:22  5   something other than the Cameron County jail policy,

13:22  6   procedures that you've been provided?

13:22  7            MR. VALDEZ:   No.   Actually, that's the one

13:22  8   I'm referring to.

13:22  9     Q.   Have you seen that book?

13:22  10     A.   No.   At that time, I had not seen that book.

13:22  11     Q.   Okay.

13:22  12     A.   So I didn't know if there was one or not.

13:22  13     Q.   All right.   Back in April of 2001, did the --

13:23  14   did the Cameron County detention officers ever receive

13:23  15   any training concerning health services of the Cameron

13:23  16   County jail?

13:23  17     A.   No, sir, not that I'm aware of.

13:23  18     Q.   And during that time frame, you were the jail

13:23  19   administrator?

13:23  20     A.   Yes, sir.

13:23  21     Q.   Did you even know that such a document or

13:23  22   pamphlet even -- or brochure or book ever even existed?

13:23  23            MR. VITTITOE:   Could you be more specific

13:23  24   on what you're referring to?

13:23  25            MR. VALDEZ:   Yes, sir.

13:23 1     Q.  It's called the Health Services of the Cameron

13:23 2 County Jail Protocols.  Let me -- let me hand this to

13:24 3 you.  We can probably have it marked as an exhibit and

13:24 4 we can make specific reference to it.

13:24 5                 (Exhibit 1 marked.)

13:24 6     A.  Mr. Elizarde, I'm going to hand you what has

13:24 7 been marked as Mr. Elizarde Exhibit No. 1 and ask you

13:24 8 -- it's actually pages -- it's entitled "The Health

13:25 9 Services of the Cameron County Jail Protocols."  And it

13:25 10 looks like there are 69 pages to it.  Okay?  I was just

13:25 11 curious.  Have you ever seen this document before?

13:25 12           MR. VITTITOE:  Let him look at it for a

13:25 13 moment.

13:25 14           MR. VALDEZ:  Yes, sir.

13:25 15     A.  This particular document, no, sir, I had not

13:25 16 seen.  I know or I knew at the time that there had to

13:25 17 be one, that it's a requirement.

13:25 18     Q.  Okay.  Back in April of 2001, do you know

13:25 19 whether or not the detention officers were exposed to

13:26 20 some form of training concerning potential medical

13:26 21 problems that could occur there in the Cameron jail?

13:26 22     A.  Not to my knowledge, no, sir.

13:26 23     Q.  Do you know whether or not the sheriff of

13:26 24 Cameron County instructed the detention officers to

13:26 25 become familiar with potential medical emergencies that

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

13:26 1    could occur in the Cameron County jail?

13:26 2        A.   I wouldn't know that.

13:26 3        Q.   Now, let me ask you this.  Did Sheriff Cantu

13:27 4    ever tell you to provide some type of training seminar

13:27 5    to your detention officers?

6        A.   No.

13:27 7            MR. VALDEZ:   Let me -- I want to also have

13:27 8    marked, Craig, as an exhibit number, the "Cameron

9    County Sheriff's Department Jail Division Operation

13:28 10   Plan," as well.

13:28 11           MR. VITTITOE:   Okay.

13:28 12               (Exhibit 2 marked.)

13:28 13       Q.   Mr. Elizarde, I'm going to hand you what has

13:28 14   been marked as Elizarde Exhibit No. 2.  And on the

13:28 15   front cover, it shows it as being the "Cameron County

13:28 16   Sheriff's Department Jail Division Operation Plan."  Do

13:28 17   you see that?

13:28 18       A.   Yes, sir.

13:29 19       Q.   And in looking at it, it appears to be 50 pages

13:29 20   long.

13:29 21       A.   Yes, sir.

13:29 22       Q.   Let me hand that to you, and take a look at

13:29 23   that exhibit, please.

24       A.   Okay.

13:29 25           MR. VITTITOE:   You want to take a break?

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

13:29  1          MR. VALDEZ:  Yeah.

13:29  2          MR. VITTITOE:  Do you want him to read the

13:29  3  whole thing?

13:29  4          MR. VALDEZ:  I don't know.  I just wanted

13:29  5  him to look through that to see whether or not he's

13:29  6  seen that before.

13:29  7      A.   Yes, I have.

13:29  8          MR. VITTITOE:  For example -- well,

13:29  9  anyway, you do what you want to do.

13:29 10          MR. VALDEZ:  Okay.

13:29 11      Q.   When do you recall seeing what has been marked

13:29 12  as Mr. Elizarde Exhibit No. 2?

13:29 13      A.   I believe it was -- I want to say maybe March,

13:30 14  April when I saw that book.

13:30 15      Q.   March April of what year?

13:30 16      A.   Of 2001.

13:30 17      Q.   All right.  What gave rise to you taking a look

13:30 18  at this book that we have marked as Elizarde Exhibit

13:30 19  No. 2?

13:30 20      A.   That it was brought to -- we had not been able

13:30 21  to find the book until somebody was cleaning out one of

13:30 22  the filing cabinets and found a copy of it and brought

13:30 23  it to me.

13:30 24      Q.   Okay.  And when that book was provided to you,

13:30 25  what is marked as Mr. Elizarde Exhibit No. 2, what did

| | | |
|---|---|---|
| 13:30 | 1 | you do with it? |
| 13:30 | 2 | A.   I briefed over it, briefly read it and checked |
| 13:31 | 3 | it, made sure that the compliances from Texas Jail |
| 13:31 | 4 | Standards were there, that we were compliant, and |
| 13:31 | 5 | apparently it was.  The only thing that I was lacking |
| 13:31 | 6 | or I was looking for was the last date of approval, |
| 13:31 | 7 | which I don't believe was on there. |
| 13:31 | 8 | Q.   I see.  Now, in this book that has been marked |
| 13:31 | 9 | as Mr. Elizarde Exhibit No. 2, it has different |
| 13:31 | 10 | sections dealing with admission, release, |
| 13:31 | 11 | classification, health services, on and on.  Do you see |
| 13:31 | 12 | that? |
| 13:31 | 13 | A.   Yes, sir. |
| 13:31 | 14 | Q.   Okay.  What training procedures were in place |
| 13:32 | 15 | to inform the detention officers as to what the |
| 13:32 | 16 | detention officers were supposed to do in order to meet |
| 13:32 | 17 | the requirements that are set forth in Elizarde Exhibit |
| 13:32 | 18 | No. 2? |
| 13:32 | 19 | A.   Most of that was taught to them at the jail |
| 13:32 | 20 | academy, at the basic jail academy. |
| | 21 | Q.   Okay. |
| 13:32 | 22 | A.   Now, the only difference is that the basic jail |
| 13:32 | 23 | academy teaches you what TCLEOSE and Jail Standards |
| 13:32 | 24 | sets out, okay, not what Cameron County wrote in their |
| 13:32 | 25 | operation plan. |

13:32 1    Q.  So my question to you again is this.  What

13:32 2  training procedures did Cameron County Sheriff's

13:32 3  Department do to make sure that its detention officers

13:33 4  were familiar with the information that's set forth in

13:33 5  what has been marked as Elizarde Exhibit No. 2?

13:33 6    A.  I know that it was a -- a practice to give the

13:33 7  employees a copy of that manual and have them read it,

13:33 8  sign off on it.  When we took over in 2001, I'm not

13:33 9  sure if it was being done or not.  That's one thing I

13:33 10  wasn't sure.  I don't know if it was.

13:33 11    Q.  Okay.  Well, let me ask you this then.  It's my

13:33 12  understanding that in January of 2001, that's when

13:33 13  Sheriff Cantu took office; is that correct?

13:33 14    A.  Yes, sir.

13:33 15    Q.  And that's when he became sheriff of Cameron

13:33 16  County.

13:33 17    A.  Yes, sir.

13:33 18    Q.  Okay.  So what programs or training procedures

13:34 19  did Sheriff Cantu have in place to make sure that the

13:34 20  detention officers knew of the information that has

13:34 21  been provided in Elizarde Exhibit No. 2?

13:34 22        MR. VITTITOE:  You're talking about new

13:34 23  detention officers.

13:34 24        MR. VALDEZ:  Just any detention officer.

13:34 25        MR. VITTITOE:  You know, he's been there

13:34  1    20 years.

13:34  2                    MR. VALDEZ:  Yes, sir.

13:34  3        A.   For new employees, I don't think there was --

13:34  4    there was anything in place.

13:34  5        Q.   Okay.  Now, I'm going to -- I guess my question

13:34  6    is going to sound rather repetitive, and maybe it is,

13:34  7    and we're going to get an objection, probably, but

13:34  8    again the question is, for all detention officers, what

13:35  9    policies or procedures did Sheriff Cantu have in place

13:35 10    to make sure that the detention officers were familiar

13:35 11    with the information that is noted in the Cameron

12    County Sheriff's Department Jail Division Operation

13:35 13    Plan shown as Elizarde Exhibit No. 2?

13:35 14        A.   None.

13:35 15        Q.   Mr. Elizarde, it's my understanding that for

13:36 16    whatever reasons back in September of 2001, Mr. Lopez

13:36 17    became the jail administrator.

13:36 18        A.   Yes, sir.

13:36 19        Q.   Okay.  Do you know why that happened or what

13:36 20    happened?  How did that occur?

13:36 21        A.   The sheriff just made a change and put Mr.

13:36 22    Lopez in charge.

13:36 23        Q.   Okay.  Were you ever provided with an

13:36 24    explanation as to why that occurred?

13:36 25        A.   No, sir.

13:36  1      Q.  Did you receive any type of a reprimand during

13:36  2  that time period, basically Cantu -- Sheriff Cantu was

13:36  3  saying, "Mr. Elizarde, I'm going to do a change because

13:36  4  I think you messed up and you didn't do your job

13:36  5  right," or something like that?

13:36  6      A.  No.  I didn't receive a formal reprimand or

13:37  7  anything.

13:37  8      Q.  Okay.  Well, did you receive an informal

13:37  9  reprimand?

13:37 10      A.  I don't know what -- I mean, this was -- I

13:37 11  think it was more of a personal deal, a personal

13:37 12  conflict that we had, and it was more on a -- we had a

13:37 13  personal conversation which I believe may have led up

13:37 14  to this.

13:37 15      Q.  Okay.  What was that, sir?  What was the

13:37 16  conflict?

13:37 17              MR. VITTITOE:  Does it have anything to do

13:37 18  with this?

13:37 19              THE WITNESS:  No, it doesn't at all.

13:37 20              MR. VITTITOE:  I'm going to instruct you

13:37 21  not to answer.

13:37 22      Q.  Did it have anything to do with your job?

13:37 23      A.  My job performance, no.

13:37 24      Q.  Okay.  When you left being a jail administrator

13:37 25  for Cameron County, you were placed in another

52

13:37 1  department; is that correct?

13:37 2      A.  Yes, sir.

13:37 3      Q.  Okay.  Where were you placed?

13:37 4      A.  I was placed in the civil process division.

13:37 5      Q.  Okay.  Was that considered to be a lateral move

13:37 6  or was that considered to be a demotion?

13:38 7      A.  A demotion.

13:38 8      Q.  Okay.  Did you also suffer a reduction in pay,

13:38 9  as well?

13:38 10      A.  Yes.

13:38 11      Q.  All right.  Is there anything noted in your

13:38 12  personnel file with the Cameron County Sheriff's

13:38 13  Department as to an explanation, at least according to

13:38 14  the Cameron County Sheriff's Department, as to why you

13:38 15  were demoted?

13:38 16      A.  None.  At least to my knowledge, none.

13:38 17      Q.  Have you had a chance to look at your personnel

13:38 18  file?

13:38 19      A.  No.

13:38 20            MR. VALDEZ:  Off the record.

13:38 21              (Off record.)

13:39 22      Q.  Okay.  Do you know who Juan Longoria is?

13:39 23      A.  Just because of this situation.  I didn't know

13:39 24  him before.

13:39 25      Q.  Okay.  What do you know about what happened to

13:39 1    Juan Longoria?  Tell me what you know.

13:39 2                   MR. VITTITOE:  Let me object.  Overly

13:39 3    broad.  Be more specific.

13:39 4                   MR. OLSON:  Yeah.

13:39 5        Q.  Okay.  What's your understanding as to how he

13:39 6    died in the Cameron County jail?

13:39 7                   MR. VITTITOE:  Let me object again.  Could

13:39 8    you be more specific?

13:39 9        Q.  What's your understanding as to how he died?

13:39 10                  MR. VITTITOE:  That's fair.

13:39 11                  MR. VALDEZ:  Okay.

13:39 12       A.  I was told that he had died of natural causes.

13:39 13       Q.  Were you the part of any form of an

13:40 14   investigation concerning Juan Longoria?

13:40 15       A.  No, sir.

13:40 16       Q.  Do you have any personal knowledge as to what

13:40 17   was the behavior of Juan Longoria while he was in the

13:40 18   Cameron County jail?  I mean, how he was behaving.

13:40 19       A.  Personal knowledge, no, sir.

13:40 20       Q.  Okay.  Then my next question is, as far as what

13:40 21   people have told you, what is your understanding as to

13:40 22   how he was behaving while he was in the Cameron County

13:41 23   jail?

13:41 24       A.  As far as what I was told, I was told that he

13:41 25   was acting -- that he was delusional, that he was

13:41 1  irrational, that when he was brought in and placed in

13:41 2  the -- in the holding cell, within minutes the inmates

13:41 3  themselves complained about him to the guards, and they

13:41 4  asked that he be removed before anything happened to

13:41 5  him.

13:41 6      Q.   Okay.  Where did you get this information from?

13:41 7      A.   From the detention officers.

13:41 8      Q.   Okay.  And as best as you can recall, who were

13:41 9  those detention officers?

13:41 10      A.   I believe that that was Mr. Mendietta.  I think

13:41 11  it's Luis Mendietta who informed me of -- of that bit,

13:42 12  and I believe Lieutenant Abel Garcia also was present

13:42 13  at the time, and he was also informing me of what had

13:42 14  transpired.

13:42 15      Q.   Okay.  After Mr. Longoria was removed from the

13:42 16  -- I guess it's the general population cell?

13:42 17      A.   What they call the large holding cell.

13:42 18      Q.   The large holding cell.  What was his behavior,

13:42 19  if you know?

13:42 20      A.   After he was removed?  No, sir, after that, I

13:42 21  don't know what his behavior was.

13:42 22      Q.   What have you heard what his behavior was?

13:42 23      A.   I believe the only thing or the only thing I

13:42 24  can recall was -- and again from Mr. Mendietta and

13:43 25  Garcia was that he was claiming that somebody wanted to

13:43 1    kill him and that somebody was after him.

13:43 2        Q.   Okay.   And that was when he was placed in what

13:43 3    they call the violent --

13:43 4        A.   The violent cell.

13:43 5        Q.   Okay.   Do you know whether or not during the

13:43 6    time period that Mr. Longoria was in the violent cell,

13:43 7    was there any written documentation concerning his

13:43 8    condition?

13:43 9        A.   I'm not aware of any.

13:43 10       Q.   Okay.   When someone, such as Juan Longoria is

13:43 11   placed in the violent cell, should there be some type

13:43 12   of written documentation as to what his condition is or

13:43 13   what the observations are while he's in that violent

13:43 14   cell?

13:44 15       A.   Yes, sir.   Usually there would be a log

13:44 16   started.

13:44 17       Q.   But this case concerning Juan Longoria, for

13:44 18   whatever reason, there was not?

13:44 19       A.   No, sir, as far as I know, there was no log

13:44 20   started.

13:44 21       Q.   Have you been given an explanation as to why

13:44 22   there was no log done?

13:44 23       A.   I believe at that time -- at that time when I

13:44 24   asked about the log, that they were extremely busy that

13:44 25   day, and they were short on officers.   And, apparently,

13:44  1    that's why it just -- one sergeant just claims he never

13:44  2    did it, he never started.  And if the sergeant didn't

13:44  3    initiate it, nobody else would initiate that.

13:44  4        Q.  Okay.  If -- let's back up here.  Do we know

13:44  5    approximately what time Juan Longoria was placed into

13:45  6    the -- the padded cell/violent cell?

13:45  7        A.  No, sir, I don't know what time.

13:45  8        Q.  Do we know if --

13:45  9            MR. VITTITOE:  You say "we."  You're

13:45  10   asking him.

       11            MR. VALDEZ:  Yes.

13:45  12            MR. VITTITOE:  I know.

13:45  13            MR. VALDEZ:  Yes, you know.  Okay.  All

13:45  14   right.

13:45  15       Q.  Let me back up just for a moment.

13:45  16            MR. VITTITOE:  Kind of like the Pope, like

13:45  17   the Pope, "We."

13:45  18            MR. VALDEZ:  Well, I'm not there, and I

13:45  19   don't claim to be there.  I have a long way to being

13:45  20   considered a Pope, a long way.

13:45  21       Q.  What -- how many shifts are there or were there

13:45  22   back in April of 2001 at the Cameron County detention

13:45  23   cell for the old county jail?

13:45  24       A.  Three shifts.

13:45  25       Q.  Okay.  And what were the working hours of the

13:45  1    people there?

13:45  2        A.  7:00 to 3:00, 3:00 to 11:00 and 11:00 to 7:00.

13:45  3        Q.  As far as you know, was Mr. Longoria placed in

13:46  4    a violent cell/padded cell during the 7:00 to 3:00

13:46  5    shift from what you can gather?

13:46  6        A.  I believe so, yes.  I believe he was placed

13:46  7    there.

13:46  8        Q.  Okay.  And from what you've told us, we have a

13:46  9    situation that if someone is placed there in that

13:46 10    particular cell, then there's going to be some form of

13:46 11    a written log that's going to be right next to that

13:46 12    cell that while an observation is being made by a

13:46 13    detention officer, they can note the observation.

13:46 14        A.  Yes, sir.

13:46 15        Q.  All right.  Now, for whatever reason, and you

13:46 16    gave us an explanation as to why it might not have been

13:46 17    done, it wasn't done as to Juan Longoria's case.

13:47 18        A.  No, sir.

13:47 19        Q.  And so we have a situation here, it wasn't done

13:47 20    during the 7:00 to 3:00 shift, and then apparently it

13:47 21    wasn't done during the 3:00 to 11:00 shift, either.

13:47 22        A.  Uh-huh.

13:47 23        Q.  Correct?

13:47 24        A.  Yes, sir.

13:47 25        Q.  And then it wasn't done for the 11:00 to 7:00

58

13:47  1    shift, either.

13:47  2        A.   No, sir.

13:47  3        Q.   Okay.  Well, do we have an explanation as to

13:47  4    why the sergeants of any of these shifts didn't take it

13:47  5    upon themselves to start a log?

13:47  6        A.   No.  I couldn't answer why.  I -- I was never

13:47  7    -- even though we asked -- I mean, I don't know why

13:47  8    they just wouldn't do it.

13:47  9        Q.   Do you find it rather odd that you've got a man

13:47 10    who's sitting in that violent cell and you don't have

13:48 11    any notations being made?

13:48 12        A.   Yes.  What I'm not aware of or I don't recall

13:48 13    is if the sergeant himself -- he keeps an activity

13:48 14    log -- if the sergeant ever wrote anything on his

13:48 15    activity log.

13:48 16        Q.   Well, being a jail administrator, did you make

13:48 17    an inquiry as to whether or not the sergeant did?

13:48 18        A.   Yes, I did, but the investigators were there

13:48 19    immediately, and they, you know, they took over all the

13:48 20    paperwork and anything that pertained to the case,

13:48 21    so --

13:48 22        Q.   Well, let me ask you this.  As far as you know,

13:48 23    there is no notations concerning the activity or

13:48 24    behavior of Juan Longoria while he was in that -- that

13:48 25    cell?

13:48  1      A.   That I know of, no, sir.

13:48  2      Q.   While Juan Longoria was there in that violent

13:49  3  cell, was there any detention officer that's capable of

13:49  4  taking his -- what I call vital signs?  Like blood

13:49  5  pressure, respiratory rate.

13:49  6      A.   Was any officer capable of doing that?

13:49  7      Q.   Yes.

13:49  8      A.   If they knew what they were doing, but I mean,

13:49  9  I don't think any were trained in knowing how to do

13:49 10  that.

13:49 11           MR. VITTITOE:   That's not what they do.

13:49 12      A.   I mean, that's -- they don't do that, I mean.

13:49 13           MR. VITTITOE:   They get strangled real

13:49 14  quick.

13:49 15      Q.   Okay.  All right.  If an individual, such as

13:50 16  Juan Longoria, is in the violent cell and you have a

13:50 17  situation where you need to check on him and you have

13:50 18  to open the door, how is that done?

13:50 19      A.   Usually with two officers.  And they would look

13:50 20  through the viewing door first or the viewing window.

13:50 21  If they couldn't see him or if he was like down in a

13:50 22  corner, they would open the door real slowly and --

13:50 23  until they could see him and react to whatever the

13:50 24  inmate would do.

13:50 25      Q.   Would the officers have any type of a baton or

13:50  1   stick --

13:50  2       A.  No, sir.

13:50  3       Q.  So when they go inside of the padded

13:51  4   cell/violent cell, what would they go in with?

13:51  5       A.  Just their hands, that's it.  What they were

13:51  6   dressed in, their uniforms, and that was it.  There's

13:51  7   no -- any type of batons or weapons at all inside the

13:51  8   facility.  Everything was hand -- hands only.

13:51  9       Q.  Okay.  In April of 2001, we talked about the

13:51  10  Cameron County jail would handle a number of people

13:51  11  that were intoxicated or drunk.

13:51  12      A.  Yes, we did.

13:51  13      Q.  Is there any statistical information on that as

13:51  14  to approximately how many drunks --

13:51  15      A.  No, sir.  I doubt that.

13:51  16      Q.  Let me finish the question.  How many drunks

13:51  17  the Cameron County jail facility would handle in any

13:51  18  given month?

13:51  19      A.  No.

13:52  20      Q.  Okay.  You just know there was a lot.

13:52  21      A.  Oh, yeah, especially like on weekends.  You

13:52  22  know, if the sheriff's office brought them in or the

13:52  23  constables would bring them in, yeah, definitely.  We

13:52  24  knew that we handled drunk people on weekends, not

13:52  25  necessarily just on weekends, but weekends were

probably the busiest times for that.

Q.   I'm trying to get you out of here, sir.

A.   That's fine.

Q.   We had -- back in April of 2001, you discussed there was some sergeants that were working there at the old county jail during that time period.  What were those sergeants' names again, if you remember?

A.   I believe it was Luis Mendietta.  I don't remember the first name, but Tenorio, Mr. Tenorio.  And I want to say maybe Juan Vera.

Q.   Okay.  And then underneath them was -- did y'all have privates?

A.   No.  They -- they called them their second man.  Some sergeants, being that they had military experience, would call them a corporal, another one would call them a second man, second key.  In other words, we knew them as the man who would be in charge or the person that would be in charge if the sergeant was out, the assistant, I guess.  That's what we normally know them as.

Q.   Do you happen to know who was the second man or the corporal when Juan Longoria was there in the county jail back in April of 2001?

A.   No, sir.  I wouldn't recall.

Q.   Okay.  Mr. Elizarde, when the Cameron County

13:55  1   jail facility back in April of 2001 received this

13:55  2   medical slip, which is shown on Lopez Exhibit No. 4,

13:55  3   did -- was -- was there a policy or procedure in s

13:55  4   place that the detention officers would call the

13:55  5   Brownsville Police Department and ask for more medical

13:55  6   information?

13:55  7       A.   Unless it was requested by the medical staff,

13:55  8   no, it wasn't a policy that the jail would call and ask

13:55  9   for more information.

13:55 10            MR. VALDEZ:  Okay.  Let me just look over

13:56 11   my notes.  I think that's all the questions I might

13:56 12   have for you.

13:57 13            Why don't you go do your training class.

13:57 14   Thank you for your time.

13:57 15            THE WITNESS:  Okay.

13:57 16            MR. VITTITOE:  I have a few questions of

13:57 17   you just to clarify some of your testimony, if I could,

13:57 18   Mr. Elizarde, and I'll try to be as brief as I can.

      19                        EXAMINATION

      20   BY MR. VITTITOE:

13:57 21       Q.   Earlier you referred to the medical staff at

13:57 22   the jail, and I believe what you're referring to is

13:57 23   actually the nursing staff.

13:57 24       A.   The nursing staff, yes, sir.

13:57 25       Q.   In other words, there's not a medical doctor

A.   Yes.

Q.   Now, is it your understanding, Officer, that if a nurse sees an inmate and examines an inmate and sees the need for medical intervention, that that nurse would call for a medical doctor to look at the inmate?

A.   Yes.

Q.   Now, let's go clarify something else.  You testified earlier that nurses are typically at the jail during daylight hours; am I correct?

A.   Yes, sir.

Q.   If an inmate comes to the jail in the evening hours when the nurses are not on location at the jail and displays a medical condition, isn't it true that the jail personnel will refuse them and tell them, instruct them to take them to a hospital?

A.   Yes.

Q.   For a medical clearance?

A.   For a medical clearance.

Q.   So if someone comes into the jail at night that's beat up, banged up or needs medical attention, does the jail book them into the jail?

A.   No.  They won't even process them.

Q.   What is the policy and the procedure?

A.   As soon as they come in, if it's something visible, they -- immediately the receiving officer will

14:00 1    tell the delivery officer, "We won't take this guy

14:00 2    until you get a medical release."  If it's something

14:00 3    that may not be visible while asking the inmate, you

14:01 4    know, "Are you okay?  Is there anything -- are you

14:01 5    hurt," or this that or the other, if the inmate says,

14:01 6    "Well, yes, I have tightness in my chest," "Well, hold

14:01 7    on.  Go take him and get him a medical clearance," and

14:01 8    so they're sent out.

14:01 9        Q.   Another thing I'd like to talk to you about is,

14:01 10   you're familiar in law enforcement lingo about the 10

14:01 11   code?

14:01 12       A.   Yes.

14:01 13       Q.   A 96 is a 10 code; am I correct?

14:01 14       A.   Yes, sir.  A 10-96 is a 10 code.

14:01 15       Q.   And would you tell the judge or the jury in

14:01 16   this case what a 10 code is?

14:01 17       A.   A 10 code is they -- they're signals that are

14:01 18   put in place for us to know what's going on so that the

14:01 19   regular layperson, if they're monitoring a radio, don't

14:01 20   know what they mean.

14:01 21       Q.   Okay.  Like, for example, a 10-4 means

14:01 22   something, right?

14:01 23       A.   Yes, sir.  10-4.  There's different numbers

14:01 24   assigned to different things that you want to know, and

14:01 25   they're preceded by a 10.

14:01 1       Q.   Well, everybody's heard people say 10-4.

14:01 2  That's like a --

14:01 3       A.   That's universal.  That's universal knowledge.

14:02 4       Q.   That's like CB language?

14:02 5       A.   That's CB language, yes, sir.

14:02 6       Q.   For example 10-50.  Do you remember what a

14:02 7  10-50 is?

14:02 8       A.   Yes, sir, an accident.

14:02 9       Q.   Okay.  That's right.  And 10-99 is what?

14:02 10      A.   A wanted person.

14:02 11      Q.   That's a wanted person.  A 10-96 is?

14:02 12      A.   A mentally ill person or a person --

14:02 13      Q.   A head case?

14:02 14      A.   Yes.

14:02 15      Q.   And that's -- that's one way of an officer

14:02 16 basically signaling to the other officer that this guy

14:02 17 may have head problems?

14:02 18      A.   Problems, yes.

14:02 19      Q.   In other words, may have some -- they could

14:02 20 either be faking or may have -- may have psychiatric

14:02 21 problems.

14:02 22      A.   You don't know what the problem is, but if he's

14:02 23 acting abnormally or strange, you can say, "Hey, this

14:02 24 guy may be a possible 10-96."

14:02 25      Q.   The 10-96 is a nice way for police officers to

14:02 1    communicate with one another that, hey, gives somebody

14:02 2    a heads up of what they might have, right?

14:02 3        A.   Yes.  Yes.

14:02 4        Q.   Okay.  So, in other words, if we came in here

14:03 5    and I would say Alfred is a 96, then that would be a

14:03 6    nice way to say that Alfred's got -- is a head case,

14:03 7    correct?

14:03 8        A.   Keep a heads up that he may --

14:03 9        Q.   But now that I've told him what that means,

14:03 10    he's going to be a little sensitive to me saying that,

14:03 11    right?

14:03 12        A.   Yes, sir.

14:03 13        Q.   Okay.  Now, another clarification.  This --

14:03 14    this particular manual that -- that Counsel asked you

14:03 15    about.

14:03 16        A.   Yes, sir.

14:03 17        Q.   My understanding is that you don't have a

14:03 18    training program where the actual manual is reviewed

14:03 19    and commented upon, et cetera.

14:03 20        A.   No, sir.

14:03 21        Q.   And I'm talking about going through the manual.

14:03 22        A.   Yes, sir, there's nothing.

14:03 23        Q.   But -- but you understand that the Cameron

24    County Sheriff's Department Jail Division Operations

14:03 25    Plan is promulgated by state law?

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

14:03 1    A.   Yes, sir.

14:03 2    Q.   In other words, the state law is regulated by

14:03 3    the Texas Commission on Jail Standards, promulgates the

14:03 4    policies and procedure manuals throughout the state?

14:03 5    A.   Yes, sir.

14:03 6    Q.   So Cameron County has a plan that conforms to

14:04 7    the requirements of the jail standards -- the Texas

14:04 8    Commission on Jail Standards?

14:04 9    A.   Yes, sir.

14:04 10   Q.   Is that your understanding --

14:04 11   A.   Yes, sir.

14:04 12   Q.   -- based on your years of experience, knowledge

14:04 13   and training?

14:04 14   A.   Yes, sir.

14:04 15   Q.   And isn't it true that the state plan that is

14:04 16   administered all over the state is customarily and

14:04 17   regularly taught in TCLEOSE seminars and in Jail

14:04 18   Standard seminars throughout the state?

14:04 19   A.   Yes.

14:04 20        MR. VALDEZ:   Objection.   Leading.

14:04 21   Q.   Is that true?

14:04 22   A.   Yes, it is true.

14:04 23   Q.   Well, let me just ask you this.   Isn't it

14:04 24   customary for jail policies and procedures that are

14:04 25   uniformly applied all over the state, taught at TCLEOSE

14:04 1    seminars and at Jail Standard seminars?

14:04 2        A.  Yes, they are taught.

14:04 3        Q.  And you know that from personal knowledge?

14:04 4        A.  Personal knowledge, yes.

14:04 5        Q.  And just as an aside, throughout your 18 years

14:04 6    -- was it 18 years?

14:04 7        A.  Yes, sir.

14:04 8        Q.  Have you attended many, many courses?

14:04 9        A.  Yes, sir.

14:04 10       Q.  And have you attended TCLEOSE courses?

14:04 11       A.  Yes, sir.

14:04 12       Q.  And have you attended Jail Standard courses?

14:04 13       A.  Yes, sir.

14:04 14       Q.  And not only do you attend and participate,

14:05 15   correct --

14:05 16       A.  Yes, sir.

14:05 17       Q.  -- but you also train?

14:05 18       A.  Yes, sir.

14:05 19       Q.  And your training, are -- are they TCLEOSE

14:05 20   approved training seminars?

14:05 21       A.  Yes, sir.

14:05 22       Q.  How about Jail Standards approved seminars?

14:05 23       A.  Yes, sir.

14:05 24       Q.  So you're actually someone that, not only goes

14:05 25   to these courses throughout the years, but you've, in

14:05 1   the last couple of years, trained yourself?

14:05 2       A.   Yes, sir.

14:05 3       Q.   Now, so let me -- let me make sure I understand

14:05 4   this.   When you started your career in 1985 --

14:05 5       A.   '85.

14:05 6       Q.   -- you had -- what course did you go to?

14:05 7       A.   I went to the basic correction's officer

14:05 8   course.

14:05 9       Q.   And how extensive a course is that?

14:05 10      A.   I don't recall the hours back then.   Right now,

14:05 11  it's 80 hours.   I believe it was probably 40, 50 hours,

14:05 12  maybe.   I don't recall.

14:05 13      Q.   So 80 hours today of -- of instruction?

14:05 14      A.   Yes, sir.

14:05 15      Q.   Okay.   And in addition, what other courses can

14:05 16  you tell us, generally -- I know we're all in a

14:06 17  hurry -- what you've attended throughout the years?

14:06 18      A.   From jail management to several issues relating

14:06 19  to jail administration, budget preparation, a suicide

14:06 20  prevention and detection, gang issues.   And then many

14:06 21  other things that I can't recall right -- right off the

14:06 22  bat.

14:06 23      Q.   A cultural diversity?

14:06 24      A.   Oh, definitely cultural diversity, yes.

14:06 25      Q.   Earlier Counsel asked you some questions

14:06  1    concerning the requirement to maintain a log when

14:06  2    someone is put in a single or the padded or the violent

14:06  3    cell, whatever you want to call it.

14:06  4        A.  Yes, sir.

14:06  5        Q.  Now, that's in the Jail Division Operations

14:06  6    Plan; is it not?

14:06  7        A.  Yes, sir.

14:06  8        Q.  In fact, I can point to you on page 25.  And

14:07  9    also I'll point to you on page 25 -- I was looking at

14:07 10    page 24 earlier -- that certain individuals that are --

14:07 11    that are classified suicidal or mentally disabled

14:07 12    patients are to be checked periodically.

14:07 13        A.  Yes.

14:07 14        Q.  Remember that testimony?

      15        A.  Yes, sir.

14:07 16        Q.  And what did you tell us?  Every 30 minutes or

14:07 17    continuous?

14:07 18        A.  There's continuous, 15 and 30.

14:07 19        Q.  Okay.  Would you read page 25 and see if that

14:07 20    comports to your information and knowledge under

14:07 21    supervision?  Can you just read that for the record?

14:07 22        A.  You want me to read it out loud?

14:07 23        Q.  Yes, sir, for the record.

14:07 24        A.  "All suicidal/mentally disability inmates who

14:07 25    are considered low risk will be checked at 30 minute

intervals.  Moderate risk inmates will be checked at 15

minute intervals, and high risk inmates will receive

continuous, or at least five minute observation.  The

correction officer will speak to the inmate at each

check, examine the inmate and his or her cell closely,

and document observations as appropriate."

Q.  Now, that says in black and white in the

English language, basically, what you said previously

in your testimony, correct?

A.  Yes, sir.

Q.  All right.  And that's right out of what

document?

A.  The Cameron County Sheriff's Department Jail

Division Operation Plan.

Q.  So how long has that particular procedure been

in place?

A.  Since Jail Standards took over the jail, so

it's a mandated thing.  You have to have an operation

plan.

Q.  And that's not been in the last year or two,

that's been --

A.  Oh, no, sir.  That's been since I believe

mid-'70s the Jail Standards was created.  At least

since I've been in -- in '95, I've known of Jail

Standards.

14:08 1    Q.  So the plan that Cameron County has comports to

14:09 2    the requirements of state law.

14:09 3                    MR. VALDEZ:  Objection.  Leading the

4    witness.

5    Q.  Is that true?

6    A.  Can you repeat your question?

14:09 7    Q.  Yeah.  This -- this particular plan -- may I

14:09 8    see it -- is the Cameron County Jail Operation Plan,

14:09 9    correct?

14:09 10   A.  Yes, sir.

14:09 11   Q.  And it's promulgated pursuant to the rules and

14:09 12   requirements of the Texas Commission on Jail Standards?

14:09 13   A.  Yes, sir.

14:09 14   Q.  Okay.  Now -- now, is it -- is it true, just

14:09 15   for clarification, is it true that a person could be

14:09 16   placed in the single padded cell or the violent cell

14:09 17   that is not a suicidal patient or is not mentally ill,

14:09 18   for example, for their own protection?

14:09 19   A.  Yes.

14:09 20   Q.  But still they're to be monitored by law; am I

14:09 21   correct?

14:09 22   A.  Yes.

14:09 23   Q.  Was that -- was that the procedure?

14:10 24   A.  Yes, sir.

14:10 25   Q.  Okay.  Concerning this particular time period

14:10  1    -- well, I don't want to ask that, because you probably

14:10  2    won't know.  Earlier, you testified that you were

14:10  3    looking for this particular manual in March or April.

14:10  4        A.  Yes, sir.  I was looking for it when we took

14:10  5    over in January of 2001.

14:10  6        Q.  Okay.  Had you been familiar with the fact that

14:10  7    there was same or similar manuals throughout the years?

14:10  8        A.  Yes, sir.

14:10  9        Q.  Okay.  So what you're saying is the sheriff

14:10 10    took charge in January as an elected official and --

14:11 11    and -- and you were basically -- came on board as a

14:11 12    jail administrator at that time?

14:11 13        A.  Yes, sir.

14:11 14        Q.  Okay.  Would it be -- to clarify the record,

14:11 15    though, even though you didn't see this particular

14:11 16    manual until March or April of 2001, you were familiar

14:11 17    with it before; am I correct?

14:11 18        A.  Yes, sir.

14:11 19        Q.  Because I -- I ask that, because it's my

14:11 20    understanding it's your recollection that typically the

14:11 21    jail operations plan was customarily given to detention

14:11 22    officers.

14:11 23        A.  Yes, sir.

14:11 24        Q.  Another thing I want to clarify.  You know,

14:11 25    Counsel asked you some questions about, "Well, what did

14:11 1   you do after you learned about this death?"  Isn't it

14:11 2   true that the law enforcement side came in and took

14:12 3   over the investigation?

14:12 4        A.  Yes, sir.

14:12 5        Q.  And that would have been acceptable and

14:12 6   customary?

14:12 7        A.  Yes, sir.

14:12 8        Q.  In other words, had you been going around

14:12 9   asking questions, you might be viewed as being

14:12 10  interfering --

14:12 11       A.  Interfering with the investigation, yes.

14:12 12       Q.  So you took a hands off approach at that time?

14:12 13       A.  Yes.

14:12 14       Q.  There are some things that are clear here that

14:12 15  -- that we don't dispute.  This gentleman was not

14:12 16  classified, correct?

14:12 17       A.  No, sir, he was not.

14:12 18       Q.  You understand that as the administrator at the

14:12 19  time.

14:12 20       A.  Yes, sir.

14:12 21       Q.  And that didn't make you feel good, did it?

      22       A.  No.

14:12 23       Q.  You were unhappy about that?

14:12 24       A.  Yes.

14:12 25       Q.  There's a practice and a procedure, and the

14:12 1    plan requires classification.

14:12 2        A.   Yes.

14:12 3        Q.   Is it your experience and knowledge, and not

14:12 4    only as a longtime jail official, that customarily and

14:12 5    typically inmates were classified at the jail?

14:12 6        A.   Yes.

14:13 7        Q.   Also another failure on the part of the jail

14:13 8    was the failure to have this fellow examined by a nurse

14:13 9    if that would have been indicated to the inmate; am I

14:13 10   correct?

14:13 11       A.   Yes.

14:13 12       Q.   And -- and, of course, you don't know, because

14:13 13   you weren't there at the time.

14:13 14       A.   I wasn't there.

14:13 15       Q.   The third possible failure and clear -- clear

14:13 16   failure here was the failure to maintain an activity

14:13 17   log while this gentleman was in the violent cell; am I

14:13 18   correct?

14:13 19       A.   Yes.

14:13 20       Q.   And that didn't make you feel happy, either?

14:13 21       A.   No.

14:13 22       Q.   In other words, to clarify for the record, when

14:13 23   you found that out, you knew that that was a violation

14:13 24   of jail policy and procedure.

14:13 25       A.   Yes.

14:13  1    Q.  Is it your testimony, based on your knowledge

14:13  2  and experience being at that jail for many years, that

14:13  3  customarily and typically that the jail policy to

14:13  4  maintain an activity log was undertaken?

14:13  5    A.  Yes.

14:13  6    Q.  My understanding that -- did -- while you

14:14  7  cleared out while the investigation was undergoing, in

14:14  8  other words, into the death of this man, it's my

14:14  9  understanding that at some time, though, you did find

14:14 10  out that there was no activity log and this fellow had

14:14 11  not been classified, correct?

14:14 12    A.  Yes, sir.

14:14 13    Q.  And you made inquiry and your understanding was

14:14 14  that, as I recall, you were told that they were too

14:14 15  busy?

14:14 16    A.  They were extremely busy and shorthanded.

14:15 17    Q.  What, if anything, did you do to make certain

14:15 18  that that failure to classify and/or failure to have an

14:15 19  activity log would not happen in the future?

14:15 20    A.  We had a supervisors' meeting soon after this

14:15 21  incident.  Everybody got -- from the lieutenants on

14:15 22  down, as a matter of fact.  I made sure that everybody

14:15 23  knew that I was very upset about what had happened and

14:15 24  that this had better not happen again.

14:15 25    Q.  One other area that I'd like to talk about, and

14:15  1    I know it's uncomfortable, but you were reassigned in

14:15  2    September of 2001; am I correct?

14:15  3        A.   Yes, sir.

14:15  4        Q.   But do you know that your reassignment had

14:15  5    nothing to do with this experience with Juan Longoria?

14:16  6        A.   Oh, no.

14:16  7        Q.   Isn't it true that -- just an education for all

14:16  8    of us here -- that upper management officials in a

14:16  9    county government, and including state government,

14:16  10   serve at the pleasure of the elected official?

14:16  11       A.   Yes, sir.

14:16  12              MR. VALDEZ:   Objection.  Leading the

14:16  13   witness and calls for speculation and this point.

14:16  14   Craig, you've been leading the witness all along here

14:16  15   and I've kept my mouth shut.

14:16  16              MR. VITTITOE:   Well, I understand.

14:16  17       Q.   Let me ask it this way.  Officer -- Officer,

14:16  18   were you reassigned because of your performance or lack

14:16  19   of performance?  Or were you reassigned because the

14:16  20   sheriff made a political decision to make a change?

14:16  21       A.   The sheriff made a political decision to make a

14:16  22   change.

14:16  23       Q.   And, in other words, you know by your -- your

14:17  24   -- your experience and your education and position that

14:17  25   the elected official, whoever that person may be, has

14:17 1    the prerogative to do that with upper management

14:17 2    personnel?

14:17 3        A.   Yes, sir.  I've known that for many years.

14:17 4        Q.   You may not agree with it, but --

14:17 5        A.   Don't agree with it, but must live with it.

14:17 6             MR. VITTITOE:   I believe I'll pass the

14:17 7    witness.

8                        EXAMINATION

9    BY MR. VALDEZ:

14:17 10       Q.   Okay.  Mr. Elizarde, back in April of 2001, was

14:18 11   being shorthanded at the county jail something that was

14:18 12   a problem that had existed for a few months?

14:18 13       A.   Yes.

14:18 14       Q.   Approximately, how long had that problem of

14:18 15   being shorthanded with your detention officers existed,

14:18 16   as far as you can recall?

14:18 17       A.   For years.

14:18 18       Q.   And being shorthanded, did that give rise to

14:18 19   mistakes occurring?

14:18 20            MR. VITTITOE:   Objection.  Overly broad.

14:18 21   Be more specific.

14:18 22       A.   I wouldn't know that.

14:18 23       Q.   Looking at Mr. Elizarde Exhibit No. 2, you had

14:18 24   read from a portion of this document; is that correct?

14:19 25       A.   Yes, sir.

14:19  1      Q.   Okay.   And specifically had read from page 25,

14:19  2  correct?

14:19  3      A.   Yes, sir.

14:19  4      Q.   Okay.   And on page 25, there is a topic called

14:19  5  "Supervision."

14:19  6      A.   Yes, sir.

14:19  7      Q.   And that is -- and that's what you read,

14:19  8  correct?

14:19  9      A.   Yes, sir.

14:19 10      Q.   And from the information that you were able to

14:19 11  gather concerning the detention officers at Cameron

14:19 12  County jail and Mr. Juan Longoria, the detention

14:19 13  officers failed to meet the requirements that are noted

14:19 14  in this particular provision of page 25?

14:19 15      A.   Yes, sir.

14:19 16              MR. VALDEZ:   Okay.   Thank you, sir.

14:19 17              MR. VITTITOE:   Thank you, Joe.

      18                  (Deposition is concluded.)

      19

      20

      21

      22

      23

      24

      25

# STIPULATIONS

Deposition(s) of: ① Robert Lopez ② Joe Elizarde ③ Rumaldo Rodriguez

Cause No.: B-01-062    Style: Maria Longaria, et al.

Date: 8-28-03    Trial Date: Jan.    vs. Cameron County, Texas, et al.

8-29-03 ④ Xavier Lee Hernandez ⑤ Sylvia Rivas ⑥ George Garcia

1.    This deposition is taken pursuant to:
   ✓ A. Notice                      ___ C. Agreement
   ___ B. Notice and Subpoena        ___ D. Court Order

2.    Objections:
   ✓ A. Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
   ___ B. All objections are reserved.
   ___ C. All objections will be made at the time of taking the deposition.

3.    Signature and Delivery:
   ✓ A. The original transcript will be sent to Alfred R. Valdez,
      the Custodial Attorney, and the original signature page, along with a copy of the
      transcript(s), will be submitted to _____ the witness or ✓ the witness' Craig Vittitoe
      attorney, who will return the executed signature page, including any changes, 1, 2, 3, 4, 5, 6 to
      Bryant & Stingley, Inc., within 20 days of transmittal.

   ___ B. Signature is waived and the reporter will deliver the original transcript and
      exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1. Copy of Transcript: Yes X   No _____   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

   8/28
   8/29   e-mail Yes _____  No _____  e-mail address _____

   Signature: A. R. Valdez    Representing: _____

2. Copy of Transcript: Yes ✓   No _____   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

   8/28
   8/29   e-mail Yes ✓  No _____  e-mail address CHVittitoe@Alavisgraham.eor,

   Signature: _____    Representing: Cameron Cly

3. Copy of Transcript: Yes _____  No _____   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

   e-mail Yes _____  No _____  e-mail address _____

   Signature: _____    Representing: _____

4. Copy of Transcript: Yes _____  No _____   Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

   e-mail Yes _____  No _____  e-mail address _____

   Signature: _____    Representing: _____

1

11:00

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2               BROWNSVILLE DIVISION

3   MARIA LONGORIA AND MARIA      ) (
    IDALIA GUTIERREZ,             ) (
4   INDIVIDUALLY AND ON           ) (
    BEHALF OF THE ESTATE OF       ) (   CIVIL ACTION NO.
5   JUAN LONGORIA, DECEASED,      ) (   B-01-062
                Plaintiffs        ) (
6                                 ) (
    VS.                           ) (
7                                 ) (   JURY DEMANDED
    CAMERON COUNTY, TEXAS,        ) (
8   THE CITY OF BROWNSVILLE,      ) (
    TEXAS, AND JOHN DOES 1-10,    ) (
9                Defendants       ) (

10  _____

11                  ORAL DEPOSITION OF
                       ROBERT LOPEZ
12                  AUGUST 28, 2003

13  _____

13      ORAL DEPOSITION OF ROBERT LOPEZ, produced as a

14  witness at the instance of the PLAINTIFFS, taken in the

15  above styled and numbered cause on AUGUST 28, 2003,

16  reported by ELIZABETH F. TORRES, Certified Court

17  Reporter No. 5516, in and for the State of Texas, at

18  the law offices of Adams & Graham, L.L.P., 222 E. Van

19  Buren, West Tower, Harlingen, Texas, pursuant to the

20  Federal Rules of Civil Procedure.

21

22

23

24

25

COPY

2

1                           APPEARANCES

2    COUNSEL FOR PLAINTIFFS:

3                   ALFRED R. VALDEZ
                    LIN & VALDEZ, L.L.P.
4                   7520 Hillcroft
                    Houston, Texas   77081
5
     COUNSEL FOR DEFENDANTS:
6
                    CRAIG VITTITOE
7                   ADAMS & GRAHAM, L.L.P.
                    P.O. Drawer 1429
8                   222 East Van Buren, West Tower
                    Harlingen, Texas   78551-1429
9
                    JOHN A. OLSON
10                  LITIGATION ATTORNEY
                    LEGAL DIVISION COMMISSIONERS COURT
11                  CAMERON COUNTY COURTHOUSE
                    964 E. Harrison Street
12                  Brownsville, Texas   78520

13                           INDEX
                                               PAGE
14   Appearances................................. 2

15   ROBERT LOPEZ:
     Examination by Mr. Valdez................... 3
16
     Errata Sheet/Signature Page................ 44
17   Reporter's Certificate..................... 46
     Attached to the end of the transcript:   Stipulations
18
                            EXHIBITS
19                                             PAGE
                                               MARKED
20   NUMBER        DESCRIPTION

21   1             Brownsville Police Arrest
                   Booking....................... 37
22   2             Brownsville Police Property
                   Voucher....................... 37
23   3             Brownsville Police Arrest
                   Narrative..................... 37
24   4             Brownsville Medical Center
                   Order......................... 37
25

                      BRYANT & STINGLEY, INC.
          McAllen          Harlingen          Brownsville
       (956) 618-2366    (956) 428-0755    (956) 542-1020

3

**ROBERT LOPEZ,**

having been duly sworn, testified as follows:

EXAMINATION

BY MR. VALDEZ:

Q.   Okay.  Would you please state your name, sir?

A.   Robert Lopez.

Q.   And Mr. Lopez, where do you live, sir, your address, please?

A.   Physical or mailing?

Q.   Physical.  Physical address, please.

A.   (Testimony is agreed to be redacted by both parties.)

Q.   Is there a zip code area, zip code?

A.   (Testimony is agreed to be redacted by both parties.)

Q.   And how old a man are you?

A.   I'm 38 years old.

Q.   And your date of birth?

A.   09-26-64.

Q.   And Social Security number?

A.   (Testimony is agreed to be redacted by both parties.)

Q.   And driver's license number?

A.   (Testimony is agreed to be redacted by both parties.)

4

11:01 1    Q.  Good.  I don't know all that.  Okay.  Where

11:01 2    were you born?

11:01 3    A.  Harlingen, Texas.

11:01 4    Q.  Where did you go to high school?

11:01 5    A.  Rio Hondo High School.

11:01 6    Q.  What year did you finish?

11:01 7    A.  12th.

11:01 8    Q.  When did you graduate?  What year?

11:01 9    A.  '83.  I'm sorry.  I got my GED on my 12th -- I

11:01 10   got out halfway through my 12th year.

11   Q.  Okay.

11:01 12   A.  Sorry about that.

11:01 13   Q.  That's all right.  Any military service?

11:01 14   A.  No.

11:01 15   Q.  Okay.  As far as work history, what did you do

11:01 16   after you got out of high school?

11:01 17   A.  I used to work for a convenience store while I

11:01 18   went to the police academy.  And then back in '83, I

11:01 19   got hired as a -- I'm sorry.  '84, I got hired as a

11:01 20   police officer.

11:02 21   Q.  With which police department?

11:02 22   A.  La Feria Police Department.

11:02 23   Q.  And how long did you work for them?

11:02 24   A.  Two years.

11:02 25   Q.  And what position did you hold while you were

11:02 1  with that particular police department?

11:02 2      A.  Police officer.

11:02 3      Q.  You would be called a street cop?

4      A.  Yeah.

11:02 5      Q.  Street police officer?

11:02 6      A.  Patrol, yeah.

11:02 7      Q.  Have you ever had your deposition taken before?

11:02 8      A.  Yes, sir.

11:02 9      Q.  For what purpose?

11:02 10     A.  Civil and criminal.

11:02 11     Q.  Okay.  How many times have you had your

11:02 12 deposition taken before?

11:02 13     A.  Let me see.  Twice.  Two times.  Two times

11:02 14 other than this one.

11:02 15     Q.  Okay.  Could you just briefly tell me what

11:02 16 those cases were about and why your deposition was

11:02 17 required?

11:02 18     A.  One was a -- was taken here actually in this

11:02 19 office.  It was a civil suit on a -- on an accident in

11:02 20 which I took a report in Rio Hondo --

11:02 21     Q.  Okay.

11:02 22     A.  -- involving a lady that fell down at a store.

11:03 23     Q.  All right.

11:03 24     A.  And then the other one was a civil suit I was

11:03 25 involved in between myself and Disney World in Florida.

11:03 1    Q.  Okay.  Why were you involved with a lawsuit in

11:03 2 Disney World in Florida?

11:03 3    A.  I had a slip and fall inside one of their

11:03 4 stores which required surgery on my right wrist.  And I

11:03 5 requested for them to pay my medical bills, which

11:03 6 totaled close to 13,000, and they refused to pay one

11:03 7 cent of it.

11:03 8    Q.  Did y'all get it worked out?

11:03 9    A.  No.  They still refused.  I went to court.  I

11:03 10 sued them, and the jury awarded -- awarded nothing to

11:03 11 me and took their side.

11:03 12    Q.  Okay.  Is that the only two times that you can

11:03 13 recall?

11:03 14    A.  Yeah.  I was involved in another one, but I

11:03 15 thought it was a depo on the criminal side, but it

11:03 16 wasn't a depo.  I'm sorry.

11:03 17    Q.  Well, we're here today as a result of a lawsuit

11:03 18 that's been filed by the Longoria family against

11:04 19 Cameron County, Texas.  Do you understand that?

11:04 20    A.  Yes, sir.

11:04 21    Q.  And you're here for the purposes of giving

11:04 22 testimony concerning that matter.

11:04 23    A.  Yes, sir.

11:04 24    Q.  All right.  What have you reviewed in

11:04 25 preparation for your deposition today?

11:04  1    A.    What have I reviewed?

11:04  2    Q.    Yes, sir.  Have you reviewed any documents?

11:04  3  Have you reviewed any manuals?

11:04  4    A.    No.

11:04  5    Q.    Okay.  Other than talking to your attorneys,

11:04  6  have you talked to anybody else about this case in

11:04  7  preparation for your deposition today?

11:04  8    A.    No.

11:04  9    Q.    Have you provided any written statements

11:04 10  concerning the matter of Mr. Juan Longoria?

11:04 11    A.    No, sir.

11:04 12    Q.    Okay.  Have you, on your own, done any

11:04 13  investigating concerning this matter of Juan Longoria

11:04 14  and how he died in the Cameron County jail?

11:04 15    A.    None at all.

11:04 16    Q.    Okay.  Let's turn back to your work history

11:05 17  again.  All right.  We had you as a police officer for

11:05 18  a couple of years, and then you moved on.  Where did

11:05 19  you go after that?

11:05 20    A.    I spent seven years with the Cameron County

11:05 21  Sheriff's Office from '86 to '92, I believe.

11:05 22    Q.    With the Cameron County Sheriff's Department.

11:05 23  And what did you do for them?

11:05 24    A.    I was a street patrol officer.

11:05 25    Q.    And when you left them in '92, what position

11:05 1    did you hold?

11:05 2        A.  With the sheriff's office?

11:05 3        Q.  Yes.

11:05 4        A.  It was the patrol.  I spent the whole seven

11:05 5    years with the patrol.

11:05 6        Q.  Okay.  As far as a rank or grade, what --

11:05 7        A.  Just deputy sheriff.

11:05 8        Q.  All right.  In order to become a Cameron County

11:05 9    deputy sheriff back in 1986, what did you have to do as

11:05 10   far as training?

11:05 11       A.  You'd have to pass a -- it was a police

11:06 12   academy.  I don't remember exactly how many hours it

11:06 13   was back then.  It changes every so often.  And you

11:06 14   have to pass a state test, a TCLEOSE state test that

11:06 15   gets you certified to be a peace officer.

11:06 16       Q.  Okay.  During the six or seven years that you

11:06 17   were affiliated with the Cameron County Sheriff's

11:06 18   Department between the time frame of 1986 through 1992,

11:06 19   did y'all have to do any continuing education or

11:06 20   training programs?

11:06 21       A.  Yes.  The state requires you to do 40 hours

11:06 22   every two years.

11:06 23       Q.  Okay.  And that 40 hours every two years, what

11:06 24   does that involve?

11:06 25       A.  Or more.  Well, you've got to do your cultural

11:08  1      Q.   Okay.   Did the constable's office even have a

11:09  2  holding cell?

11:09  3      A.   No.

11:09  4      Q.   Okay.   When you arrested someone, where would

11:09  5  you take your prisoners?

11:09  6      A.   We used the jail in the city of Los Fresnos,

11:09  7  which is about 15 miles away.

11:09  8      Q.   Okay.   So now we're up to the year 2000.   And

11:09  9  what did you do after that?

11:09 10      A.   I won my third term as a constable and I

11:09 11  resigned to take an administrative slot with Sheriff

11:09 12  Cantu here in Cameron County.   And I started that, I

11:09 13  believe, in January of 2001.

11:09 14      Q.   Okay.   Okay.   So in January of 2001, you took

11:09 15  an administrative position with Sheriff Cantu.

11:09 16      A.   Yes, sir.

11:09 17      Q.   Okay.   For Cameron County.   And that

11:09 18  administrative position that you took, what exactly was

11:09 19  that position?

11:10 20      A.   I was a -- I was appointed captain to oversee

11:10 21  the budgetary and patrol division of the sheriff's

11:10 22  office.

11:10 23      Q.   Okay.   Okay.   I have captain to oversee the

11:10 24  budget of the sheriff's division.   And what else was

11:10 25  there?

A.   And patrol.

Q.   And patrol.  Okay.  Did this job duty include anything with managing the jail facilities of that county?

A.   No, sir.

Q.   No?

A.   No, sir.

Q.   Okay.  And are you still holding this same position?

A.   Just title.  All -- all I do now is -- well, no.  To answer your question, no.

Q.   Okay.  So what are you doing now?

A.   They -- they changed my title.  I'm a chief administrator.  And all I do is I administrate the office of the sheriff's office.  I don't do jail.  I don't do patrol, just -- just the office work over there.

Q.   Okay.  I'm not a very bright guy, so you're going to have to explain.  What exactly are you doing?

A.   Okay.  I oversee the budgetary process.  I oversee the payroll.  I oversee the order of equipment. Any -- any purchase orders that have to be made have to be approved by me.  I do all the invoices that have to be approved for payment.  And I attend commissioner court meetings.

11:11 1     Q.  Over the past two years, have you even stepped

11:11 2 foot in the county jail?

11:11 3     A.  Yes, sir.

11:11 4     Q.  Okay.  All right.

11:11 5           MR. VITTITOE:  Hit a home run there.

11:12 6     Q.  Okay.  Well, then my next question is, you went

11:12 7 to jail management school?

11:12 8     A.  Yes, sir.

11:12 9     Q.  Okay.  Why did you go to jail management

11:12 10 school?

11:12 11     A.  Because I was overseeing the jail at one point.

11:12 12     Q.  Okay.  When were you overseeing the jail?  Time

11:12 13 frame.

11:12 14     A.  Approximately September 2002 to the summer --

11:12 15 let me see.  What year is it?  2003?

11:12 16           MR. VITTITOE:  This is 2003, yeah.  Can we

11:12 17 go off the record?

18           MR. VALDEZ:  Sure.

11:12 19               (Off record.)

11:12 20     A.  September 2001 till about the summer of 2002.

11:12 21           MR. VITTITOE:  We're back on the record.

11:12 22           THE WITNESS:  Yeah.

23           MR. VALDEZ:  Back on the record.

24           MR. VITTITOE:  Okay.

11:12 25           THE WITNESS:  Sorry about that.

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | MR. VALDEZ:  That's fine.                                 |
| 11:12 | 2  | THE WITNESS:  I'm trying to remember my                  |
| 11:12 | 3  | dates.                                                    |
| 11:12 | 4  | MR. VITTITOE:  I understand.                              |
| 11:12 | 5  | Q.  So -- so I have a complete understanding of          |
| 11:12 | 6  | what the record is, you were responsible for overseeing  |
| 11:13 | 7  | the Cameron County jail from September of 2001 until     |
| 11:13 | 8  | the summer of 2002?                                       |
| 11:13 | 9  | A.  That's correct.                                       |
| 11:13 | 10 | Q.  Okay.  And how did you find yourself holding         |
| 11:13 | 11 | that job responsibility?                                  |
| 11:13 | 12 | A.  The -- the sheriff just appointed me at that        |
| 11:13 | 13 | time.                                                     |
| 11:13 | 14 | Q.  Was there any specific reason as to why you         |
| 11:13 | 15 | were appointed during that time frame?                   |
| 11:13 | 16 | A.  No.  The sheriff just appointed me at that         |
| 11:13 | 17 | time.  He made the decision, and I oversaw the patrol    |
| 11:13 | 18 | site at a high ranking, so he just shifted me over at    |
| 11:13 | 19 | that time.                                                |
| 11:13 | 20 | Q.  Okay.  Who was holding that position before         |
| 11:13 | 21 | September of 2001?                                        |
| 11:13 | 22 | A.  Joe Elizarde.                                         |
| 11:13 | 23 | Q.  Sorry?                                                |
| 11:13 | 24 | A.  Joe Elizarde.                                         |
| 11:13 | 25 | Q.  Elizarde.  That's the fellow we're going to be       |

11:13 1    talking to this afternoon, I guess.

11:13 2        A.   Next.  I think next, if I'm not mistaken.

11:13 3        Q.   Okay.  So what happened?  Joe resigned?  Joe

11:13 4    stepped down?  Joe got fired?  Why did this position

5    become open?

11:14 6        A.   He was reassigned to -- I think he became a

11:14 7    training officer.

11:14 8        Q.   Okay.  Was that a promotion?  A lateral move

11:14 9    for Joe?  Or was it a drop down for Joe?

11:14 10       A.   It was a drop down.

11:14 11       Q.   Okay.  Why was Joe reassigned?  What happened?

11:14 12       A.   I have no idea, sir.  The sheriff made some

11:14 13   decisions and that was done.

11:14 14       Q.   Okay.  How long was Mr. Elizarde in the

11:14 15   position of the -- I guess it was jail administrator?

11:14 16       A.   Well, from January of 2001 to September.

11:14 17       Q.   Okay.  All right.  The incident that we're here

11:15 18   for today concerning Mr. Longoria happened in April of

11:15 19   2001.  And my question to you is, did you have anything

11:15 20   to do in the way of policy making for the jail facility

11:15 21   in Cameron County for April of 2001?

11:15 22       A.   No, sir, none at all.

11:15 23       Q.   Who was responsible for administrating policy

11:15 24   for the Cameron County jail in April of 2001?

11:15 25            MR. VITTITOE:  What was your question

11:15 1  again?

2                    MR. VALDEZ:  Yeah.

11:15 3                    MR. VITTITOE:  I'm sorry.  I was writing

4  here.

11:15 5                    MR. VALDEZ:  That's fine.

11:15 6      Q.  Who was responsible for administrating the

11:15 7  policy for the Cameron County jail?

11:15 8      A.  Can I ask you something?

11:15 9      Q.  Sure.

11:15 10                    MR. VITTITOE:  Yeah.

11:15 11      A.  Is that making policy, the sheriff or

11:15 12  administrative --

11:15 13                    MR. VITTITOE:  The sheriff.  I think he's

11:15 14  talking about who sets policy.

11:15 15                    THE WITNESS:  Who sets policy?

11:15 16      Q.  Well, we'll start with that.  Who sets policy?

11:15 17      A.  The sheriff.

11:15 18      Q.  Okay.  In April of 2001, who made sure that the

11:16 19  policy got carried out for the Cameron County jail?

11:16 20      A.  The jail administrator, which was Joe at that

11:16 21  time.

11:16 22      Q.  Okay.  And we're referring to Joe Lazarde?

11:16 23      A.  Joe Elizarde.

24                    MR. VITTITOE:  Elizarde.

11:16 25      Q.  Elizarde.  I have it spelled as

11:16 1    E-l-i-z-a-r-d-e.

11:16 2        A.  Yeah.  Elizarde.  Yeah.

11:16 3        Q.  Okay.  I've got to roll my Rs.  All right.

11:16 4    Okay.  Is there anyone else that would have been

11:16 5    responsible for administrating the policy of the

11:16 6    sheriff in April of 2001 besides Mr. Elizarde?

11:16 7        A.  Well, I mean, I would assume that his -- his

11:16 8    supervisors, you know.  He had lieutenant and

11:16 9    sergeants.  When you have policy and procedures in the

11:16 10   jail, they have to be carried out by your supervisors.

11:16 11       Q.  What was the job title of Mr. Elizarde in April

11:16 12   of 2001?

11:17 13                MR. VITTITOE:  If you don't know --

11:17 14       Q.  Don't guess.  If you don't know, you don't

11:17 15   know.

11:17 16       A.  Exact title, name, I don't know.  I don't

11:17 17   remember.

11:17 18       Q.  What rank did he hold in April of 2001?

11:17 19       A.  Well, he was the jail administrator.

11:17 20       Q.  Okay.  They don't go by captain or lieutenant

11:17 21   or --

11:17 22       A.  I don't remember if he had a certain title.

11:17 23   I'd hate to lie to you.  I don't remember.  He was a

11:17 24   jail administrator.  I can't remember if he was -- I

11:17 25   don't know.

11:17  1        Q.   Okay.  All right.  Did he have any immediate

11:17  2   assistants underneath him?

11:17  3        A.   I believe he had a couple of lieutenants, yes.

11:17  4        Q.   And who were they?

11:17  5        A.   At the time, it was Frank Gonzalez and some --

11:17  6   some Lieutenant Garcia, but he's -- he's retired.

11:17  7        Q.   Okay.  Is the other fellow -- is it Mr.

11:18  8   Gonzalez?  Is he still --

11:18  9        A.   He's still employed.

11:18 10        Q.   Is he still there as -- in the jail system?

11:18 11        A.   Yes, sir.

11:18 12        Q.   In September of 2001, was he your assistant, as

11:18 13   well?

11:18 14        A.   No.

11:18 15        Q.   Okay.  In September of 2001 when you took the

11:18 16   position of jail administrator, who did you have as

11:18 17   your immediate assistants?

11:18 18        A.   A gentleman by the name of Lieutenant Joel

11:18 19   Zamora.

11:18 20        Q.   Joel?

11:18 21        A.   Joel Zamora.

11:18 22        Q.   Okay.  Was there anyone else?

11:18 23        A.   Immediate, no.

11:18 24        Q.   Okay.  When Mr. Elizarde was removed from his

11:18 25   position of jail administrator, was his immediate

11:18 1    assistants also removed, as well?

11:18 2        A.  Not by the sheriff.

11:18 3        Q.  Okay.  Who removed them?

11:18 4        A.  I did.

11:18 5        Q.  You did.  Why did you remove them?

11:19 6        A.  When -- when I got appointed jail

11:19 7    administrator, I wanted some supervisors that I thought

11:19 8    would be able to help me.  It was just a lateral move,

11:19 9    a shift of staff for the purpose of working with me,

11:19 10   not somebody I didn't know nothing about.

11:19 11       Q.  You wanted your own team?

11:19 12       A.  My own team.

11:19 13       Q.  Okay.  Now, you went to this jail management

11:19 14   school on two occasions.  When did you go?

11:19 15       A.  I know I went -- I went that -- well, no.  I

11:19 16   went in 2002.  I went in 2002 and 2003.

11:19 17       Q.  Okay.

11:19 18       A.  They're -- they're held in May in San Antonio.

11:19 19       Q.  All right.  As we sit here today, are -- does

11:20 20   your present job involve anything in the way of jail

11:20 21   management for Cameron County?

11:20 22       A.  Presently, no.

11:20 23       Q.  Tell me how long this jail management school

11:20 24   is.

11:20 25       A.  It's like -- it's like four days total, but it

takes about two days of in-house actual training.  The rest is just recreation and socializing and so forth.

Q.  So we're talking about, what, 16 classroom hours basically?

A.  Something like that, yes, sir.

Q.  Okay.

A.  Approximately.

Q.  Okay.  Do you receive a certification --

A.  Yes, sir.

Q.  Let me finish the question, because you're anticipating.  That's fine.  Did you receive a certification after you completed these classes of jail management?

A.  Yes, sir.

Q.  And what certification do you get?

A.  I believe it's a 20 hour jail management issues -- certification, something like that, done by the -- the jail management.  It's -- it's a -- the people that sponsor it is -- I can't recall the name of the people that sponsor it, but it's from them.  And it is TCLEOSE certified by the state.

Q.  And what is TCLEOSE?

A.  It's Texas -- Texas law enforcement standards and education.  It stands for that, you know, for the state, for both peace officers and jailers.

11:21 1    Q.   Okay.

11:21 2    A.   And Texas education on -- on standards.

11:21 3    Q.   For jails.

11:21 4    A.   For jails and law enforcement.

11:21 5    Q.   Okay.  And you also went back again to that --

11:21 6    I assume that same school again?

11:21 7    A.   The following year.

11:21 8    Q.   Yes.  Do you have to be -- get recertified

11:21 9    every year or what happens?  Or why did you go back?

11:21 10   A.   Well, I'm -- I was the jail administrator at

11:22 11   that time.  And it's -- it's -- I go for two purposes.

11:22 12   One is training and one is for -- you have over a

11:22 13   hundred exhibitors there, so you get to try all kinds

11:22 14   of new -- new products for jails, you know.  So it's

11:22 15   -- it's -- and it's the most popular school there is

11:22 16   for the state.  So everybody from the state goes by, so

11:22 17   you get to socialize with other people from jails that

11:22 18   are the same size, so --

19    Q.   Okay.

11:22 20   A.   It's a real neat school.

11:22 21   Q.   All right.  Is it put on by some national

11:22 22   association or not?

11:22 23   A.   It's put on by the -- from the -- Texas Jail

11:22 24   Association puts it on.  That's what it is.

11:22 25   Q.   Okay.  As far as reading materials or

11:22 1  educational materials for your certification program,

11:22 2  is that something you get to take home and keep or --

11:22 3      A.  Yes.  They will give you some handouts

11:22 4  depending on the type of class that they're giving at

11:22 5  the time.

11:22 6      Q.  Okay.  At least in September of 2001, would you

11:23 7  be familiar with the procedure that an individual would

11:23 8  go through for processing if he finds himself in the

11:23 9  Cameron County jail?

11:23 10     A.  No.

11:23 11     Q.  You are not?

11:23 12     A.  I was not familiar -- I was not familiar with

11:23 13 the jail at the time when they appointed me.

11:23 14     Q.  Okay.  After you completed your certification

11:23 15 classes, would you be able to give testimony to us as

11:23 16 to what the process or procedures should have been for

11:23 17 someone going through the Cameron County jail, say, in

11:23 18 December of 2001?

11:23 19     A.  After these`classes?

11:23 20     Q.  Yes.

11:23 21     A.  No.

11:23 22     Q.  Okay.  And at any time from September of 2001

11:23 23 till summer of 2002, can you give us testimony as to

11:23 24 what the proper procedures would be for someone being

11:23 25 processed through the Cameron County jail?

23

A.  Yes.

Q.  Okay.  And what would that be?  Let's say, for example, I get arrested.  Okay?

A.  Yes, sir.

Q.  And I find myself there entering your Cameron County jail.  Okay?  What happens to me?  What is supposed to happen to me as far as processing?  Take me step by step.

A.  Okay.  You walk in, you turn over your paperwork, the commitment papers that we call where the JP or a judge commits you to our jail.  And we -- we do a view of -- a view of the body, make sure he's okay.  And then there's a series of questions that -- that we ask.  And then the booking officer will -- or the supervisor, they will make a determination if there is any reason he needs to go back for a medical clearance or needs medical attention or can just be -- be booked.

Q.  Okay.  And when you use the word -- the term "booked," what do you mean by that?

A.  Where we actually, you know, take a picture, take your fingerprints and get all your -- your information into our computer for -- to print out a booking sheet on that individual.

Q.  And then what happens to me?

A.  Once he's been booked, and so forth, if he

11:25 1   doesn't require medical attention, then he goes into a

11:25 2   separate room where he gets his -- his inmate clothing.

11:25 3   Gets dressed, and then gets put in a -- in a holding

11:25 4   cell until they get classified, put back into their

11:25 5   proper cell.

11:26 6      Q.   So at the time that you have this, what you

11:26 7   call booking, is there actually a classification that's

11:26 8   also done at that time?

11:26 9      A.   Yes.

11:26 10     Q.   When using the word "classification," that

11:26 11  seems to be a specific term to be classified.  What do

11:26 12  you mean by that?

11:26 13     A.   We have officers that do classifications

11:26 14  depending on -- we have inmates that come in that are

11:26 15  gangs, we have inmates that are sexual --

11:26 16     Q.   Offenders?

11:26 17     A.   -- offenders.  And the different types of

11:26 18  inmates that come in or people that come in have to be

11:26 19  classified and put into proper cells to -- to protect

11:26 20  them against other people or -- I mean, you don't want

11:26 21  to put a sexual offender in a -- in a crimes against

11:26 22  people side, because then, you know, he might get in

11:26 23  trouble.  So they classify them accordingly and put

11:26 24  them in the proper area so we can kind of protect them.

11:27 25     Q.   Okay.  And then once I get classified, I guess

11:27 1    I get taken to the proper room or cell; is that

11:27 2    correct?

11:27 3        A.   Right.

11:27 4        Q.   Okay.  Do you know whether or not the

11:27 5    procedures that you went by that we've just discussed

11:27 6    were the same procedures that were done in April of

11:27 7    2001?

11:27 8        A.   I couldn't tell you, sir.  I wasn't there.

11:27 9        Q.   Okay.  Well, when you took over your job of

11:27 10   jail administrator in September of 2001, okay, what

11:27 11   changes, if any, did you do in the way of how to run

11:27 12   that Cameron County jail?

11:27 13       A.   What changes did I do?

11:27 14       Q.   That you figure are significant changes.

11:27 15            MR. VITTITOE:  Let me just object.  Are

11:27 16   you talking about administrative?  Personnel?  Or

11:27 17   policy?

11:27 18            MR. VALDEZ:  Those are fair questions.

11:28 19       Q.   Let's start with administrative.  What changes

11:28 20   did you do?

11:28 21       A.   I mean, I've changed people around, I mean,

11:28 22   administratively.

11:28 23       Q.   Okay.  All right.  Well, how about in the way

11:28 24   of policy?  What changes in the way of policy did you

11:28 25   do, if any?

11:28  1     A.   None.

11:28  2     Q.   Okay.  When you left this position of jail

11:28  3   administrator in the summer of 2002, is there anything

11:28  4   noteworthy that occurred while on your -- while on your

11:28  5   watch that you can go around and tell friends about in

11:28  6   the way of, "Yeah, the jail was this way before I took

11:28  7   office and now it's better running or in better shape?"

11:28  8     A.   Well, I -- I can say that, because we're

11:28  9   talking about two different facilities, you know.  We

11:29 10   now have a state of the art facility.  We have more

11:29 11   space, you know, more -- the other was an old facility,

11:29 12   so I can say things are better running now.  I mean --

11:29 13     Q.   Okay.

11:29 14     A.   But nothing has been changed, you know, as far

11:29 15   as policy and procedure.

11:29 16     Q.   All right.  When did we get this state of the

11:29 17   art facility?

11:29 18     A.   We moved in -- into it January -- approximately

11:29 19   January or February of 2002.

11:29 20     Q.   Okay.  And I guess Mr. Juan Longoria was in the

11:29 21   not so much state of the art facility.

11:29 22     A.   Well, he was in our regular county jail.

11:29 23     Q.   Okay.  Now, as we sit here today and you've had

11:29 24   an opportunity to perhaps think about it, do you have

11:29 25   any idea why Joe Elizarde was removed from that

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

11:30  1    position of jail administrator?

11:30  2       A.   There were some concerns over a -- some

11:30  3    paperwork that had happened there, but, I mean, I had

11:30  4    nothing to -- specifics, I don't know.  The sheriff

11:30  5    just made a move over that.

11:30  6       Q.   What paperwork?

11:30  7       A.   I don't know.  It was just --

11:30  8       Q.   Well, what rumors have you heard?

11:30  9       A.   There's no rumors.

11:30 10       Q.   Okay.  Did you talk to Mr. Elizarde after he

11:30 11    was removed?

11:30 12       A.   We talk as -- as co-workers, but we don't get

11:30 13    into details why I was there and why he's not there no

11:30 14    more.  I mean, it's just on a professional level.

11:30 15       Q.   All right.  Let's go back now to me -- me --

11:30 16    me, Alfred Valdez, being processed through the jail

11:30 17    here.  Okay.

11:30 18            So, initially I find myself coming to jail

11:30 19    and I've got some paperwork in hand and you call it

11:31 20    commitment papers; is that correct?

11:31 21       A.   Yes, sir.

11:31 22       Q.   Okay.  Now, do I literally have these

11:31 23    commitment papers in my hand or does a --

11:31 24       A.   The officer.

11:31 25       Q.   The officer does.  Okay.  And those commitment

11:31 1   papers would typically come either from a -- maybe a

11:31 2   Justice of the Peace or a municipal court judge?

11:31 3       A.   Correct.

11:31 4       Q.   Okay.  If -- if I was sitting over in the city

11:31 5   jail, okay, and I get arraigned by a municipal court

11:31 6   judge, what paperwork would come with me then when I

11:31 7   get transferred over to the county jail?

11:31 8       A.   Same thing.  Municipal or JP, you have to bring

11:31 9   a commitment paper.

11:31 10      Q.   What does that commitment paper look like?

11:31 11      A.   It's just a -- well, everybody is different now

11:31 12  with computers.  Everybody prints their own.  But it's

11:31 13  just a paper.  The JP uses a long paper, and it just

11:32 14  says that it was brought before them and the bond and

11:32 15  the charge and that he's been remanded to the county

11:32 16  jail on a so-so bond and to be kept there until he can

11:32 17  post bond.  Just legal -- legal wording, but it's

11:32 18  basically your charge and your bond.

11:32 19      Q.   Okay.  If I have some -- if I've been to the

11:32 20  hospital while I was over at the city jail, would that

11:32 21  paperwork come with me, as well?

11:32 22      A.   A medical clearance.

11:32 23      Q.   A medical clearance.  Describe to me what do

11:32 24  you mean by a medical clearance?  What is a medical

11:32 25  clearance?

11:32  1       A.    What I've seen in the past is just a piece of

11:32  2   paper like that the doctor gives you like to return

11:32  3   back to work.   It's just a paper like that and it's

11:32  4   signed by a doctor that he's been -- the patient has

11:32  5   been -- that the subject has been viewed and he's

11:32  6   cleared to be placed back into jail.

11:32  7       Q.    Okay.

11:32  8       A.    And then I've seen some -- every doctor is

11:33  9   different.

11:33  10      Q.    All right.   It could be on a medical

11:33  11  prescription pad or --

11:33  12      A.    Yeah.

11:33  13      Q.    Is that correct?   Yes?

11:33  14      A.    It could be, yes.

11:33  15      Q.    Okay.   What else would come with me if I had

11:33  16  been at the hospital while I was in the city jail?   Is

11:33  17  there anything else besides this medical clearance?

11:33  18  Would y'all get some type of information sheet from the

11:33  19  city jail describing what was going on while in the

11:33  20  city jail?

11:33  21      A.    No.   None at all.

11:33  22      Q.    If you receive a medical clearance as you've

11:33  23  just discussed or if I was to have a medical clearance

11:33  24  as we've just discussed, would the folks at the Cameron

11:33  25  County jail make an inquiry as to what was going on at

11:34 1  the city jail while I was staying there?

11:34 2     A.  They could make an inquiry on what happened

11:34 3  with the subject or what is his condition, but it would

11:34 4  be solely up to that booking officer at that time.

11:34 5  Depends on what he sees.  Every person is different.

11:34 6     Q.  Okay.  All right.  At least while you were the

11:34 7  jail administrator, was there any type of a policy in

11:34 8  place that the Cameron County jail personnel would make

11:34 9  an inquiry as to what was going on with a particular

11:34 10  prisoner from the previous jail facility if they were

11:34 11  to have a document called a medical clearance?

11:35 12     A.  Explain that to me again.

11:35 13     Q.  Yeah.  That's a rather lengthy question, so I'm

11:35 14  going to break it down.  While you were the jail

11:35 15  administrator for Cameron County, okay, was there a

11:35 16  policy in place with the county that when someone, a

11:35 17  prisoner receives a medical clearance, that the Cameron

11:35 18  County personnel would make an inquiry as to the

11:35 19  medical history of this individual?

11:35 20     A.  I don't know.  I don't know if it's

11:35 21  specifically like that in our policy.

11:35 22     Q.  As far as you know, at least you're not aware

11:35 23  of it.  Is that a fair statement or not?

11:35 24           MR. VITTITOE:  Let me -- let me just --

11:35 25  aware of what?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

| | | |
|---|---|---|
| 11:35 | 1 | MR. VALDEZ:  Aware of the policy of making |
| 11:35 | 2 | an inquiry as to the medical history of an individual. |
| 11:36 | 3 | MR. VITTITOE:  Are you aware of any -- any |
| 11:36 | 4 | policy other than the Cameron County jail policy? |
| 11:36 | 5 | THE WITNESS:  No. |
| 11:36 | 6 | MR. VITTITOE:  Okay.  Tell him that. |
| 11:36 | 7 | A.   It would be no. |
| 11:36 | 8 | Q.   Okay.  All right.  So here I am, I'm now inside |
| 11:36 | 9 | the building of the Cameron County jail facility.  I've |
| 11:36 | 10 | got what you call the commitment papers in hand.  I |
| 11:36 | 11 | have a medical clearance in hand.  I'm now at the -- at |
| 11:36 | 12 | the door, the front door, just got by the front door. |
| 11:36 | 13 | What happens next? |
| 11:36 | 14 | A.   Like I say, the booking officer receives the |
| 11:37 | 15 | paperwork.  The -- the inmate or the person is asked to |
| 11:37 | 16 | stand there, and then they look at all the paperwork. |
| 11:37 | 17 | And, you know, every case is different.  If the booking |
| 11:37 | 18 | officer decides to think that there's medical -- a |
| 11:37 | 19 | nurse has to check him out or not, that's his call.  I |
| 11:37 | 20 | couldn't tell you what exactly would happen, you know. |
| 11:37 | 21 | All I do know is that if the booking officer makes a |
| 11:37 | 22 | determination that everything is fine, he'll tell the |
| 11:37 | 23 | officer he's dismissed.  The officer can leave, and |
| 11:37 | 24 | then they start with proceedings of booking this |
| 11:37 | 25 | gentleman. |

11:37 1    Q.   Okay.   What happens if someone is -- what's it

11:37 2  called?  A 96?  What's a 96?

11:37 3    A.  A mental patient.

11:37 4    Q.   Yes.  Right.  What happens if when I come in

11:37 5  the booking officer is told I'm a 96?  What happens

11:38 6  then?

11:38 7    A.  Well, most of the time when they arrest a 96,

11:38 8  they normally get them committed to -- to Tropical

11:38 9  Texas or MHMR and get them -- get them checked there.

11:38 10  They'll commitment him there.  They won't bring him to

11:38 11  our jail.  Or if they bring him to our jail, if he is

11:38 12  booked there by the officer, then we would -- we would

11:38 13  contact a nursing staff or medical staff, and then they

11:38 14  would have a screen nurse come and screen them to see

11:38 15  if they can stay there or he needs to be committed

11:38 16  somewhere else.

11:38 17    Q.  So if I have --

11:38 18    A.  But we don't take 96s from outside agencies.

11:38 19  That would only be our deputy sheriffs.  Outside

11:38 20  agencies, they have to handle that on their own.

11:38 21    Q.  Okay.  But if I come in and I'm labeled a 96,

11:38 22  what's supposed to happen is you have some form of a

11:39 23  nursing staff come in to do an evaluation on me?

11:39 24    A.  No.  They check him out, and then they contact

11:39 25  normally Tropical Texas to come in and do an evaluation

11:39  1    if they feel it's needed.

11:39  2        Q.   Okay.   When we're using the word "they," who

11:39  3    are you referring to?

11:39  4        A.   The infirmary department, our nursing staff.

11:39  5        Q.   Okay.   So let's say I'm now in front of the

11:39  6    individual or individuals that first greet me when I

11:39  7    walk into the Cameron County jail, and these

11:39  8    individuals are informed I'm a 96.  What are they

11:39  9    supposed to do?

11:39 10        A.   Well, you're being charged.  Normally if he

11:39 11    needs to be watched, they'll put him in a holding cell

11:39 12    where they can watch him at all times until he gets

11:39 13    checked.  Or the next day, they'll come and screen him,

11:39 14    you know.

11:39 15        Q.   Okay.   So then I'm being put in a holding cell?

11:40 16        A.   Yes, sir.

11:40 17        Q.   Okay.   Am I being put in a holding cell by

11:40 18    myself?  Or am I being put in a holding cell with the

11:40 19    general population?

11:40 20        A.   Well, you're asking me so many -- every --

11:40 21    every person is different.  I mean, I can't -- you

11:40 22    know, if I explain for one person, you're going to

11:40 23    think we do that for everybody, you know.

      24        Q.   All right.

11:40 25        A.   Every inmate that comes in is -- is treated

11:40 1   case by case.  Somebody could go straight into a cell,

11:40 2   somebody could be put in a hold cell.  Everybody is

11:40 3   different.  I don't want you to think -- what I'm

11:40 4   explaining to you is for one person.  It could be

11:40 5   different procedures for different people.

11:40 6       Q.  Okay.  So if I have a label of a 96, there's no

11:40 7   set procedure for how to handle me?

11:40 8       A.  We have a policy and procedure how to handle a

11:40 9   -- a mental person.

11:40 10      Q.  Okay.  Tell me what the policy and procedure is

11:41 11  for handling a mental person?

11:41 12      A.  I don't have it in front of me.  I couldn't --

11:41 13      Q.  All right.  You don't know.

11:41 14      A.  I couldn't tell you right offhand word for word

11:41 15  of it.

11:41 16      Q.  Would the folks that were the jail

11:41 17  administrators back in April of 2001, would they know?

11:41 18  Or you don't have any idea if they would know what the

11:41 19  jail procedures were?

11:41 20      A.  I don't know if they would or not.

11:41 21      Q.  All right.  Now, on -- I just went through the

11:41 22  first set of individuals, as far as you said, for

11:41 23  booking.  Is that the word we used, booking?

11:41 24      A.  Yes, sir.

11:41 25      Q.  And booking is where actually, I guess, I get

11:41 1   my fingerprints done, correct?

11:41 2       A.  Uh-huh.

11:41 3       Q.  Picture taken?

11:41 4       A.  Yes.

11:41 5       Q.  Okay.  And then what happens to me after that?

11:42 6       A.  They -- they -- like I said, they give you your

11:42 7   clothing.

11:42 8       Q.  Okay.

11:42 9       A.  And they put you in a holding cell until they

11:42 10  classify you where you're going to head out.

11:42 11      Q.  When I'm in a holding cell, am I there with

11:42 12  other prisoners, as well?

11:42 13      A.  Yes.

11:42 14      Q.  Approximately how long does it take for this

11:42 15  classification to occur?

11:42 16      A.  The next working day is how we're doing it now.

11:42 17      Q.  Okay.  Back in April of 2001, how was it done,

11:42 18  if you know?

11:42 19      A.  I believe it was the next working day.

11:42 20      Q.  Okay.  The Cameron County jail in April of 2001

11:42 21  had a hospital ward, infirmary; is that correct?

11:43 22      A.  Yes, sir.

11:43 23      Q.  Tell me about that.  How -- how many doctors,

11:43 24  how many nurses, how many beds, if you know?

11:43 25      A.  We -- we had at least -- in that county jail,

11:43 1   we had probably two, maybe three nurses.  And in the

11:43 2   infirmary area, the holding cells probably had, two,

11:43 3   three, six -- 12, maybe 15 beds.

11:43 4       Q.  Okay.  Is there a doctor on full-time duty back

11:43 5   in --

11:43 6       A.  No.

11:43 7       Q.  -- April of 2001?  No?  There was not?

11:43 8       A.  On duty?

11:43 9       Q.  Yes.

11:43 10      A.  No.

11:43 11      Q.  Like --

11:43 12      A.  We contract out with doctors.

11:43 13      Q.  Okay.  So in April of 2001, the Cameron County

11:43 14  jail had doctors that you contracted with.

11:44 15      A.  Right.

11:44 16      Q.  Okay.  Was there a doctor on the premises at

11:44 17  all times?

11:44 18      A.  No.

11:44 19      Q.  Okay.  Were there nurses on the premises at all

11:44 20  times?

11:44 21      A.  I -- I don't -- I don't know.

11:44 22          MR. VITTITOE:  That's fine, if you don't

11:44 23  know.

11:44 24      Q.  If you don't know, you don't know.  That's all

11:44 25  right.

| | | |
|---|---|---|
| 11:44 | 1 | MR. VITTITOE:  Alfred, during that period |
| 11:44 | 2 | of time, you're going to get most of your |
| | 3 | information -- |
| 11:44 | 4 | MR. VALDEZ:  From the next fellow. |
| 11:44 | 5 | MR. VITTITOE:  Joe Elizarde or George |
| 11:44 | 6 | Garcia.  In fact, is Joe here?  Do you know? |
| 11:44 | 7 | Q.  While you were the jail administrator from |
| 11:45 | 8 | September of 2001 till the summer of 2002, did you make |
| 11:45 | 9 | any policy for the jail? |
| 11:45 | 10 | A.  No. |
| 11:45 | 11 | Q.  Is the only person that was making policy the |
| 11:45 | 12 | sheriff?  Or do you know? |
| 11:45 | 13 | A.  I don't know. |
| 11:45 | 14 | THE WITNESS:  Can I tell you something? |
| 11:45 | 15 | Joe is going to be about 15 minutes late. |
| 11:45 | 16 | MR. VITTITOE:  Okay.  We're not going |
| | 17 | anywhere. |
| 11:46 | 18 | MR. VALDEZ:  You want to take a break? |
| 11:46 | 19 | MR. VITTITOE:  Yeah. |
| | 20 | MR. VALDEZ:  Okay.  Let's take a break. |
| | 21 | (Off record.) |
| 12:00 | 22 | MR. VALDEZ:  Let me have some things |
| 12:00 | 23 | marked as exhibits. |
| 12:04 | 24 | (Exhibits 1-4 are marked.) |
| 12:04 | 25 | MR. VITTITOE:  The first three documents |

12:04 1  appear to be Brownsville PD records or something.

12:05 2          THE WITNESS:  Okay.

12:05 3          MR. VALDEZ:  All right.  Ready to go,

12:05 4  ma'am?  Okay.

12:05 5     Q.  Mr. Lopez, I've handed you what has been marked

12:05 6  as four exhibits, Mr. Lopez 1, 2, 3 and 4.  Do you see

12:05 7  those?

12:05 8     A.  Yes, sir.

12:05 9     Q.  Have you had an opportunity to look at them?

12:05 10    A.  Yes, sir.

12:05 11    Q.  Okay.  When you talked about initially

12:05 12 commitment papers -- do you remember we talked about

12:05 13 that earlier?

12:05 14    A.  Yes.  Uh-huh.

12:05 15    Q.  Okay.  Are those the papers that are marked as

12:05 16 1, 2, 3 and 4 that would typically accompany a prisoner

12:05 17 that's transferred from the City of Brownsville jail to

12:05 18 the Cameron County jail?

12:05 19         MR. VITTITOE:  Let me just object.  Overly

12:05 20 broad.  But go ahead.

12:05 21    Q.  Yeah.  You can go ahead and answer the

12:05 22 question.

12:05 23    A.  This one for sure.

12:05 24         MR. VITTITOE:  Exhibit 4, for the record.

12:05 25    A.  Exhibit 4, for sure.  I don't know about these.

12:07 1    what would your jail personnel do when they received

12:07 2    such a document?

12:07 3              MR. VITTITOE:  Objection.  Speculation.

12:07 4    Go ahead and answer subject to the objection.

12:07 5        A.  Once again, the booking officer would make that

12:07 6    call.  When he would get this paperwork and being --

12:07 7    he's looking at the body.  I don't have a body in front

12:07 8    of me, so I couldn't answer, but looking at the body,

12:07 9    he would make the call as far as what more -- what

12:07 10   other procedure would happen after that.

12:07 11       Q.  All right.  Well, let me ask you this.  If you

12:08 12   were to receive such a document, what would you have

12:08 13   done?

12:08 14             MR. VITTITOE:  Let me just object again.

12:08 15   Overly broad.  What are you talking about?  When

12:08 16   somebody comes into the jail or --

12:08 17             MR. VALDEZ:  Yes, sir.  When somebody

12:08 18   comes into the jail and if he was to receive this

12:08 19   document, what would he have done?

12:08 20             MR. VITTITOE:  Assuming he was the booking

12:08 21   officer?

12:08 22             MR. VALDEZ:  Correct.

12:08 23       A.  Once again, I don't have a body in front of me,

12:08 24   you know, but close observation could be anywhere in

12:08 25   our jail, because we have observation throughout the

whole jail.

Q.  And when you say, "Observation throughout the whole jail," what do you mean by that?

A.  Well, we have guards throughout the whole jail observing inmates at all times, so, in my opinion, I think our whole jail is close observation, because we have guards observing inmates at all times.

Q.  All right.  Do you have someone -- do y'all have a specific cell or specific cell where a prisoner is put and you call it like -- the term is a padded cell?

A.  Yes.

Q.  Okay.  And when is that cell typically used?

MR. VITTITOE:  Let me just object again for the record the overbreadth of that question, because we have different facilities and different time periods involved.  My -- my objection is the question is overly broad.  Would you be more specific over the time period?

MR. VALDEZ:  I'll be happy.

Q.  When you were the jail administrator between September of 2001 and two- -- summer of 2002, did y'all use a -- did y'all have a padded cell?

A.  Yes.

Q.  Okay.  When was that padded cell used, under

42

what circumstances?

A.   Violent people, people that can't take care of themselves.

Q.   Okay.  And as far as observing people that are in that padded cell, how often were the jailers required to check on them?

A.   I don't have the policy in front of me, but I don't know.  It's often, but I don't know a specific.

Q.   Okay.  Do you know whether or not the policy required that a written log be in place to make any type of written documentation as to what was going on?

A.   I believe so.

Q.   Okay.  All right.  So as we sit here today, if you got a doctor's order that says "Okay to return back to jail, but keep under close observation," you don't know quite what to do with that person?

A.   Well, like I told you before, to compare this with the body, I would know what to do with them.  But you're showing me just a -- you're asking me to place him somewhere and -- anybody that comes with something like this could be put just about anywhere in our jail.

          MR. OLSON:  And you're referring to Lopez Exhibit No. 4.

          THE WITNESS:  Right.

          MR. VALDEZ:  And thank you, Mr. Lopez.

43

12:11  1    That's all the questions I have.

12:11  2              MR. VITTITOE:  We'll reserve questions.

12:11  3    And can he be excused?

12:11  4              MR. VALDEZ:  Yeah.  Thank you.

       5                   (Deposition concluded.)

       6

       7

       8

       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

44

ROBERT LOPEZ - ERRATA SHEET

Reasons for changes:  (1)   Clarify the record
                      (2)   Conform to the facts
                      (3)   Correct transcription errors

<u>PAGE</u> <u>LINE</u>   <u>CHANGE FROM/CHANGE TO</u>          <u>REASON</u>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

<u>SIGNATURE OF ROBERT LOPEZ</u>

1

2    I have read the foregoing transcript of my

3  deposition and it is a true and accurate record of my

4  testimony given on AUGUST 28, 2003, except as to any

5  corrections I have listed on Page 44 herein.

6

7    _____

8                              ROBERT LOPEZ

9  THE STATE OF TEXAS

10 COUNTY OF _____

11         SUBSCRIBED AND SWORN TO BEFORE ME, the

12 undersigned authority on this the _____ day of

13 _____, 2003.

14

15                          _____

16                          Notary Public in and for
                            The State of Texas

17                          My commission expires:

18                          _____

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   MARIA LONGORIA AND MARIA      ) (
     IDALIA GUTIERREZ,             ) (
 4   INDIVIDUALLY AND ON           ) (
     BEHALF OF THE ESTATE OF       ) (   CIVIL ACTION NO.
 5   JUAN LONGORIA, DECEASED,      ) (   B-01-062
                  Plaintiffs       ) (
 6                                 ) (
     VS.                           ) (
 7                                 ) (   JURY DEMANDED
     CAMERON COUNTY, TEXAS,        ) (
 8   THE CITY OF BROWNSVILLE,      ) (
     TEXAS, AND JOHN DOES 1-10,    ) (
 9                  Defendants     ) (

10               REPORTER'S CERTIFICATE
                 ORAL DEPOSITION OF
11                  ROBERT LOPEZ
                  AUGUST 28, 2003
12

13         I, ELIZABETH TORRES, Certified Court Reporter,
     certify that the witness, ROBERT LOPEZ, was duly sworn
14   by me, and that the deposition is a true and correct
     record of the testimony given by the witness on AUGUST
15   28, 2003; that the deposition was reported by me in
     stenograph and was subsequently transcribed under my
16   supervision.
           I FURTHER CERTIFY that I am not a relative,
17   employee, attorney or counsel of the parties, nor a
     relative or employee of such attorney or counsel, nor
18   am I financially interested in the action.

19   WITNESS MY HAND on this ____8th____ day of
20   September, 2003.

21

22
     ELIZABETH TORRES, Texas CSR 5516
23   Expiration Date: 12-31-04
     Bryant & Stingley, Inc.
24   4900 North 10th, Building A, Suite 3
     McAllen, Texas  78504
25   (956) 618-2366
```

```
                        BROWNSVILLE POLICE                    PAGE     1
                        ARREST BOOKING


                  ADULT                    JUVENILE
                  -----                    --------
                    X
        BLOCK/CELL        PROPERTY CABINET    ARREST NUMBER      BOOKING NUME
        ----------        ----------------    -------------      -----------
        1    102                                  10020667              265

              ARREST           BOOKING
           DATE    TIME     DATE    TIME                        CASE NUMBER
           --------------- ----------------                     -----------
         4/10/2001     15:58    4/10/2001    16:27:46             200130117

        LAST NAME                 FIRST      MIDDLE                 DOB
        ---------                 -----      ------                 ---
        LONGORIA        JUAN                 ANTONIO           10/07/1959

          ADDRESS                      CITY            ZIP      SOCIAL SECUR
          -------                      ----            ---      -----------

          1802  E JACKSON          BROWNSVILLE      78520       449518506

        ALIAS
        -----
        JUAN LONGORIA

        PLACE OF BIRTH        HOME PHONE        WORK PHONE    DRIVERS LIC # STATI
        --------------        ----------        ----------    -------------------
        TX    ARREST DATE =

        RACE SEX AGE HGT WGHT COMPLEX HAIR EYES GLASSES BEARD MUSTACHE   OCCUPATION
        ---- --- --- --- ---- ------- ---- ---- ------- ----- --------   ----------
        W    M   41  68  185          BLACK BROWN                        DISABEL

        DISTINGUISHING CHAR BK OFFICER FP/PHOTO EMPLOYER            DISPOSITION
        ------------------- ---------- -------- --------            -----------
                                4886     Y    Y

        ADD#            ARREST LOC.                       ARRESTING OFFICER
        ----            -----------                       -----------------
            1124 INTERNATIONAL BLVD.              218     RIVERA,FALCON

        CHARGE #1       F  SJ  M          COURT FINDING       ARS       CIT./WAR
        ---------                         -------------       ---       --------
        220         BURGLARY (FI/TII)                         30.02     BUILDING
        CHARGE #2       F  SJ  M
        ---------

        CHARGE #3       F  SJ  M
        ---------

        CHARGE #4       F  SJ  M
        ---------
```

Lopez

EXHIBIT NO. 1

Bryant & Stingley, Inc.

ownsville Police CAD

JMS610                          BROWNSVILLE POLICE                          PAGE
RUN DATE: 4/10/2001             PROPERTY VOUCHER
RUN TIME: 16:37:25

NAME:    10020667  JUAN LONGORIA              BOOKING NO.        26569

TOTAL MONEY RECEIVED :
TOTAL MONEY DISBURSED: _____
TOTAL AT RELEASE      : _____

| CLASS | TYPE | DESCRIPTION | COLOR | REC # |
|-------|------|-------------|-------|-------|
| MISCELLAN | | 3.00 US CURR | | |
| MISCELLAN | | BRN. WALLET | | |
| MISCELLAN | | 1 KEY | | |
| MISCELLAN | | 0.97 US CENTS | | |
| MISCELLAN | | BRN. BOOTS | | |
| MISCELLAN | | BLK. BELT | | |
| MISCELLAN | | BOX 11 | | |

Lopez

EXHIBIT NO. 2

Bryant & Stingley, Inc.

(uncooperative)    Note
Placed in cell (Busy)
RM.
4490

4590

witness PC #4492

Out X 96 S

Released to
J. Soliau

PC  4/11/01

10:10 AM.

BROWNSVILLE POLICE
ARREST NARRATIVE

SUBJECT WAS SEEN BY JAIL STAFF ALONG W/OFFICER
REMES BANGING HIS HEAD AGAINST THE WALL AND FLOOR
OF CELL #114///SUBJECT WAS ALSO SEEN RUNNING FROM
ONE END OF THE CELL AND CRASHING FACE FIRST ONTO
THE ADJACENT WALL. THIS INCIDENT HAPPENED AT APPRO
XIMATELY 0145.//// SUBJECT SHOWED SOME BRUISING TO
THE ELBOWS.
SUBJECT WAS TAKEN TO HOSPITAL BY OFF.RIVERAAND
MYSELF#4490 AFTER SEEING SUBJECT ACTING UP IN CELL
114 SUBJT. WAS TRANSPORTED TO HOSPITAL AT APPROX.
6:00 PM. SUBJECT HAD REFUSED TO GO TO HOSPITAL
EARLYER WHEN HE GOT CHECKED OUT BY EMS.SUBJECT WAS
SEENING THINGS AND ACTING ABNORMAL IN CELL 114
SUBJECT WAS CHECKED OUT BY DOCTOR,WHO HAD A PERSON
FROM TEXAS TROPICAL TO COME AND SCREEN HIM. HE WA
S GIVEN  A MEDICAL CLEARANCE WHICH NOTED TO KEEP
HIM A MEDICAL CLEARANCE WHICH NOTED TO KEEP HIM
UNDER CLOSE OBSEVATION. WE RETURNED AT APPROX.8:45
PM. SUBJECT WAS PLACED IN CELL 114 ONCE AGAIN FOR
HIS SAFTEY AND WELL BEING. SUBJECT CONT. ACT
ABNORMAL AND CLAIMED TO SEE GHOST,AND PEOPLE WANTI
NG TO KILL HIM ECT.RELIEVING SHIFT ADVISED TO KEEP
A CLOSE ABSEVATION ON HIM.

*Lopez*

EXHIBIT NO. 3

Bryant & Stingley, Inc.

4-11-61
Released
1020 pm
TO Cot Joe Sdnas
CRL

EXHIBIT NO. 4

Bryant & Stingley, Inc.

**Brownsville Medical Center**
1040 W. Jefferson, Brownsville, Texas 78520
Phone (956) 544-1400

NAME _____ AGE _____

ADDRESS _____ DATE _____

R̸x   May return to jail
but should be kept under
close observation

Refill _____ times

Directions in Spanish

PRODUCT SELECTION PERMITTED          DISPENSE AS WRITTEN

ADDRESS _____     DEA # _____   Date _____
                                                      ☐ I request that this prescription not be dispensed in a
PHONE _____                       Child Resistant Container.
                          BC023912 (11/00)            Signature _____

<pre>
 1            IN THE UNITED STATES DISTRICT COURT?
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   MARIA LONGORIA AND MARIA      ) (
     IDALIA GUTIERREZ,             ) (
 4   INDIVIDUALLY AND ON           ) (
     BEHALF OF THE ESTATE OF       ) (   CIVIL ACTION NO.
 5   JUAN LONGORIA, DECEASED,      ) (   B-01-062
              Plaintiffs          ) (
 6                                 ) (
     VS.                           ) (
 7                                 ) (   JURY DEMANDED
     CAMERON COUNTY, TEXAS,        ) (
 8   THE CITY OF BROWNSVILLE,      ) (
     TEXAS, AND JOHN DOES 1-10,    ) (
 9            Defendants           ) (
</pre>

---

10

                        ORAL DEPOSITION OF
11                          SYLVIA RIVAS
                         AUGUST 29, 2003
12

---

13        ORAL DEPOSITION OF SYLVIA RIVAS, produced as a

14   witness at the instance of the PLAINTIFFS, taken in the

15   above styled and numbered cause on AUGUST 29, 2003,

16   reported by ELIZABETH F. TORRES, Certified Court

17   Reporter No. 5516, in and for the State of Texas, at

18   the law offices of Adams & Graham, L.L.P., 222 E. Van

19   Buren, West Tower, Harlingen, Texas, pursuant to the

20   Federal Rules of Civil Procedure.

21

22

23

24

25                                          COPY

2

```
 1                        APPEARANCES

 2    COUNSEL FOR PLAINTIFFS:

 3              ALFRED R. VALDEZ
               LIN & VALDEZ, L.L.P.
 4              7520 Hillcroft
               Houston, Texas   77081
 5
      COUNSEL FOR DEFENDANTS:
 6
               CRAIG VITTITOE
 7              ADAMS & GRAHAM, L.L.P.
               P.O. Drawer 1429
 8              222 East Van Buren, West Tower
               Harlingen, Texas  78551-1429
 9

10                          INDEX
                                              PAGE
11    Appearances................................. 2

12    SYLVIA RIVAS:

13    Examination by Mr. Valdez................... 3

14    Errata Sheet/Signature Page................. 44
      Reporter's Certificate...................... 46
15    Attached to the end of the transcript:   Stipulations

16

17

18                 (NO EXHIBITS MARKED.)

19

20

21

22

23

24

25
```

**SYLVIA RIVAS,**

having been duly sworn, testified as follows:

EXAMINATION

BY MR. VALDEZ:

13:37    Q.  Ms. Rivas, have you ever had your deposition

13:37    taken before like this, this type of setting?

13:37    A.  About 10, 15 years ago, I had one done.

13:37    Q.  Okay.  And for what purpose?

13:37    A.  A family was suing Circle K in a wrongful

13:37    death.

13:37    Q.  Were you a nurse?  Or were you working at the

13:37    store?

13:37    A.  I was working at the store.

13:37    Q.  Okay.  Could you please state your full name,

13:37    please?

13:37    A.  Mary Sylvia Rivas.

13:37    Q.  And what is your date of birth, Ms. Rivas?

13:37    A.  8-27-60.

13:37    Q.  And were you born in the Valley area here?

13:38    A.  Brownsville.

13:38    Q.  Okay.  And did you attend high school here in

13:38    the area, as well?

13:38    A.  Yes, sir.

13:38    Q.  What high school did you attend?

13:38    A.  Homer Hanna.

BRYANT & STINGLEY, INC.
McAllen    Harlingen    Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

13:38 1    Q.  And when did you graduate from high school?

13:38 2    A.  1978.

13:38 3    Q.  And as far as education or work history, what

13:38 4  did you do after you graduated from high school?

13:38 5    A.  After high school, I attended college part time

13:38 6  for about two or three years.  I worked for Circle K as

13:38 7  a store manager and an auditor, and then I moved to San

13:38 8  Antonio.

13:38 9    Q.  All right.  And your college education, was

13:38 10  that in the area of nursing or was it in the area of

13:38 11  something else?

13:38 12    A.  It was just general courses, just basics.

13:39 13    Q.  All right.  And then you indicated you worked

13:39 14  as an auditor for Circle K?

13:39 15    A.  Uh-huh.

13:39 16    Q.  Is that a -- you have to say "yes" or "no"

13:39 17  instead of "uh-huh."

13:39 18    A.  Yes.

13:39 19    Q.  Okay.  Thank you.  And were you an auditor for

13:39 20  various stores or just for one location?

13:39 21    A.  No, all over the Valley.

13:39 22    Q.  Okay.  And how long were you employed with

13:39 23  Circle K approximately?

13:39 24    A.  Approximately three years.

13:39 25    Q.  And when you moved to San Antonio, did you

5

13:39 1   continue with your employment with Circle K or did you

13:39 2   change jobs?

13:39 3      A.  No, I stayed home as a housewife.

13:39 4      Q.  And how long did you remain home as a

13:39 5   housewife?

13:39 6      A.  Probably till about '93, about four or five

13:39 7   years.

13:39 8      Q.  And did you return back to work after that

13:39 9   time, '93, '94?

13:39 10      A.  I went back to school.

13:39 11      Q.  And what did you do, as far as your education

13:40 12   when you went back to school?

13:40 13      A.  Became an LVN.

13:40 14      Q.  Okay.  And when did you obtain your license as

13:40 15   an LVN?

13:40 16      A.  1994.

13:40 17      Q.  Okay.  And when we say "LVN," are we referring

13:40 18   to a licensed vocational nurse?

13:40 19      A.  Yes, sir.

13:40 20      Q.  And I'm assuming you obtained that license here

13:40 21   in the State of Texas; is that correct?

13:40 22      A.  Yes, sir.

13:40 23      Q.  And the school you attended was there in San

13:40 24   Antonio?

13:40 25      A.  In San Antonio.

6

13:40 1    Q.  What school was that, ma'am?  It's not a trick

13:40 2    question.

13:40 3    A.  No, I --

13:40 4            MR. VITTITOE:  She drew a blank.

13:40 5            MR. VALDEZ:  Why don't we do this?  If we

13:40 6    can ask the court reporter to leave a space or line and

13:40 7    you can fill it in when you read it.  And if it comes

13:40 8    to you --

13:40 9    A.  Vocational Health -- Health Institute of Texas,

13:40 10   Vocational Nursing.

13:40 11   Q.  All right.

13:40 12   A.  That's what it was.

13:40 13   Q.  Okay.  Could you repeat it again for my

13:41 14   benefit, then, again?

13:41 15   A.  Health Institute of -- Health Institute of

13:41 16   Vocational Nurses.

13:41 17   Q.  All right.  And was it at a university or was

13:41 18   it an institution that was on its own?

13:41 19   A.  On its own.

13:41 20   Q.  When you obtained your license as a nurse, did

13:41 21   you immediately start working?  Or did you continue as

13:41 22   a housewife?

13:41 23   A.  I started working about three months later.

13:41 24   Q.  And where did you begin your work?

13:41 25   A.  At Normandy Terrace Northeast.

13:41 1    Q.  Normandy --

13:41 2    A.  Normandy Terrace Northeast.

13:41 3    Q.  Hospital?

13:42 4    A.  It's nursing and rehab.  It's a nursing home.

13:42 5    Q.  Okay.  And how long did you work there?

13:42 6    A.  Since '94 to about '99.

13:42 7    Q.  And was that nursing home also located in the

13:42 8    San Antonio area?

13:42 9    A.  Yes.

13:42 10   Q.  Okay.  And in 1999, you left there and you came

13:42 11   back to the Brownsville area?

13:42 12   A.  I started working at the jail.

13:42 13   Q.  Okay.  And why did you change jobs?

13:42 14   A.  All my family is here.

13:42 15   Q.  And so you've been working with the Harris

13:42 16   County Sheriff's Department since --

13:42 17   A.  No.  Cameron County.

13:42 18   Q.  I'm sorry.  I'm from Houston.

13:42 19        MR. VITTITOE:  It's that Tres Leches that

13:42 20   is kicking in.

13:42 21        MR. VALDEZ:  Yeah, I think it is.  Right.

13:42 22   Q.  The Cameron County Sheriff's Department since

13:42 23   1999?

13:42 24   A.  Yes, sir.

13:42 25        MR. VITTITOE:  Off the record.

13:42  1                    (Off record.)

13:43  2        Q.  So do you work for the Cameron County Sheriff's

13:43  3   Department?  Or you work for the Cameron County Health

13:43  4   Department?

13:43  5        A.  Cameron County Health Department at the jail.

13:43  6        Q.  Okay.  And as we sit here today, are you still

13:43  7   working for the Cameron County Health Department at the

13:43  8   Cameron County jail?

13:43  9        A.  Yes, sir.

13:43 10        Q.  And you have done that continuously since 1999?

13:43 11        A.  Yes.

13:43 12        Q.  And back in April of 2001, were you a licensed

13:43 13   vocational nurse at that time or were you an RN?

13:44 14        A.  Licensed vocational nurse.

13:44 15        Q.  Okay.  And as we sit here today, you're a

13:44 16   licensed vocational nurse?

13:44 17        A.  Yes, sir.

13:44 18        Q.  Okay.  Tell me what your job duties are at the

13:44 19   Cameron County jail?  What do you do there?

13:44 20        A.  Everything.  We see the inmates coming into the

13:44 21   jail.  We see all of them individually, do a quick

13:44 22   assessment, vital signs, weight, talk to them about

13:44 23   their medical problems, what medications they're on,

13:44 24   who's their doctor.  If I need to, I get a release of

13:44 25   information.  I have them sign it.  I administer a TB

9

13:45  1    test and refer them as needed to the psychiatrist, to

13:45  2    the doctor, to the nurse practitioner.  If they've got

13:45  3    any wounds, anything, we dress it, clean it.  We get

13:45  4    sick calls every morning, and we sort those out by

13:45  5    sections and we see a group of inmates at a time, one

13:45  6    at a time, but they bring a few at a time.

13:45  7        Q.  When you separate them, you're doing like a

13:45  8    triage, you're taking the most serious ones first or --

13:45  9        A.  Say I get 30 sick calls, so I separate them by

13:45 10    the sections.

13:45 11        Q.  Cell blocks?

13:45 12        A.  Yes.  Like the cell blocks.

13:45 13        Q.  Okay.

13:45 14        A.  And then I'll give the guard a list, "Okay.

13:45 15    These are the people that I need to see."  And they

13:45 16    bring them down a few at a time from each section.  And

13:45 17    depending whether they have a cold, an injury, a cut,

13:46 18    they were involved in a fight, then we have protocols

13:46 19    to deal with all of that.

13:46 20        Q.  Okay.  What you're describing me as your

13:46 21    present job duties, as we sit here today, is this the

13:46 22    same thing you would do back in April of 2001?

13:46 23        A.  Yes.

13:46 24        Q.  Okay.  I interrupted you, did you complete your

13:46 25    answer as far as what you did?

A.   We also pass medication.  We deal with on-site emergencies.  We note the doctor's orders, the psychiatrist's.  We help set up appointments for the inmates.  We notify the federals, if it's involving a federal inmate, what we need to do for them and get their approval.  That -- I'd say that's pretty much it.

Q.   Okay.  Are LVNs now allowed to give shots?  Can you administer a shot on a patient?

A.   Yes, I can.  Yes.

Q.   All right.  Now, back in April of 2001, were you responsible for taking care of the inmates that were located at the Cameron County jail at the what's called the old Cameron County jail facility?  Yes?

A.   Yes, sir.

Q.   Okay.  Was there anyone else that was working with you as a nurse at that facility, as well, at that time?

A.   I would need to look at the schedule.  I honestly don't know at this time.

Q.   Okay.  Typically, would there just be one person there?  Or would there be two people there or three people?  You don't recall or you don't know?

A.   I really don't know.

Q.   Okay.  I thought we had a statement from a -- I'm trying to think who that person was.

13:48  1          MR. VALDEZ:  Do you remember, Craig?

13:48  2          MR. VITTITOE:  Mr. Esquivel.

13:48  3      Q.  Does a Mr. Esquivel, does that ring a bell?

13:48  4      A.  Uh-huh.

13:48  5      Q.  You have to answer out "yes" or "no," just for

13:48  6  housekeeping purposes, please.

13:48  7      A.  He used to work with us.

13:48  8      Q.  Okay.  And what is his full name?

13:48  9      A.  Felipe Esquivel.

13:48 10      Q.  Okay.  And you say he used to work with you.

13:48 11  He no longer is employed?

13:48 12      A.  He's no longer employed with us.

13:48 13      Q.  Do you know where he's gone off to, where he's

13:48 14  working now?

13:48 15      A.  One of the home health companies.  I'm not sure

13:48 16  which.

13:48 17      Q.  When was the last time you saw Mr. Esquivel?

13:48 18      A.  I'd say within nine months to a year.

13:49 19      Q.  Do you know if he still lives in the area?

13:49 20      A.  Yes, he does.

13:49 21      Q.  Okay.  Do you happen to know what his street

13:49 22  address may be?

13:49 23      A.  No.

13:49 24      Q.  Okay.  You wouldn't happen to have his phone

13:49 25  number still, would you?

13:49  1       A.  Not me, no.

13:49  2       Q.  Okay.  Was he also a licensed vocational nurse?

13:49  3       A.  As far as I know, yes.

13:49  4       Q.  At the time he was working for y'all, he was a

13:49  5  licensed vocational nurse?

13:49  6       A.  Yes.

13:49  7       Q.  Now, do you even know who Juan Longoria is?

13:49  8       A.  I've heard of him.

13:49  9       Q.  What do you know of Mr. Juan Longoria, what

13:49  10  have you heard?

13:49  11      A.  That was an inmate that was brought in by the

13:50  12  Brownsville PD, and he had medical clearance from the

13:50  13  hospital.

13:50  14      Q.  Okay.  And what else did you -- is there

13:50  15  anything else you're aware about him?

13:50  16      A.  No, sir.

13:50  17      Q.  Are you aware that he died while he was in the

13:50  18  Cameron County jail?

13:50  19      A.  Yes.

13:50  20      Q.  Okay.  Were you involved in any part of the

13:50  21  investigation as to why he died?

13:50  22      A.  No.

13:50  23      Q.  Have you provided any statements to anyone

13:50  24  concerning Juan Longoria?

13:50  25      A.  Not that I can recall.  This is the first time

13:50  1   I've ever been questioned.

13:50  2      Q.  Okay.  Have you reviewed anything to prepare

13:50  3   yourself for your deposition today?

13:50  4      A.  No.

13:50  5      Q.  You have not looked at any witness statements?

13:51  6      A.  No.

13:51  7      Q.  Back in April of 2001, tell me what would be

13:51  8   the process or procedure for a person or a prisoner

13:51  9   being transferred from the City of Brownsville Police

13:51 10   Department over to the Cameron County jail?  What would

13:51 11   be the steps?  What would be involved?

13:51 12      A.  The soonest I might see them would be when they

13:51 13   come into the sally port.

     14      Q.  Into what part?

13:51 15      A.  The sally port where they get unloaded from the

13:51 16   vehicle.  It's an enclosed area.

13:51 17      Q.  Okay.  And it's called a --

13:51 18      A.  Sally port.

13:51 19      Q.  Sally port.  Okay.

13:51 20      A.  They -- they bring them into the booking area.

13:51 21   They get -- they're patted down, again.  The booking

13:52 22   officer and whatever other officers are there, see

13:52 23   them.  If there's a need, they'll call a nurse.  And if

13:52 24   not, they get put into the holding cell right in

13:52 25   front -- right in front of the booking area, and I

13:52  1   won't see them until later when we're medically

13:52  2   clearing them after they've been booked.

13:52  3       Q.   And you're going through a pre-assessment

13:52  4   portion of the booking?  Is that what it's called,

13:52  5   pre-assessment?  Or do you know?

13:52  6       A.   The booking officers will -- when they book

13:52  7   him, they'll ask him about medical problems,

13:52  8   medication.

13:52  9       Q.   Okay.  I have here that there's a portion of

13:52 10   the booking process called a premedical assessment.

13:52 11   Are you familiar with that term?

13:52 12       A.   Yes.

13:53 13       Q.   What does that mean to you when someone says

13:53 14   premedical assessment?

13:53 15       A.   The guards will ask if he's allergic to any

13:53 16   food or medication, if he's taking any medication, if

13:53 17   he has any diseases, diabetes, high blood pressure,

13:53 18   heart disease, epilepsy, drug or alcohol problems.  And

13:53 19   then the inmate either answers yes or no.  Sometimes

13:53 20   they'll tell the officer no, and then we get a

13:53 21   different story, but --

13:53 22       Q.   Okay.

13:53 23       A.   They do get a rundown of that before they ever

13:53 24   see a nurse.

13:53 25       Q.   All right.  Are the nurses assigned to see the

13:54 1  prisoners as they come into the booking process?  Do

13:54 2  the nurses interview every single prisoner that goes

13:54 3  through there?

13:54 4      A.  After they've been booked.

13:54 5      Q.  Okay.  Normally, how soon after they have been

13:54 6  booked would the nurses have the opportunity to see the

13:54 7  prisoners to ask them some additional questions?

13:54 8      A.  If -- we try to get to them as soon as

13:54 9  possible.  If they come in in the middle of the night,

13:54 10 they're not seen until the morning, that sort of thing.

13:54 11 But, generally, it's within a couple of hours.

13:54 12     Q.  Okay.  It's my understanding that Mr. Juan

13:54 13 Longoria was received by the Cameron County Sheriff's

13:55 14 Department detention facility some time in the morning

13:55 15 hours of April the 11th of 2001.  And as best as we can

13:55 16 tell, it would be right around 10:30 in the morning.

13:55 17 Okay?  And my question to you is, would there be a

13:55 18 nurse, such as yourself, there waiting for the

13:55 19 prisoners to be processed through?

20     A.  No.

13:55 21     Q.  Okay.  Where would the nurse be typically?  In

13:55 22 their office or --

13:55 23     A.  At the infirmary.

13:55 24     Q.  Okay.  Now, when you talk about an infirmary,

13:55 25 it doesn't have a hospital bed, or does it?

13:56 1    A.   No, sir.

13:56 2    Q.   It has an examining table?

13:56 3    A.   Yes, sir.

13:56 4    Q.   Okay.  And I imagine it might have a room for

13:56 5 the nurses to put their things and their files.  Would

13:56 6 that be correct, too?

13:56 7    A.   Yes.

13:56 8    Q.   So we're talking about maybe two rooms, one is

13:56 9 an examining room --

13:56 10    A.   Actually, the particular building you're

13:56 11 talking about is one large room.  It's all open.

12    Q.   Okay.  All right.

13:56 13    A.   It isn't separate.

13:56 14    Q.   Okay.  So when the individuals are being

13:56 15 processed through, when does the nurse show up to take

13:56 16 a look at these various prisoners and ask them

13:56 17 questions concerning their medical condition or medical

13:56 18 history?

13:56 19    A.   After the sick calls are done in the morning.

13:56 20 After -- as soon as we're done with the sick calls, we

13:57 21 start medically clearing inmates.  If there is two

13:57 22 nurses, that process is started earlier.

23    Q.   Okay.

13:57 24    A.   There isn't any set time.

13:57 25    Q.   Normally, it would be done within three to four

**13:57 1**   hours following at least the completion of the booking

**13:57 2**   process.  Is that a fair statement?

**13:57 3**      A.  Yes.

**13:57 4**      Q.  Okay.  Do you happen to recall whether or not

**13:57 5**   you were even working on April the 11th of 2001?

**13:57 6**      A.  No, sir.  I couldn't tell you.

**13:57 7**      Q.  Okay.  Could you tell me what your typical work

**13:57 8**   hours were back in April of 2001?

**13:58 9**      A.  No.

**13:58 10**      Q.  Okay.  What are your present work hours?

**13:58 11**      A.  5:00 to 1:00, 7:00 to 3:00, 1:00 to 9:00.  Take

**13:58 12**   your pick.  Monday through Thursday, I worked 1:00 to

**13:58 13**   9:00, today 7:00 to 3:00.  Come Monday, I'll be in at

**13:58 14**   5:00.

**13:58 15**      Q.  5:00 in the morning?

**13:58 16**      A.  Yes, sir.  It's -- you just never know what you

**13:58 17**   get.

**13:58 18**      Q.  Well, who determines your work schedule?

**13:58 19**      A.  My immediate supervisor, Fidel Calvillo.

**13:58 20**      Q.  So how did you get such a great schedule?

**13:58 21**      A.  I must be special.  No.  Just about everyone's

**13:58 22**   schedule changes that way.

**13:58 23**          MR. VITTITOE:  That was a very good

**13:58 24**   answer.

**13:58 25**      Q.  Now, you'll have to go slow for me on this work

14:00  1    working, as far as a nurse, on April the 11th of 2001?

14:00  2    A.   The schedule should be on file with the

14:00  3    supervisor.

14:00  4    Q.   All right.

14:00  5    A.   And all our time sheets always get turned into

14:00  6    the office, so all -- all of that is on record.

14:00  7    Q.   When Juan Longoria was found dead in his cell,

14:00  8    were you contacted or notified in the middle of the

14:00  9    night?

14:00 10    A.   No, sir.

14:00 11    Q.   Do you know who was contacted?

14:00 12    A.   No, sir.  It should have been whoever the nurse

14:00 13    on call was.

14:01 14    Q.   Are you familiar with the term -- what's called

14:01 15    "commitment papers?"

14:01 16    A.   Yes.

14:01 17    Q.   Okay.  What are commitment papers?

14:01 18    A.   Those are orders.  Tropical Texas direct team

14:01 19    does an assessment on an individual.  And the doctor

14:01 20    makes a recommendation for commitment to Rio Grande

14:01 21    State Hospital.  And we have 24 hours to act on those

14:01 22    orders, otherwise they'll expire.

14:01 23    Q.   All right.  How about the papers that are used

14:01 24    to transfer a prisoner from the City of Brownsville

14:01 25    Police Department to the Cameron County jail facility,

14:01  1    is that also called commitment papers?  Or are you not

14:02  2    familiar with that term?

14:02  3        A.  I'm not familiar with those.

14:02  4        Q.  Okay.

14:02  5        A.  The only paperwork I would receive from the

14:02  6    Brownsville PD would be a medical clearance.

14:02  7        Q.  Okay.  Tell me what you mean by a medical

14:02  8    clearance.  What is that?

14:02  9        A.  If the individual has been taken to the local

14:02 10    hospital and examined for whatever problem he's

14:02 11    currently experiencing.  And once they've decided he's

14:02 12    stable, then they send him to the jail.

14:02 13        Q.  And would there be some form of doctor orders

14:02 14    accompanying that medical clearance, as well, like

14:02 15    maybe a medication prescription --

14:02 16        A.  Yes.

14:02 17        Q.  Okay.  Or other further instructions that the

14:02 18    doctor wants concerning that inmate?

14:02 19        A.  Right.

14:02 20        Q.  Okay.  Do you get that information concerning

14:03 21    the medical clearance documents from the detention

14:03 22    officers that are responsible for booking and

14:03 23    classification?  Or do you get them from another

14:03 24    source?  I'm just curious how the paperwork gets moved

14:03 25    about.

A. Okay. It gets put in the medical box with his medical from the booking. And we collect all of that.

Q. Okay. And this is the same thing that would have happened back in April of 2001? The medical clearance document would have been put in some form of a box?

A. (Witness nods head.)

Q. Where is that box located at the old Cameron jail, at least back in April of 2001?

A. In the booking area. In the booking area.

Q. Okay. Is it a box that's called "Medical Clearance Box?" Is it labeled? Or how do people know where to put it?

A. It just says, "Medical." And anything that needs to go to the infirmary staff gets put in there.

Q. All right. I'm going to hand you what has been previously marked in another person's deposition testimony as Mr. Lopez Exhibit No. 4. And I'm going to ask if you can identify this document, please.

A. It's a release from the hospital from Brownsville Medical Center, "May return to jail, but should be kept under close observation."

Q. Okay. And is that concerning a Mr. Juan Longoria?

A. I can't tell. There's no name on it.

14:05 1    Q.  All right.  Have you ever seen that document

14:05 2  before?

14:05 3    A.  I don't recall ever seeing this before.

14:05 4    Q.  Okay.  Is this the type of document that you

14:05 5  would typically see when you're referring to a medical

14:05 6  clearance document?

14:05 7    A.  Yes.

14:05 8    Q.  Okay.

14:05 9    A.  Except, I would have the original.

14:05 10   Q.  All right.  And would that document be attached

14:05 11 to any other papers?  Or would that document just be

14:06 12 standing on its own and was placed in a box --

14:06 13   A.  No.  It would be attached to other papers.

14:06 14   Q.  Okay.  And what other papers would typically be

14:06 15 attached to this medical clearance document?

14:06 16         MR. VITTITOE:  You're talking about

14:06 17 generic, generally?

14:06 18         MR. VALDEZ:  Yeah.  Generally.

14:06 19   A.  You were seen at Brownsville Medical room for

14:06 20 this reason, say, a laceration,.

14:06 21   Q.  Okay.

14:06 22   A.  And it will give you instructions to keep it

14:06 23 clean and dry.  And if you notice any signs or symptoms

14:06 24 of infection, return to the emergency room or follow up

14:06 25 with your physician.  That sort of -- and don't drink

14:06  1    and don't smoke.  Those type.

14:06  2        Q.   So there would be other medical instructions

14:06  3    that accompany --

14:06  4        A.   Real -- yes.  Very generic instructions.

14:06  5        Q.   Very generic instructions that you would see

14:06  6    coming out of a hospital.

14:07  7        A.   What we received specifically would be on a

14:07  8    prescription type.

14:07  9        Q.   Okay.  So when the document noted as Lopez

14:07 10    Exhibit No. 4 gets into your box, then, or gets into

14:07 11    the medical box back in April of 2001, then what would

14:08 12    happen, as far as a process or procedure?  What would

14:08 13    happen next?

14:08 14        A.   We would get all that paperwork and start

14:08 15    clearing the -- all the inmates that were recently

14:08 16    booked.  Okay.

14:08 17        Q.   And what would you do after that?  Like this

14:08 18    one says, "May return to jail, but should be kept under

14:08 19    close observation."

14:08 20        A.   Then my job would be to be sure that is being

14:08 21    carried out.

14:08 22        Q.   Okay.  When you receive such an instruction as

14:08 23    that, what does that mean to you when you say, "Keep

14:08 24    under close observation?"  What would you do or what

14:08 25    should be done, as far as keeping a person under close

14:09 1     observation?

14:09 2         A.   Start an activity log on the individual.

14:09 3     Depending on his situation, an assessment, vital signs,

14:09 4     talk to him.  Each situation at the jail is very

14:09 5     different.  But, normally, yes, something like that,

14:09 6     I'd start a log and I would want to know why, you know,

14:09 7     why are we keeping him under close observation.  You

14:09 8     don't just read that, and, okay, start a log.

14:09 9         Q.   So that would, to you, mean some additional

14:09 10    questions have to be raised?

14:09 11        A.   Yes.  Why am I doing this?

14:09 12        Q.   If such a document would have reached your

14:09 13    hands, I'm not saying that it did.  But if such a

14:10 14    document were to have reached your hands, would you

14:10 15    find yourself contacting the City of Brownsville and

14:10 16    inquiring with them, "What's going on?  Why are we

14:10 17    keeping this man under close observation?"  Or do you

14:10 18    ever find yourself having to do that?

14:10 19        A.   I would see the individual and speak to the

14:10 20    booking officers, whoever -- whoever took him in, who

14:10 21    was there when they accepted him.  Most likely I would

14:10 22    deal with them instead of calling Brownsville PD.

14:10 23        Q.   Okay.  Have you ever had an occasion where you

14:10 24    actually tried to contact the hospital and contact the

14:10 25    doctor to see what was going on as to why someone had

14:10  1    to be kept under close observation?

14:10  2         A.   No, I haven't had that.

14:10  3         Q.   Okay.  When we talk about the activity log, is

14:10  4    this activity log -- activity log something that the

14:10  5    nursing staff only keeps?  Or is the activity log

14:11  6    paperwork transferred with the prisoner to the cell

14:11  7    block so that the detention personnel can also keep a

14:11  8    log, as well?

14:11  9         A.   They have copies, so they can start one at any

14:11 10    time.

14:11 11         Q.   Okay.

14:11 12         A.   I don't necessarily send it out from the

14:11 13    infirmary.

14:11 14         Q.   I see.  So we'd have with these types of

14:11 15    instructions, as what's noted in Lopez Exhibit No. 4,

14:11 16    you would maintain or the nurses would maintain an

14:11 17    activity log, and then perhaps the detention officers

14:11 18    would also maintain a separate activity log.  Is that

14:11 19    my understanding?  Is that correct or not?

14:11 20         A.   (Witness shakes head.)

14:11 21         Q.   No?

14:11 22         A.   No.  At this point what you're describing --

14:11 23         Q.   Yes.

14:11 24         A.   -- under close observation, just straight like

14:11 25    that.  The officer would -- we would notify the officer

14:13 1    Q.   Okay.

14:13 2    A.   So at 10:30 if you see a number 13, that

14:13 3  individual was sleeping.  If you see 22, he was eating,

14:13 4  for example.

14:13 5    Q.   Okay.

14:13 6    A.   And then there is a space for any remarks or

14:13 7  anything else you need to fill in.

14:13 8    Q.   I see.  So typically what would happen is that

14:14 9  when the nursing staff at the Cameron County jail back

14:14 10  in April of 2001 would see such a document noted as

14:14 11  Lopez Exhibit No. 4, the instruction to the detention

14:14 12  officers would be to maintain an activity log, correct?

14:14 13    A.   Yes, sir.

14:14 14    Q.   And this activity log is a sheet that has these

14:14 15  various notations that can be made at specific times of

14:14 16  the day, correct?

14:14 17    A.   Yes.

14:14 18    Q.   Okay.  And it would address behavior --

14:14 19  behavioral issues; is that true?

14:14 20    A.   (Witness nods head.)

14:14 21    Q.   You have to say out loud.

14:14 22    A.   Yes.

14:14 23    Q.   Okay.  Thank you.  I'm not giving you a hard

14:14 24  time, it's just --

14:14 25    A.   No.  No.  No.  I know.

14:14 1    Q.  The court reporter has to record.  Now, have

14:15 2 you ever seen an activity log for Juan Longoria

14:15 3 concerning the dates of April the 11th of 2001 and

14:15 4 April the 12th of 2001?

14:15 5    A.  No, sir, I haven't.

14:15 6    Q.  All right.  Do you know whether or not one

14:15 7 exists?

14:15 8    A.  I don't know.

14:15 9    Q.  Has anyone come to you and said that one

14:15 10 exists?

14:15 11    A.  No.

14:15 12    Q.  Now, this activity log that we're talking

14:15 13 about, how are the times broken down?  You said it's

14:15 14 from -- I heard 7:00 to 3:00, 3:00 to 11:00 and 11:00

14:15 15 to 7:00, correct?  Is that true?

14:15 16    A.  It's broken down per shift, and then I think

14:15 17 it's by the 15 minutes.

14:15 18    Q.  Intervals?

14:15 19    A.  Yes, sir.

14:15 20    Q.  Okay.  Is the activity log that is presently

14:16 21 being used by the Cameron County jail facility the same

14:16 22 format or form that was used back in April of 2001?

14:16 23    A.  I'm very sure it is.

14:16 24    Q.  Okay.  And this activity log is broken down

14:16 25 every 15 minutes?

BRYANT & STINGLEY, INC.
McAllen       Harlingen       Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

29

14:16  1    A.  I believe so.

14:16  2    Q.  Okay.  And when you, as a nurse, have this

14:16  3  information, assuming that there is an activity log,

14:16  4  how do you find out what's going on?  Do you go up to

14:16  5  the cell block and look at the activity log?  Or do

14:16  6  they send it back down to you?  Or how do you get the

14:16  7  information as to what's going on in this activity log?

14:16  8    A.  That activity log would be turned in at the end

14:17  9  of the three shifts and forwarded to the medical staff.

14:17  10    Q.  Well, how about if something -- I was going to

14:17  11  say if something -- I don't want to use the word

14:17  12  "serious."  But if something is going on where this guy

14:17  13  is being kept under close observation, how do you find

14:17  14  out before seven hours or before 14 hours as to what's

14:17  15  going on as a nurse?

14:17  16    A.  The -- if something changes, if it's serious,

14:17  17  depending on what the guard sees, depending on their

14:17  18  observation, they notify us immediately, and we're

14:17  19  required to go and see the individual.

14:17  20    Q.  Okay.  If -- if a doctor gives orders to keep

14:18  21  an individual under close observation, is it nonmedical

14:18  22  personnel that are keeping the individual under close

14:18  23  observation?

14:18  24    A.  Would you ask me that again?

14:18  25    Q.  Yes.  If we have a doctor's order, such as what

14:18 1   is marked as Lopez Exhibit No. 4, and we have an

14:18 2   activity log being generated as a result of Lopez

14:18 3   Exhibit No. 4, is it nonmedical trained people who are

14:18 4   keeping the close observation on that particular

14:18 5   inmate?

14:19 6       A.   Yes.  But the nurse would in this case?

14:19 7       Q.   Yes.

14:19 8       A.   No, the situation is a little different.

14:19 9       Q.   Okay.

14:19 10      A.   Then, yes, the nurse also would be keeping a

14:19 11  log.

14:19 12      Q.   Okay.

14:19 13      A.   See, if, for example, the psychologist orders a

14:19 14  log on an individual and he's not suicidal or anything,

14:19 15  we just want to know what he's doing, how he's getting

14:19 16  along, can we put him in general population instead of

14:19 17  just a cell with four or five people?  So we're keeping

14:19 18  a log on this one, also, but it's for a different

14:19 19  reason.  And in that case, then, just the guard

14:19 20  would -- the officer would keep the log.  If there was

14:20 21  somebody actually sick or restrained in any way or a

14:20 22  danger to himself, then the nurse would be involved and

14:20 23  be also keeping a log.

14:20 24      Q.   Okay.

14:20 25      A.   We do have our own separate logs.

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

14:20 1    Q.  And what does your log have in it as far as
14:20 2 information?  Or what are the questions typically you
14:20 3 would find yourself addressing?
14:20 4    A.  An overall assessment, if he's alert and
14:20 5 oriented, the vital signs, what's going on with him
14:20 6 that little while.
14:20 7    Q.  Given moment.
14:20 8    A.  Yes.
14:20 9    Q.  And how often would you find yourself -- I'm
14:20 10 using "yourself."  Generically I'm saying, how often
14:20 11 would the nursing staff at the Cameron County jail
14:20 12 facility back in April of 2001 be documenting their own
14:21 13 log or journal if we have someone here that's supposed
14:21 14 to be looked at every 15 minutes?
14:21 15    A.  Well, if he's supposed to be looked at every 15
14:21 16 minutes, then we're looking at him every 15 minutes.
14:21 17    Q.  So if we have a situation that the detention
14:21 18 officers are making a log or a journal every 15
14:21 19 minutes, then the nursing staff also is going to be
14:21 20 making notations every 15 minutes, as well?
14:21 21    A.  Yes.
14:21 22    Q.  Okay.  Do you know whether or not there is any
14:21 23 logs or journals from the nursing staff concerning Juan
14:22 24 Longoria and the notations of vital signs every 15
14:22 25 minutes or the things that we've just talked about from

14:22  1    a nursing perspective?

14:22  2        A.  I'm not aware.

14:22  3        Q.  As far as you know, they don't exist?  As far

14:22  4    as you know.

14:22  5        A.  I really didn't hear much until later, until

14:22  6    the next morning about this.

14:22  7        Q.  Yes.

14:22  8        A.  No.  Honestly never checked into what we did or

14:22  9    didn't do.

14:22  10       Q.  Okay.  All right.  But my question is, as far

14:22  11   as you're aware, there are no nursing logs concerning

14:22  12   Juan -- Juan Longoria while he was staying at the

14:22  13   Cameron County jail?

14:22  14       A.  No, I'm not aware of any.

14:23  15       Q.  Okay.  Could you be able to provide me with an

14:23  16   explanation as to why Juan Longoria was never

14:23  17   classified when he arrived at the Cameron County jail

14:23  18   in April of 2001?

14:23  19       A.  That would be the booking department.  I

14:23  20   honestly couldn't answer that.

14:23  21       Q.  Okay.

       22            MR. VALDEZ:  Let's go off the record for a

       23   moment until she gets her phone.

14:23  24            (Off record.)

14:23  25       Q.  If Juan Longoria had this document that is

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

noted as Lopez Exhibit No. 4 accompanying him when he was transferred from the Brownsville Police Department to the Cameron County Sheriff's Department jail facility, what should have been done with him as far as in the process in the way of medical attention?

A. It would have been brought in -- put into the holding cell that would have been forwarded to us.

Q. Okay. And then what would have been done in the way of an assessment or evaluation of him?

A. The nurses should have acted on it.

Q. Okay. And when you say the nurses should have acted upon what's reflected on Lopez Exhibit No. 4, what do you mean by that? What should the nurses have done?

A. Assess him, start a log, notify the -- the nurse practitioner or the physician with what we saw.

Q. Okay. So there would be a log that was commenced by the nursing staff. And as I understand your prior testimony, there would also be instructions from the nurses to instruct the detention officers to also begin a log, as well. Is that true?

A. Yes.

Q. Okay. Are you aware of any other inmates or prisoners that have died in the Cameron County jail?

A. One other one, I believe.

14:26 1    Q.  Okay.  Tell me about that.  What do you know

14:26 2    about that situation?

14:26 3    A.  I -- I'm not real sure.  I believe he had a

14:26 4    heart attack.  I'm not -- I wouldn't swear to it.

14:26 5    Q.  Okay.  Do you know whether or not that was

14:26 6    before Juan -- Juan Longoria's death or after Juan

14:26 7    Longoria's death?

14:26 8    A.  I believe it was before.

14:27 9    Q.  Okay.  Ma'am, I'm going to hand you what has

14:27 10   been marked as Mr. Lopez Exhibit No. 3, and I'm going

14:27 11   to ask you -- I'm going to give you a moment to read

14:27 12   that, then I'm going to ask some questions from that,

14:27 13   please.

14:29 14   A.  Okay.

14:29 15   Q.  Okay.  My question to you is, do you know

14:29 16   whether or not that document that is noted as Lopez

14:29 17   Exhibit -- is it No. 2?

14:29 18   A.  3.

14:29 19   Q.  Lopez Exhibit No. 3, accompanied the papers

14:29 20   when Mr. Longoria was transferred from the City of

14:29 21   Brownsville jail to the Cameron County jail?

14:29 22   A.  I wouldn't know that.

14:29 23   Q.  Okay.  This is some information from the

14:29 24   Brownsville jail that provides some medical history

14:29 25   concerning Mr. Longoria, correct?

A.  Correct.

Q.  Do you see that?  I would imagine that this is not the first time that Cameron County jail has received folks from the City of Brownsville jail that had some form of a medical clearance.  Would that be a fair statement?

A.  Oh, yes.

Q.  Okay.  Do you know whether or not this type of information, similar to what we see in Mr. Lopez Exhibit No. 3, would accompany the transfer papers when it was brought over from the city jail over to the county jail?

MR. VITTITOE:  Object.  Calls for speculation.

Q.  Do you know?

A.  I have never received a narrative report from them.

Q.  Okay.  Typically what you would receive or the medical staff at the Cameron County jail would receive would be something comparable to what is marked as Lopez Exhibit No. 4?

A.  Correct.

Q.  Okay.  Is what we term -- you call it the medical release, correct?

A.  Yes.

14:31 1    Q.   Okay.  And then the medical staff, in turn,

14:31 2    would start doing their own history of the patient,

14:31 3    correct?

14:31 4    A.   We would follow up, yes.

14:31 5    Q.   Okay.  And as a matter of course or practice,

14:31 6    the medical staff wouldn't find themselves typically

14:31 7    calling the City of Brownsville jail facility to find

14:31 8    out, "Hey, what's going on with this" or "What

14:31 9    information can you provide us?"  Y'all normally

14:31 10   wouldn't do that?

14:31 11   A.   No.

14:31 12   Q.   And the medical staff at the Cameron County

14:31 13   jail typically wouldn't contact the doctor, either, or

14:31 14   the hospital?

14:32 15   A.   When I see him and try to get information from

14:32 16   him?

14:32 17   Q.   Yes, ma'am.

14:32 18   A.   If he's been to the hospital, I will have him

14:32 19   sign a release of information so I can get any lab

14:32 20   results, any x-rays, anything that was done to him at

14:32 21   that time.

14:32 22   Q.   Okay.  All right.  Do you have an explanation

14:32 23   or can you provide me with an explanation as to why

14:32 24   there was never a -- a medical assessment of Juan

14:32 25   Longoria while at the Cameron County jail facility?

14:32 1    A.  No, I can't.

14:32 2    Q.  From what you have seen so far, would it be

14:32 3    fair to say that there should have been a medical

14:32 4    assessment concerning Juan Longoria while he was at the

14:33 5    Cameron County jail back in April of 2001?

14:33 6    A.  I would think so, yes.

14:33 7    Q.  Now, when the nurse does his or her checks on

14:33 8    the individual every 15 minutes as we've previously

14:33 9    discussed, do y'all -- as a nursing staff, do y'all go

14:33 10   up to this particular cell block and observe him while

14:33 11   he's in that particular cell or what happens?  Do you

14:33 12   have the detention officer bring him down to the

14:33 13   infirmary?  How do you get your information, typically,

14:33 14   as a nurse?

14:34 15   A.  If the individual is combative, then I go to

14:34 16   where the individual is.  The less we move him, the

14:34 17   less chance for anyone else being injured.  If he's in

14:34 18   a cell, then they will open the door for me to observe

14:34 19   him.  But if it's someone I'm keeping an eye on because

14:34 20   I'm monitoring blood sugar or blood pressures, yes, the

14:34 21   officers will bring him to the infirmary.

14:34 22   Q.  Okay.  You just have to look at the particular

14:34 23   situation is what you're telling me?

14:34 24   A.  Yes, sir.

14:34 25   Q.  Okay.  Were you aware that during most of Mr.

14:34  1    Longoria's stay at the Cameron County jail, he was

14:34  2    placed in what's called a padded cell?

14:35  3        A.  I wasn't aware of it until later.

14:35  4        Q.  Okay.  Under those circumstances, and assuming

14:35  5    that indeed he was in what's called a padded cell, then

14:35  6    in order for the nurse to obtain his or her information

14:35  7    to note in their log, would they actually go up to the

14:35  8    particular cell facility to get that information for

14:35  9    medical?

14:35 10        A.  Uh-huh.

14:35 11        Q.  Is that yes?

14:35 12        A.  Yes.

14:35 13        Q.  Okay.  And what information would be the --

14:35 14    what I'd consider the vital signs, correct?

14:35 15        A.  Yes, sir.

14:35 16        Q.  All right.  Are the nurses at the Cameron

14:35 17    County jail trained to note a potential alcohol

14:35 18    withdrawal situation?

14:36 19        A.  A nurse that is experienced, yes.  Yes.

14:36 20        Q.  Yes?  Okay.  Have you seen men or women

14:36 21    suffering from alcohol withdrawal or from -- what's it

14:36 22    called?  Delirium tremens?

14:36 23        A.  Tremors.

14:36 24        Q.  Tremors?

14:36 25        A.  Yes, sir.

14:36  1      Q.  Back in April of 2001, was a nursing staff at

14:36  2  the Cameron County jail facility trained to assess

14:36  3  someone that was suffering from those conditions of

14:36  4  alcohol withdrawal and DTs, delirium tremens?

14:36  5      A.  I believe so, yes.

14:36  6      Q.  Okay.  Generally speaking, when someone is

14:37  7  suffering from alcohol withdrawal or delirium tremens,

14:37  8  are there facilities at the Cameron County jail that

14:37  9  are adequate to take care of such an individual?  Or

14:37 10  does he have to be transferred to the hospital?

14:37 11      A.  I think it depends on how bad he is when we get

14:37 12  him.  We do start them on a protocol for withdrawal

14:37 13  symptoms.

14:37 14      Q.  Okay.  The protocol is what?  What would you

14:37 15  typically do?

14:37 16      A.  Librium, 25 milligrams, two caplets four times

14:38 17  a day.  Sweets, as needed.  A log.  We notify the

14:38 18  doctor immediately.  We call Tropical to get an

14:38 19  assessment on him.

14:38 20      Q.  Is there anything else that you can recall

14:38 21  concerning the protocol?

14:38 22      A.  Not this minute, no.

14:38 23      Q.  But from what I can gather, certainly the

14:38 24  doctor would be notified?

14:38 25      A.  Yes.

1    sure.

2                    MR. VALDEZ:  Yes, ma'am.  Yeah.  Why I was

3    asking that question, ma'am, I was just curious whether

4    or not this information that's noted on Lopez Exhibit

5    No. 3 would accompany the papers when an individual is

6    transferred from the City of Brownsville over to the

7    Cameron County jail facility.

8                    THE WITNESS:  No.

9                    MR. VALDEZ:  Your response, as far as you

10   know, that it's not.

11                   THE WITNESS:  As far as I know, no.

12                   MR. VALDEZ:  Let me take a two or three

13   minute break, restroom break, and I think that might be

14   all the questions I have.

15                    (Off record.)

16   Q.  Ma'am, we were talking originally about

17   protocol and procedures when someone, such as Juan

18   Longoria, has accompanying with him this medical

19   release, which is noted as Lopez Exhibit No. 4.  And

20   we've talked about that already.

21                   Now, while we're off the record, there was

22   a discussion as to what would be the protocol if while

23   Juan Longoria is there at the Cameron County jail

24   facility, and for whatever reasons he's put in a padded

25   cell, is the detention officers, are they supposed to

15:07 1  notify the medical department that this man has been

15:07 2  put in a padded cell?

15:07 3      A.  Yes.

15:07 4      Q.  Okay.  And how soon after Mr. Longoria is put

15:07 5  in a padded cell is the medical staff supposed to be

15:07 6  notified?  Are we talking immediately?

15:07 7      A.  As soon as possible, immediately.

15:07 8      Q.  Okay.  And then with that information that Mr.

15:07 9  Longoria is put in a padded cell, what would the

15:07 10  medical personnel at the Cameron County jail do?

15:07 11      A.  Go to the padded cell, see him, get vital

15:07 12  signs, make an assessment, note any injuries, any

15:08 13  behavior.

15:08 14      Q.  And what form of log or documentation would

15:08 15  then be commenced, if any?

15:08 16      A.  I would start my own medical log.

15:08 17      Q.  And what are the detention officers supposed to

15:08 18  do?

15:08 19      A.  They start an activity log.

15:08 20      Q.  As we've previously discussed?

15:08 21      A.  Yes.

15:08 22      Q.  During your years at the Cameron County jail,

15:08 23  have you found yourself in situations where you've had

15:08 24  to make an assessment or a -- I don't think you're

15:08 25  allowed to make a diagnosis, but make an assessment of

43

15:08  1   the possibility of alcohol withdrawals or DTs?

15:08  2       A.   Yes.

15:08  3       Q.   Does the Cameron County jail have a lot of what

15:08  4   I call "drunks" or "alcoholics" coming through the

15:09  5   system?

15:09  6       A.   We have a lot of people with some substance

15:09  7   abuse problem or another.

15:09  8       Q.   Okay.  And that would be true for in April

15:09  9   2002?  Excuse me.  April 2001.

15:09  10      A.   Yes.

15:09  11           MR. VALDEZ:  Ma'am, thank you for your

15:09  12   time.  That's all the questions I have.

15:09  13           MR. VITTITOE:  Thank you, Sylvia.

14                    (Deposition is concluded.)

15

16

17

18

19

20

21

22

23

24

25

SYLVIA RIVAS - ERRATA SHEET

Reasons for changes:  (1)  Clarify the record
                      (2)  Conform to the facts
                      (3)  Correct transcription errors

PAGE LINE  CHANGE FROM/CHANGE TO                    REASON

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

1     <u>SIGNATURE OF SYLVIA RIVAS</u>

2     I have read the foregoing transcript of my

3 deposition and it is a true and accurate record of my

4 testimony given on AUGUST 29, 2003, except as to any

5 corrections I have listed on Page 44 herein.

6

7     _____

8          SYLVIA RIVAS

9 THE STATE OF TEXAS

10 COUNTY OF _____

11          SUBSCRIBED AND SWORN TO BEFORE ME, the

12 undersigned authority on this the _____ day of

13 _____, 2003.

14

15

16     Notary Public in and for
       The State of Texas

17     My commission expires:

18     _____

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2                 BROWNSVILLE DIVISION

3  MARIA LONGORIA AND MARIA        ) (
   IDALIA GUTIERREZ,               ) (
4  INDIVIDUALLY AND ON             ) (
   BEHALF OF THE ESTATE OF         ) (    CIVIL ACTION NO.
5  JUAN LONGORIA, DECEASED,        ) (    B-01-062
            Plaintiffs             ) (
6                                  ) (
   VS.                             ) (
7                                  ) (    JURY DEMANDED
   CAMERON COUNTY, TEXAS,          ) (
8  THE CITY OF BROWNSVILLE,        ) (
   TEXAS, AND JOHN DOES 1-10,      ) (
9            Defendants            ) (

10              REPORTER'S CERTIFICATE
                ORAL DEPOSITION OF
11                 SYLVIA RIVAS
                 AUGUST 29, 2003

12

13         I, ELIZABETH TORRES, Certified Court Reporter,
   certify that the witness, SYLVIA RIVAS, was duly sworn
14 by me, and that the deposition is a true and correct
   record of the testimony given by the witness on AUGUST
15 29, 2003; that the deposition was reported by me in
   stenograph and was subsequently transcribed under my
16 supervision.
           I FURTHER CERTIFY that I am not a relative,
17 employee, attorney or counsel of the parties, nor a
   relative or employee of such attorney or counsel, nor
18 am I financially interested in the action.

19 WITNESS MY HAND on this _8th_ day of

20 _September_, 2003.

21

22         _Elizabeth Torres_

23 ELIZABETH TORRES, Texas CSR 5516
   Expiration Date: 12-31-04
   Bryant & Stingley, Inc.
24 4900 North 10th, Building A, Suite 3
   McAllen, Texas  78504
25 (956) 618-2366

                 BRYANT & STINGLEY, INC.
        McAllen        Harlingen        Brownsville
      (956)618-2366  (956)428-0755   (956)542-1020

**STIPULATIONS**

Deposition(s) of: ① Robert Lopez ② Joe Elizarde ③ Rumaldo Rodriguez

Cause No.: B-01-062    Style: Maria Longoria, et al.

Date: 8-28-03  Trial Date: Jan.  vs. Cameron County, Texas, et al.

8-29-03 ④ Xavier Lee Hernandez ⑤ Sylvia Rivas ⑥ George Garcia

1.    This deposition is taken pursuant to:

✓ A. Notice                          ___ C. Agreement
___ B. Notice and Subpoena           ___ D. Court Order

2.    Objections:

✓ A. Objections will be made pursuant to the Texas Federal Rules of Civil Procedure.
___ B. All objections are reserved.
___ C. All objections will be made at the time of taking the deposition.

3.    Signature and Delivery:

✓ A. The original transcript will be sent to  Alfred R. Valdez ,
      the Custodial Attorney, and the original signature page, along with a copy of the
      transcript(s), will be submitted to ___ the witness or ✓ the witness' Craig Vittitoe
      attorney, who will return the executed signature page, including any changes, to 1,2,3,4,5,6
      Bryant & Stingley, Inc., within 20 days of transmittal.

___ B. Signature is waived and the reporter will deliver the original transcript and
      exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1.    **Copy of Transcript: Yes** X **No** ____    **Video: (If Applicable) Yes** ____ **No** ____
      *( ASCII Disk and Condensed Transcript included)*

8/28
8/29  e-mail **Yes** ____ **No** ____ **e-mail address** _____
      **Signature:** A. R. Valdez      **Representing:** _____

2.    **Copy of Transcript: Yes** ✓ **No** ____    **Video: (If Applicable) Yes** ____ **No** ____
      *( ASCII Disk and Condensed Transcript included)*

8/28
8/29  e-mail **Yes** ✓ **No** ____ **e-mail address** CHVittitoe@Adamsgraham.
      **Signature:** CHV      **Representing:** Cameron Cty
                                                        e.or.

3.    **Copy of Transcript: Yes** ____ **No** ____    **Video: (If Applicable) Yes** ____ **No** ____
      *( ASCII Disk and Condensed Transcript included)*

      e-mail **Yes** ____ **No** ____ **e-mail address** _____
      **Signature:** _____      **Representing:** _____

4.    **Copy of Transcript: Yes** ____ **No** ____    **Video: (If Applicable) Yes** ____ **No** ____
      *( ASCII Disk and Condensed Transcript included)*

      e-mail **Yes** ____ **No** ____ **e-mail address** _____
      **Signature:** _____      **Representing:** _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

MARIA LONGORIA, and MARIA IDALIA    :
GUTIERREZ, Individually and on behalf    :
of the Estate of JUAN LONGORIA,    :
Deceased    :
    :
VS.    :          CIVIL ACTION NO. B-01-062
    :          **(JURY DEMANDED)**
CAMERON COUNTY, TEXAS, THE    :
CITY OF BROWNSVILLE, TEXAS    :
XAVIER LEE HERNANDEZ, and    :
JOHN DOES 1-10    :
    :

---

**DEFENDANT, CAMERON COUNTY, TEXAS' RESPONSES TO PLAINTIFFS' REQUEST FOR PRODUCTION**

---

TO:   Plaintiffs,   **MARIA   LONGORIA   and   MARIA   IDALIA   GUTIERREZ, INDIVIDUALLY and as on Behalf of the Estate OF JUAN LONGORIA, DECEASED**, by and serving their attorney of record:

Mr. Alfred R. Valdez
**LIN & VALDEZ, L.L.P.**
6300 Hillcroft, Suite 200
Houston, TX 77081

COMES NOW, CAMERON COUNTY, TEXAS, one of the Defendants herein, and

submits its Responses to Plaintiffs' Request for Production, pursuant to Rule 34, Federal Rules of

Civil Procedure, in the spaces provided in such instrument served on this Defendant.

Respectfully submitted,

**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
222 East Van Buren, West Tower
Harlingen, Texas 78551-1429
956/428-7495
956/428-2954 (Fax)


By:_____
      **CRAIG H. VITTITOE**
Federal Bar I.D. No. 18756
State Bar No. 20593900
ATTORNEYS FOR DEFENDANT,
CAMERON COUNTY, TEXAS


## CERTIFICATE OF SERVICE

*I HEREBY CERTIFY* that the original of the above and foregoing instrument was forwarded to Plaintiffs' counsel of record and a true and correct copy of the above and foregoing instrument was forwarded to Co-Defendants' counsel of record, on this the ____ day of October, 2003:


Mr. Alfred R. Valdez
**LIN & VALDEZ, L.L.P.**
6300 Hillcroft, Suite 200
Houston, TX 77081

**CM/RRR # 7002 2410 0001 9643 4676**


Ms. Eileen Leeds
**WILLETTE & GUERRA, L.L.P.**
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78521

**U.S. 1ST CLASS MAIL**


Mr. Ricardo J. Navarro
Mr. Rene Gonzalez
**DENTON AND NAVARRO, P.C.**
222 East Van Buren, Suite 405
Harlingen, TX 78550

**U.S. 1ST CLASS MAIL**

_____
Craig H. Vittitoe

## PLAINTIFF'S REQUEST FOR PRODUCTION TO
## DEFENDANT, CAMERON COUNTY, TEXAS

1.      Plaintiff is seeking the production of the file of "Juan Longoria Death" investigation that was disclosed and discussed during the deposition of Rumaldo Rodriguez on Thursday, 28 August 2003.

**RESPONSE:**

**Such is produced.**

2.      Plaintiff is seeking production of the copy of any and all forms that should have been used by detention officers and medical personnel for the documentation of medical information and behavioral issues concerning Juan Longoria; these forms were discussed by the nurse Sylvia Rivas, Xavier Hernandez, and George Garcia during their deposition of 29 August 2003. The Plaintiff is also seeking production of these same forms for the present time frame.

**RESPONSE:**

**Such is produced. Both forms were utilized during the time periods referenced in this request.**

**CAMERON COUNTY SHERIFF'S DEPARTMENT**
**CAMERON COUNTY JAIL**

**SHIFT ACTIVITIES LOG**

| SHIFT SUPERVISOR: | | DAY OF THE WEEK: | |
|---|---|---|---|
| FLOOR OFFICER: | | FLOOR ASSIGNED: | |
| DATE: | | FACILITY: | |
| SHIFT: | | | |

**ACTIVITY**

| TIME STARTED | TIME FINISHED | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

CCSD-010

# CAMERON COUNTY JAIL & DETENTION CENTERS
## *MEDICAL LOG*

### OBSERVATION CHECKLIST FOR CRISIS MANAGEMENT, PSYCHOLOGICAL OBSERVATION, SECLUSION, RESTRAINT OR MEDICAL

INMATE NAME: _____    I. D. ____    UNIT: ____    CELL: ____

**CHECK THE APPROPRIATE TYPE:**
___ CRISIS MANAGEMENT          ___ PSYCHOLOGICAL OBSERVATION
___ SECLUSION                  ___ RESTRAINT
                               ___ MEDICAL

ORDERED BY: _____
         Date & Time Began: _____    Date & Time Ended: _____

**ITEMS ALLOWED: (Check appropriate boxes)**

| | | | |
|---|---|---|---|
| ___ | CLOTHING | ___ | REGULAR TRAY |
| ___ | UNDERGARMENTS ONLY | ___ | PAPER TRAY |
| ___ | SUICIDE BLANKET | ___ | SACK LUNCH |
| ___ | MATTRESS | ___ | OTHER (Specify) : _____ |
| ___ | PILLOW | | _____ |

**CODE EXPLANATION**

**TIME OF VISUAL CHECKS**

| Code | Explanation | 7 a.m. - 3 p.m. | 3 p.m. - 11 p.m. | 11 p.m. - 7 a.m. |
|---|---|---|---|---|
| 1 | Beating on door/wall | 7:00 ___ | 3:00 ___ | 11:00 ___ |
| 2 | Yelling, screaming | 7:15 ___ | 3:15 ___ | 11:15 ___ |
| 3 | Crying | 7:30 ___ | 3:30 ___ | 11:30 ___ |
| 4 | Laughing | 7:45 ___ | 3:45 ___ | 11:45 ___ |
| 5 | Singing | 8:00 ___ | 4:00 ___ | 12:00 ___ |
| 6 | Mumbling | 8:15 ___ | 4:15 ___ | 12:15 ___ |
| 7 | Talking to self | 8:30 ___ | 4:30 ___ | 12:30 ___ |
| 8 | Talking to others | 8:45 ___ | 4:45 ___ | 12:45 ___ |
| 9 | Standing still | 9:00 ___ | 5:00 ___ | 1:00 ___ |
| 10 | Walking | 9:15 ___ | 5:15 ___ | 1:15 ___ |
| 11 | Sitting or lying down | 9:30 ___ | 5:30 ___ | 1:30 ___ |
| 12 | Quiet | 9:45 ___ | 5:45 ___ | 1:45 ___ |
| 13 | Sleeping | 10:00 ___ | 6:00 ___ | 2:00 ___ |
| 14 | Meals / fluids | 10:15 ___ | 6:15 ___ | 2:15 ___ |
| 15 | Bath / shower | 10:30 ___ | 6:30 ___ | 2:30 ___ |
| 16 | Toilet | 10:45 ___ | 6:45 ___ | 2:45 ___ |
| 17 | Restraints loosened | 11:00 ___ | 7:00 ___ | 3:00 ___ |
| 18 | Range of motions | 11:15 ___ | 7:15 ___ | 3:15 ___ |
| 19 | Out-of-cell | 11:30 ___ | 7:30 ___ | 3:30 ___ |
| 20 | Watching TV | 11:45 ___ | 7:45 ___ | 3:45 ___ |
| 21 | _____ | 12:00 ___ | 8:00 ___ | 4:00 ___ |
| 22 | _____ | 12:15 ___ | 8:15 ___ | 4:15 ___ |
| | | 12:30 ___ | 8:30 ___ | 4:30 ___ |
| | | 12:45 ___ | 8:45 ___ | 4:45 ___ |
| | | 1:00 ___ | 9:00 ___ | 5:00 ___ |
| | | 1:15 ___ | 9:15 ___ | 5:15 ___ |
| | | 1:30 ___ | 9:30 ___ | 5:30 ___ |
| | | 1:45 ___ | 9:45 ___ | 5:45 ___ |
| | | 2:00 ___ | 10:00 ___ | 6:00 ___ |
| | | 2:15 ___ | 10:15 ___ | 6:15 ___ |
| | | 2:30 ___ | 10:30 ___ | 6:30 ___ |
| | | 2:45 ___ | 10:45 ___ | 6:45 ___ |

| PRINTED NAME | INITIALS |
|---|---|
| | |
| | |
| | |

11 p.m. - 7 a.m. Shift Sgt.'s Signature & Date

*Created by:LLGJ.G.09-99*

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 19 DAY OF April, 2001, DID APPEAR: Armando Guerrero, WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Armando Guerrero. I am 35 years old. My date of birth is 09/09/1965. I reside at 24 Linda Brownsville,Texas 78520. I can be reached (956) 504-2908.

I don't recall the date or day. All I can remember is that it was sometime last week , I was in the small holding cell in front of the booking area. I had been there for about a month or more.
At about lunch time. I heard an inmate that was in the large holding. He started yelling that someone was beating on his. He was yelling  in spanish. I looked at him and did not see anybody beating or touching him at. He was in the corner of the cell yelling that someone was beating him up. I did not notice anybody beating him up. I then saw two jailers open the door to the large cell. They took the inmate out and walked him right in front of the small holding cell where I was at. They placed him in the padded cell located right behind the small holding cell. After that this inmate was yelling that someone was hitting. I looked towards the padded cell. I then noticed anybody beating him up. He was kicking the door.  He continued yelling for the next four to five hours. Nobody checked up on him.
I would say that the inmate stopped yelling about an hour right before the briefing to the incoming shift started.
I believe Sgt. Mendieta started at around 10:30 to 10:45pm.

I would like to state that I have given this statement of my own free will and accord and without being subjected to any threats, promises, compulsion, or persuasion of any kind.

The above is a true and correct statement to the best of my knowledge and ability.

SIGN _Armando Guerrero_

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 19 DAY OF April A.D. 2001.

_____
NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

THE STATE OF TEXAS §

COUNTY OF CAMERON §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 19th , Day of _April_, 2001, A.D, did personally appear: Anthony Edward Cipollaro DOB 10/18/62 I am currently incarcerated at the Cameron County Jail in Brownsville, Texas   , who after being by me duly sworn, did depose and say:

I recall feeding subject detained in the padded cell at noon time as I help feed all inmates in the infirmary and booking area in the county jail. I saw a guard open the door to the padded cell so I could feed the guy inside. I gave him two sandwiches; subject appeared to have no interest in the food. He appeared to be scared and was speaking very fast but I don't understand Spanish. He wanted to get out of the cell; I was holding the food tray against his body and eventually took the tray from my hands. I pulled away and he stayed inside as the guard closed the cell slowly.

I then returned to the kitchen area to finish of my shores. That is the last time I saw him since I don't remember feeding him in the evening of that same day.

The following day I found out that the guy in the padded cell was dead, and then I remember hearing from inmate Mike Baskin that he had seen that same guy having a seizure, and that he had told a guard known to us in the jail as XL, of the incident, and XL had told Mike Baskin "That guy is just crazy".

I don't recall any other information or the day this occurred until Investigator Javier Reyna CCSO asked over the incident that occurred on April 11, 2001.

This statement that I give is of my own free will. I have not been threatened nor have I been promised anything in return for my statement. The above statement is true and correct to the best of my knowledge and ability.

Sworn and subscribed to before me on this the  19th  day of  April  , 2001, A.D.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm Exp. 02-01-2005

Notary Public for Cameron County, Texas



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA, and MARIA
IDALIA GUTIERREZ, Individually and      }
on behalf of the Estate of              }     CIVIL ACTION NO. B-01-062
JUAN LONGORIA, Deceased                 }
                                        }
VS.                                     }
                                        }
CAMERON COUNTY, TEXAS,                  }     JURY DEMANDED
THE CITY OF BROWNSVILLE,                }
TEXAS, and JOHN DOES 1-10               }

## PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT

Alfred R. Valdez
   Federal ID 6389
   State Bar No. 20426200
   7520 Hillcroft
   Houston, Texas 77081
   (713) 271-0719
   (713) 270-8134 fax

   Attorney for the Plaintiffs

VOLUME __2__ OF __3__

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA )(
IDALIA GUTIERREZ, )(
INDIVIDUALLY AND ON BEHALF )(
OF THE ESTATE OF JUAN )(
LONGORIA, DECEASED )(
      Plaintiffs )(
       )(
VS. )(   CIVIL ACTION NO. B-01-062
       )(
CAMERON COUNTY, TEXAS, )(
THE CITY OF BROWNSVILLE, )(   JURY DEMANDED
TEXAS AND JOHN DOES 1-10 )(
      Defendants )(

---

ORAL DEPOSITION OF
FELIPE SILVA, JR.
FEBRUARY 17, 2004



---

     ORAL DEPOSITION OF FELIPE SILVA, JR., produced

as a witness at the instance of the PLAINTIFFS, taken

in the above styled and numbered cause on FEBRUARY 17,

2004, reported by DONNA McCOWN, Certified Court

Reporter No. 6625, in and for the State of Texas, at

the offices of Adams & Graham, L.L.P., 222 East Van

Buren, West Tower, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

## APPEARANCES

COUNSEL FOR PLAINTIFFS:                 .

    ALFRED R. VALDEZ
    BARRY BERGER
    LAW OFFICE OF ALFRED R. VALDEZ
    7520 Hillcroft
    Houston, Texas  77081

    BARRY S. BERGER
    LAW OFFICE OF BARRY S. BERGER, P.C.
    1863 Post Oak Park Drive
    Houston, Texas  77027

COUNSEL FOR DEFENDANTS:

    CRAIG VITTITOE
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren, West Tower
    Harlingen, Texas  78551

## INDEX

|  | PAGE |
|---|---|
| Appearances ................................... | 2 |

FELIPE SILVA, JR.

| | |
|---|---|
| Examination by Mr. Berger ..................... | 3 |
| Errata Sheet/Signature Page ................... | 99 |
| Reporter's Certificate ........................ | 101 |

Attached to the end of the transcript:  Stipulations

## EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Statement ............................... | 28 |
| 2 | Drawing ................................. | 41 |
| 3 | Drawing ................................. | 45 |

before?

   A.   No.   This is the first time.

   Q.   Okay.   Just little guidelines here.   This is not a -- there's no yes-and-no answers.   Okay?   So it's not a test.   Okay.   One thing.

       Two -- to everything, there may be to some things, but not everything.   Two, you need to wait until I finish my question before you answer because the court reporter has a problem taking us down talking at the same time.   Okay?

   A.   Yes, sir.

   Q.   And I may change the question in midstream, so you may be anticipating where I'm going and try to cut me off at the pass, in a sense.   But I may change the question at midstream, and we want to make sure that your response is to the question that I actually ask on the record.   Do you understand?

   A.   Yes, sir.

   Q.   Okay.   If you don't understand my question or if you don't hear me, ask me to repeat the question or rephrase it, and I'll be glad to do so.   Okay?

   A.   Yes, sir.

   Q.   I'll assume if you answer a question that you both heard it and you thought you understood it.   Okay?

   A.   Yes, sir.

09:33:11 1   reminds you or somebody reminds you that you shook your

09:33:15 2   head or didn't say "yes" or "no," we're not being

09:33:17 3   critical of you, because even the most experienced

09:33:20 4   person sometimes taking depositions or giving testimony

09:33:24 5   by deposition sometimes forgets and shakes their head

09:33:28 6   or says "yeah," "huh-uh," or "uh-huh" or something like

09:33:31 7   that.  Okay?

09:33:32 8       A.  Yes.

09:33:36 9       Q.  Okay.  Any time you need to take a break, stop

09:33:39 10  to go to the restroom, call your girlfriend, your wife,

09:33:45 11  fiance -- it may be all the same; I don't know, but if

09:33:48 12  they're different -- or check in with the County or

09:33:53 13  whatever you need to do, please tell us, and we'll be

09:33:56 14  glad to do so.

09:33:57 15      A.  Yes, sir.

09:33:57 16      Q.  Have you ever testified in a court of law

09:33:59 17  before?

09:34:00 18      A.  Yes.

09:34:01 19      Q.  Okay.  In a criminal matter; is that correct?

09:34:03 20      A.  Yes.

09:34:05 21      Q.  Okay.  How long have you been with the Cameron

09:34:08 22  Sheriff's Department -- Cameron County Sheriff's

09:34:12 23  Department?

09:34:12 24      A.  About seven year.

09:34:14 25      Q.  Seven years?

09:34:15 1          Okay.  How old are you?

09:34:17 2      A.  I'm 32.

09:34:19 3      Q.  And what did you do before you went to work for

09:34:24 4  the Cameron County Sheriff's Department?

09:34:26 5      A.  I used to be a paraprofessional for the school

09:34:29 6  district in Brownsville.

09:34:31 7      Q.  Paraprofessional?  You were an assistant?

09:34:34 8      A.  A teacher's aide.

09:34:34 9      Q.  Teaching assistant?

09:34:36 10      A.  Yes.

09:34:39 11      Q.  Okay.  Did you serve in the military?

09:34:41 12      A.  No, sir.

09:34:44 13      Q.  Okay.  Did you go to college?

09:34:47 14      A.  Two years.

09:34:48 15      Q.  Two years?  Where at?

09:34:50 16      A.  Texas Southmost College.

09:34:52 17      Q.  Okay.

09:34:53 18      A.  University of Brownsville -- UT Brownsville,

09:34:58 19  University of Texas Brownsville.

09:34:59 20      Q.  Okay.  Did you get an AA degree?

09:35:01 21      A.  No, sir.

09:35:02 22      Q.  Did you have any particular field of study or

09:35:04 23  just general?

09:35:04 24      A.  Just general.

09:35:08 25      Q.  When you went to work in the sheriff's

department, what was your first assignment?

    A.  I started off as a detention officer.

    Q.  Okay.  So you started off in the jail?

    A.  Yes, sir.

    Q.  Okay.  And you started off as a detention officer, and then when you became -- came into the jail, did you get any training from the Cameron County Sheriff's Department on what it took to be a detention officer?

    A.  A couple of months after I got hired, I went to the basic jailer's course.

    Q.  Basic.  Where was that?

    A.  I'm sorry?

    Q.  Where was the basic jailer's course taught?

    A.  There at the detention.  It's called the Ruben Torres Detention Center 1.

    Q.  And where is that?

    A.  It's located in Brownsville.

    Q.  In Brownsville.  Okay.

    And who taught that course?  Do you recall?  I know it's been some time ago.

    A.  It was, at the time, Captain Luis Esparza.

    Q.  Can you spell the last name?  Do you know?

    A.  E-S-P-A-R-Z-A.

    Q.  Okay.  And did you get any certification as a

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

09:37:58 1    like that; is that right?

09:38:00 2        A.  Yes, sir.

09:38:00 3        Q.  You see -- I imagine you have drunks come in;

09:38:00 4    is that correct?

09:38:05 5        A.  Yes.

09:38:06 6        Q.  You see -- have people with -- they're on

09:38:09 7    drugs; is that correct?

09:38:10 8        A.  Yes.

09:38:11 9        Q.  You see people that have other medical type of

09:38:14 10   problems; is that correct?

09:38:15 11       A.  Yes, sir.

09:38:16 12       Q.  Maybe asthma.

09:38:19 13       A.  Yes.

09:38:20 14       Q.  People come in with medication, various types

09:38:23 15   of things for various types of medical problems.

09:38:26 16       A.  Yes.

09:38:27 17       Q.  Okay.  You see people with mental disorders.

09:38:31 18       A.  Yes.

09:38:35 19       Q.  Okay.  Do you have any idea what percentage of

09:38:36 20   the population that you see in the jail has some

09:38:39 21   medical related type of problem either because they

09:38:43 22   have medication or they're drunk or they're high on

09:38:47 23   drugs or low on drugs, depending on the situation, or

09:38:55 24   have some mental type of problems that you see in an

09:39:00 25   ordinary day?

Q.  Yes.

A.  Not that I recall.

Q.  Okay.  Do you recall anything that they told you what to do or how to do it?

MR. VITTITOE:  Objection, overly broad.

Q.  In the jailer's course from a medical standpoint.

A.  I don't recall.

Q.  Okay.  In the exam, did it have any medical questions or medically related questions?

MR. VITTITOE:  If you remember.

THE WITNESS:  If I remember.  I mean --

Q.  I know it's a long time ago, sir.

A.  I don't recall if it did have questions on the state exam or not.

Q.  Subsequent to the time that you became certified and you continued to work in the detention center, did you have any other medically related courses or studies?

A.  No.

Q.  Okay.  As I understand it, there's an infirmary in that jail or former old jail; is that correct?

A.  Yes, sir.

Q.  Okay.  Before we get into that, let me ask you, as I understand it, the old jail, old detention center

09:42:37 1    county jail detention center?

09:42:40 2        A.   Yes.

09:42:40 3        Q.   Okay.   Did it have any other facility?

09:42:46 4        A.   It had two other facilities.   It had the DC-1.

09:42:49 5        Q.   DC-1?

09:42:50 6        A.   Detention Center 1.

09:42:52 7        Q.   Where was that?

09:42:52 8        A.   It's about a block away from the old county

09:42:55 9    jail down Harrison Street.

09:42:58 10        Q.   Okay.

09:42:58 11        A.   And right next to that is Detention Center 2.

09:43:01 12        Q.   That's in Brownsville?

09:43:02 13        A.   Yes, sir.   All three facilities are located in

09:43:05 14    Brownsville.

09:43:06 15        Q.   Now, in April of 2001, which detention center

09:43:16 16    were you assigned to?

09:43:16 17        A.   The old county jail.

09:43:18 18        Q.   Since your work as a detention jailer or in the

09:43:24 19    detention center, did you work in the old county jail

09:43:29 20    from the time you started working for the Cameron

09:43:33 21    County until when?

09:43:35 22        A.   I started there, and then they moved me around.

09:43:39 23        Q.   Moved you around.

09:43:40 24        A.   Yes.

09:43:41 25        Q.   Okay.   Ultimately, you became -- besides a

detention officer, what other capacities did you serve in?

    A.  I was a booking officer.

    Q.  Booking officer.  Okay.

            What does a booking officer do besides -- as opposed to being a detention officer?

    A.  Take general information on the inmates being processed, take fingerprints, pictures.

    Q.  Put them in a computer system?

    A.  Yes, sir.  Assign their ID number to them.

    Q.  Have you ever acted as a classification officer?

    A.  I'm sorry?

    Q.  Have you ever acted as a classification officer?

    A.  No.

    Q.  Okay.  Now, besides the detention officer, which I guess would be -- well, correct me if I'm wrong, would be just somebody that's assigned to the general population to oversee and make sure that they stay healthy, they stay locked up, get food and things like that?

    A.  Yes.

    Q.  Okay.  Any other capacity as a jailer in the detention center?  Have you ever served in any other

capacity?

A.   After a booking officer, I became assistant sergeant for -- I can't recall the facility.  I think it was Detention Center 2.

Q.   Okay.

A.   And then I went back to booking and then promoted to sergeant.

Q.   So you went back to sergeant, and you went back to booking at the old county jail?

A.   Yes, sir.

Q.   Okay.  When did -- now you're at a different facility, the new facility.  What is your position now?

A.   Sergeant.

Q.   You still in booking?

A.   I went back as a -- in February of 2002, I resigned my position.  That's when I left for border patrol.  In July 2002, I went back to the -- I reapplied.  I got hired as a booking officer.

Q.   Okay.  When did you leave the County and become a border patrolman?

A.   That was February of 2002.

Q.   February of 2002.

        How long did you stay a border patrolman?

A.   I believe about five months.

Q.   Five months.

09:46:13 1          Any particular reason why you went --

09:46:18 2      A.  I left to the academy.  I didn't pass my

09:46:24 3  academics, so I got terminated.

09:46:26 4      Q.  Federal academy for border patrol, so you went

09:46:27 5  back to the sheriff's department; is that right?

09:46:29 6      A.  Yes, sir.

09:46:31 7      Q.  Now are you a sergeant booking at the unit you

09:46:34 8  work in?

09:46:35 9      A.  When I got rehired, I got rehired as a booking

09:46:37 10 officer.

09:46:40 11     Q.  Okay.  Are you still a booking officer?

09:46:42 12     A.  No.  There was a sergeant's position available.

09:46:45 13 I applied for it, and I got it, so I'm currently a

09:46:49 14 sergeant at the moment.

09:46:50 15     Q.  Okay.  You're a sergeant.  And what is your

09:46:52 16 function besides being a sergeant?  I mean, what

09:46:57 17 department are you in at the new facility?  And I won't

09:47:00 18 try to pronounce it.  What is your function, job

09:47:05 19 function now at the new facility?

09:47:08 20     A.  My duties or --

09:47:10 21     Q.  Yes, sir.  Duties.

09:47:11 22     A.  Okay.  To oversee the safety of the inmates.

09:47:17 23     Q.  Okay.  Are you a safety officer, or are you a

09:47:19 24 detention officer, or what?

09:47:20 25     A.  No.  Just -- in my position, we do everything,

09:48:12 1   Sergeant?

09:48:13 2       A.  Sergeant.

09:48:13 3       Q.  Yes, sir.  And, again, that was the same type

09:48:14 4   of thing?  You did a little of everything?

09:48:18 5       A.  Yes, sir.

09:48:19 6       Q.  Okay.  Where you in charge of any particular

09:48:22 7   floor or section or anything like that?

09:48:24 8       A.  Just in charge of the facility.

09:48:26 9       Q.  The facility.

09:48:27 10      A.  Yes, sir.

09:48:28 11      Q.  Okay.  So there was a sergeant, a shift

09:48:31 12  sergeant; is that correct?

09:48:32 13      A.  Yes, sir.

09:48:32 14      Q.  Was there a shift lieutenant?

09:48:37 15      A.  Not specifically assigned to -- during the

09:48:40 16  time -- I mean, all lieutenants go -- they work in the

09:48:43 17  morning hours, so --

09:48:43 18      Q.  Okay.

09:48:45 19      A.  -- there's no assigned -- there's no lieutenant

09:48:47 20  assigned to a certain shift.

09:48:53 21      Q.  Is there a lieutenant assigned for detention

09:48:56 22  that comes -- that came to the old county jail in any

09:49:00 23  particular time of day?

09:49:06 24      A.  Each facility had their own lieutenants

09:49:07 25  assigned to them, but --

BRYANT & STINGLEY, INC.
McAllen         Harlingen         Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

Q. Okay. Were they just supervisory over the whole jail?

A. Yes.

Q. Okay. And then was there a captain also?

A. At the time --

Q. April 11, 2001.

A. I'm -- I can't recall if there was a captain or not.

Q. Okay. Was there anybody, in April 2001, called a jailer or the jail administrator?

A. Chief jailer.

Q. Chief jailer? Who was that?

A. At the time, it was Joe Elizarde.

Q. And who was the lieutenant?

A. We had several. We had a lead lieutenant which is -- was Joel Zamora.

Q. Zamora?

A. Yes.

Q. Okay.

A. And then we had a few other lieutenants under him.

Q. Come in and out or what?

A. One was in charge of the, I believe, booking and classifications. The rest was just in charge of --

Q. The rest of the jail?

A.   The rest of the jail you could say.

Q.   Okay.  The classification officer, do you remember, in 2001, who the -- April of 2001, who the classification officer was on the morning shift that you were on?

A.   I believe it was Mario Vera.

Q.   How do you spell the last name?  V-E-R-A?

A.   Yes.

Q.   What does a classification officer do?

A.   What they do, they -- before they send somebody to general population, they check their prior arrests, they check if they're gang-related, and, if so, what gangs they cannot mix them with and  --

Q.   Sure.

A.   -- you know, just to prevent the fights, if they have any medical problems.

Q.   Okay.  HIV positive?  Things like that?

A.   Well, only the medical staff know.

Q.   Okay.

A.   Unless the inmate states it, that he is HIV or whatever, then we'll know.  But other than that, we don't -- if it's confidential, they don't release that information to us.

Q.   Sure.  Do you recall whether or not Officer Morales was your booking officer that morning?

A.   I don't recall.

Q.   Do you recall anybody else that was your booking officer in April of 2001 on the morning shift that you were on?

A.   I don't recall who the booking officer at the time was.

Q.   Okay.  Now, we took Officer Morales' deposition yesterday, and he said that he was the booking officer that reported to you.

A.   We do shift work, so every shift is different.

Q.   Okay.  I mean, you wouldn't disagree with that if he said that, would you?

A.   No, sir.

Q.   Okay.  Now, your experience as booking officer -- and let me ask you what your experience -- what would you do when a person was brought over, like a prisoner from the city jail that went through -- been arraigned and sent over to the county jail, as a booking officer?

A.   You're saying as what I would do?

Q.   Yes.

A.   Just --

Q.   What a booking officer would do.  Is that the same as a receiving officer, or would there be a separate officer receiving the prisoner?

A. That's different. They do different duties, in other words.

Q. Okay. Were you ever a receiving officer?

A. No, sir.

Q. Okay. Do you supervise receiving officers --

A. Do I supervise --

Q. -- any time you were a sergeant?

A. When I was a sergeant, we assign different officers to different posts. And whoever was not assigned to a post were what we call runners. So they assist changing the inmates, helping the booking officers take inmates to the holding cells or whatever so they can be processed and so on.

Q. Okay. Well, what would a receiving officer do versus a booking officer?

A. Well, at the time, we didn't have receiving officers.

Q. In April of 2001?

A. No, sir.

Q. Okay. Now --

A. There was no such thing then.

Q. Okay. When did that change? Do you recall?

A. When they opened the Carrizales-Rucker Detention Center.

Q. I see. And when was that?

A.  I believe it was -- I left in February, March, April -- April of 2002.

Q.  April of 2002.  Okay.

So what would you do in the old county jail if you received -- a prisoner came in brought over by either the bailiff or the court or the city police officer -- Brownsville City Police officer, somebody else come in, what would you do as the prisoner was brought in as a booking officer?

A.  In my own deal for my own --

Q.  Sure.  You own process.

A.  You know, every officer or every sergeant is different.  So the way I would handle -- if I was to have received somebody at the time would -- as they come in my questions to them were:  "Do you have any medical problems, and if so, do you have your medications with you?  If not, what kind of medications are you taking?  Are you hurt or injured?"

We'll check for visual markings --

Q.  Yes.

A.  -- you know, any kind of bruising, cuts, limping.  I would ask him, "Anybody look suspicious?  Do you have any problems with anybody in here?  Are you suicidal?"

I would even ask the officer -- anybody --

"Should we take any kind of precautions, you know,
with" --

    Q.  Yeah.

    A.  If we did, we take different measures.

    Q.  Okay.  And then you would do what?

    A.  I would call the nurse on duty.  If nothing was
wrong with anybody, I would just -- I mean --

    Q.  What would be the process if the person just
came in, would you then take down other information and
put it in the computer?

    A.  No.  No, I don't.

    Q.  As a booking officer?

    A.  Oh, as a booking --

    Q.  Yeah.  As a booking officer.

    A.  You were asking me a question as a sergeant
or --

    Q.  As a booking officer, yeah.

    A.  Okay.  What I just stated right now was when I
was a sergeant.

    Q.  Oh, okay.

    A.  Those were my duties.

    Q.  What would you do as a booking officer?

    A.  As a booking officer, when I'm processing them,
you know, take general information, you know.  What
else?  Put in their charges.

09:56:47 1          I don't recall if at the time we were

09:56:49 2  doing -- we ask them for -- if they had any medical

09:56:55 3  problems.  I don't recall that.

09:56:58 4    Q.  Okay.  If they came --

09:56:59 5    A.  I know during a certain time they were doing

09:57:01 6  it.  All the booking officer would do, just process

09:57:05 7  them.  And I believe the runners would do -- the

09:57:09 8  classifications would be asking them medical problems

09:57:15 9  and so on.

09:57:24 10    Q.  Okay.  How about -- would they take their

09:57:24 11  fingerprints?

09:57:24 12    A.  Yes.

09:57:24 13    Q.  Okay.  Would they take the photographs of

09:57:24 14  them --

09:57:24 15    A.  Yes.

09:57:24 16    Q.  -- of the prisoner?

09:57:24 17        Okay.  Now, as the sergeant there, then

09:57:32 18  you were in the morning -- or you -- had you described

09:57:35 19  previously what you would do with that prisoner coming

09:57:38 20  in --

09:57:39 21    A.  Yes.

09:57:39 22    Q.  -- in addition to what the booking officer did?

09:57:41 23    A.  Yes.

09:57:41 24    Q.  So you would actually talk to the prisoner.

09:57:44 25    A.  Even when I was a booking officer, I mean, I

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

09:57:46 1   would ask the person receiving, "Does anybody have any

09:57:49 2   medical problems?"

09:57:50 3              So as a booking officer, you know, if

09:57:58 4   somebody did and so on, I'd ask them what kind of

09:58:03 5   medical problems and tell them, "You know what.   I

09:58:05 6   think this person should be seen by the medical staff."

09:58:07 7   Q.  Now, as a sergeant, you were acting -- in July

09:58:08 8   11th of 2001, you were a sergeant.

09:58:11 9              MR. VITTITOE:  Object.  Let me -- I think

09:58:14 10  you meant to say April.

09:58:17 11             MR. BERGER:  April.  Yeah.  You're

09:58:18 12  correct.  April of 2001.

09:58:20 13  Q.  You were the sergeant.

09:58:22 14  A.  Yes, sir.

09:58:23 15  Q.  Okay.  Now, in addition to whatever -- if there

09:58:27 16  was a booking officer, would you also meet the incoming

09:58:32 17  prisoners?  In other words, would you talk to the

09:58:37 18  incoming prisoners to ask them some questions in

09:58:42 19  addition to what the booking officer asked them?

09:58:46 20  A.  Just what I stated a little while ago.

09:58:48 21  Q.  I'm sorry.  Could you speak up?

09:58:49 22  A.  Just what I stated a little while ago.

09:58:51 23  Q.  Okay.  That's what I mean.  Yeah.  What you

09:58:53 24  stated a little while ago is what you do?

09:58:55 25  A.  Yes, sir.

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755     (956)542-1020

Q.  Do you recall meeting Mr. Longoria?

A.  At the time when he came in, I was not on the area where he came in.

Q.  Okay.  And I understand he came in about 10:30 a.m. in the morning.  Was that about right?  You want -- if you want to look at your statement.  Let's go ahead and mark your statement as Silva Exhibit No. 1.

This says something about 10:37 a.m. where you came back to the first floor to the booking area. It says something, "I remember about the inmate's request."  Which inmate request?  About some inmate up on the third floor?

MR. VITTITOE:  Counsel, just where are you referring to on the statement?

MR. BERGER:  At the bottom of the page.

MR. VITTITOE:  Of the first page?

MR. BERGER:  Yeah.

MR. VITTITOE:  Okay.  Somewhere, I guess, in the last paragraph.

MR. BERGER:  Last paragraph.

Q.  Is that where you first encountered Inmate Longoria?

A.  Oh, during the time -- it was -- I was up on the third floor conducting my rounds.  And I -- I don't

10:00:38  1    recall -- somebody asked me for something.  I guess

10:00:41  2    maybe it could have been a property.

10:00:42  3        Q.  Okay.

10:00:43  4        A.  And in the laundry is where we used to hold the

10:00:46  5    clothing and -- not personal belongings, but, like,

10:00:52  6    cell property or any hygiene products and so on.

10:00:58  7        Q.  But when you went in the laundry room, is that

10:01:02  8    the first time that you encountered Inmate Longoria?

10:01:05  9        A.  Yes, sir.

10:01:07 10        Q.  Okay.  And he was changing into inmate uniform?

10:01:10 11        A.  Yes.

10:01:10 12        Q.  Okay.  What was the uniform?  What did it look

10:01:13 13    like at that time?

10:01:18 14        A.  It was a jumpsuit.  I don't recall the color.

10:01:22 15    We have different colors, so --

10:01:24 16        Q.  Well, would the color depend upon the

10:01:29 17    classification or anything?  Did the color have any

10:01:34 18    significance?

10:01:35 19        A.  Well, I mean, the color they use there is a

10:01:39 20    brown color, kind of beige.  But if none were

10:01:42 21    available, they use orange or green or --

10:01:45 22        Q.  I see.  Whatever is available.

10:01:46 23        A.  Exactly.

10:01:48 24        Q.  Okay.  Now, was it made out of paper or was it

10:01:52 25    cloth?

A.  It's cloth.

Q.  No belt or anything like that?

A.  No belt.

Q.  How about shoes?  What type of shoes?

A.  Sandals.

Q.  Sandals?

No -- no laces and things like that?

A.  No laces.  Only Velcro.

Q.  Okay.  And those sandals would be given to the prisoner?

A.  Yes, sir.

Q.  And it says here you noticed Inmate Longoria's left elbow.  And I take it the laundry room was on the first floor; is that correct?

A.  Yes, sir.

Q.  Now, I've never been to that old jail.  Could you give us the general layout of what it was like? What was on the first floor, and what was on the second floor, and what was on the third floor?

A.  Okay.  In the first floor you had the kitchen, infirmary.  You want me to more or less --

Q.  Yeah.  I'm not going to ask you to draw a drawing because you've got three floors on top of each other.  But I may ask you -- can you draw what the first floor looked like?

10:02:53 1      A.  Yes.

10:02:53 2      Q.  Okay.  You don't have to be an artist.  It's

10:02:55 3   not to scale, but could you draw me what the first

10:02:59 4   floor looked like?

10:03:00 5      A.  Yes.

10:03:00 6      Q.  Okay.  I'll give you -- you need a pen?

10:03:06 7      A.  Yes, sir.

10:03:06 8      Q.  Okay.  Here you go.

10:03:17 9          Try to fill up the whole page so we can --

10:03:22 10  as long as you got it.

10:04:12 11          Are you labeling each room or cell?

10:04:15 12     A.  Yes.

10:04:35 13          MR. VITTITOE:  There's a place that you've

10:04:36 14  probably seen here called the drunk tank.

10:04:42 15          MR. BERGER:  Well, I haven't seen it in

10:04:44 16  that jail.  I can tell you that.

10:04:47 17          MR. VITTITOE:  That you remember anyway.

10:04:53 18          MR. BERGER:  They call that the borracho

10:04:55 19  tank here, don't they?

10:04:55 20          (Brief recess)

10:06:38 21     Q.  Can you initial that drawing?

10:06:45 22     A.  Anywhere?

10:06:45 23     Q.  Yeah.  Anywhere.

10:06:47 24          Is there any difference on the second and

10:06:50 25  third floor?

| | | |
|---|---|---|
| 10:06:52 | 1 | A.   Yes. |
| 10:06:53 | 2 | Q.   Okay.  What's the -- is the third floor |
| 10:06:57 | 3 | different from the second floor? |
| 10:06:59 | 4 | A.   Yes. |
| 10:06:59 | 5 | Q.   Okay.  Well, what's on the second floor? |
| 10:07:01 | 6 | A.   Second floor, we have all single cells.  As you |
| 10:07:05 | 7 | go to the elevator -- as you come out of the elevator |
| 10:07:08 | 8 | to the right, it's a women's ward. |
| 10:07:08 | 9 | Q.   Women's ward.  Okay. |
| 10:07:11 | 10 | A.   Well, at the time it used to be a women's ward. |
| 10:07:11 | 11 | Q.   Yeah. |
| 10:07:13 | 12 | A.   To the left, it was all single cells.  That's |
| 10:07:24 | 13 | for what you call the hole. |
| 10:07:24 | 14 | Q.   The hole?  Okay. |
| 10:07:24 | 15 | Is that for penalty people? |
| 10:07:25 | 16 | A.   Disciplinary actions and for separation from |
| 10:07:32 | 17 | other gangs. |
| 10:07:35 | 18 | Q.   If there was a gang problem.  Okay. |
| 10:07:37 | 19 | And are these single cells, the hole or |
| 10:07:41 | 20 | whatever it was, are these a solid door, or are they |
| 10:07:44 | 21 | just bars? |
| 10:07:45 | 22 | A.   Bars. |
| 10:07:46 | 23 | Q.   Bars? |
| 10:07:46 | 24 | A.   Yes, sir.  Bars. |
| 10:07:48 | 25 | Q.   Okay.  And the third floor is what?  Was what? |

A.  It was just general population.

Q.  Was it a dormitory type setting?

A.  Yes.

Q.  Did they have individual cells, or did you have multiple prisoner cells or --

A.  It was just open dorms.

Q.  Open dorms.

A.  Yes.

Q.  Okay.  And so there would be just a door or bars or whatever it was at one end of the dorm, and then there would be a guard inside watching?

A.  Yes, sir.

Q.  Okay.  See that there wasn't any fights or people got sick or something like that.  They would be able to see them or help them?

A.  Yes, sir.

Q.  Okay.  The isolation -- I'll call them isolation cells on the second floor.  They were bars; is that right?  Not a solid steel door with a window in it?

A.  They were steel bars.

Q.  Huh?

A.  Steel bars.

Q.  Steel bars.

    Was there a detention officer assigned to

that floor?

A.   Yes, sir.

Q.   Was a detention officer assigned to the section which has isolation cells?

A.   Yes, sir.

Q.   Was there a separate detention officer assigned to the women's --

A.   Yes.   Female officers.

Q.   -- female section?

Do they have open cells, or was that a dormitory type thing?

A.   Dormitory with steel bars.

Q.   Steel bars.

Did they -- the women have an isolation cell?

A.   They had some single cells in there.

Q.   Single cells.

They have women gangs too, didn't they?

A.   Yes.

Q.   Okay.   Let me look what's on the first floor now.

The sally port that's on the right, is that where the prisoners are brought in?

A.   Yes, sir.

Q.   Okay.   And you got a drunk tank up in the first

enclosed area.  Is that an open bar area?  In other words --

A.  No.  It's closed.  It's a steel door.

Q.  Steel door?

A.  Yes.

Q.  Okay.

A.  There's no bars on that.

Q.  There's no bars in it?

Can you -- if you were looking into it, could you see into it or just --

A.  There's a steel door, and there's a tray slot, and it has a window.

Q.  It has a window.

I take it it would be multiple -- hold multiple people?

A.  Yes.

Q.  Okay.  Then you have a booking area?

A.  Yes.

Q.  Is that correct?

A.  Yes, sir.

Q.  And how many officers would that normally hold, would be in that booking area?

A.  How many officers?

Usually just -- the only people that were allowed in the back would be myself to open the doors,

10:11:01 1    the sally port, just the booking officer and the person

10:11:05 2    who was in charge of the bonds area which --

10:11:07 3        Q.   A bonding officer?

10:11:09 4        A.   Yes.  Usually it's not normal traffic for other

10:11:13 5    officers to be in that area.

10:11:15 6        Q.   I see.  Okay.

10:11:16 7        A.   I know it's kind of big there, but it's not

10:11:19 8    that big.

10:11:20 9        Q.   Okay.  Not as big as you've drawn.

10:11:22 10       A.   No.

10:11:23 11       Q.   Then you've got "large HC"?

10:11:26 12       A.   Large holding cell.

10:11:27 13       Q.   Holding cell?

10:11:28 14       A.   Yes, sir.

10:11:28 15       Q.   Is that a padded cell?

10:11:29 16       A.   No.

10:11:31 17       Q.   What type?  Does it have bars or is that a --

10:11:34 18       A.   Steel bars.

10:11:34 19       Q.   Steel bars.

10:11:35 20       A.   Yes, sir.

10:11:36 21       Q.   Okay.  Then you have "small HC"?

10:11:40 22       A.   Yes.

10:11:40 23       Q.   And what was that?  Was that a padded cell?

10:11:41 24       A.   No.  That's a small holding cell.  That's also

10:11:43 25    steel bars.  I didn't put in the padded cells.

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

10:11:46 1    Q.  Okay.

10:11:47 2    A.  They're right next to the --

10:11:48 3    Q.  Could you put that in?

10:11:50 4    A.  Yes.

10:12:20 5    Q.  Okay.  Were there one or two?

10:12:23 6    A.  Actually, there was three of them.

10:12:24 7    Q.  Three of them.  Okay.

10:12:25 8    A.  Two of them were for use.  The other one was

10:12:28 9    just a storage area.

10:12:32 10   Q.  Okay.  Would you put the third one in also?

10:12:44 11   A.  Or was there two?  I'm trying to recall.

10:12:48 12        MR. VITTITOE:  If you don't remember --

10:12:50 13   Q.  Yeah.  If you don't remember, that's fine.  You

10:12:53 14   know there was at least two, right?

10:12:55 15   A.  Yes.  I know one of them was a storage room,

10:12:57 16   just papers and so on.

10:12:59 17   Q.  Okay.

10:13:00 18        MR. VITTITOE:  That's all right.

10:13:01 19   Q.  That's okay.  That's okay.

10:13:04 20        Is it true that there was at least two

10:13:07 21   padded cells and one was used as a storage area?

10:13:10 22   A.  And then the other one was in use.

10:13:12 23   Q.  Okay.

10:13:13 24   A.  I'm trying to -- yeah.  I think there was three

10:13:15 25   of them.

Q.  Well, okay.  I don't want you to guess.  But whatever it is, the padded cells -- where -- do they have bars, or do they have solid doors?

A.  Solid doors.

Q.  Like the drunk tank?

A.  Yes.

Q.  And they had a window in the door?

A.  A window and food tray slot.

Q.  Food tray slot.  Okay.

And that included whether there was two or three padded cells and one was used as a storage area.  One cell was used as a storage area.  Did all of them have the same type of configuration with a solid door with food slides and a window?

A.  A window.

Q.  Okay.  Did they have a bed in those -- or a bunk or a cot in those padded cells, the ones that were used?

A.  It's --

MR. VITTITOE:  A bench?

THE WITNESS:  Like a bench.

Q.  A bench.  Okay.

Was it in the middle of the cell or one end or what?

A.  No.  It was -- they were, I believe, to the

10:14:29 1    left part of the cell block.

10:14:31 2         Q.   Did it have a toilet, each cell?

10:14:41 3         A.   It's a -- it's just a hole in the floor.

10:14:41 4         Q.   A urinal with a hole in the floor?

10:14:41 5         A.   Yes.

10:14:44 6         Q.   Okay.

10:14:46 7         A.   Yeah.  They have the hole, yeah, in the middle,

10:14:50 8    I guess, but it's not --

10:14:53 9         Q.   Yeah.  It's not sitting above ground.

10:14:55 10        A.   No, sir.

10:14:55 11        Q.   Okay.  Like a toilet or something.  So if the

10:14:58 12   prisoner had to go, they could go in the hole in the

10:15:02 13   ground.

10:15:03 14        A.   Yes.

10:15:04 15        Q.   Either one or the other.

10:15:11 16             Okay.  Then you got offices over here.

10:15:17 17   Whose offices were those?

10:15:20 18        A.   One of them was the lieutenant's office.  And

10:15:21 19   the other office was the classifications.

10:15:24 20        Q.   I see.

10:15:26 21             Then you have officers dining area?

10:15:29 22        A.   Yes, sir.

10:15:30 23        Q.   Then you have an elevator bank, is that

10:15:37 24   correct, a square over here?

10:15:38 25        A.   Yeah.  All that area was storage for food for

10:15:47 1    the kitchen.  We had the elevator and the property,

10:15:52 2    property room.

10:15:53 3       Q.  Property room where they store the prisoner's

10:15:55 4    property?

10:15:55 5       A.  Yes.

10:15:56 6       Q.  Okay.  Where was the lockers for the officers?

10:16:00 7       A.  We don't --

10:16:01 8       Q.  You didn't have any lockers?

10:16:02 9       A.  No.

10:16:04 10      Q.  Okay.  The laundry room was where?

10:16:07 11      A.  Up in the --

10:16:10 12      Q.  Oh, I see.  It's up at the top of this drawing.

10:16:12 13      A.  Yes, sir.

10:16:13 14      Q.  Okay.  Then they had showers.  Is that for the

10:16:15 15     prisoners or is that for the officers?

10:16:17 16      A.  No.  For the prisoners.

10:16:19 17      Q.  A briefing area, what was that for?

10:16:23 18      A.  Officers meetings, briefing before we go to --

10:16:27 19      Q.  Shift changes?

10:16:28 20      A.  Shift changes, before we do our duties and so

10:16:30 21     on.

10:16:33 22      Q.  Okay.  And the kitchen, was that both for the

10:16:36 23     officers mess and the prisoners?

10:16:39 24      A.  And prisoners, both.

10:16:41 25      Q.  Okay.  And then you have a trustee ward.  Was

that open?

A.  That was open.  No.  It had a solid door also, but it -- I mean, the door's not locked.

Q.  The door is not locked.  Trustee should --

A.  Come in and come out.

Q.  -- come out.  Okay.

And then they had an infirmary area.

A.  Yes, sir.

Q.  And that was in the -- opposite of the sally port.

A.  Yes.

Q.  Okay.  And was the infirmary area open, or was it -- had a locked door or what?

A.  They had one open door with steel bars, and then it had six individual cell blocks also with steel doors -- I mean steel bars.

Q.  Steel.  Okay.

Why don't you -- can you just draw the infirmary on the second page?

MR. VITTITOE:  Is that page marked as an exhibit?

MR. BERGER:  Yeah.  Go ahead and mark this as Silva Exhibit No. 2.

Q.  Here, let me give you another page here.  Just draw a bigger drawing of the infirmary for me, would

| | | |
|---|---|---|
| 10:18:08 | 1 | you? |
| 10:18:09 | 2 | A.   Okay. |
| 10:18:12 | 3 | Q.   Again, it's not to scale and not to -- and I |
| 10:18:15 | 4 | know you're not an artist, but just a general idea what |
| 10:18:20 | 5 | it looked like. |
| 10:18:20 | 6 | (Brief recess) |
| 10:21:17 | 7 | Q.   Why don't you initial that also and just mark |
| 10:21:21 | 8 | on the top of the page "Infirmary." |
| 10:21:27 | 9 | MR. VITTITOE:   This is the -- at the old |
| 10:21:28 | 10 | jail? |
| 10:21:30 | 11 | THE WITNESS:   Yes, sir. |
| 10:21:31 | 12 | Q.   Put "Old jail infirmary" on there. |
| 10:21:52 | 13 | Okay.   You had -- you have it marked on |
| 10:21:56 | 14 | here "Infirmary area old county jail," and you have a |
| 10:22:03 | 15 | nurse's office here.   Is that where the nurse usually |
| 10:22:07 | 16 | stayed, nurses? |
| 10:22:09 | 17 | A.   Yes. |
| 10:22:10 | 18 | Q.   Okay.   Then you have an officer's office.   And |
| 10:22:13 | 19 | what type of officer would that be? |
| 10:22:15 | 20 | A.   The infirmary officer, whoever was assigned to |
| 10:22:20 | 21 | that area. |
| 10:22:21 | 22 | Q.   Infirmary officer? |
| 10:22:23 | 23 | A.   Yes.   There's not a specific assigned person, |
| 10:22:25 | 24 | but whoever in the shift we assigned to it, that was |
| 10:22:29 | 25 | his area. |

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

Q.  Is that -- you've got it closed here with a door.  Is that --

A.  It had a door, but it was never closed.

Q.  Never closed?  Okay.

A.  No.

Q.  Okay.  Then you have a single cell 1, 2, 3, 4, 5, and 6, so it would -- would that hold somebody that needed medical attention?

A.  Yes.

Q.  And were those -- is that a cell with bars?

A.  Yes, sir.

Q.  Did it have a cot in there for a person that was sick or needed medical attention versus a bench?

A.  No, it didn't have a bench.  It had a bed.

Q.  A bed.  Okay.

A.  Yes, sir.

Q.  And then you had an open dorm.

A.  Yes.

Q.  Okay.  And what was the open dorm for?

A.  Also medical, but not as critical as somebody placed in a single cell.

Q.  Not as what?

A.  Not as critical.  You know, even though they had a medical problem, but they can move around because the open dorm had, you know, two bunks.  In other

10:23:36  1    words, top one and a bottom one, so --

10:23:39  2        Q.  Okay.  I see.  That means they were not as sick

10:23:41  3    or they were not as serious?

10:23:43  4        A.  Hurt or if somebody could not move, you can put

10:23:46  5    them in an open dorm because they can't climb up so --

10:23:49  6        Q.  I see.  Okay.

10:23:51  7        A.  Or -- I mean, they could also be assigned to

10:23:54  8    the open dorm, but they have to sleep on the bottom.

10:23:57  9        Q.  Not the top.

10:23:58 10        A.  No.

10:24:01 11        Q.  Okay.  The -- was there an examining room, I

10:24:05 12    mean, where the nurses actually examined the patients,

10:24:09 13    or would the nurses examine the patient -- prisoner in

10:24:13 14    the individual cells or the dorm?

10:24:16 15        A.  In the -- well, I put "nurse office," but

10:24:18 16    that's where they had their office and had the --

10:24:21 17        Q.  Examining room?

10:24:22 18        A.  Yes.

10:24:24 19        Q.  Okay.  Could you just put "nurse's office and

10:24:26 20    examining room."  And I know it's not to scale, so.it

10:24:28 21    may be bigger than how you put it or it may be smaller.

10:24:43 22            Now, is this how the infirmary looked on

10:24:46 23    about the 11th of 2001?

10:24:49 24        A.  Yes.

10:24:50 25            MR. BERGER:  Okay.  We're going to mark

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

this as Exhibit 3, Sergeant Silva's Exhibit No. 3.

Q.  You would get to the -- according to this, would you get to the nurse's office and examining room through the officer's -- nurse's office and examining area through the sheriff officer's office?

A.  Yes.  We would go through there.

Q.  Okay.  And you got an inmate shower area.

A.  Yes.

Q.  Okay.  And that's for the people that need medical attention.

A.  Yes, sir.

Q.  So there were actually eight beds in the infirmary; is that correct?

A.  You're talking about the -- including the open dorm?

Q.  Including the open dorm.

How many beds in the open dorm, top and bottom?

A.  I don't recall the capacity there, but, I mean, there was not more than 12 or 10 maybe.

Q.  10 or 12 beds in the open dorm?

A.  Yes.

Q.  Okay.  So then, the capacity of the infirmary was 10 to 12 in the open dorm and six individual cells.

A.  Yes.

Q.  Okay.  And these cells are open so they were open to the officer or the nurse as they walked by and could see the people in there?

A.  Yes, sir.

Q.  See how they were doing and things like that without going over and individually examining them.

A.  Yes.

Q.  Okay.  Was there any procedure, at the time, in the infirmary, for the nurse -- time for each -- examine each patient, whether they're supposed to keep a log on each patient that they examined or they keep their own nurse's notes, or do you know?

A.  Maybe you can rephrase that question again.

Q.  Okay.  Have you ever served -- did you ever serve as an infirmary officer assigned to the infirmary?

A.  Yes.

Q.  Okay.  Did you keep a separate log as an infirmary officer of each time the patient was examined or looked on by the officer or the nurse, in other words, a written log?

A.  I mean, the officer kept his own activity log there.

Q.  Yeah.  An activity log would be -- would include looking on the patients?

A. Yes.

Q. Okay. And I take it the nurse kept -- as far as you know, kept there own nurse's notes when they examined the patient.

A. I believe so, yes.

Q. Okay. Now, getting back to your Exhibit No. 1, the statement that you gave. Getting back -- I'll get to the bottom in a minute. But do you have specific times in the middle of the statement? Did you keep your own activity log?

A. Yes.

Q. Could you tell us what happened to your own activity log? Is it -- do you keep it personally for yourself, or do you keep it as part of the sheriff's records?

A. The sheriff records.

Q. Okay. Would the -- was a -- the booking officer who was there or receiving officer or whatever they did, would they keep their own activity log?

A. No.

Q. Oh, okay. Just you as a sergeant would keep your own activity log?

A. Yes. Of my duties throughout the whole facility.

Q. I see. Okay. Now, you said the infirmary

officer, whoever was assigned to the infirmary, would keep --

A. His log.

Q. -- his activity log.

A. Yes.

Q. Okay. Would the detention officer keep their own activity log?

A. On the --

Q. In each floor?

A. In each floor, yes.

Q. Or each area they were assigned to?

A. Yes, sir.

Q. Okay. Who was assigned to the -- on the first floor, to the drunk tank, the borracho tank?

A. We didn't have -- I mean, who was assigned to that?

Q. Yeah. To keep an activity log.

A. It could be anybody. I mean, whoever is the runner.

Q. Oh, okay. The booking officer would not be the one keeping the activity log?

A. If you're a booking officer, you don't have time to.

Q. Okay. How about the large holding cell?

A. There's no specific officer assigned to that,

only the runners.

Q. Would look in on them?

A. Yes. Yes.

Q. And how about the small holding cell and -- the same thing?

A. Yes.

Q. And the padded cells? Same thing?

A. Same thing.

Q. The runner?

A. The runner.

Q. Would there be a -- was there supposed to an activity log put on a door of these cells to show when these runners actually examined the welfare of the patients or the prisoners or looked in on the prisoners as part of the policies and procedures of the Cameron County Sheriff's Department?

A. Well, if the person needed that log, activity log, then one would be placed on it.

Q. Okay. How would you determine whether a person needed an activity log?

A. It could be -- the medical staff could advise us, you know, due to medical problems or suicidal tendencies or -- one would be assigned to them.

Q. So unless the medical staff -- which included the nurses, right?

10:30:54  1   A.  Yes.

10:30:56  2   Q.  Okay.  Made -- assigned to keep an activity log

10:30:59  3   on one of the cells on the first floor, including the

10:31:05  4   drunk tank, the large holding cell, the small holding

10:31:10  5   cell, and the padded cells, there would -- are you

10:31:14  6   saying that there was no policy or procedure to keep an

10:31:16  7   activity log regarding examining the welfare of the

10:31:22  8   prisoners or seeing how the prisoners were doing to see

10:31:27  9   if they're still there?

10:31:27 10   A.  Yeah.  It's just the activity log.  I mean,

10:31:29 11   the -- how would you say.  It's an activity log.

10:31:35 12   Q.  Okay.  But, I mean, would that be posted on the

10:31:38 13   door or would it placed someplace?

10:31:44 14   A.  Posted on the door.  It could be, like, in the

10:31:46 15   booking area.

10:31:47 16   Q.  In the booking area.

10:31:49 17        So -- but I'm trying to get -- unless a

10:31:52 18   medical personnel said that an activity log should be

10:32:04 19   taken --

10:32:04 20   A.  Or, for example, an inmate states to me, "I

10:32:05 21   feel like killing myself."

10:32:06 22   Q.  Yeah.

10:32:06 23   A.  Well, then, I got a -- even though the medical

10:32:08 24   staff is not there, that's my decision to create an

10:32:10 25   activity log on them.

10:32:11  1    Q.  Okay.  I mean, that's the policy and procedure

10:32:13  2  is to if they state to you some problem or some

10:32:17  3  other --

10:32:18  4    A.  Or if the nurse is not available, for example,

10:32:21  5  it's graveyard, you know, a person comes in with

10:32:23  6  medical problems -- diabetic or some type of medical

10:32:28  7  problem or just as a precaution -- we'll keep a medical

10:32:34  8  log on them.

10:32:35  9    Q.  Okay.  I mean, a medical log would be an

10:32:36 10  activity type of log?

10:32:38 11    A.  An activity log, yes.

10:32:39 12    Q.  Look in on them?

10:32:40 13    A.  Yes.

10:32:41 14    Q.  And when you said the "graveyard shift," what

10:32:43 15  was that?

10:32:44 16    A.  I'm sorry.

10:32:44 17    Q.  What was the graveyard shift?

10:32:47 18    A.  The hours?

10:32:48 19    Q.  Yes.

10:32:48 20    A.  From 10:45 p.m. to 7 a.m.

10:32:53 21    Q.  7 a.m.

10:32:54 22         Okay.  Were there less nurses on duty,

10:32:56 23  medical personnel on duty on the graveyard shift than

10:32:59 24  on other shifts?

10:33:00 25    A.  There was no medical staff available then.

10:34:04 1    Q.   Well, I mean, let's say in April of 2001, the

10:34:07 2    old county detention center, how many nurses were on

10:34:11 3    the morning shift?

10:34:15 4    A.   I don't know.

10:34:16 5    Q.   At least one?

10:34:17 6    A.   At least -- I know one for sure.

10:34:19 7    Q.   Okay.  And the second shift is the same thing?

10:34:21 8    At least one?

10:34:22 9    A.   At least one, minimum.

10:34:23 10   Q.   And there was also, I take it, x-ray techs and

10:34:27 11   medical techs there also?

10:34:29 12   A.   Well, those are not assigned.  They're not part

10:34:31 13   of the County.  Those are people from the outside

10:34:33 14   coming in to do x-rays.

10:34:35 15   Q.   Oh, I see.  Did you have your own x-ray machine

10:34:38 16   in there?

10:34:38 17   A.   No.  It's portable.  They bring it.

10:34:40 18   Q.   Portable.  Okay.

10:34:43 19        So the only medical personnel assigned to

10:34:47 20   county -- old county jail -- detention center, were

10:34:49 21   nurses; is that correct?

10:34:52 22   A.   What was the question again?

10:34:53 23   Q.   The only medical trained personnel that had

10:34:57 24   some -- medical trained personnel that was assigned to

10:35:02 25   the old county jail were the nurses.

A.  Yes.

Q.  Okay.  Was there a doctor there full-time or just on call in April of 2001?

A.  I know we have a nurse practitioner.

MR. VITTITOE:  I just object.

Q.  Don't speculate.

MR. VITTITOE:  Yeah.  Speculation.

Q.  If you recall.

A.  I don't recall.

Q.  Okay.  Do you know what the difference between a nurse practitioner and a nurse is?

A.  No.

Q.  Okay.  So if there were any techs or people passed around medicine, they would come -- would the people that passed around medicine, would that include trustees or just nurses?  In other words, if they were giving medication to people, either in the infirmary or in the general population, would they use nurses or would they use trustees or both?

A.  No.  Nurses.

Q.  Nurses.  Okay.

Trustees wouldn't be giving meds?

A.  No.

Q.  What type of prisoners went into the general population on the third floor?

10:36:25  1          MR. VITTITOE:  Let me just object.  Overly

10:36:25  2     broad.  Could you be more specific?

10:36:27  3          Q.  In April of 2001, what type of prisoners were

10:36:31  4     assigned to the third floor?

10:36:37  5          A.  These inmates were all mostly -- the old county

10:36:42  6     jail is a maximum security jail, so we had aggravated

10:36:45  7     robbery, murder, capital murder, you know.

10:36:52  8          Q.  They would go into the third floor dormitory?

10:36:55  9          A.  Third floor, yes.

10:36:56 10          Q.  And that's the dormitory?

10:36:58 11          A.  Yes.

10:36:59 12          Q.  Okay.  So you might have very serious charged

10:37:06 13     criminals and minor felonies and misdemeanors or what?

10:37:13 14          A.  I'm not sure what kind of -- those are the only

10:37:16 15     charges I recall, only classifications where they

10:37:19 16     assigned all these people.

10:37:21 17          Q.  Okay.

10:37:21 18          A.  So I couldn't tell you.

10:37:23 19          Q.  Well, where would you put people charged with

10:37:25 20     misdemeanors?

10:37:27 21          A.  The detention -- we have a maximum, minimum,

10:37:34 22     and medium --

10:37:35 23          Q.  I see.

10:37:36 24          A.  -- facilities.

10:37:37 25          Q.  The old county was the maximum?

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

A.   Yes.

Q.   Okay.  And the Detention 1 and Detention 2 were --

A.   Detention 2 was a medium and Detention Center 1 was minimum.

Q.   I see.  Okay.  So the more serious charged people were sent to the old county jail.

A.   Old county jail.

Q.   Okay.  That would include all people charged with felonies?

A.   I don't know.

Q.   How would somebody determine whether the person should be placed in the minimum, medium, or maximum population?

A.   I can't really answer that question because I'm not -- only classification officers -- that's their duty to classify them as --

Q.   I see.  Whatever the case --

A.   Whatever the case is, the offense, gang-related and so on.

Q.   Whatever the case, the prisoner who came over from the City or came over from the courthouse or wherever, they first came into the old county --

A.   Yes.

Q.   -- jail for booking and for classification.

10:38:59  1    A.  Yes.

10:38:59  2    Q.  And then they would be classified either to

10:39:04  3    the --

10:39:05  4    A.  Medium -- maximum, medium or --

10:39:07  5    Q.  -- third floor in the old county or the medium

10:39:10  6    or the minimum; is that right?

10:39:15  7    A.  Correct.

10:39:15  8    Q.  Depending upon their --

10:39:17  9    A.  Their offense.

10:39:18 10    Q.  -- offense.

10:39:18 11    A.  Their history.  If they're gang-related or not

10:39:21 12    and so on.

10:39:22 13    Q.  Okay.  You know -- you've never been a

10:39:23 14    classification officer, so you don't know where

10:39:29 15    Mr. Longoria, assuming he was arrested for or charged

10:39:34 16    with burglary of a store in the daylight, would be --

10:39:39 17    how he would be classified; is that right?

10:39:40 18    A.  No.

10:39:47 19    Q.  Okay.  The drunk tank, would that include

10:39:53 20    people that were being held for classification,

10:39:58 21    including DWIs?

10:40:00 22    A.  DWIs, PIs.

10:40:03 23    Q.  PIs?

10:40:06 24    A.  Burglary of habitation, burglary of vehicle,

10:40:07 25    robberies.  I mean, everybody was just --

Q.   If they were borracho, they were put in the drunk tank whatever they were charged with.

A.   Yes, sir.

Q.   Okay.

A.   It doesn't -- it says "drunk tank," but that's what the name of it was, okay, but it's not specifically just for drunk people.

Q.   How about people high on drugs?

A.   I mean, if we knew about it --

Q.   Okay.

A.   -- then I wouldn't think -- we wouldn't place them there.

Q.   Okay.  What -- why would you use a drunk tank then?  I know that's what it's called, but why would you put that?  Is that just a holding cell?

A.   Just like a holding cell.

Q.   Okay.  Until a person is booked and classified?

A.   Yes, sir.

Q.   So it's not necessarily drunks in there.

A.   No.

Q.   Okay.  Or somebody that's intoxicated.

A.   No.

Q.   Okay.  Now, how would it be determined whether they're put in the drunk tank, which is a larger holding cell, I guess, versus the large holding cell

10:41:16  1   and the small holding cell?

10:41:17  2        How would that be determined and who would

10:41:19  3   determine that?  In other words, when they came in,

10:41:25  4   they went to the booking officer.  And how would it be

10:41:28  5   determined whether they were put in the drunk tank,

10:41:30  6   which you've got here labeled as the drunk tank.

10:41:34  7      A.  Yes.

10:41:34  8      Q.  Which we determined is really a holding cell

10:41:37  9   versus the -- what you've got labeled here as the large

10:41:40 10   holding cell and the small holding cell.

10:41:44 11      A.  Every officer is different where they're going

10:41:48 12   to place people as they come in, you know.  They come

10:41:50 13   in.  They change them out.  They put them anywhere, you

10:41:55 14   know.  If the drunk tank is kind of full, they'll put

10:41:55 15   them in the large holding cell.

10:41:55 16      Q.  I'm sorry.  I didn't hear that.

10:41:58 17      A.  If the drunk tank is full of people, we put --

10:42:01 18   normally put them in the large holding cell.

10:42:03 19      Q.  I see.

10:42:04 20      A.  Or unless he came in with a charge for sexual

10:42:09 21   assault or -- on a child or --

10:42:11 22      Q.  Might be --

10:42:12 23      A.  You know, we're not going to put him in the

10:42:14 24   drunk tank, because they'll beat him up in there.

10:42:17 25      Q.  Yeah.  Okay.

10:42:17 1    A.   So we would separate him from the rest of the

10:42:20 2   guys, put him in either the large or the small holding

10:42:24 3   cell.

10:42:24 4    Q.   Depending on the situation.

10:42:26 5    A.   Yes.

10:42:26 6    Q.   Was it left to the discretion of the officers

10:42:29 7   that received these people where to put them, or wasn't

10:42:31 8   there any policy or procedures where to put them?

10:42:35 9    A.   It's to the officer's discretion.

10:42:49 10    Q.   Okay.  Now, was there policies and procedures

10:42:55 11   what to do when -- in place in April 11th, 2001, on

10:43:00 12   what to do with a prisoner as they came in for whatever

10:43:05 13   condition they were in?  In other words, were they

10:43:08 14   supposed to be booked first as soon as they had an

10:43:12 15   opportunity to do so, as soon as the booking officer

10:43:19 16   had an opportunity to process them?

10:43:21 17    A.   Yes.

10:43:22 18    Q.   Okay.  They were supposed to be booked; is that

10:43:22 19   right?

10:43:26 20    A.   As they -- I mean -- see if you can rephrase

10:43:33 21   that.

10:43:34 22    Q.   Okay.  When they were brought in in April of

10:43:37 23   2001 -- April 11th, 2001, they were first brought to

10:43:43 24   the booking area; is that correct?  The prisoner was

10:43:48 25   brought --

A.  Yes.

Q.  -- to the booking area.

A.  Uh-huh.

Q.  Then they were supposed to go through the booking process; is that correct?

A.  When they would get to them.

Q.  When they would get to them.

A.  Uh-huh.

Q.  Okay.  Depending on how many people you had coming in; is that right?

A.  The morning shift, we've got a lot of traffic. You've got courts going on.  You've got booking, releases.  You've got people being released on bond. You have agencies bringing in people.

        So -- and they could -- if you have people pending from the night before or the day before pending process, you know, you need to get rid of those first, then so on.

Q.  As I understand the process, though, is that as they -- as the booking officer got to the people to process them, they were supposed to be booked in, is that right, as they got to them?

A.  Yes.

Q.  Then that would also -- they would include information -- they input information into the

10:44:52  1    computer; is that right?

10:44:53  2        A.  Yes.

10:44:54  3        Q.  Then they would go to the classification

10:44:56  4    officer; is that correct?

10:44:59  5        A.  No.  They didn't go to the classification

10:45:01  6    office.

10:45:02  7        Q.  For the booking?

10:45:03  8        A.  They never send inmates there.

10:45:05  9        Q.  I'm not talking about you.  I'm talking about a

10:45:08 10    prisoner.

10:45:09 11        A.  We don't send them to the classification.

10:45:11 12        Q.  Classification office -- then would go where?

10:45:14 13        A.  Once they -- once the booking officer processes

10:45:17 14    them, you know, get the paperwork, puts it in a slot,

10:45:31 15    the classification officer comes in, picks up all the

10:45:31 16    files or the -- and then they determine where they can

10:45:31 17    send them to.

10:45:31 18        Q.  Okay.  So the prisoner is not taken to the

10:45:33 19    classification officer.  He's just put in a holding

10:45:35 20    cell?

10:45:35 21        A.  Yeah.  After they've been booked in, they go

10:45:37 22    back to the holding cell.

10:45:39 23        Q.  Okay.  And then they would -- the

10:45:44 24    classification officer would come in and pick up the

10:45:46 25    papers --

10:45:47 1    A.   Uh-huh.

10:45:47 2    Q.   -- for the prisoners.

10:45:49 3         And then what would the classification

10:45:50 4    officer do?

10:45:53 5    A.   I don't recall.  I don't know their duties.

10:45:55 6    Q.   Okay.  After they saw the classification

10:45:57 7    officer, would they then see the nurse, or would that

10:46:02 8    be part of the process of classification?

10:46:14 9    A.   That would -- it is part of the process also, I

10:46:17 10   mean, but it's separate.  You know, just classification

10:46:19 11   is one department; medical staff is another.

10:46:21 12   Q.   Well, I know, but would they -- okay.  Would

10:46:25 13   the classification officer just decide whether they

10:46:28 14   should be placed in minimum, medium, or maximum

10:46:34 15   security --

10:46:34 16   A.   Yes.

10:46:35 17   Q.   -- facility?

10:46:35 18   A.   Yes.

10:46:37 19   Q.   Okay.  Then would the nurse look at the file or

10:46:42 20   see the prisoner to determine whether they ought to be

10:46:47 21   in the infirmary?

10:46:48 22   A.   If -- when she -- I'm trying to make it to

10:46:56 23   where it's kind of simple for you to understand the

10:46:58 24   process.

10:47:00 25   Q.   Okay.  Yeah.  I just want to know what's the

standard process.

A.   As the booking officer processes them, you know, he asks them for their medical history.  He prints out all of the information.  One of the sheets goes to the medical.  The other -- which is -- includes all his --

Q.   Is it a multiple sheet thing?

A.   No.  It's just one single sheet, and it states all questions that he asked them and so on, you know, what kind of medical problems did he have and inputs that information.

The nurses pass by whenever they have the opportunity, pick them up, and, I guess, get a bunch of people.  And then once they have a certain amount of group, then they would get seen by medical staff to get your tuberculosis shot and, I guess, ask them for their medical history.

Q.   Okay.  Or examine if they have any obvious medical type of problems?

A.   Uh-huh.

Q.   Is that yes?

A.   Yes.

And then the classification officer would get with medical staff to see who have been cleared to be moved out of there.

Q.   Okay.

A.   Once they're being seen by the medical staff, then classification makes their files, and then we ship them out to wherever.

Q.   Either to the third floor or --

A.   Second or medium --

Q.   -- the second floor?

A.   -- or minimum.

Q.   Were there any holding tanks or solitary confinement cells at the medium -- at the medium facility?

A.   They do have single cells.

Q.   Single cells?

A.   Yes.

Q.   Were there any padded --

A.   The only facility who doesn't have it is Detention Center 2.

Q.   That's the minimum security?

A.   That's medium.   Medium.

Q.   Medium.

     What do they have?

A.   Just open dorms.

Q.   Just open dorms.

A.   Yes.

Q.   But the minimum security had single cells?

10:48:55  1    A.  Yes.  That building was constructed with single

10:48:57  2  cells.

10:49:00  3    Q.  Okay.  The -- did they have -- did any of those

10:49:08  4  facilities have padded cells?

10:49:12  5    A.  No.  Just the old county jail.

10:49:22  6    Q.  Okay.  Now, getting back to your -- when you

10:49:30  7  confronted Longoria, you placed in here that you

10:49:33  8  noticed an injury to his left elbow; is that right?

10:49:36  9  Getting back to your statement, which is Silva Exhibit

10:49:39  10  No. 1.

10:49:39  11    A.  Yes.

10:49:41  12    Q.  And you looked at his elbow, and then you

10:49:44  13  looked -- he showed you another injury on the left

10:49:46  14  lower part of his leg.

10:49:48  15    A.  Yes.

10:49:54  16    Q.  Then you -- then, apparently, you had asked

10:49:57  17  Sergeant Lerma -- Assistant Sergeant Lerma what agency

10:50:00  18  had brought Longoria in; is that correct?

10:50:04  19    A.  Yes.

10:50:05  20    Q.  And you asked him if he had Longoria's medical

10:50:08  21  clearance.

10:50:09  22    A.  Yes.

10:50:10  23    Q.  And then Lerma told you that the Brownsville

10:50:14  24  Police Department Officer Salinas had brought Inmate

10:50:17  25  Longoria in and that he was medically cleared; is that

correct?

    A.  Yes.

    Q.  What does "medically cleared" mean?

    A.  That -- I mean, it could mean many things.  I mean, to me, it was, like, is he medically cleared. It's has he been seen by the nurse or if --

    Q.  In this case he came from the Brownsville City jail.

    A.  Okay.  If, for example, he went to the hospital, was he cleared for --

    Q.  Okay.

    A.  -- jail.

    Q.  And Lerma said he -- Lerma told you that he was.

    A.  Yes.

    Q.  Okay.  Now, assume with me that Mr. Longoria came into the -- your detention center with a medical file or some type of medical slip that said he had been seen by a emergency room physician and he was -- the slip says that he was advised to keep close watch on him --

    A.  Uh-huh.

    Q.  -- observation on him.  Does that mean that he was cleared, assuming that was correct?

    A.  If it says "cleared for jail," I mean, he's

been cleared to go back to --

Q. Okay. So even if it said, "Keep close observation on him," it means he was medically cleared to you? To you, would that mean -- if it said seen by somebody at the emergency room at Brownsville Hospital, doctor, he was okay to go back to the jail population, but to please keep close observation on him, to you, would that mean medically cleared?

A. To me, yes.

Q. Did you ever see any medical information on the prisoner Longoria that came with him?

A. No.

Q. Did you ever see a slip that -- like I described, about need to keep close observation on him?

A. No. I did not receive that inmate.

Q. I'm sorry?

A. I did not receive that inmate.

Q. Okay. If it came in with Officer Salinas to the booking officer, who would have seen that? The booking officer?

A. The booking officer or the person -- the officer receiving the inmates as they come in.

Q. Would that have been Assistant Sergeant Lerma?

A. Yes, sir.

Q. Am I pronouncing the name correctly?

10:52:49 1   A.  Yeah.  Lerma.

10:52:51 2   Q.  Okay.  If that slip or a medical file came in

10:52:56 3   with the prisoner, along with the prisoner, some type

10:53:00 4   of medical information, what would happen to that

10:53:05 5   medical information?

10:53:08 6   A.  You saying as in --.

10:53:10 7   Q.  Would it be a box or a place to put that --

10:53:12 8   A.  A box.  A medical box.  You put the paperwork

10:53:15 9   in there.

10:53:15 10  Q.  Okay.  And that would be -- then a nurse would

10:53:17 11  come by to pick up the box?

10:53:19 12  A.  Yes.

10:53:20 13  Q.  Okay.  And I take it your testimony is that you

10:53:22 14  didn't receive any medical information on Prisoner

10:53:26 15  Longoria to put in that box.

10:53:30 16  A.  No.

10:53:31 17  Q.  Okay.  And you don't know if there was anything

10:53:33 18  in that box.

10:53:34 19  A.  No.

10:53:34 20  Q.  As far as you know, there wasn't anything --

10:53:38 21  any medical information that came with him; is that

10:53:38 22  correct?

10:53:40 23  A.  Yes.

10:53:41 24  Q.  Okay.  And now, when a prisoner came in -- now,

10:53:44 25  going back as a booking officer, let me ask you a

question as a booking officer now.

When you -- when a prisoner would come in from the city jail, and assume with me that a prisoner had gone to the emergency room for whatever reason, and the prisoner had -- there was some medical information generated, would the prisoner then have the entire medical file come in with him or just whatever the doctor gave the --

A.  Just whatever the doctor gave.

Q.  Whatever the doctor gave.

So he wouldn't have the entire medical file that may --

A.  No.

Q.  -- contain all different types of information that you could see.

A.  No, sir.

Q.  As a booking officer, you would ask the prisoner about what his medical problems are?

A.  Yes.

Q.  Okay.  And in this case, you don't know what the briefing officer found out about the medical problems of Mr. Longoria.

A.  No, sir.

Q.  Whatever it is, you found out he had some medical problems, including the bruise on his elbow and

a cut on his knee; is that right?

     A.   What was the question?

     Q.   Yeah.  You had found out because you saw that he had a bruise on his elbow and a cut on his knee.

     A.   Swollen knee.

     Q.   Swollen knee.

     A.   Yes.

     Q.   Okay.  And then you asked the nurse to come over, a nurse to come over?

     A.   Yes.

     Q.   And you also saw that he was a little slow in answering questions.  What do you mean by that?

     A.   That means people will answer rapid, you know, when you're answering questions, people just --

     Q.   What kind of questions would you ask him?

     A.   I don't recall the questions I asked him.

     Q.   I know.  But what kind of questions would you ask a prisoner?

     A.   Oh.  "How did you get those injuries?  Who did them to you?"

     Q.   Yeah.

     A.   You know, "Were you assaulted?  Was it the arresting agency?"  You know.

     Q.   Did he tell you that he had been shot the night before?

10:55:56  1    A.  No.

10:55:57  2    Q.  Okay.  Did he tell you --

10:55:58  3    A.  Was he shot?  I don't know.  Was he shot?

10:56:01  4    Q.  I don't --

10:56:02  5            MR. VITTITOE:  No.

10:56:03  6    Q.  No, he wasn't.

10:56:05  7    A.  No.

10:56:06  8    Q.  Okay.  But at least according to other

10:56:07  9    statements, let me tell you that he told them that he

10:56:11 10    was shot.

10:56:11 11    A.  Okay.

10:56:13 12    Q.  Okay.  I just wanted to see if he told you that

10:56:14 13    he was shot.

10:56:14 14    A.  No.

10:56:17 15    Q.  Okay.  You would have recorded that, wouldn't

10:56:20 16    you have?

10:56:20 17    A.  Yes.

10:56:23 18    Q.  Did the -- do you recall, did he tell you how

10:56:28 19    he got those injuries?

10:56:33 20    A.  I know he gave me an answer, but I can't recall

10:56:36 21    the answer he gave me.

10:56:37 22    Q.  Okay.  Whatever answer he gave you, he was kind

10:56:38 23    of slow in giving it; is that right?

10:56:40 24    A.  Correct.

10:56:42 25    Q.  Okay.  Did you ask him if he had any other

medical problems?

A.  At the time, just -- my concern was the bruises.  That's why I called the medical staff.

Q.  Okay.

A.  I don't recall the questions that she asked him.

Q.  And this was Nurse Rivas?

A.  Sylvia Rivas.

Q.  Is she an LVN?   Do you know?

A.  I don't know what her --

Q.  Is she still there?

A.  Yes.

Q.  Now, Inmate Longoria was then assigned -- okay. Rivas told you the bruises were minor on the left leg and on the elbow.  Did she tell you there ought to be some ice for the elbow and for the left leg, give him some ice to quell the swelling?

A.  Yeah.  I don't recall if she told me that.

Q.  Okay.  Did Mr. Longoria exhibit to you some type of odd behavior, like he was saying something like, "They're after me," or "They're going to shoot me," or --

A.  No.

Q.  -- delusional or something that appeared to you that there was something wrong with him --

A. No.

Q. -- besides having the bruises and being a little slow?

A. Correct.

Q. He didn't exhibit anything to you?

A. No.

Q. Okay.

A. I didn't see any -- nothing abnormal from him.

Q. Okay. Were you able to see his neck to see if there were any markings on his neck? Was his shirt open or something?

A. I don't recall. Just like I said, my visual was the bruising on the elbow and on the knee.

Q. The -- whatever he was wearing had a short sleeve?

A. Well, the uniform is --

Q. A short-sleeve uniform?

A. Short-sleeve.

Q. Okay. And were they open at the neck?

A. It's a button-down.

Q. Button-down.

A. But I don't recall seeing anything.

Q. Okay. And I take it he was wearing long pants so he would have had to lift his pant leg to show you.

A. Yes.

10:59:02  1      Q.  Did you see any bruising around his ankles?

10:59:02  2      A.  No.  I don't recall.

10:59:03  3      Q.  Okay.  Does a prisoner wear socks when he comes

10:59:06  4  in?

10:59:08  5      A.  Are they allowed to wear socks?

10:59:10  6      Q.  Yeah.

10:59:10  7      A.  If they're white.

10:59:12  8      Q.  White socks --

10:59:13  9      A.  If they're white socks.

10:59:14 10      Q.  -- or a white prisoner?  What do you mean?

10:59:16 11  White socks?

10:59:17 12      A.  White socks.

10:59:18 13      Q.  Okay.  Do you recall whether he was wearing

10:59:20 14  socks?

10:59:22 15      A.  No.  I don't recall.

10:59:28 16      Q.  Okay.  Did you see any other bruising on his

10:59:29 17  legs --

10:59:32 18      A.  I don't recall.

10:59:32 19      Q.  -- besides the one that you described?

10:59:34 20      A.  I don't recall.

10:59:39 21      Q.  Okay.  Now, it says, "Inmate Longoria was

10:59:41 22  assigned to the large holding cell that's located to

10:59:43 23  the right side of the booking area."

10:59:45 24          Is that the drunk tank, or is that the

10:59:48 25  large HC?

10:59:49  1    A.  The large HC.

10:59:52  2    Q.  Okay.  And the large HC has bars?

10:59:55  3    A.  Yes.

10:59:55  4    Q.  So you could -- somebody could see in who was

10:59:59  5    there and stuff like that.

11:00:01  6    A.  Correct.

11:00:01  7    Q.  How many prisoners would the large HC hold?

11:00:05  8    A.  What was that?

11:00:06  9    Q.  How many prisoners would it hold?

11:00:08 10    A.  We put -- I don't recall.  I don't know the

11:00:10 11    capacity there.

11:00:12 12    Q.  Oh, okay.  Five?  Ten?  What?

11:00:15 13    A.  We put up to 15 or more.

11:00:18 14    Q.  15?

11:00:19 15    A.  More.

11:00:20 16    Q.  Or one, depending on the prisoner count; is

11:00:20 17    that right?

11:00:24 18    A.  Yes.

11:00:28 19    Q.  Okay.  And you say there was a bench in there.

11:00:30 20    A.  Yes.

11:00:31 21    Q.  One bench.

11:00:31 22    A.  One bench.

11:00:35 23    Q.  So could the booking officer then see inside

11:00:42 24    the large holding cell from wherever he was -- from

11:00:49 25    his --

11:00:49 1     A.  I mean, there's a blind spot, but he can see

11:00:52 2 probably half of the -- almost half of the --

11:00:55 3     Q.  Okay.  Was there a window or something here

11:00:57 4 that was open to the hallway from the booking office?

11:01:02 5     A.  Yes.

11:01:02 6     Q.  Okay.  So there was a window in front.

11:01:04 7     A.  Window with a -- a middle --

11:01:07 8     Q.  Glass partition?

11:01:08 9     A.  Glass and metal screen.

11:01:10 10     Q.  Okay.  You want to mark that on here?

11:01:12 11           MR. VITTITOE:  Barry, can we take a

11:01:13 12 bathroom break?

11:01:14 13           MR. BERGER:  Sure.  Let him mark that on

11:01:16 14 there, and we'll take a bathroom break.

11:01:19 15           THE WITNESS:  You want me to mark what,

11:01:19 16 sir?

11:01:20 17     Q.  The window in the briefing room.   Okay.

11:01:51 18           Thank you, Sergeant.  You're marking

11:01:55 19 something else on there.  What are you marking?

11:01:57 20     A.  The metal screen.

11:01:58 21           MR. BERGER:  Okay.  You go ahead and take

11:02:03 22 your bathroom break.  I'm not going to ask you any more

11:02:05 23 questions while the attorney is gone.  Okay?

11:02:08 24           THE WITNESS:  Yes, sir.

11:02:08 25           MR. BERGER:  Thank you, sir.

11:02:08  1           (Brief recess)

11:14:29  2      Q.  Let's get back to your statement here.

11:14:32  3  Starting at the second page in the middle of the

11:14:35  4  paragraph where it starts, "At 11:15."

11:14:38  5      A.  Yes, sir.

11:14:38  6      Q.  Okay.  After you left, Inmate Longoria was

11:14:44  7  assigned to the large holding cell.  And then at 11:15,

11:14:51  8  while you were in the booking area, it says here you

11:14:54  9  heard Longoria arguing with several other inmates in

11:14:57 10  the holding cell.

11:14:58 11      A.  That is correct.

11:14:59 12      Q.  What was he saying?  Do you recall?

11:15:02 13      A.  He was saying that they were trying to beat him

11:15:04 14  up.

11:15:04 15      Q.  Beat him up?

11:15:06 16      A.  Yes.

11:15:07 17      Q.  Did he say they were trying -- going to shoot

11:15:07 18  him?

11:15:07 19      A.  No.

11:15:08 20      Q.  Okay.  Just trying to beat him up.

11:15:10 21      A.  Trying to beat him up.

11:15:12 22      Q.  Okay.  Was he being loud or was he hollering

11:15:15 23  for help or both?

11:15:16 24      A.  Both.  Just, "Take me out of here.  They're

11:15:18 25  going to beat me up."

him in the small holding cell"?

A. The reason -- well --

Q. Well, is that what he told you? Is your statement correct?

A. Yes.

Q. Okay. And you told him that the small holding cell was already full?

A. That it was already full.

Q. And how many would the small holding cell -- prisoners -- would they hold?

A. It normally holds about three or four. But this time, we had more than --

Q. More than three or four?

A. Yes.

Q. Okay. How much would the whole facility hold? Do you know?

A. I can't remember the capacity.

Q. Was it --

A. I can't recall the capacity.

Q. Okay. I mean, the old county jail, not the other two facilities.

        MR. VITTITOE: Let me object. Calls for speculation. He already said he doesn't know.

        MR. BERGER: Well, but I -- I'm not saying --

1   Q.   It was -- at times it was full, wasn't it?

2   A.   Yes.

3   Q.   Okay.  Whatever it held, it held, right?

4   A.   Yes.

5   Q.   Okay.  But I imagine some days it was full,

6   some days it was less full, and things like that.

7   A.   I mean, I can't recall the capacity, but, I

8   mean, if we got -- just the first floor could be full

9   of inmates.  Who knows.

10  Q.   I'm talking about all three floors.

11              MR. VITTITOE:  Object, speculation.

12              THE WITNESS:  I can't really give you a

13  total because --

14  Q.   I know a total, but, I mean, it was -- I'm sure

15  it was on certain days all three floors were full.

16  A.   Yes, sir.

17  Q.   Okay.  In fact, they were more than full; is

18  that correct?

19              MR. VITTITOE:  Objection --

20              THE WITNESS:  Correct.

21              MR. VITTITOE:  -- calls for speculation.

22  Q.   Now, you -- Lieutenant -- you said, "Lieutenant

23  Gutierrez agreed and advised him to -- me to put him in

24  single cell No. 1."

25              That's the padded cell that you have

marked here padded cell No. 1?

        A.   That is correct.

        Q.   Whatever it is, that's not the one which is a
storage room; is that right?

        A.   No.

        Q.   Used as a storage room?

        A.   No, sir.

        Q.   Okay.  And that had a solid steel door with the
window in it and a food slot.

        A.   Yes.

        Q.   Okay.  Did -- at the time, besides the
argument, did Mr. Longoria appear that he was suicidal
to you, that he was suicidal?

        A.   Did he tell me?

        Q.   Yeah.  Did he tell you or did it appear to you?

        A.   No, sir.

        Q.   Okay.  He didn't tell you or appeared to be
suicidal?

        A.   No.

        Q.   Did he tell you or did it appear to you that he
was loco en cabeza?

        A.   No.

        Q.   Okay.

        A.   He didn't show any symptoms to me.

        Q.   Okay.  Did it appear to you that he was drunk

and disorderly?

    A.  No.

    Q.  Okay.  Or high on drugs?

    A.  No.

    Q.  So you and Lieutenant Gutierrez agreed to put him in the padded cell, was kind of a holding cell; is that right?

    A.  Correct.

    Q.  Pending his booking.

    A.  Pending booking.

    Q.  And classification.

    A.  Correct.

    Q.  Okay.  At that time, did you find out whether or not he had been booked?

    A.  Was he booked at the time?

    Q.  Yes.

    A.  No.  He just barely came in.

    Q.  I'm sorry.

    A.  He just came in, so he was still pending booking.

    Q.  Okay.  And, of course, then, he wasn't classified.

    A.  He can't, because he gets booked first.

    Q.  Right.  That's what I mean.  Okay.

        And so if he wasn't booked, he wasn't

11:20:00 1    classified.

11:20:01 2        A.   Correct.

11:20:08 3        Q.   Okay.  Then you advised Officer Rora and

11:20:12 4    Officer Lerma -- these are the kind of runner officers

11:20:17 5    who check on the inmates from time to time?

11:20:19 6        A.   Yes.

11:20:28 7        Q.   Okay.  And then at -- when you were leaving at

11:20:31 8    about 3:00, you told -- you briefed the incoming shift

11:20:35 9    about the -- a problem with Longoria and with other

11:20:40 10   inmates and that you had put him in that single cell,

11:20:44 11   padded cell; is that right?

11:20:46 12       A.   Yes, sir.

11:20:46 13       Q.   Per what Lieutenant Gutierrez told you to do.

11:20:50 14       A.   For his -- for the inmate's safety.

11:20:53 15       Q.   For his own safety.

11:20:55 16       A.   Yeah, because either the single cell or the

11:20:59 17   drunk tank, they wanted to --

11:21:04 18       Q.   Beat the hell out of him?

11:21:04 19       A.   Yeah.

11:21:04 20       Q.   At least that's what he told you.

11:21:06 21       A.   No.  Well, you know, I know he had problems in

11:21:10 22   the large holding cell, so the other guys, you know,

11:21:13 23   everybody listens so, you know, just when somebody

11:21:15 24   tells you, "Bring him over here and we'll fix him,"

11:21:18 25   you know, what does that tell you?  You know, that you

11:21:20  1    can't put him anywhere.

11:21:21  2        Q.  Okay.

11:21:22  3        A.  So --

11:21:23  4        Q.  Either in the drunk tank or the large holding

11:21:25  5    cell or the small holding cell was too full.

11:21:30  6        A.  Yes, sir.

11:21:31  7        Q.  Okay.  So you wanted to separate him from the

11:21:32  8    population.

11:21:33  9        A.  Yes.

11:21:36 10        Q.  Okay.  The general population in the holding

11:21:37 11    area.

11:21:39 12        A.  Correct.

11:21:41 13        Q.  Okay.  And then you briefed the incoming shift,

11:21:47 14    and you went by the -- as you were leaving, you went by

11:21:53 15    booking and you looked in, saw Longoria standing by his

11:21:58 16    cell door window.  Is this just a plain glass window,

11:22:03 17    or is it wired glass, or what?

11:22:07 18        A.  Plain glass.

11:22:08 19        Q.  No bars in the window?

11:22:09 20        A.  It has a steel door, but it was open to the --

11:22:13 21        Q.  Okay.  The window has a steel door on it, but

11:22:16 22    you can open the window.

11:22:19 23        A.  The window is there.  It does not remove.  The

11:22:22 24    door, you can move it.

11:22:23 25        Q.  Okay.  But when you saw him, the door was --

11:22:25  1    the steel door window was open.

11:22:27  2        A.  Correct.

11:22:29  3        Q.  Steel door to the window was open.

11:22:31  4        A.  Correct.

11:22:33  5        Q.  Okay.  Was it always kept open while -- the

11:22:37  6    time that Longoria was in there?

11:22:42  7        A.  I don't recall if it was open or not.

11:22:45  8        Q.  Okay.  How large is this padded cell, estimate?

11:22:53  9        A.  I would have to say 5 by 8 maybe.

11:23:01 10        Q.  5 by 8?

11:23:04 11        A.  Maybe.

11:23:04 12        Q.  A regular type of cell size?  Was this a

11:23:06 13    regular cell, a single cell, a 5 by 8?

11:23:09 14        A.  I don't recall the specific measurements

11:23:11 15    really, but, you know, that's just my estimate.

11:23:15 16        Q.  Estimate.

11:23:16 17        A.  Yes.

11:23:18 18        Q.  Okay.  If you just walked by that cell and the

11:23:23 19    steel door to the window was open, how much of the cell

11:23:28 20    could you see if you just walked by it and glanced in?

11:23:34 21        A.  You can't -- if you glance, you can't see the

11:23:39 22    bottom.

11:23:40 23        Q.  Oh, you can't see the bottom.

11:23:41 24        A.  No.

11:23:42 25        Q.  Okay.  Could you see the prisoner at all times

if you just walk by and glanced in?

    A.  Well, you've got to look inside, you know.  You can't just -- if you just pass by and glance through it, you can't --

    Q.  In this case, you just glanced by and you saw him standing -- his face in the window looking out.

    A.  Looking out.

    Q.  Okay.  You didn't actually go into the window and see what he was doing.

    A.  No.

    Q.  Okay.  And then the last page, when the briefing ended and you then pass -- I take it just passed by the door to the padded cell and just saw Mr. Longoria standing there by the window.

    A.  Yes.

    Q.  Okay.  You didn't go in to specifically look to see what he was doing or how he was doing or anything like that?

    A.  No.

    Q.  Okay.  And then you didn't see him any further while he was alive; is that correct?

    A.  I'm sorry?

    Q.  You didn't see him any further, Mr. Longoria, while he was alive.  In other words, you didn't see him anymore after that.

A.   After that, after I left, I don't know what --

Q.   What happened?

A.   -- what happened.

Q.   You didn't see him alive after that.

A.   No, sir.

Q.   You didn't see him dead after that.

A.   No.

Q.   And you didn't log in anywhere in any log that you had actually seen him.  This is -- your statement was given from your recollection and not from logs; is that right?

A.   Yes.  Correct.

Q.   Okay.

     MR. VITTITOE:  Let me ask a question.  Can I ask you to read back that, because I missed it.

     Was a statement prepared from his log?

     (Requested portion was read back)

     MR. BERGER:  About seeing Mr. Longoria.

     MR. VITTITOE:  Okay.

Q.   Okay.  I noticed you had a log about other events during the day, but the statement that you gave regarding your encounters with Mr. Longoria was based upon your recollection and not from any logs.

A.   Correct.

Q.   Okay.  I mean, the rest of this that you

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

11:25:52  1    recorded as to time and dates I take it was taken from

11:25:57  2    your actual logs that you made.

11:26:00  3        A.  Yes.

11:26:06  4        Q.  Okay.  Were there any policies and procedures

11:26:09  5    in force as to whether or not -- how to deal with a

11:26:11  6    patient that came in that appeared to be crazy?

11:26:20  7            MR. VITTITOE:  Let me just object.  I

11:26:22  8    believe you used the word "patient" as opposed to

11:26:24  9    "inmate."

11:26:25 10        Q.  I'm sorry.  Prisoner that appeared to be crazy,

11:26:27 11    in other words, was acting crazy.

11:26:30 12        A.  If I -- if he comes in?

11:26:32 13        Q.  Yeah.  Was there any policy or procedures of

11:26:34 14    what to do with that type of prisoner?

11:26:39 15        A.  Well, it depends if he's suicidal or did he

11:26:41 16    have medical problems or --

11:26:42 17        Q.  Well, I don't know.  I mean, just acted crazy.

11:26:44 18    In other words, saying, you know, "I'm Superman, and

11:26:48 19    I'm God," and -- or something like that.

11:26:52 20        A.  I would make sure that proper paperwork was

11:26:56 21    with him such as if he's been seen by medical staff, by

11:27:00 22    an ER doctor, or if he's being screened by MHMR,

11:27:05 23    Tropical Texas.

11:27:07 24        Q.  Would you call the nurse to look at him also?

11:27:09 25        A.  Yes.

Q.  Okay.

A.  If there's no nurse available, I would reject. I would not accept him.

Q.  You wouldn't accept the prisoner?

A.  No.

Q.  Okay.  You would tell -- if he came from the City police, "Take him back wherever you got him from"?

A.  Well, I would call medical staff, and if they say, "Go ahead and take him," they we'll take him.  But other than that, I would reject him.

Q.  Okay.  Are those your standards, or is that policy and procedure?

A.  That's my own.

Q.  Okay.  Do you know if there's any policy and procedure with the sheriff's department there on what to do with medical -- people with medical problems? Was there any written policies or procedures in place April 2001 to your recollection and knowledge regarding what to do with prisoners if they had medical problems.

A.  If they do, you know, there is to where, you know, you put an activity log on them, or if he's crazy or suicidal, you remove their clothing, give them --

Q.  Paper suit?

A.  -- a paper suit.  No spoons given to that person or blankets, you know.

Q.  Okay.  Do you recall -- if a person was kept in the padded cell like Mr. Longoria during your shift -- I take it that your shift included lunchtime; is that right?

A.  Yes.

Q.  Would he be given any food and water if he was in that padded cell through the food slot?

A.  Yes.

Q.  Okay.  Would there be anybody checking on him to see whether he ate that food and water?

A.  I mean, unless he had a specific log on him, a medical log --

Q.  Yeah.

A.  -- you know, make a food intake log and keep track of how much percentage --

Q.  Do you recall whether or not Longoria had that type of log for him?

A.  No.

Q.  Okay.

MR. VITTITOE:  You don't recall, or he didn't have it?

Q.  Yeah.  You don't recall, or he didn't have it?

A.  He didn't have it.

Q.  He didn't have it.  Okay.

If you look into the window of the padded

11:29:31 1    cell, in other words, if the door was open and you look

11:29:34 2    in and not just walking by, can you see the entire cell

11:29:39 3    except the floor?

11:29:41 4        A.  You can see the ceiling.

11:29:44 5        Q.  Inside of the cell.

11:29:45 6        A.  Not on this side of the cell.

11:29:48 7        Q.  Huh?

11:29:48 8        A.  Not if you're looking down.

11:29:50 9        Q.  No.  I mean, if you just look -- if I went --

11:29:54 10    if I'm here -- I'm a roving runner or whatever it was

11:29:58 11    that's making some type of -- trying to pick up a

11:30:04 12    client, I guess, or something, but I was walking

11:30:07 13    through there, and I was looking to see what a prisoner

11:30:11 14    was doing, I was looking in on a prisoner, okay, and

11:30:16 15    the metal door to the window was open, and if I had

11:30:22 16    actually looked in that metal window, could I see the

11:30:25 17    entire cell, inside the entire cell, in other words, if

11:30:32 18    I put my face to the window --

11:30:34 19        A.  You're going to see this area.

11:30:36 20        Q.  Huh?

11:30:38 21        A.  This side of the wall, you're not going to see

11:30:39 22    it.

11:30:40 23        Q.  I'm sorry?

11:30:40 24        A.  You're not going to see this side of the wall.

11:30:43 25        Q.  You mean the wall that's adjacent to that

11:30:47 1   window, you're not going to see that?

11:30:49 2      A.  No, not on this side.

11:30:52 3      Q.  Can you see the floor?

11:30:52 4      A.  You can see the floor.  You can see the bunk

11:30:53 5   area, where the -- the bench.

11:30:55 6      Q.  Okay.  But you can't see the part of the floor

11:30:57 7   that's adjacent to where that window is.

11:30:59 8      A.  Correct.

11:31:02 9      Q.  Do you know if any of the jail personnel

11:31:07 10  actually opened the door to the cell to see about

11:31:13 11  Longoria, see what he was doing or --

11:31:15 12      A.  No, I don't know.

11:31:19 13      Q.  Okay.  When you saw Longoria, was he -- seem

11:31:22 14  like he was talking or was he silent?

11:31:26 15      A.  He was silent.

11:31:27 16      Q.  Okay.  Could you hear somebody talking or

11:31:30 17  screaming if you walked by the door from that cell?

11:31:35 18      A.  If somebody was placed -- besides him?

11:31:37 19      Q.  Yeah.

11:31:38 20      A.  Yes.  If somebody was banging or yelling or

11:31:40 21  talking or singing.

11:31:41 22      Q.  Talking loud, you could hear them?

11:31:43 23      A.  You could hear them.

11:31:46 24      Q.  Okay.  What was the procedure for somebody

11:31:58 25  placed in that cell, policy and procedure for somebody

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

that's placed in that cell for doing an activity log?

A.  The only time you put an activity log on them is if, like I said, you know --

Q.  Medically.

A.  Medical, mentally retarded.

Q.  Suicidal.

A.  Suicidal.  What else?

Any crisis such as a death in the family, you know, suicide prevention, you know, try to make sure that --

Q.  Okay.  Do you know -- or have you been told by anybody why he was still in that cell at 10:30 or 11:00 at night and hadn't been booked?

A.  What was the question again?

Q.  Why was he still being -- did anybody tell you at the cell, at the jail, or have you been informed in any other way that he was -- why he was still in that padded cell in the holding -- which you use as a holding cell --

A.  Yes, sir.

Q.  -- at 10:30 or 11:00 at night?

A.  No.

Q.  Have you reviewed anything prior to your deposition today except for that statement that you prepared?

A. This is the only thing.

Q. Okay. And that you gave.

A. Yes, sir.

Q. And that statement, everything in there is correct now that you had time to look over it and reflect on your memory?

A. Yes, sir.

Q. If a person is placed in an isolated cell, padded cell in this case like Mr. Longoria, is the nursing staff supposed to be notified about the placement in that cell that somebody is placed in that cell?

A. If it's for medical reasons such as being combative or try to hurt himself or others or suicidal or --

Q. To you, he wasn't being combative.

A. No, sir.

Q. Except for he was getting into arguments with somebody else.

A. Yes.

Q. Okay. And to you, he didn't appear or say he was suicidal.

A. No.

Q. And to you, he didn't appear or he told you that besides the bruises, he didn't have any medical

problems; is that right?

A.   That's correct.

Q.   Okay.  And if he did have some medical problems or some medical stuff that came in, you didn't know about it; is that correct?

A.   I don't know.

Q.   Okay.  I notice you have a -- just a question, and it may be personal, and you can tell me, but you have a tatoo on your neck.

A.   Yes.

Q.   Is that a gang tatoo or not?

A.   No.

Q.   It's somewhat of a -- what is it?  A cross or a blade or something?

A.   It's an independent sign.

Q.   Independence?

A.   Yes.

Q.   Independence from what?

A.   Independent.

Q.   Independent.

A.   Yes.

Q.   Is it an "I" or what?

A.   Yes.

Q.   Okay.  You've got one on your chest too?

A.   No.

Q.   Oh, Independent Truck Company.

A.   Yeah.

Q.   Oh, okay.

A.   It's just -- not the truck company.  It's just independent.

Q.   Okay.  Do you have your own trucking company?

A.   No.  I'm my own.

Q.   Your own independent?

MR. VITTITOE:  He's a GDI.

THE WITNESS:  I have my own bike group.

Q.   I'm sorry?

A.   Motorcycle bike group.

Q.   Motorcycle bike group.  Okay.

You have a patch on your jacket.  Is that part of your motorcycle bike group?

A.   No.  That's just a patch that I bought at the bike fest, and I put it on.

Q.   Oh, put it on your jacket.

You actually got the tatoo on both sides of your neck.

A.   Correct.

Q.   Okay.  That's the independent -- is that a biking group?

A.   Yes.

Q.   Bikers.

A.   We call it something else, but I won't say it on the record.

Q.   Okay.  Not Hell's Angels?

A.   No.  We're not an outlaw club.

Q.   You're not an outlaw group.

A.   No.

Q.   Okay.

A.   We're all law enforcement.

        MR. BERGER:  I don't have any further questions.

        MR. VITTITOE:  We'll reserve our questions.

        (Deposition concluded)

```
 1                    FELIPE SILVA - ERRATA SHEET

 2       Reasons for changes:    (1) Clarify the record
                                 (2) Conform to the facts
 3                               (3) Correct transcription errors

 4       PAGE  LINE   CHANGE FROM/CHANGE TO                    REASON

 5       ____  ____   _____        ____

 6       ____  ____   _____        ____

 7       ____  ____   _____        ____

 8       ____  ____   _____        ____

 9       ____  ____   _____        ____

10       ____  ____   _____        ____

11       ____  ____   _____        ____

12       ____  ____   _____        ____

13       ____  ____   _____        ____

14       ____  ____   _____        ____

15       ____  ____   _____        ____

16       ____  ____   _____        ____

17       ____  ____   _____        ____

18       ____  ____   _____        ____

19       ____  ____   _____        ____

20       ____  ____   _____        ____

21       ____  ____   _____        ____

22       ____  ____   _____        ____

23       ____  ____   _____        ____

24

25                        _____
                               FELIPE SILVA, JR.
```

1    <u>SIGNATURE OF FELIPE SILVA, JR.</u>

2    I have read the foregoing transcript of my

3    deposition and it is a true and accurate record of my

4    testimony given on FEBRUARY 17, 2004, except as to any

5    corrections I have listed on page 99 herein.

6    _____

7    FELIPE SILVA, JR.

8

9    THE STATE OF TEXAS

10   COUNTY OF CAMERON

11   SUBSCRIBED AND SWORN TO BEFORE ME, the

12   undersigned authority on this the _____ day of

13   _____, 2004.

14

15   _____

16   Notary Public in and for
     The State of Texas

17   My commission expires:

18   _____

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3    MARIA LONGORIA AND MARIA   ) (
      IDALIA GUTIERREZ,          ) (
 4    INDIVIDUALLY AND ON BEHALF ) (
      OF THE ESTATE OF JUAN      ) (
 5    LONGORIA, DECEASED         ) (
              Plaintiffs         ) (
 6                               ) (
      VS.                        ) (    CIVIL ACTION NO. B-01-062
 7                               ) (
      CAMERON COUNTY, TEXAS,     ) (
 8    THE CITY OF BROWNSVILLE,   ) (    JURY DEMANDED
      TEXAS AND JOHN DOES 1-10   ) (
 9            Defendants         ) (

10                    REPORTER'S CERTIFICATE
          I, Donna McCown, Certified Court Reporter, certify
11    that the witness, FELIPE SILVA, JR., was duly sworn by
      me, and that the deposition is a true and correct
12    record of the testimony given by the witness on
      FEBRUARY 17, 2004; that the deposition was reported by
13    me in stenograph and was subsequently transcribed under
      my supervision.
14
          I FURTHER CERTIFY that I am not a relative,
15    employee, attorney or counsel of any of the parties,
      nor a relative or employee of such attorney or counsel,
16    nor am I financially interested in the action.

17                    WITNESS MY HAND on this the 1st day of
      March                     , 2004.
18

19

20    DONNA McCOWN, CSR NO. 6625
      Expiration Date: 12/31/05
21    Bryant & Stingley, Inc., CRN No. 41
      2010 East Harrison
22    Harlingen, Texas  78550

23

24

25
```

# STIPULATIONS

Deposition(s) of: _Lawrence Dahm MD_

Cause No.: _B-01-0062_ Style: _maria longoria et al_

Date: _2-17_ Trial Date: _____ vs. _Cameron County texas et al_

1. This deposition is taken pursuant to:
   ___ A. Notice                          ___ C. Agreement
   _✓_ B. Notice and Subpoena             ___ D. Court Order

2. Objections:
   _✓_ A. Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
   ___ B. All objections are reserved.
   ___ C. All objections will be made at the time of taking the deposition.

3. Signature and Delivery:
   _✓_ A. The original transcript will be sent to ___ _mr Valdez_ ___,
   the Custodial Attorney, and the original signature page, along with a copy of the
   transcript(s), will be submitted to _✓_ the witness or ___ the witness' attorney,
   who will return the executed signature page, including any changes, to
   Bryant & Stingley, Inc., within ___ days of transmittal.

   ___ B. Signature is waived and the reporter will deliver the original transcript and
   exhibits to the Custodial Attorney, _____

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1. Copy of Transcript:  Yes _✓_  No ___       Video: (If Applicable)  Yes ___  No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail  Yes _✓_  No ___       E-mail Address: _cHVittito@ Aclansgraham._
                                                 _c ony_
   Signature: _____       Representing: _Cameron County, Texas_

2. Copy of Transcript:  Yes ___  No ___       Video: (If Applicable)  Yes ___  No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail  Yes ___  No ___        E-mail Address: _____

   Signature: _____       Representing: _____

3. Copy of Transcript:  Yes ___  No ___       Video: (If Applicable)  Yes ___  No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail  Yes ___  No ___        E-mail Address: _____

   Signature: _____       Representing: _____

4. Copy of Transcript:  Yes _✓_  No ___       Video: (If Applicable)  Yes ___  No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail  Yes ___  No ___        E-mail Address: _____

   Signature: _____       Representing: _Plaintiff_

THE STATE OF TEXAS          §

COUNTY OF CAMERON      §

    BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS ON THIS THE 1ˢᵗ. DAY OF May, 2001, A.D., DID PERSONALLY APPEAR: Felipe Silva DEPOSE AND SAY:

My name is Felipe Silva. I am currently employed at the Cameron County Jail as a Sgt. Correctional Officer assigned to the County Jail in Brownsville, Texas. If I am needed I can be contacted at my residence and the address is 743 Florence Lane, Brownsville, Texas and my telephone number is 956-534-6488. I can also be contacted at the County Jail and the telephone number is 956-5440865.

On April 11, 2001 at 6:44 a.m., I reported for duty. I made contact with Sgt. Luis Mendieta who briefed me on pending activities. Sgt. Mendieta was relived of all his duties and I continued. Due to the fact that Sgt. Mendieta did not leave the facility he escorted me to the third floor to Cell 3bl and 3br, this cells hold 13 (thirteen) inmates in each cells. We went to these cells to check on one of the inmate who had a question. When we finished Sgt. Mendieta and I went back to the booking area. When we got to the booking area, Sgt. Mendieta left the facility. By this time shift officers including guard Rora had reported for duty and were assigned to different post. I assigned Officer Rora as a runner since he was a new employee. I advised Officer Rora to station himself close to the booking area to assist the booking officers.

At 7:45 a.m., Lt Joe Villarreal arrived for duty.

At 7:58 a.m., ten (10) federal inmates were released to USDM for Federal Court by USDM Agent Contreras.

At 8:00 a.m., Female Inmate Ana Olguin was taken to Doctor appointment.

At 8:00 a.m., Lt. Able Garcia arrived for duty.

At 8:35 a.m., Officer Hilda Trevino called in sick.

At 8:38 a.m., I escorted the trustee to throw out the trash.

At 9:32 a.m., I made around to 3cl and 3cr due to problems in the cells.

At 9:36 a.m., 1 (one) state female was brought in by Hall of Justice.

At 9:58 a.m., 1 (one) inmate brought in by County Sheriff Deputy Trevino.

At 10:06 a.m., Border Patrol Agent Flores picked up inmate Cuevas, Domingo Moy.



At this point I left the booking area to follow-up on 3cl and 3er. An inmate asked me about his personal belongings and I told him that I would check up on it with the Laundry Officer.

At 10:37 a.m., I came back to the first floor to the booking area. I remember about the inmate's request, so I went to the laundry room. Once at the laundry room, I saw officer Gregorio Escamilla, Officer Rora and inmate Longoria, Juan Antonio. Inmate Longoria was changing into an inmate uniform. I looked towards Inmate Longoria and I noticed an injury to his left elbow. This injury was red in color and swollen. I asked inmate Longoria if that was the only injury on his body. Inmate Longoria showed me another injury, which was on his left lower part of his leg. This injury was approximately two to four inches below his left kneecap. After seeing these injuries we went to the briefing area, and I called Assistant Sergeant Frank Lerma. I asked Officer Lerma what agency had brought Inmate Longoria into our facility. I also asked

FS

page 2 of 3
Felipe Silva Jr.

Officer Lerma if Inmate Longoria had a medical clearance. Officer Lerma responded that Brownsville Police Department Officer Salinas had brought inmate Longoria and that he was medically cleared. As we were still in the briefing area, I saw nurse Sylvia Rivas passing by, so I called her to come and observer the bruising. I also saw that inmate Longoria was a little slow when answering questions, but nothing thing that alarmed me that I didn't to bring it to the attention of the nurse. These bruises were swollen and red and blue in color. The nurse asked inmate Longoria if he had any other bruising, the inmate pulled up his left leg and show her a bruise that he had in his left knee, which was red in color and swollen. Nurse Rivas told me that the bruises were minor and would be looked closer during medical clearance by her staff. Inmate Longoria was assigned to the large holding cell that is located to the right side of the booking area
At 10: 46 a.m., I was at the booking area, two inmate brought in by County Sheriff Deputy Juan Hinojosa.

At 10:52 a.m., Infirmary Inmate Miguel Vela was transferred to Detention II for special visit.

At 10:56 a.m., Brownsville Police Department Officer Salinas brought in one male inmate.

At 11:15 a.m., while still in the booking area when I heard inmate Longoria arguing with several other inmates in the holding cell and I immediately went over to see what was the problem. I asked Inmate Longoria what was the problem and he said that several inmates wanted beat him up. I then decided to remove Inmate Longoria from the cell to avoid further problems. At that time Lt. Alfredo Gutierrez was passing by and asked me what was the problem. I told him that inmate Longoria was arguing with several inmates and to avoid further problems I was removing him from that cell. Lt. told me to put inmate in the small holding cell. I told Lt. Gutierrez that due to fact that we already had the limit of inmates in the small holding cell, we couldn't place him there. Lt. Gutierrez agreed and advised me to put him in the single cell # 1 (padded cell). At this time I advised him that we already had one inmate in this cell. Lt. Gutierrez asked me if the inmate in the single cell was giving anyone any problems. I said, "no". Lt. Gutierrez told me to remove the inmate that was in the single cell and place Inmate Longoria in the single cell. After I did what Lt. Gutierrez advised me, I went on with my duties. I then advised Officer Rora and Officer Lerma to check on inmate Longoria during the shift.

At 11:45 a.m., one inmate is released at this time.

At 12:00 p.m. 2 (two) new federal males and 5 (five) males recommitted.

At 12:55 p.m., Lt. Able Garcia advised me to advise the officer on duty to remove vehicles on the south side.

At 1:22 p.m., 5 (five) inmates were removed from 2 AL/2AR to cells in the third floor.

At 1:53 p.m., 1 (one) federal male was brought in by Wackenhunt.

At 2:16 P.M., 3 (three) Federal Inmates were released to Wackenhunt Officer.

At 2:30 p.m., incoming shift started to arrive.

At 2:55 p.m., I briefed the incoming shift of the activities that occurred in the morning shift. I told them that inmate Longoria was brought in by Brownsville Police Department and due to an incident that occurred during the shift between inmate Longoria and other inmates, Inmate Longoria was placed in the single cell #1 (one) and per Lt. Gutierrez. I also advised them that inmate Longoria had an injury to his left knee area and elbow and had also been seen by Nurse Rivas and she stated that he would be checked when classified. I then went back to booking, I saw Inmate Longoria standing by his cell door window looking out not saying anything.

I further want to state that our briefing ended at 3:12 p.m., and as I was heading toward the booking area I saw Inmate Longoria standing by the door. This was the last time I saw him alive. I did not have any other encounter with him other then what I already mentioned in this statement. I did see him during the shift, but I did not log it anywhere in the logs.


_Felipe Silva_
(Signature of person giving statement)


SWORN AND SUBSCRIBED TO BEFORE ME, ON THIS THE 1st DAY OF May, 2001____, A.D.

_Mary Ann Flore_
NOTARY PUBLIC IN AND FOR CAMERON COUNTY, TEXAS

MARY ANN FLORES
Notary Public, State of Texas
My Commission Expires
April 5, 2003

NAME   (PRINT OR TYPE)   COMMISSION EXPIRES


Statement taken at the Ruben Torres Detention Center
By Inv. Mary Ann Flores.





IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA   ) (
IDALIA GUTIERREZ,          ) (
INDIVIDUALLY AND ON BEHALF ) (
OF THE ESTATE OF JUAN      ) (
LONGORIA, DECEASED         ) (
   Plaintiffs  ) (
         ) (
VS.                        ) (    CIVIL ACTION NO. B-01-062
         ) (
CAMERON COUNTY, TEXAS,     ) (
THE CITY OF BROWNSVILLE,   ) (    JURY DEMANDED
TEXAS AND JOHN DOES 1-10   ) (
   Defendants  ) (

---

ORAL DEPOSITION OF
JOSE MORALES
FEBRUARY 16, 2004



---

   ORAL DEPOSITION OF JOSE MORALES, produced as a
witness at the instance of the PLAINTIFFS, taken in the
above styled and numbered cause on FEBRUARY 16, 2004,
reported by DONNA McCOWN, Certified Court Reporter
No. 6625, in and for the State of Texas, at the offices
of Adams & Graham, L.L.P., 222 East Van Buren, West
Tower, Harlingen, Texas, pursuant to the Federal Rules
of Civil Procedure.

BRYANT & STINGLEY, INC.
McAllen    Harlingen    Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

## APPEARANCES

COUNSEL FOR PLAINTIFFS:

      ALFRED R. VALDEZ
      LAW OFFICE OF ALFRED R. VALDEZ
      7520 Hillcroft
      Houston, Texas  77081

      BARRY S. BERGER
      LAW OFFICE OF BARRY S. BERGER, P.C.
      1863 Post Oak Park Drive
      Houston, Texas  77027

COUNSEL FOR DEFENDANTS:

      CRAIG VITTITOE
      ADAMS & GRAHAM, L.L.P.
      222 East Van Buren, West Tower
      Harlingen, Texas  78551

## INDEX

| | PAGE |
|---|---|
| Appearances ................................... | 2 |
| JOSE MORALES | |
| Examination by Mr. Valdez ..................... | 3 |
| Errata Sheet/Signature Page ................... | 66 |
| Reporter's Certificate ........................ | 68 |

Attached to the end of the transcript:  Stipulations

## EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Statement .............................. | 43 |
| 2 | Medical Note ........................... | 26 |

JOSE MORALES,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. VALDEZ:

   Q.  Mr. Morales, would you please state your full name.

   A.  My name is Jose Francisco Morales, Jr.

      MR. VALDEZ:  And let's go off the record again if we could, please.

      (Brief recess)

      MR. VITTITOE:  Just -- while we're back on the record, we have -- Mr. Morales has provided plaintiffs' counsel with his address, his home phone number, his date of birth, his Texas driver's license number, and his social security number with the understanding that such information will remain confidential within this litigation to protect the security of Mr. Morales and his family because of the fact that he is a detention officer and we don't want that information public.

      MR. VALDEZ:  That's agreed.  That was the understanding.

   Q.  (By Mr. Valdez) Mr. Morales, give me a little bit of your educational background -- where did you go to school, whether or not you went to college, what

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

type of technical training you have -- if you would please, sir.

A.   Educational background is just high school. Graduated from Palm Beach County, Florida.  I graduated in '93.

And after there, I was there for about two years working in an auto supply store, warehouse.

And then in '95, I joined the military. From '95 to '99, I was living in California, United States Marine Corps, and when I finished my enlistment in '99, I came back to Brownsville, and I've been here in Brownsville ever since '99.

Q.   I assume you were honorably discharged?

A.   Yes, sir.

Q.   Okay.  And your four years in the Marines, did you remain in California, or were you stationed somewhere besides California?

A.   I did boot camp in South Carolina, Parris Island, did the training there.

And then from there, I went to North Carolina to do the technical training that I was provided in the Marine Corps, which is motor transport.

And then from there, I got transferred to California.  I was there for three -- three years and two months in California.

Q.  And when you left the service, what rank had you obtained?

A.  Corporal, E4.

Q.  Okay.  And when you came back to Brownsville, did you immediately start working with the County, or did you take on a different type of a job?

A.  No.  I started working -- got here in January, started working in the County in May of '99.

Q.  In May 1999 while working for the County, what position did you take with the County?

A.  I was a booking officer when I started.

Q.  And that would be at the Cameron County Jail?

A.  Yes, sir.  Cameron County Jail, the old county jail which is in Brownsville.

Q.  Okay.  And what position do you presently hold today?

A.  Right now, I'm the Texas Department of Criminal Justice Coordinator.

Q.  And what does that mean?

A.  That means anybody who gets sentenced, I'm in charge to -- they will be transferred to the facility of the prison where they're going to be serving their sentence.

Q.  Okay.  Is that a position that's held through Cameron County, or is that a position that's --

11:12:51 1    A.    No.    Through Cameron County.    Yes, sir.

11:12:55 2    Q.    Have you ever had your deposition taken before,

11:12:57 3    sir?

11:12:57 4    A.    No.

11:12:59 5    Q.    Okay.    So this is a new experience for you.

11:13:01 6    A.    Yes, sir.

11:13:07 7    Q.    How long did you hold the position of booking

11:13:09 8    officer for?

11:13:11 9    A.    That was from May of '99, I believe, to

11:13:16 10   September or October of 2001, I was booking officer.

11:13:26 11   Q.    When you left the position as a booking

11:13:28 12   officer, did you immediately go into the position you

11:13:32 13   presently hold today?

11:13:33 14   A.    Yes, sir.

11:13:34 15   Q.    Okay.    Is that considered to be a promotion?

11:13:36 16   A.    No.    Just from booking officer will be a

11:13:40 17   rotating shift ward position.    And the coordinator

11:13:46 18   right now where I'm working, it's just a

11:13:49 19   during-the-week position with the courts, more

11:13:51 20   paperwork.    It's not a promotion.    I don't consider it

11:13:55 21   a promotion, but I don't know.    Maybe an opening they

11:13:57 22   had, and I got transferred over there.

11:14:01 23   Q.    Okay.    When you initially became a booking

11:14:03 24   officer for the Cameron County Sheriff's Department,

11:14:07 25   what type of training did you have to obtain in order

11:14:10  1    to hold that position?

11:14:13  2        A.  As a booking officer?

11:14:14  3        Q.  Yes, sir.

11:14:15  4        A.  The only thing they asked me if I knew -- if I

11:14:17  5    had computer knowledge, typing.  And I told them yes,

11:14:20  6    because you need to be typing -- when asking a

11:14:24  7    question, you've got to be typing them in the computer.

11:14:30  8        Q.  Okay.  Did you have to go through any type of a

11:14:32  9    certification program?

11:14:34  10       A.  Not before I got the position.  I had to --

11:14:38  11   while I was there, I needed to get my license, Texas

11:14:40  12   correctional license.  That's when I took an exam after

11:14:43  13   a while.

11:14:45  14       Q.  Okay.  And so when did you actually obtain your

11:14:47  15   certification?

11:14:48  16       A.  I got it in, I believe, in September, October

11:14:51  17   2001.

11:15:05  18       Q.  Now, the certification that you obtained in

11:15:08  19   September or October of 2001, what specifically is that

11:15:14  20   certification called?

11:15:16  21       A.  It's just a jailer's license.

11:15:16  22       Q.  A jailer's license?

11:15:20  23       A.  Yes.  Detention officer or jailer's license.

11:15:33  24       Q.  Okay.  Tell me exactly what was a -- what were

11:15:37  25   your job duties when you first started in May of 1999.

11:15:42 1      A.  Well, the main duties of a booking officer was

11:15:52 2   to book everybody who comes into the jail as a new

11:15:52 3   person, new inmate.  We will obtain their information.

11:15:52 4   And the general information for the charts is

11:15:56 5   fingerprint them and take pictures of, you know, the

11:15:59 6   inmates, whether it be tatoos, scars, and everything

11:16:02 7   like that.  That was my primary job as a booking

11:16:05 8   officer.

11:16:07 9      Q.  Okay.  Is it fair to say that you would be the

11:16:10 10  first person that a prisoner would see upon entering

11:16:10 11  the Cameron County jail?

11:16:18 12     A.  No.  It would be the shift supervisor.

11:16:19 13     Q.  I'm sorry.  Who?

11:16:20 14     A.  The sergeant supervisor, supervisor on duty.

11:16:23 15     Q.  Okay.

11:16:23 16     A.  It would be the first person to see that

11:16:26 17  person, whoever comes in first.

11:16:27 18     Q.  All right.  And then what other training did

11:16:34 19  you have as a booking officer when you began in May of

11:16:39 20  1999 besides -- you said you had computer knowledge.

11:16:42 21  What else was there for you as far as training?

11:16:47 22     A.  For qualification as a booking officer, I mean,

11:16:50 23  I don't know.  I didn't have any priors before.

11:16:53 24     Q.  No prior training?

11:16:54 25     A.  No qualification.  No.  No prior training as a

11:16:56 1  correction officer or detention officer.

11:17:00 2      Q.  So was your job title back in May of 1999 a

11:17:06 3  detention officer?

11:17:08 4      A.  Yes.

11:17:10 5      Q.  Okay.  And if I understand you correctly, you

11:17:14 6  didn't actually get your certification as a detention

11:17:17 7  officer until September or October of 2001?

11:17:22 8      A.  Yes, sir.

11:17:26 9      Q.  Okay.  So from May of 1999 through September of

11:17:32 10  2001, you were an uncertified detention officer?

11:17:39 11      A.  I had my temporary license.  They issue a

11:17:42 12  temporary license when you start working at the county

11:17:45 13  jail.  They issue a temporary license so you work as a

11:17:48 14  detention officer.

11:17:50 15      Q.  Okay.  And so in order to obtain this temporary

11:17:53 16  license, what training did you have to go through in

11:17:58 17  order to obtain the temporary license as a detention

11:18:02 18  officer?

11:18:03 19      A.  I didn't went through no training at all.

11:18:06 20      Q.  Okay.  Were you required to read any type of a

11:18:09 21  policy or procedures manual concerning jail standards?

11:18:15 22      A.  I don't remember getting anything about

11:18:17 23  standards.

11:18:18 24          MR. VITTITOE:  He's talking about in

11:18:18 25  connection to obtaining the temporary license.

| | |
|---|---|
| 11:18:21 1 | MR. VALDEZ:  Yes, sir. |
| 11:18:21 2 | MR. VITTITOE:  Okay. |
| 11:18:23 3 | Q.  All right.  Did you see any types of videos or |
| 11:18:27 4 | any types of movies concerning your job as a detention |
| 11:18:32 5 | officer? |
| 11:18:33 6 | A.  Before obtaining the job as a booking officer, |
| 11:18:35 7 | no, I didn't. |
| 11:18:36 8 | Q.  How about afterwards? |
| 11:18:37 9 | A.  Afterwards, yes, I did, when I got my license. |
| 11:18:41 10 | Q.  Okay.  So when you actually got your license in |
| 11:18:43 11 | September of 2001, is that the first time you saw some |
| 11:18:47 12 | type of a video? |
| 11:18:48 13 | A.  Yes, because there's a two-week course, and |
| 11:18:49 14 | they showed us videos there. |
| 11:18:53 15 | Q.  Okay.  When did you take the two-week course? |
| 11:18:58 16 | A.  Like in September or August of 2001. |
| 11:19:02 17 | Q.  Okay. |
| 11:19:02 18 | A.  Before I got the license. |
| 11:19:05 19 | Q.  How is it that you went for over two years |
| 11:19:10 20 | without actually getting your certification as a |
| 11:19:14 21 | detention officer?  How did that come about? |
| 11:19:17 22 | A.  Because I was there for a year before I got |
| 11:19:21 23 | licensed.  I was transferred to classifications |
| 11:19:24 24 | officer, sent to process, and then I got laid off, and |
| 11:19:28 25 | they rehired me back as a booking officer. |

Q.  Okay.  So you were -- so from May of 1999 through October of 2001, you also held a position sometime in that time frame as a classification officer as well?

A.  Yes.

Q.  Okay.  And as a classification officer, when did you hold that position, approximately?

A.  It was -- it was from July of -- June or July of 2000 all the way to September 31st of 2000.

Q.  Okay.  And what training did you have to go through in order to become a classification officer at the Cameron County Jail?

A.  It was almost the same training as a booking officer.  What we do in classifications, it would be to input the information from the court after the inmates return from court.

We input the information in the computer. It's almost similar information when you're booking them as a booking officer.  So I had the experience from booking officer.  That's why I was transferred to classification officer.

Q.  As a classification officer, are you evaluating where a prisoner is going to be placed?

A.  No.  I wasn't holding that position.

Q.  Okay.  Is that somebody else's job duties or

title?

A.  Yes.

Q.  Okay.  What would that person be called there at the Cameron County Jail?

A.  Most of it would be the officer or supervisor in charge of classifications.

Q.  Okay.  Let's go back to the category of a booking officer.  What medical training did you have from May of 1999 through October of 2001 in the way of medical training?

A.  I had no medical training.

Q.  Okay.  In the military, did you have to go through any type of medical training?

A.  Only CPR.

Q.  Okay.  While with the Cameron County Jail facility, did they have any type of medical training that you had to go through between May of 1999 through October of 2001?

A.  I didn't know if they had any training.

Q.  Okay.  Fair enough.

My question is, is whether or not you went through any type of medical training.

A.  No, I didn't go through any training.

Q.  And so that we're not talking over each other -- because the court reporter might have had us

11:22:53  1    talking at the same time -- just for the benefit of the

11:22:57  2    record, my question was, between May of 1999 through

11:23:01  3    October of 2001, you did not have any medical training

11:23:06  4    while employed with the Cameron County Sheriff's

11:23:08  5    Department.

11:23:09  6        A.   No.

11:23:15  7        Q.   Okay.   Now, in April of 2001, were you employed

11:23:26  8    at the Cameron County Jail?

11:23:27  9        A.   Yes, sir.

11:23:29 10        Q.   Okay.   In April of 2001, what was your job

11:23:33 11    title?

11:23:34 12        A.   I was a booking officer.

11:23:36 13        Q.   In April of 2001, could you please describe for

11:23:40 14    me what your job duties were as a booking officer?

11:23:44 15        A.   My job duties as a booking officer in April of

11:23:46 16    2001 was the same ones I stated earlier -- people who

11:23:50 17    come in, I would book them in, arrest -- provide the

11:23:55 18    information, ask them their information so I can input

11:23:57 19    it in the computer, put the charges, take the

11:24:00 20    fingerprints and the pictures of a new inmate.

11:24:06 21        Q.   And if they're coming from the City of

11:24:09 22    Brownsville jail facility, would the procedure for you

11:24:14 23    be the same as to whether they were initially being

11:24:17 24    brought in by a deputy sheriff?

11:24:20 25        A.   Yes, sir.

Q.   There was no distinction?

A.   No, sir.

Q.   Okay.  Now, you indicated to me that typically the sergeant would be the first one normally to greet these people.

MR. VITTITOE:  Welcome.

Q.   Welcome them to the jail, correct?

A.   Yes, sir.

MR. VITTITOE:  Alfred, do you talk from experience.

MR. VALDEZ:  Yes, having had some visits there -- visits, not permanent stays fortunately.

Q.   Now, typically, how many people would y'all process at -- in a day?

A.   It varies.  It would sometimes go from 10, 15, up to 40 or 50 a day.

MR. VITTITOE:  You're talking April or now?  Just to clarify.

MR. VALDEZ:  That's a fair question.

THE WITNESS:  Oh, in April?

Q.   Yes, sir.  Of 2001.

A.   Of 2001, I don't remember.  I mean, it could be, like I say, maybe 15 or 20.

MR. VITTITOE:  Don't guess, unless you remember.

Q.  Correct.

A.  I don't remember exactly how many.

Q.  Low side, approximately 15; high side, maybe --

A.  30, 40.

Q.  All right.  Do you recall what shift you were working in April of 2001?

A.  Yes, sir.

Q.  And what shift was that?

MR. VITTITOE:  Are you talking about the day of -- I mean, let me just object that the question is overly broad.  April has, as I recall, 30 days in it.

MR. VALDEZ:  All right.

MR. VITTITOE:  And there's at least three shifts, maybe four, during that period of time.

MR. VALDEZ:  Fair enough.

Q.  In April of 2001, were you just working one shift, or did you have various shifts?

A.  I had various shifts.

Q.  Okay.  And would you happen to recall what shift you were working on April the 11th of 2001?

A.  Yes.  I was working 7:00 to 3:00 -- 7 a.m. to 3 p.m. shift.

Q.  Okay.  And how do you remember it to be the morning shift?

A.   It was a busy day during -- throughout the day because people were going to court, coming from court, new inmates coming into the jail from different agencies.

Q.   Okay.  Do you even remember a Mr. Juan Longoria?

A.   I do remember him for -- a little bit.

Q.   Okay.  What do you remember of him or about him?

A.   The only thing I remember when he came into the jail and the sergeant or assistant sergeant looked at the paperwork, and they handed it to me, the commitment and the probable cause for the municipal jail.  And after that, they took him to the laundry to get him changed into uniform.

They brought him back from the laundry to place him in the large holding cell.  And then he started acting, like I stated in my statement, to get him out of the large holding cell.

Q.   Okay.  How was he acting that took him out of the large holding cell?

A.   He was just screaming and yelling "Sacame de aqui" meaning, "Get me out of here."

Q.   Okay.  Is there anything else that you recall about Mr. Longoria?

A.  At that moment, yes.  That's what happened. They had him in the large holding cell.  And they took him out of the large holding cell, and they put him in the padded cell No. 1.

And I remember he -- we tried to give him a plate, a plate of food between the time of 11:30 or 12 p.m., and he tried to push the door.  And the officer just closed the door, secured the door.  And I don't know what -- if he pushed him or not, but I know he secured the door.

And after a little bit, I went to the door, through the window, to see if ever he calmed down so I could book him in.  And he would look at me, and he told me, "Let me go."

And I didn't say nothing to him.  I went back to my business of booking officer because I wanted to process the inmate.

Q.  Okay.  Do you remember whether or not he was hallucinating?

A.  No.

Q.  He was not, or you don't remember?

A.  I don't remember.

Q.  Okay.  Now, did you actually have Mr. Longoria going through a booking process, or was that somehow bypassed?

A.   It was bypassed.

Q.   Okay.   Do you have an explanation as to why it was bypassed?

A.   Because I told the sergeant he was uncooperative to me.   And my knowledge as -- working as a booking officer for one year and a half before the incident happened, Mr. Longoria was uncooperative for me to ask him the questions.   I don't know if he was going to provide me the correct information.

Q.   Okay.   When you say he was uncooperative, what was he doing that led you to believe that he was uncooperative?

A.   Because he was yelling, "Sacame de aqui."   "Let me go."

Q.   Okay.   Was there anything else that you noticed or observed about him that led you to believe that he was uncooperative?

A.   No.

Q.   So I imagine you reported this to your sergeant?

A.   Yes, sir.

Q.   And who was the sergeant at that time?

A.   Felipe Silva.

Q.   Mr. Silva.

Is Mr. Silva still with the County?

11:29:58 1    A.   Yes, sir.

11:29:58 2    Q.   And what position did Mr. Silva have back in

11:30:03 3  April of 2001 when Mr. Longoria was there?

11:30:07 4    A.   He was the sergeant from the 7-to-3 p.m. shift.

11:30:12 5    Q.   Okay.  And at that time, do you have any

11:30:15 6  recollection as to who else was working there with you?

11:30:19 7    A.   As a booking officer?

11:30:21 8    Q.   Whether a booking officer or detention officer,

11:30:23 9  yes, sir.

11:30:25 10   A.   The ones I remember off the top of my head

11:30:27 11 right now, it's Sergeant Felipe Silva and his assistant

11:30:32 12 Frank Lerma -- he's not employed with the County no

11:30:36 13 more -- and Officer Rora, which is -- that was his

11:30:38 14 first day as a detention officer -- and myself.  I was

11:30:43 15 just the only booking officer for that day.  And there

11:30:48 16 was other people, but I don't recall the rest of the

11:30:50 17 names.

11:30:50 18   Q.   Okay.  Did y'all also have a classification

11:30:54 19 officer that was working in your group that morning as

11:30:57 20 well?

11:30:59 21   A.   They were working but in a different office.

11:31:02 22 They don't -- we don't have the same office.

11:31:07 23   Q.   Okay.  Well, where in this process would

11:31:09 24 Mr. Longoria have found himself going through a

11:31:12 25 classification process?

A.   It would be after I booked him in.   After I take his information, put the charts in the computer, take his pictures and fingerprints, they would take him to the back.   They had a computer, and they would do the classifications over there.

Q.   Okay.   Do you have any recollection as to whether or not you had seen Mr. Longoria in the county jail before April the 11th of 2001 for any other reason?

A.   No.

Q.   When you do your booking process -- and you indicated to me you have a computer system -- does that computer system also show the past criminal history of an individual?

A.   Yes.   It should.

Q.   Okay.   And that would have been true on April the 11th of 2001?

A.   Yes.

Q.   Okay.   Do you have any recollection as to whether or not when you initially saw Mr. Longoria you actually pulled up on the screen of this computer system what his criminal history was before that?

A.   No, I don't remember doing that.

Q.   Okay.   Now, when you indicated that he was uncooperative, certainly you already had some

commitment papers from the municipal court judge, correct?

A.  Yes.

Q.  And you also had information that would have identified Mr. Longoria.  Would that be true?

A.  The only information we would have, it would be his name only.

Q.  Only his name?

A.  Yes, sir.  From the municipal jail.

Q.  Okay.  How about if he had previously seen a doctor?  Wouldn't y'all have some type of medical information concerning Mr. Longoria?

A.  I wouldn't have that information.  I wouldn't have received it because the medical staff probably received that information.

Q.  Okay.  So maybe, for my benefit, you can give me a little bit of an idea as to how this works.

When a prisoner such as Mr. Longoria enters into the Cameron County Jail facility, he is initially seen by the sergeant, correct?

A.  Correct.

Q.  And on this particular day, it was Sergeant Felipe Silva.

A.  Yes, sir.

Q.  Okay.  And who actually takes the commitment

11:33:45  1    papers of a prisoner, you or Felipe Silva?

11:33:50  2        A.  I do.

11:33:54  3        Q.  Okay.  Does Sergeant Felipe Silva, back in

11:33:58  4    April of 2001, would he ever actually take those

11:34:02  5    commitment papers and see whether or not someone may

11:34:05  6    have had some medical attention or not?

11:34:10  7        A.  I don't remember if he did or not.

11:34:14  8        Q.  Okay.  Well, what was the typical procedure

11:34:15  9    back in April of 2001 when someone was brought over

11:34:19 10    from the City of Brownsville jail and brought to the

11:34:22 11    Cameron County Jail as it pertains to the commitment

11:34:26 12    papers?

11:34:27 13        A.  I would look at the paperwork, make sure it was

11:34:30 14    signed by the judge that set a bond, their -- name of

11:34:34 15    the defendant.  And the probable cause would be the

11:34:37 16    same thing -- name of the defendant, the charge, the

11:34:38 17    bond, and the signature of the judge ordering the

11:34:41 18    commitment to the Cameron County Jail.  And if that

11:34:44 19    information was correct, I would save the paperwork,

11:34:46 20    only the paperwork.

11:34:48 21             Now, the sergeant on duty, it would be his

11:34:50 22    responsibility for the inmate is not -- is clear to be

11:34:54 23    incarcerated into the jail, he is not taking any

11:34:58 24    medications, or he is not on any medical conditions.

11:35:00 25        Q.  So it's the sergeant on duty that makes the

11:35:04  1    determination as to whether or not there's a medical

11:35:05  2    clearance?

11:35:05  3        A.  He doesn't make the determination whether he's

11:35:08  4    to be accepted, because if they misstate that he is

11:35:11  5    taking medication, he will call one of the nurses on

11:35:14  6    duty.  And then the nurses will ask him -- I don't know

11:35:17  7    what kind of questions they will ask the inmate.  And

11:35:20  8    if he says -- if they say, "Yes, he's clear to stay in

11:35:24  9    the jail," we will keep him in the jail.

11:35:27 10        Q.  All right.  Now, do you have a recollection as

11:35:30 11    to who the nurses on duty were that day back in

11:35:33 12    April 11th of 2001?

11:35:36 13        A.  No, sir.

11:35:37 14        Q.  Okay.  How many nurses were typically on duty

11:35:40 15    on the morning shift for, say, 7:00 in the morning

11:35:43 16    until 3:00?

11:35:45 17        A.  We have three facilities.  It could be maybe

11:35:48 18    six or eight nurses.

11:35:50 19        Q.  Fair enough.

11:35:51 20            At the facility where you were located,

11:35:53 21    how many nurses were there on April the 11th of 2001?

11:35:59 22        A.  I'd say it would be three at the Cameron County

11:36:09 23    Jail.

11:36:09 24            MR. VITTITOE:  Let me just raise an

11:36:09 25    objection.  It's speculation.

Q. Well, as far as you can recall, there were three nurses on duty?

A. Yes, sir.

Q. Okay. And -- on the morning shift?

A. On the morning shift.

Q. Okay. Now, do you know whether these nurses were what I would call LVNs or RNs, or do you have any idea?

A. I believe LVNs.

Q. Okay. And when prisoners would arrive there initially at the Cameron County Jail facility, would a nurse actually be there present while these prisoners are being brought in?

A. No, they're not present. If the nurse -- I mean, the sergeant who asks the prisoner if they're taking any medication, they will call the nurse to the front of the jail, the entrance, to screen the inmates.

Q. Okay. My next question for you is, typically, when a prisoner is brought from the City of Brownsville jail over to the Cameron County Jail, who actually carries these documents that are called "commitment papers," the prisoner or the police officer or the bailiff that's bringing the papers over?

A. The detention officers from the city jail.

Q. The transportation officer?

A.   Yes, sir.

Q.   Okay.   Those papers that are brought by the transportation officer from the City of Brownsville jail, to whom does he give those papers?

A.   To me, the booking officer.

Q.   Booking officer.

Now, you had indicated to me that before April the 11th of 2001 you had been working for almost -- would it be fair to say two years as a booking officer?

A.   Yes, sir.

Q.   Okay.   And you held that position continuously while you were with the Cameron County Jail from May of 1999 through April of 2001.

A.   Yes, sir.

Q.   Okay.   Now, I would imagine before the incident of Mr. Juan Longoria, would it be fair to say that you had a situation where a prisoner had some type of doctor's orders or doctor's instructions attached to the commitment papers?

A.   Yes, sir.

Q.   Okay.   And when a prisoner has such information attached to their commitment papers, that information being these doctor's orders, what would you do?

A.   I would give it to the sergeant.   The sergeant

would review the papers, and then he would take it to the nurse. And they will make the decision whether he's to be clear to stay in the jail or not.

Q. All right. Now, do you have any recollection as to what was contained in the commitment papers concerning Juan Longoria?

A. No, sir.

Q. Okay. Now, if Juan Longoria indeed had some type of doctor order/instructions attached to the commitment papers, your procedure would be to give those -- that information to the sergeant.

A. Yes, sir.

Q. And the sergeant on duty that particular day working with you is Sergeant Felipe Silva.

A. Yes, sir.

Q. Okay. I'm going to hand you what has been marked as Mr. Morales Exhibit No. 2. And I want to ask whether or not you have any recollection of ever seeing this document.

A. You mean if I had seen this document in April?

Q. Yes, sir.

A. No, I don't remember.

Q. April of 2001.

Have you seen that document afterwards?

A. Oh, yes.

11:40:42 1      Q.   Okay.   When did you see it?   When can you

11:40:45 2   recall seeing that document?

11:40:47 3      A.   Not this particular document, no, but I've seen

11:40:50 4   similar documents from different inmates.

11:40:53 5      Q.   Okay.   Let me ask you this:   You said you've

11:40:57 6   seen similar documents noted as Mr. Morales Exhibit

11:41:01 7   No. 2.   Would it be true to say that you have seen such

11:41:07 8   documents before April 11th of 2001 and that type of

11:41:13 9   document that is noted as Morales Exhibit No. 2 would

11:41:19 10  typically be attached to these commitment papers that

11:41:22 11  we've been discussing?

11:41:24 12     A.   Yes.

11:41:25 13     Q.   Now, when you would see a doctor's order such

11:41:28 14  as that, what would you do?

11:41:30 15     A.   I would give the orders to the sergeant.

11:41:36 16     Q.   Okay.   Can you read what is written on the

11:41:39 17  doctor's instruction for Mr. Morales Exhibit No. 2?

11:41:42 18  Can you see that?

11:41:43 19     A.   Yes.

11:41:44 20     Q.   What does it say, sir?

11:41:47 21     A.   "May return to jail but should be kept with

11:41:53 22  close observation."

11:41:56 23     Q.   Now, when such an order is given, what was

11:42:02 24  supposed to happen there at the Cameron County Jail

11:42:06 25  back in -- on April the 11th of 2001?   What was

11:42:10 1    supposed to happen with Mr. Longoria?

11:42:15 2        A.   That duties, it would be in terms of the

11:42:19 3    sergeant because I would not read this notice, like I

11:42:22 4    stated.   I would have given it to the sergeant so he

11:42:24 5    would know what would be done because I didn't know

11:42:26 6    what to do with that.

11:42:30 7        Q.   Okay.   Now, when Mr. Longoria came in back

11:42:34 8    on -- it was -- I guess it was April the 11th of 2001;

11:42:38 9    is that correct?

11:42:38 10       A.   Yes, sir.

11:42:40 11       Q.   Okay.   And because, as you indicated, you say

11:42:43 12   he was uncooperative, he was not booked.   Now -- and he

11:42:50 13   was taken back to the laundry room to get some clothes,

11:42:54 14   correct?

11:42:54 15       A.   To be changed into uniform.

11:42:56 16       Q.   Okay.   And then, in turn, he was put into the

11:42:58 17   general population cell?

11:43:00 18       A.   Yes sir.

11:43:01 19       Q.   Okay.   For my benefit, what do you mean by "the

11:43:03 20   general population cell"?

11:43:05 21       A.   Well, it's not a general population cell.   It

11:43:07 22   would be the large holding cell.   It would be -- once

11:43:11 23   the sergeant brings him back from the laundry area,

11:43:22 24   they will place him in the large holding cell until

11:43:22 25   they are booked.

11:43:22 1    After we book him in, they will do the
11:43:22 2 classifications.  After the classifications, they would
11:43:22 3 take him to the nurse.  The nurse will see him, ask him
11:43:24 4 their questions.  I don't know what the questions are.
11:43:26 5 And then from there, he will be assigned a cell.
11:43:29 6    Q.  All right.  How many people are typically held,
11:43:32 7 back in April 11th, 2001, in this holding cell?
11:43:36 8    A.  I don't remember.
11:43:37 9    Q.  Okay.  Is there an approximate number?
11:43:44 10    A.  Maybe ten.
11:43:45 11    Q.  All right.  Approximately -- in your unit or
11:43:53 12 facility, approximately how many prisoners would be in
11:43:57 13 that facility back in April of 2001?
11:44:00 14    A.  Over all the facility?
11:44:02 15    Q.  Well, in your section.
11:44:03 16    A.  In my section?
11:44:04 17    Q.  Yes.
11:44:07 18    MR. VITTITOE:  Let me just object to
11:44:09 19 form -- we're in federal court -- overly broad.  Could
11:44:13 20 you define his section?  I mean, he's in a little
11:44:16 21 cubicle that's about --
11:44:19 22    MR. VALDEZ:  I'll be more clarifying.
11:44:22 23    Q.  All right.  Back in April -- on April the 11th
11:44:24 24 of 2001, you indicated to me that the Cameron County
11:44:28 25 Jail had -- was it three detention facilities?

A.  Yes.

Q.  Okay.  What detention facility were you in?

A.  I was in the main county jail.

Q.  In the main county jail.

In the main county jail back in April of 2001, approximately how many prisoners would that main county jail be able to hold?

MR. VITTITOE:  Wait.

Object.  Calls for speculation, unless you know.

Q.  Do you know?

A.  No, I don't remember exactly how many.

Q.  All right.  Fair enough.

Would it hold more than 80?

A.  Well, yes.

Q.  Okay.  Would it hold more than 100?

A.  Yes.

Q.  Would it hold more than 150?

A.  Yes.

Q.  Okay.  Would it hold more than 200?

A.  Yes.

Q.  Okay.  250 prisoners?

A.  Correct.  About 250.

Q.  All right.  Back in April of 2001, do you have a recollection now of what the average population was

in that --

A. No.

Q. -- jail facility?

A. No, I don't.

Q. Okay. What is it presently in the old county jail, or is that old county jail even open anymore?

A. Right now, it's under construction, so I don't know how many. They're not holding anything right now.

Q. All right. So getting back to Mr. Longoria. Mr. Longoria was put into -- would you call it the general population cell or did you use another word?

A. Large holding cell.

Q. Large holding cell. All right.

And for approximately how long was he there before he was moved to a padded cell?

A. He was there, I'd say, maybe like an hour and a half.

Q. Okay. Do you know approximately the time that Mr. Longoria was placed into the large holding cell, the approximate time?

A. No, sir.

Q. Okay. Do you know the approximate time that Mr. Longoria was placed in the padded cell?

A. No.

Q. Okay. Now, is it true that when Mr. Longoria

11:46:53  1   was placed in the padded cell that a chart was supposed

11:46:59  2   to be placed on the door for purposes of monitoring

11:47:02  3   Mr. Longoria?  Is that true?

11:47:04  4       A.  Could you repeat the question?

11:47:05  5       Q.  Yes.

11:47:06  6            Is it true that when Mr. Longoria was

11:47:08  7   placed in the padded cell that some form of a chart or

11:47:15  8   a log was supposed to be -- was supposed to commence

11:47:20  9   while he was placed in the padded cell?

11:47:22 10       A.  Yes, sir.

11:47:24 11       Q.  Okay.  And is it true that that log was not

11:47:27 12   done?

11:47:28 13       A.  As far as I know, no, it wasn't done.

11:47:33 14       Q.  Okay.  Is it also true that when Mr. Longoria

11:47:36 15   was placed in the padded cell that a nurse was to be

11:47:42 16   notified of him being placed in the padded cell?  Is

11:47:46 17   that also true?

11:47:47 18       A.  I don't know about that.  I don't know if a

11:47:49 19   nurse was supposed to be notified that he was going to

11:47:52 20   be placed in the padded cell.

11:47:53 21       Q.  All right.  Now, would it also be true that

11:48:01 22   when Mr. Longoria was placed in a padded cell there was

11:48:04 23   supposed to also be another chart or some form of a log

11:48:10 24   for information concerning Mr. Longoria's medical

11:48:14 25   situation?  Would that also be true?

11:48:22  1    A.  I don't know if it would be true or not.

11:48:23  2    Q.  Fair enough.

11:48:28  3         Do you know why a log was not begun on

11:48:34  4    Mr. Longoria when he was placed in the padded cell?

11:48:38  5    A.  No, I don't know why.

11:48:41  6    Q.  Okay.  Who would have been responsible for

11:48:43  7    making sure that that log was placed on the door next

11:48:45  8    to him or on the wall?

11:48:47  9    A.  It would be the supervisors on duty.

11:49:37 10    Q.  Okay.  Now, you indicated to me that one of the

11:49:41 11    supervisors was to put this log.  Where would this log

11:49:48 12    be placed?  Would it be placed on the wall next to the

11:49:50 13    door of the padded cell?

11:49:51 14    A.  It should be in the front of the door.

11:49:56 15    Q.  Okay.  Before Mr. Longoria was placed in this

11:50:01 16    padded cell on April 11th of 2001, had you seen

11:50:05 17    situations where other prisoners were placed in that

11:50:08 18    padded cell?

11:50:09 19    A.  No.

11:50:11 20    Q.  All right.  Before April 11th of 2001, were you

11:50:20 21    aware that a log was to be kept in a manner we just

11:50:25 22    described where this log was -- or piece of paper was

11:50:28 23    placed on the wall next to the door of the padded cell?

11:50:31 24    A.  Yes.

11:50:36 25    Q.  Okay.  Do you know how often Mr. Longoria was

11:50:38 1    supposed to have been checked?

11:50:40 2        A.  No.

11:51:06 3        Q.  Okay.  Do you have any recollection as to the

11:51:09 4    amount of prisoners that could be held in the whole

11:51:12 5    Cameron County Jail facility back in April of 2001,

11:51:16 6    approximately?

11:51:17 7        A.  In the whole Cameron County Jail?

11:51:19 8        Q.  Yes, sir.  In 2001.

11:51:22 9            MR. VITTITOE:  Let me just object.

11:51:23 10   Speculation.

11:51:24 11           THE WITNESS:  About 250 inmates total.

11:51:39 12       Q.  Okay.  Before April of -- well, let me back up.

11:51:42 13           Before the Cameron County Jail was closed

11:51:46 14   for renovations, what have you, what was the

11:51:48 15   approximate number of prisoners that could be held in

11:51:51 16   there?

11:51:53 17       A.  About 250 inmates.

11:52:08 18       Q.  What was the average daily population in that

11:52:13 19   Cameron County Jail that you were in?

11:52:16 20           MR. VITTITOE:  Objection, speculation.

11:52:18 21       Q.  If you know.

11:52:18 22       A.  I don't remember.

11:52:21 23       Q.  Before it was closed down, do you know?

11:52:23 24       A.  No, I don't remember.

11:52:24 25       Q.  Okay.  The -- while you were a detention

11:52:37 1    officer before April 11th of 2001, do you have any

11:52:46 2    recollection as to whether or not you saw a document

11:52:54 3    referred to as the "Health Services of the Cameron

11:52:58 4    County Jail Protocols"?

11:52:59 5        A.  No.

11:53:01 6        Q.  I'm going to hand you what has been marked as

11:53:05 7    Mr. Elizarde Exhibit No. 1 and ask you whether or not

11:53:10 8    you've seen this document that's been marked as

11:53:13 9    Mr. Elizarde Exhibit No. 1 before.

11:53:40 10       A.  No, I don't remember seeing this.

11:53:43 11       Q.  All right.  And that -- Mr. Elizarde Exhibit

11:53:48 12   No. 1 is entitled "The Health Services of the Cameron

11:53:53 13   County Jail Protocols," correct?

11:53:54 14       A.  Yes, sir.

11:53:55 15       Q.  Okay.  The next document over -- I believe it's

11:53:59 16   Exhibit No. 2 of Mr. Joe Elizarde's deposition dated

11:54:08 17   August 28th of 2003, and it talks about the Cameron

11:54:15 18   County Sheriff's Department jail division operation

11:54:17 19   plan.

11:54:19 20            And I want to ask whether or not you have

11:54:21 21   ever seen this document before.  And that's marked as

11:54:25 22   Mr. Elizarde Exhibit No. 2.

11:54:33 23       A.  No, I don't remember.  I've probably seen it,

11:54:35 24   but I don't remember.

11:54:47 25       Q.  I'm sorry.  What was your response, sir?

11:54:49  1    A.  I don't remember seeing one of these.

11:54:50  2    Q.  Very good.

11:55:04  3        If I understand your testimony correctly,

11:55:06  4  sir, you did not go through a two-week training program

11:55:14  5  to become certified as a detention officer, sir, until

11:55:21  6  September or October of 2001; is that correct?

11:55:25  7    A.  No.  I went through a prior training.

11:55:29  8    Q.  Okay.  And when did you go through that

11:55:31  9  two-week program?

11:55:32 10    A.  It was --

11:55:34 11        MR. VITTITOE:  Let me just object.

11:55:39 12  Mischaracterizes the testimony.  I don't think he said

11:55:41 13  he went to a prior two-week program.  You may want to

11:55:45 14  ask him.

11:55:46 15    Q.  Okay.  Did you go through a two-week program?

11:55:48 16    A.  Yes.

11:55:52 17    Q.  Okay.  And when did you go through that

11:55:54 18  two-week program, sir?

11:55:56 19    A.  It was in April of 2000.

11:56:04 20    Q.  Okay.  So it was in April of 2000 that you went

11:56:06 21  through a two-week program.  Now -- but you indicated

11:56:10 22  you didn't actually get your certification until

11:56:13 23  September or October of 2001.

11:56:15 24    A.  Yes, sir.

11:56:17 25    Q.  Okay.  And the two-week program that you went

11:56:20 1    through, where did you take that program at?

11:56:22 2         A.   It was at one of the facilities of the Cameron

11:56:25 3    County Jail.

11:56:27 4         Q.   Okay.  And do you recall exactly what reading

11:56:31 5    materials you obtained, or what did you do during that

11:56:34 6    two-week period as far as training?

11:56:36 7         A.   It was the manual for Texas correction officer.

11:56:45 8         Q.   While in that two-week training program, did

11:56:49 9    y'all go through any type of a medical training at all?

11:56:55 10        A.   No.

11:56:59 11        Q.   Okay.  Do you know whether or not, back in

11:57:02 12   April of 2001, Felipe Silva had any medical training?

11:57:06 13        A.   I don't know.

11:57:08 14        Q.   Okay.  Now, if I understand this correctly,

11:57:16 15   since Mr. Longoria did not get booked, then he would

11:57:26 16   not have been classified.  Is that a fair statement?

11:57:29 17        A.   Correct.

11:57:31 18        Q.   Okay.  Because the procedures back in April of

11:57:33 19   2001 at the Cameron County Jail is that you -- it would

11:57:40 20   be noted that you exist in the system through the

11:57:42 21   booking process, correct?

11:57:44 22        A.   Correct.

11:57:48 23        Q.   Okay.  And then you get classified thereafter,

11:57:52 24   correct?

11:57:52 25        A.   Yes, sir.

Q.   Okay.  And who was the classification person back on April the 11th of 2001?

A.   Classification would be one of the officers during the shift.  It could be -- it could vary who they put as to who would be classifying the inmate.

Q.   Okay.  Before April of 2001, were you ever a classification officer?

A.   No.

Q.   Okay.  What type of credentials or training does a classification officer have in order for them to be called a classification officer at the Cameron County Jail?

A.   I wouldn't know what kind of credentials would they need.

Q.   Well, from what I can gather, according to your testimony, you were a classification officer, was it in June of 2000 through July of 2000?

A.   Yeah.  It was classification for the information from the court.  They would be called classification officer of that department.  And they would call the classification people who classify the inmates after they'd been booked up to the screening.

Q.   Okay.  So we're using this term "classification officer" for two different things then, or are we?

A.   No.  Only for one.

Q.  All right.  Well, when you were a classification officer back in June of 2000 through July of 2000, what were you doing as a classification officer then?

A.  I would just input the information from the court when the people return from court.  I would obtain the records of the court and input them into their file in the computer.

Q.  Okay.  The classification officer that was on duty in April -- on April the 11th of 2001, do you recall who that person would have been?

A.  No, sir.

Q.  Okay.  Do you know what training that person would have had?

A.  No.

Q.  What was that person supposed to do as classification officer?

A.  Well, we've got two types of classification officers, like I stated.  It would be the classification who would classify the inmate as of whether he's taking any medications or have any suicidal tendencies; and there will be the other classification officer who input the information from the court.

Q.  Okay.  The person who actually makes a

12:00:29  1    determination whether or not someone is taking any

12:00:32  2    medication or whether or not someone has any type of

12:00:35  3    suicidal tendencies, do you know whether or not that

12:00:38  4    person had any medical training or background?

12:00:41  5        A.  No.

12:00:42  6        Q.  You do not know?

12:00:43  7        A.  I do not know.

12:00:44  8        Q.  Okay.  And as far as -- as we sit here today,

12:00:47  9    you just don't have a recollection who that person was

12:00:49 10    back in April of 2001?

12:00:51 11        A.  No, sir.

12:00:54 12        Q.  Okay.  Let me ask you this:  Was the

12:00:58 13    classification officer on April the 11th of 2001, was

12:01:02 14    that person a nurse?

12:01:04 15        A.  No.

12:01:09 16        Q.  Okay.  Do you know whether or not, on April

12:01:11 17    the 11th of 2001, a nurse would be present at the time

12:01:17 18    that this classification officer was making the

12:01:21 19    determination as to whether or not someone had suicidal

12:01:26 20    tendencies or was on medication?

12:01:29 21        A.  No, I don't remember.

12:01:32 22        Q.  Let me ask this:  Back in April of 2001, was

12:01:36 23    there a policy or procedure for the nurse to be present

12:01:40 24    while the classification officer was making a

12:01:44 25    determination as to whether or not someone had some

12:01:46  1    type of suicidal tendencies or was on medication?

12:01:50  2        A.  No.

12:02:01  3        Q.  Okay.  Did you ever find yourself having to

12:02:04  4    make a determination as to whether or not someone

12:02:06  5    needed medical attention?

12:02:07  6        A.  No.

12:02:15  7        Q.  Okay.  What happens after an individual would

12:02:18  8    see a classification officer?  What happens?  What's

12:02:22  9    the next step?

12:02:22 10        A.  They would take that information to the nurse.

12:02:27 11    And then they would decide whether -- where they're

12:02:30 12    going to put him at so they can provide the attention

12:02:35 13    if he needs any.

12:02:37 14        Q.  So is it the classification officer that makes

12:02:40 15    a determination as to whether or not an individual sees

12:02:42 16    a nurse?

12:02:44 17        A.  No, because it's a policy that everybody who

12:02:47 18    gets through the jail will have to see a nurse.

12:02:52 19        Q.  Okay.  So it's the policy back in -- on

12:02:55 20    April the 11th of 2001 that everyone who passes through

12:03:02 21    the Cameron County Jail must see a nurse.

12:03:06 22        A.  After they've been booked and classified.

12:03:08 23        Q.  After they've been booked and classified.

12:03:10 24        A.  Yes, sir.

12:03:11 25        Q.  Okay.  What happens if they never get booked or

12:03:14  1   they never get classified?  Does that mean they don't

12:03:17  2   get the medical attention or see the nurse?

12:03:21  3       A.  I don't think they would.

12:03:22  4       Q.  You don't think they would?

12:03:24  5       A.  No.

12:03:28  6       Q.  Is that what happened in Mr. Longoria's case?

12:03:30  7               MR. VITTITOE:  Objection, speculation.

12:03:33  8       Q.  If you know.

12:03:34  9       A.  I don't know.

12:03:37 10       Q.  Okay.  Well, let me ask you this:  Where is the

12:03:44 11   padded cell in relationship to where you are seated as

12:03:50 12   the booking officer?

12:03:53 13       A.  It's about 10 feet away from my -- the working

12:03:57 14   side that I was.

12:04:00 15       Q.  Okay.  Is the padded cell room separated from a

12:04:06 16   wall between yourself and that padded cell area?

12:04:10 17       A.  Yes, sir.

12:04:11 18       Q.  Okay.  Do you have the ability to view or see

12:04:15 19   the padded cell from where you would be seated, or do

12:04:18 20   you have to walk through another doorway?

12:04:22 21       A.  I have to walk to the padded cell to see if

12:04:23 22   anybody was there.

12:04:31 23       Q.  Okay.  Let me ask you this:  While you were on

12:04:34 24   this shift from 7:00 in the morning until 3:00 in the

12:04:38 25   afternoon, did you ever book Mr. Longoria?

A.  No, sir.

Q.  Okay.  Did you ever request that Mr. Longoria be seen by a nurse?

A.  No.

Q.  Okay.  Do you know whether or not anyone else that you were working with requested that Mr. Longoria be seen by a nurse?

A.  I don't remember.

Q.  Okay.  Now, if a log was to be placed on the wall next to the doorway where Mr. Longoria was being housed in padded cell No. 1, who would have been responsible for making the notations as to what they observed concerning Mr. Longoria?

A.  That would be the supervisor on duty.

Q.  Okay.  On the 7:00-to-3:00 shift on April the 11th of 2001, who was the officer in charge?

A.  Sergeant Felipe Silva.

Q.  Okay.  After the death of Mr. Juan Longoria, did you or anyone else have to go through some type of additional training concerning the handling of prisoners?

A.  No.

Q.  We have marked as Mr. Morales Exhibit No. 1 a document, and I'm to going ask if you could please identify this document for us, sir.

A.   This is the statement that I provided to the investigator, Zamorano, back in May of 2001.

Q.   Okay.  And who was the investigator, sir, again?

A.   The initials J.A. Zamorano.  Jose A. Zamorano was the investigator.

Q.   Okay.  Is Investigator Jose Zamorano still with Cameron County Sheriff's Department?

A.   I don't know if he is or not.

Q.   Have you spoken with Mr. Zamorano since taking -- the taking of this statement?

A.   No.

Q.   What information or documentation did you review in preparation for your deposition today?

A.   Nothing at all, just my statement.  I remember it.

Q.   Okay.  And that's what has been marked as Exhibit No. 1?

A.   Yes, sir.

Q.   Okay.  What has been marked as Mr. Morales Exhibit No. 1, is that a true and accurate copy of the statement that you provided to Officer Jose Zamorano, looks like back on the first day of May 2001?

A.   Yes, sir.

Q.   Okay.  You've had a chance to look at it, this

document?

A.   No.  I remember outside of that date.

Q.   Okay.  Well, look at the one that's in front of you.  And I'm going to ask you once again, is this a true and correct copy of the statement that you provided under oath to Officer Zamorano?

A.   Yes, sir.

Q.   Okay.  All right.  It is true and accurate?

A.   Yes, sir.

Q.   Okay.  Now, who is Willie Cardoza?

A.   Willie Cardoza, right now, he's the warrant officer in the sheriff's department.

Q.   Okay.  Back on April the 11th of 2001, what position did Mr. Cardoza hold?

A.   He was in charge of taking the paperwork of people pending arraignment -- his responsibility would be to take the paperwork to the JP so they can arraign the new inmates.

Q.   Okay.  Now, if we look at your statement here -- I'm going to go down, let's see, it would be one, two, three, four, the fifth paragraph.  And if you would, I'm going to go through this with you and perhaps ask some questions.

The statement says, "At around 10:30 a.m. I noticed that the Transportation Officer Salinas with

Brownsville Police Department brought in an inmate."

              Is that a true statement?

    A.  Yes, sir.

    Q.  Okay.  It goes on to say, "Officer Salinas gave me the paperwork that was the probable cause, commitment, and medical clearance from the hospital."

              Is that also a true statement?

    A.  Yes, sir.

    Q.  Officer Salinas is the individual that works with the City of Brownsville Municipal Courts; is that true?

    A.  I believe so.  Yes, sir.

    Q.  Do you recall if he's the bailiff over there, or do you know?

    A.  He -- I don't know.

    Q.  Okay.  Then it goes on to say, "I asked the assist sergeant," okay, "if the inmate was medically cleared.  And then Sergeant Lerma advised me that he was medically cleared."

              Do you see that?

    A.  Yes, sir.

    Q.  Okay.  Now -- so apparently, when Officer Salinas brought Mr. Longoria to the Cameron County Jail, he did have some medical documents with him, correct?

A.  Yes, sir.

Q.  And, apparently, according to this statement that you provided back on May 1st of 2001, there was a document concerning Mr. Longoria, a medical document, correct?

A.  Yes, sir.

Q.  Okay.  Now, if we look at what has been marked as Morales Exhibit No. 2, now do you recall whether or not that was the document that was attached?

A.  No, I don't recall it because if it would have been, I would have had it given to the sergeant, so --

Q.  Okay.  Are you comfortable or confident that whatever medical information was tendered to you by Officer Salinas concerning Mr. Longoria was tendered to the -- Sergeant Silva?

A.  Yes, sir.

Q.  Okay.  Now, when Sergeant Silva would have received this information concerning Mr. Longoria, the medical information, would it have been the practice of Sergeant Silva to notify the nurse, or do you know?

A.  Yes, sir.

Q.  Okay.  Now, in this statement in that same paragraph it indicates that Mr. Longoria was taken to the laundry department so the inmate could change back in -- is that supposed to be "inform"?  I'm assuming

| | |
|---|---|
| 12:12:38 | 1 |
| 12:12:39 | 2 |
| 12:12:40 | 3 |
| 12:12:42 | 4 |
| 12:12:46 | 5 |
| 12:12:51 | 6 |
| 12:12:53 | 7 |
| 12:12:54 | 8 |
| 12:12:55 | 9 |
| 12:12:56 | 10 |
| 12:13:00 | 11 |
| 12:13:01 | 12 |
| 12:13:02 | 13 |
| 12:13:03 | 14 |
| 12:13:04 | 15 |
| 12:13:07 | 16 |
| 12:13:10 | 17 |
| 12:13:14 | 18 |
| 12:13:17 | 19 |
| 12:13:17 | 20 |
| 12:13:19 | 21 |
| 12:13:20 | 22 |
| 12:13:23 | 23 |
| 12:13:27 | 24 |
| 12:13:31 | 25 |

that means uniform?

    A.  In uniform.

    Q.  Okay.  "After the inmate changed, Sergeant Lerma placed him in the large holding cell.  About five to ten minutes later, Inmate Longoria started yelling, saying 'Sacame de aqui,' meaning get him out of the large holding cell."

        Do you see that?

    A.  Yes, sir.

    Q.  Okay.  Do you remember Mr. Longoria actually saying those things?

    A.  Yes, sir.

    Q.  Okay.  You heard it yourself?

    A.  Yes, sir.

    Q.  Okay.  And then you go on to say, "Then I saw Sergeant Felipe Silva take Inmate Longoria out of the large holding cell.  Sergeant Silva then placed Longoria in a single cell No. 1."

        And you go on to say, "I continued my booking duties," correct?

    A.  Yes, sir.

    Q.  Now, earlier you testified that your recollection was that Mr. Longoria was in the large holding cell for approximately one hour.  According to this statement, he may have only been there for

approximately five to ten minutes.  Do you see that?

A.  Yes, sir.

Q.  Okay.  So now that you -- we've had an opportunity to read your statement, as far as you recall now, was he only in there for five to ten minutes, or was he in there an hour in the large holding cell?

A.  Five to ten minutes.

Q.  Then we go around to say that -- the next paragraph, "At around 11:30 a.m. or 12:00, Officer Rora opened the door to the single cell."

Who is Officer Rora?

A.  He was a -- one of the detention officers that used to work at the Cameron County Jail with Sergeant Felipe Silva.

Q.  And what position did Officer Rora hold there?

A.  He was a detention officer.

Q.  Is Officer Rora still employed with the Cameron County Jail?

A.  No, sir.

Q.  Do you know where Officer Rora lives?

A.  No.

Q.  Do you socialize, I assume, with Officer Rora?

A.  No, not at all.

Q.  Okay.  "Officer Rora gave Inmate Longoria a

plate of food."

Did you actually see this?

A.  Yes, sir.

Q.  "When Inmate Longoria grabbed the plate, he started pushing on the door against Officer Rora. Officer Rora pushed the door closed and secured it."

Do you see that?

A.  Yes, sir.

Q.  "I then went to lunch between 12:00 p.m. and 12:30 p.m.  I then came back and went to the small single cell to check on Inmate Longoria."

Do you see that?

A.  Yes, sir.

Q.  Okay.  Did you actually do that?  Did you actually check on him?

A.  Yes, sir.

Q.  Okay.  Now, there was no piece of paper for a log on the door at that time; is that correct?

A.  I don't remember if there was one or not.

Q.  Okay.  Well, did you make any notations on that log?

A.  No.  It would have not been my responsibility.

Q.  Okay.  All right.  Well, why were you going by there to check on him then?

A.  To book him in.

Q.  All right.  Now, from your shift on 7:00 to --
in the morning until 3:00, you never booked this man,
correct?

A.  No, sir.

Q.  Okay.  You go on to say, "I did this to see if
Inmate Longoria had calmed down so I could book him in.
Inmate Longoria looked at me and told me to let him go.
I didn't say anything back to him.  I just walked back
to the booking area and continued my duties."

On the second page of your statement, "At
around 1:45 p.m., I went back to the cell No. 1 to pick
up," -- no, "to check up on Inmate Longoria.  Inmate
Longoria was standing by the left side of the wall.  I
went back to the booking area."

Then you go on to say, "At about 2:45
p.m., Officer Jerry Sanchez arrived to work.  I met
with -- I met," excuse me -- "he met with me at the
booking area.  I then briefed him.  I told him that
Inmate Juan Antonio Longoria was in the small single
cell No. 1.  I then showed him the paperwork on
Longoria.  I told him that we couldn't book him in
because Inmate Longoria was being uncooperative.  I
then went off duty."

Is the information I read so far true and
correct as to what you recall happening?

A.  Yes, sir.

Q.  Okay.  This is an accurate statement?

A.  Yes, sir.

Q.  Now, as far as you know, is it true that Mr. Longoria was never booked at all while he was at the Cameron County Jail?

A.  Yes, sir.

Q.  That's a true statement?

A.  Yes, sir.

Q.  And he was never classified either?  Is that also a true statement?

A.  Yes, sir.

Q.  Do you think mistakes were made while Mr. Longoria was at the Cameron County Jail?

MR. VITTITOE:  Objection, speculation.

THE WITNESS:  I don't think there was any mistakes done.

Q.  You think it was okay for Mr. Longoria not to have been booked at all?

A.  No, sir.

Q.  That it was improper?

A.  No, sir.

Q.  It was okay for him not to have been booked?

A.  Oh, no, sir.

Q.  And the failure of the Cameron County Sheriff's

12:18:01  1    Department to classify Mr. Longoria, was that also a

12:18:04  2    mistake?

12:18:06  3                    MR. VITTITOE:  Objection, speculation.

12:18:14  4                    THE WITNESS:  Well, I wouldn't know what

12:18:15  5    happened.

12:18:18  6        Q.  Well, in any event, it just wasn't done,

12:18:20  7    correct?

12:18:21  8        A.  Yes, sir.

12:18:26  9        Q.  Okay.  As far as you know, Mr. Longoria was

12:18:28 10    never seen by a nurse?

12:18:30 11        A.  He was seen by the nurse.

12:18:32 12        Q.  When was he seen by the nurse?

12:18:33 13        A.  When he arrived at the county jail.

12:18:35 14        Q.  Okay.  Who saw him?

12:18:36 15        A.  I don't remember who did.

12:18:38 16        Q.  And when was he seen?

12:18:41 17        A.  Excuse me?

12:18:42 18        Q.  When he arrived at the Cameron County Jail, he

12:18:45 19    was seen by a nurse?

12:18:46 20        A.  Yes, sir.

12:18:47 21        Q.  Okay.  You don't know who it was?

12:18:48 22        A.  No, sir.

12:18:49 23        Q.  All right.  When was he seen?

12:18:51 24        A.  I believe at about 10 a.m. when he arrived at

12:18:54 25    the county jail.

Q.   And are there any notes reflecting whether or not he was seen?

A.   I don't have any notes by me, but, I mean, there should be some.

Q.   Okay.  Is it your testimony that you actually recall Mr. Longoria being seen by a nurse?

A.   Yes, sir.

Q.   Okay.  Now, in our -- the statement that you provided back on May the 1st of 2001 you make no mention of Mr. Longoria being seen by a nurse, do you?

A.   Yes, sir.

Q.   Okay.  Do you have an explanation as to why you failed to mention that?

A.   I stated here that -- when I asked Sergeant Silva if he was cleared, he said, "Yes, medically clear."

Q.   All right.  Now, the medical clearance that you're referring to is a medical clearance that accompanied Mr. Longoria from the City of Brownsville?

A.   No.  Because I know that when he arrived there, Sergeant Silva called the nurse.  And I don't remember who the nurse was.  And, like I say, they do whatever they got to do over there.  And if she says he's okay to stay in jail, we will keep him in jail.

Q.   Well, let me ask you this:  Are you testifying

12:20:14 1    that when the prisoner Longoria arrived at the Cameron

12:20:20 2    County Jail along with Sergeant Silva, there was also a

12:20:23 3    nurse there evaluating the prisoners as they came in?

12:20:26 4        A.   Yes, sir.

12:20:27 5        Q.   Okay.  So it's your testimony that back on

12:20:30 6    April the 11th of 2001, there was a nurse that was next

12:20:34 7    to Officer Silva evaluating these prisoners?

12:20:37 8        A.   No, not all the prisoners.

12:20:41 9        Q.   Only Mr. Longoria?

12:20:43 10       A.   Yes, sir.

12:20:44 11       Q.   Okay.  Do you remember, as we sit here today, a

12:20:47 12   nurse actually examining Mr. Longoria?

12:20:52 13       A.   I don't know if they examined him or not.

12:21:00 14       Q.   Was the nurse male or female?

12:21:02 15       A.   I don't remember who the nurse was.

12:21:10 16       Q.   Okay.  Now, from what I can gather, your

12:21:13 17   earlier testimony was that typically after an

12:21:25 18   individual is classified is when they are seen by the

12:21:25 19   nurse.

12:21:25 20       A.   Yes, sir.

12:21:30 21       Q.   Okay.  Do you have an explanation as to why

12:21:33 22   Mr. Longoria was seen by the nurse beforehand?

12:21:38 23       A.   Because they probably brought the paperwork

12:21:41 24   from the Brownsville Medical Center, and I gave it to

12:21:45 25   the sergeant so the sergeant would need to notify the

12:21:47 1   nurse to make sure that information is correct as to

12:21:50 2   whether he is to be cleared for jail or not.

12:21:58 3       Q.  Are you making an assumption that he was seen

12:22:01 4   by a nurse only because someone said that he was

12:22:04 5   medically cleared?  Are you making that assumption?

12:22:07 6       A.  No.

12:22:09 7       Q.  Okay.  So what are you basing your comment on

12:22:12 8   that he was seen by a nurse?

12:22:15 9       A.  Because every time we get a notice from the

12:22:17 10  Brownsville Medical Center or any other medical

12:22:20 11  facility that he's cleared to be incarcerated, we need

12:22:24 12  to call -- they called the -- sergeant on duty will

12:22:25 13  call the nurse and do their duties.  I don't know what

12:22:29 14  they are.

12:22:33 15      Q.  But you didn't actually see a nurse.

12:22:36 16      A.  No, sir.

12:22:37 17      Q.  Okay.  All right.  You're just talking about

12:22:39 18  what would typically occur.

12:22:41 19      A.  Yes, sir.

12:23:04 20      Q.  Okay.  Before April the 11th of 2001, had you

12:23:07 21  ever had a situation where you could not book someone

12:23:13 22  just as what had occurred with Mr. Longoria?

12:23:16 23      A.  No.

12:23:27 24      Q.  Had you ever received any type of training

12:23:30 25  concerning a situation such as Mr. Longoria where you

12:23:35 1    couldn't book the man and get him eventually

12:23:38 2    classified?

12:23:39 3              MR. VITTITOE:  Objection, speculation.

12:23:43 4    Objection, overly broad.

12:23:46 5        Q.  Had you ever received any type of training to

12:23:49 6    deal with something like that?

12:23:50 7        A.  No.

12:23:52 8        Q.  Okay.  Since the Juan Longoria incident, have

12:23:56 9    you ever had a situation where you couldn't find

12:24:00 10   yourself booking an individual?

12:24:01 11       A.  No.

12:24:05 12       Q.  Okay.  How often was that padded cell used,

12:24:07 13   that padded cell No. 1?

12:24:09 14       A.  I don't remember.

12:24:11 15       Q.  Was it something that occurred on a weekly

12:24:14 16   basis or a monthly basis?

12:24:18 17       A.  I don't remember.

12:24:18 18             MR. VITTITOE:  Objection, speculation.

12:24:20 19       Q.  You don't recall.

12:24:24 20             Would there be any logs or journals kept

12:24:27 21   as to the number of times that padded cell No. 1 was

12:24:29 22   used?

12:24:30 23             MR. VITTITOE:  Objection, speculation.

12:24:33 24             THE WITNESS:  I don't remember.

12:24:35 25       Q.  Okay.  You don't know?

12:24:43  1          Now that we've had an opportunity to

12:24:45  2  visit for a while here, do you have a recollection,

12:24:49  3  back in April of 2001 what the average population was

12:24:52  4  in the old Cameron County Jail?

12:24:57  5          MR. VITTITOE:  Objection, speculation.

12:24:59  6          THE WITNESS:  No.

12:24:59  7      Q.  Still don't remember?

12:25:09  8          Back in April of 2001, was the jail ever

12:25:11  9  full?

12:25:16 10          MR. VITTITOE:  Objection; overly broad,

12:25:17 11  speculation.

12:25:18 12          THE WITNESS:  I don't remember if it was

12:25:18 13  full or not.

12:25:29 14      Q.  Have you ever had a situation where the jail

12:25:31 15  was filled up over this past two or three years?

12:25:35 16          MR. VITTITOE:  What's the question?  I'm

12:25:36 17  sorry.

12:25:37 18      Q.  Have you ever had a situation or do you recall

12:25:39 19  a situation where the jail was totally full over the

12:25:42 20  past two or three years?

12:25:44 21      A.  No.

12:25:46 22          MR. VALDEZ:  Let me take a break.

12:25:46 23          (Brief recess)

12:36:04 24      Q.  About four or five months ago, I took the

12:36:08 25  deposition of a Sylvia Rivas.  Do you know Sylvia

Rivas?

A.   Yes, sir.

Q.   Okay.  That's one of the nurses over there?

A.   Correct.

Q.   Is she still there?

A.   Yes, sir.

Q.   Okay.  And in her deposition, she talks about there being some type of a medical box where the medical papers are to be placed when you have someone with commitment papers having also some medical documentation.  Do you know what she's speaking of?

A.   Yes, sir.

Q.   Okay.  Tell me about that.  How does that go about?  Like, if you were to get the commitment papers and the commitment papers has a doctor's order, what happens after that?  Does it go in this medical box, or do you give it to the sergeant, or what happens?

A.   Most of the time I'll give it to the sergeant, and then the sergeant will call the nurse, and then after, either he gives the paperwork to the nurse or he will put the paperwork in the box.

Q.   As a booking officer back on April the 11th of 2001, would you have put the medical documents in that box?

A.   I don't remember.

Q. Well, in the past, had you put the medical documents in the box?

A. Yes.

Q. Where exactly is this box located that's titled "Medical"?

A. It's attached about 8 feet away from my working area.

Q. When the medical information is placed in that box, what happens after that? Is that where the nurses go to pick it up or what?

A. Yes, sir.

Q. Do you have any idea whether or not the document noted as Mr. Morales No. 2 was ever placed in that box?

A. I don't remember if it was or not.

Q. Before April 11th of 2001, have you ever seen a medical order that says a prisoner is to be kept under close observation?

A. I don't remember.

Q. How about after April 11th of 2001? Have you ever seen a medical order that says a prisoner is supposed to be kept under close observation?

A. No.

Q. So as far as -- would it be a violation of policies and procedures not to put the medical document

A.  I was aware after he was found dead.

Q.  What did you hear about it?  What did you hear that they noticed or observed?

A.  I didn't talk to the sergeant.  I spoke to the booking officer of that night, which it was Sylvia Santillana.  And she told me -- she briefed me.  She told me that Inmate Longoria was found dead in the padded cell or was taken to the hospital.  I don't remember what she actually told me.

Q.  This particular booking officer, what was her name again?

A.  Sylvia Santillana.

Q.  Ms. Santillana, which shift would she have worked?

A.  She was working the 11:00-to-7:00 -- 11 p.m.-to-7 a.m. shift.

Q.  And so you would have relieved her the next day.

A.  Yes, sir.

Q.  Okay.  Was there any other information that she provided to you concerning Mr. Longoria?

A.  No.

Q.  Did she indicate to you who found him dead?

A.  No.

Q.  All right.  Were you given any information as

12:42:15  1   to how he died?

12:42:16  2       A.  No.

12:42:23  3       Q.  Okay.  When an individual or a detention

12:42:26  4   officer would normally go inside of a padded cell, when

12:42:31  5   they go inside the padded cell, what would be the

12:42:34  6   procedure?  How would that be done?

12:42:38  7                 MR. VITTITOE:  Objection, speculation.

12:42:39  8                 THE WITNESS:  I wouldn't know because I'm

12:42:40  9   not a detention officer.  I was a booking officer.  I

12:42:43 10   don't know what would the -- procedures would be for

12:42:46 11   them.

12:42:47 12       Q.  Have you ever seen detention officers go inside

12:42:49 13   the padded cell?

12:42:51 14       A.  Yes.

12:42:53 15       Q.  Okay.  From your observations of a detention

12:42:55 16   officer going into a padded cell, what do they have on?

12:42:58 17   How many people would go in?  What would you observe?

12:43:02 18       A.  It would be the sergeant on duty and then maybe

12:43:06 19   two or three officers open the doorway and talk to the

12:43:10 20   inmate.

12:43:13 21       Q.  Okay.  Would they have any type of equipment on

12:43:19 22   them?

12:43:19 23       A.  No.

12:43:24 24       Q.  All right.  Do y'all even have any type of what

12:43:28 25   I would call the sticks?  The batons?

12:43:31  1      A.  No.

12:43:32  2      Q.  Okay.  Do any of the detention officers have

12:43:34  3   any of the batons or sticks?

12:43:35  4      A.  No.

12:43:44  5      Q.  Did you hear any rumors about Juan Longoria

12:43:48  6   being choked to death?

12:43:49  7      A.  No.

12:43:52  8      Q.  Did you see any news reports concerning Juan

12:43:55  9   Longoria?

12:43:55 10      A.  No.

12:43:59 11      Q.  Do you watch TV?

12:44:01 12      A.  Once in a while.

12:44:04 13      Q.  Okay.  And you didn't see anything on the

12:44:05 14   television concerning accusations that Juan Longoria

12:44:09 15   was strangled while he was in the cell?

12:44:11 16      A.  No.

12:44:20 17      Q.  As a result of the failure of Juan Longoria to

12:44:26 18   be booked, were you demoted or penalized for that

12:44:29 19   incident?

12:44:30 20      A.  No.

12:44:31 21      Q.  Was anyone demoted or penalized as a result of

12:44:37 22   the lack of booking or classification of Juan Longoria?

12:44:41 23      A.  I don't remember.

12:44:50 24      Q.  Following the Juan Longoria incident, were you

12:44:52 25   ever promoted?

| | |
|---|---|
| 12:44:53 | 1 |

A.   No.

12:44:57   2          MR. VALDEZ:  Thank you, Mr. Morales.

12:44:58   3   That's all the questions I have.

12:45:01   4          THE WITNESS:  No problem.

12:45:01   5          MR. VITTITOE:  Thank you.  We'll reserve

12:45:02   6   our questions.

7              (Deposition concluded)

1          JOSE MORALES - ERRATA SHEET

2    Reasons for changes:   (1) Clarify the record
                            (2) Conform to the facts
3                           (3) Correct transcription errors

4    PAGE LINE   CHANGE FROM/CHANGE TO                    REASON

5    ____ ____  _____     ____

6    ____ ____  _____     ____

7    ____ ____  _____     ____

8    ____ ____  _____     ____

9    ____ ____  _____     ____

10   ____ ____  _____     ____

11   ____ ____  _____     ____

12   ____ ____  _____     ____

13   ____ ____  _____     ____

14   ____ ____  _____     ____

15   ____ ____  _____     ____

16   ____ ____  _____     ____

17   ____ ____  _____     ____

18   ____ ____  _____     ____

19   ____ ____  _____     ____

20   ____ ____  _____     ____

21   ____ ____  _____     ____

22   ____ ____  _____     ____

23   ____ ____  _____     ____

24

25                    JOSE MORALES

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION

 3   MARIA LONGORIA AND MARIA    ) (
     IDALIA GUTIERREZ,           ) (
 4   INDIVIDUALLY AND ON BEHALF) (
     OF THE ESTATE OF JUAN       ) (
 5   LONGORIA, DECEASED          ) (
              Plaintiffs         ) (
 6                               ) (
     VS.                         ) (   CIVIL ACTION NO. B-01-062
 7                               ) (
     CAMERON COUNTY, TEXAS,      ) (
 8   THE CITY OF BROWNSVILLE,    ) (   JURY DEMANDED
     TEXAS AND JOHN DOES 1-10    ) (
 9            Defendants         ) (

10               REPORTER'S CERTIFICATE
11        I, Donna McCown, Certified Court Reporter, certify
     that the witness, JOSE MORALES, was duly sworn by me,
12   and that the deposition is a true and correct record of
     the testimony given by the witness on FEBRUARY 16,
13   2004; that the deposition was reported by me in
     stenograph and was subsequently transcribed under my
14   supervision.

15        I FURTHER CERTIFY that I am not a relative,
     employee, attorney or counsel of any of the parties,
16   nor a relative or employee of such attorney or counsel,
     nor am I financially interested in the action.

17                WITNESS MY HAND on this the 1st day of
18   March               , 2004.

19                    Donna McCown

20   DONNA McCOWN, CSR NO. 6625
     Expiration Date: 12/31/05
21   Bryant & Stingley, Inc., CRN No. 41
     2010 East Harrison
22   Harlingen, Texas  78550

23

24

25
```

                        BRYANT & STINGLEY, INC.
       McAllen            Harlingen           Brownsville
    (956)618-2366      (956)428-0755       (956)542-1020

# STIPULATIONS

Deposition(s) of: _____

Cause No.: _B - 01 - 06 2_    Style: _Maria Longoria et al_

Date: _2~16_    Trial Date: _____    vs. _Cameron County Tx et al_

1. This deposition is taken pursuant to:
   - ✓ A. Notice
   - ___ B. Notice and Subpoena
   - ___ C. Agreement
   - ___ D. Court Order

2. Objections:
   - ✓ A. Objections will be made pursuant to the ~~Texas~~/Federal Rules of Civil Procedure.
   - ___ B. All objections are reserved.
   - ___ C. All objections will be made at the time of taking the deposition.

3. Signature and Delivery:
   - ✓ A. The original transcript will be sent to _Mr Valdez_ , the Custodial Attorney, and the original signature page, along with a copy of the transcript(s), will be submitted to ___ the witness or ___ ~~the witness'~~ attorney, who will return the executed signature page, including any changes, to Bryant & Stingley, Inc., within ___ days of transmittal.

   - ___ B. Signature is waived and the reporter will deliver the original transcript and exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the following:

1. Copy of Transcript: Yes ___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _Cameron City, Texas_

2. Copy of Transcript: Yes _X_ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _A. R. Valdez_    Representing: _PLTS_

3. Copy of Transcript: Yes ___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _____

4. Copy of Transcript: Yes ___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _____

THE STATE OF TEXAS  }{

COUNTY OF CAMERON   }{

BEFORE ME THE UNDESIGHEND AUTHORITY in and for Cameron County, Texas on this the 1st day of May, 2001, A.D., did personally appear: Jose F. Morales Depose and say:

My name is Jose F. Morales.  I am currently employed at the Cameron County Jail as a Correctional Officer assigned as a Booking Officer at the County Jail.  If I am needed I can be contacted at my residence and the address is 2043 Diamante Drive, Brownsville, Texas and my telephone number is 956-548-9368.  I can also be contacted at the County Jail and the telephone number is 956-544-0865.

On April 11, 2001 I arrived for duty at 6:45 a.m., I reported to my post in the booking area.  Officer Mason briefed me on the activities that had occurred during the night.  He finished briefing me and left the facility.

At 7:30 a.m.,  bailiffs  from County and District Courts started arriving to pick inmate that needed to go to court. At about 7:45am Willie Cardoza arrived at the booking area to pickup arraignment papers so he could take the papers to the J.P. I then started with my duties as booking officer.

At around 10:30am, I noticed that the transportation officer Salinas with Brownsville Police Department brought in an inmate. Officer Salinas gave me the paperwork that was the Probable cause, commitment and the medical clearance from the hospital. I asked the assist Sgt. If the inmate was medical cleared. Sgt. Lerma advised me that he was medical cleared. I saw on the paperwork that the inmates name was Juan Antonio Longoria. Ass. Sgt. Frank Lerma took inmate Longoria back to the laundry department so the inmate could change back in inform. After the inmate changed, Sgt. Lerma placed him in the large holding cell. About Five to ten minutes later, inmate Longoria started yelling say "sacame de aqui" meaning get him out of the large holding cell. I then saw Sgt. Felipe Silva take inmate Longoria out of the large holding cell. Sgt. Silva then placed Longoria in single cell number one. I continued with my booking duties.

At around 11:30am or 12:00, Officer Rora opened the door to the single cell. Officer Rora gave inmate Longoria a plate of food. When inmate Longoria grabbed the plate. He started pushing on the door against officer Rora. Officer Rora pushed the door closed and secured it. I then went to lunch between 12:00pm-12:30pm. I then came back and went to the small single cell to check on inmate Longoria. I did this to see if inmate Longoria had calmed down so I could book him in. inmate Longoria looked at me and told me to let him go. I didn't say anything back to him. I just walked back to the booking area and continued my duities.



EXHIBIT NO. 1
BRYANT & STINGLEY, INK.

At around 1:45pm, I went back to the single cell number one to check up on inmate Longoria. Inmate Longoria was standing by the left side of the wall. I went back to the booking area.

At about 2;45pm Officer Jerry Sanchez arrived to work. He met with me at the booking area. I then briefed him. I told him that Inmate Juan Antonio Longoria was in the small single cell number one. I then showed him the paperwork on Longoria. I told him that we couldn't book him in because inmate Longoria was being uncooperative. I then went off duty.

Sign: _Joe F. Morales Jr_

SUBSCRIBE AND SWORN TO AND BEFORE ME THIS 1 DAY OF MAY A.D 2001



NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

Statement taken at Ruben.Torres Detention Center
By Inv. Jose a. Zamorano

**Brownsville Medical Center**
1040 W. Jefferson, Brownsville, Texas 78520
Phone (956) 544-1400

NAME _____ AGE _____

ADDRESS _____ DATE _____

Rx  May return to jail
but should be kept under
close observation

Refill _____ times

Directions in Spanish

PRODUCT SELECTION PERMITTED          DISPENSE AS WRITTEN

ADDRESS                              DEA #    Date _____

PHONE                                ❏ I request that this prescription not be dispensed in a
                                     Child Resistant Container.
                                     Signature _____

BC023912 (11/00)



EXHIBIT NO. 2
2-16-04
BRYANT & STINGLEY, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA ) (
IDALIA GUTIERREZ, ) (
INDIVIDUALLY AND ON BEHALF ) (
OF THE ESTATE OF JUAN ) (
LONGORIA, DECEASED ) (
    Plaintiffs ) (
                  ) (
VS. ) (    CIVIL ACTION NO. B-01-062
                  ) (
CAMERON COUNTY, TEXAS, ) (
THE CITY OF BROWNSVILLE, ) (    JURY DEMANDED
TEXAS AND JOHN DOES 1-10 ) (
    Defendants ) (

---

ORAL DEPOSITION OF
ARMANDO TENORIO
FEBRUARY 17, 2004



---

    ORAL DEPOSITION OF ARMANDO TENORIO, produced as a witness at the instance of the PLAINTIFFS, taken in the above styled and numbered cause on FEBRUARY 17, 2004, reported by DONNA McCOWN, Certified Court Reporter No. 6625, in and for the State of Texas, at the offices of Adams & Graham, L.L.P., 222 East Van Buren, West Tower, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure.

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

## APPEARANCES

COUNSEL FOR PLAINTIFFS:

    ALFRED R. VALDEZ
    BARRY BERGER
    LAW OFFICE OF ALFRED R. VALDEZ
    7520 Hillcroft
    Houston, Texas  77081

    BARRY S. BERGER
    LAW OFFICE OF BARRY S. BERGER, P.C.
    1863 Post Oak Park Drive
    Houston, Texas  77027

COUNSEL FOR DEFENDANTS:

    CRAIG VITTITOE
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren, West Tower
    Harlingen, Texas  78551

## INDEX

|                                                    | PAGE |
|----------------------------------------------------|------|
| Appearances ...................................... | 2    |

ARMANDO TENORIO

| Examination by Mr. Berger ...................... | 3  |
| Examination by Mr. Vittitoe .................... | 58 |
| Examination by Mr. Berger ...................... | 59 |

Errata Sheet/Signature Page ................... 62

Reporter's Certificate ........................ 64

Attached to the end of the transcript:  Stipulations

## EXHIBITS

| NUMBER | DESCRIPTION |  PAGE IDEN. |
|--------|-------------|-------------|
| 1      | Statement ............................. | 13 |

14:42:12 1          MR. VITTITOE:  Before we start, I'd like

14:42:19 2     to get on the record that we have previously provided

14:42:21 3     Counsel -- in particular, the witness has previously

14:42:23 4     provided Counsel with his residential address, his home

14:42:30 5     phone number, and his Texas driver's license number

14:42:33 6     with the understanding that such will remain

14:42:37 7     confidential in connection with this case for the

14:42:40 8     security and protection of the officer and will not --

14:42:46 9     and will be protected and will not be used other than

14:42:49 10    in connection with this litigation.

14:42:51 11         MR. BERGER:  That's correct.

14:42:51 12              ARMANDO TENORIO,

14:42:51 13    having been duly sworn, testified as follows:

14:42:56 14              EXAMINATION

14:42:56 15    BY MR. BERGER:

14:42:56 16    Q.  Okay.  Now, the only thing I'm going to ask you

14:43:00 17    to do is state for the record, sir, what your real name

14:43:03 18    is.

14:43:03 19    A.  Okay.  Armando Tenorio.

14:43:06 20    Q.  Is it Sergeant Tenorio?

14:43:08 21    A.  I'm a corporal.

14:43:09 22    Q.  You're a corporal?

14:43:11 23    A.  Yes, sir.

14:43:12 24    Q.  Okay.  You presently work for Cameron County

14:43:15 25    Sheriff's Office?

14:43:16  1     A.   Yes, sir.

14:43:16  2     Q.   You're -- and you work in a detention section?

14:43:19  3     A.   Yes, sir.

14:43:21  4     Q.   How long have you worked for Cameron County

14:43:24  5 Sheriff's Department?

14:43:24  6     A.   Over nine years.

14:43:26  7     Q.   What did you do before you worked with the

14:43:28  8 sheriff's?

14:43:30  9     A.   Security.

14:43:30 10     Q.   Where at?

14:43:32 11     A.   At the Island, Louie's Backyard security.

14:43:36 12     Q.   Oh, okay.  Did you get -- when you worked for

14:43:42 13 them, did you have police powers?  In other words, you

14:43:45 14 were able to a carry pistol and --

14:43:46 15     A.   No, sir.

14:43:48 16     Q.   -- become a licensed police officer?

14:43:49 17     A.   Not with them.

14:43:50 18     Q.   Not with them.  Okay.

14:43:53 19          How long did you work as security?

14:43:56 20     A.   About a year and a half.

14:43:59 21     Q.   And what did you do before that?

14:44:00 22     A.   I worked with the school district, Los Fresnos.

14:44:05 23     Q.   Were you a -- what did you do for the school

14:44:07 24 district?

14:44:07 25     A.   Teacher's aide.

Q.  Teacher's aide?

A.  Yes, sir.

Q.  Okay.  Is that like -- do you know Sergeant Silva?

A.  Yes, sir.

Q.  Okay.  He was a teacher's aide also.  Did y'all work together?

A.  No.  I didn't know that.

Q.  Okay.  At one time, he was a teacher's aide.

A.  Yeah.

Q.  Or he put it as a paraprofessional.

A.  Yeah.

Q.  Did you, as a teacher's aide or paraprofessional, did you get any medical training at all?

A.  No.

Q.  Okay.  Did you get -- as a security officer with the security company that you worked for, did you get any medical training?

A.  No, sir.

Q.  You started to work for the Cameron County Sheriff's Department nine years ago, so what?  1995, something like that?

A.  '94.

Q.  '94?

14:45:10  1          Did you get certified as a detention

14:45:12  2  officer through the Cameron County Sheriff's Office?

14:45:17  3      A.  Yes, sir.

14:45:17  4      Q.  Did you take a test?

14:45:18  5      A.  Yes, sir.

14:45:19  6      Q.  And when did you take it?  How long were you

14:45:22  7  there before you took the test?

14:45:27  8          Well, let me step back.  How long were you

14:45:29  9  there before you took a course that was provided for --

14:45:34 10  to become a certified detention officer?

14:45:38 11      A.  I can't remember, sir.  It wasn't that much

14:45:40 12  long.  I know it was less than a year.  Probably less

14:45:43 13  than six months.

14:45:47 14      Q.  Okay.  Did you take the test -- was the test by

14:45:51 15  the State or Cameron County?

14:45:54 16      A.  I took one from Cameron County after the course

14:45:56 17  and then the State.

14:45:57 18      Q.  Okay.  Did you pass both of them on the first

14:45:59 19  try?

14:45:59 20      A.  Yes, sir.

14:46:02 21      Q.  Okay.  Your first job when you started there,

14:46:06 22  even before you took the course and the test, was what?

14:46:09 23      A.  Detention officer.

14:46:10 24      Q.  Detention officer.

14:46:11 25          And what did you do as a detention

officer?

A.   Supervise the inmates.

Q.   Okay.  Did you ever serve in any other capacity while working there for the sheriff in the jails at -- besides a detention officer?  In other words, did you ever serve as a booking officer?

A.   No, sir.

Q.   Did you ever serve as a classification officer?

A.   No, sir.

Q.   Did you ever serve as a -- in the infirmary?

A.   No, sir.

Q.   Okay.  So you never worked in the infirmary as an officer that was -- watched the infirmary even when you were a detention officer.

A.   The only one there is when you escort inmates to the infirmary.

Q.   Okay.

A.   Because at the detention center, we don't have an infirmary area.

Q.   You don't have a separate infirmary -- oh, you were at detention No. 2, weren't you?

A.   No. 1.

Q.   No. 1.

A.   Yes, sir.

Q.   Okay.  Did you ever work at the old courthouse?

14:47:05  1    A.  Yes, sir.

14:47:07  2    Q.  April of 2001, were you working at the old

14:47:10  3  courthouse?

14:47:11  4    A.  Yes, sir.

14:47:11  5          MR. VALDEZ:  Old courthouse or old

14:47:11  6  jailhouse?

14:47:16  7    Q.  Old county jailhouse.

14:47:18  8    A.  Yes, sir.

14:47:19  9    Q.  Okay.  Did you ever work there as a booking

14:47:22 10  officer?

14:47:23 11    A.  No, sir.

14:47:24 12    Q.  Or did you ever work there as an -- in the --

14:47:29 13  officer in the infirmary?

14:47:30 14    A.  Yes, sir.

14:47:35 15    Q.  Okay.  How many beds in that infirmary?

14:47:38 16    A.  Infirmary?

14:47:39 17          There's a big dorm.  There's like six

14:47:44 18  single cells, something like that.

14:47:46 19    Q.  Okay.  So it would hold at least ten prisoners?

14:47:49 20    A.  Yes, sir.

14:47:50 21    Q.  Is that where the nurses are located?

14:47:53 22    A.  Uh-huh.

14:47:54 23    Q.  Is that "yes"?

14:47:55 24    A.  Yes.  That's the area.  Sorry.

14:47:57 25    Q.  I didn't go through the same litany that I went

BRYANT & STINGLEY, INC.
McAllen         Harlingen        Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

14:47:59  1    through the other people because we're trying to get

14:48:01  2    you finished up, but you need to answer "yes" or "no"

14:48:03  3    to my question so we can get a clear response.  Okay?

14:48:07  4         A.  Yes, sir.

14:48:14  5         Q.  When did you first start working at the old

14:48:17  6    county jail?

14:48:19  7         A.  I think it was in '96.  I don't remember

14:48:21  8    exactly the month.

14:48:22  9         Q.  And what was your position then?

14:48:24 10         A.  Detention officer.

14:48:26 11         Q.  So were you assigned to any particular floor?

14:48:29 12    Any particular duties?  Just whatever?

14:48:31 13         A.  No, sir.  Whatever rotation.  Whatever you get

14:48:32 14    assigned.  Every day it's different.

14:48:35 15         Q.  Okay.  Did you become the shift sergeant or

14:48:43 16    shift officer --

14:48:43 17         A.  Yes, sir.

14:48:43 18         Q.  -- in charge of a shift at any time?

14:48:43 19         A.  Uh-huh.

14:48:45 20         Q.  Is that "yes"?

14:48:45 21         A.  Yes, sir.

14:48:45 22         Q.  Okay.  And when was that?

14:48:48 23         A.  Like in 2000.

14:48:50 24         Q.  In 2000.

14:48:51 25         A.  Something like that.

14:48:52   1      Q.  Okay.  And what were your duties as a shift

14:48:54   2   supervisor?

14:48:55   3      A.  Supervise the inmates and supervise the crew.

14:48:59   4      Q.  What members of the crew would you supervise?

14:49:02   5      A.  At that time, I think I had, like, 10 or 11.

14:49:06   6      Q.  Detention officers?

14:49:07   7      A.  Yes, sir.

14:49:07   8      Q.  Any of those officers that you supervised, were

14:49:10   9   any of them booking officers?

14:49:12  10      A.  Yes, sir.

14:49:13  11      Q.  Were any of them classification officers?

14:49:16  12      A.  No, sir.

14:49:18  13      Q.  Okay.  So you didn't supervise any

14:49:20  14   classification officers at any time?

14:49:22  15      A.  No.  Classification is only, like, 8:00 to

14:49:25  16   4:00, and we were --

14:49:27  17      Q.  Oh, I see.  Were you always on the -- what was

14:49:29  18   it?  2:00-to-11:00 or 3:00-to-11:00 shift?  What was

14:49:33  19   it?

14:49:33  20      A.  No.  We rotate.  It's 3:00 to 11:00, 11:00 to

14:49:39  21   7:00, and 7:00 to 3:00.

14:49:41  22      Q.  Okay.  So you -- were you ever the supervisor

14:49:43  23   on the morning shift?

14:49:44  24      A.  Yes, sir.

14:49:44  25      Q.  Were you ever the supervisor on the graveyard

14:49:48  1    shift?

14:49:48  2        A.  Yes, sir.

14:49:49  3        Q.  And on April 11th in 2001, you were the

14:49:53  4    supervisor on the second shift.  Is that called the B

14:49:56  5    shift?

14:49:57  6        A.  Yes, sir.

14:50:05  7        Q.  Okay.  Now, if -- did you ever have occasion to

14:50:09  8    meet an inmate called Longoria?

14:50:13  9        A.  Yes, sir.  He was there.

14:50:14 10        Q.  Okay.  And where do you recall that he was

14:50:17 11    where you met him or saw him?

14:50:19 12        A.  The first time I saw him, he was in the padded

14:50:21 13    cell.

14:50:22 14        Q.  And is that padded cell No. 1?

14:50:24 15        A.  Yes, sir.

14:50:26 16        Q.  How many padded cells were there?

14:50:28 17        A.  There's two downstairs and there's two

14:50:31 18    upstairs, the third floor.

14:50:33 19        Q.  Was padded cell No. 2 used for storage, or was

14:50:35 20    it --

14:50:36 21        A.  Yes, sir.  Just storage.

14:50:38 22        Q.  Okay.  As I understand it, there was a large

14:50:40 23    holding cell; is that correct?

14:50:43 24        A.  Yes, sir.

14:50:43 25        Q.  On the first floor.

14:50:43  1      A.   Uh-huh.

14:50:44  2      Q.   Is that "yes"?

14:50:45  3      A.   Yes, sir.

14:50:45  4      Q.   There was a small holding cell?

14:50:47  5      A.   Yes, sir.

14:50:47  6      Q.   Is that correct?

14:50:48  7      A.   Yes, sir.

14:50:49  8      Q.   There was a padded cell No. 1 that was used to

14:50:51  9   hold a single prisoner?

14:50:53 10      A.   Yes, sir.

14:50:54 11      Q.   And there was what was called a drunk tank.

14:50:57 12      A.   Yes, sir.

14:50:57 13      Q.   Is that right?  But it was used to hold other

14:51:00 14   prisoners pending booking that weren't necessarily

14:51:06 15   drunk.

14:51:06 16      A.   Yes, sir.

14:51:08 17      Q.   Okay.  There was also the infirmary was on the

14:51:11 18   first floor; is that correct?

14:51:12 19      A.   Yes, sir.

14:51:13 20      Q.   Okay.  Did you have an office on the first

14:51:15 21   floor?

14:51:16 22      A.   No, sir.

14:51:17 23      Q.   You were just as a supervising officer?

14:51:20 24      A.   Yeah.  We had, like in the area through our

14:51:22 25   work, but not a said office where we --

14:51:24 1  Q.  I see.  Okay.  If a prisoner such as

14:51:32 2  Mr. Longoria came -- assume with me he came in about

14:51:36 3  10:30 or something like that and was brought in by

14:51:38 4  the -- a.m. -- brought in by the Brownsville Police

14:51:45 5  Department, an officer, and you arrived about 3:00; is

14:51:45 6  that right?

14:51:51 7  A.  Uh-huh.

14:51:52 8  Q.  Is that "yes"?

14:51:53 9  A.  Yes, sir.

14:51:54 10  Q.  You would then -- the officer, the authority,

14:51:58 11  in this case it was Officer Silva, Sergeant Silva,

14:52:02 12  would he then brief you and other members of your crew

14:52:07 13  as to what was going on in the jail?

14:52:11 14  A.  Yes, sir.

14:52:12 15  Q.  As part of this briefing, did he tell you

14:52:15 16  about -- about Mr. Longoria?

14:52:20 17  A.  Yes, sir.

14:52:20 18  Q.  And what did he tell you?

14:52:21 19  A.  He told me that --

14:52:23 20  Q.  And you can refer to your statement.  I mean,

14:52:24 21  you know.

14:52:25 22  A.  Okay.  He told me that he was put in the padded

14:52:28 23  cell because he was having problems with other inmates,

14:52:30 24  and he was kind of aggressive, so --

14:52:32 25  Q.  He was aggressive.

14:52:33 1  A. -- for his safety, they put him in there.

14:52:36 2  Q. Okay.  And he didn't tell you that there was an

14:52:36 3 argument?

14:52:38 4  A. He was arguing with the other guys there.

14:52:39 5  Q. Okay.

14:52:41 6  A. They put him there for his safety.

14:52:43 7  Q. Did he tell you why they were arguing?

14:52:45 8  A. No, sir.

14:52:46 9  Q. Did he tell you that -- that Mr. Longoria was

14:52:57 10 crazy or acting crazy?

14:52:58 11  A. No, sir.

14:52:59 12  Q. Did he tell you -- I think that's referred to

14:53:01 13 as a 96; is that correct?

14:53:03 14  A. Yes, sir.  That's correct.

14:53:05 15  Q. Okay.  Did he tell you that he was drunk or

14:53:09 16 uncooperative?

14:53:10 17  A. No, sir.

14:53:13 18  Q. Okay.  So all he told you was that he had an

14:53:14 19 argument, whether he was aggressive or the other side

14:53:19 20 was aggressive, he had an argument.  Mr. Silva thought

14:53:22 21 it would be best to put him in a separate cell.

14:53:24 22  A. Yes, sir.

14:53:25 23  Q. Okay.  Did he tell you that lieutenant told him

14:53:28 24 to put him -- Lieutenant Gonzalez told him to put him

14:53:31 25 in a separate cell?

14:53:32  1    A.  No, sir, he didn't tell me.

14:53:35  2    Q.  Okay.

14:53:35  3         MR. VITTITOE:  Just for the record --

14:53:38  4    well, I believe he's Gutierrez as opposed to Gonzalez.

14:53:47  5         MR. BERGER:  Oh, okay.  Gutierrez.

14:53:47  6    Q.  Was it Lieutenant Gonzalez or Lieutenant

14:53:48  7    Gutierrez?

14:53:50  8    A.  Lieutenant Gutierrez was there.

14:53:52  9    Q.  Okay.  Then it would be Lieutenant Gutierrez

14:53:52 10    told him to put him in the padded cell?

14:53:55 11    A.  No, sir.  He didn't tell me that.

14:53:58 12    Q.  Okay.  Did he tell you that Lieutenant

14:54:00 13    Gutierrez told him to put him in the small holding cell

14:54:03 14    but decided not to do it because there were too many

14:54:05 15    prisoners in the small holding cell --

14:54:07 16    A.  No, sir.

14:54:09 17    Q.  -- and that's why he put him in the padded

14:54:11 18    cell?

14:54:12 19    A.  No, he didn't tell me.

14:54:15 20    Q.  Okay.  Tell you anything else about

14:54:17 21    Mr. Longoria --

14:54:19 22    A.  No, sir.

14:54:20 23    Q.  -- either that you recall or what you have in

14:54:23 24    your statement.

14:54:25 25    A.  Just that.  He was there and we saw him.  When

14:54:27 1    we left, we saw that he was there.

14:54:30 2        Q.  Okay.  And when you said you saw him, you said

14:54:36 3    in here that you checked on the inmate about four or

14:54:39 4    five times in the time frame of 2:45 to 6:45.

14:54:43 5            Now, how did you check on him?

14:54:53 6        A.  There's a window on that cell, on the door.

14:54:53 7    It's a glass window.  You can see inside.  And there's

14:54:53 8    a light on the ceiling so, you know, it illuminates the

14:54:55 9    whole cell.

14:54:55 10       Q.  Were you able to visualize Mr. Longoria at all

14:54:58 11   times that you saw him?

14:54:59 12       A.  Yes, sir.

14:54:59 13       Q.  Did you record those inspections that you made

14:55:04 14   or visits, I mean, looking through the glass at any

14:55:07 15   time?

14:55:07 16       A.  No, sir.

14:55:08 17       Q.  Was there a place to record that on the door?

14:55:11 18       A.  No, sir.

14:55:13 19       Q.  If the person is in a holding cell like that, a

14:55:15 20   padded cell, are there -- is there supposed to be a log

14:55:20 21   as to the -- every time a person inspects -- looks in

14:55:26 22   there and see if the person's okay?

14:55:29 23       A.  Usually the logs are, like, for suicidals or

14:55:32 24   people, you know, like that.  But this guy was -- he

14:55:36 25   was -- he wasn't suicidal.  He was clear, so we didn't

have no log on him.

Q.   Do you know that he had a medical problem?

A.   No, sir.  As far as I know, he had a medical clearance from the hospital.

Q.   Did you ever see the medical clearance?

A.   No, sir.  The booking officer has that.

Q.   Okay.  Do you know if the booking officer put that medical clearance in the medical box?

A.   I don't know, sir, about that.

Q.   Or do you know if that booking officer gave the medical clearance to the nurse or any of the nurses?

A.   I don't know, sir.

Q.   On April 11th, 2001, how many nurses were there on your shift, worked there with you on the shift that you were on, B shift?

A.   I saw one there, but I wasn't sure if that was the only one there.

Q.   Do you remember who that nurse's name -- who that was?

A.   No, sir, I don't remember.

Q.   Okay.  Ever work with Nurse Rivas?

A.   Yes.

Q.   Ever work with Nurse Esquivel?

A.   Esquivel, yes.

        I think it was Nurse Rivas that was there.

14:56:40 1   I'm not sure.

14:56:45 2       Q.   Okay.   How big is this glass window?   6 by 6

14:56:54 3   would be fair, or less than that?   6 inches by 6

14:56:57 4   inches?

14:56:58 5       A.   Something like that.   Yeah.   6 by 4 or 6 by 6.

14:57:01 6       Q.   6 by 4?

14:57:02 7            As I understand it, there's a metal door

14:57:08 8   in front of that window.

14:57:09 9       A.   Yes, sir.

14:57:10 10      Q.   And all the times that you were there, was that

14:57:12 11  metal door open or closed?

14:57:15 12      A.   It was open.

14:57:16 13      Q.   It was open?

14:57:17 14      A.   Yes.

14:57:17 15      Q.   Do you know if there was any policy or

14:57:19 16  procedures about leaving that metal door open or

14:57:23 17  closed --

14:57:24 18      A.   No, sir.

14:57:24 19      Q.   -- while a prisoner was in there?

14:57:27 20           Are you aware of any?

14:57:28 21      A.   The only one would be, like, if they had, like,

14:57:32 22  a female or something that you have to close it or

14:57:34 23  something.   Other than that --

14:57:36 24      Q.   Have you ever had a female in that -- put in

14:57:39 25  that padded cell on the first floor?

A.   I think they had one time when they had to put one in there.

Q.   That prisoner was suicidal?

A.   She was aggressive.

Q.   Aggressive.

A.   Yes.

Q.   So -- but she wasn't suicidal?

A.   No.  She was put there just for a small amount of time.

Q.   How much time did she spend there?

A.   Like two hours.

Q.   Two hours.

A.   She calmed down.

Q.   Did it appear to you that Mr. Longoria, when you looked through the window and saw him, looked aggressive to you or acting in an aggressive manner?

A.   No.  He was by himself, so --

Q.   Okay.  Well, was he being aggressive towards himself?

A.   No.

Q.   Did he give you the finger or something like that looked like he was --

A.   No.

Q.   -- being aggressive towards you?

A.   No, sir.

14:58:29  1      Q.  Were you able to hear -- did you hear him

14:58:31  2   yelling and screaming, yelling, or anything like that?

14:58:33  3      A.  No, sir.

14:58:35  4      Q.  He looked normal.

14:58:37  5      A.  Yes.

14:58:38  6      Q.  Okay.  He wasn't talking to himself?

14:58:40  7      A.  No.

14:58:42  8      Q.  You didn't see him bang his head against the

14:58:45  9   wall?

14:58:45 10      A.  No, sir.

14:58:47 11      Q.  Nobody told you that he was banging his head or

14:58:50 12   his body against the wall?

14:58:51 13      A.  No, sir.

14:58:53 14      Q.  Okay.  Is the inside of that metal cell door

14:58:58 15   padded also?

14:58:59 16      A.  Yes, sir.

14:58:59 17      Q.  Is that window padded?

14:59:01 18      A.  No, sir.

14:59:04 19      Q.  Is there any wire mesh in that window, or is it

14:59:07 20   just plain tempered glass?

14:59:10 21      A.  It's tempered glass.

14:59:11 22      Q.  Is the glass tinted or nontinted?

14:59:14 23      A.  No, sir.  It's clear.

14:59:17 24      Q.  When you -- each time that you said you went by

14:59:21 25   there and looked in there four or five times, did you

15:00:11 1     A.   You couldn't see all of it.

15:00:14 2     Q.   Is the -- the bed that was in there, was that

15:00:17 3  just opposite that glass window, or was the bed on one

15:00:21 4  side or the other?

15:00:22 5     A.   It's on one side.

15:00:23 6     Q.   Okay.  Which side was it as you looked in?

15:00:25 7     A.   I think it's the right side.

15:00:28 8     Q.   What was in there just opposite when you looked

15:00:39 9  in the window, assuming that the prisoner was not in

15:00:39 10  your face?

15:00:39 11     A.   Just the walls.

15:00:39 12     Q.   Just the wall?

15:00:39 13     A.   There's nothing else in there.

15:00:39 14     Q.   Where was the floor urinal, hole in the floor,

15:00:43 15  in relationship to the window?

15:00:45 16     A.   In the center.

15:00:46 17     Q.   In the center of the room?

15:00:47 18     A.   Uh-huh.

15:00:47 19     Q.   Is that "yes"?

15:00:48 20     A.   Yes, sir.

15:01:01 21     Q.   When you checked on the -- on Mr. Longoria in

15:01:05 22  the padded cell No. 1, what was he doing four or five

15:01:09 23  times?

15:01:11 24     A.   Sometimes he was just standing there, sitting

15:01:13 25  down, or laying down.

Q.   Okay.  Laying on the floor or on the bed?

A.   Laying on the floor opposite of the bed and sometimes on the bed.

Q.   Okay.  You said from -- "At 6:35, I was in the classification office."

And what were you doing in the classification office?

A.   I was talking to Lieutenant Gutierrez.

Q.   Okay.  He was -- is that where his office was located, or is that -- somebody else is located there but you just happened to see Lieutenant Gutierrez in that office?

A.   Yeah.  Somebody -- that's just classification.  The lieutenant's office is next to it.

Q.   Do you recall who the classification officer was on your watch that day?

A.   I didn't understand.

Q.   In other words, on your shift, who was the classification officer?

A.   I think it was Jerry Sanchez.

Q.   Sanchez?

A.   Yes, sir.

Q.   Do you remember who the booking officer was?

A.   No.  They were gone for the day.  They only --

Q.   Did all the --

A.   Yeah.   They leave, I think, at 5:00 or 4:00 or something like that.

Q.   Well, I'm talking about a person that -- intake booking rather than the booking supervisor.

A.   Yeah.   It would be Jerry Sanchez.   He's the booking officer.   He does all that.

Q.   So he's also a classification officer?

A.   Uh-huh.

Q.   Is that "yes"?

A.   Yes.   Or we do it ourselves.   We assign the cells.   But usually we leave them a list where everybody is going to go, whoever is already booked.

Q.   Well, I mean, what happens if the prisoner is not booked?   They're just kept in a holding cell?

A.   Yes.   Until his turn arrives to get booked.

Q.   Until he's booked?

A.   Uh-huh.

Q.   Is that "yes"?

A.   Yes, sir.

Q.   And then he doesn't get to see the classification officer until after he's booked; is that right?

A.   Yes, sir.

Q.   The classification officer decides where he's going to be put or -- he or she.

A.  Yes, sir.

Q.  Okay.

A.  But sometimes when we have a lot of them, the booking officer will do the classification.

Q.  Also?

A.  Yes.  And we'll go by the status to decide what cell he will go to.

Q.  Whether minimum --

A.  Yes, sir.

Q.  -- medium or in the old county jail, which is maximum security.

A.  Yes, sir.

Q.  Okay.  And the women's section; is that right?

A.  That's right, sir.

Q.  Did it have maximum women's section, or is that the -- maximum women's section?  Is that the facility for all women that were in the county jail or just for the maximum?

A.  That's for all women.

Q.  Okay.  And that's on the second floor.

A.  Yes, sir.

Q.  Now, does the -- is there an officer in the infirmary that sits in the infirmary and watches all the people in the infirmary?

A.  Yes, sir.

Q.  Do you remember who the officer that was in the infirmary on your shift?

A.  Can't remember his name, sir.

Q.  Okay.

A.  I don't remember.

Q.  Is he still with the department?

A.  I don't think so.

Q.  That officer is supposed to stay in the infirmary as long as some prisoners are in the infirmary?

A.  Yes, sir.

Q.  Do you recall being in the infirmary during your shift?

A.  Yes, sir.

Q.  Were all the beds occupied, or were some empty?

A.  I think they were mostly occupied.

Q.  Okay.  Were they all occupied, or were there some empty?

A.  I'm not sure.  I can't say yes or no.

Q.  Okay.  And did you go in the dorm as well as the cells to look?

A.  Yes.  There's a hallway where you can make a round and look at them.

Q.  That's part of your rounds?

A.  Yes, sir.

Q.  How many bunks are there in the dormitory and the infirmary?

A.  Six.

Q.  Six?

Is that -- does that mean that 12 people can be in there?  Is there an upper and lower or --

A.  Yes.  One up and one lower.

Q.  So six of those bunks?

A.  I think so.

Q.  And there's six single beds in each of the single cells?

A.  Yes, sir.

Q.  There's also an examination room or examination --

A.  Yes.  Area.

Q.  -- area?

A.  Yes.

Q.  Is there a kind of couch or -- in the examination area, is there kind of a couch or examination table?

A.  Yes, sir.

Q.  So if worse came to worse, you can put a prisoner on the examining table.

A.  No, sir, because that door is locked when the nurse leaves.

15:05:33 1    Q.  Oh, I see.

15:05:34 2    A.  It's inside the infirmary.

15:05:38 3    Q.  So I understand it, the -- there's no nurse on

15:05:41 4    the graveyard shift that's present at the facility; is

15:05:45 5    that correct?

15:05:46 6    A.  That's right, sir.  There's no nurse.

15:05:47 7    Q.  You worked that graveyard shift, though.

15:05:49 8    A.  Yes, sir.

15:05:57 9    Q.  Okay.  Did you send any nurse or ask any nurse

15:05:59 10   to look in on Mr. Longoria?

15:06:02 11   A.  No, sir.

15:06:07 12   Q.  Did anybody tell you that Mr. Longoria came in

15:06:10 13   with a medical clearance but that the medical clearance

15:06:14 14   stated that he was to be closely observed at all times?

15:06:18 15   A.  No, sir.  They told me he had a medical

15:06:21 16   clearance, but not that --

15:06:22 17   Q.  Not to have close observation.

15:06:23 18   A.  No, sir.

15:06:24 19   Q.  What would you have done if he would have

15:06:26 20   told -- you'd been told he was -- required close

15:06:30 21   observation according to the medical slip?

15:06:33 22   A.  Then that means that we would start a log and

15:06:36 23   keep more --

15:06:38 24   Q.  Okay.

15:06:38 25   A.  Keep a closer eye on him, you know, shorter

period of time at all times.

Q.  Well, if he was in the holding cell 1 or 2 rather than in the padded cell, you could -- any detention officer walking by could pretty well see how that person was doing, couldn't they?

A.  Yes, sir.

Q.  The cells were bars rather than the solid door?

A.  Yes, sir.

Q.  So if he was placed in the padded cell, it's harder to watch him, the prisoner, isn't that correct, harder to see how he's doing?

A.  You don't have a clear view compared to the holding cell, but you can still see him.

Q.  Well, if you stop and look.

A.  Yeah.  Stop and look through the glass.  Yeah.

Q.  Okay.  But if you just walk past, that's kind of hard to see anything unless he's staring you in the -- looking in the window, right?

A.  That's right.

Q.  Okay.  And that light is supposed to be on all the time; is that correct?

A.  Yes, sir.

Q.  Anybody tell you that he was -- had complained or said that he was shot?

A.  No, sir.

15:07:48 1     Q.  Or that he was shot the night before and was on

15:07:51 2  the television the night before?

15:07:52 3     A.  No, sir.

15:07:53 4     Q.  At any time did you examine Mr. Longoria?

15:07:56 5     A.  No, sir.

15:08:04 6     Q.  Now, when you and the infirmary officer then

15:08:09 7  came in the classification office -- and that's Manuel

15:08:13 8  Cortinas.

15:08:14 9     A.  Yes, sir.

15:08:15 10     Q.  Was he the officer assigned to the infirmary at

15:08:19 11  that time?

15:08:20 12     A.  Uh-huh, yes, sir.

15:08:21 13     Q.  Yes?

15:08:22 14     A.  I think so.

15:08:24 15     Q.  He was looking for an inmate, so he opened the

15:08:27 16  door --

15:08:29 17     A.  Yes, sir.

15:08:33 18     Q.  -- to see if the prisoner in padded cell No. 1

15:08:38 19  was the prisoner he was looking for.

15:08:41 20     A.  Yes, sir.

15:08:41 21     Q.  Is that correct?

15:08:42 22     A.  Yes, sir.

15:08:46 23     Q.  Well, you then continued -- was Mr. Longoria

15:08:57 24  the inmate that he was looking for?

15:09:00 25     A.  No, sir.

Q.  He wasn't?

A.  No, he wasn't.

Q.  Oh, okay.  How did they lose an inmate?

A.  No.  They didn't lose him.  They were just -- they needed -- for some reason, that inmate, the booking officer, they needed that inmate and called the infirmary to see if he had him, so he came and checked and made sure that --

Q.  So he was checking all the holding cells to see where that inmate was?

A.  Yes, sir.

Q.  Okay.  Now, between 6:45 and 10:45, did you happen to look in on Mr. Longoria in padded cell No. 1?

A.  Yes, sir.

Q.  I don't see that in your affidavit or statement that you gave.  It says 2:45 to 6:45.  I'm asking from 6:45 to 10:45, did you happen to look in?

A.  I did.

Q.  Okay.  And you didn't -- you agree with me that it's not in your affidavit -- I mean, your statement?

A.  No, because they stopped to put that I was in the classification office.

Q.  Well, okay.  When were you in the classification office?

A.  About 6:35.

Q.  6:35.

Okay.  Between 6:45 p.m. and 10:45 p.m., you did not state in your statement that you had looked in on him, Mr. Longoria, but you recall that you did?

A.  Yes, because every time we would go by there, we would look inside.

Q.  Well, every time you went by there?  You said "we"?

A.  Well, the runners, because it's like a habit you get of checking that cell.

Q.  Oh, okay.  Well, would they just walk by and see if he was standing up, or would they actually stop and look in the glass thing like you said you did previously?

MR. VITTITOE:  Objection, speculation of what others would do.

THE WITNESS:  I wouldn't know, sir.

Q.  Oh, did you tell them to do anything about Mr. Longoria, to inspect him?

A.  No, sir.

Q.  Did you actually see anybody besides yourself stop to look in and see how he was doing through the glass?

A.  Just before I left, when I was leaving already.

Q.  Okay.  Besides that, between 6:45 and 10:45,

did you ever see anybody else?

A.   No, sir.

Q.   What did Mr. Cortinas -- Officer Cortinas say, when he opened the door looking for the prisoner he was checking for, about Mr. Longoria, if anything?

A.   Nothing, sir.

Q.   Didn't say a thing?

A.   (Moving head side to side)

Q.   You said you were checking on Inmate Longoria. "At 10:45, I was going to give the briefing to the oncoming shift," and you noticed Officer Javier Hernandez looking in the window of the padded cell that Longoria was in.

A.   Yes, sir.

Q.   Did Mr. -- did Officer Hernandez say anything to you about the prisoner, Longoria, when he was looking in the window?

A.   No, sir.  I just saw him stop there and look inside.

Q.   You just saw him looking inside?

A.   Uh-huh.

Q.   Is that "yes"?

A.   Yes, sir.

Q.   All right.  He didn't say anything to you at all?

A.  No, sir.

Q.  Was he on the floor, he was not responding, just whatever?

A.  No, sir.  He didn't tell me.

Q.  At 11:05, you're waiting for paperwork before the end of the shift.  You looked in the window at 11:05, and you saw Longoria was walking inside of his cell; is that correct?

A.  Yes, sir.

Q.  How did you know it was 11:05?

A.  I looked at my watch right before leaving.  We have a big clock there.

Q.  Okay.  Was he pacing back and forth?  Was he -- from what you could tell?

A.  The way I saw him, he was standing up taking, like, small steps, walking slowly.

Q.  Small steps?

A.  Yeah.

Q.  How big is that cell?

A.  I really don't know the measurements.

Q.  Is it fairly small?

What's the measurement of a regular cell?

A.  The regular cells, they're big over there. This is small.

Q.  Single cell.

15:13:34 1    A.  Single cell.

15:13:35 2    Q.  What's the regular measurement of a single

15:13:37 3 cell?

15:13:38 4    A.  I don't know, sir.

15:13:46 5    Q.  Okay.  Then Officer Hector Galicia asked me who

15:13:51 6 was in the padded cell, and that's when you told him a

15:13:53 7 95?

15:13:54 8    A.  Yes, sir.

15:13:54 9    Q.  Okay.  So you told him it was a person in

15:14:04 10 custody.

15:14:04 11    A.  Yes, sir.

15:14:04 12    Q.  Okay.  Then you saw Officer Galicia look in the

15:14:04 13 padded cell?

15:14:04 14    A.  Yes, sir.

15:14:07 15    Q.  And then you went outside to smoke a cigarette

15:14:11 16 together with Officer Galicia?

15:14:13 17    A.  Yes, sir.

15:14:13 18    Q.  Did he say anything about Mr. Longoria

15:14:15 19 besides -- anything about when you went out there for a

15:14:19 20 smoke?

15:14:20 21    A.  No, sir.

15:14:21 22    Q.  Anybody else say anything?

15:14:22 23    A.  No, sir.

15:14:23 24    Q.  Did Officer Silva -- Sergeant Silva tell you

15:14:26 25 anything about it?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

A.   He wasn't there anymore.

Q.   He had already left at --

A.   Yeah.  He left at around 3:00 or a little bit after 3:00.

Q.   Officer Galicia, was he on your watch, your shift?

A.   No, sir.  He was from detention center 1.  He came over to bring some paperwork.

Q.   Okay.  There's two Officer Galicias --

A.   Yeah.  They're brothers.  One works there and one works at the other one.

Q.   You went out with -- to smoke with the one that came over with the paperwork from detention center 1, or did you go out --

A.   I think both of them went out there.

Q.   Huh?

A.   Actually, I think it was him or both of them went out there.

Q.   Okay.  Meaning both the Galicias?

A.   Uh-huh.

Q.   Is that yes?

A.   Yes, sir.

Q.   Okay.  Besides Officer Cortinas, did you ever see anybody else in the holding cell or padded cell -- single cell No. 1?

15:15:30 1      A.  No, sir.

15:15:32 2      Q.  And you never went in there?

15:15:33 3      A.  No, sir.

15:15:36 4      Q.  Okay.  Besides the window, is there anything in

15:15:38 5  that padded cell where a prisoner could hurt himself --

15:15:41 6      A.  No, sir.

15:15:42 7      Q.  -- in there?

15:15:45 8          Of course, you didn't know -- you had no

15:15:48 9  information one way or the other whether or not Inmate

15:15:54 10  Longoria was suicidal; is that correct?

15:15:58 11      A.  Yes, sir.  That's correct.

15:16:00 12      Q.  Would you ask the booking agent, you know,

15:16:02 13  "What's with this guy?"

15:16:05 14      A.  No.

15:16:05 15      Q.  Besides what you got in briefing?

15:16:08 16      A.  Yeah.  Because I wasn't told he was suicidal.

15:16:11 17  Usually, when they're suicidal, they get put in a paper

15:16:13 18  suit, in a blue suit to identify them from the other

15:16:16 19  inmates.

15:16:17 20      Q.  What color suit did he have?

15:16:19 21      A.  A regular suit.  I don't remember the color.

15:16:21 22  It was a regular suit.

15:16:22 23      Q.  A regular cloth suit?

15:16:24 24      A.  Yes, sir.

15:16:24 25      Q.  When you saw him, you didn't think he was a

suicidal?

A.  No, sir.

Q.  He didn't look like he was crazy?

A.  No, sir.

Q.  He didn't look to you like he had a medical problem?

A.  No, sir.

Q.  He wasn't -- didn't appear to be talking to himself?

A.  No, sir.

Q.  When you saw Officer Cortinas open the door, you didn't see the inmate, Longoria, rush the door or rush at Officer Cortinas?

A.  No, sir.  I didn't see him open the door.  I just heard him from the --

Q.  Oh, you just heard him open --

A.  Yes.

Q.  Officer Cortinas didn't complain about Mr. Longoria trying to be aggressive towards him, did he?

A.  He said he just started walking through the door so he closed it.

Q.  So he closed the door?

A.  Uh-huh.

Q.  Okay.  Did he tell you that he pushed him in

the chest or something, put his hand out, Officer Cortinas?

A. I think he just put his hand out and closed the door.

Q. Did he tell you that he actually touched Mr. Longoria?

A. I don't recall him telling me that.

Q. When you were able to see Mr. Longoria, was his shirt collar open or closed?

A. I don't remember, sir, that.

Q. Did you see any marks on his body, on Mr. Longoria's body?

A. No, sir. He had a uniform on when I saw him.

Q. Okay. So all you saw was his face, and you were able to see his arms, though, couldn't you?

A. Yeah, but I didn't notice any marks or --

Q. You didn't notice anything about him?

A. No, sir.

Q. Okay. Did you ever ask anybody why he was sitting there and hadn't been booked yet?

A. No, sir.

Q. Do you understand that you had a briefing by Sergeant Felipe Silva about Longoria that apparently had came in under that shift, that he came in sometime under that shift; is that correct?

A.   Yes, sir.

Q.   Is it unusual at the Cameron County Jail that the -- for somebody to maintain -- be maintained in a holding cell for 12 hours without being booked?

A.   Sometimes it's not because we run chains.

Q.   What's a "chain"?

A.   A chain is when several inmates are taken to, like, TDC or by the federal.  And they'll bring a load back.  We'll have all the cells full, and they have to go to the processing.  And then the booking officer, in the afternoons, he has to stop to conduct his counts.

Q.   Well, do you know if any chains were run that morning or afternoon?

A.   I don't remember, sir.

Q.   The chains come in from the courthouse also?

A.   No.  We get new inmates from the courthouse.

Q.   Do you take -- for trial or court appearances, do you take chains over to courthouse?

A.   We take inmates over there.

Q.   Inmates in chains.

A.   Not in chains, but in groups, depending how many the judge requests he wants to see for the cases.

Q.   Okay.  Are there any -- do you ever -- when you take a prisoner from one room to another facility, do you ever put leg chains on them?

A.  Yes, sir.

Q.  Every time you move from one jail -- I mean, one jail cell to another jail cell, do you put leg chains on them?

A.  Within the building?

Q.  Yes, sir.

A.  No, sir.

Q.  Okay.  If you take them out of the building, you put the leg chains on them?

A.  Yes, sir.

Q.  How about handcuffs?

A.  Yes, sir.

Q.  Did you ever see Mr. Longoria hit his head on the wall or hear him hitting his head on the wall?

A.  No, sir.

Q.  Okay.  When you walked by -- I understand there's a food -- what do you call it?  A hole?

A.  Yes.

Q.  Were the food and water is put in and, I guess, taken out.  Did you ever see whether or not there was any food outside the door?

A.  No, sir.

Q.  Did you ever see whether there was any food inside?

A.  No, sir.

Q.   So you never noticed if -- assuming that he was fed and given water, you weren't able to see whether he was eating it or drinking the water, eating the food and drinking the water.

A.   No, sir.

Q.   There wasn't any intake log kept on him or even a visitation log; is that right?

A.   That's right, sir.

Q.   Okay.  If you have an intake log and a visitation log in that padded cell of the person that you're keeping under close watch, are you supposed to have that log next to the cell and record?

A.   Well, some people would stick it on the door, but others would carry it on the clipboard and keep track of it.

Q.   Okay.  Both the intake and the visitation log or the inspection log?

A.   Yes, sir.

Q.   Okay.  You didn't see any on the wall?

A.   No.

Q.   And you didn't have any in your clipboard?

A.   No, sir.

Q.   Okay.  Who would keep the log for intake, in other words, food and water intake?

A.   It would usually be posted on the door.

Whenever we would go by or whoever would see it would log it in.

Q. On the door?

A. Yeah.

Q. Okay. You ever seen anybody in D.T.'s, have the delirium tremors, alcohol withdraw.

A. No, sir.

Q. You've never seen anybody that was shaking and --

A. Withdrawals, yes, I have.

Q. Withdrawal symptoms?

A. Yes, sir.

Q. What are the withdrawal symptoms to you -- that you've seen?

A. They start shaking, getting nervous and --

Q. Have you seen anybody that had withdrawal symptoms be delusional, in other words, that they see spiders on the wall or people coming at them or things like that?

A. I've seen it, but I wouldn't know if it was that or -- until medical staff would see it, and then they would tell us that they were having that.

Q. Okay. But you've seen somebody in the process of alcohol withdrawal?

A. Yeah. I've seen. Yeah.

Q.  Okay.  Did Mr. -- to you, in your observation, did Mr. Longoria appear to be in alcohol withdrawal being -- have symptoms of alcohol withdrawal?

A.  That time that I saw him, no.

Q.  Okay.  Did anybody relate to you that he might have been talking to himself?

A.  No, sir.

Q.  Anybody relate to you that he was -- like we asked before, that he was shot?

A.  No, sir.

Q.  Did anybody relate to you that he said that someone in the jail was going to shoot him?

A.  No, sir.

Q.  Did anybody tell you that he had said that he's seeing things that weren't there?

A.  No, sir.

Q.  Okay.  The only thing you knew about him was that he had gotten in an argument, for some reason, with somebody in the regular -- large holding cell and that's why he was separated for their good and his good.

A.  Yes, sir.

Q.  Okay.  Now, if he was ill or if he was having some type of problems, you would be able to see him better, observe him better if he was in a kind of an

```
15:24:36  1    open cell versus a closed cell, wouldn't you?
15:24:41  2         A.  I would imagine.
15:24:42  3         Q.  Okay.  I mean, if the guy was going through
15:24:45  4    delirium D.T.'s or alcohol withdrawal, you'd be able to
15:24:50  5    see what he was going through better in an open cell
15:24:52  6    than a closed one, wouldn't you?
15:24:54  7         A.  Yeah.
15:24:54  8         Q.  Huh?
15:24:54  9         A.  Yes, sir.
15:25:00 10         Q.  Okay.  Before April 11th, 2001, did you have
15:25:02 11    any medical training?
15:25:04 12         A.  No, sir.
15:25:05 13         Q.  Besides taking a little bit about suicide
15:25:09 14    prevention in your certification course?
15:25:14 15         A.  No.  Besides that, no.  Just whatever I was
15:25:16 16    trained on.
15:25:16 17         Q.  I think I asked you this, but did you have an
15:25:18 18    office where you would stay during the shift, a
15:25:21 19    particular office rather than -- in other words, like
15:25:24 20    Lieutenant Gutierrez or --
15:25:26 21         A.  No.
15:25:27 22         Q.  -- the booking officer or something like that?
15:25:29 23         A.  The booking officer is in the booking area.
15:25:32 24    Then the lieutenant's office, classification, and we
15:25:34 25    had, like, an open area for where the sergeants can sit
```

15:25:37  1    and do paperwork, but mainly we were on the -- we have

15:25:40  2    three floors to take care of, so --

15:25:41  3        Q.  So you're walking up and down.

15:25:42  4        A.  Yeah.

15:25:43  5        Q.  Okay.  So you didn't have a specific office.

15:25:45  6        A.  No, sir.

15:25:48  7        Q.  Was your detention shift, the second detention

15:25:50  8    shift, capable -- in other words, they had the proper

15:25:54  9    personnel, and I'm not saying "able to" under the

15:25:59 10    circumstances that you had up there, but were they

15:26:01 11    capable of both booking and classifying a prisoner?

15:26:08 12        A.  Maybe classifying, but not booking.  We weren't

15:26:10 13    trained for booking.

15:26:12 14        Q.  You weren't -- you couldn't book them?

15:26:14 15        A.  No.

15:26:15 16        Q.  Why is that?

15:26:16 17        A.  Only the booking officers had access to the

15:26:18 18    computers to where they can do all that.  We weren't

15:26:21 19    allowed to.

15:26:22 20        Q.  Okay.  So wasn't there -- how long would the

15:26:25 21    booking officer be there until?

15:26:28 22        A.  There's one there, usually, all day long.

15:26:33 23        Q.  Okay.  Well, that's --

15:26:34 24        A.  When our shift ended, usually their shift ended

15:26:37 25    and another one would came in.

A.   After their hours?

Q.   No.  What was -- how many -- from the --

A.   When I got there, I think Nurse Rivas --

Q.   3:00 to 11:00, how many nurses did you have?

A.   We have -- they call a nurse's aide.  She passed out medications.

Q.   How about -- I'm talking about LVNs.

A.   I don't recall, sir.

Q.   More than one?

A.   No, I don't think so usually.

Q.   One and a nurse's aide?

A.   I don't recall having an LVN.  I know we had some medical aide that gives out the medications.

Q.   Well, okay.  Well, who would the prisoner see in the infirmary during your shift?  I'm talking about your shift, the second shift.  Okay.  I know you worked all shifts, but --

A.   On ours, the medical aide would look at them. And then if something, I guess, she'll call the main nurse wherever there was one available.

Q.   So you're saying there's a -- is there a difference between a medical aide and a nurse's aide, or is that one in the same?

A.   No, I think there's a difference.  I wouldn't know exactly what the differences are, but I think they

15:28:27  1    are different.

15:28:27  2        Q.  Okay.  So the nurse's aide would give meds; is

15:28:27  3    that right?

15:28:31  4        A.  Uh-huh.

15:28:32  5        Q.  Is that "yes"?

15:28:33  6        A.  Yes, sir.

15:28:33  7        Q.  But a medical aide, what would they do?

15:28:37  8        A.  I think they're both the same.  I'm referring

15:28:39  9    to a medical aide, nurse's aide.  They're the same.

15:28:41 10        Q.  Okay.  So the nurse's aide, if a prisoner

15:28:44 11    needed examining, would --

15:28:48 12        A.  Usually it will be one nurse, but -- for the

15:28:49 13    whole three facilities, so --

15:28:51 14        Q.  Oh, I see.

15:28:52 15        A.  Yeah.

15:28:55 16        Q.  So --

15:28:56 17        A.  Because he will be in one section taking care

15:28:56 18    of inmates or in the other one.

15:28:58 19        Q.  But the infirmary is in the old county jail.

15:29:00 20        A.  There's an infirmary area in every jail.

15:29:04 21        Q.  There is?  But there's only one nurse for all

15:29:06 22    three?

15:29:06 23        A.  At that time, there was.

15:29:07 24        Q.  In the morning shift, how many nurses were

15:29:09 25    there?

15:29:11 1    A.  I wouldn't know, sir.  I wasn't there that

15:29:12 2 morning.

15:29:13 3    Q.  I know.  But not that morning but --

15:29:14 4    A.  No, but during -- basically, I think we have

15:29:17 5 one in each jail.

15:29:19 6    Q.  One in each jail in the morning shift.

15:29:22 7    A.  Yes, sir.

15:29:22 8    Q.  Okay.  So in the afternoon shift, you just have

15:29:24 9 one nurse --

15:29:24 10    A.  I think so.

15:29:25 11    Q.  -- for three shifts -- for three jails, I

15:29:27 12 mean -- facilities.  I'm sorry.

15:29:29 13    A.  Yes, sir.

15:29:29 14    Q.  And as I understand it, the graveyard shift,

15:29:33 15 there would not be any.

15:29:34 16    A.  No, sir.

15:29:35 17    Q.  Is that correct?

15:29:35 18    A.  That's correct.

15:29:43 19    Q.  If a person is placed in the isolated cell,

15:29:47 20 padded cell, is there any policies or procedure

15:29:52 21 regarding notifying the nursing staff that a prisoner,

15:29:58 22 a 95, is in the isolated cell No. 1 on the first floor?

15:30:03 23    A.  Yes.  We would have to notify the nurse.

15:30:05 24    Q.  Okay.  Did you notify any nurse that --

15:30:08 25    A.  No, sir.  When I came in that day, the nurse

```
15:30:10  1   was there present, so they were aware.
15:30:12  2        Q.  So the nurse -- which nurse was that?
15:30:14  3        A.  I think it was Nurse Rivas.  I'm not sure.
15:30:17  4        Q.  She was aware that Mr. Longoria was in a padded
15:30:20  5   cell?
15:30:21  6             MR. VITTITOE:  Objection, speculation.
15:30:23  7        Q.  Do you know?
15:30:23  8        A.  I wouldn't know.
15:30:25  9        Q.  Okay.  Well, that's -- I don't want you to
15:30:27 10   speculate or guess.
15:30:28 11        A.  Yeah.  I wouldn't.  Actually, I wouldn't.  To
15:30:30 12   know, no, I wouldn't.
15:30:47 13        Q.  Okay.  Have you recounted all the contacts that
15:30:50 14   you had regarding Mr. Longoria in your testimony today?
15:30:55 15   Do you recall anything else besides what's in your
15:30:57 16   statement that you gave here today --
15:30:59 17        A.  No, sir.
15:30:59 18        Q.  -- about Mr. Longoria?
15:31:00 19        A.  No, sir.
15:31:01 20        Q.  Do you recall anything else about talking with
15:31:04 21   anybody else about Mr. Longoria, like Mr. Silva or
15:31:09 22   Nurse Rivas or --
15:31:11 23        A.  No, sir.
15:31:13 24        Q.  -- Mr. -- any of the other officers about
15:31:18 25   Mr. Longoria?
```

A.  No, sir.

Q.  You became aware at some time, did you not, that Mr. Longoria was found nonresponsive in the padded cell about 11:30 at night, 11 p.m. on the 11th?

A.  I got a phone call later that night about that.

Q.  Okay.  And you said you saw him about what time walking around?

A.  11:05 when I was leaving.

Q.  11:05.  Okay.

Did you recall when you heard that he was found nonresponsive in his cell, in that cell?

A.  The time that --

Q.  Yeah.

A.  No, sir, I don't recall the time.

Q.  Okay.  Besides Mr. Cortinas, Officer Cortinas, was there any time during your shift was cell -- to your knowledge, was isolated cell No. 1 door open to observe Mr. Longoria?

A.  No, sir.

Q.  To your knowledge?

A.  To my knowledge, no.

Q.  How long did Mr. Cortinas -- Officer Cortinas have that cell door open?

A.  Not long.  Less than --

Q.  I mean, you only heard it, so --

A.  Yeah.  I heard it open, and then I heard it close.

Q.  And he didn't tell you what happened, officer Cortinas?

A.  He just told me that that wasn't the guy he was looking for.

Q.  Oh, okay.  So it was kind of -- you heard it open and close kind of very close together, not long?

A.  Yeah.  Not long.

Q.  Do you know if there was any record of Mr. Longoria eating or drinking -- and/or drinking water during Officer Tenorio's shift?

A.  No, sir, I don't know.

Q.  Do you know if there was any record of Mr. Longoria eating or drinking water during your own shift?

A.  No, sir.

Q.  Okay.  You're Mr. Tenorio.

A.  Yes.

Q.  Any other officer?

A.  No, sir.

Q.  Are you diabetic?

A.  Yes, sir.

Q.  Okay.  Are you supposed to eat at certain intervals?

A.   Yes, sir.

Q.   And what would happen if you didn't eat at certain intervals?

A.   My sugar would go too low.

Q.   And then what would happen when your sugar went too low?

A.   The one time that -- the only thing that happened when that happened, I had a headache.

Q.   You had a headache?

A.   Yeah.  That's what I get.

Q.   Have you ever passed out when your sugar went too low?

A.   No.

Q.   You ever had a hypoglycemia attack when your sugar went too low?

A.   No, sir.

Q.   You ever seen anybody go in hypoglycemic shock when their sugar levels are too low?

A.   No, sir.  I haven't seen them.

Q.   Where they start acting crazy or cursing and everything else and start shaking?

A.   No, sir.

           MR. VITTITOE:  You're talking about yourself?

           MR. BERGER:  No, but I've seen it.  Okay?

MR. VITTITOE:  Okay.

Q.  But that hasn't happened to you?

A.  No.

Q.  Okay.  You're aware that at least from your own experience as a diabetic that some people that are diabetic that don't eat at certain intervals can go into hypoglycemic shock and die.

A.  I heard about it, but I've never seen one.

Q.  Okay.  And it doesn't happen to you.

A.  No, it hasn't happened to me.

Q.  But you've heard about it.

A.  Something like that.

Q.  So if Mr. Longoria was a diabetic in that cell, you would want to make sure that he was -- ate at least the right diet, at least, and drank water, wouldn't you?

A.  Yes, sir.

Q.  Okay.  Do you know what happens to a person when they get in the D.T.'s or alcoholic withdrawal?

A.  Just that they shake and all that.

Q.  Okay.

A.  Really, the main things I would have known about that.

Q.  Do you think they -- I don't know.  Strike that.

                    Do you -- or let me ask you specifically.
Do you take any medication for your diabetes?

    A.  Yes, sir.

    Q.  Okay.  What would happen if you didn't take --
have your medication?

    A.  My sugar would go high.

    Q.  Go too high?

    A.  Yes, sir.

    Q.  Would you -- you ever had that happen to you?

    A.  Yes, sir.

    Q.  And what would happen if that happened?  You'd
get a headache?

    A.  No.  I started, like, seeing blurry.

    Q.  Oh, okay.  Did you ever pass out?

    A.  No.

    Q.  Okay.  As far as you know, Longoria had medical
clearance.  Is that what you were told, or is that what
you understood?

    A.  That's what I was told.

    Q.  Okay.  Who told you that?

    A.  Sergeant Silva.

    Q.  Okay.  You ever had a situation, while you were
supervisor, where the person was telling you, "I need
my meds"?

    A.  Yes, sir.

15:36:31 1    Q.  Ever had a situation where you had a person in

15:36:33 2    there that says, "I need something alcoholic to drink.

15:36:36 3    I've got the shakes"?

15:36:40 4    A.  Not alcoholic.  They haven't asked for that.

15:36:44 5    Q.  Not yet?

15:36:45 6    A.  Not yet.

15:36:45 7    Q.  Well, you wouldn't give it.  I know that.

15:36:48 8    A.  I wouldn't give it, no.

15:36:49 9    Q.  You never had a person say, "I need something

15:36:51 10   alcoholic to drink because I've got the shakes"?

15:36:54 11   A.  No.  We've given them, like, sweets.

15:36:57 12   Q.  Like --

15:36:58 13   A.  Sugar and that.

15:36:59 14   Q.  Orange juice?

15:37:01 15   A.  Yes.

15:37:03 16   Q.  Okay.  Other liquids?

15:37:05 17   A.  Yes, sir.

15:37:07 18   Q.  Okay.  You want to make sure they drink fluids

15:37:10 19   and stuff?

15:37:10 20   A.  Uh-huh.

15:37:11 21   Q.  Is that correct?

15:37:11 22   A.  Yes, but that's ordered by the medical

15:37:14 23   department.  They would tell us.

15:37:15 24   Q.  Okay.  But from your own experience, is that

15:37:17 25   what happens?

A.   Uh-huh, yes, sir.

MR. BERGER:   Okay.   We're finished, sir.

MR. VITTITOE:   Just a few clean-up questions here.

EXAMINATION

BY MR. VITTITOE:

Q.   The medical staff is under the supervision of the Cameron County Health Department; is that correct?

A.   Yes, sir.   Exactly.

Q.   Would they be in the best position to tell the attorneys and the lawyers and the judge and the jury in this case how many nurses were available --

A.   Yes, sir.

Q.   -- in the Cameron County Jail on April the 10th and the 11th?

A.   Yes, sir.

Q.   That also would be true for the other facilities; am I correct?

A.   Yes, sir.

Q.   Now, what I understand is, during the evening hours at the old Cameron County Jail back in April, nurses were not typically on premises; am I correct?

A.   That's right, sir.

Q.   They were on call during the nighttime, like during the graveyard shift?

A.   Yes.   We have them on call.

Q.   Okay.   Is it your understanding or do you know -- let me ask this question.   Do you know whether the nurses maintained activity logs?

A.   I wouldn't know, sir.   I don't know.

Q.   Did you, as a sergeant back in April of 2001, maintain an activity log for your shift?

A.   Yes, sir.

          MR. VITTITOE:   Okay.   Pass the witness.

                    EXAMINATION

BY MR. BERGER:

Q.   One more question.   Were you a sergeant back in April of 2001?

A.   Yes, sir.

Q.   Now you're a corporal?

A.   Yes, sir.

Q.   What happened?

A.   They promoted the sergeant -- a sergeant to lieutenant, and I was promoted to sergeant.

Q.   When was that?

A.   I don't recall.

          And then they demoted that lieutenant back to sergeant, then I got demoted back to --

Q.   So you took his place and when he got demoted --

A.   I went back.

Q.   -- you went back.

When was that?

A.   That was two years ago, something like that.

Q.   2002 or 2001?

A.   2001, probably, or 2000, somewhere around there.

Q.   After April 11th?

A.   Yeah.  And that was --

Q.   Were you ever demoted or penalized or criticized for anything that happened to Mr. Longoria?

A.   No, sir.

Q.   Okay.  Who was the sergeant that went to lieutenant and then went backwards that you went with him, whatever it was?  Do you recall?

A.   Oh, I think it was Lieutenant Villarreal.  He's now a lieutenant again.

Q.   Oh, but you haven't got to be sergeant again, huh?

A.   No.  I didn't want to apply for it.  I'm -- you know, I'm diabetic and all that.  I didn't want to go through nothing.  I had came up with cancer and all that, so I wanted to stay.

Q.   You had cancer?

A.   Yes, sir.

15:39:59  1        Q.  Oh, you have cancer too.  Okay.

15:40:01  2             MR. VITTITOE:  Sorry to hear that.

15:40:03  3        Q.  I didn't know that.  Sorry.

15:40:04  4        A.  Okay.

15:40:04  5        Q.  What kind?

15:40:05  6        A.  Colon cancer.  I had surgery and chemo and all

15:40:10  7   that, so I was going through all that, and I didn't

15:40:10  8   want --

15:40:11  9        Q.  Yeah.

15:40:11 10        A.  I just wanted to --

15:40:11 11        Q.  I understand.

15:40:13 12             But you're still a supervisor.

15:40:14 13        A.  Yes, sir.

15:40:15 14             MR. BERGER:  Okay.  I have no further

15:40:16 15   questions.

15:40:16 16             MR. VITTITOE:  Thank you.  We'll reserve

15:40:17 17   our questions.

         18             (Deposition concluded)

         19

         20

         21

         22

         23

         24

         25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ARMANDO TENORIO - ERRATA SHEET

Reasons for changes:    (1) Clarify the record
                        (2) Conform to the facts
                        (3) Correct transcription errors

PAGE  LINE   CHANGE FROM/CHANGE TO                        REASON

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

____  ____   _____  ____

                ARMANDO TENORIO

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

1          SIGNATURE OF ARMANDO TENORIO

2     I have read the foregoing transcript of my

3  deposition and it is a true and accurate record of my

4  testimony given on FEBRUARY 17, 2004, except as to any

5  corrections I have listed on page 62 herein.

6                                   _____

7                                   ARMANDO TENORIO

8

9  THE STATE OF TEXAS

10 COUNTY OF CAMERON

11          SUBSCRIBED AND SWORN TO BEFORE ME, the

12 undersigned authority on this the _____ day of

13 _____, 2004.

14

15                                  _____

16                                  Notary Public in and for
                                     The State of Texas

17 My commission expires:

18 _____

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3   MARIA LONGORIA AND MARIA    ) (
     IDALIA GUTIERREZ,           ) (
 4   INDIVIDUALLY AND ON BEHALF) (
     OF THE ESTATE OF JUAN       ) (
 5   LONGORIA, DECEASED          ) (
                 Plaintiffs       ) (
 6                               ) (
     VS.                         ) (   CIVIL ACTION NO. B-01-062
 7                               ) (
     CAMERON COUNTY, TEXAS,      ) (
 8   THE CITY OF BROWNSVILLE,    ) (   JURY DEMANDED
     TEXAS AND JOHN DOES 1-10    ) (
 9              Defendants        ) (

10                REPORTER'S CERTIFICATE
        I, Donna McCown, Certified Court Reporter, certify
11   that the witness, ARMANDO TENORIO, was duly sworn by
     me, and that the deposition is a true and correct
12   record of the testimony given by the witness on
     FEBRUARY 17, 2004; that the deposition was reported by
13   me in stenograph and was subsequently transcribed under
     my supervision.
14
        I FURTHER CERTIFY that I am not a relative,
15   employee, attorney or counsel of any of the parties,
     nor a relative or employee of such attorney or counsel,
16   nor am I financially interested in the action.

17                 WITNESS MY HAND on this the 1st day of
     march                , 2004.
18

19                          _____
                            DONNA McCOWN, CSR NO. 6625
20                          Expiration Date: 12/31/05
                            Bryant & Stingley, Inc., CRN No. 41
21                          2010 East Harrison
                            Harlingen, Texas  78550
22

23

24

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

# STIPULATIONS

Deposition(s) of: _Lawrence Dahm MD_

Cause No.: _B-01-0062_ Style: _Merie Longoria et al_

Date: _2-17_ Trial Date: _____ vs. _Cameron County Texas et al_

1. This deposition is taken pursuant to:
   ___ A. Notice                          ___ C. Agreement
   _✓_ B. Notice and Subpoena             ___ D. Court Order

2. Objections:
   _✓_ A. Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
   ___ B. All objections are reserved.
   ___ C. All objections will be made at the time of taking the deposition.

3. Signature and Delivery:
   _✓_ A. The original transcript will be sent to ___ _Mr Valdez_ ___,
   the Custodial Attorney, and the original signature page, along with a copy of the
   transcript(s), will be submitted to _✓_ the witness or ___ the witness' attorney,
   who will return the executed signature page, including any changes, to
   Bryant & Stingley, Inc., within ___ days of transmittal.

   ___ B. Signature is waived and the reporter will deliver the original transcript and
   exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1. Copy of Transcript: Yes _✓_ No ___       Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes _✓_ No ___       E-mail Address: _CHVittitoe@ Adamsgraham.com_

   Signature: _____  Representing: _Cameron County, Texas_

2. Copy of Transcript: Yes ___ No ___       Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___       E-mail Address: _____

   Signature: _____  Representing: _____

3. Copy of Transcript: Yes ___ No ___       Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___       E-mail Address: _____

   Signature: _____  Representing: _____

4. Copy of Transcript: Yes _✓_ No ___       Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___       E-mail Address: _____

   Signature: _____  Representing: _Plaintiff_

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, THE UNDERSIGNED AUTHORITY IN AND FOR CAMERON COUNTY, TEXAS, ON THIS THE 17 DAY OF April 2001, DID APPEAR: Armando Tenorio, WHO AFTER BEING BY ME DULY SWORN, DID DEPOSE AND SAY:

My name is Armando tenorio. I am 34 years old. My date of birth is 1.12.67. I reside at 1944 Cordova Dr. Brownsville, Texas 78521. I can be reached (956) 546-3421. I am employed with the Cameron County Sheriff's Department located on 954 E Harrison St. Brownsville, Texas 78520. I am currently a Sgt with the Jail Division..

On April 11,2001 I Came in to work at the Cameron County Jail at 2:45pm. At that time we were brief by Sgt. Felipe Silva. Sgt. Silva told us that we had an inmate Longoria in a padded cell. This inmate was brought in by Brownsville Police Department. The inmate was kind of aggressive and causing problems with other inmates in the large holding cell. We finished the briefing. I recall checking on this inmate about four to five time from the time frame 2:45pm and 645pm. at around 635pm I was in the classification office. This office is located almost across the hallway from the padded cell where inmate Longoria was in. The infirmary officer then came into the classifications office. Manuel Cortinas told me that he opened the door to the padded cell where inmate Longoria was. Officer Cortinas opened the door checking to see if it was the inmate that he was looking for. I then continued my shift and checking on inmate Longoria. At 10:45pm I was going to give the briefing to the oncoming shift. I then noticed Officer Javier Hernandez looking into the window to the padded cell where Longoria was in. Right before I was going to finish the briefing Officer Hector Galicia. We were there for a little while and waited for the paper work. At around 11:05 I walked over to the booking area with the paper work. I was walking back to the booking from the briefing area that by the laundry room. As I was walking by the padded cell where inmate Longoria was. I looked into the window. I noticed that inmate Longoria was walking inside the cell. Officer Hector Galicia asked me who was in the padded cell. I told him that it was and a 95. 95 being a person in custody. About a minute later Officer Galicia looked into the padded cell. We then started talking by the booking area. Hugo Galicia then walked towards the booking area. We then went outside to smoke a cigarette. I then went home after that.

SIGN _____

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 17 DAY OF APr/ A.D. 2001.

_____
NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

Tenorio
EXHIBIT NO. 1
2-17-04
BRYANT & STINGLEY, INC.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION



MARIA LONGORIA, and MARIA
IDALIA GUTIERREZ, Individually and    }
on behalf of the Estate of    }    CIVIL ACTION NO. B-01-062
JUAN LONGORIA, Deceased    }
    }
VS.    }
    }
    }
CAMERON COUNTY, TEXAS,    }    JURY DEMANDED
THE CITY OF BROWNSVILLE,    }
TEXAS, and JOHN DOES 1-10    }


## <u>PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT</u>

Alfred R. Valdez
    Federal ID 6389
    State Bar No. 20426200
    7520 Hillcroft
    Houston, Texas 77081
    (713) 271-0719
    (713) 270-8134 fax

Attorney for the Plaintiffs

VOLUME ___3___ OF ___3___

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3    MARIA LONGORIA AND MARIA      ) (
      IDALIA GUTIERREZ,             ) (
 4    INDIVIDUALLY AND ON           ) (
      BEHALF OF THE ESTATE OF       ) (   CIVIL ACTION NO.
 5    JUAN LONGORIA, DECEASED,      ) (   B-01-062
                   Plaintiffs      ) (
 6                                  ) (
      VS.                           ) (
 7                                  ) (   JURY DEMANDED
      CAMERON COUNTY, TEXAS,        ) (
 8    THE CITY OF BROWNSVILLE,      ) (
      TEXAS, AND JOHN DOES 1-10,    ) (
 9                   Defendants     ) (
      _____
10
                        ORAL DEPOSITION OF
11                     XAVIER LEE HERNANDEZ
                        AUGUST 29, 2003
12
      _____
13
          ORAL DEPOSITION OF XAVIER LEE HERNANDEZ, produced as
14
      a witness at the instance of the PLAINTIFFS, taken in
15
      the above styled and numbered cause on AUGUST 29, 2003,
16
      reported by ELIZABETH F. TORRES, Certified Court
17
      Reporter No. 5516, in and for the State of Texas, at
18
      the law offices of Adams & Graham, L.L.P., 222 E. Van
19
      Buren, West Tower, Harlingen, Texas, pursuant to the
20
      Federal Rules of Civil Procedure.
21

22

23

24

25                                          COPY
```

1                    APPEARANCES

2    COUNSEL FOR PLAINTIFFS:

3              ALFRED R. VALDEZ
               LIN & VALDEZ, L.L.P.
4              7520 Hillcroft
               Houston, Texas   77081
5
     COUNSEL FOR DEFENDANTS:
6
               CRAIG VITTITOE
7              ADAMS & GRAHAM, L.L.P.
               P.O. Drawer 1429
8              222 East Van Buren, West Tower
               Harlingen, Texas   78551-1429
9
     COUNSEL FOR WITNESS:
10
               RENE B. GONZALEZ
11             DENTON, NAVARRO, ROCHA & BERNAL, P.C.
               Bank of America Building
12             222 East Van Buren, Suite 405
               Harlingen, Texas   78550-6804
13
                      INDEX
14                                            PAGE
     Appearances.................................. 2
15
     XAVIER LEE HERNANDEZ:
16   Examination by Mr. Valdez.................... 3
     Examination by Mr. Vittitoe................. 45
17   Examination by Mr. Valdez.................... 56
     Examination by Mr. Vittitoe................. 59
18   Examination by Mr. Valdez.................... 66

19   Errata Sheet/Signature Page................. 69
     Reporter's Certificate...................... 71
20   Attached to the end of the transcript:   Stipulations

21                    EXHIBITS
                                              PAGE
22                                            MARKED

     NUMBER         DESCRIPTION
23
     1              Statement...................... 31
24

25

**XAVIER LEE HERNANDEZ,**

having been duly sworn, testified as follows:

EXAMINATION

BY MR. VALDEZ:

Q.   Your name is Mr. Xavier Hernandez?

A.   Yes, sir.

Q.   And we need to go off the record so we can get some general information from you.

·         MR. VITTITOE:   Yeah.   Let's go off the record.

(Off record.)

Q.   What's your date of birth?

A.   9-20-65.

Q.   Were you born here in the Har- --

A.   Brownsville, Texas.   Brownsville Medical Center.

Q.   Okay.   Work history.   What did you do after you got out of high school?

A.   I was a security guard for different agencies. And I graduated, what, '85.   And then I went to work with the Smith Security, Stanley Smith Security.   And then from there I went to Posada De Las Palmas Apartments.   I was a security guard there.   From there, I went to Fort Knox Security, the Island, worked there for a couple of years.   From there, I became a police

10:11 1    officer -- well, at the same time, I was a part-time

10:11 2    police officer in Santa Rosa, Texas.  Eventually, I

10:11 3    quit there, went for a better paying job with the

10:11 4    Raymondville Police Department.  Worked there for five

10:11 5    months or so and came to work for Cameron County

10:11 6    Sheriff's Department.  Been there ever since 1989.

10:11 7        Q.  Okay.  So you actually have a -- do you have to

10:12 8    have a license to be a police officer?

10:12 9        A.  Yes, sir.

10:12 10        Q.  Okay.  And you obtained your license as a

10:12 11    police officer/peace officer when?

10:12 12        A.  In 1986.

10:12 13        Q.  Okay.  And how many hours of training did you

10:12 14    have to go through to do that?

10:12 15        A.  300 hours.

10:12 16        Q.  And where did you acquire that training at?

10:12 17        A.  At Texas Southmost College in San Benito, there

10:12 18    was a little small facility.  The instructor was Terry

10:12 19    Vincent.  And he was part of the college, but he had

10:12 20    his own building out here in San Benito, and that's

10:12 21    where I attended.

10:12 22        Q.  Okay.  Why did you get out of, let's say, being

10:12 23    a police officer and moving into being a detention

10:12 24    officer?

10:12 25        A.  In 1989, they had new -- hired a new Chief of

10:12  1    Police, and I was still on probation.  So from there,

10:13  2    they just let me go, and I applied with the sheriff's

10:13  3    department for better pay.

10:13  4        Q.  Okay.  When you applied for the sheriff's

10:13  5    department, did you go immediately to becoming a

10:13  6    detention officer?  Or were you a what I want to call a

10:13  7    patrol officer initially, a deputy patrol officer?

10:13  8        A.  No.  I was a jailer.

10:13  9        Q.  You were a jailer?

10:13  10       A.  Started off as a jailer.

10:13  11       Q.  All right.  And that was in 1989 you did that.

10:13  12       A.  Yes, sir.  In December.

10:13  13       Q.  And you've been a detention officer from 1989

10:13  14   till the present time?

10:13  15       A.  Yes, sir.

10:13  16       Q.  And during this 12 or 13 years with the Cameron

10:13  17   County Sheriff's Department -- well, let me back up.

10:13  18   Have you always been with the Cameron County Sheriff's

10:13  19   Department from 1989 to the present time?

10:13  20       A.  Yes, sir.

10:13  21       Q.  And during this 13 years, you've always been a

10:13  22   detention officer?

10:13  23       A.  Yes, sir.

10:13  24       Q.  Okay.  Tell me what training you obtained in

10:14  25   1989, if any, to become a Cameron County Sheriff's

10:17 1    Q.   In 1989?

10:17 2    A.   In 1989.

10:17 3    Q.   Over the course of the last 13 years of being

10:17 4    affiliated with the Cameron County Sheriff's

10:17 5    Department, and specifically in their detention center,

10:17 6    have you been provided with a manual or a handbook

10:17 7    concerning the jail procedures or policies within a

10:18 8    detention center?

10:18 9    A.   Yes, sir.

10:18 10   Q.   Okay.  When did you receive that information?

10:18 11   A.   Probably about six, seven years ago.

10:18 12   Q.   Okay.  Was there any instruction that was

10:18 13   provided to you concerning the manual or the book?  Or

10:18 14   was it just handed to you and that was it?

10:18 15   A.   It was just handed to us.

10:18 16   Q.   Okay.  Over the course of the 13 years, was

10:18 17   there any type of, what I would call, training provided

10:18 18   by the Cameron County Sheriff's Department concerning

10:19 19   that manual or book?

10:19 20   A.   As far as what, sir?

10:19 21   Q.   Well, for example, perhaps some type of meeting

10:19 22   or educational classes being offered by the Cameron --

10:19 23   Cameron County Sheriff's Department to go through the

10:19 24   -- the manual or the operation book.

10:19 25             MR. VITTITOE:   I think what he's asking

10:19 1  you is, did anybody -- did you have a meeting where you

10:19 2  reviewed the manual?  The manual is a collection of

10:19 3  your policies and procedures in jail --

10:19 4           THE WITNESS:  Yes, sir.

10:19 5           MR. VITTITOE:  -- that are TCLOESE jail

10:19 6  standards.  I think he's saying -- or as I understand

10:19 7  it, he's saying was there ever a meeting where you

10:19 8  actually reviewed the manual, per se?  In other

9  words --

10:20 10          THE WITNESS:  I don't recall, sir.

10:20 11     Q.  Okay.  You don't have any recollection of ever

10:20 12  doing that?

10:20 13     A.  No, sir.

10:20 14     Q.  Okay.  I'm going to hand you what has been

10:20 15  marked as Mr. Elizarde Exhibit No. 2.  Do you know who

10:20 16  Mr. Elizarde is?

10:20 17     A.  Yes, sir.

10:20 18     Q.  Okay.  Who is he?

10:20 19     A.  He's a training officer at this time.

10:20 20     Q.  Okay.  My understanding is that back in April

10:20 21  of 2001, he was the jail administrator; is that

10:20 22  correct?

10:20 23     A.  Yes, sir.

10:20 24     Q.  Okay.  I'm going to hand this over to you, sir,

10:20 25  and ask if you've ever seen that before.

10:20  1       A.   Yes, sir.

10:20  2       Q.   Okay.  What is that?

10:20  3       A.   This is a part of the manual that they gave us

10:20  4  during the -- the years of Lucio, the operation

10:20  5  procedures.

10:20  6       Q.   Okay.  And so my question to you is, have you

10:21  7  ever read through that manual?

10:21  8       A.   Yes, sir.

10:21  9       Q.   Okay.  When was the last time you can recall

10:21 10  reading through that manual?

10:21 11       A.   I do not --

10:21 12            MR. VITTITOE:  Yeah, don't guess.  If you

10:21 13  don't know, just say you don't know.

10:21 14       A.   I don't recall.

10:21 15       Q.   It's been several years?

10:21 16       A.   At least several years.

10:21 17       Q.   Okay.  Thank you.  And the manual that we're

10:21 18  referring to is what has been marked as Mr. Elizarde

10:21 19  Exhibit No. 2?

10:21 20       A.   Yes, sir.

10:21 21       Q.   Okay.  So as a -- as a follow-up question to

10:21 22  you, Mr. Hernandez, what has been marked as Mr.

10:21 23  Elizarde Exhibit No. 2 is -- has the Cameron County

10:22 24  Sheriff's Department had any types of classes where

10:22 25  y'all would -- where the detention officers would sit

10:22 1    out and discuss the manual, the procedures within the

10:22 2    manual?

10:22 3                MR. VITTITOE:  Wait a minute.  That's two

10:22 4    questions, because the procedures are reviewed all the

10:22 5    time.  Now, if you're asking whether they've had

10:22 6    specifically gone through the manual, that's -- that's

10:22 7    a different question.

10:22 8                MR. VALDEZ:  Well --

10:22 9                MR. VITTITOE:  Because they're taught

10:22 10   procedures all the time.

10:22 11       Q.   All right.  Where y'all have gone through the

10:22 12   manual.  Have you had any classes where y'all have

10:22 13   actually gone through the manual to discuss procedures

10:22 14   that are noted in the manual?

10:22 15                MR. VITTITOE:  If you remember.

10:22 16       Q.   If you remember.

10:22 17       A.   I believe there was one time, sir.

10:22 18       Q.   And when was that?

10:22 19       A.   Some years ago.

10:22 20       Q.   Okay.  Let me ask another question, then.

10:23 21   While Sheriff Cantu has been a sheriff in Cameron

10:23 22   County, has there been any types of classes or

10:23 23   instruction dealing with the manual that's marked as

10:23 24   Elizarde Exhibit No. 2?

10:23 25                MR. VITTITOE:  Let me just object as

10:23 1    overly broad.  Are you asking whether there's been a

10:23 2    specific class where they've gone through the manual.

10:23 3              MR. VALDEZ:  Yes, sir.  Yes, sir.

10:23 4              MR. VITTITOE:  Because training is on --

10:23 5              MR. VALDEZ:  I'm going to get to the

10:23 6    next --

10:23 7              MR. VITTITOE:  Okay.  My objection is

10:23 8    overly broad.

10:23 9      Q.  Okay.  Where y'all have actually gone through

10:23 10   the manual while Sheriff Cantu was on board as a

10:23 11   sheriff in Cameron County.

10:24 12     A.  I can't recall, sir, if it was his

10:24 13   administration or Lucio's administration.

10:24 14     Q.  Okay.  Now, as a follow-up question, Mr.

10:24 15   Vittitoe was talking about having reviewed procedures

10:24 16   concerning what's in this manual.  Do y'all do that?

10:24 17     A.  Can you repeat the question?

10:24 18     Q.  Yes, sir.  My next question turns to not so

10:24 19   much having a specific class and someone handing you

10:24 20   the manual or having discussions saying, "This is the

10:24 21   manual we work by," but having some form of in-house

10:24 22   training concerning procedures that are to be followed

10:24 23   by the jailers at the Cameron County Sheriff's

10:24 24   Department.  Do y'all have that?

10:24 25             MR. VITTITOE:  For example, booking.  For

10:24  1    example --

10:24  2        A.  Yes, sir.

10:25  3               MR. VITTITOE:  -- logging.  For example,

10:25  4    medical.  That kind of stuff.

10:25  5        A.  Yes, sir.

10:25  6        Q.  Okay.  How often is that done?

10:25  7        A.  Not too -- not too often on that case.

10:25  8        Q.  Okay.  Well, let me ask it this way.  When is

10:25  9    the last time you've had such a program or teaching of

10:25 10    such things?

10:25 11        A.  Probably a couple of years ago.

10:25 12        Q.  Okay.  My next question to you is, when you

10:25 13    have these forms of teaching or meetings, is there a

10:25 14    sign-in sheet that y'all have to sign to acknowledge

10:25 15    that, yes, I attended that -- that meeting?

10:25 16        A.  Yes, sir.

10:25 17        Q.  Okay.  All right.  When was the last time you

10:26 18    can recall doing that?

10:26 19               MR. VITTITOE:  Doing what?  Objection.

10:26 20        Q.  Going to these meetings concerning procedures

10:26 21    for the Cameron County Sheriff's Department detention

10:26 22    center.

10:26 23        A.  It was when Joe Elizarde was the instructor.  A

10:26 24    couple of years ago.  The cultural diversity, as well.

10:26 25        Q.  Okay.

10:26  1     MR. VITTITOE:  Alfred, go off the reccrd.

10:26  2     MR. VALDEZ:  Sure.

10:26  3       (Off record.)

10:30  4 Q.  Mr. Hernandez, let's talk about the booking.

10:30  5 Have you been a detention officer who's been

10:30  6 responsible for booking?

10:30  7 A.  As a booking officer, no, sir.

10:30  8 Q.  Okay.  During the 13 years that you have been

10:30  9 with the Cameron County Sheriff's Department, where

10:30 10 have you actually worked within the detention facility?

10:30 11     MR. VITTITOE:  Let me --

10:30 12     MR. VALDEZ:  Go ahead.

10:30 13     MR. VITTITOE:  Let me just object.  Are

10:30 14 you talking about the -- what is commonly called now as

10:30 15 the old jail?  Because he's assigned to a different

10:30 16 unit now.

10:30 17 Q.  Okay.  What I'm looking for is, for example --

10:30 18 from what I can gather in talking to other folks, you

10:30 19 have certain detention officers that take care of

10:30 20 booking, you have certain detention officers that take

10:31 21 care of classification, and you have certain officers

10:31 22 that once they have been classified and are being put

10:31 23 in the various cells are responsible for overseeing

10:31 24 those individuals once they have an assigned particular

10:31 25 cell.

BRYANT & STINGLEY, INC.
McAllen    Harlingen    Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

10:32 1    Q.  Okay.

10:32 2    A.  -- booking them in, as far as fingerprinting

10:32 3  them, things like that.

10:32 4    Q.  You have never, as best as you can recall, held

10:32 5  a job where the prisoners are initially transferred

10:33 6  from, say, the City of Brownsville jail over to the

10:33 7  Cameron County jail, that you would be the first

10:33 8  detention officer that these individuals would see?

10:33 9    A.  No, sir.

10:33 10    Q.  Do you remember Mr. Juan Longoria?

10:33 11    A.  I remember seeing him, but just real quick.  If

10:33 12  you tell me right now, "How does he look like," I don't

10:33 13  know.  I never knew him before.

10:33 14    Q.  April of 2001, where were you working?

10:33 15    A.  I was a runner at that time.

10:33 16    Q.  A runner?

10:33 17    A.  A runner.

10:33 18    Q.  What does that mean?

10:33 19    A.  Also an assistant sergeant.  The sergeant at

10:33 20  that time was Armando Tenorio.  He was the sergeant in

10:34 21  charge.  I was the assistant sergeant.  At that time,

10:34 22  that day, I was a runner.  Since he was the one in

10:34 23  charge that day, I was a runner taking him to the

10:34 24  infirmary, bringing inmates back, going -- responding

10:34 25  to floors, responding to the officers that requested

BRYANT & STINGLEY, INC.
McAllen     Harlingen     Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

10:34 1  for one of us to go up there, you know, take care of
10:34 2  problems up there, making sure they got showered or
10:34 3  served lunch, dinner.  Well, that day was dinner.
10:34 4  Transporting inmates back and forth from one facility
10:34 5  to another, DC-II, DC-I, you know, back and forth,
10:35 6  fingerprinting inmates that needed to be fingerprinted.
10:35 7  That was about it.
10:35 8      Q.  On April the 11th and April the 12th of 2001,
10:35 9  what shift were you working?
10:35 10     A.  3:00 to 11:00.
10:35 11     Q.  During the time that you were on that shift, do
10:35 12  you remember in which cell Mr. Longoria was being held?
10:35 13     A.  When I arrived there, he was in single cell #1,
10:35 14  which was --
10:35 15     Q.  Which is what, sir?
10:35 16     A.  The padded cell.
10:35 17     Q.  Okay.  Did you review anything in preparation
10:36 18  for your deposition today?
10:36 19     A.  As far as what, sir?
10:36 20     Q.  Any documents, any statements you made before.
10:36 21     A.  Just my statement.
10:36 22     Q.  Okay.  Do you have that with you, your
10:36 23  statement?
10:36 24     A.  No, sir.
10:36 25     Q.  Okay.  All right.  When did you review that?

10:36 1    Yesterday or this morning?

10:36 2    A.  About one o'clock this morning.

10:36 3    Q.  One o'clock this morning?

10:36 4    A.  Yes, sir.

10:36 5    Q.  Okay.  Did you have it at home?  Or where did

10:37 6    you review it?

10:37 7    A.  I had it with me at work.

10:37 8    Q.  Okay.  Is there any other statements that

10:37 9    you've reviewed?

10:37 10    A.  No, sir.

10:37 11    Q.  All right.  This single cell that you're

10:37 12    talking about, how long, if you know, was Mr. Longoria

10:37 13    in that cell?

10:37 14    A.  From the time I arrived on duty that day, he

10:37 15    was already in there.

10:37 16    Q.  Was there any type of a log or a journal that

10:37 17    was kept on Mr. Longoria while he was in that cell?

10:37 18    A.  No, sir.

10:37 19    Q.  Is there an explanation as to why there wasn't

10:37 20    a log or a journal kept?

10:37 21    A.  No, sir.

10:37 22    Q.  Was there supposed to have been a log or

10:37 23    journal kept on Mr. Longoria while he was in that cell?

10:37 24    A.  There should have been.

10:37 25    Q.  Okay.  Now, my understanding is that this log

19

10:38 1    or journal would typically be kept on a wall next to

10:38 2    the cell door where Mr. Longoria was being held. Would

10:38 3    that be correct?

10:38 4        A.  On the wall or on the door itself.

10:38 5        Q.  Okay. All right. Can you describe the cell

10:38 6    door for me, please, so I can kind of visualize what

10:38 7    the cell door looks like?

10:38 8        A.  On the outside, it's a metal door. You've got

10:38 9    the handle on your right side.

10:38 10       Q.  Yes, sir.

10:38 11       A.  You have a little window about so big, probably

10:38 12   about seven -- 7 X 8, 8 X 8. Not too big. Okay. With

10:38 13   heavy duty glass, thick glass. Then you have right

10:39 14   here on the bottom, you have a tray or a door for a

10:39 15   tray to slide in the trays.

10:39 16       Q.  Okay.

10:39 17       A.  There's a little door. You open it, unlock it,

10:39 18   and slide in the trays. It's brown. That's basically

10:39 19   what it is. It's a big, heavy duty door.

10:39 20       Q.  The glass window pane that you were talking

10:39 21   about that is on the door itself is approximately six

10:39 22   or seven inches in width by six or seven inches in

10:39 23   heighth, approximately?

10:39 24       A.  Around there.

10:39 25       Q.  Okay. Tell me what you remember of Mr. Juan

10:40  1   Longoria, as far as how his behavior was.  What do you
10:40  2   remember about that?
10:40  3       A.  Well, when I arrived on duty, entered the door
10:40  4   and started going towards the briefing area, I could
10:40  5   hear him yelling, calling out names.
10:40  6       Q.  What was he saying, if you can recall?
10:40  7       A.  "Quitate de alli.  Me van a matar.  Jose,
10:40  8   dejame solo."  And, you know, things like that of that
10:41  9   nature.
10:41  10      Q.  Okay.  Perhaps for the benefit of the jury,
10:41  11  could you translate those things for us, please, into
10:41  12  English?
10:41  13      A.  "Leave me alone.  They're going to kill me.
10:41  14  Jose, you know, tell them to leave me alone," basically
10:41  15  what he would yell.
10:41  16      Q.  Okay.  From what your observation was of Mr.
10:41  17  Longoria, was he hallucinating?
10:41  18          MR. VITTITOE:  Objection.  Form.
10:41  19  Speculation.
10:41  20      Q.  From your observation, what do you think was
10:41  21  happening to him?
10:41  22      A.  He was probably upset.  I don't know, sir.
10:41  23      Q.  What was he -- was he yelling at someone inside
10:42  24  the jail cell?  Was he yelling at you outside the jail
10:42  25  cell?  Was he --

10:42 1    A.   Well, when I passed by, he started yelling, so

10:42 2    maybe he got mad because I passed by.  I don't know.

10:42 3    Q.   Okay.  How long did the yelling continue for?

10:42 4    A.   Several hours, sir.  Approximately, I don't

10:42 5    know, four or five hours, six, more.

10:42 6    Q.   So pretty much for your entire shift?

10:42 7    A.   Yes, sir.

10:42 8    Q.   And during the six or seven hours that he was

10:42 9    yelling, was he saying pretty much the same things that

10:42 10   we have just discussed or was he saying other things

10:42 11   that you can recall?

10:42 12   A.   No.  That's basically what he was saying.

10:42 13   Q.   Okay.  At any time during your shift from 3:00

10:43 14   to 11:00, did you or any other detention officer go

10:43 15   inside the cell to see how he was doing?

10:43 16   A.   I never went in.  No, sir.

10:43 17   Q.   All right.  How many other detention officers

10:43 18   were working that shift that you were working at that

10:43 19   particular facility?

10:43 20   A.   About seven or eight.

10:43 21   Q.   Working that same floor?

10:43 22   A.   Well, you got officers that are there -- come

10:43 23   in at a certain time and leave at a certain time.  So

10:43 24   at certain hours, we have more officers, you know, than

10:44 25   our regular shift.  Our regular shift was maybe about

10:44  1    seven officers, but you had more officers there because

10:44  2    you have 8:00 to 5:00, you have 9:00 to 5:00, you have

10:44  3    7:00 to 3:00.

10:44  4        Q.  Overlapping shifts?

10:44  5        A.  Overlapping shifts.

10:44  6        Q.  Okay.  All right.  The facility where Juan

10:44  7    Longoria was at back in April 11th and 12th of 2001,

10:44  8    what is that facility called?

10:44  9        A.  Cameron County jail.

10:44 10        Q.  Is it called the old Cameron County jail?

10:44 11        A.  Now it's called the old county jail.

10:44 12        Q.  Okay.  And what floor was he located on?

10:44 13        A.  First floor.

10:44 14        Q.  Now, who was responsible for the safety of Mr.

10:45 15    Juan Longoria during the 3:00 to 11:00 shift?

10:45 16        A.  What do you mean, sir?

10:45 17        Q.  Well, who was responsible for taking care of

10:45 18    the prisoner on the 3:00 to 11:00 shift?

10:45 19        A.  All -- all the guards that worked.

10:45 20        Q.  Okay.  All the guards that were working that

10:45 21    shift would have been responsible for the safety of Mr.

10:45 22    Juan Longoria?

10:45 23        A.  (Witness nods head.)

10:45 24        Q.  Is that a yes?

10:45 25        A.  Yes.

10:45 1    Q.   Okay.  The reason why I'm asking that question

10:45 2    is because I'm trying to educate myself as to what

10:45 3    y'all's procedures were then.  And I'm trying to equate

10:45 4    it -- for example, my mother is a retired nurse.  When

10:46 5    she's at a hospital, she's assigned certain patients.

10:46 6    Okay.  And for those certain patients that she's

10:46 7    assigned, she's responsible to do certain things in

10:46 8    accordance to what the doctor orders, right?

10:46 9    A.   Yes, sir.

10:46 10   Q.   Okay.  So I'm trying to use that and equate it

10:46 11   to perhaps what y'all do at the detention facility, and

10:46 12   that's my question.  Were guards there on the 3:00 to

10:46 13   11:00 shift assigned certain jail cells or certain

10:46 14   prisoners to make sure that these individuals were

10:46 15   watched, that their safety was attended to, that type

10:46 16   of nature?  And you're saying to me that that's not the

10:46 17   way things were done; is that correct?

10:46 18   A.   No.  Certain officers assigned to not any

10:46 19   particular cell.

10:46 20   Q.   Okay.

10:46 21   A.   Now, you're talking cell block.  That's

10:47 22   different.

10:47 23   Q.   Let's talk about a cell block, then.  Why is

10:47 24   that different?

10:47 25   A.   Because you've got the third floor and you've

24

10:47 1    got the second floor.

10:47 2        Q.  Okay.  So if we have, for example, where Mr.

10:47 3    Juan Longoria was located on -- during the hours from

10:47 4    3:00 to 11:00, all the detention officers that happened

10:47 5    to be there during that time frame of 3 p.m. till 11

10:47 6    p.m. on December -- excuse me, on April the 11th of

10:47 7    2001 would be responsible to make sure that Mr. Juan

10:47 8    Longoria was safe?

10:47 9            MR. VITTITOE:  Do you understand the

10:47 10    question?

10:47 11        A.  Yes, sir.  But --

10:47 12            MR. VITTITOE:  Explain it.

10:47 13        A.  There's different shifts.

10:48 14        Q.  Yes, sir.

10:48 15        A.  So they overlap.  People leave at 5:00, people

10:48 16    leave at 6:00.

10:48 17        Q.  Okay.

10:48 18        A.  So it's not just our shift.

10:48 19        Q.  Correct.  Now, so -- as I understand your

10:48 20    response, then, and see -- see if I'm saying this

10:48 21    correctly.  Okay.  If I'm on duty sometime during the

10:48 22    hours between 3 p.m. and 11 p.m., okay, while I'm there

10:48 23    on duty, even if I knock off at five o'clock, assuming

10:48 24    I knock off at five o'clock, I'm done with my shift, I

10:48 25    would still be responsible for the safety of prisoners

25

10:48  1    while I'm on duty during that time?

10:48  2       A.   Yes, sir.

10:48  3       Q.   Okay.  And as things worked back in April of

10:48  4    2001 at this Cameron County jail facility, no

10:48  5    particular detention officer was responsible for a

10:48  6    specific jail cell or a specific location within that

10:49  7    cell block.  Is that also true?

10:49  8       A.   True.

10:49  9       Q.   Okay.  All right.  Now, as far as you know,

10:49 10    while someone like Juan Longoria is in there in that --

10:49 11    in that, what we call "padded cell," right, what are

10:49 12    the detention officers supposed to do?  Are they

10:49 13    supposed to simply peek in the window and see if he's

10:49 14    okay?  Or is there a policy and procedure where they're

10:49 15    supposed to occasionally go inside and check him to see

10:49 16    what he's doing?  Or is there any procedure at all?

10:50 17             MR. VITTITOE:  Do you understand the

10:50 18    question?

10:50 19       A.   Not really.

10:50 20       Q.   Okay.  Well, during the time that Juan Longoria

10:50 21    was inside of this particular cell, is there a policy

10:50 22    or procedure there at the Cameron County Sheriff's

10:50 23    Department where the detention officers would

10:50 24    occasionally go in to see how the man was doing,

10:50 25    something more than just looking inside the window?

10:50 1    A.   No, sir.  Unless he has to go to the restroom,

10:50 2  then we'd take him out to the restroom.

10:50 3    Q.   Okay.  During the time frame that Mr. Longoria

10:51 4  was yelling or screaming for the six or seven hours, do

10:51 5  you know whether or not anyone called a nurse to come

10:51 6  check on this man?

10:51 7    A.   No, sir.

10:51 8    Q.   When you have a situation, such as Mr. Juan

10:51 9  Longoria, and the situation being he's there in the

10:51 10  padded cell, okay, who makes the determination as to

10:51 11  whether or not medical -- medical attention is needed

10:51 12  for this individual?

10:51 13    A.   Well, the medical staff will have to check him

10:51 14  out, but --

10:52 15    Q.   Well, if the medical -- I'm assuming the

10:52 16  medical staff is not present there where Mr. Longoria

10:52 17  is situated in this jail cell; is that true?  They're

10:52 18  not there.  The medical staff is not there.  Is that

10:52 19  true?

10:52 20    A.   True.

10:52 21    Q.   Okay.  So if you see a prisoner that you think

10:52 22  needs medical attention, then what do you do?

10:52 23    A.   If I see he needs medical attention, then I'll

10:52 24  advise my supervisor.

10:52 25    Q.   Okay.  And your supervisor would call the nurse

10:52 1   or whomever?

10:52 2       A.   Yes, sir.

10:52 3       Q.   All right.  As best as you can recall,

10:53 4   approximately, how many times did you find yourself

10:53 5   looking inside the window concerning Mr. Juan Longoria?

10:53 6       A.   About several times, sir, throughout my shift.

10:53 7       Q.   Okay.  Did you make any written documentation

10:53 8   or notation as to how he was doing during those time

10:53 9   periods?

10:53 10      A.   No, sir.

10:53 11      Q.   What time are meals served?  If you know, when

10:53 12  did Mr. Longoria get fed?

10:53 13      A.   I don't know when he got fed.  The meal times

10:53 14  back then were from between 4:00 and 5:00, 4:00 and

10:54 15  6:00.

10:54 16      Q.   Okay.  And who would issue the meal trays to

10:54 17  the various prisoners?

10:54 18      A.   Whoever was around that had the key to open the

10:54 19  door for the individual and whenever dinner was being

10:54 20  served.

10:54 21      Q.   Okay.  How do we know that Mr. Longoria was

10:54 22  served a meal?  Is there any documentation?

10:54 23      A.   No, sir.  I don't recall.

10:54 24      Q.   All right.  Is it someone besides the detention

10:54 25  officers that actually serves the meals to the

28

| | | |
|---|---|---|
| 10:54 | 1 | prisoners or do the detention officers serve the meals |
| 10:54 | 2 | to the prisoners? |
| 10:54 | 3 | A.  The trustees are the ones that hand it to them. |
| 10:54 | 4 | Q.  Okay. |
| 10:54 | 5 | A.  And with the officer supervising. |
| 10:54 | 6 | Q.  All right.  In Mr. Longoria's case, since he |
| 10:55 | 7 | was in this padded cell, would the trustee have to get |
| 10:55 | 8 | a detention officer to unlock, I guess, a panel in |
| 10:55 | 9 | order to slide the food through to Mr. Longoria? |
| 10:55 | 10 | A.  Yes, sir. |
| 10:55 | 11 | Q.  Okay.  And we don't have any log or journal |
| 10:55 | 12 | noting whether or not he got served? |
| 10:55 | 13 | A.  No, sir. |
| 10:55 | 14 | Q.  Okay.  Now, are you familiar with the term |
| 10:55 | 15 | "commitment papers?" |
| 10:55 | 16 | A.  Yes, sir. |
| 10:55 | 17 | Q.  When commitment papers accompany a prisoner, |
| 10:55 | 18 | such as Mr. Longoria, to the Cameron County jail |
| 10:55 | 19 | facility, where do those commitment papers go? |
| 10:55 | 20 | A.  When they're brought in from a different |
| 10:55 | 21 | agency, they're given to the booking officer. |
| 10:56 | 22 | Q.  Okay.  And what does the booking officer do |
| 10:56 | 23 | with them? |
| 10:56 | 24 | A.  They review them, see what charges he has, see |
| 10:56 | 25 | what other papers come -- come along with them. |

10:56 1    Q.   Okay.   Are you familiar with the term "medical

10:56 2  release?"

10:56 3    A.   Yes, sir.

10:56 4    Q.   Okay.   Tell me what is meant by a medical

10:56 5  release as you understand it.

10:56 6    A.   When any agency takes a prisoner to a hospital

10:56 7  and they are released from the hospital, they are to

10:56 8  come back with a medical release saying they're cleared

10:56 9  to go back to the jail or he's medically released.

10:56 10 That paper is brought along with the commitment or the

10:56 11 warrant or whatever papers they bring along with them.

10:56 12   Q.   Okay.   If a prisoner comes with a medical

10:57 13 release, does that medical release information

10:57 14 accompany the prisoner when he's in a cell -- assigned

10:57 15 to a particular cell block?   Or how do you know

10:57 16 yourself if you're working on the floor with these

10:57 17 prisoners that one of them had in the past some form of

10:57 18 medical attention?

10:57 19   A.   When those papers are brought in, they're given

10:57 20 to the booking officer.   From there, the booking

10:57 21 officer will give them to the classifications or

10:57 22 they'll use them there.

10:57 23   Q.   With the classification officer?

10:57 24   A.   With the classifications to -- to let them

10:57 25 know, and they'll advise the medical staff.   When they

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

10:57 1   come in with a medical release, they have to advise the

10:58 2   medical staff.

10:58 3        Q.   Okay.   That's a must.

10:58 4        A.   Uh-huh.

10:58 5        Q.   Is that a yes?

10:58 6        A.   Yes, sir.

10:58 7        Q.   Okay.   All right.   And then what does the

10:58 8   medical staff do, if you know?

10:58 9        A.   They'll review them.

10:58 10       Q.   Okay.   When you're talking about the medical

10:58 11  staff, you're referring to a nurse or a doctor; is that

10:58 12  correct?

10:58 13       A.   Yes, sir.   On that medical release, once the --

10:58 14  the supervisor, whoever is on duty gets it with that

10:58 15  medical release, you know, that means that the officer

10:58 16  is okay that -- they can say that, "All right.   He came

10:58 17  in with a medical release," and from there, they just

10:59 18  start following procedures.

10:59 19       Q.   If you are working -- I'm going to call it on

10:59 20  the floor of a particular cell block, how would you be

10:59 21  aware that a particular individual had some form of a

10:59 22  medical release?   Is it noted inside a computer system?

10:59 23  Is it noted on some form of a log or a journal so that

10:59 24  you're informed that this guy came in with some prior

10:59 25  medical problems?   How do you know that?

10:59　1　　A.　On that -- on any particular day, sometimes

10:59　2　they'll advise us during the brief that certain people

10:59　3　came in with med- -- a medical release.  That means

11:00　4　they were taken to the hospital and they came back with

11:00　5　a medical release.  So that's when we'll know.

11:00　6　　Q.　So there's a briefing that's done when you take

11:00　7　over a shift is what you're telling me?

11:00　8　　A.　Uh-huh.

11:00　9　　Q.　Okay.  So at that point in time, you're

11:00　10　supposed to be advised as to whether or not a prisoner

11:00　11　has some form of a medical release?

11:00　12　　A.　Yes.

11:00　13　　Q.　Okay.  Do you actually have a copy of a medical

11:00　14　release itself or are you just told orally that this

11:00　15　particular prisoner --

11:00　16　　A.　No, we were told orally.

11:00　17　　Q.　Okay.

11:00　18　　　　　MR. VITTITOE:  Can we take a break?

19　　　　　MR. VALDEZ:  Sure.

20　　　　　　　(Off record.)

11:21　21　　　　　　(Exhibit 1 marked.)

11:25　22　　Q.　Mr. Hernandez, were you present when Mr.

11:25　23　Longoria was found dead?

11:25　24　　A.　No, sir.

11:25　25　　Q.　Okay.  When you left your shift at 11 o'clock

11:25  1  on the evening of April the 11th of 2001, how do you

11:25  2  remember the condition of Mr. Longoria being, if you

11:25  3  can recall?

11:25  4      A.  Well, it was around 10:45, we were going to the

11:25  5  briefing room to debrief the other shift of the

11:25  6  activities of that day.  But when I was going over

11:25  7  there, I'd looked into the window and I saw him sitting

11:26  8  down with his thumbs -- with his hands on his stomach

11:26  9  twiddling his thumbs and moving his legs in a nervous

11:26 10  position and mumbling at the same time, just mumbling

11:26 11  and mumbling and doing this number.

11:26 12      Q.  Did -- were you able to hear exactly what he

11:26 13  was saying?  Or you could just notice he was talking,

11:26 14  but you didn't know what he was saying?

11:26 15      A.  I could hear him mumbling, talking, but I

11:26 16  couldn't understand what he was saying.

11:26 17      Q.  Okay.  Did you open the door at that time to go

11:26 18  inside?

11:26 19      A.  No, sir.

11:26 20      Q.  Do you know of anyone else that went by to

11:26 21  check on Mr. Longoria during the eight hour shift that

11:27 22  you were on?

11:27 23      A.  Well, the other officers that worked that floor

11:27 24  monitored or probably saw him, as well.

11:27 25      Q.  But you don't know for certain?

11:27 1    A.  No, sir.

11:27 2    Q.  Okay.  In front of you, sir, is an exhibit

11:27 3 which I believe is probably marked Xavier Hernandez

11:27 4 Exhibit No. 1.

5    A.  Yes, sir.

11:27 6    Q.  Do you see that?

11:27 7    A.  Yes, sir.

11:27 8    Q.  What is that?

11:27 9    A.  It's a statement I gave to Mr. Zamorano.

11:27 10   Q.  Okay.  Concerning the Juan Longoria matter?

11:27 11   A.  Yes, sir.

11:28 12   Q.  Now that we're sitting here, is what you have

11:28 13 stated in this affidavit true and correct?

11:28 14   A.  Yes, sir.

11:28 15   Q.  Is there anything in this affidavit that you

11:28 16 wish to change or add to?

11:28 17   A.  No, sir.

11:28 18   Q.  The next to the last statement of your

11:28 19 affidavit says, "This inmate was yelling and tapping on

11:28 20 the wall throughout my shift."  Do you see that?

11:29 21   A.  Yes, sir.

11:29 22   Q.  Okay.  When you say "Tapping on the wall," was

11:29 23 he -- you want to use the word "banging" on the wall or

11:29 24 was he just tapping, lightly tapping?  What was he

11:29 25 doing when you say, "Tapping?"

11:29 1    A.   Pounding.

11:29 2    Q.   More pounding on the wall?

11:29 3    A.   Pounding.

11:29 4    Q.   Was he pounding on the door?  Was he pounding

11:29 5    on the wall?  What was he doing?

11:29 6    A.   I really don't know if he was pounding on the

11:29 7    wall or door, but you could hear it.

11:29 8    Q.   Do you know whether or not he was hitting his

11:29 9    head against the wall?

11:29 10   A.   No, sir.  I never saw that.

11:29 11   Q.   Is there a urinal inside of this padded cell

11:29 12   where Mr. Longoria was located?

11:30 13   A.   There's a hole in the ground that -- that they

11:30 14   use to urinate in.

11:30 15   Q.   Okay.  Did you ever see him hitting his head

11:30 16   against the floor, against the urinal grate?

11:30 17   A.   No, sir.

11:30 18   Q.   Mr. Hernandez, I'm going to hand you what has

11:30 19   been previously marked as Mr. Lopez Exhibit No. 4 and

11:30 20   ask if you can identify that for us, please.

11:30 21             MR. VITTITOE:  What was the statement

11:30 22   marked as?

11:30 23             MR. VALDEZ:  Hernandez Exhibit No. 1.

24             MR. VITTITOE:  Thank you.

11:30 25             MR. VALDEZ:  This one here?

11:30  1          MR. VITTITOE:  Yes.

11:30  2      A.  What was this?

11:30  3      Q.  I was going to ask you, have you ever seen what

11:30  4  has been marked as Lopez Exhibit No. 4 before?

11:30  5      A.  No, sir, I didn't see it.

11:30  6      Q.  Okay.  Do you know whether or not that appears

11:31  7  to you as being a medical release?

11:31  8      A.  Yes, sir.

11:31  9      Q.  Okay.  Now, what is marked as Lopez Exhibit No.

11:31  10  4, is that a -- a medical release, something like that,

11:31  11  would that typically accompany a prisoner when he's

11:31  12  assigned to a particular cell block?

11:31  13      A.  No, sir, not to where everybody can see it.

14  No.

11:31  15      Q.  Okay.  My next question for you is, before

11:31  16  April the 10th -- or excuse me, before April the 12th

11:32  17  of 2001, are you aware of anyone else who has died as a

11:32  18  prisoner in the Cameron County jail?

11:32  19      A.  Yes, sir.

11:32  20      Q.  Okay.  When and under what circumstances?

11:32  21      A.  I don't know the circumstances, but what I

11:32  22  heard, that he was in the drunk tank.

11:32  23      Q.  Okay.

11:32  24      A.  He slashed his throat from one side to the

11:32  25  other, that was all.

11:32 1    Q.  When did that happen?  Do you know?

11:32 2    A.  I don't recall, sir.

11:32 3    Q.  But it was before April the 12th of 2001?

11:32 4    A.  Yes, sir.

11:32 5    Q.  And do you know, was it when Sheriff Cantu was

11:33 6    in office or was it before Sheriff Cantu taking office?

11:33 7    A.  I believe it occurred on Lucio's

11:33 8    administration.  I'm not really sure, sir.

11:33 9    Q.  Okay.  Did you have any involvement in that

11:33 10   matter?

11:33 11   A.  No, sir.

11:33 12   Q.  Was your deposition ever taken concerning that

11:33 13   matter?

11:33 14   A.  No, sir.

11:33 15   Q.  Was any statements given by you concerning that

11:33 16   matter?

11:33 17   A.  No, sir.

11:33 18   Q.  Have you ever had your deposition taken before?

11:33 19   A.  No, sir.

11:33 20   Q.  Is it your first one?

11:33 21   A.  Yes, sir.

11:33 22   Q.  Okay.  As far as dealing with people who are

11:33 23   intoxicated or dealing with drunks, is that something

11:33 24   as a detention officer at the Cameron County jail that

11:33 25   you do on a daily basis?

11:35 1    A.   Sweats.   And they tell us, "I want more beer,

11:35 2  alcohol," things like that.

11:35 3    Q.   Okay.   How about -- do you know whether

11:35 4  hallucinating is a form or sign or symptom of alcoholic

11:35 5  withdrawal?

11:36 6    A.   Yes.

11:36 7    Q.   How did you find out that Juan Longoria had

11:36 8  died in the jail cell?

11:36 9    A.   I was called at home and told that he was -- he

11:36 10  was dead, that he died during the night.

11:36 11    Q.   Okay.   Did anyone tell you what the approximate

11:36 12  time of his death was?

11:36 13    A.   When they advised me, no.

11:36 14    Q.   Who actually found him in the jail cell dead?

11:36 15    A.   11:00 to 7:00 shift.

11:36 16    Q.   And do you know who the individuals were?

11:36 17    A.   Sergeant -- what's his name?   Mendietta.

11:37 18    Q.   Okay.   Is Sergeant Mendietta still with the

11:37 19  Cameron County Sheriff's Department?

11:37 20    A.   I don't know, sir.   I haven't seen him.

11:37 21    Q.   All right.   Do you know what time he found him

11:37 22  in the cell?

11:37 23    A.   No, sir.

11:37 24    Q.   Okay.   Were you called in the middle of the

11:37 25  night or were you called the next -- say the next

11:37  1    morning about the death of Juan Longoria?

11:37  2        A.   I believe they attempted to call me during the

11:37  3    night, but I was fast asleep.  I got home that night

11:37  4    and I took some NyQuil, because I was sick, and I went

11:37  5    to sleep.  Didn't find out till I woke up about

11:37  6    seven-something that they told me that they were

11:37  7    calling from work.

11:37  8        Q.   Okay.  How did the rumors start that he was

11:38  9    murdered there at the jail cell?

11:38  10       A.   I don't know, sir.

11:38  11       Q.   Have you talked to anybody that said, "I

11:38  12   believe that Mr. Longoria died as a result of a choke

11:38  13   hold?"

11:38  14       A.   I heard about it.

11:38  15       Q.   Where did you hear it from?

11:38  16       A.   You know, through -- later on, you know, maybe

11:38  17   a couple of days afterwards, just -- I don't know by

11:38  18   whom, but I can't specifically say who, but I, you

11:38  19   know -- I heard about it.

11:38  20       Q.   Okay.  If anyone was to go inside of the jail

11:39  21   cell of Juan Longoria, is there any type of

11:39  22   documentation or log or journal that would reflect that

11:39  23   a detention officer would go -- would go inside that

11:39  24   cell?

11:39  25       A.   No, sir.

11:39  1      Q.   Okay.  Now, we were talking earlier about a

11:39  2   journal that would normally be placed on the door next

11:39  3   to where Juan Longoria was housed, correct?

11:39  4      A.   Yes, sir.

11:39  5      Q.   And that wasn't done?

11:39  6      A.   Yes, sir.

11:39  7      Q.   Okay.  Is there another log or journal that's

11:39  8   kept somewhere else in that cell block area like in an

11:39  9   office where maybe y'all would have your briefings

11:39 10   done?  I'm just curious.  Is there -- would there be

11:39 11   two journals or two logs, one for the specific prisoner

11:39 12   and then another one, a general log?

11:40 13      A.   No, sir.  I just know about the one for him,

11:40 14   you know, for people placed in that cell.

11:40 15      Q.   Okay.  When y'all had the shift change at

11:40 16   10:45, who gave the briefing to the next shift, for the

11:40 17   11:00 to 7:00 shift?

11:40 18      A.   Sergeant Tenorio.

11:40 19      Q.   Okay.  Were you present when the shift change

11:40 20   was done and that briefing was conducted?

11:40 21      A.   Yes, sir, for part of the briefing.  I was

11:40 22   there for the beginning, but then I had to back out and

11:40 23   come back, so I was --

11:40 24      Q.   In and out?

11:40 25      A.   In and out.

11:40  1       Q.  Mr. Hernandez, you've had an opportunity to

11:40  2  look at what has been marked as Elizarde Exhibit No. 1,

11:41  3  which is entitled, "The Health Services of Cameron

11:41  4  County Jail Protocols."  Is that correct?

11:41  5       A.  Yes, sir.

11:41  6       Q.  Have you seen this document before?

11:41  7       A.  No, sir.  I do not recall.

11:41  8       Q.  During your years with the Cameron County jail

11:41  9  detention facilities, have you had any type of training

11:41 10  seminars or in-service concerning the various matters

11:41 11  that are discussed in this Exhibit No. 1 with --

11:41 12  Elizarde Exhibit No. 1?

11:41 13            MR. VITTITOE:  Let me just object.  Overly

11:41 14  broad.  Can you be more specific, because he hasn't

11:41 15  ever seen the document, hasn't read the document.  He

11:41 16  doesn't know what's in the document.

11:41 17       Q.  Okay.  Over your years of being with the

11:41 18  Cameron County Sheriff's Department detention

11:41 19  facilities, have you had any types of in-service

11:41 20  meetings that deals with various medical conditions

11:42 21  that are discussed in this Exhibit No. 1 entitled

11:42 22  Elizarde Exhibit No. 1?

11:42 23            MR. VITTITOE:  Again I object.  Overly

11:42 24  broad.  Can you be more specific?

11:42 25       A.  I've never seen that, so I don't know what's in

11:42 1    there, sir.

11:42 2        Q.  Okay.  Well, let me be more specific for you,

11:42 3    then.  Let me sit here next to you, because I like you.

4            MR. VITTITOE:  Make sure you get that on

11:42 5    the record.  I'm starting to get worried.  Xavier, you

11:42 6    better get worried.  When a lawyer sits close to you,

7    look out.

11:42 8            MR. VALDEZ:  I'm sitting between the

11:42 9    defense counsel and Mr. Hernandez here, put that on the

11:42 10   record, too.

11:42 11           MR. VITTITOE:  I'm getting worried.

11:42 12           THE WITNESS:  Yeah.

11:42 13       Q.  All right.  Here we are.  We've been talking

11:43 14   about El- -- Elizarde Exhibit No. 1, correct?

11:43 15       A.  Yes, sir.

11:43 16       Q.  And that's entitled, "Health Services of

11:43 17   Cameron County Jail Protocols."  Do you see that?

11:43 18       A.  Yes, sir.

11:43 19       Q.  Okay.  And in this exhibit, it talks about

11:43 20   various medical conditions.  Do you see that on the

11:43 21   table of contents?

11:43 22       A.  Yes, sir.

11:43 23       Q.  Okay.  All right.  And in this table of

11:43 24   contents, it talks about various -- it says

11:43 25   cardiorespiratory conditions, gastrointestinal

11:43 1  conditions.  What is that?  Ophthalmic conditions,

11:43 2  otologic conditions, nose, neurologic and psychiatric

11:43 3  conditions.  Do you see that?

11:43 4      A.  Yes, sir.

11:44 5      Q.  Okay.  And it's goes on to even talk about

11:44 6  cough, colds and flu, neurological problems.  What else

11:44 7  has it got?  Skin problems, musco- -- musculoskeletal

11:44 8  problems, metabolic problems.  Do you see that?

11:44 9      A.  Yes, sir.

11:44 10     Q.  Okay.  My question to you is, in your 13 years

11:44 11 of being with the Cameron County Sheriff's Department

11:44 12 detention facilities, has -- have you ever been exposed

11:44 13 to any type of in-service meetings or training

11:44 14 concerning these various medical conditions?

11:44 15     A.  No, sir.

11:44 16     Q.  During your 13 or so years with the Harris

11:44 17 County Sheriff Department detention facilities --

11:44 18     A.  Cameron.

11:44 19     Q.  Excuse me.  Excuse me.  During your 13 years

11:44 20 with the Cameron County Sheriff's Department detention

11:45 21 facilities, have you ever had any form of in-service

11:45 22 meetings or training concerning alcohol withdrawal?

11:45 23     A.  I can recall something that -- I mean, I don't

11:45 24 recall it was related to that.

11:45 25     Q.  And when was that and how long ago?

11:45 1     A.   Probably a couple of years ago.  It was a quick

11:45 2  thing, like 20 minute, 15 minute.  It wasn't even a

11:45 3, course.  It was just a person that specializes in

11:45 4  things like that, so it was briefly about 15, 20 -- 25

11:45 5  minute thing.

11:46 6     Q.   Was there a sign-in sheet for that meeting?

11:46 7     A.   No, sir.

11:46 8          MR. VALDEZ:  That's all the questions I

11:46 9  have, Mr. Hernandez.  Thank you.

11:46 10         MR. VITTITOE:  Let me ask a few questions.

11:46 11         MR. VALDEZ:  Do you want to sit next to

11:46 12 him?

11:46 13         MR. VITTITOE:  Why don't you come over

11:46 14 here.

15                       EXAMINATION

16  BY MR. VITTITOE:

11:46 17    Q.   Just to clarify, you're not trained as a

11:46 18 medical doctor?

11:46 19    A.   No, sir.

11:46 20    Q.   You're trained as a detention officer, right?

11:46 21    A.   Yes, sir.

11:46 22    Q.   Isn't it true that if you see someone that's in

11:46 23 need of medical assistance at the jail, you're trained

11:46 24 to notify the nursing personnel to check?

11:46 25    A.   Yes, sir.

11:46  1     Q.   And one of the conditions that you have

11:46  2     observed is -- and know of is alcohol withdrawal,

11:46  3     correct?

11:46  4     A.   Yes, sir.

11:46  5     Q.   And you've learned that through your experience

11:46  6     that one of the symptoms is sweating, correct?

11:46  7     A.   Yes, sir.

11:46  8     Q.   And as I understood your testimony, many times

11:47  9     the inmate or the prisoner will tell you they're having

11:47  10    alcohol withdrawal?

11:47  11    A.   Yes, sir.

11:47  12    Q.   And in that particular case, what do you do?

11:47  13    Do you notify the nurse?

11:47  14    A.   We'll notify the nurse and we'll let her know

11:47  15    that he's advising us that he's having withdrawals.

11:47  16    Q.   If somebody is bleeding, when you see bleeding,

11:47  17    do you advise the nurse?  Is that practice?

11:47  18    A.   Yes, sir.

11:47  19    Q.   If someone is admitted to the jail and

11:47  20    complains of physical injury that requires medical

11:47  21    attention, are you trained to advise the nurse?

11:47  22    A.   Yes, sir.

11:47  23    Q.   The Cameron County Jail Division Operation

11:47  24    Plan, Exhibit No. 2, as I recall your testimony, you've

11:48  25    seen before several years before; am I correct?

11:48  1      A.   Yes, sir.

11:48  2      Q.   I don't want to take the time, but if we go

11:48  3   through that, it's basically a statewide procedure

11:48  4   concerning how to handle inmates.  And, for example, it

11:48  5   tells you how to do searches, it tells you how to book,

11:48  6   it tells you an inmate -- how to log in mental or

11:48  7   suicide patients.  Is that the sort of information that

11:48  8   you receive at your basic jail academy and throughout

11:48  9   the seminar courses that you receive from time to time?

11:48 10      A.   Yes, sir.

11:48 11      Q.   And in addition, my understanding is that each

11:48 12   shift, there's also briefings?

11:48 13      A.   Yes, sir.

11:48 14      Q.   And that's where you're informed about the

11:48 15   condition of certain inmates and placement of certain

11:48 16   inmates and problem inmates, et cetera?

11:48 17      A.   Yes, sir.

11:48 18      Q.   That's the time that you receive or communicate

11:49 19   the most recent information about -- about situations,

11:49 20   correct?

11:49 21      A.   Yes, sir.

11:49 22      Q.   One of the other things I want to clarify.  My

11:49 23   understanding is -- is you remember back in April of

11:49 24   2001 when you arrived at this shift, you were told

11:49 25   about why Juan Longoria was in the single padded cell;

am I correct?

    A.  Yes, sir.

    Q.  And what were you told, just for the record, at the shift change?

    A.  That when he was brought in and after he was changed, he was placed in a large holding cell where he got into a confrontation with other inmates and he couldn't be anywhere else, so for his own safety and the safety of others, he was placed in a padded cell, a single cell.

    Q.  And the single padded cell is not used to punish an inmate, is it?

    A.  No, sir.

    Q.  It's used to place an inmate who may be in danger to himself or danger to others; am I correct?

    A.  Yes, sir.

    Q.  Is there any other -- at that time at the Cameron County jail, was there any other space that you could put an inmate that was a danger to himself or a danger to others?

    A.  No, sir.

    Q.  And whenever an inmate was put in a single padded cell, was it your understanding based on your training, experience, that there was to be an activity log maintained?

11:50 1      A.  Yes, sir.

11:50 2      Q.  And, in fact, that activity log is -- is

11:50 3  referenced as part of your training as a detention

11:50 4  officer?

11:50 5      A.  Yes, sir.

11:50 6      Q.  And, in fact, you knew that way before April of

11:50 7  2001; am I correct?

11:50 8      A.  Yes, sir.

11:50 9      Q.  Would it surprise you that that -- that

11:50 10 requirement is in Exhibit No. 2, which is the Jail

11:51 11 Division Operation Plan?  Wouldn't surprise you, would

11:51 12 it?

11:51 13     A.  No, sir, it wouldn't.

11:51 14     Q.  In fact, inmates that are in the single padded

11:51 15 cell are to be mon- -- monitored at certain levels, 30

11:51 16 minute or 15 minute or continuous, as the case may be,

11:51 17 correct?

11:51 18     A.  Yes, sir.

11:51 19     Q.  Now, that particular decision is made by the

11:51 20 nurse; am I correct?

11:51 21     A.  Yes, sir.

11:51 22     Q.  Is that your understanding based on your

11:51 23 experience and training?

11:51 24          MR. VALDEZ:  Objection.  Leading the

11:51 25 witness.

11:51  1      Q.  Let me just ask you, is that your knowledge

11:51  2   based on your training?

11:51  3      A.  Yes, sir.

11:51  4      Q.  And is that referenced on page 25 of the

11:51  5   Cameron County Jail Operation Plan under "Supervision?"

11:52  6           MR. VALDEZ:  Craig, you might have him

11:52  7   reference the Exhibit No. 2 that he's reading from.

11:52  8      Q.  So, in other words, Exhibit No. 2 references

11:52  9   the monitoring of an inmate that is in a single padded

11:52 10   cell?

11:52 11      A.  Yes, sir.

11:52 12           MR. VALDEZ:  That's Elizarde Exhibit No.

11:52 13   2.

11:52 14      Q.  Elizarde Exhibit No. 2, which is entitled,

     15   "Cameron County Sheriff's Department Jail Division

11:52 16   Operation Plan."  Throughout the years, have you

11:52 17   attended training seminars that have been sponsored by

11:52 18   TCLEOSE and/or the Texas Jail Standards Commission?

11:52 19      A.  Yes, sir.

11:52 20      Q.  One of the other things I wanted to clarify is,

11:53 21   after you got your briefing on this particular shift

11:53 22   and you were told that this man was in the single

11:53 23   padded cell for his -- for the protection of himself,

11:53 24   my understanding is, you told us that you recall him

11:53 25   saying certain things in Spanish, correct?

11:53 1    A.  Yes, sir.

11:53 2    Q.  And you also translated that for the record

11:53 3  into English; am I correct?

11:53 4    A.  Yes, sir.

11:53 5    Q.  And my understanding is those statements would

11:53 6  be made as you would walk by or look by into the --

11:53 7  into the viewing window; is that true?  Or was he doing

11:53 8  this all the time?

11:53 9    A.  He was doing that all the time.

11:53 10    Q.  Was he doing that constantly for several hours?

11:53 11    A.  Yes.

11:53 12    Q.  Would it -- would it stop and then would it

11:53 13  come back up?  Or what was going on?

11:53 14    A.  He would stop in intervals, and he would start

11:53 15  up again.

11:53 16    Q.  Do you know what would cause him to start up

11:53 17  again?

11:53 18    A.  No, sir.

11:53 19    Q.  Did he ever ask you for assistance at any time?

11:53 20    A.  No, sir.

11:53 21    Q.  Would you have been able to know -- know if he

11:53 22  was trying to get some assistance?

11:54 23    A.  If he had said something, yes.

11:54 24    Q.  Okay.  But he never did?

11:54 25    A.  No, sir.

11:54 1    Q.   Okay.  So, in other words, if an inmate is

11:54 2  inside the padded cell, he can communicate with you if

11:54 3  he wants to.

11:54 4    A.   Yes, sir.

11:54 5    Q.   Now, another thing for -- for people that are

11:54 6  out and going to be trying this lawsuit that are not

11:54 7  experienced in jail operations or have never spent any

11:54 8  time in a jail as an inmate or otherwise.  Is it -- is

11:54 9  it true that a jail is a very active place, there's a

11:54 10  lot of activity going on all the time?

11:54 11    A.   Yes, sir.

11:54 12    Q.   And isn't it true that there's a lot of noise

11:54 13  in the jail a lot of time?

11:54 14    A.   Yes, sir.

11:54 15    Q.   Isn't it true that you have different sorts of

11:54 16  people in the jail that have different personality

11:54 17  characteristics?

11:54 18    A.   Yes, sir.

11:54 19    Q.   Isn't it true that you have people that are

11:54 20  quiet?

11:54 21    A.   Yes, sir.

11:54 22    Q.   Isn't it true that you have people that are

11:55 23  loud?

11:55 24    A.   Yes, sir.

11:55 25    Q.   Isn't it true that you have people that are

11:55  1    very, very verbal and verbally abusive?

11:55  2        A.  Yes, sir.

11:55  3        Q.  Isn't it true that you have violent people in

11:55  4    the jail?

11:55  5        A.  Yes, sir.

11:55  6        Q.  Isn't it true that you have individuals that

11:55  7    are not violent that are very sensitive to being abused

11:55  8    by the inmates?

11:55  9        A.  Yes, sir.

11:55  10       Q.  So you have all types of people?

11:55  11       A.  Yes, sir.

11:55  12       Q.  Isn't it true that -- that many of the inmates

11:55  13   that are in the jail are -- appear to you as a person

11:55  14   to be mentally ill?

11:55  15       A.  Yes, sir.

11:55  16       Q.  Isn't it true that you have people that come

11:55  17   into the jail that require medical attention?

11:55  18       A.  Yes, sir.

11:55  19       Q.  Isn't it true that those -- whenever you know

11:55  20   that there's a medical condition, that you are to

11:55  21   advise the medical staff?

11:55  22       A.  Yes, sir.

11:55  23           MR. VALDEZ:  Objection.  Leading the

24   witness.

11:55  25       Q.  Is that your understanding?

11:56  1    A.  Yes, sir.

11:56  2    Q.  Had you have known that Mr. Longoria had a

11:56  3  medical condition during his incarceration at the

11:56  4  Cameron County jail, what would you have done?

11:56  5    A.  Advised the medical staff.

11:56  6    Q.  Okay.  Is that what you're trained to do?

11:56  7    A.  Yes, sir.

11:56  8    Q.  Is that what the policy say that you're to do?

11:56  9    A.  Yes, sir.

11:56 10    Q.  And hasn't that been your practice in the past

11:56 11  with other inmates when you know of a medical

11:56 12  condition?

11:56 13    A.  Yes, sir.

11:56 14    Q.  Do you -- do you pretty much attend TCLEOSE or

11:56 15  Jail Standard Commission seminars on a yearly basis?

11:56 16    A.  Yes, sir.

11:56 17    Q.  And not only do you do that, but you -- you --

11:56 18  as I understand it, you -- you went to a law

11:56 19  enforcement academy --

11:56 20    A.  Yes, sir.

11:56 21    Q.  -- early in your career?

11:56 22    A.  Yes, sir.

11:56 23    Q.  And then you also went to the jailer's school?

11:57 24    A.  Yes, sir.

11:57 25    Q.  Where did you attend the jailer's school --

11:57  1    A.  At -- .

11:57  2    Q.  -- back in 1990?

11:57  3    A.  There at the DC-No.  I there in a classroom that

11:57  4    they have.

11:57  5    Q.  And you were certified by TCLEOSE --

11:57  6    A.  Yes, sir.

11:57  7    Q.  -- at that time?  Would you tell the ladies and

11:57  8    gentlemen of the jury what TCLEOSE is to your

11:57  9    understanding?

11:57  10    A.  Texas Commission on Jail Standards -- it's --

11:57  11    Q.  Are they the agency that basically certifies

11:57  12    the qualifications of jail detention officers in the

11:57  13    State of Texas?

11:57  14    A.  Yes, sir.  That's where you get your license

11:57  15    from.

11:57  16    Q.  And they're the ones that monitor the

11:57  17    continuing education standards?

11:57  18    A.  Yes, sir.

11:57  19    Q.  Is it your understanding that information

11:57  20    concerning your attendance and your course attendance

11:57  21    and your course passing is maintained by TCLEOSE?

11:57  22    A.  Yes, sir.

11:57  23    Q.  So you or someone wanted to check up on your

11:57  24    background and your course attendance, that information

11:58  25    is available from TCLEOSE, isn't it?

| | | |
|---|---|---|
| 11:58 | 1 | A. Yes, sir. |
| 11:58 | 2 | MR. VITTITOE: Pass the witness. |
| | 3 | EXAMINATION |
| | 4 | BY MR. VALDEZ: |
| 11:58 | 5 | Q. Mr. Hernandez, I was looking at this document |
| 11:58 | 6 | marked as Elizarde Exhibit No. 2 entitled, "Cameron |
| | 7 | County Sheriff's Department Jail Division Operation |
| 11:58 | 8 | Plan." And on page 24, it talks about mental |
| 11:58 | 9 | disabilities, suicide prevention plan, and it says |
| 11:58 | 10 | something about objective here. |
| 11:58 | 11 | MR. VITTITOE: Say that again, Counsel. |
| 11:58 | 12 | What was that? Says something about what? |
| 11:58 | 13 | Q. The objective. The objective. And the |
| 11:58 | 14 | objective, as I'm reading, it says, "The objective of |
| 11:59 | 15 | this plan is to assist in flagging those inmates who |
| | 16 | are potentially suicidal or who have severe mental |
| | 17 | disabilities and to provide appropriate care for those |
| 11:59 | 18 | inmates internally and through other available |
| 11:59 | 19 | agencies. The following plan has been coordinated with |
| 11:59 | 20 | the Cameron County Jail Medical Department." Do you |
| 11:59 | 21 | see that? |
| 11:59 | 22 | A. Yes. That's what it says. |
| 11:59 | 23 | Q. That's what it says. All right. And then it |
| 11:59 | 24 | goes on to say, "Upon employment, all correctional |
| 11:59 | 25 | officers will receive four hours of training from the |

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

11:59 1    Classification Supervisor, which will include

11:59 2    recognition, supervision, documentation, and handling

11:59 3    of inmates who are mentally disabled and potentially

11:59 4    suicidal.  The training will be provided through oral

11:59 5    and written orientation guided by procedures set forth

11:59 6    by Texas Commission on Jail Standards."  Do you see

11:59 7    that?

11:59 8        A.  Yes, sir.

11:59 9        Q.  It says, "All staff presently employed, will

10    receive the aforementioned training prior to

11:59 11    implementation of this plan and will receive four hours

11:59 12    of training biannually."  Did you ever receive this

12:00 13    training?

12:00 14        A.  I don't recall, sir.  I don't remember.

12:00 15        Q.  Okay.  It goes on to say, "All staff members

12:00 16    should be certified in CPR and First Aid on an annual

12:00 17    basis."  Do you see that?

12:00 18        A.  Yes, sir.

12:00 19        Q.  Okay.  Did you receive on an annual basis CPR

12:00 20    training and first aid?

12:00 21        A.  I went to the -- when I went to the academy, I

12:00 22    was -- I went through that course.

12:00 23        Q.  Yes, sir, but did you get that training

12:00 24    annually every year?

12:00 25        A.  No, sir.

12:00 1      Q.  Okay.  So my next question to you, going back

12:00 2   over here concerning this other four hours of training

12:00 3   concerning mentally disabled and potentially suicidal

12:00 4   persons, do you recall receiving that training?

12:00 5      A.  No, sir, I don't recall.

12:00 6      Q.  Okay.  Let's handle it this way, as well.

12:01 7   During Sheriff Cantu's administration, do you recall

12:01 8   ever receiving the training concerning the training for

12:01 9   handling of inmates who were mentally disabled and

12:01 10  potentially suicidal.

12:01 11     A.  I don't recall, sir.

12:01 12     Q.  You don't recall ever having that training?

12:01 13     A.  It rings a bell, but I don't recall.

12:01 14     Q.  All right.  The next item that we have on page

12:01 15  25, and this was something that Mr. Vittitoe was

12:01 16  discussing with you concerning the supervision.  Do you

17  see that?

18     A.  Yes, sir.

12:01 19     Q.  And the checking of an inmate.  It talks about

12:02 20  30 minute intervals, and it talks about moderate risk,

12:02 21  15 minute intervals, and then continuous or at least

12:02 22  five minute observations.  Do you see that?

12:02 23     A.  Right.

12:02 24     Q.  Okay.  From what we can gather, this wasn't

12:02 25  done during your shift.  Is that true?

59

12:02 1              MR. VITTITOE:  On this particular case?

12:02 2              MR. VALDEZ:  On this particular shift.

12:02 3     A.   True.

12:02 4     Q.   Okay.  And at least, would it also be a fair

12:02 5 statement, since there wasn't any type of a journal or

12:02 6 log, it wasn't done on the previous shift, which would

12:02 7 have been from the 7:00 to 3:00 shift, either?

12:02 8     A.   Yes, sir.

12:02 9     Q.   It's also a true statement?

12:02 10    A.   Yes.

12:02 11    Q.   You have to answer out loud.

12:02 12    A.   Oh.  Yes, sir.

12:02 13             MR. VALDEZ:  All right.  Thank you, sir.

12:02 14 That's all the questions I have.

12:02 15             MR. VITTITOE:  Let me make sure we

12:02 16 understand, then, for the record.

17                         EXAMINATION

18 BY MR. VITTITOE:

12:03 19    Q.   It's clear that a log, activity log, was not

12:03 20 maintained to your knowledge, your personal knowledge,

12:03 21 relating to Juan Longoria being in a single padded

12:03 22 cell.

12:03 23    A.   Yes, sir.

12:03 24    Q.   But was it the custom and practice to have an

12:03 25 activity log --

12:03  1    A.   Yes, sir.

12:03  2    Q.   -- before and after?

12:03  3    A.   Yes, sir.

12:03  4    Q.   Can you -- can you tell us why there wasn't one

12:03  5    done on this particular day?  And I don't want you to

12:03  6    guess.  If you don't know, just say you don't know.

12:03  7    A.   I don't know why it wasn't started.

12:03  8    Q.   .Okay.  Just wasn't done.

12:03  9    A.   Yes, sir.

12:03  10   Q.   Now, Counsel asked you questions about mental

12:03  11   disabilities and suicide prevention, right?

12:03  12   A.   Yes, sir.

12:03  13   Q.   Whether you've attended a course like that.

12:03  14   A.   Yes, sir.

12:03  15   Q.   And as I understand it, you've attended a

12:03  16   number of different courses; am I correct?

12:03  17   A.   Yes, sir.

12:03  18   Q.   Can you tell us some of the names of those

12:03  19   courses?

12:03  20   A.   I can't tell you all the names or all the

12:04  21   courses.  I know culture diversity, cell searches,

12:04  22   inmates' rights, privileges.

12:04  23   Q.   Does -- does -- is it your understanding that

12:04  24   the booking officer asks certain questions at booking

12:04  25   which tries to identify medical conditions and/or

12:04 1    mental health issues?

12:04 2        A.    Yes, sir.

12:04 3        Q.    And would it be fair to say that throughout

12:04 4    your career, that you have received some instruction

12:04 5    and training on what to do if someone you might think

12:04 6    is a suicidal?

12:04 7        A.    Yes, sir.

12:04 8        Q.    And would that also be true on -- on -- on

12:05 9    mental cases?

12:05 10       A.    Yes, sir.

12:05 11       Q.    And is -- is that -- is -- is a detention

12:05 12   officer, is it -- are you faced with the fact that

12:05 13   there may be potential suicide cases in the jail on a

12:05 14   daily or weekly basis?  How often does that come to

12:05 15   your attention that someone might be suicidal?

12:05 16       A.    When other inmates tell us or we hear from

12:05 17   other inmates talking about it or this or any

12:05 18   individual that wants to tells us.

12:05 19       Q.    When you know that information and you -- based

12:05 20   on your experience and training and the procedures in

12:05 21   place, what do you do with that information?

12:05 22       A.    We advise the medical staff, we make reports,

12:06 23   we make out a psychological mental -- mental

12:06 24   psychological form and we ask them questions.

12:06 25       Q.    So when Counsel earlier was asking you whether

12:06 1    you had received any kind of training along those

12:06 2    lines, it sounds like you have.

12:06 3            MR. VALDEZ:  Objection.  Leading the

12:06 4    witness.

12:06 5        Q.  Is that true?

12:06 6            MR. VALDEZ:  Objection.  Leading the

12:06 7    witness.

12:06 8        A.  Yes, sir.

12:06 9        Q.  In other words, inquiry as to mental health and

12:06 10   suicide issues is something that you've been trained to

12:06 11   watch for; am I correct?

12:06 12       A.  Yes, sir.

12:06 13       Q.  And not only that, but from what I'm hearing

12:06 14   you say, when you receive that sort of information that

12:06 15   you may have a mental issue or a suicide issue, you

12:06 16   report that to the medical staff?

12:06 17       A.  Yes, sir.

12:06 18       Q.  Did I also hear you say that you actually

12:06 19   prepare reports?

12:06 20       A.  Yes, sir.

12:06 21       Q.  What sort of reports do you prepare?

12:07 22       A.  The incident reports.  Say they're brought in

12:07 23   that particular day when they're booked, at that time

12:07 24   or when they're booked, we also ask them, "Have you

12:07 25   ever had suicidal tenancies?  Are you thinking about

12:08  1   attention that led you to believe that Mr. Longoria was

12:08  2   a suicide risk?

12:08  3        A.   No, sir.

12:08  4        Q.   Now, you've told us that he acted -- acted out

12:08  5   by yelling and saying things and making noises.  But do

12:09  6   those types of activities happen a lot at the Cameron

12:09  7   County jail by people that might be otherwise normal?

12:09  8   Are you following what I'm saying, asking?

12:09  9        A.   No, sir.

12:09 10        Q.   Let me ask it this way.  Just because a person

12:09 11   makes statements and makes noises, does that mean he's

12:09 12   a mental patient --

      13        A.   No, sir.

12:09 14        Q.   -- or a suicide risk?

12:09 15        A.   No, sir.

12:09 16        Q.   Have you had occurrences in the jail where

12:09 17   people act out, make noises, say things, curse, allege

12:09 18   that people are trying to kill them when otherwise they

12:09 19   appear to be absolutely normal?

12:09 20        A.   Yes, sir.

12:09 21        Q.   Have you known individuals in the jail that

12:09 22   will act out when you believe that they are actually

12:10 23   faking?

12:10 24        A.   Yes, sir.

12:10 25        Q.   Why would somebody do that?

12:11 1    Q.  Okay.  And it is clear, to your knowledge, that

12:11 2    there was no activity log made?

12:11 3    A.  Yes, sir.

12:11 4    Q.  And I can see in your expression, you don't

12:11 5    like that.

12:11 6    A.  No, sir.

12:11 7    Q.  Because that was not the practice, correct?

12:11 8    A.  Correct.

12:11 9    Q.  And you just don't know why it wasn't done?

12:11 10   A.  No, sir.

12:12 11        MR. VITTITOE:  Pass the witness.

12         EXAMINATION

13    BY MR. VALDEZ:

12:12 14   Q.  Mr. Hernandez, in Mr. Longoria's situation, for

12:12 15   him to be placed into the padded cell area, does it

12:12 16   require both the supervisor's direction, as well as

12:12 17   medical staff being notified?  Or can the supervisor do

12:12 18   it on his own decision-making without the support of

12:12 19   the medical staff?

12:12 20   A.  No, they can advise the medical staff, as well.

12:12 21   Q.  Can they?  Or is it a matter of policy they

12:12 22   will notify the medical staff?

12:12 23   A.  They -- they will notify the medical staff.

12:12 24   Q.  Okay.  Do we know whether or not the medical

12:12 25   staff was notified in Mr. Longoria's situation when he

12:14  1      A.  As far as like what, sir?

12:14  2      Q.  I don't know.  Watching, medical attention.

12:14  3      A.  Oh, yes, sir.  You have to -- you have to view

12:14  4  them when they're placed in there.  And the log is

12:14  5  kept.  You've got to view them and jot it down.

12:14  6      Q.  What you noticed?

12:14  7      A.  Uh-huh.

12:14  8      Q.  Is that yes?

12:14  9      A.  Yes, sir.

12:14  10             MR. VALDEZ:  I don't have any further.

12:14  11             MR. VITTITOE:  Thank you, Officer.

12:14  12             MR. VALDEZ:  Yeah.  I think that's enough.

       13                 (Deposition concluded.)

       14

11:43  15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

XAVIER LEE HERNANDEZ - ERRATA SHEET

Reasons for changes:  (1)  Clarify the record
                      (2)  Conform to the facts
                      (3)  Correct transcription errors

PAGE LINE   CHANGE FROM/CHANGE TO            REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

70

1    SIGNATURE OF XAVIER LEE HERNANDEZ

2    I have read the foregoing transcript of my

3    deposition and it is a true and accurate record of my

4    testimony given on AUGUST 29, 2003, except as to any

5    corrections I have listed on Page 69 herein.

6

7    _____

8    XAVIER LEE HERNANDEZ

9    THE STATE OF TEXAS

10   COUNTY OF _____

11          SUBSCRIBED AND SWORN TO BEFORE ME, the

12   undersigned authority on this the _____ day of

13   _____, 2003.

14

15   _____

16   Notary Public in and for
     The State of Texas

17   My commission expires:

18   _____

19

20

21

22

23

24

25

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   MARIA LONGORIA AND MARIA       ) (
     IDALIA GUTIERREZ,              ) (
 4   INDIVIDUALLY AND ON            ) (
     BEHALF OF THE ESTATE OF        ) (   CIVIL ACTION NO.
 5   JUAN LONGORIA, DECEASED,       ) (   B-01-062
               Plaintiffs           ) (
 6                                  ) (
     VS.                            ) (
 7                                  ) (   JURY DEMANDED
     CAMERON COUNTY, TEXAS,         ) (
 8   THE CITY OF BROWNSVILLE,       ) (
     TEXAS, AND JOHN DOES 1-10,     ) (
 9             Defendants           ) (

10                   REPORTER'S CERTIFICATE
                     ORAL DEPOSITION OF
11                   XAVIER LEE HERNANDEZ
                     AUGUST 29, 2003

12

13        I, ELIZABETH TORRES, Certified Court Reporter,
     certify that the witness, XAVIER LEE HERNANDEZ, was
14   duly sworn by me, and that the deposition is a true and
     correct record of the testimony given by the witness on
15   AUGUST 29, 2003; that the deposition was reported by me
     in stenograph and was subsequently transcribed under my
16   supervision.
          I FURTHER CERTIFY that I am not a relative,
17   employee, attorney or counsel of the parties, nor a
     relative or employee of such attorney or counsel, nor
18   am I financially interested in the action.

19        WITNESS MY HAND on this ___8th___ day of
20   September, 2003.

21

22
     ELIZABETH TORRES, Texas CSR 5516
23   Expiration Date: 12-31-04
     Bryant & Stingley, Inc.
24   4900 North 10th, Building A, Suite 3
     McAllen, Texas  78504
25   (956) 618-2366
```

BEFORE ME the undersigned authority on this <u>18</u> day of <u>April, 2001</u>

personally appeared <u>Xavier Lee Hernandez</u> who after being by me

duly sworn did depose and say:

My name is Xavier Lee Hernandez. I am 35 years old. My date of birth is 9/20/65. I reside at 5663 Boca Chica Brwonsville,Texas 78521. I can reached at (956). I am currenty Assistant Sargent(dentention officer) with the Cameron County Sheriff's department. I am currently assigned to the 2:45pm to 11:00pm shift.

On Wednsday April 11,2001, I arrived at work at around 2:45pm. We were briefed by Sgt. Felipe Silva. Sgt. Silva stated at around 10:25am inmate Longoria was brought in by Brwonsville Police Department with a medical clearance. The inmate was taken to the laundry area and changed into a county issued uniform. After he was changed he was taken to the large holding cell.The inmate started having problems with other inmates as per Sgt. Silva. In order to prevent problems and for the inmates own safety, he was placed in the single cell.While the briefing was going on , Inmate Longoria was yelling names such as "Jose". He continued yelling saying "quitate de ayi""dejame solo""me ban a matar". This meaning "leave me alone", "they are going to kill me" At that time I continued my shift.

At about 3:05pm after the briefing was over,I walked towards the booking area. As I was walking the inmate was yelling, so I looked into single cell through the window. The inmate was standing to the left of the room facing the wall towards the door. I kept going towards the booking area. I continued checking on him through out my shift. I would say that I checked up on him about eight times or more.

At around 10:45pm I was walking towards the briefing area. I looked inside the window and I observed the inmate slumpt over leaning against the right side of the wall facing the opposite way. He was mumbling away words that I could not understand what he was saying, He had his hands on his stomach. He was moving his hand and feet like in a nervous motion. I then continued to the briefing area.That was the last time that I observed the inmate.This inmate was yelling and tapping on the wall through out my shift. I then ended my shift and Left the facilty.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS _18_ DAY OF _April_ A. D. _2001_.

NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005



Hernandez
EXHIBIT NO. 1
Bryant & Stingley, Inc.

THE STATE OF TEXAS    §

COUNTY OF CAMERON    §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 19th day of April, 2001, A.D., did personally appear: Michael Gene Baskin, who after being by me duly sworn, did depose and say: My name is Michael Gene Baskin. I am 38 years old. My date of birth is on September 25, 1962. I reside at 3090 Kasey Avenue in Springdale Arkansas. I am presently held in The Cameron County Jail. I am charged with Theft and I am assigned in Trusty Ward. I am the lead trusty there in the jail.

I think it was Wednesday night on April 11, 2001. I remember seeing a guy in the padded cell. I do not know his name. At around 5:30 p.m. that day I looked in the padded cell. I seen this man look as if he was swimming. He was in a prone position on his stomach with his arms stretched out over his head. His feet apart going back and forth sort of like doing jumping jacks. The reason I saw this inmate was because I was handing out the food to the inmates and I was going to give the inmate in the padded cell food. I tried to call him but he would not respond. I then told the guard. He is a big guy by the name of XL. He is the assistant sergeant who was on duty that day on the 3-11p.m shift. XL then told me that the inmate was doing it for attention. XL then opened the cell door because the inmate would not get up to take his food. I then placed the plate on the small cement slab in the padded cell. XL closed the door. I then left and I came back later because I had to give out some sugar with water to a guy in the small holding cell and I looked inside again in the padded cell and the inmate was in the same position and looked as if he was like a fish out of water. His body was like quivering. To me it looked like if he was having a seizure. I then told XL again that the inmate in the padded cell was still having the fit, which is what I referred to it as. XL then told me that the inmate would get tired of it. This was at around 5:45pm. The inmate would not get his water. XL then opened the door and I went inside and set the water down and he shut the door. I told XL again and XL said that he would get tired of it. XL then shut the door.

At around 8:30 p.m. I went back to attend to an inmates needs for a sugar drink in the holding cell. I then peeked inside the padded cell. I saw the inmate in the same position with his face down. The inmate was still quivering. The man never changed positions. I then told another guard but I do not know his name that the inmate in the padded cell was having a fit. That officer did not say nothing when I told him. I then went back to the kitchen and they then locked us down at around 8:45 p.m. for the night.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA   ) (
IDALIA GUTIERREZ,          ) (
INDIVIDUALLY AND ON BEHALF ) (
OF THE ESTATE OF JUAN      ) (
LONGORIA, DECEASED         ) (
        Plaintiffs         ) (
                           ) (
VS.                        ) (     CIVIL ACTION NO. B-01-062
                           ) (
CAMERON COUNTY, TEXAS,     ) (
THE CITY OF BROWNSVILLE,   ) (     JURY DEMANDED
TEXAS AND JOHN DOES 1-10   ) (
        Defendants         ) (

---

ORAL DEPOSITION OF
LUIS ALBERTO MENDIETA
FEBRUARY 17, 2004



---

ORAL DEPOSITION OF LUIS ALBERTO MENDIETA,

produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on FEBRUARY 17, 2004, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the offices of Adams & Graham, L.L.P., 222

East Van Buren, West Tower, Harlingen, Texas, pursuant

to the Federal Rules of Civil Procedure.

## APPEARANCES

COUNSEL FOR PLAINTIFFS:

    ALFRED R. VALDEZ
    LAW OFFICE OF ALFRED R. VALDEZ
    7520 Hillcroft
    Houston, Texas  77081

    BARRY S. BERGER
    LAW OFFICE OF BARRY S. BERGER, P.C.
    1863 Post Oak Park Drive
    Houston, Texas  77027

COUNSEL FOR DEFENDANTS:

    CRAIG VITTITOE
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren, West Tower
    Harlingen, Texas  78551

## INDEX

|  | PAGE |
|---|---|
| Appearances ..................................... | 2 |
| LUIS ALBERTO MENDIETA | |
| Examination by Mr. Berger ..................... | 3 |
| Errata Sheet/Signature Page ................... | 86 |
| Reporter's Certificate ........................ | 88 |

Attached to the end of the transcript:  Stipulations

## EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Statement ............................... | 34 |

11:59:10 1            MR. VITTITOE:  Just for the record, prior

11:59:12 2  to the commencement of this deposition, we -- the

11:59:15 3  witness provided his residential address, his phone

11:59:19 4  number, and his driver's license number to Counsel with

11:59:23 5  the understanding that such information will remain

11:59:25 6  confidential to this suit for purposes of the officer's

11:59:31 7  security, and that information will not appear in the

11:59:33 8  formal record of this deposition.

11:59:36 9             MR. BERGER:  That's correct.

11:59:36 10            LUIS ALBERTO MENDIETA,

11:59:36 11  having been duly sworn, testified as follows:

11:59:36 12               EXAMINATION

11:59:36 13  BY MR. BERGER:

11:59:40 14     Q.  Okay.  The only thing we're going to ask you

11:59:41 15  for the formal record of this deposition is what your

11:59:48 16  real name is.  Okay?

11:59:51 17     A.  Yes, sir.

11:59:51 18     Q.  Could you tell us what your real name is.

11:59:53 19     A.  Luis Alberto Mendieta.

11:59:58 20     Q.  Okay.  Mendieta?

11:59:58 21     A.  Yes, sir.  Correct.

12:00:04 22     Q.  Okay.  Are you presently employed by the

12:00:06 23  Cameron County Sheriff's Department?

12:00:08 24     A.  Yes, sir, I am.

12:00:09 25     Q.  What's your present position?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

12:00:11  1      A.  I'm currently an investigator for the auto

12:00:14  2  theft division.

12:00:16  3      Q.  So you're in the field now.

12:00:17  4      A.  Yes, sir.  Correct.

12:00:18  5      Q.  Okay.  That's why you're carrying a pistol?

12:00:20  6      A.  Yes, sir.  Correct.

12:00:21  7      Q.  And the badge.

12:00:23  8      A.  Yes, sir.

12:00:24  9      Q.  Okay.  The -- in April of 2001, were you

12:00:28 10  assigned to the detention department?

12:00:30 11      A.  Yes, sir, correct.

12:00:32 12      Q.  Okay.  Now, when did you start working for the

12:00:36 13  sheriff's department?

12:00:39 14      A.  June the 20th of 1996.

12:00:41 15      Q.  '96?

12:00:42 16      A.  Yes, sir, correct.

12:00:43 17      Q.  So now it's eight years.

12:00:45 18      A.  Correct.

12:00:46 19      Q.  Almost eight years.

12:00:47 20          Okay.  Have you ever had your deposition

12:00:50 21  taken before?

12:00:52 22      A.  No, sir.

12:00:53 23      Q.  Okay.  Have you testified in court?

12:00:55 24      A.  No, sir.

12:00:58 25      Q.  Okay.  Although we're taking your deposition

12:01:00  1    here today in informal circumstances, you realize that

12:01:03  2    you've been sworn to tell the truth just like you were

12:01:06  3    testifying in a court of law?

12:01:08  4        A.   Correct, yes, sir.

12:01:09  5        Q.   You're subject to the same penalties of

12:01:11  6    perjury, if it was determined later that you were

12:01:13  7    fibbing to us, as if you were testifying in a court of

12:01:16  8    law and fibbing.   You understand that?

12:01:18  9        A.   Yes, sir, I do.

12:01:20 10        Q.   Okay.   If you don't understand my question or

12:01:22 11    if you don't hear my question, ask me to repeat it or

12:01:26 12    rephrase it, because even though --

12:01:28 13             MR. BERGER:   I take it he's reading and

12:01:29 14    signing; is that correct?

12:01:36 15        Q.   Okay.   That you're going to have an opportunity

12:01:38 16    to read and sign your deposition, that if you answer a

12:01:40 17    question, I'm going to assume that you both heard and

12:01:43 18    understood the question and responded appropriately.

12:01:46 19    Do you understand that?

12:01:47 20        A.   Yes, sir, I do.

12:01:49 21        Q.   Okay.   You need to wait until I finish my

12:01:52 22    question before you finish your answer because, one,

12:01:54 23    the court reporter has a hard time taking us talking at

12:01:58 24    the same time.   Do you understand that?

12:02:01 25        A.   Yes, sir.

Q.  Okay.  And this is going to -- whatever you say here today is going to appear in a typewritten booklet type of thing, so it's got to be recorded that way.  Do you understand that?

A.  Yes, sir, I do.

Q.  Okay.  And because it's going to appear in a typewritten thing and not an oral or video recording, you have to answer out loud to a question.  Do you understand that?

A.  Yes, sir, I do.

Q.  Okay.  A shake of the head is not good enough. You understand that?

A.  Yes, sir, I do.

Q.  I may see what you're doing and how you're responding and the court reporter may see and put it down on the typewritten page, but to be clear about your answer, we need a verbal answer to a question.  Do you understand that?

A.  I do.

Q.  If the answer calls for a "yes" or "no," then say "yes" or "no," and don't say "uh-huh," "huh-uh," grunt, "yeah," or, you know, something that may be misconstrued.  Do you understand?

A.  Yes, sir.

Q.  And if we correct you or I correct you or say

12:02:57 1    you shook your head or something like that, it's not to

12:03:00 2    be critical of you, because even the most experienced

12:03:04 3    person that gives his deposition or testifies from time

12:03:08 4    to time forgets those things.  Okay?

12:03:11 5        A.  Yes, sir.

12:03:15 6        Q.  Okay.  And, also, another reason why we

12:03:17 7    shouldn't talk over each other or you try to anticipate

12:03:20 8    where I'm going with a question is because sometimes I

12:03:22 9    change the question in midstream.

12:03:24 10            So you may anticipate where I'm going with

12:03:27 11   a question, you kind of cut me off, answer a question,

12:03:30 12   and then I actually change the question in midstream,

12:03:35 13   unless your answer is not responsive to the question as

12:03:38 14   it winds up.  Do you understand that?

12:03:39 15       A.  Yes, sir.

12:03:40 16       Q.  Okay.  And we'll try to work together, and I'll

12:03:43 17   try not to step on your lines.  Okay?  Same reason,

12:03:47 18   because the court reporter can't take us down talking

12:03:49 19   at the same time.  Okay?

12:03:51 20       A.  Yes, sir.

12:03:51 21       Q.  Okay.  If you need to finish your answer,

12:03:56 22   please tell me.  I may try to cut you off with the next

12:03:59 23   question.  Say, "I'm not finished with my answer."

12:04:01 24   Okay?

12:04:02 25       A.  Yes, sir.

Q.  If you need to go to the bathroom, you need to call somebody, you get a call, you need to take a break anytime, let us know, and we'll do so.  Okay?

A.  Yes, sir.

Q.  Okay.  Now, have you had any education beyond high school?

A.  Yes, sir.

Q.  And could you tell us where and when?

A.  Texas Southmost College.

Q.  Texas what?

A.  Southmost College.

Q.  Southmost College?

        And is that located in Brownsville?

A.  Yes, sir, it is.

Q.  And did you graduate?

A.  Yes, sir, I did.

Q.  You got a degree?

A.  Not a degree, sir.  I went through the police academy through the college.

Q.  Oh, police academy.

A.  Yes, sir.  Correct.

Q.  Okay.  You got a certificate there?

A.  Correct.  Yes, sir.

Q.  How long did you go?

A.  Approximately six months, sir.

Q.  Did any of that police academy training include medical information?

A.  Yes, sir.

Q.  How much of it?

A.  Honestly, I don't recall.

Q.  Okay.  Was it about eight years ago?

A.  I got my certificate in 1997.

Q.  '97?

A.  Yes, sir.

Q.  Okay.  Do you recall any information that they gave you at all about what medical information?  From that --

A.  What I remember is CPR, sir.

Q.  CPR?

A.  CPR, correct.

Q.  Okay.  Had you had any medical training since that time either by a course or seminars or -- besides CPR?

A.  Well, through the jail, I went, again, through CPR as well -- once I became a deputy, almost two years ago, I went through a course in the same college, Texas Southmost College.  I went through what you call the -- it's like a machine that you use to start getting the heart going back again.

Q.  Oh, the defibrillator?

12:06:16  1    A.  Correct.

12:06:16  2    Q.  Okay.  So you learned how to do that.

12:06:18  3    A.  Yes, sir.

12:06:18  4    Q.  Did you take any advanced CPR courses?

12:06:22  5    A.  I don't recall.  Possibly yes, but I've got to

12:06:25  6  go back to my files -- to my certificates.

12:06:27  7    Q.  Okay.  But you got -- you know you got a

12:06:29  8  certificate for at least beginning CPR?

12:06:32  9    A.  Yes, sir.  As well as one from the Red Cross.

12:06:34 10    Q.  The Red Cross.  Okay.

12:06:35 11    A.  Yes, sir.

12:06:38 12    Q.  Did you get any lessons in anatomy or

12:06:42 13  psychology or things like that?

12:06:44 14    A.  No, sir, not at all.

12:06:46 15    Q.  Okay.  When you -- when you became -- stop?  Is

12:06:51 16  there something?

12:06:52 17    A.  Yes, sir.  You said any psychology?

12:06:56 18    Q.  Yes.

12:06:56 19    A.  What I did go through was a course in the jail.

12:07:00 20  I believe it was a suicidal.

12:07:02 21    Q.  Suicidal tendencies?

12:07:04 22    A.  Yes, sir.

12:07:04 23    Q.  Okay.  So they taught you how to identify

12:07:06 24  suicidal tendencies?

12:07:11 25    A.  I don't recall too much whether going into what

12:07:13 1  you just mentioned, and I don't recall a year either.

12:07:17 2      Q.  Okay.  Now, I take it you got some type of

12:07:21 3  certificate as -- for a jailer or detention officer in

12:07:26 4  the jail?

12:07:27 5      A.  Yes, sir, I did.

12:07:28 6      Q.  Okay.  Did you go -- when you first joined the

12:07:33 7  sheriff's office, did you go into the detention office,

12:07:37 8  or did you go as investigation or what?

12:07:40 9      A.  No, sir.  I started as jailer.

12:07:42 10     Q.  As a jailer?

12:07:43 11     A.  As a jailer.

12:07:44 12     Q.  Okay.  Prior to the experience as a detention

12:07:46 13 officer jailer with the sheriff's office, what did you

12:07:49 14 do?

12:07:49 15     A.  I worked at a store.  It was a fabric store

12:07:53 16 here in Brownsville.

12:07:54 17     Q.  A fabric store?

12:07:55 18     A.  Yes, sir.

12:07:55 19     Q.  Okay.  Did you cut fabric or sell it or what?

12:07:58 20     A.  I did in general, received orders, cut, yes,

12:08:01 21 sir.

12:08:02 22     Q.  You weren't a tailor, though?

12:08:04 23     A.  No, sir.

12:08:06 24     Q.  Okay.  My grandfather was a tailor so --

12:08:10 25          Then you became -- you took the -- you

joined the department, passed the physical, I guess, whatever they give?

A.  Well, once I was working at the fabric store, I started joining college, which was a police academy. Once I was in the police academy, I overheard some officers taking that training, that there were some openings at the Cameron County Sheriff's Department jail area, so I submitted an application.

Q.  Okay.  How long were you working there at the jail before you actually -- they gave you the course of -- for detention?

A.  I'd say about -- within five months.

Q.  Okay.  Do they give that course once a year?

A.  You have a year within that period.  Once you get hired, you have a year to take that test.

Q.  Take it and pass it.

A.  Yes, sir.

Q.  I take it you took it and passed it on the first try?

A.  No, sir.  It was on the second try.

Q.  Second try.

A.  Yes, sir.

Q.  Okay.  So I guess you took the course twice in one year?

A.  I only took the course one time, failed the

12:09:16  1   first time, and then I took it upon myself to keep on

12:09:20  2   studying my books.  And I went -- actually drove up to

12:09:23  3   Austin and passed my test.

12:09:24  4       Q.  I see.  Okay.

12:09:29  5           What positions did you hold as a detention

12:09:31  6   officer there until the time you became an auto theft

12:09:31  7   investigator?

12:09:40  8       A.  Okay.  I started as a regular jailer working

12:09:43  9   the pod areas.

12:09:44 10       Q.  What's that?

12:09:45 11       A.  The pod areas where, basically -- we call them

12:09:47 12   pods.

12:09:48 13       Q.  Okay.

12:09:48 14       A.  It's like you have -- back then --

12:09:50 15       Q.  Is it a pod or a pot?  P-O-D or P-O-T?

12:09:54 16       A.  P-O-D.

12:09:55 17       Q.  Pod.  Okay.

12:09:58 18       A.  And back then in DC -- when I started in DC-1,

12:10:02 19   we had three pods.

12:10:03 20       Q.  Is DC-1 a minimum security place?

12:10:08 21       A.  Yes, sir.

12:10:08 22       Q.  Okay.

12:10:08 23       A.  And I started there, worked myself up to become

12:10:11 24   an assistant sergeant, once I passed my TCLEOSE exam,

12:10:18 25   and I went over to DC No. 2.

12:10:22  1      Q.   That's the medium security facility?

12:10:24  2      A.   Yes, sir.

12:10:24  3      Q.   Okay.

12:10:24  4      A.   And I started there as an assistant supervisor

for Sergeant Esparza.

12:10:29  6      Q.   Okay.

12:10:34  7      A.   From there, it took me about -- say about six

more months, somewhere around that area, and then

became a supervisor, a sergeant, what we call

sergeant --

12:10:44 11      Q.   Okay.

12:10:44 12      A.   -- of DC No. -- went over to DC No. 1.

12:10:49 13      Q.   You went back to DC No. 1 as a supervisor?

12:10:53 14      A.   That's a supervisor.

12:10:53 15      Q.   Okay.   What was your position in April of 2001?

12:10:58 16      A.   I was a sergeant at the old Cameron County

Jail.

12:11:00 18      Q.   A sergeant.

12:11:01 19           Is that the maximum security --

12:11:03 20      A.   Yes, sir.   That is a maximum security.

12:11:06 21      Q.   Now, were you -- did you ever -- in your

capacity as a jailer, whatever rank that you held, did

you ever act as a booking officer?

12:11:17 24      A.   At no time, sir.

12:11:18 25      Q.   No time.

12:11:19  1          Did you ever act as classification

12:11:21  2   officer?

12:11:30  3       A.  At no time.

12:11:30  4       Q.  Did you ever act as an infirmary officer, in

12:11:30  5   other words, assigned to the infirmary?

12:11:30  6       A.  At no time, sir.

12:11:30  7       Q.  At no time.  Okay.

12:11:33  8          You did -- as a sergeant then, you were a

12:11:36  9   supervisory officer, though, for one or more different

12:11:40 10   detention facilities; is that correct?

12:11:44 11       A.  No, sir.  Once you get assigned to a facility,

12:11:46 12   to a detention, you are the only supervisor in that

12:11:48 13   area besides two more.  We have -- every facility --

12:11:53 14   every facility has three supervisors.  That's the A

12:11:56 15   shift, B shift, and the C shift.

12:11:57 16       Q.  I see.  When you got -- when did you get

12:12:00 17   assigned to the old county jail?

12:12:17 18       A.  I don't recall, but I would say in February,

12:12:21 19   beginning of February of 2001.

12:12:23 20       Q.  2001, sometime before April 2001, sometime in

12:12:29 21   that year.

12:12:29 22       A.  That is correct.

12:12:29 23       Q.  Okay.  And when you got assigned to that

12:12:31 24   position at the old county jail, the maximum security

12:12:36 25   and the intake -- would that be fair to classify it

both as an intake and the maximum security facility?

A.   Yes, sir.

Q.   Okay.   What was your position there?

A.   A supervisor for -- I believe I had, back then, ten other detention officers at the time.

Q.   So you were a sergeant.

A.   Yes, sir, correct.

Q.   Okay.   And the -- being a supervisor, did you also supervise a booking officer -- office -- officer? I'm sorry.

A.   Yes, sir.   In a way, but they had their own supervisor as well.

Q.   Okay.   Who -- on April 11th, 2001, who was the -- on each shift, did they have a booking supervisor on each shift for the booking office?

A.   No, sir.   They only have one.   And if I'm not mistaken, I believe it was Kevin Crossly.

Q.   Was he a lieutenant or what rank?   Do you know?

A.   During that time, if I'm not mistaken, he was a corporal.   And then at a later time, I believe he became a lieutenant.   I'm not quite sure whether, during that time, he was a lieutenant or a corporal.

Q.   Okay.   Well, I take it somewhere in between he became a sergeant, right?

A.   In between, I believe.

Q. Okay. And was that person assigned to the
actual old county jail as a supervisor, whatever his
rank was?

A. Are we talking about Kevin Crossly, correct?

Q. Yes.

A. He was assigned to the old Cameron County Jail.

Q. Okay. And where was his office? Did he have
an office?

A. Yes, sir, he did.

Q. Where was his office?

A. Near the single cell No. 1. Okay. First we
had -- right across was a lieutenant's office, okay,
that single cell No. 1.

Q. Okay.

A. It was a hallway, okay, coming in from the
booking area. And then there was a wall, okay, right
in front of single cell No. 1. Then we had Kevin
Crossly's office. And I believe there was two more
other employees in the classification -- in his office
as well.

Q. Was the booking officer in charge to supervise
the booking office, was he also a classification
officer?

A. He had training as well in there. He used to
be a booking officer as well.

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

12:15:07  1    Q.  Oh, okay.

12:15:08  2    A.  Yes, sir.

12:15:08  3    Q.  But was he also -- who was classified on your

12:15:11  4    shift as a classification officer?  Do you recall?

12:15:17  5    A.  I don't recall, sir.

12:15:18  6    Q.  Do you recall any of the classification names

12:15:21  7    of any of the classification officers in April of 2001?

12:15:31  8    A.  I believe we had some changes, but I'm not

12:15:36  9    quite sure during that time whether we had Chris

12:15:48 10    Maldonado.  I don't know if Martha Gutierrez was there

12:15:50 11    at the time.  She's not with us no more.

12:15:55 12    Q.  Okay.

12:16:00 13    A.  I'm not quite sure whether Mario Vera as well.

12:16:04 14    Q.  Okay.  Did you -- did an officer have to have

12:16:07 15    special training to be a classification officer?

12:16:10 16    A.  Yes, sir.

12:16:11 17    Q.  Above and beyond being a normal detention?

12:16:15 18    A.  If you get assigned to the classification or

12:16:17 19    booking department --

12:16:18 20    Q.  Yes, sir.

12:16:19 21    A.  -- you have to go through some training.

12:16:21 22    Q.  Further training.

12:16:22 23    A.  Yes, sir.

12:16:24 24    Q.  Okay.  Does a booking officer get further

12:16:26 25    training in any medical information, to your knowledge?

A.  To my knowledge, I have no idea, sir.  I don't know.

Q.  How about a classification officer?

A.  I don't know again, sir, on that area -- in that area.

Q.  Okay.  Now, we have a -- let me show you what's been marked as Silva No. 2 and No. 3.  And this is -- you knew Mr. Silva?

A.  Yes, sir.

Q.  He came in here, and we went out by his motorcycle and looked at it, right?

A.  Yes, sir.

Q.  I take it you knew him from the jail.  Is that also correct?

A.  Yes, sir.

Q.  Okay.  Let me show you some diagrams that he drew.  And you take a look at it.  And if you see anything that you recall any different, I want you to draw it for me.  Okay?  Don't mark on those that I gave you.

A.  No, sir.

Q.  But if you recall anything that's any different -- people's memories change.

MR. VITTITOE:  Tell me about it.

MR. BERGER:  The older you get, the less

says "office."

A.  Correct.

Q.  Okay.  Where would the booking supervisor's office be?

A.  Right above the lieutenant's office.

Q.  Okay.  Right above the lieutenant's office on that diagram.

A.  Yes, sir.

Q.  Okay.  On Exhibit No. 2.

A.  Correct.

Q.  Silva No. 2.

And the classification officer would be right above him?

A.  Right above the lieutenant's office?  That's what you're trying to tell me?

Q.  Is it right above the booking supervisor or right above the lieutenant's office also on that -- on No. 2?

A.  Okay.  Can you repeat the question.  I'm sorry, sir.

Q.  Okay.  As I understand it, there's a booking officer who is in the booking area.

A.  Right here, yes, sir.

Q.  Okay.  What's marked "booking area" on the diagram.

A.   Okay?

Q.   And then the lieutenant's office would be -- in other words, the lieutenant would have overall responsibility for that facility?

A.   Yes, sir.  For overall -- for the classification and booking department.

Q.   Okay.  And detention?

A.   As well.  He would get involved, yes, sir.

Q.   Okay.  And he had a separate office where it's marked "office" on there?

A.   The supervisor of the booking and classification?

Q.   No.  The lieutenant.

A.   The lieutenant?

He would have his own office here.

Q.   Okay.

A.   For the whole facilities and the two other facilities.

Q.   I see.  Okay.

A.   Yes, sir.

Q.   So he would be over the two other facilities too?

A.   This would be the main office for the whole lieutenants.

Q.   Is there -- was there a captain at the time

12:21:22  1    that was in charge of the jail?

12:21:23  2        A.   It was Joe Elizarde.  He was our captain at the

12:21:28  3    time.

12:21:28  4        Q.   Where would his office be?

12:21:30  5        A.   Where it says sheriff's office, it would be a

12:21:33  6    hallway.  We had a door there to the administration.

12:21:33  7        Q.   To administration.

12:21:35  8        A.   Yeah.  The captain would be in the

12:21:37  9    administration facility, the administration office.

12:21:39  10       Q.   Would he also be the chief jailer, the captain,

12:21:44  11   or considered chief jailer?

12:21:48  12       A.   Well, you can say that.  Yes, sir.

12:21:50  13       Q.   Okay.  And then the captain reported to the

12:21:53  14   sheriff?

12:21:54  15       A.   To Chief Mendoza, which was the chief in

12:21:57  16   general of patrol.

12:21:58  17       Q.   I see.  And then the chief reported to the

12:22:00  18   sheriff.

12:22:01  19       A.   To the sheriff.

12:22:01  20       Q.   I see.  Okay.  And they were all over in the

12:22:07  21   administration office, is that right, the captain, the

12:22:07  22   chief, and the sheriff?

12:22:08  23       A.   Yes, sir.

12:22:11  24       Q.   Okay.  And would the lieutenant supervise the

12:22:15  25   jails -- and it was actually located in the jails --

12:22:19  1   would he -- was his a 9:00-to-5:00 type of job, or did

12:22:23  2   he have a shift, or do they have different shifts for

12:22:27  3   lieutenants or what?

12:22:28  4       A.  The lieutenants, they would --

12:22:31  5       Q.  This is April 2001.  I know it may have changed

12:22:35  6   from time to time.

12:22:35  7       A.  Yes, sir, it did.  Back then, if not mistaken,

12:22:38  8   it was from 8:00 to 4:00, 8:00 in the morning until 4

12:22:42  9   p.m.

12:22:42 10       Q.  Okay.  Was there any other supervisory besides

12:22:46 11   sergeants on duty at other times, midnight shift,

12:22:52 12   besides being on call?

12:22:55 13       A.  Basically, at all times, whether it would be

12:22:58 14   the A, B, C shift, we would always be as supervisors,

12:23:02 15   and if the sergeant would not be there, we had an

12:23:06 16   assistant sergeant.

12:23:07 17       Q.  I understand.  I'm talking about, would there

12:23:08 18   be a lieutenant there at all times?

12:23:10 19       A.  At all times during midnight?  No, sir.  At

12:23:13 20   that time, no, sir.

12:23:19 21       Q.  Okay.  Any other thing that you see --

12:23:23 22       A.  No, sir.

12:23:24 23       Q.  -- on Silva No. 2, which is a diagram of the

12:23:27 24   first floor of the old county jail, or on Silva No. 3,

12:23:35 25   which is Sergeant Silva's diagram of the infirmary area

12:23:39  1    in the old county jail on April 2001?

12:23:57  2              Don't mark on that if you see anything.

12:23:59  3        A.   No, sir.   Where it says "inmates' shower area,"

12:24:02  4    it was divided in two shower areas.

12:24:05  5        Q.   Okay.

12:24:06  6        A.   That's the only --

12:24:07  7        Q.   Two -- one for what and one for what?

12:24:10  8        A.   For two inmates.

12:24:11  9        Q.   I see.   There were two shower stalls.

12:24:13 10        A.   With a wall in between.   Yes, sir.   Two shower

12:24:15 11    stalls.

12:24:18 12        Q.   Okay.   Was there a separate shower area for

12:24:20 13    women?

12:24:21 14        A.   In the infirmary, sir?

12:24:23 15        Q.   Yes, sir.

12:24:23 16        A.   There was no women.

12:24:25 17        Q.   No women in the infirmary?

12:24:29 18        A.   No, sir.

12:24:29 19        Q.   What happened to a woman that had a medical

12:24:30 20    problem?

12:24:33 21        A.   At the old county jail, if not mistaken, in the

12:24:36 22    second floor, we had females.   They would have -- I

12:24:42 23    have never went into those areas too much unless we had

12:24:45 24    an emergency in there.

12:24:47 25              I believe, as well, they had their own

12:24:48 1    single cells.  And I believe single cell No. 1, on both

12:24:54 2    sides they had a single cell No. 1.  I believe that's

12:24:56 3    where, by any chance, any medical problems, they would

12:25:00 4    take care of them as well there.  I might be wrong

12:25:03 5    again.

12:25:03 6        Q.  Okay.  That's fine.

12:25:04 7            And I noticed on Silva No. 2 that there

12:25:15 8    was a shower area apart from the infirmary.  Is that

12:25:15 9    where the general population that was still on floor

12:25:16 10   No. 1 went for their showers?

12:25:18 11       A.  Okay.  You're talking about Exhibit No. 2, the

12:25:21 12   showers area?

12:25:22 13       Q.  Yes.  Where it says "showers."

12:25:24 14       A.  Okay.  These showers here were used for the

12:25:27 15   intakes that we had.  Basically, that shower would be

12:25:31 16   used for that.

12:25:33 17       Q.  For people -- and I take it people who were on

12:25:35 18   floor No. 1 were either in holding cells for intakes,

12:25:39 19   for booking and classification purposes or for being in

12:25:46 20   the infirmary; is that right?

12:25:48 21       A.  Here in this floor, again, where I'm seeing

12:25:50 22   "shower," this one was never used for infirmary

12:25:53 23   purposes.

12:25:53 24       Q.  I understand that.  But I mean, whatever we see

12:25:57 25   on floor No. 1, floor No. 1 was used for intake,

12:26:01 1   administration of the jail, and for infirmaries, and

12:26:05 2   for the kitchen, cooking the food and stuff.

12:26:09 3       A.  Correct.  As -- well, this is the first floor

12:26:10 4   as well.

12:26:11 5       Q.  Yes.  Well, we just -- all he did was just draw

12:26:16 6   a bigger picture of what's in the infirmary, what's on

12:26:19 7   No. 3 than what's on No. 2.

12:26:21 8       A.  Uh-huh.

12:26:24 9       Q.  Now, since you -- if you were a supervisor,

12:26:28 10  would you ever get involved with the intake aspect of

12:26:33 11  taking a prisoner in?

12:26:37 12      A.  I did get involved once we had the prisoners

12:26:39 13  coming in, yes, sir.

12:26:41 14      Q.  Okay.  I mean, sometimes you had more than one

12:26:43 15  prisoner coming in, right?

12:26:44 16      A.  It was a rush, a rush in that old county jail.

12:26:47 17  Yes, sir.

12:26:47 18      Q.  Okay.  You've got people from the courthouse

12:26:49 19  that had been arraigned.  You've got people from the

12:26:53 20  federal.  You've got -- all over, right?

12:26:55 21      A.  Correct, sir.  Different agencies coming in.

12:26:58 22      Q.  Okay.  So you just -- you might have assisted

12:27:02 23  the booking officer as a supervisor on your shift when

12:27:06 24  you had a number of people coming in; is that right?

12:27:10 25      A.  The question again?  I'm sorry.

12:27:10  1    Q.  Yeah.

12:27:11  2         If you had a number -- a group of people

12:27:13  3    coming in, you might have assisted the booking officer

12:27:17  4    in asking these prisoners questions; is that right?

12:27:22  5    A.  No, sir.  I never got involved in the

12:27:24  6    classification of asking questions.

12:27:25  7    Q.  Or booking or classification?

12:27:28  8    A.  My only question when they were coming in,

12:27:29  9    whether it would be our agency or any other agency,

12:27:32 10    would be -- is medical.

12:27:35 11    Q.  Okay.

12:27:35 12    A.  "Do you have any medical problems?"

12:27:37 13         "Well, I have a scratch here," or etc.

12:27:41 14         But from there on, I wouldn't ask them no

12:27:44 15    questions whatsoever besides that medical deal.  My

12:27:47 16    concern was the medical deal there.

12:27:52 17    Q.  Okay.  Would you ever see the prisoner's file

12:27:58 18    when they came in that might have had some medical

12:28:00 19    information in it?  In other words, if they came from,

12:28:06 20    say, the city jail and they had some medical treatment

12:28:11 21    or information or whatever problems in that file,

12:28:15 22    whatever the papers that come along, would you ever see

12:28:18 23    those?

12:28:18 24    A.  The only deal that I would see would be where

12:28:22 25    they would bring them in with a -- basically, to commit

12:28:26  1    them back to jail, the medical clearance.

12:28:28  2        Q.  Medical clearance?  Okay.

12:28:29  3        A.  Any other files coming in a file, I would never

12:28:31  4    open that file.  That would be directly to the

12:28:34  5    infirmary.  Okay.  But the only thing that I would see,

12:28:37  6    from whether Brownsville PD or any other agency, would

12:28:40  7    come in with a medical clearance from a hospital.

12:28:43  8        Q.  Okay.  Where would you see that?  Where would

12:28:45  9    that be?

12:28:46 10        A.  The police officer would be carrying them with

12:28:49 11    him besides any probable cause or affidavits he had

12:28:55 12    with him.

12:28:55 13        Q.  Okay.  And would he -- would that officer

12:28:58 14    bringing the prisoner in, say, from the City of

12:29:03 15    Brownsville, would they -- he present that to the

12:29:06 16    booking officer or the receiving officer, or would he

12:29:08 17    give it to you as a supervisor?

12:29:10 18        A.  It would go through us first.  Okay?

12:29:12 19        Q.  When you say "us," who is us?

12:29:14 20        A.  Okay.  It would be the supervisors.

12:29:16 21        Q.  Okay.

12:29:17 22        A.  Correction.  Supervisors.

12:29:19 23            Again, not at all times we would actually

12:29:22 24    be there at the entrance receiving inmates.  I just

12:29:24 25    want to bring that for the record.  Okay?

12:29:28  1   And when I would be there, I would ask the
12:29:32  2  prisoner his medical, how was he doing medically, any
12:29:37  3  hepatitis, anything like that.
12:29:39  4        He would say, "No."
12:29:39  5        I would ask, again, the officer, "Any deal
12:29:42  6  that you have with this gentleman in the medical deal?"
12:29:45  7        "Well, he's cleared by the hospital."
12:29:47  8        "Can I see the receipt?"
12:29:48  9        He would show me the receipt.  I would
12:29:50 10  give it back to the officer, and his responsibility was
12:29:52 11  to take it to the booking officer.
12:29:58 12   Q.  Okay.  If you weren't there, who would do that
12:30:00 13  type of thing?
12:30:01 14   A.  What we call -- would be the runners.
12:30:05 15   Q.  The runners.
12:30:06 16        Okay.  But people under your supervision.
12:30:07 17   A.  The detention officers.  Correct.
12:30:09 18   Q.  Detention officers.  Okay.
12:30:10 19        So they would act like -- kind of like a
12:30:12 20  receiving officer.
12:30:14 21   A.  Correct.
12:30:15 22   Q.  Okay.  They received the file, look at it for
12:30:18 23  medical stuff, medical clearance, and then they -- if
12:30:23 24  it was medical clearance, they'd take it to the booking
12:30:25 25  officer.

A.    Correct.  Again --

Q.    The prisoner.

A.    Correct.

      The officer would get back to the police officer or any other agency for them to be responsible to take it to the booking department.

Q.    Now, if you got some information about a clearance slip that says you're clear to go back to jail but keep under close observation, did you see any such slip regarding Mr. Longoria?

A.    Well, true, honestly, no, sir.  I had never seen one of those.

Q.    Okay.  Have you ever seen a slip like that?

A.    No, sir, not at all.

Q.    So you wouldn't know what you would do with that type of thing?

A.    Not that I wouldn't know what to do.  I would bring it up to the infirmary department for them to take care of it.

Q.    Okay.  So you would inform the nurse, the nurse's office to take care of that type of situation where you said, "Okay, he's clear to go back to jail but keep under close observation."  You would give it to -- directly -- call the nurse or give it directly to the infirmary?

12:31:33  1    A.   Correct.  Because, you see, what you're telling
12:31:35  2  me or what that slip would state is keep under close
12:31:38  3  observation.  And then you have this slip, basically,
12:31:40  4  coming in from a hospital.  I'm no medical expert or
12:31:44  5  know what's going on with this person.  I would refer
12:31:50  6  it to the infirmary department.
12:31:51  7    Q.   Okay.  For whatever --
12:31:52  8    A.   For whatever reason.
12:31:54  9    Q.   Okay.  If it came in to you.
12:31:56 10    A.   Correct.
12:31:58 11    Q.   Okay.  Assuming that that's what it said,
12:31:59 12  that's what you would do.  Is that -- you understand
12:32:03 13  the policy and procedure of the sheriff's office to
12:32:07 14  refer that type of situation to the infirmary?
12:32:10 15    A.   Yes, sir, I do.
12:32:11 16    Q.   Is there an infirmary box or place where that
12:32:16 17  type of information is placed, or would you call the
12:32:19 18  nurse on the telephone, assuming there's one available?
12:32:23 19    A.   Basically, in my deal, I would never put
12:32:26 20  anything in an infirmary box.  I would always bring it
12:32:28 21  up to the infirmary, especially when I was taking an
12:32:31 22  intake into our facility.
12:32:33 23    Q.   Okay.  You would make sure that that was --
12:32:36 24  there was no slip in the lip, so to speak.  You would
12:32:39 25  directly refer that.

A.  That is me, sir.

Q.  Okay.  Is that -- I know that's you, but is that, do you understand, the policy and procedure of the sheriff's department?

A.  Correct.  Yes, sir.

Q.  Okay.  Now, your shift was the -- at that time, April 11th, 2001 -- you can refer to your statement if you wish.  Your shift was the graveyard shift.  What do you call that?  Shift C or --

A.  Yes, sir.  Correct.

Q.  You had the graveyard shift.

On the graveyard shift, how many -- or were there any nurses in the -- or anybody in the -- medical personnel in the infirmary on duty at that time?

A.  Not at the time, sir.

Q.  Okay.  Has that changed any since, for that period of time, that time period, the graveyard shift, to your knowledge, you know, either what you know personally or what somebody told you?

A.  Again, now?

There's been changes.  I haven't worked for the jail for about, actually, two years already.

Q.  Yeah.  At the time you left the jail.

A.  At the time, usually, nurses would leave.  The

latest would be somewhere around 10:30, 11:00, because they would stay to pass out medications, check files, check the intakes we had for the incoming morning shift so they won't be backed up.  But the latest that I remember would be somewhere around 10:30, 11:00 the most that we had --

Q.  At night.

A.  -- a nurse.  Yes, at night.

Q.  Okay.  And then there would be a nurse on call; is that correct?

A.  That is correct.

Q.  Okay.  Did you ever work any other shifts, A and B shifts?

A.  Oh, yes, sir.

Q.  How many nurses would be on the -- A shift was the morning shift?

A.  Correct.

Q.  How many nurses would there be on the morning shift, if you recall, there present, not on call?

A.  Present.  We're talking, in general, the three facilities now back then?

Q.  Old county jail.

A.  The old county jail?

Q.  At the old county jail.

A.  That would be the base of the other two jails.

In that area, in that old county jail, approximately about three nurses.

Q.  Okay.  And that would be on the B shift as well?

A.  On the A shift and on the -- the B shift, again, starting the B shift, some nurses would be --

Q.  There may be some overlap.

A.  Yeah.  There would be some nurses leaving, and we would have two nurses for all three facilities.

MR. VITTITOE:  Could we go off the record?

(Discussion off the record)

Q.  There's an A, B, C shift for the sheriff's officers.

A.  That is correct.

Q.  Okay.  And as it was explained to us that the nurses actually worked for the County Health Department; is that correct?

A.  Yes, sir.

Q.  And there may be more than three shifts for the nurses.

A.  Possibly.

MR. VITTITOE:  They have overlapping shifts.

Q.  But whatever it was, there wasn't any nurses there after 11:00 to what?  7:00 in the morning?  6:00

in the morning?

     A.   Correct.

     Q.   Okay.  I mean, present, not on call.

          Okay.  And -- but did you have -- from
11:00 to 7:00 when you had the graveyard shift, did you
actually receive prisoners at that time?

     A.   I don't recall getting any other prisoners
during this period of time.

     Q.   No.  I mean just in an 11:00-to-7:00 period,
not on the time that --

     A.   That this incident happened?

     Q.   -- this happened.  Anytime.

     A.   Yes, sir.

     Q.   You got prisoners in without a nurse being
present; is that right?

     A.   Yes, sir.

     Q.   If you thought or somebody thought the
person -- or if they said they had a medical problem,
you'd call the nurse up?

     A.   Yes, sir.

     Q.   "Come over and look at him"?

     A.   Yes, sir.

     Q.   Okay.  But there was no medical personnel in
the infirmary.

     A.   No, sir.

Q.   Okay.   Now, Sergeant -- looking at your statement, the second paragraph, Sergeant Tenorio was the second shift supervisor?

A.   Correct.   The B shift supervisor.

Q.   Okay.   And it says here, I didn't see Sergeant Tenorio look inside the padded cell to check on the inmate.

But you were told that there was somebody in padded cell No. 1; is that correct?

A.   Yes, sir.   Upon being briefed by Sergeant Tenorio.

Q.   Did you go check padded cell No. 1 at that time?

A.   No, sir.

Q.   Okay.   Did you send anybody to go check on padded cell No. 1 at that time when you came in?

A.   No, sir.

Q.   Okay.   Did you see whether or not there was a log, a visual log on padded cell No. 1 at that time to see if somebody was checking -- to see if there was a log checking in on that prisoner in padded cell No. 1?

A.   No, sir.

Q.   What were you told by Sergeant Tenorio about the -- that prisoner when you were briefed by him?

A.   That he was brought in by Brownsville Police

Department and that supposedly earlier on the A shift,
Sergeant Silva's shift, this person in single cell No.
1, I believe, had had some kind of problem in the large
holding cell with some other inmates that supposedly
wanted to beat him up.

Q.  Oh, okay.  So he was just -- he was being held
in the padded cell pending booking?

A.  Well, the reason -- what I heard -- when
Mr. Longoria was taken out of the large holding cell
was for his own safety and the safety of others.

Q.  I understand.  Somebody was threatening to beat
him up or something or he was complaining about
somebody threatening to beat him up or harm him
physically; is that right?

A.  Correct.

Q.  And so is what you understood, he was taken out
and put in padded cell No. 1 as kind of a holding cell
for him?

A.  Correct.

Q.  A segregated holding cell.

A.  Correct.  Because at the time, the drunk tank
was packed as well.

Q.  And the small holding cell was also packed?

A.  We had -- I'm not familiar, but if not
mistaken, we had about four or somewhere around there

| | |
|---|---|
| 12:39:58 1 | other prisoners as well. |
| 12:39:59 2 | Q.  In the small holding cell? |
| 12:40:00 3 | A.  In the small holding cell right next to the |
| 12:40:02 4 | large holding cell. |
| 12:40:04 5 | Q.  A large holding cell held about how much? |
| 12:40:10 6 | A.  Gosh.  I don't recall. |
| 12:40:11 7 | Q.  Okay. |
| 12:40:11 8 | A.  I can't tell you right off the number. |
| 12:40:14 9 | Q.  We have -- |
| 12:40:15 10 | A.  Somewhere -- |
| 12:40:19 11 | Q.  More than 10? |
| 12:40:21 12 | A.  Yes. |
| 12:40:22 13 | Q.  Okay.  Less than 15? |
| 12:40:24 14 | A.  Somewhere 10, 15, around that area. |
| 12:40:27 15 | Q.  Okay.  How about the drunk tank, what says the |
| 12:40:29 16 | drunk tank? |
| 12:40:30 17 | A.  That one would fit more than 20, I believe. |
| 12:40:37 18 | Q.  20 prisoner? |
| 12:40:38 19 | A.  20 prisoners. |
| 12:40:40 20 | Q.  Okay.  Had you ever placed any prisoner in the |
| 12:40:45 21 | holding cell, the padded holding cell No. 1, yourself |
| 12:40:52 22 | or under your supervision? |
| 12:40:55 23 | A.  Well, under my supervision, yes. |
| 12:40:58 24 | Q.  Okay.  And what kind of -- what was the problem |
| 12:41:00 25 | with that prisoner?  Was he suicidal? |

A.   In that case, yes, he was suicidal.   And this was the -- I got an approval from the infirmary department in this case because this gentleman, we had a blue suit on this gentleman.

Q.   What's a blue suit?

A.   It's a paper suit, a blue suit, paper suit, that only has a zipper.  Okay?  And it's a complete uniform suit, paper suit.  And he kept on tearing this uniform off.  Okay?  He tore up the zipper, little metal zipper.

Q.   And he tried to cut his wrist with it?

A.   Cut himself, yes, sir.

     And what else?  Another time we had other prisoners in that small holding cell where we had a log.  There was a log on this gentleman, a fluid log, the whole deal.  And every -- if I'm not mistaken, we were doing a log on this gentleman --

Q.   You're not talking about Mr. Longoria.  You're talking about somebody else.

A.   Somebody else.  Yes, sir.  -- about every ten minutes.

Q.   Okay.

A.   Or sometimes even lesser than ten minutes.  It was critical.  And that was the only time.  He calmed down after several hours.  He didn't have his uniform

on.  There was nothing inside the cell, the single cell
No. 1 for him to harm himself.  He was being fed.
Okay.  No spoon, just a paper plate.

Q.  Okay.

A.  And that same day -- I don't recall the hours.
It was before my shift ended, which my shift was eight
hours at the time.  We brought him out.  He was calm.
And we placed him back, still with a log, in the small
holding cell right in front of the booking area.

Q.  Okay.  As I understand it, the small holding
cell is -- has -- just has bars on it; is that right?

A.  It has bars and a cement bench.

Q.  Okay.  And you can -- somebody just walking
past can look in to see how the prisoners are doing in
there.

A.  Most definitely, yes.

Q.  Yeah.  And the large holding cell is the same
way; is that correct?

A.  That is correct.

Q.  With bars.

As I understand it, the drunk tank had a
steel door type thing, solid steel?

A.  Yes, sir.

Q.  Or did it have bars?

A.  No, sir.  It was a solid metal door with a

1  window on it and a lid for the trays to go in through

2  there.

3      Q.  Okay.  Is that like the holding cell No. 1, the

4  padded cell?

5      A.  That cell particular --

6      Q.  Except for larger.

7      A.  The drunk tank.  That name there was a drunk

8  tank, okay, what we call a drunk tank.  But it was --

9  to my understanding, I never heard anything saying,

10 "Okay.  This is cell No. 1 or No. 2."  We

11 always identified small holding cell, large holding

12 cell, drunk tank.

13     Q.  Okay.

14     A.  And then we had single cell 1.

15     Q.  Okay.  But so there were more -- there was not

16 just drunks in the drunk tank.

17     A.  Oh, no.  No, no, no, no, no.

18     Q.  Okay.  It was just a type of a holding cell.

19     A.  Correct.  Because Cameron County holds a lot of

20 prisoners.  I mean, a lot of agencies work under us.

21 Yes.

22     Q.  Sure.  Federal, border --

23     A.  Yes, sir.

24     Q.  -- customs, all kinds -- immigration, all kinds

25 of stuff probably; is that correct?

A.  That is correct, sir.

Q.  Okay.  The -- so you understood, at least from Sergeant Tenorio, that the -- there was an inmate in the padded holding cell No. 1, single cell No. 1, and you then did a security check; is that right?

A.  That is correct, sir.

Q.  And Sylvia Santillana --

A.  Santillana.

Q.  Santillana.  -- was your booking officer?

A.  During that night, yes, sir.

Q.  And you found out that two of them were going to leave, and you did a head count.  Did that include checking on Mr. Longoria in padded cell No. 1?

A.  When checking the doors?

Q.  No.  When you checked head count.

A.  The head count --

Q.  A head count was then conducted at 11:30 p.m.?

A.  Correct.  At around 11:30.

Q.  Okay.  Did you actually count Mr. Longoria's head?

A.  The head count always started from the top.

Q.  I see.

A.  The third floor towards the bottom.

Q.  Okay.

A.  Okay?

Q. Then you decided to clean out your locker. Where was your locker area?

A. I'm going to use Exhibit No. 2.

Q. Silva's Exhibit No. 2?

A. Yes, sir.

It was in the briefing area. My locker was in the briefing area.

Q. Okay. So you had to pass by padded cell -- single cell No. 1.

A. That is correct, sir.

Q. And you -- was the -- I understand there was a steel door over the glass, is that correct, to padded cell No. 1?

A. Yes, sir. Correct.

Q. Was that door open when you passed by, or did you open it?

A. It was open.

Q. Okay.

A. Yes, sir.

Q. Is it always kept open?

A. Yes, sir.

Q. Okay. Even when you've got a prisoner that's suicidal?

A. Yes, sir.

Q. Is it a practice or procedure to keep that

12:46:51 1    steel door open so that there's some visibility into

12:46:54 2    there at all times?

12:46:55 3        A.   That is correct, sir.   In my experience there

12:46:58 4    working, which was not too much at the old county jail,

12:47:02 5    I always saw that window open.

12:47:04 6        Q.   Okay.   It would be against procedures and

12:47:05 7    policies to close it?

12:47:07 8             MR. VITTITOE:   Objection, speculation.

12:47:10 9        Q.   Do you know?

12:47:15 10       A.   Being open or closed?

12:47:17 11       Q.   Yes, sir.   If you had -- I mean, if you had a

12:47:21 12   prisoner for whatever reason, would it be against

12:47:26 13   policies or procedures of the sheriff's department,

12:47:29 14   detention, to have it closed, if you know?

12:47:32 15            MR. VITTITOE:   Objection, speculation.

12:47:38 16            THE WITNESS:   True honestly?

12:47:41 17       Q.   Yes.

12:47:42 18       A.   I don't recall seeing it in the book, the

12:47:44 19   policy.

12:47:49 20       Q.   Okay.   So as you passed by, you knew there was

12:47:51 21   an inmate inside, but -- and you stopped.   You didn't

12:48:00 22   just walk past it.   Your assistant Sergeant Galicia

12:48:08 23   stopped at the single cell.   "And he told me that he

12:48:11 24   was going to check out the inmate inside."

12:48:12 25            This was -- was this -- what time was

this?  It was after 11:00, right?

A.  Yes, sir.  Correct.

Q.  And the head count started at 11:30.  It was sometime between 11:00 and 11:30?

A.  At around that area, yeah.  The head count actually had started.  It was called out that it been started.  And from there, I decided to go back there and fix my locker, correct.

Q.  Okay.  And Assistant Sergeant Galicia told you that he couldn't see any movement, while he was looking inside the window, of the inmate?

A.  He didn't actually see -- told me that -- like, that he didn't see no movement.  We were passing by.  I was the first one.  He was in back of me.  I stopped. Okay?

Q.  Yes, sir.

A.  And then Galicia stopped.  And, like, he reacted saying, you know, "Let's check this guy."

Q.  Okay.

A.  Okay.  Like at the same time I did.

Q.  There was no activity log on the --

A.  No, sir.

Q.  -- on the door?

A.  No, sir.

Q.  Okay.

A.  I didn't see one.

So we glanced in there and started knocking.  And Galicia actually started knocking as well and to no avail.  There was no movement whatsoever.

Q.  Okay.  And you told him --

A.  To open up single cell No. 1 --

Q.  Okay.

A.  -- with caution as well.

Q.  Yeah.

A.  Okay.  Since, at the time, his legs -- I could only visualize his legs, okay, and, like, half of his body from the window.  Okay?

Q.  To the floor?

A.  To the floor, correct.  Okay?

I told him, "Open up carefully," because of his head, you see, obviously, if the body is pointing this way, I believe it's west --

Q.  Towards the door?

A.  No, not towards the door.  The door is on his head.  That was my deal, that his head was on the door, and once we opened it, he would fall down and wake up and etc.

Q.  Okay.

A.  But his head was actually leaning, like, near

the door with the door open.  He was kneeling.  His

head was leaning against the small portion of the wall

before, you know, once the door opens.  Okay?  So his

head was leaning --

Q.  By the door.

A.  -- by the door.

Q.  Okay.

A.  Once he opened it --

Q.  Okay.  How large is that cell?  Estimate it.

A.  Gosh.  I can't just estimate --

Q.  Okay.

A.  -- the measurements of that cell.

Q.  Okay.  If there's only a bench inside?

A.  A bench inside?

Q.  Yeah.  Is there a bench inside?

A.  There is a small, like, a bed.  It's not a

bench bench.  It's a small bed cushion bed from the

floor, I'd say, about 8 inches high from the floor.

Q.  Okay.  And that's away from the door so if

somebody is on the bed, you could see them?

A.  Oh, yes, sir.

Q.  Okay.  And there's a recessed urinal in there

or some type of --

A.  There is a --

Q.  -- a hole?

12:51:15  1      A.  Yes, sir.  There is hole there and -- where

12:51:15  2  they could urinate through that area.

12:51:15  3      Q.  Okay.  Now, if you went -- if you went to

12:51:17  4  the -- if you went to the window itself, could you see

12:51:23  5  all parts of that -- and look into the window, could

12:51:26  6  you see all parts of that -- inside of the cell?

12:51:34  7      A.  All parts?

12:51:36  8          I would only see the front portion of the

12:51:38  9  cell, the bed that I was talking about, and that would

12:51:47 10  be -- that would be it.

12:51:48 11      Q.  That would be it.

12:51:49 12      A.  From herein on, okay, if you would be laying

12:51:52 13  down the way Mr. Longoria would be, I wouldn't have

12:51:55 14  access to see, like, from your chest.

12:51:57 15      Q.  Up.

12:51:58 16      A.  Correct.

12:51:59 17      Q.  What you did, you saw his feet, but you

12:52:01 18  couldn't see the rest of him.

12:52:02 19      A.  I couldn't see, like, from his chest up.

12:52:04 20      Q.  Okay.  Mr. Longoria was behind -- all that

12:52:08 21  door, feet and head.  You couldn't see him at all.

12:52:12 22      A.  No.  I could see his feet.

12:52:14 23      Q.  I know, at the time.  But I'm saying if --

12:52:18 24  well, suppose he was standing up behind that door and

12:52:23 25  you looked in the window, could you see him standing up

12:52:26  1    there?

12:52:26  2        A.   Yes.

12:52:29  3                  Right behind door?

12:52:31  4        Q.   No.  Beside the door.

12:52:34  5        A.   Away from the door on the sides, yes.

12:52:36  6        Q.   Okay.

12:52:36  7        A.   Yes.

12:52:37  8        Q.   But because his head was laying down, you

12:52:40  9    couldn't see his head.

12:52:42 10        A.   That is correct.

12:52:42 11        Q.   Okay.  If he was laying on the floor away from

12:52:46 12    the door but close to the door, could you see him at

12:52:49 13    all?  Or sitting?  Laying or sitting?

12:52:53 14        A.   Yes.  I would -- unless he would be near the

12:52:56 15    door, sitting down near the door or next to the door, I

12:52:59 16    wouldn't have access to see him.

12:53:39 17        Q.   Okay.  If you were just passing by, a runner or

12:53:43 18    whatever was just passing by with the open -- the

12:53:46 19    window, could you see -- in other words, if you didn't

12:53:51 20    stop to look specifically but were just passing by,

12:53:55 21    could you -- while you're passing, could you visualize

12:53:58 22    the whole interior of the cell?

12:54:01 23        A.   You would have to turn to your right in order

12:54:02 24    to see the cell.

12:54:03 25        Q.   So you'd have to actually look into it.

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

12:54:05  1     A.  Like -- yeah.

12:54:06  2     Q.  Okay.

12:54:06  3     A.  Well, it all depends the way your height is as

12:54:10  4  well.

12:54:10  5     Q.  Sure.  How high off the ground was the window?

12:54:14  6     A.  It wasn't too high and not too low, but we had

12:54:17  7  some guys --

12:54:18  8     Q.  Average height?

12:54:19  9     A.  Yeah.

12:54:22 10     Q.  So then you called for -- you saw him laying --

12:54:29 11  Mr. Longoria was laying face up.  Was his eyes closed?

12:54:36 12  Partially open?

12:54:37 13     A.  When I opened the first time the cell, with

12:54:39 14  Officer Galicia, I saw a complete body with his face

12:54:46 15  up, okay, his chin, actually, somewhere touching his

12:54:51 16  chest.

12:54:51 17     Q.  Yeah.

12:54:52 18     A.  Okay?  And I couldn't see his eyes, whether

12:54:55 19  open or closed.  I had to kneel down a bit.  Okay?

12:54:58 20     Q.  Did he appear -- from the chest down, did he

12:55:00 21  appear gray and ashen?

12:55:02 22     A.  He had his uniform on, sir.

12:55:04 23     Q.  Okay.  How about from the head?  Did his head

12:55:06 24  appear to be gray and ashen?

12:55:13 25     A.  To me, it was the color or the way the light we

had in there, stuff like that --

Q.  You couldn't tell?

A.  -- I couldn't say whether gray or whatever the colors you're mentioning there.

Q.  Okay.  I mean, when you first looked at him, he didn't look dead?

A.  Excuse me?

Q.  When you first looked at him, you couldn't tell whether he looked dead or not?

A.  Correct.  Or faking it.

Q.  Or faking.

A.  Yeah.

Q.  Or asleep?

A.  Yeah.  Incidents I've had before, encounters.

Q.  You've seen faking.

A.  Not him, but other inmates.

Q.  Yeah.  Did you -- when you came on -- did you ask Officer Tenorio, Sergeant Tenorio, why this inmate in padded cell No. 1 had not been booked and classified yet?

A.  No, sir.  That question wasn't -- didn't -- was not brought up by me.

Q.  Did anybody tell you what time he had come in? Mr. Longoria?

A.  Not at the time.  They just told me in Sergeant

12:56:16  1    Silva's shift.  They didn't specify a time.

12:56:19  2        Q.  Okay.  I mean, normally, what -- how long does

12:56:20  3    it take to book a prisoner?

12:56:27  4        A.  Again, I wouldn't -- not to answer this

12:56:31  5    question, but I wouldn't know because the booking

12:56:34  6    officers, they know the way they come in and the many

12:56:39  7    prisoners they have, they go, you know, the way they

12:56:42  8    come.  They start doing the process with the booking

12:56:45  9    department.

12:56:45  10       Q.  Okay.  And as I -- do you know if -- in other

12:56:50  11   words, you testified what you would do if somebody --

12:56:53  12   you saw that medical slip that I talked about --

12:56:56  13       A.  Correct.

12:56:57  14       Q.  -- you would directly inform the infirmary or

12:57:01  15   the nursing staff about it, but is it typical that once

12:57:10  16   it goes through booking and then classification, then

12:57:13  17   they're seen by the nurse to see if there's any other

12:57:15  18   problems that the nurse may need to take care of to

12:57:17  19   decide where to put the prisoner?

12:57:19  20       A.  It doesn't have to actually work that way, like

12:57:22  21   the way you mentioned, by going through that, unless,

12:57:27  22   again, if that slip pops up or any medical slips, the

12:57:29  23   nurse has to come over to the booking department and

12:57:31  24   see this person, this prisoner.

12:57:34  25       Q.  Okay.  Suppose somehow the slip didn't get

12:58:58  1    wake him up.  You said you only tapped him a couple of

12:59:01  2    times.  Where did you tap him?

12:59:05  3        A.  In this area, sir.  He was, like -- on his

12:59:10  4    right upper arm, near his shoulders.

12:59:13  5        Q.  Near his shoulder?

12:59:14  6        A.  Yes, sir.

12:59:14  7        Q.  You never put your hand around his neck or

12:59:17  8    anything?

12:59:17  9        A.  None whatsoever.  And what I hit him was with

12:59:19 10    the back of my palm, my hands.  I was tapping.

12:59:22 11        Q.  Try to get his -- light tap, trying to get his

12:59:24 12    attention?

12:59:24 13        A.  Yes, sir.

12:59:25 14        Q.  Okay.  Did Officer Galicia put his hand around

12:59:30 15    Mr. Longoria's neck?

12:59:33 16        A.  No, sir.

12:59:33 17        Q.  Or -- to see if he was faking or anything like

12:59:35 18    that?

12:59:35 19        A.  No, sir.

12:59:35 20        Q.  Try to get his attention?

12:59:37 21        A.  No, sir, not at all.

12:59:38 22        Q.  Okay.  Did you notice any bruising or

12:59:41 23    discoloration around Mr. Longoria's neck when you saw

12:59:44 24    him?

12:59:45 25        A.  No, sir.

Q. Was he in a paper uniform or a cloth uniform?

A. He was in a cloth uniform.

Q. The regular prisoner population uniform?

A. That is correct. During that night, when I found Mr. Longoria, he was wearing an orange uniform.

Q. An orange uniform.

A. Cloth.

Q. Okay. Was his -- the neck -- I mean, the uniform open so you could look at the neck?

A. I don't recall whether how many buttons that were tied up, okay, all the way to his neck. So I can't say whether it was all the way up to his neck.

Q. Okay. So you don't recall seeing any type of markings on his throat or anything?

A. No, sir.

Q. Okay. Could you -- did you see the markings on any other part of his body -- bruises, discolorations, anything else?

A. No, sir, not at all.

Q. Okay. This was a short-sleeve uniform?

A. Yes, sir. Correct. Up to his elbow.

Q. Okay. One thing that's not in your statement, and I want to see if you remember it. Could you see if there was any food plates in there, food or water, when you went inside that -- opened the door?

13:00:58 1    A.  I don't recall.  The only thing that I do

13:01:00 2  remember was some sandals.

13:01:04 3    Q.  Sandals?

13:01:04 4    A.  Yes, sir.  Some sandals.

13:01:05 5    Q.  So he was barefooted when you found his body?

13:01:08 6    A.  Again, I don't remember whether he had a sandal

13:01:10 7  on or both of them, but I remember -- do seeing one

13:01:13 8  sandal off.

13:01:14 9    Q.  Off.  Okay.

13:01:16 10    But you don't remember seeing any food?

13:01:19 11    A.  I don't recall seeing any food.

13:01:23 12    Q.  I take it that even though -- even, like you

13:01:26 13  said, even a prisoner who's put in there for whatever

13:01:31 14  reason and whether he's suicidal or not, you described

13:01:35 15  the procedure for suicidal is to put paper plates,

13:01:39 16  right?

13:01:39 17    A.  Correct.

13:01:40 18    Q.  But if he's not suicidal or voiced being

13:01:43 19  suicidal, you would have a -- the prisoner is supposed

13:01:47 20  to be fed at normal times; is that right?

13:01:50 21    A.  Okay.  Again, on normal plates or --

13:01:53 22    Q.  Any plate.  Any plate.

13:01:55 23    A.  Okay.  In general, down in the first floor --

13:01:57 24    Q.  Yeah.

13:01:57 25    A.  -- what we call the drunk tank, single cell,

13:02:00  1   large holding cell, small, they all get fed with a

13:02:00  2   paper plate.

13:02:00  3        Q.  Okay.

13:02:05  4        A.  A foam plate, correct.

13:02:05  5        Q.  A foam plate.

13:02:06  6        A.  A foam plate.

13:02:07  7        Q.  Okay.  And although -- if he's not suicidal, he

13:02:09  8   may have some plastic forks or knives or something?

13:02:13  9        A.  If he --

13:02:15 10        Q.  Plastic fork?

13:02:16 11        A.  We don't use any forks.  What they use is a

13:02:19 12   plastic spoon.

13:02:21 13        Q.  A plastic spoon.

13:02:22 14        A.  A plastic spoon.

13:02:23 15        Q.  Okay.  And if they got any water or something

13:02:26 16   to drink, is it in a plastic foam type of cup like the

13:02:29 17   one we're -- have in front of us?

13:02:31 18        A.  That is correct, sir.  It's a foam cup.

13:02:39 19        Q.  Okay.  If the person is suicidal or -- do you

13:02:43 20   give him any eating utensils?

13:02:46 21        A.  No, sir.

13:02:47 22        Q.  None at all?

13:02:48 23        A.  No.

13:02:48 24        Q.  Not even a plastic spoon?

13:02:50 25        A.  Not even a plastic spoon.

Q.   Okay.  Are those prisoners, whatever they are, are they supposed to be fed at a certain time like other prisoners?

A.   Yes.  Like any other prisoner.

Q.   Okay.  What are the feeding times?

A.   The same time.  We had one before 7:00 in the morning, then we had one starting at 11:30 in the morning, and then the dinner would be starting at 4:30 in the afternoon.

Q.   Okay.  And it would end at what time?

A.   The dinner would end, in general, say about close to 6:00.

Q.   Okay.  Now, a person that's on suicide watch, say he's suicidal, is somebody supposed to go in and check to see whether they're actually eating as part of the activity log?

A.   Yes, sir.  All suicidals we have a log, an intake fluid log.  Once they get fed, the officer, detention officer, or anyone that's passing out the plates, which includes sometimes myself as a supervisor, write down in the log what time, the amount of fluid, okay, and what would they be feeding, you know, whether it would be ground beef, what the plate was, the portion of the plate would be containing.

Q.   Okay.  Would anybody check to see -- I know you

13:04:23  1    would have what they were given, but was anybody

13:04:25  2    checking to see if they were eating or fluid was

13:04:38  3    actually taken by the prisoner?

13:04:38  4        A.  Yes, sir.

13:04:38  5        Q.  Okay.  How would you do that?

13:04:38  6        A.  When the plates are being picked up.

13:04:38  7        Q.  Okay.  So you actually see -- well, you

13:04:40  8    wouldn't know if the water was poured down the urinal

13:04:42  9    or not then, or the food, would you?  You wouldn't go

13:04:48 10    in the cell?

13:04:50 11        A.  You see, if we would pass this plate at so time

13:04:52 12    with water, a foam cup, okay, log it in.  Okay.

13:04:57 13    Between those ten minutes, okay, I wouldn't actually be

13:05:00 14    there seeing him eat the whole portion or the water,

13:05:03 15    drink his water.  I wouldn't be actually just there.

13:05:08 16        Q.  That's what I'm trying to find out.

13:05:09 17        A.  So I couldn't say whether he would put it down

13:05:12 18    the hole, the water, or anything like that.  And if

13:05:17 19    they did, it would in between that time when I would

13:05:21 20    come back.

13:05:22 21        Q.  Okay.  But at least you would check to see if

13:05:23 22    the plate was empty and the cup was empty.

13:05:25 23        A.  Yes, sir, because I have to put it down in my

13:05:28 24    log.

13:05:30 25        Q.  Okay.  Did you see any plates or anything

13:05:32 1   outside the jail cell that Mr. Longoria was in?

13:05:36 2   A.   No, sir.  Yeah.  By that time, basically, all

13:05:38 3   plates would be picked up, be cleaned up.

13:05:41 4   Q.   Okay.  If they picked up plates that were full,

13:05:44 5   would anybody log that in somewhere?  In other words,

13:05:49 6   the plates went in full, the plates came out full,

13:05:54 7   unless he was on a medical watch, would they --

13:05:57 8   A.   Yes, sir.  That's when we check, basically --

13:06:01 9   Q.   Okay.  Whoever, the trustee or whoever picks up

13:06:03 10  the plates or anything like that, would they go notify

13:06:05 11  him, "Hey, this -- nobody touched anything in this

13:06:07 12  food"?

13:06:09 13  A.   In general?  With general population?

13:06:11 14  Q.   Yeah.

13:06:11 15  A.   No.

13:06:12 16  Q.   Okay.  They would if it was on suicide watch?

13:06:15 17  A.   That is correct, sir.

13:06:16 18  Q.   Okay.  But that would be at the intake log.

13:06:20 19  A.   That is correct, sir.

13:06:28 20  Q.   Okay.  Now, what's the difference between a 95

13:06:30 21  and a 96?  Do you know the difference?

13:06:35 22  A.   Meaning the number?

13:06:36 23  Q.   Somebody says, "He's a 96."

13:06:38 24      MR. VITTITOE:  10 codes.

13:06:39 25      THE WITNESS:  Oh, the 10 codes?

13:06:40  1      Q.   Yeah.  10 codes.

13:06:42  2      A.   95 being a suspect, subject being under arrest.

13:06:46  3  Okay.  That's when you call it in.  Or a 95 being

13:06:48  4  inside the jail, as well.  That's what we call inmates.

13:06:52  5      Q.   Okay.

13:06:52  6      A.   Prisoners, 95s.

13:06:53  7      Q.   What's a 96?

13:06:54  8      A.   96, what it is, a 96 is, possibly, okay,

13:07:01  9  whether he's mental ill, okay, but we're not

13:07:05 10  specifying, okay, he is a mental ill.

13:07:08 11      Q.   Okay.  So possible mental ill person.

13:07:10 12      A.   Possible.  Be cautious.

13:07:13 13      Q.   Okay.  Were you told that Mr. Longoria was a 96

13:07:17 14  during his briefing?

13:07:18 15      A.   Not at all, sir.

13:07:22 16      Q.   Okay.  Were you told he was a 95?  I mean,

13:07:24 17  everybody's a 95 that's in there, isn't it?

13:07:26 18      A.   That we had a 95 in single cell No. 1.

13:07:29 19      Q.   Okay.  I mean, 95 meaning there's a body in

13:07:31 20  there.

13:07:31 21      A.   Correct.

13:07:31 22      Q.   A live body, hopefully, right?

13:07:34 23      A.   Correct.

13:07:37 24      Q.   Okay.  You then had a dispatch.  You call EMS?

13:07:41 25  You dispatch for EMS?

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755     (956)542-1020

A.  I contacted our dispatch department to contact EMS, yes, sir.

Q.  And then you asked your booking officer to call the nurse on call; is that right?

A.  That is correct.  The first one I made contact with was to call -- for medical, was Sylvia Santillana. Due to that, I had to go through her first, okay, into the booking area.  She was standing on my left side inside the booking area and told her, "Contact the nurse on call," which we had a schedule.

More than likely, we still have a schedule, who's the nurse on call.  I ran towards the back on extension 331, contacted dispatch advising them, you know -- what -- this is what I have right now.

Q.  How much time did this take?  A minute?  Couple of minutes?

A.  It was so quick.  I mean, I'd just say a minute or less than a minute where, boom, boom, and I did it, and that was -- it was fast.

Q.  You never logged in exactly when you discovered the body or went into the cell, discovered Mr. Longoria lying on the floor, did you?

A.  In the statement, no, sir.  But it happened around 11:30.

13:08:47  1    Q.  Okay.

13:08:49  2    A.  Somewhere around 11:30 p.m.  I won't say 12:00.

13:08:54  3    It was way before 12:00.  It was in that period, 11:30,

13:08:57  4    11:40, somewhere around that area.

13:09:00  5    Q.  You then contacted your lieutenant; is that

13:09:01  6    right?

13:09:01  7    A.  Yes, sir.  My lieutenant Frank Gonzalez right

13:09:04  8    after I finished with dispatch.

13:09:06  9    Q.  And you secured the area; is that correct?

13:09:07 10    A.  That was the first thing I did, sir.

13:09:11 11    Q.  Okay.  Were there any other detention officers

13:09:16 12    inside the cell besides you and Assistant Sergeant

13:09:21 13    Galicia?

13:09:22 14    A.  Yes, sir.  The second time -- the first time me

13:09:24 15    and Galicia checked, we closed the door, and I called

13:09:27 16    in for backup.  That's when my other officers, Randy

13:09:32 17    Dierlam and this other detention officer that's not

13:09:36 18    working with us no more by the name of Ibarra, Jorge

13:09:40 19    Ibarra, who stopped with the head count to respond

13:09:44 20    downstairs.

13:09:45 21    Q.  Okay.  So you call up on the second floor?

13:09:46 22    A.  Via portable.  Yes, sir.  I don't know what

13:09:49 23    floor they were on.  "Get down here ASAP."

13:09:52 24    Q.  Okay.  Why did you call for backup?

13:09:54 25    A.  Since incidents and encounters that I've had

before with other prisoners when we go into the cells, single cells, that they'll pop up and possibly surprise you.

Q.  Oh, okay.

A.  You know.

Q.  You hadn't determined that he was -- he was probably dead by that time.

A.  I'm not saying that, sir.  No, sir.  Not at all.

Q.  Okay.  Well, had you determined that he was probably dead?

A.  There was no determination whatsoever the first time I saw him, sir.

Q.  Okay.  So that's when you called for backup.

A.  Yes, sir.  I closed the door, called for backup, they came down, and I -- small brief, "This is what we're going to do.  You go in first.  You're second.  I'm third."

And then Mr. Dierlam was the one near the head area standing up.

Q.  Okay.  Well, at least you noticed that you could only see the white -- his eyes had rolled up.

A.  That was the second time, sir, that I went in there that --

Q.  Oh, okay.

13:10:41  1      A.  Yes, sir.

13:10:43  2      Q.  So he was either unconscious or -- did you

13:10:46  3  interpret that to mean he was unconscious or something

13:10:49  4  worse, that his eyes were rolled up in his head?

13:10:53  5           MR. VITTITOE:  Or faking.

13:10:54  6      Q.  If you know.

13:10:55  7      A.  Yes, sir.  Faking it.

13:10:56  8      Q.  Or faking?

13:10:58  9      A.  Or faking.

13:10:59 10      Q.  Okay.  You've seen faking like that?

13:11:01 11      A.  That was the second time.

13:11:07 12      Q.  Okay.  Did you try to take his pulse,

13:11:10 13  Mr. Longoria's pulse?

13:11:13 14      A.  No, sir.  What I did was grabbed ahold of his

13:11:16 15  right arm, forearm, for my safety.

13:11:16 16      Q.  Okay.

13:11:21 17      A.  And kneeled down a bit, not completely, my

13:11:25 18  knees not touching the ground.  When I glanced to his

13:11:28 19  eye, his right eye was slightly open.  That's when I

13:11:31 20  noticed a white portion of the eye.

13:11:34 21      Q.  Okay.

13:11:34 22      A.  That's when, actually, I just let go of the

13:11:37 23  arm.  And I said, "Guys, don't move anything.  Let's

13:11:39 24  just go out."

13:11:40 25      Q.  Okay.  When you touched him, was he cold?

13:11:42  1      A.   I was wearing gloves, sir.

13:11:44  2      Q.   Okay.  That was part of your security detail to

13:11:47  3  wear gloves?

13:11:48  4      A.   Whether we had any fights or anything like

13:11:50  5  that.

13:11:50  6      Q.   To wear gloves?

13:11:51  7      A.   Wear gloves.  Yes, sir.

13:11:53  8      Q.   For your self-protection?

13:11:54  9      A.   Yes, sir.  Correct.

13:11:55 10           MR. VITTITOE:  Just to clarify, I think

13:12:01 11  these are latex gloves.

13:12:03 12      Q.   Yes.  I understand.

13:12:04 13      A.   Correction.  That I used to carry them in my

13:12:06 14  duty belt.

13:12:07 15      Q.   Were you able to feel whether or not, to the

13:12:09 16  touch, that Mr. Longoria was firm or not?  In other

13:12:14 17  words, when you touched him, did he feel like he was

13:12:16 18  stiff or not stiff or normal to you?

13:12:20 19      A.   Honestly, I didn't even pay attention on that

13:12:23 20  area where you hold someone's arm and -- okay, you're

13:12:26 21  normal or not normal, or you're stiff, you know.

13:12:29 22      Q.   Okay.  That's fine.  That's fair.

13:12:34 23           So you told the dispatcher that you had a

13:12:37 24  inmate that was not responding; is that right?

13:12:39 25      A.   That is correct, sir.

13:12:43　1    Q.  Okay.  Were you always inside the cell while

13:12:49　2    these other detention officers were there, or were you

13:12:54　3    outside the cell at times where the other detention

13:12:58　4    officers were in the cell?

13:13:00　5    A.  The first time?

13:13:01　6    Q.  Yes, sir.

13:13:02　7    A.  It was me and Galicia.

13:13:03　8         The second time, the officers went inside

13:13:04　9    the cell with me.  Once I told them to retreat, to go

13:13:07　10   out, they all went completely out with me.  I

13:13:10　11   personally locked the door.

13:13:11　12   Q.  Okay.  So they were never alone with the

13:13:13　13   prisoner?

13:13:14　14   A.  No, sir.  And I took the key.  I had the key

13:13:16　15   with me.

13:13:16　16   Q.  Okay.  Without your presence.

13:13:17　17   A.  Yes, sir.

13:13:22　18   Q.  Okay.  You called Lieutenant Gonzalez?

13:13:25　19   A.  Correct.

13:13:26　20   Q.  And you told Santillana to write down who comes

13:13:31　21   in and out for security purposes I take it; is that

13:13:31　22   correct?

13:13:35　23   A.  That is correct, sir, because, as well, I do

13:13:36　24   have a log that I do during my eight hours.  So

13:13:41　25   everything that she would put into this log that she

1    was doing, I would submit it as well to my log.

2            Since it was happening so fast, I didn't

3    want to miss anything.  I wanted to write who came in,

4    who came out, and what happened during that time.

5        Q.  All right.  How long did it take Felipe

6    Esquivel, the nurse, to get there?

7        A.  Honestly, I was amazed.  It was so quick that I

8    can't tell you.  I looked at my watch, and it would be

9    five minutes.  It was so fast that it happened.  I

10   don't know whether he lived nearby the area of the old

11   county jail or what.  Right after Esquivel came in, I

12   mean, EMS was there.  It was so quick.

13       Q.  Was the EMS there ten minutes or dispatch or --

14       A.  Again, I don't just recall looking at my watch

15   saying, okay, it was ten minutes.  It was fast.

16       Q.  Okay.

17       A.  It was real fast.

18       Q.  Less than half an hour, I take it.

19       A.  Oh, definitely.  Definitely less than half an

20   hour.

21       Q.  Okay.  Then you had Randy Dierlam, who was one

22   of your detention officers, then went with the EMS

23   people out -- escorted Mr. Longoria out with the EMS

24   people to the ambulance; is that correct?

25       A.  That is correct.  I assigned Mr. Dierlam to go,

```
13:15:06  1    actually, in the ambulance and to the hospital.
13:15:08  2         Q.  Hospital.
13:15:09  3         A.  Yes, sir.
13:15:11  4         Q.  Did any of the EMS people tell you that
13:15:13  5    Mr. Longoria was already dead?
13:15:16  6         A.  No, sir, not at all.  The only thing that I
13:15:18  7    would be hearing, because I let them do what they
13:15:20  8    wanted to do, that he wasn't responding.
13:15:21  9         Q.  Okay.  How about Mr. Esquivel?  Did he say that
13:15:24 10    he was already dead?
13:15:25 11         A.  I didn't speak to him whatsoever, sir.  In that
13:15:26 12    area right there, you know, you tell me, so it's just
13:15:29 13    medical deal.  I didn't get involved.
13:15:31 14         Q.  Okay.  You then had lieutenants begin to arrive
13:15:34 15    as well as Captain Elizarde?  And that's the
13:15:40 16    administrative captain?
13:15:43 17         A.  That is correct, sir.
13:15:43 18         Q.  Okay.  How many lieutenants came?
13:15:59 19         A.  If not mistaken, I believe there were four.
13:16:02 20    And it was Lieutenant Frank Gonzalez; Abel Garcia, that
13:16:06 21    is not working with us no more.
13:16:09 22         Q.  Okay.
13:16:12 23         A.  Joe Villarreal.
13:16:15 24              MR. VITTITOE:  Joe who?
13:16:16 25              THE WITNESS:  Villarreal.
```

13:16:19  1    Q.  Lieutenant Gonzalez?

13:16:20  2    A.  Yes, sir.  He was the first one.  Yes, sir.

13:16:31  3        And I don't recall, but possibly George

13:16:36  4  Garcia, Lieutenant George Garcia.

13:16:38  5    Q.  Okay.  Are they lieutenants at different

13:16:40  6  facilities or what?

13:16:41  7    A.  Yes, sir.  Correct.  Correct.

13:16:45  8    Q.  Okay.  Then it says, "At around 1:20 a.m., I

13:16:48  9  had a call from a Dr. Richardson from Brownsville

13:16:51 10  Medical Center.  He told me the body of the inmate had

13:17:03 11  rigor mortis."  Do you know what rigor mortis is?

13:17:03 12    A.  It's -- not in medical medical terms, but what

13:17:03 13  I do know is where the blood sits for a period of time.

13:17:06 14  Okay?

13:17:08 15    Q.  Okay.  So it was --

13:17:11 16    A.  It was bruised up.

13:17:11 17    Q.  Bruised up.

13:17:12 18        That's how you interpret it?

13:17:14 19    A.  It had some bruising.

13:17:21 20    Q.  Okay.  And he asked you what you knew about the

13:17:24 21  roommate -- I mean, the inmate.  You told him what

13:17:30 22  you -- in a way, he's a roommate.  He was in the same

13:17:32 23  facility as you, but he's in a different capacity.

13:17:35 24    A.  That's correct.

13:17:41 25    Q.  Okay.  And you told Dr. Richardson that the

only thing you knew, he was cleared by Brownsville

Medical Center earlier in the day.  Did you know that

it was Dr. Richardson who had apparently cleared him

and wrote the note to keep him under close observation?

A.  No, sir, not at all.

Q.  Did he tell you that?

A.  No, sir, not at all.

Q.  Okay.  Did he tell you that the prisoner had

some more bruising about his body than what he had

found when he first examined Mr. Longoria on the 10th?

A.  None whatsoever, sir.

Q.  Okay.  Did you have any further conversation

with Dr. Richardson regarding this man --

A.  No, sir.

Q.  -- after that time as stated in your statement?

A.  No, sir.

Q.  Did you have any further conversation with any

pathologist?  Dr. Dahm?

A.  No, sir.

Q.  Regarding Mr. Longoria.

A.  No, sir.

Q.  Did you have any conversation with any other

detention officer regarding Mr. Longoria's conduct

during the course of his time he was brought in the

jail to the time that you found him in the condition as

13:18:59 1    you stated about 11:30 p.m. at night on the same night

13:19:05 2    he was brought in at -- assume with me he was brought

13:19:10 3    in about 10:30 in the morning.

13:19:13 4       A.  No, sir.  Once this was going on and it

13:19:17 5    finished and provided my statement, which is right in

13:19:21 6    front of me --

13:19:22 7       Q.  Yes, sir.

13:19:23 8       A.  -- I would have -- in any other case, I don't

13:19:28 9    like to start anything else, speaking to someone else

13:19:32 10   or asking any questions or anything like that that

13:19:34 11   would jeopardize any investigations.

13:19:36 12      Q.  I see.  Okay.

13:19:37 13      A.  Okay?  In this case, this is what I did.  I

13:19:40 14   would rather not know too much since I was basically

13:19:44 15   the one that found the body of Mr. Longoria.  I didn't

13:19:49 16   want anything else crossing my mind --

13:19:51 17      Q.  Okay.

13:19:51 18      A.  -- besides what I knew, what I had just found.

13:19:55 19   I didn't want to get involved.

13:19:57 20      Q.  So you didn't know whether he died on your

13:19:58 21   watch or the previous watch, is that right, well, for

13:20:05 22   one thing, right?

13:20:07 23      A.  Yes, sir.

13:20:08 24      Q.  Okay.  You don't know why he stayed there

13:20:10 25   all -- in that cell all day; is that correct?

13:20:13 1      A.   That is correct, sir.

13:20:15 2      Q.   Okay.  As far as you know, no one expressed to

13:20:18 3  you that he was suicidal; is that correct?

13:20:21 4      A.   No, sir.

13:20:22 5      Q.   Did anybody express to you that he had a mental

13:20:26 6  problem or he was showing some delusions or things like

13:20:29 7  that?

13:20:30 8      A.   No, sir.

13:20:34 9      Q.   Okay.  Did anyone ever tell you that he had a

13:20:37 10 medical problem?

13:20:43 11     A.   No, sir.

13:20:49 12     Q.   You can look at your statement.  Besides

13:20:52 13 Dr. Richardson.

13:20:56 14     A.   The only thing that I knew is like I explained

13:20:58 15 that to the doctor, as well, was that he was medically

13:21:00 16 cleared.

13:21:00 17     Q.   Okay.  And --

13:21:05 18     A.   I just --

13:21:05 19     Q.   Go ahead.

13:21:05 20     A.   Right now, that I just state what your question

13:21:09 21 was, you see, I'm trying, like you said, like, I was

13:21:13 22 sworn in that I don't want to lie in this case, so --

13:21:15 23     Q.   Sure.

13:21:16 24     A.   -- I was backing myself up trying to see if by

13:21:18 25 any chance anyone just basically told me --

Q.  Yeah.

A.  -- in this case --

Q.  That's what I'm trying to get you -- if you recall.  I mean, if you don't recall, I don't want you to guess.

A.  Yeah.  The only thing that I recalled was when we got briefed that this gentleman came in by Brownsville PD and the incident that Sergeant Felipe Silva had with this particular person, Mr. Longoria, which was that fight, if they didn't take him out --

Q.  Argument?

A.  -- if it occurred, argument --

Q.  Was it a fight or an argument?

A.  An argument.

Q.  Okay.

A.  I'm sorry.  An argument between him or other prisoners in the area.

Q.  Okay.  Now, you came on your shift.  Even after you found Mr. Longoria in the condition that you found him in in that holding cell or padded cell No. 1, did you happen to go into the infirmary before or after?  In other words, sometime during your shift, did you go into the infirmary that night and morning?

A.  No, sir, I didn't.

Q.  Do you know one way or the other whether the

infirmary was full or not full when -- on your shift?

A.   Again, I don't want to speculate.

Q.   I don't want you to speculate.

A.   No, sir.  I don't recall whether it was full or not, or if there was any space or not.

Q.   Okay.  Do you recall whether or not, as a diagram of -- that Sergeant Silva put on the infirmary that there were six single cells with beds in there in that infirmary?

A.   Both -- all six had beds.  Yes, sir.

Q.   Okay.  And were there more than two beds in the dormitory put in there?

A.   Yes, sir.  In there, we called them bunks.

Q.   Bunks.

A.   Yes, sir.

Q.   Okay.  So there was a holding area for -- or whatever for at least six to eight to ten prisoners; is that right?

A.   Correct.

Q.   Who had medical problems.

A.   Correct.

Q.   Okay.  And the examining room was in the nurse's station office?

A.   That is correct, sir.

Q.   I take it the medical supplies were there also?

A.   If they did --

Q.   If you know.

A.   If they did have them, I would never have access to them or look into -- that I remember, they did have some kind of door.  I don't know whether it was a closet for medical supplies.  I have no idea.  I never went in there.

Q.   Okay.  And you never asked the nurse.

A.   No, sir.

Q.   Okay.

A.   No, sir.

Q.   When you relieved the previous shift, did they give you a briefing on the status of anything that's going on?

A.   What went on during the day, yes.

Q.   Okay.  And besides the fact that there was a 95 in the holding cell, the small holding cell, padded cell No. 1, were you given any other information about him, and the fact that he had an argument and that's why he was there?

        MR. VITTITOE:  You mean a 95 as opposed to a 96?  I want to clarify that you're talking about just that there was an inmate in there.

Q.   There was inmate in there.  Did anybody ever tell you he was a 96?

13:25:07 1    A.   No, sir.

13:25:07 2    Q.   Okay.  Did anybody tell you, besides the

13:25:10 3  argument, there was anything unusual about the inmate

13:25:13 4  in the padded cell --

13:25:22 5    A.   No, sir.

13:25:22 6    Q.   -- when you were briefed?

13:25:25 7    A.   (Moving head side to side)

13:25:26 8    Q.   Okay.  Afterwards, did anybody tell you there

13:25:29 9  was anything unusual about him?

13:25:32 10    A.   No, sir.

13:25:33 11    Q.   Okay.  So as far as you know, he wasn't crazy,

13:25:37 12  suicidal -- or suicidal, is that correct, as far as you

13:25:42 13  know?

13:25:43 14    A.   Well, again, suicidal, mental, a deal like

13:25:47 15  that, I had no idea whether we had one in there or

13:25:49 16  whether he was mental ill or any suicidal deal.

13:25:53 17    Q.   As far as you know, you never talked to him, is

13:25:56 18  that correct, one way or the other?

13:25:57 19    A.   No, sir.

13:25:58 20    Q.   Okay.  You only know what somebody told you,

13:26:00 21  and you told us what that -- what you were briefed

13:26:03 22  about; is that correct?

13:26:03 23    A.   That we had a 95 in there, yes, sir.

13:26:07 24    Q.   Okay.  You were never told he was a 96.

13:26:09 25    A.   Not at all, sir.

MR. VITTITOE:  Or a 97.

Q.  Or a 97, right.

Okay.  Do each shift, A, B, C in shifts, for the detention and the old county jail, were they -- each shift capable of booking, classifying -- and classifying a prisoner?

A.  Would any?

Q.  Any shift, including your shift.

A.  Any of my detention officers?

Q.  No.  If a prisoner came in -- let's say you were the C shift -- was your shift capable of booking and classifying a prisoner?

A.  Again, it would be up to the booking officer could do it.  Okay.  How much people he had pending. Again, my booking officer -- .

Q.  No.  No.  Not whether you were -- he had the -- you know, time to do it.  Were you capable of doing it? In other words, could you book -- say only one prisoner came in.  Okay.

Could your shift both book and classify a prisoner, or would a classification of a prisoner have to be done in conjunction with a nurse that had to be there?

A.  It could happen, yes.

Q.  Okay.

13:28:05  1      A.  It all depends, again, on the -- on this

13:28:10  2  prisoner himself.

13:28:11  3      Q.  Medical --

13:28:12  4      A.  Medical condition, mental stage.  It would have

13:28:16  5  to be -- if it was on the C shift, a nurse would have

13:28:19  6  to be called in, or the nurse would specify, "You know

13:28:23  7  what?  You brief me."

13:28:25  8          Okay.  "This is what's going on with this

13:28:28  9  prisoner.  He doesn't want to answer.  He's stuttering

13:28:31 10  too much," etc., etc.

13:28:31 11      Q.  Okay.

13:28:32 12      A.  She would tell you, "You know what?  Send him

13:28:34 13  to the hospital," okay, "to get medical clearance from

13:28:37 14  the hospital."

13:28:40 15      Q.  If a prisoner came in with a medical clearance,

13:28:43 16  some type of clearance, would your shift then -- if you

13:28:51 17  experienced some problem with the prisoner, would you

13:28:54 18  then call the nurse and the nurse may tell you to send

13:28:56 19  them back to the hospital?

13:28:57 20      A.  Yes, sir.  Correct.

13:28:58 21      Q.  Even if he had clearance.

13:29:00 22      A.  Even if he had clearance and --

13:29:02 23      Q.  Okay.  And can you think of any reason in the

13:29:11 24  world why a prisoner should be held in a holding cell

13:29:17 25  for 12 hours without being booked?

13:29:27 1    A.  I can't comment on that because I wasn't there

13:29:30 2  during the day shift, whether how many prisoners they

13:29:34 3  had had intake or released or the B shift.

13:29:37 4    Q.  So there's a possible reason why he could be

13:29:40 5  held for 12 hours without being booked?

13:29:45 6    A.  Honestly, I don't know whether --

13:29:47 7    Q.  Okay.  That's fair.

13:29:47 8    A.    -- it was 12 hours or not.

13:29:52 9    Q.  You've had, in your experience as a detention

13:29:54 10  officer, people that came in that looked mentally ill

13:30:00 11  to you; is that correct?

13:30:02 12    A.  I can't say mentally ill because I'm not an

13:30:04 13  expert on just detecting someone that would be mentally

13:30:07 14  ill.

13:30:08 15    Q.  Well -- but I mean, from your experience,

13:30:09 16  acting kind of crazy.

13:30:11 17    A.  It has happened, you know --

13:30:13 18    Q.  Okay.

13:30:14 19    A.    -- where you can have a 95, a prisoner, coming

13:30:17 20  in from an agency during midnight, and this gentleman

13:30:21 21  is actually speaking to himself.

13:30:23 22        Once he comes into the jail, I mean, right

13:30:25 23  off the bat you're, you know, like, something's not

13:30:28 24  right here, whether he's on drugs or possibly mental

13:30:31 25  ill.  I won't take him in.  I would have to have a

13:30:34 1    medical clearance.

13:30:37 2        Q.  So you would call the nurse.

13:30:38 3        A.  No.  I would actually tell the agency there,

13:30:39 4    the agency himself, whether it would be any other

13:30:42 5    agency under us, I'd tell him, "You know what, sir?

13:30:44 6    I'm not going to take this prisoner."

13:30:46 7            Well -- you -- right off the bat you would

13:30:46 8    tell an officer, You know what?  No.  Come on.  That --

13:30:49 9    you would have to.  It was us, we would have to.  They

13:30:53 10   would tell us, when I started, anyone that comes or

13:30:56 11   anything, you have to send them out to get medical

13:30:58 12   clearance.

13:30:58 13       Q.  Okay.  I mean, when they told you, that was

13:30:59 14   part of your training; is that right?

13:31:01 15       A.  Correct.

13:31:03 16       Q.  Okay.  And I take it in the course of your

13:31:07 17   actions as a detention officer, whether you worked the

13:31:09 18   C shift, A shift, or B shift, I don't know -- we

13:31:12 19   haven't gone in to whether you worked the other shifts.

13:31:14 20       A.  Yes, I have.

13:31:15 21       Q.  But you've seen persons that would come in that

13:31:17 22   would be talking to themselves.

13:31:19 23       A.  Uh-huh.

13:31:20 24       Q.  Is that correct?

13:31:20 25       A.  Correct.

13:31:29  1      Q.   That you refused to take in without getting
13:31:29  2  medical clearance?
13:31:29  3      A.   That is correct, sir.
13:31:29  4      Q.   You've seen people that were complaining about
13:31:29  5  somebody was about to shoot them or that the stars were
13:31:34  6  falling around in your head or things like that, making
13:31:38  7  types of crazy claims?
13:31:42  8      A.   Yes, sir.
13:31:42  9      Q.   And would you again ask that that person not be
13:31:45 10  taken in and get a medical clearance?
13:31:48 11      A.   Yes, sir.
13:31:50 12      Q.   Okay.  You've seen people -- I imagine you've
13:31:54 13  seen a lot of people that come in that were paranoid
13:31:56 14  coming into the jail or somebody was after them?
13:32:00 15      A.   I mean, because we have what we call the
13:32:02 16  "first-timers," meaning young guys coming in for the
13:32:05 17  first time.
13:32:05 18      Q.   Yeah.  They would be scared.
13:32:08 19      A.   Well, I'd say, yes, scared, of course.  I would
13:32:12 20  be scared.  Yeah.
13:32:16 21      Q.   Have you ever had anybody that, in your
13:32:18 22  experience, would come in and tell the police, the
13:32:21 23  detention officer, "I've been shot, and you probably
13:32:25 24  saw it on the news the night before," and there's no
13:32:28 25  evidence of anybody -- him being shot?  Would you think

that's strange?

A.   I never had a case like that.

Q.   Okay.  I mean, from your -- tell me now, would you think that's kind of strange?

A.   Telling him being shot?

Q.   No.  He says, "I came in" -- he comes in and somebody asked him, "What happened?"

And he says, "I've been shot.  And not only I've been shot, but you probably saw it on TV the night before."

And you looked at him, and there's no evidence of gunshot wounds, either physical evidence of it or any medical papers that come in about a gunshot wound.

A.   I wouldn't take him.  I would get medical clearance.

MR. BERGER:  Thank you, sir.  That's -- I don't have any further questions.

MR. VITTITOE:  We'll reserve our questions.

(Deposition concluded)

1          LUIS ALBERTO MENDIETA - ERRATA SHEET

2   Reasons for changes:   (1) Clarify the record
                             (2) Conform to the facts

3                              (3) Correct transcription errors

4   PAGE   LINE    CHANGE FROM/CHANGE TO                 REASON

5   ____   ____   _____   ____

6   ____   ____   _____   ____

7   ____   ____   _____   ____

8   ____   ____   _____   ____

9   ____   ____   _____   ____

10   ____   ____   _____   ____

11   ____   ____   _____   ____

12   ____   ____   _____   ____

13   ____   ____   _____   ____

14   ____   ____   _____   ____

15   ____   ____   _____   ____

16   ____   ____   _____   ____

17   ____   ____   _____   ____

18   ____   ____   _____   ____

19   ____   ____   _____   ____

20   ____   ____   _____   ____

21   ____   ____   _____   ____

22   ____   ____   _____   ____

23   ____   ____   _____   ____

24

25                  LUIS ALBERTO MENDIETA

BRYANT & STINGLEY, INC.
McAllen       Harlingen       Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

<u>SIGNATURE OF LUIS ALBERTO MENDIETA</u>

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on FEBRUARY 17, 2004, except as to any corrections I have listed on page 86 herein.

_____
LUIS ALBERTO MENDIETA

THE STATE OF TEXAS

COUNTY OF CAMERON

      SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the _____ day of _____, 2004.

_____
Notary Public in and for
The State of Texas

My commission expires:
_____

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3    MARIA LONGORIA AND MARIA    ) (
      IDALIA GUTIERREZ,           ) (
 4    INDIVIDUALLY AND ON BEHALF  ) (
      OF THE ESTATE OF JUAN       ) (
 5    LONGORIA, DECEASED          ) (
               Plaintiffs         ) (
 6                                ) (
      VS.                         ) (   CIVIL ACTION NO. B-01-062
 7                                ) (
      CAMERON COUNTY, TEXAS,      ) (
 8    THE CITY OF BROWNSVILLE,    ) (   JURY DEMANDED
      TEXAS AND JOHN DOES 1-10    ) (
 9             Defendants         ) (

10                   REPORTER'S CERTIFICATE
          I, Donna McCown, Certified Court Reporter, certify
11    that the witness, LUIS ALBERTO MENDIETA, was duly sworn
      by me, and that the deposition is a true and correct
12    record of the testimony given by the witness on
      FEBRUARY 17, 2004; that the deposition was reported by
13    me in stenograph and was subsequently transcribed under
      my supervision.
14
          I FURTHER CERTIFY that I am not a relative,
15    employee, attorney or counsel of any of the parties,
      nor a relative or employee of such attorney or counsel,
16    nor am I financially interested in the action.

17                   WITNESS MY HAND on this the 1st day of
      March               , 2004.
18

19

20    DONNA McCOWN, CSR NO. 6625
      Expiration Date: 12/31/05
21    Bryant & Stingley, Inc., CRN No. 41
      2010 East Harrison
22    Harlingen, Texas  78550

23

24

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

# STIPULATIONS

Deposition(s) of: _Lawrence Dahm MD_

Cause No.: _B-01-0162_ Style: _meria lu, urro et al_

Date: _2-17_ Trial Date: _____ vs. _Camero County texas et al_

1. This deposition is taken pursuant to:
   ___ A. Notice        ___ C. Agreement
   _L_ B. Notice and Subpoena     ___ D. Court Order

2. Objections:
   _✓_ A. Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
   ___ B. All objections are reserved.
   ___ C. All objections will be made at the time of taking the deposition.

3. Signature and Delivery:
   _✓_ A. The original transcript will be sent to ___ m. Valdez ___,
   the Custodial Attorney, and the original signature page, along with a copy of the
   transcript(s), will be submitted to _✓_ the witness or ___ the witness' attorney,
   who will return the executed signature page, including any changes, to
   Bryant & Stingley, Inc., within ___ days of transmittal.

   ___ B. Signature is waived and the reporter will deliver the original transcript and
   exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1. Copy of Transcript: Yes _✓_ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes _✓_ No ___    E-mail Address: _CHVittito@ AdAnsgraham. com_

   Signature: _____    Representing: _Camero County, Texas_

2. Copy of Transcript: Yes ___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _____

3. Copy of Transcript: Yes ___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _____

4. Copy of Transcript: Yes _✓_ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _Plaintiff_

BEFORE ME the undersigned authority on this 18th day of April, 2001

personally appeared Luis Alberto Mendieta who after being by

me duly sworn did depose and say:

My name is Luis Alberto Mendieta. I am 27 years of age. My date of birth is on February 24, 1974. I reside at 2447 Carnesi Apartment "D", in Brownsville TX. My home phone number is 982-1057. I am employed with the Cameron County Sheriff Department assigned to the County Jail as Detention Sergeant. I have been a Sergeant for 2 and a 1/2 years. I have been employed for the County for 5 years. I may be contacted at work at 544-0865.

On April 11, 2001 my shift came in from 11:00 p.m. to 7:00 a.m. My shift was briefed by Sergeant Tenorio. Tenorio brought up the fact that there was somebody inside the single cell #1 which is known to be the padded cell. No name was given just the fact that there was an inmate inside. Tenorio left after 11:00 p.m. and at no time did I see Sergeant Tenorio look inside the padded cell to check on the inmate.

After the previous shift completely left I proceeded to check the county jail doors for a security check. From there I proceeded to the booking area and talked to Sylvia Santillana, my booking officer, to see what we had pending. I then started getting my paper work set together. I then learned from Santillana that two inmates would be leaving out on what we call "state chain" early that morning. I did what I had to do in regards to that. The head count was then conducted at around 11:30 p.m around there and everything was ok. The inmates that were leaving were brought in that were leaving on State Chain. Me and my Asst. Sergeant, Galicia then decided to clean out my locker. During that time Galicia stopped at the single cell #1 when he told me that we should check out the inmate inside. I started hitting the door to see if the inmate would move. He would not move. I could only see his legs. I could not see his head. There was no response nor movement from the inmate. I then advised Galicia, with caution, to open up the single cell #1. The door was slowly opened because we thought he was laying by or on the door. The door was opened and we noticed that the guy was laying face up. I holaer, "hay sir wake up" while on a kneeling position. It was to no avail and we got no response. My instinct and thought was that the inmate was faking of being asleep so my instinct was to call for back-up. We then called Officers Randy Dierlam and Jorge Ibarra. They arrived and I briefed the guys of what was going on and to be cautious upon going in there because the inmate might be faking it. We opened the door. Galicia was the first one to go and got by the inmates feet. Jorge Ibarra went after Galicia near his leg area and then myself and Randy was after me. I went back in a kneeling position and I started tapping inmate Longoria to wake up as well as Galicia telling Longoria in both English and Spanish to wake up. At no time did anyone move the body of Longoria. I only tapped him a couple of times to see if he would awaken. It was to no avail. I then grabbed him with my right hand on to his right wrist because I noticed his eyes were half way open and he would not blink. I grabbed his wrist so that I could visually see if he was awake or asleep so I could see his pupils. At that time I noticed that his eyes were rolled up and I could only see the white portion of his eye. I noticed that on his right eye. From there I told the guys to get out and not to move anything nor touch anything. We secured the door and I went to the booking area and advised Santillana to get me the nurse on call as soon as possible on the line. I then used extention 331 for dispatch and I told the dispatcher to send an ambulance to the county jail because I had an inmate not responding to us. Dispatch stated ok and that they would contact EMS. I then received a call from the nurse. It was Felipe Esquivel. I told him what was going on and he immediately arrived minutes later. I had also contacted Lt.Frank Gonzalez I told Santillana to write down who comes in and out of the county jail from that point on. Esquivel arrived and about two minutes later, EMS arrived. They worked on the inmate and later took him out on the ambulance. Randy Dierlam was directed by me to supervise the inmate in the ambulance on the way to the hospital. Minutes later, Leuitenants began to arrive as well as the Captain Elizardi.

At around 1:20 a.m. I got a call from a Doctor Richardson from Brownsville Medical Center. He told me that the body of the inmate had Rigor Mortis. He also asked what I knew about the inmate. I told him the inmate was incarcerated and I told him that I had just begun my shift. I also told him that the only thing I knew was that the inmate had been cleared by Brownsville Medical Center earlier during that day. The doctor said he would check up on that. I said o.k. That was basically all that happened. *Luis Mendieta*



Mendieta

EXHIBIT NO. 1
2-17-01

forced nor threatened in any way for my statement and I have not been promised anything in return for my statement.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS 18 DAY OF April A. D. 2001.

NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

JAVIER REYNA
Notary Public, State of Texas
My Commission Expires
03-31-2004

THE STATE OF )(
COUNTY OF CAMERON )(

BEFORE ME the undersigned authority on this <u>18</u> day of <u>April, 2001</u>

personally appeared <u>Jorge Ibarra</u> who after being by me

duly sworn did depose and say:

My Name is Jorge Ibarra. I am 28 years old. My date of birth is 9/17/72. I reside at 3573 Rey Enrique Brwonsville, Texas 78521. I can be reached at (9560 838-6020. I am currently a detention officer with the Cameron County Sgeriff's department. I am currently assigned to the 11:00pm to 7:00am.

On Wednsday April 11,2001, I arrived at work at around 10:45pm. We were briefed by one of the sergents. I don't recall which sergent it was possible Sgt. Tenorio. We were advised that we had an inmate that was being uncoopertive. We were advised that this inmate was in the padded cell. They advised us that as soon as the inmate calmed down he would be booked in. The briefing was finished. I then reported to my station being the infirmary room.

At around 12:15am Sgt. Mendieta advised me to report to second floor to the woman's ward to assist officer Randy Dierlam. I then went over to the second floor. Fifteen minutes past by and Sgt. Mendieta advised us to report down stairs on the floor. We went over to the first floor and made contact with Sgt. Mendieta and officer Hugo Galicia. Sgt. Medieta told us to put on some gloves being that the inmate was an uncoopertive person. Sgt. Mendieta told us to assist him because the inmate on the padded cell was not responding. We walked to the padded cell. I don't remember who opened the door to the padded cell. Once the door was open ,I went in first. I noticed that the inmate's body was lying flat on the floor with his head leaning against the wall. The inmate's chin was touching part of his chest. Officer Santillana came in after me. I kneeled down and touched the inmate's right wrist area. I was checking for a pulse. I felt no pulse on the inmate. I then placed my left open hand on the inmate's chest. At that time, I felt that the inmate was cold.I then tought that we had to get medical attention for the inmate. I told Sgt. Mendieta that I didn't feel a pulse. Sgt. Mendieta told me not move the inmate. We then closed the door to the cell. I then went back to my station at the infirmary. About ten minutes later I returned back to the padded cell and Felipe Esquivel(County Jail Nurse) was working on the inmate. I assisted the nurse by holding the breather that placed on the inmate's mouth. The nurse was pumping the chest . at that time EMS arrived at location. Sgt. Mendieta then told me to go back to my station.

THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.

_Jorge Ibarra_

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS _18_ DAY OF _Apr.l_ A. D. _2001_.

NOTARY PUBLIC IN AND FOR CAMERON COUNTY, TEXAS

J. A. ZAMORANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-01-2005

THE STATE OF TEXAS          §
COUNTY OF CAMERON          §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 17th day of April, 2001, A.D., did personally appear: Felipe Esquivel,, who after being by me duly sworn, did depose and say: My name is Felipe Esquivel. I am 27 years of age. My date of birth is on October 5, 1973. I reside at 735 W.Levee in Brownsville TX. My phone number is 544-6689. I am with the Health Department with Cameron County as a Licenced Vocational Nurse. I have been a nurse for one year and two months.

On April 12, 2001 at around 12:42 a.m. I was called by Sgt. Mendietta of the Cameron County Jail in reference to an inmate without respiration. Mendietta further told me that EMS was already en route. I then headed out to the County Jail myself. I live close by. I got to the jail before EMS. When I walked in the jail I was lead by Galicia and Sgt.Mendieta to the padded cell. They unlocked the door and the prisoner was laying on the floor. The prisoner was sitting down with his legs extended leaning against the wall. The prisoner was on the actual floor not on the part that looks like a bed. The first thing I did was check his pulse and respiration. I also checked his skin tone. I immediately knew that the prisoner had no pulse and respiration. I noticed that rigor mortis was already setting in. I felt his skin rough and he was already cold. I then ran to the infirmary and got the necessary supplies which were Oxygen, ambu bag and a blood pressure cuff and a stethoscope and a oxygen line and some gloves. I then went back to the prisoner and began CPR and first aid. This is part of my procedure even though I knew he was already dead. Minutes later was when EMS arrived and they then took over.

When I was relieved by EMS I asked Sgt.Mendietta what had happened. He told me that the prisoner was beaten up at Brownsville P.D. He further said that when the prisoner arrived he was violent and aggressive. That was the reason the Sergeant stated he was placed in the padded cell. I also asked the Sergeant if he notified the medical staff and if they had started a log on him every fifteen minutes and he stated no that there was no log on him and that they did not notify the medical staff. Mendieta further stated that the outgoing shift told him that there was a guy in the padded cell. That was all he told me. I then finished my notes and I later left.

I have read my statement and find my statement true and correct. I have also given my statement voluntarily. I have not been forced nor threatened nor promised anything in return for my statement.

_____

Sworn and subscribed to before me on this the 17 day of April , 2001, A.D.

_____
Notary Public for Cameron County, Texas

JAVIER REYNA
Notary Public, State of Texas
My Commission Expires
03-31-2004

THE STATE OF TEXAS          §
COUNTY OF CAMERON          §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the 17th day of April, 2001, A.D., did personally appear: Jesus Eduardo Perez, who after being by me duly sworn, did depose and say: My name is Jesus Eduardo Perez. I am 30 years of age. My date of birth is on December 11, 1970. I reside at 1025 Wild Rose Lane Apt# 701-D. My phone number is 504-9555. I am employed with the City of Brownsville as a EMT Intermediate. I have worked with the city for about 1year. I have 5 years experience in my field. I may be contacted at work at 541-9491.

On April 12, 2001 at around 1:10 am or around their I remember responding to the Cameron County Jail in regards to a cardiac arrest. I was dispatched along with my partner by the name of Claudio Ortiz. When we arrived I saw a jailer ventilating a prisoner who was wearing a beige uniform. The prisoner was on the floor half way out of the padded cell. I also saw a nurse, a man, doing with CPR compressions on the chest of the prisoner. We then intervened and took over and later removed the prisoner and placed him on a back board and secured him. The prisoner was already dead which me and my partner immediately noticed. In my opinion he had been dead for at least two hours. The prisoner was cyanotic from his chest area up to his face. That means there was lack of oxygen and his pupils were fully dilated and no reactive which means there is no brain activity. We then had to continue the procedure because CPR had already been started. I then placed the E.T. Tube onto the prisoners airway. We then transported the prisoner to the hospital being Brownsville Medical Center. The prisoner was pronounced dead on arrival.

My statement today is on my own free will. I have not been forced nor threatened nor promised anything in return for my statement. My statement is true and correct to the best of my knowledge.

_Jesus E. Perez EMT-I_

Sworn and subscribed to before me on this the 17 day of April, 2001, A.D.

_____
Notary Public for Cameron County, Texas

JAVIER REYNA
Notary Public, State of Texas
My Commission Expires
03-31-2004

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
MARIA LONGORIA AND MARIA    ) (
IDALIA GUTIERREZ,           ) (
INDIVIDUALLY AND ON BEHALF  ) (
OF THE ESTATE OF JUAN       ) (
LONGORIA, DECEASED          ) (
        Plaintiffs          ) (
                            ) (
VS.                         ) (    CIVIL ACTION NO. B-01-062
                            ) (
CAMERON COUNTY, TEXAS,      ) (
THE CITY OF BROWNSVILLE,    ) (    JURY DEMANDED
TEXAS AND JOHN DOES 1-10    ) (
        Defendants          ) (
```

―――――――――――――――――――――――――――――――――――――

ORAL DEPOSITION OF
LAWRENCE J. DAHM, M.D.
FEBRUARY 17, 2004



―――――――――――――――――――――――――――――――――――――

ORAL DEPOSITION OF LAWRENCE J. DAHM, M.D.,
produced as a witness at the instance of the
PLAINTIFFS, taken in the above styled and numbered
cause on FEBRUARY 17, 2004, reported by DONNA McCOWN,
Certified Court Reporter No. 6625, in and for the State
of Texas, at the offices of Adams & Graham, L.L.P., 222
East Van Buren, West Tower, Harlingen, Texas, pursuant
to the Federal Rules of Civil Procedure.

17:26:24  1    correct?

17:26:28  2        A.  They can, but not often.  These kinds of

17:26:33  3    bruises don't usually cause fatal bleeding.

17:26:35  4        Q.  The fatal bleeding would come from varices --

17:26:39  5        A.  Yes, sir.

17:26:40  6        Q.  -- in the esophagus and things like that?

17:26:43  7        A.  Yes, sir.

17:26:43  8        Q.  Did you find any of those varices?

17:26:46  9        A.  I did not find esophageal varices I could

17:26:50 10    identify.

17:26:51 11        Q.  Okay.  So -- and, of course, your findings were

17:26:54 12    that he didn't die from internal bleeding to death.

17:26:59 13        A.  No, sir, he did not.

17:27:02 14        Q.  Okay.  Okay.  Could a person who was undergoing

17:27:05 15    stress and having that, would that aggravate the liver

17:27:09 16    disease or could it aggravate it to the point where the

17:27:14 17    person eventually may die of it at close proximity to

17:27:20 18    the aggravation?

17:27:26 19        A.  People dying of liver disease like this usually

17:27:29 20    die because of the deranged metabolism from the -- the

17:27:34 21    diseased liver is not able to handle all the breakdown

17:27:37 22    products of food and body proteins and so on.  This is

17:27:43 23    what causes severe brain dysfunction.

17:27:46 24            And of course, that's what he dies of

17:27:48 25    here.  He becomes disoriented, becomes unconscious, and

dies.  The role that stress plays at this point is pretty minor.

　　　　With this condition, his liver was so far gone, he was steadily advancing toward death probably over the last ten days to two weeks of his lifetime, and his time to die just came when he happened to be lying on the floor of the solitary cell at the jail.

Q.  Well, if he was --

A.  But, of course, before he loses consciousness, he's disoriented, he's agitated, he's exhibiting bizarre thinking, and so on.

　　　　But that's what happened to this man. And, of course, he's got various other anatomic findings to go along indicating he's got end-stage liver disease, namely these little easy bruising everywhere.

Q.  Well, how long could a person live with end-stage liver disease?

A.  Well, everybody is different.  Some people die slowly, and some die more quickly, and a lot of people will go along with severe liver disease for a very long time, but then they reach some threshold, and when they do, then they tip over, as it were, very, you know, relatively quickly compared to a very slow progression previously.

17:29:08  1    Q.  Okay.  And one of those things that could tip

17:29:10  2    you over would be a person going into alcohol

17:29:14  3    withdrawal?

17:29:16  4    A.  Could be.

17:29:18  5    Q.  Okay.  Would it also -- one of the things that

17:29:20  6    could tip you over is not eating or drinking water over

17:29:28  7    a 24-hour period?

17:29:32  8    A.  Well, certainly, dehydration would, you know,

17:29:35  9    contribute to it.  I don't know about not eating,

17:29:38 10    because if you eat the wrong foods, you can go into

17:29:41 11    hepatic coma very quickly too.

17:29:42 12    Q.  I know.  But let's say not having anything to

17:29:43 13    eat or drink and water.  In other words, there's an

17:29:46 14    imbalance in the system.  There's a lack of fluids and

17:29:49 15    a lack of --

17:29:50 16    A.  Lack of carbohydrates.

17:29:52 17         Yeah.  Probably.  I mean, I think those

17:29:53 18    things could certainly contribute to it.

17:29:55 19    Q.  Contribute to it.  Okay.

17:29:59 20         Assuming that those things happened,

17:30:02 21    would -- I mean, you gave your opinion here that,

17:30:06 22    ultimately, that you had some contribution from alcohol

17:30:10 23    withdrawal or delirium tremens --

17:30:12 24    A.  Correct.

17:30:13 25    Q.  -- to the end-stage liver disease as a cause of

17:30:16 1   his death; is that correct?

17:30:17 2        A.  Correct.

17:30:19 3        Q.  Okay.  So you concluded that he was in the

17:30:22 4   process of alcohol withdrawal at the time he died.

17:30:25 5        A.  Yes, sir.

17:30:32 6        Q.  Okay.  Would -- not just stress of being

17:30:36 7   arrested, but would physical contact contribute to the

17:30:42 8   likelihood or chance of dying from end-stage liver

17:30:45 9   disease?

17:30:46 10       A.  No, sir.

17:30:47 11       Q.  In other words, if he was beaten or hit or --

17:30:50 12       A.  Well, short of direct physical injuries due to

17:30:52 13  trauma, I mean, yes, if you bash somebody's head in

17:30:56 14  that would make it worse.

17:30:57 15       Q.  Did you see any evidence in your autopsy that

17:30:59 16  he had head injuries?

17:31:03 17       A.  He did not.  The brain was -- and the scalp

17:31:07 18  were free of injuries.

17:31:09 19       Q.  Would that be consistent with a report from

17:31:12 20  various police officers that he was banging his head on

17:31:16 21  the urinal in the padded cell?

17:31:19 22       A.  Well, I guess he wasn't doing a very good job

17:31:21 23  of it because we didn't find the bruises.

17:31:24 24       Q.  Especially a person with end-stage liver

17:31:26 25  disease who would bruise easily, right?

```
17:31:28   1      A.   He probably wasn't banging with very much

17:31:31   2   force.

17:31:32   3      Q.   Apparently, he was banging other parts of his

17:31:34   4   body a little bit harder than his head; is that

17:31:37   5   correct?

17:31:37   6      A.   Perhaps.

17:31:39   7      Q.   Okay.  Or at least somebody was touching on

17:31:41   8   other parts of his body besides his head; is that

17:31:41   9   correct?

17:31:44  10      A.   Well, I don't know what happened.  I can't say.

17:31:47  11      Q.   Well, I mean, he got the bruises somehow.  They

17:31:50  12   don't just erupt without anything, do they?

17:31:53  13      A.   Well, with end-stage liver disease, they erupt

17:31:57  14   with, you know, things that the rest of us wouldn't

17:31:59  15   call injuries.

17:32:00  16      Q.   Well, I know that.  But, I mean, when I say an

17:32:00  17   "injury" --

17:32:01  18      A.   Well, if you sit down on a chair, you know, the

17:32:02  19   pressure of sitting on a chair could cause injury and

17:32:05  20   bleeding in somebody like this.

17:32:07  21      Q.   Okay.  But he didn't have bruising on his butt,

17:32:10  22   did he?

17:32:11  23      A.   No.

17:32:12  24      Q.   He had it on his shoulders; is that right?

17:32:16  25      A.   I think he had it on the forward part of his
```

hips.

Q.  Hips where he might --

A.  Pressure points.

Q.  Pressure points.

A.  He might have been lying there and --

Q.  Okay.  He had it on the front of his legs, knees.

A.  Uh-huh, yes.

Q.  He was maybe kneeling on the floor.

A.  And his arms and the back of his elbows.

Q.  Okay.  Kneeling on the floor even, right?

A.  Yeah.

Q.  Okay.  He had -- I think you have a -- some type of bruising or ecchymosis on his back besides the scar that he had from a previous surgery.

A.  Yeah.  He had an old scar, yes.

Q.  An old scar where he had a previous surgery.

And, of course, you have the one on his neck, and what you opine that could have happened during intubation.  Could it have happened any other way?

A.  Could it happen any other way?

Q.  Yes, sir.

A.  Well, yeah, but none somehow seem very likely.

Q.  What do you mean?

A.   Well, yes, I mean, somebody could certainly have held him or pushed him or tilted his head back and done this, but there were no injuries to suggest any threat to life.

Q.   I understand, but I mean --

A.   Yes.

Q.   I understand it's not a threat to life --

A.   Right.

Q.   -- but could it have occurred some other way than --

A.   But if somebody was holding and steadying the neck to put in an intubation tube, yes, somebody could hold and steady the neck for some other reason.

Q.   Yeah.  Well, so somebody could hold and steady the neck to eat and drink, right?

A.   Yes.

Q.   Okay.  Somebody could have held -- just pushed him with their hands slightly.

A.   Yes.

Q.   Okay.  Now, you're not suggesting that his ligament tear in his hyoid bone is something that would -- could be caused easily by liver disease, are you?

A.   Not the tear, no, no.

Q.   Okay.  The tear is a more -- more of an insult,

physical insult, than the bleeding.

A.   Yes.   That would be physical contact of some sort.

Q.   Okay.   How many people do you see -- as a pathologist do you see that have hyoidal tears as a result of intubation on a normal basis, average basis?

A.   A fair number will have injuries -- I guess on -- hyoidal tears are not as common as other forms of little bleedings and bruises in the neck.

Q.   Yeah.   In the throat.

A.   Well, not only in the throat, but in the soft tissues of the neck outside the throat, outside the Adam's apple.

Q.   I mean, the tube usually doesn't go through the hyoid bone, does it?

A.   No, but, you know, the lining of the throat is frequently bruised when they install the tubes.

Q.   So would you agree with me that it's really infrequent that you would see some tear to the hyoid -- ligament of the hyoid bone during intubation?

A.   Infrequent but not rare.

Q.   Infrequent but not rare.   Okay.

It was actually broken.

A.   No, no.   The bone was not broken.   It was a slight sprain of some fibrous ligament tissue.

Q.  Okay.  If the bone was broken, what you first suspected --

A.  Yes.

Q.  -- in three pieces, then would that -- could that occur by intubation?

A.  Yes, it could.  Especially in old people where the bones are brittle.

Q.  Was there any indication to you that -- when -- during the course of your autopsy -- of course, it wasn't broken, but was there any indication to you that Mr. Longoria's bones were brittle?

A.  No.

Q.  Okay.  Now, your preliminary report says there's widespread contusions and ecchymoses of extremities, greatest about the knees, left calf and elbows; small truncal ecchymoses" -- what are those?

A.  Well, small bloodstains or bruises.

Q.  On the body?

A.  Well, the trunk, and I think, of course, I'm probably referring to the ones here on the -- down here on the fronts of the hips.  You know, that's part of the trunk.

Q.  And a small bandaged, superficial laceration of the left calf.

A.  Calf, yes.

Q.  Do you have an opinion whether that superficial laceration of the left calf was caused by end-stage liver disease or by some other physical insult?

A.  Well, that had to be some other physical incident.

Q.  Okay.  Now, you have, "Small abrasions and contusions around the ankles in ankle-cuff or shackle application pattern."

Is that something that you would typically find with a prisoner that's come from the city jail to the county -- through the court system to the county jails?

A.  Of course, most of them don't have end-stage liver disease.  That's the reason we can see it.  I mean --

Q.  I understand that.  Well, okay.  But I mean --

A.  A lot of people are handcuffed in one way or another and restrained, and usually there's no injury, no appreciable injury.  This guy, of course, every injury -- I mean, every contact is leaving a record.

Q.  It's appreciable.

A.  Right.

Q.  And -- but you've seen people with -- I would imagine you would see people that had contusions, marks around their ankles from the cuffs being too tight for

whatever reason.

    A.  No, not often.  I mean, considering the number of people that have been in jail, it's -- it happens, but it's not frequent.

    Q.  Is there any -- do you have any opinion why there was no marks around his wrist for where there would be handcuffs?

    A.  Well, I'm not really sure.  I mean, you know, it's one of those things.  Maybe they used very soft cuffs or something else that didn't cause a tendency to bruising.

    Q.  Well, what other things?

    A.  Either that or didn't have him in handcuffs but just had him in ankle cuffs.

    Q.  Oh, just ankle cuffs.  Okay.

           You've got, "Micronodular cirrhosis with marked fatty degeneration consistent with advanced alcoholic liver disease."

    A.  Yes.

    Q.  You didn't say "end-stage alcohol liver disease," did you?

    A.  Well, I guess I didn't use the word "end stage" at that point, but that's what I mean.

    Q.  Okay.  Advanced means it's pretty well gone.

    A.  Yes, sir.

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

17:38:29  1    Q.  Okay.  Now, you did use, "End-stage chronic

17:38:32  2    pancreatitis with pancreatic ductal lithiasis,

17:38:37  3    fibrosis, and atrophy."  So is there a difference

17:38:39  4    between advanced chronic pancreatitis and --

17:38:47  5    A.  It was virtually nonrecognizable in this case.

17:38:49  6    It was just a scar.

17:38:50  7    Q.  Okay.  Well, is there any difference between

17:38:52  8    end-stage chronic pancreatitis and advanced chronic

17:38:58  9    pancreatitis?

17:38:59  10   A.  Well, you know, I would say that it's subtle

17:39:04  11   shades of gray.  I mean, there is no question that this

17:39:06  12   man died of liver disease.

17:39:08  13   Q.  Okay.  He didn't die of pancreatitis?

17:39:10  14   A.  He did not die of pancreatitis, no, sir.

17:39:14  15   Q.  Okay.  How can you tell?  I mean, what would be

17:39:16  16   the --

17:39:17  17   A.  The pancreas is not as essential an organ as

17:39:19  18   the liver.  Without liver function, you can't live more

17:39:23  19   than a few hours.  And there are a lot of people

17:39:28  20   running around with little or no pancreatic function.

17:39:33  21   Q.  They get insulin and things like that?

17:39:34  22   A.  Well, insulin.  They can take the pancreatic

17:39:36  23   digestive enzymes in pill form and --

17:39:40  24   Q.  Now, was Mr. Longoria's entire liver cirrhotic?

17:39:45  25   A.  Entire liver?

17:39:46 1    Q.  Well, I mean, was the cirrhosis in -- did it

17:39:46 2    involve --

17:39:52 3    A.  Yes.  It's a very generalized, very uniformly

17:39:55 4    distributed process.  Every area was as cirrhotic as

17:39:57 5    every other.

17:39:58 6    Q.  Okay.  So cirrhosis is a scar; is that correct?

17:40:01 7    A.  Yes.  Cirrhosis is scar, and then fat is, you

17:40:04 8    know, what accumulates in the remaining liver cells.

17:40:08 9    Q.  Okay.  So it was consistent -- it was

17:40:11 10   consistent through the liver.  He didn't have a healthy

17:40:13 11   part of his liver?

17:40:14 12   A.  Yes, sir.  Uniform throughout the liver.

17:40:15 13   There was no healthy remnant of liver.

17:40:18 14   Q.  Okay.  I mean, the liver has two lobes; is that

17:40:18 15   correct?

17:40:21 16   A.  Yes, sir.

17:40:22 17   Q.  Okay.  And this one was -- the left and right

17:40:26 18   lobe was both fatty and cirrhotic.

17:40:29 19   A.  Correct.

17:40:36 20   Q.  Okay.  "Anomalous origin of circumflex coronary

17:40:36 21   artery."  Does that -- does that have any significance,

17:40:39 22   or it's just a finding?

17:40:40 23   A.  It's just a finding.

17:40:50 24   Q.  Okay.  They found no alcohol or common drugs or

17:40:52 25   abuse were found in his urine; is that right?

A.  That's correct.

Q.  Okay.  There was -- you concluded that he had severe liver disease, likely alcoholic.  Why was that?

A.  Well, because of the appearance of the liver. It was very fatty.  The pattern of cirrhosis, which we call micronodular, a very uniformly distributed tiny dividing up of the liver is typical of alcohol.

Q.  Versus hepatitis C?

A.  Versus hepatitis.

Q.  Okay.  Or a viral cause, other viral causes.

A.  Correct.

Q.  Or other chemical or drug-related causes.

A.  Yes, sir.

Q.  Okay.  Now, you -- this initial preliminary opinion of probably homicide, did you release that to the newspapers?

A.  No, sir, I did not.

Q.  You know how it was released to the newspapers?

A.  No, I do not.

Q.  Okay.  Are you aware that it was released to the newspapers?

A.  No, I am not.

Q.  Okay.  The final principal findings says, microndular cirrhosis consistent with advanced alcoholic liver disease and end-stage chronic

17:42:13 1    pancreatitis.  Then you go -- other findings -- this is

17:42:18 2    on page 7.

17:42:20 3        A.  That's the final report.

17:42:21 4        Q.  Is that the final report?

17:42:22 5        A.  Well, the one where it says "Final principal

17:42:25 6    findings" and "micronodular cirrhosis" is the first

17:42:27 7    one.  That's the final report.

17:42:31 8        Q.  Okay.  And "Recent ligamental fracture of the

17:42:32 9    left side of the hyoid bone in the neck with minimal

17:42:36 10   surrounding interstitial soft tissue bleeding."

17:42:38 11       A.  Yes, sir.

17:42:45 12       Q.  What's the difference between a fracture --

17:42:46 13   ligament fracture and a sprain?

17:42:50 14       A.  Well, there really isn't any difference.  As I

17:42:52 15   say, it is like a sprain.  Now, I use that in layman's

17:42:57 16   terms so that a layperson reading it can understand

17:42:59 17   what kind of an injury this was.

17:43:01 18       Q.  Is there a difference between a strain and a

17:43:03 19   sprain?

17:43:05 20       A.  Well, a sprain is the name of an injury.

17:43:09 21       Q.  How about a strain?

17:43:12 22       A.  Well, a strain, I think, is sort of like

17:43:15 23   stress.  It's a condition, whereas a sprain is an

17:43:19 24   actual microscopic tearing of the fibroligmentous

17:43:25 25   tissue, usually as it connects to a bone.

17:43:27 1       Q.  Is this -- well, when you said a fracture,
17:43:30 2   this is actually a tear.
17:43:31 3       A.  This is a tear of fibroligamentous, you know,
17:43:35 4   the stiff fibrous tissue.
17:43:37 5       Q.  Between the bone or as it connects to the bone
17:43:38 6   or between  --
17:43:41 7       A.  Actually, it was between two parts of this
17:43:42 8   bone.
17:43:42 9       Q.  Two parts of this bone.
17:43:44 10      A.  Yes.
17:43:53 11      Q.  Okay.  And your other findings was he had
17:43:56 12  numerous tatoos.  And that final summary, you concluded
17:44:06 13  that he had died of severe alcohol or liver disease and
17:44:11 14  had widespread superficial soft tissue bleeding from
17:44:14 15  slight extremity trauma and handling.  So you said the
17:44:17 16  liver disease is likely the cause of this soft
17:44:20 17  tissue --
17:44:21 18      A.  -- bleeding, that's correct.
17:44:21 19      Q.  -- bleeding.
17:44:22 20         It wasn't the cause of the elbow bruise,
17:44:28 21  was it, the back of his elbow?  I mean, somebody hit it
17:44:32 22  or he hit something?
17:44:34 23      A.  Well, yeah.  He probably bumped into something
17:44:36 24  or somebody or something bumped into him.
17:44:38 25      Q.  And the laceration on his leg wasn't the result

17:44:42  1    of the slight physical contact.

17:44:48  2        A.  Well, I don't know how he got the laceration to

17:44:53  3    the leg, but it had to be contact sufficient to cause a

17:44:55  4    shallow cut in the skin of the knee, correct?

17:44:59  5        Q.  You said the slight neck injuries could have

17:45:02  6    occurred during handling of this inmate before death or

17:45:04  7    perhaps during resuscitation.  What do you mean "before

17:45:07  8    death"?

17:45:09  9        A.  Well, over the last day or two of his life, you

17:45:14 10    know, if he had had physical contact -- someone had had

17:45:16 11    physical contact with his neck, it could have left

17:45:19 12    those marks.

17:45:20 13        Q.  And you concluded that namely the cause of

17:45:23 14    death is namely alcoholic liver disease perhaps with

17:45:27 15    alcohol withdrawal as a contributory factor.

17:45:29 16            Did you issue a death certificate?

17:45:32 17        A.  No.  The JP issues the death certificate.

17:45:35 18        Q.  Do you have a copy of the death certificate?

17:45:37 19        A.  I do not.

17:45:51 20        Q.  Okay.  Now, you took contents of the stomach.

17:45:55 21    You looked at contents of the stomach?

17:45:57 22        A.  I believe I looked at them, yes.

17:45:58 23        Q.  Okay.  Did he have any evidence of any food or

17:46:01 24    other things in his stomach?

17:46:03 25        A.  Well, I guess I'm going to have to refer to the

17:46:05 1  report, if that's all right.

17:46:07 2      Q.  Sure.

17:46:11 3      A.  I think I said it has about 50 cc's, which is

17:46:14 4  about 2 ounces of thin dark reddish blood-stained

17:46:18 5  fluid.  No pills or foreign substances are found

17:46:21 6  therein.  There are no odors of alcohol or food

17:46:23 7  particles seen.

17:46:25 8      Q.  Okay.  Based upon your finding, could you

17:46:27 9  make -- reach any conclusions about whether or not he

17:46:30 10  had eaten?

17:46:33 11     A.  At least not in the last few hours of life.

17:46:36 12     Q.  Okay.  How long would food remain in the

17:46:37 13  stomach before it was passed on?

17:46:41 14     A.  Anywhere from one and a half to three hours.

17:46:44 15     Q.  Okay.  And how about fluid?  What was the

17:46:48 16  fluid?  Was it water?  Acid?  Blood?

17:46:52 17     A.  Well, it was gastric secretions with maybe a

17:46:55 18  minimal amount of blood.

17:46:58 19     Q.  Okay.  Was there any -- how long would water

17:47:00 20  last in the stomach?

17:47:03 21     A.  Well, probably only a few minutes to 30 minutes

17:47:07 22  maybe.

17:47:09 23     Q.  Okay.  Was there any -- did you look at his

17:47:11 24  bladder?

17:47:13 25     A.  Yes, sir.  I'm sure I did.  Let me see.

17:47:15  1    Q.  And was there any fluids in his bladder?

17:47:21  2    A.  2 cc's of cloudy, light, reddish pink urine.

17:47:25  3    So not much urine, no, sir.

17:47:27  4    Q.  Not much urine.  Okay.

17:47:28  5        And did you look -- you also looked at his

17:47:32  6    intestines and so forth?

17:47:33  7    A.  Yes, sir.

17:47:34  8    Q.  Did he have any evidence of any food passing

17:47:38  9    through his small intestine process of --

17:47:42 10    A.  Well, I really only described the intestines as

17:47:44 11    being unremarkable.

17:47:50 12    Q.  Whatever -- he didn't -- apparently, he didn't

17:47:55 13    have much in his stomach.  He didn't have much in his

17:47:58 14    bladder.  There wasn't any indication that he excreted

17:48:02 15    any urine at the time of his death, was there?

17:48:07 16    A.  Well, I mean, I can't say what he excreted in

17:48:09 17    the last hours of life.  I can't say whether he vomited

17:48:13 18    or not, for example.

17:48:14 19    Q.  Okay.

17:48:15 20    A.  You know, there are a lot of things like that

17:48:26 21    that I don't know.

17:48:26 22    Q.  Yeah.  Would your investigator want to look at

17:48:26 23    those types of things, to see if he had eaten or had

17:48:26 24    drunk any fluids?

17:48:28 25    A.  Well, I mean, he didn't starve to death in the

17:48:30 1    last 12 hours of life.

17:48:32 2        Q.   I understand that.  But, I mean, as a

17:48:33 3    contributing factor as to whether or not he had food

17:48:39 4    and water to contribute to his --

17:48:44 5        A.   I think with the severity of his condition, his

17:48:46 6    combination of end-stage liver disease and alcohol

17:48:49 7    withdrawal, I don't think he was in any condition to

17:48:51 8    take any food or fluid in the last 12 to 24 hours of

17:48:55 9    life.

17:48:55 10        I don't think somebody could have fed him

17:48:58 11   or offered him anything -- any fluids and have gotten

17:49:01 12   him to take it.  He was too disoriented at that point.

17:49:06 13       Q.   Oh, okay.  How long was he disoriented?

17:49:09 14       A.   Well, I don't know, but I suspect at least the

17:49:11 15   last 24 hours or so of his life from the accounts that

17:49:14 16   I have.

17:49:15 17       Q.   From the time that you saw him or from the time

17:49:16 18   that he was reported to be dead?

17:49:18 19       A.   No.  From the time he was reported to be dead.

17:49:20 20       Q.   Okay.  Around 12:00 to 1:00?

17:49:22 21       A.   Yeah.  I'd say for at least the last 24 hours

17:49:24 22   or so, he was, you know, mentally disoriented, out of

17:49:29 23   it, if you will.

17:49:31 24       Q.   Okay.  Can a person that -- well, strike that.

17:49:42 25            A person that has DTs, what is the

17:49:44  1   treatment for that?

17:49:47  2        A.   The treatment is IV fluids, the appropriate

17:49:51  3   kinds of tranquilizers.  I think especially Valium is

17:49:54  4   what they give for this to minimize and prevent

17:49:57  5   seizures and minimize the agitation.

17:50:01  6        Q.   Quiet place?

17:50:02  7        A.   Quiet place.  IV fluids to rehydrate them.

17:50:10  8        Q.   Okay.  Did you see any information regarding,

17:50:13  9   when you checked his heart, whether there was maybe an

17:50:16 10   imbalance of enzymes?  Well, certainly, there was an

17:50:18 11   imbalance of enzymes if he had severe liver disease;

17:50:22 12   isn't that correct?

17:50:25 13        A.   Well, you know, heart disease was not his

17:50:29 14   primary problem.

17:50:30 15        Q.   I understand that, but, I mean, you could

17:50:33 16   have -- a person could die from imbalance of enzymes

17:50:39 17   that affected the heart, cause the heart to cease

17:50:41 18   beating, couldn't you?

17:50:45 19        A.   Well, you know, I guess we don't normally think

17:50:49 20   of imbalance of enzymes as being the way people die,

17:50:54 21   and that's not a term in current, you know, medical

17:50:56 22   usage.

17:50:58 23             But he did die of, you know, metabolic

17:51:02 24   imbalance due to loss of liver function.  Loss of

17:51:04 25   normal liver function is what he died of.  But the

17:51:08  1    release of enzymes from the liver or the heart is not

17:51:11  2    what killed him.

17:51:13  3        Q.  Well, did you do -- did you take any toxicology

17:51:17  4    studies to see if he had a -- heart enzymes had

17:51:23  5    increased?

17:51:24  6        A.  We did not run cardiac enzymes.

17:51:26  7        Q.  Okay.  Did you run liver enzymes?

17:51:28  8        A.  No, we did not run liver enzymes.

17:51:31  9        Q.  Did you -- do you know if -- whether a normal

17:51:33 10    CBC contained liver enzymes?

17:51:37 11        A.  No, a CBC doesn't measure liver enzymes.  It's

17:51:40 12    a blood count that counts the number of red and white

17:51:43 13    cells and platelets and -- circulating in the

17:51:45 14    bloodstream.

17:51:46 15        Q.  How about the heart enzymes?  Would a CBC?

17:51:52 16        A.  No, a CBC does not measure heart enzymes.  A

17:51:55 17    CBC stands for "complete blood count."  It counts red

17:51:58 18    cells, white cells, and platelets.

17:52:02 19        Q.  Is that what they call a 7-CBC?

17:52:08 20        A.  Sir, with all due respect, I think you're

17:52:11 21    confusing the various kinds of lab tests that can be

17:52:14 22    done.  And, you know, probably now is not the ideal

17:52:18 23    time to go through all the various kinds of lab tests.

17:52:22 24            You know, the autopsy does not involve a

17:52:23 25    lot of chemical testing or blood testing except for

17:52:27 1    toxicology.  In other words, we look for alcohol and

17:52:29 2    drugs.  The other diagnosis we make primarily by the

17:52:33 3    combination of the gross or naked eye inspection and

17:52:37 4    the microscopic examination.

17:52:39 5        Q.  Okay.  You did not make that initial

17:52:41 6    determination, based upon your initial autopsy, until

17:52:44 7    you had confirmation of this from Dr. DiMaio; is that

17:52:51 8    correct?

17:52:52 9        A.  I consulted Dr. DiMaio.  Yes, sir, I did.

17:52:55 10       Q.  Okay.  And he gave you oral consultation, and

17:52:56 11   you asked the questions that were in -- of him.

17:53:00 12       A.  Yes, I asked those questions in that letter.

17:53:07 13       Q.  Okay.  And you put "and/or delirium tremens" in

17:53:07 14   your letter.

17:53:11 15       A.  Yes.

17:53:11 16       Q.  Okay.  And what was his opinion?

17:53:14 17       A.  Well, his opinion was that this man died of

17:53:18 18   end-stage severe chronic liver damage brought on by

17:53:22 19   alcohol.

17:53:24 20       Q.  And how about "and/or delirium tremens or

17:53:27 21   alcohol withdrawal"?

17:53:28 22       A.  Well, yes.  I'm sure he mentioned that as

17:53:30 23   being --

17:53:31 24       Q.  A contributory cause?

17:53:32 25       A.  -- a contributory factor.  And I think it was.

17:53:34 1   I mean, I don't think there's any question about that.

17:53:37 2   Q.   Okay.   But "and/or" here, are you trying to get

17:53:40 3   him to tell you whether or not he feels that the death

17:53:46 4   was caused primarily by end-stage liver disease or by

17:53:51 5   the delirium tremens?

17:53:55 6   A.   What I'm trying to do is get his opinion and

17:53:57 7   his perspective on this case.

17:53:57 8   Q.   Yeah.

17:54:01 9   A.   And people don't normally die of delirium

17:54:06 10  tremens by itself.   They can recover from delirium

17:54:06 11  tremens.

17:54:09 12          The disease from which he could not

17:54:11 13  recover in this case, because the liver was scarred

17:54:14 14  beyond any functionality, any ability to function, was

17:54:20 15  the alcoholic liver disease.   That is what he died of

17:54:23 16  now.

17:54:23 17  Q.   Okay.   Well, he had some --

17:54:25 18  A.   The delirium tremens, you know, undoubtedly

17:54:27 19  helped him along, but if he had still had a normal

17:54:29 20  liver, he could have recovered from the delirium

17:54:34 21  tremens.   That was a treatable disease.   The end-stage

17:54:34 22  liver disease is not.

17:54:36 23  Q.   Okay.   I understand that.   But if he was given

17:54:39 24  timely care for his delirium tremens.

17:54:49 25  A.   He would have died anyway.

Q.  At the same time?

A.  They might have been able to keep him alive for another three or four days in a coma.

Q.  In a coma?

A.  In a coma.

Q.  Okay.

A.  He had no more meaningful life left.  You know, he died of the alcoholic liver disease with a possible contribution from the delirium tremens.  In other words, that might have speeded it up a little bit, but he was going to die, if not that day, the next day or the day after.

And even if they had rushed him to the hospital at the first sign of DTs and gotten him in and rehydrated him and so on, he might have lived another three or four days, maybe even a week in a coma.

He was never going to recover consciousness.  He was never going to have a meaningful existence again because he did not have a liver to live on.

Q.  Well, Doctor, when did he lose consciousness?

A.  Well, I don't know exactly, but it sounded like it was in the last hours of his life.

Q.  From what you understand, was he conscious up to the last hour of his life?

17:55:49 1    A.  Well, I don't know.  He was certainly -- it

17:55:52 2    sounded like he was confused and disoriented, and at

17:55:56 3    what point you go from fully alert and oriented to

17:56:00 4    comatose, all these seemed to have developed over a

17:56:04 5    period of -- sounds like about 24 hours, you know,

17:56:09 6    acting strangely and getting more agitated, getting

17:56:13 7    more disoriented, saying stranger and stranger things.

17:56:16 8            And then finally they go in, and he's

17:56:17 9    laying there on the floor, and then somebody realizes

17:56:19 10   he's dead.  Well, you know, he passed through a stage

17:56:21 11   of coma to death.

17:56:23 12           MR. BERGER:  Okay.  Well, I'll object to

17:56:25 13   the response.

17:56:28 14    Q.  Do you know, Doctor, when he lost consciousness

17:56:30 15   versus --

17:56:30 16    A.  No, I don't.

17:56:32 17    Q.  Okay.  Assume with me that one of the officers

17:56:35 18   at the station that was on duty said he was -- saw him

17:56:42 19   at 11:05 and he was walking around.  Would that

17:56:48 20   indicate that he'd be conscious if he was walking

17:56:51 21   around at 11:05?

17:56:54 22    A.  Yes.  In some manner of speaking, yes.  He

17:56:56 23   might not have been oriented, but he was conscious.

17:56:58 24   Yeah.

17:56:58 25    Q.  Yeah.  There's a lot of people that are drunk

17:57:00 1    that are conscious but are walking around in a fog too,

17:57:03 2    aren't there?

17:57:04 3        A.   Yeah.   Yes, sir.

17:57:05 4        Q.   Okay.   They ordinarily recover unless they're

17:57:08 5    in a bad accident or a bad fight because their liver is

17:57:10 6    ordinarily in good shape; isn't that correct?

17:57:13 7        A.   Or in good enough shape.

17:57:14 8        Q.   Good enough shape to recover.

17:57:16 9        A.   Right.   His liver was no longer compatible with

17:57:18 10   life.   I think that's the take-home point here.

17:57:22 11       Q.   Okay.   And there was other testimony that he

17:57:24 12   acted perfectly normal.   Would that be consistent with

17:57:29 13   a person with end-stage liver disease?

17:57:32 14       A.   Not that I saw.

17:57:34 15       Q.   Okay.   But assume with me that other people

17:57:36 16   have testified that he acted perfectly normal, that he

17:57:39 17   was walking around, that he was not acting agitated,

17:57:42 18   that he cooperated, in fact, with a nurse at --

17:57:49 19            MR. BERGER:   In fact, let's mark this as

17:57:51 20   Exhibit No. 4.

17:58:05 21       Q.   Let me show you what's been marked as Dahm

17:58:07 22   No. 4, sir.   And it's a nurse's note, a progress note

17:58:13 23   from Cameron County Sheriff's Department nursing

17:58:17 24   facility dated 4-11-01.   Have you seen this before?

17:58:22 25       A.   No, I have not seen this before.

Q.  Okay.  Apparently, this is an encounter with the nurse at the jail when -- about the time that Mr. Longoria came into the Cameron County Jail where he apparently cooperated with the nurse in showing his injury to his left -- where she asked him about, "Have any injuries?"

And he said he had one to his elbow and one -- showed him one to his knee.

A.  Okay.

Q.  Okay?  Do you see what's written there?

A.  Yes.  Appears alert and oriented.

Q.  Cooperative?

A.  And cooperative, yes, sir.  This is at 10:45 p.m.?

Q.  Yeah.

MR. VITTITOE:  Go ahead.

Q.  Well, does it say "uncooperative" or "cooperative"?

A.  It says, "Alert and cooperative.  Answered all questions asked."

Q.  Does that seem like a person that --

A.  "Denied any food or medication allergies."

MR. VITTITOE:  This is in the morning.

Q.  Well, we know that's a.m. on the 11th.

MR. VITTITOE:  He asked you a question,

17:59:43  1   Counsel, of -- he asked you whether it was in the p.m.

17:59:46  2       Q.  Well, I think it says --

17:59:48  3       A.  It says "10:45," but it doesn't say a.m. or

17:59:51  4   p.m.

17:59:51  5       Q.  Well, it's a.m.?

17:59:53  6       A.  It's a.m.  All right.  This is 12 hours

17:59:53  7   before --

17:59:54  8       Q.  Right.

17:59:54  9       A.  Because, you know, as I understand it, he was

17:59:56 10   found dead about 11:05 p.m.

17:59:58 11       Q.  Well, about 12 hours later.

18:00:00 12       A.  Yeah.

18:00:00 13       Q.  Okay.  Is that the type of behavior that's

18:00:02 14   consistent with end-stage liver disease?

18:00:06 15       A.  No, sir.

18:00:10 16       Q.  Okay.  I mean, even 12 hours earlier?

18:00:13 17       A.  Well --

18:00:13 18       Q.  Cooperative and shows him his injuries and --

18:00:16 19       A.  I'm a little surprised that he would have been

18:00:19 20   completely oriented and cooperative, especially with

18:00:21 21   records of previous bizarre behavior and so on.

18:00:27 22            He was already symptomatic, at least for a

18:00:27 23   day or so before that from everything everyone has

18:00:30 24   said.

18:00:31 25       Q.  Okay.  Well, I mean --

A. But I know that, you know, people pass in and out of varying levels of consciousness, and for whatever reason, he was lucid at that time.

Q. Okay. Now, we've seen various records and we've taken various depositions of various people and have seen various statements given by county officers and city officers that stated various aspects that he was somewhat bizarre type of activities to somewhat normal type of activities.

And my question to you, is that an indication to you of end-stage liver disease during that period.

A. Well, from my observation, people with -- dying of end-stage liver disease is, yes, they frequently will pass in and out of -- but it's a steady downward trend overall.

Q. Okay.

A. But, yes. I mean, I'm sure he had more and less lucid periods and was behaving more or less bizarrely at times.

Q. Well, would you say that the behavior, bizarre behavior would progress downwards, or would it sometimes go up and down?

A. It would sometimes go up and down. But if you looked at an overall trend, it was downhill.

18:01:50 1     Q.  Okay.  If he was not exhibiting any bizarre

18:01:54 2  symptoms as late as 2645 and 11:00 --

18:02:00 3     A.  In the morning?

18:02:00 4     Q.  In the evening.

18:02:01 5     A.  In the evening.

18:02:02 6     Q.  Would that be consistent with end-stage liver

18:02:06 7  disease?  In other words, he was walking around.  He

18:02:09 8  wasn't talking to himself.  He wasn't hollering.  He

18:02:11 9  wasn't crying out.  He didn't look like he had bruises

18:02:16 10  on his body or things like that.  Would that be

18:02:17 11  consistent with end-stage liver disease?

18:02:19 12     A.  I really don't know, sir.  I mean, I think it

18:02:22 13  would be unusual.

18:02:23 14     Q.  Okay.  I mean, would it be more consistent with

18:02:28 15  delirium tremens than with end-stage liver disease?

18:02:32 16     A.  Well, he had end-stage liver disease.  That

18:02:34 17  part can't be argued because --

18:02:36 18     Q.  Well, I don't know --

18:02:37 19     A.  -- we have the liver.  I mean, --

18:02:38 20     Q.  Well, you've got the liver, but you put that it

18:02:39 21  was advanced.  You didn't put end-stage, is that

18:02:42 22  correct, on your autopsy report?

18:02:44 23     A.  Yes, that's correct.  I used the word

18:02:46 24  "advanced."

18:02:47 25     Q.  Is there a difference?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

A.  Not really.

Q.  Well --

A.  Not in my mind anyway.

Q.  I mean, was he a candidate for a liver transplant?

A.  Well, not being a chronic alcoholic.  They would not have transplanted his liver.  But, obviously, they do transplant people with advanced liver disease.  That's why they transplant the livers.

Q.  Okay.  You don't make the devil's decisions as to the liver transplants to when they transplant it or not, do you, as a pathologist?

A.  No.

Q.  Okay.  You don't make any decisions whether a person can live or die on this situation because you don't treat live people, do you?

A.  Well, I take care of lots of live people.

Q.  You treat only dead people, don't you?

A.  No.  I'm involved actively in the care of lots of live people.

MR. VITTITOE:  Sure he is.

Q.  Well, you're actively involved in the care of people that samples of tissue are taken from, aren't you?

A.  Well, yes, but that has serious implications

18:03:49 1   for living people.

18:03:49 2       Q.  I know it.

18:03:50 3       A.  So we do take these things seriously, sir.

18:03:52 4       Q.  Do you take liver biopsies?

18:03:54 5       A.  We examine liver biopsies many times, yes, sir.

18:03:57 6       Q.  Could you have concluded, based on the liver

18:04:00 7   biopsy, what stage his liver disease was?

18:04:03 8       A.  Yes.

18:04:06 9       Q.  From one liver biopsy?

18:04:06 10      A.  Probably.

18:04:09 11      Q.  If a liver biopsy was performed on him, could

18:04:11 12  you tell how long he --

18:04:11 13      A.  If it was performed properly.

18:04:12 14      Q.  Huh?

18:04:13 15      A.  If it had been performed properly, yes, I think

18:04:16 16  we could have told what was going on and given a

18:04:17 17  prognosis.

18:04:19 18      Q.  Okay.  And could that -- would that prognosis

18:04:21 19  include that he had three or four days to live in a

18:04:24 20  coma?

18:04:25 21      A.  Yeah.

18:04:26 22      Q.  Could it be something else?

18:04:29 23      A.  What do you mean could it be something else?

18:04:31 24      Q.  Well, I mean, could there be some other --

18:04:33 25      A.  I'm sure we would have given an estimate.

18:04:36 1    Q.  Okay.  He could have lived not in a coma, could

18:04:39 2    he?

18:04:39 3    A.  Well, he lived for some time not in a coma and

18:04:42 4    then went into a coma and then he died.

18:04:44 5    Q.  Okay.  Well, do you know --

18:04:45 6    A.  His time had come.  This liver was going to

18:04:47 7    carry him off, if not today, it was going to be

18:04:50 8    tomorrow or the next day.  We're not talking about six

18:04:51 9    months.  We're not talking about one month.  We're not

18:04:54 10    talking about a year.

18:04:57 11        I mean, we're talking about somebody that

18:04:58 12    was going to die in a matter of hours, anywhere from

18:05:04 13    1 hour to 12 to 24 or 48 or 72 hours, but, you know,

18:05:09 14    more than a week, unlikely.

18:05:11 15    Q.  Would he be in a coma the entire time?

18:05:13 16    A.  Yes, probably.

18:05:21 17    Q.  Okay.  When did you determine that?  After you

18:05:23 18    had given the preliminary diagnosis of homicide?

18:05:28 19    A.  Yes.

18:05:29 20    Q.  Okay.  Had you -- when you gave your

18:05:30 21    preliminary diagnosis of homicide, had you performed an

18:05:33 22    autopsy yet?

18:05:36 23    A.  Yes.

18:05:37 24    Q.  Okay.

18:05:37 25    A.  But we had not done the microscopics and the

other testing.  You know, we had not examined the hyoid bone in minute detail.  We had not done the microscopic exam.  We did not have the toxicology.  We did not have a lot of stuff, and we had to issue a preliminary report.

Q.  Well, I understand.  But toxicology was negative on him except for atropine.

A.  Correct.

Q.  Okay.  And you could look at his liver grossly and tell he had liver disease.

A.  Yeah.  We had a pretty good idea that --

Q.  Okay.  But you didn't state that in your preliminary report that he had end-stage liver disease and that he most likely died from liver disease versus homicide.

A.  Well, we said he had the disease, but, you know, we weren't sure what it was that killed him.  We wanted to be sure that they ruled out any mishandling or foul play in the jail.

Q.  And after you talked Dr. -- how do you pronounce his name?

A.  It's DiMaio.

Q.  -- DiMaio, that helped rule out the homicide and stuck it all on the liver disease; is that correct?

A.  That's correct.

18:06:35  1    Q.  The oral report that you got.

18:06:37  2    A.  The oral report.

18:06:39  3    Q.  Okay.  What's the treatment -- I think you

18:06:41  4    already -- I already asked you what the treatment plan

18:06:43  5    for alcohol withdrawal and DTs  is the same thing; is

18:06:43  6    that correct?

18:06:46  7    A.  Essentially, yes.

18:06:49  8    Q.  Okay.  There were no illegal drugs found in his

18:06:51  9    body; is that correct?

18:06:52 10    A.  That's correct.

18:06:53 11    Q.  No alcohol.

18:06:53 12    A.  No alcohol either.

18:06:57 13    Q.  Okay.  Isn't it true that his behavior is more

18:07:01 14    consistent with DTs and/or alcohol withdrawal than with

18:07:06 15    end-stage liver disease from what's described in

18:07:11 16    various information that we've given you?

18:07:25 17    A.  Well, I think he had the DTs, and I think he

18:07:25 18    had end-stage liver disease.

18:07:25 19    Q.  But, I mean --

18:07:25 20    A.  His time had come.

18:07:25 21    Q.  The behavior that's described to you versus

18:07:25 22    looking at the liver itself.

18:07:27 23    A.  Yeah, but he didn't die of the behavior.  You

18:07:29 24    know, he died of the liver disease.

18:07:30 25    Q.  Well, Doctor, is that -- are you within a

18:07:35  1   medical certainty that he died of liver behavior --

18:07:39  2   liver disease and not the behavior that resulted from

18:07:41  3   some physical contact to his body?

18:07:43  4       A.  Yes, sir.

18:07:44  5       Q.  Are you -- is it a certainty that he -- a

18:07:48  6   person could die -- strike that.

18:07:49  7            A person can die from lack of care for

18:07:53  8   alcohol withdrawal, can't they, especially if they have

18:07:57  9   a damaged liver?

18:08:01 10       A.  This person died of the damaged liver.

18:08:03 11       Q.  Doctor --

18:08:04 12            MR. BERGER:  I'll object to his response.

18:08:05 13       Q.  Doctor, please answer my question.

18:08:07 14       A.  Yes, sir.

18:08:07 15       Q.  A person can die --

18:08:09 16       A.  Yes, sir.

18:08:09 17       Q.  -- of alcohol withdrawal --

18:08:11 18       A.  Yes, sir, absolutely.

18:08:12 19       Q.  -- especially with a damaged liver; is that

18:08:13 20   correct?

18:08:14 21       A.  Yes, sir, absolutely.

18:08:15 22            MR. BERGER:  Okay.  Thank you.  I have no

18:08:16 23   further questions.

18:08:16 24            MR. VITTITOE:  Just a few, if I may.

18:08:21 25            May I see the exhibits that are marked?

18:08:21  1          MR. BERGER:  Yeah.

18:08:31  2          MR. VITTITOE:  Now, my understanding is,

18:08:33  3   Dr. Dahm's file will be marked as Exhibit 1; is that

18:08:37  4   correct?

18:08:37  5          MR. BERGER:  Yeah.  Well, the file that we

18:08:39  6   got is marked as Exhibit 1.

18:08:41  7          MR. VITTITOE:  Well, I'd like to see what

18:08:43  8   you're talking about.

18:08:44  9          MR. BERGER:  Well, okay.  Well, I'll give

18:08:45 10   you the entire file.  That will be marked as Exhibit 1.

18:08:51 11          MR. VITTITOE:  All right.  Can we go off

18:08:51 12   the record for just a moment, please?

18:09:06 13          (Brief discussion off the record)

18:09:06 14          MR. VITTITOE:  Exhibit 1 will be the

18:09:09 15   previously submitted deposition by written questions

18:09:13 16   that Mr. Cowen submitted, and that was responses by the

18:09:19 17   witness back in November of 2001; is that correct?

18:09:29 18          MR. BERGER:  As far as I know, yes.

18:09:33 19          MR. VITTITOE:  Earlier you said your --

18:09:34 20   "Dr. Dahm, your file will be offered as an exhibit

18:09:36 21   except for one document."  What one document are you

18:09:39 22   referring to?

18:09:41 23          MR. BERGER:  The letter which is

18:09:42 24   Exhibit -- May 14th or 16th or whatever it is, which is

18:09:46 25   a separate exhibit -- I marked it as a separate

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

18:09:49 1    exhibit -- and the exhibits that were subpoenaed from

18:10:00 2    the Brownsville Medical Center, apparently one of which

18:10:06 3    was not in Dr. Dahm's file and one of which was.

18:10:11 4         MR. VITTITOE:  But Exhibit No. 2 is within

18:10:12 5    Exhibit No. 1 as I read Exhibit 1, correct?

18:10:15 6         MR. BERGER:  Yes.  Correct.

18:10:17 7         MR. VITTITOE:  Okay.  All right.

18:10:17 8                   EXAMINATION

18:10:26 9    BY MR. VITTITOE:

18:10:26 10        Q.  Dr. Dahm, earlier you were shown an exhibit

18:10:28 11   marked as Exhibit 3-A by Counsel, and you were asked to

18:10:33 12   compare it with the document -- a same or similar

18:10:37 13   document in your file.

18:10:38 14        A.  Yes, sir.

18:10:39 15        Q.  Would you find that?

18:10:40 16        A.  I can try.  Okay.  This is the page, I think.

18:10:44 17        Q.  Okay.  Now --

18:10:46 18        A.  There seems to be a comment added on your

18:10:48 19   exhibit document that's not on, you know, my copy that

18:10:51 20   was in the file.

18:10:52 21        MR. VITTITOE:  I would ask that you make

18:10:54 22   available to the court reporter, as Exhibit No. 5, your

18:10:58 23   complete file.

18:10:59 24        MR. BERGER:  That's fine with me.

18:11:02 25        MR. VITTITOE:  And in that connection,

18:11:04  1   we'll mark that as Exhibit 5.

18:11:06  2       Q.  As part of Exhibit 5, there is a document

18:11:10  3   that -- from the Brownsville Medical Center; am I

18:11:13  4   correct?

18:11:14  5       A.  Yes.

18:11:14  6       Q.  And when is that document dated?  It's -- is it

18:11:17  7   dated, Doctor?

18:11:22  8       A.  It's going to require a little -- of course, I

18:11:26  9   think this was a front and back of a page that was

18:11:28 10   Xeroxed.  Let me see.  This is the other page.  I'm not

18:11:37 11   seeing a date on this.  I'm sorry.

18:11:38 12       Q.  Well, at any rate, Exhibit -- Dahm Exhibit 5,

18:11:47 13   the bottom record is a record from Brownsville Medical

18:11:51 14   Center, correct?

18:11:56 15       A.  Yes, sir.

18:11:56 16       Q.  And it has as an initial at the bottom of the

18:11:59 17   page, I believe, an "R."

18:12:03 18       A.  J.R.

18:12:04 19       Q.  J.R.  And I suppose that stands for

18:12:05 20   Dr. Richardson.  Would that reasonable to you?

18:12:08 21       A.  I believe so.  Let me see if I record his first

18:12:11 22   name here somewhere.  N. Richardson.

18:12:17 23       Q.  All right.  But at any rate, that appears --

18:12:20 24   looking at the document in your file, Dahm Exhibit 5,

18:12:26 25   that appears to be a photocopy, a true and correct

18:12:29  1    photocopy of the original from the Brownsville Medical

18:12:31  2    Center emergency room, correct?

18:12:36  3         A.   I would think so.  Yes.

18:12:38  4         Q.   All right.  Now, you noted a difference between

18:12:42  5    Exhibit 3-A, which was offered by plaintiff's counsel,

18:12:45  6    and the document in your -- the same document in your

18:12:49  7    chart; am I correct?

18:12:50  8         A.   Correct.

18:12:50  9         Q.   What is the difference?

18:12:52 10         A.   Well, up here between where you have this

18:12:55 11    boldface word "neck" and the boldface "respiratory" is

18:13:00 12    handwritten "erythema around throat."

18:13:04 13         Q.   Erythema around throat.

18:13:06 14              What does that mean in layman's terms?

18:13:08 15         A.   Well, you know, kind of a reddish area in the

18:13:11 16    skin, you know, on the surface around the throat.

18:13:14 17         Q.   Looking at the original document in your file

18:13:16 18    and looking at Exhibit 3-A, would it appear that

18:13:19 19    information was added to 3-A from the original?

18:13:23 20         A.   It kind of looks like it, yes, sir.  I mean,

18:13:25 21    the way that it's there on that one and clearly not on

18:13:26 22    this one.

18:13:27 23         Q.   Do you know who added that additional

18:13:29 24    information about redness about the throat?

18:13:31 25              MR. BERGER:  Objection to the form because

18:13:33 1    it might have been retracted from his form, so

18:13:37 2    objection to the form, assuming something that's not in

18:13:41 3    evidence that was added.

18:13:43 4        Q.  I'm just saying do you know who made these

18:13:45 5    additions to Exhibit 3-A?

18:13:49 6        A.  No, sir, I don't.

18:13:49 7        Q.  Do you have any idea?

18:13:50 8        A.  No.

18:13:51 9        Q.  All right.

18:13:51 10               MR. BERGER:  I'll object to the form of

18:13:52 11   the question.  It assumes something was added.

18:13:58 12       Q.  Well, let me ask you just to clarify Counsel's

18:14:01 13   concern.  Is there a difference between the document in

18:14:06 14   your file and 3-A?

18:14:14 15       A.  Yes.

18:14:14 16       Q.  It appears to be the same form.  It appears to

18:14:17 17   have all the same handwriting marks other than there's

18:14:20 18   some additional language; am I correct?

18:14:22 19       A.  That's correct.  That's the only difference I

18:14:24 20   can --

18:14:25 21       Q.  The additional language, you don't know who

18:14:28 22   added that additional language or when it was added, do

18:14:28 23   you?

18:14:30 24       A.  No, sir.

18:14:31 25               MR. BERGER:  Objection to the form of the

question.

Q. You just know that you haven't seen Exhibit 3-A until today.

A. That's correct.

Q. All right. Exhibit 3-B, have you seen 3-B before today?

A. Not before today, no.

Q. Do you know who made Exhibit 3-B?

A. No, I do not.

Q. Okay. Now, Doctor, I'm going to ask your opinion based on a reasonable medical probability. You understand what that means, do you not?

A. Yes, sir, I do.

Q. Doctor, it's my understanding that you first saw the body of the deceased on April the 12th in the morning; am I correct?

A. Yes, sir.

Q. Is that the time that you performed your autopsy upon the body?

A. Yes, sir.

Q. Did you complete the autopsy on that day?

A. No, sir.

Q. Did you do some additional testing or studies that you need to send off for lab results, etc.?

A. Yes, sir.

Q.  What additional things did you do besides go into the body and cut open the body and etc.?

A.  Well, we --

MR. BERGER:  Objection, leading.

Q.  Go ahead.

A.  All right.  We examined samples that we took and examined samples of the tissue removed after an appropriate time of fixation for microscopic examination to make slides.

We sent off blood samples for toxicology studies.  We did further exams upon the hyoid bone and the neck tissues to document and establish the degree of injuries and types of injuries, if any, that we thought we had found in the initial examination.

Q.  Prior to --

A.  And, you know, when a collection of things didn't seem to add up, that's when I sought expert consultative help from a known authority in the field.

Q.  Prior to receiving back the results of the -- this additional testing that you just told us about, did you write your preliminary report indicating that there might be a possible homicide?

A.  Yes.  That was written very shortly after the gross or unaided eye examination but before any of these other studies were done.

18:16:44  1     Q.  It's my understanding your preliminary report,

18:16:47  2   which is dated what?  April the 16th, 2001?

18:16:51  3     A.  Yes, sir.

18:16:51  4     Q.  -- was prepared by you prior to receiving the

18:16:54  5   microscopic examination, the radiologic information,

18:16:58  6   and the other testing that you had requested.

18:17:01  7              MR. BERGER:  Objection, leading.

18:17:01  8              THE WITNESS:  That's correct.

18:17:04  9     Q.  Is that true?

18:17:04 10     A.  That's correct.

18:17:05 11              MR. BERGER:  Objection, leading.

18:17:06 12     Q.  Now, in connection with your preliminary report

18:17:13 13   of April 16th, had you had a chance to talk with

18:17:16 14   Dr. Richardson?

18:17:19 15     A.  You know, at that time, I don't think yet, and

18:17:21 16   I'm searching to see.  You know, I did have at least

18:17:24 17   one conversation and maybe two, but when exactly that

18:17:31 18   happened, I don't know --

18:17:33 19     Q.  Did --

18:17:34 20     A.  -- because I hadn't written the body of the

18:17:35 21   report yet at that point.

18:17:36 22     Q.  Did Dr. Richardson tell you that he had been

18:17:39 23   sent down to Brownsville Medical Center by the

18:17:43 24   Brownsville Police Department for physical injuries and

18:17:47 25   in connection with bizarre behavior and that he was

18:17:52  1    seen by him, by Dr. Richardson, at Brownsville Medical

18:17:59  2    Center?

18:17:59  3        A.  I believe so, yes.  And, of course, later on, I

18:18:02  4    recorded that information here.

18:18:04  5        Q.  I think my question is, were you aware of that

18:18:06  6    prior to the preparation of your preliminary report of

18:18:10  7    April 16th.

18:18:13  8        A.  I don't know.  I don't think so.

18:18:15  9        Q.  Did Dr. Richardson tell you that he had asked

18:18:18 10    for a psychological consult from Texas MHMR and that

18:18:29 11    after consulting with the individual from MHMR in the

18:18:33 12    emergency room that he referred Mr. Longoria back to

18:18:38 13    the Brownsville jail for incarceration?

18:18:42 14        A.  I believe -- yeah, the mechanism of the

18:18:44 15    consult, I don't know.  I think, you know -- I think I

18:18:47 16    can remember him mentioning something about having a

18:18:49 17    psychologist or psychiatrist look at him, but you know,

18:18:53 18    who it was or what agency they were connected with I'm

18:18:55 19    afraid I can't remember specifically.

18:18:57 20        Q.  Do you know whether that information was

18:18:58 21    brought to your attention before April 16th?

18:19:02 22        A.  I don't think so.

18:19:03 23        Q.  Were you made aware that during the emergency

18:19:07 24    room visit that Mr. Longoria was requesting several

18:19:12 25    beers to be consumed, five or six beers in the

18:19:15  1    emergency room, requesting beer?

18:19:18  2        A.  Yeah.  I'm not aware of that, but I guess that

18:19:20  3    wouldn't surprise me, but I'm not aware of it.

18:19:25  4        Q.  Based on your experience as a medical doctor,

18:19:28  5    is it protocol to assess for alcohol-related issues as

18:19:34  6    part of the differential diagnosis?

18:19:37  7        A.  Yes, sir.

18:19:37  8        Q.  Do you know whether that was done in this

18:19:39  9    particular case?

18:19:42 10        A.  I don't specifically know, but I rather

18:19:44 11    strongly suspect that that was high on their list when

18:19:47 12    they brought him in.

18:19:51 13        Q.  Okay.

18:19:52 14            MR. BERGER:  Object to the response.  It

18:19:53 15    calls for speculation.

18:19:55 16        Q.  If -- what is the protocol for a medical doctor

18:19:58 17    if they diagnose delirium tremens?  What is the medical

18:20:03 18    protocol?

18:20:04 19        A.  I think if delirium tremens is actually

18:20:07 20    diagnosed, I think that's when they're generally

18:20:09 21    admitted to the hospital setting.

18:20:12 22        Q.  And that's where they're prescribed the

18:20:16 23    sedative to settle down the brain?

18:20:17 24        A.  Correct.  Sedative and rehydration.

18:20:21 25        Q.  A sedative such as Valium or Lithium?

A.  Yes, sir.

Q.  And then they're rehydrated, you're talking about intravenous fluids are applied?

A.  Fluids.

Q.  And they're actually incarcerated in a hospital for medical treatment.

A.  Yes.  And frequently restrained to prevent self-injury.

Q.  Okay.  Now, assume with me that Dr. Richardson had admitted this -- had diagnosed delirium tremens and had placed Mr. Longoria in the hospital, which is the medical protocol for treatment of delirium tremens, based on reasonable medical probability, what was the life expectancy of this gentleman in light of the autopsy report?

A.  Less than a week.

Q.  And that's because of the end-stage liver disease?

A.  That's correct.

MR. BERGER:  Objection, leading.

Q.  In your medical opinion, what's the reason for the fact that his life expectancy would not have been any longer than a week even had he received treatment for delirium tremens by a medical doctor?

A.  His end-stage alcoholic liver disease would

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

18:21:27  1   have -- was no longer compatible with his living more

18:21:30  2   than a week or so.

18:21:31  3       Q.   That's based on reasonable medical probability?

18:21:34  4       A.   Yes, sir.

18:21:34  5       Q.   Now, Doctor, when you prepared your preliminary

18:21:40  6   autopsy of April 16th, you've told us that you had some

18:21:44  7   other testing that you were looking for the results.

18:21:48  8       A.   Correct.

18:21:48  9       Q.   But you thought it was important and you were

18:21:52 10   considering and you were thinking that possibly this

18:21:57 11   might be a choke hold death; am I correct?

18:21:58 12       A.   Correct.

18:21:59 13       Q.   And at that point in time, did you have any

18:22:03 14   idea who might be the assailant in this choke hold?

18:22:07 15       A.   No, I had no idea who the assailant might have

18:22:11 16   been.

18:22:11 17       Q.   For the benefit of the jury in this particular

18:22:13 18   case, would you tell us what a choke hold is, a choke

18:22:17 19   hold death?

18:22:18 20       A.   Well, a choke hold is a method --

18:22:20 21           MR. BERGER:  Object.  Excuse me, Doctor,

18:22:22 22   I'm going to object to the form of the question because

18:22:23 23   it's two different questions in one.

18:22:25 24       Q.   Okay.  What is a choke hold death, a death by

18:22:28 25   choke hold?

A.  Well --

Q.  In the normal --

A.  Well, first of all, a choke hold is a method sometimes used, and they were previously used by security guard personnel to control somebody by grabbing them about the neck, usually between the crook of the elbow, and squeezing off the airway to the point that they begin to lose consciousness, and then they let go.

Q.  Okay.  The next part of that question is, what is a choke hold death?

A.  Well, you know, if they fail to let go in time, the person can die either by cutoff of blood supply to the brain or perhaps cardiac arrhythmia, and then they fail to recover.  And, of course, to do that, it requires extensive, prolonged, severe pressure and gripping.

And when that happens, there's going to be extensive injury -- bruises about the neck, bruises about the Adam's apple, broken hyoid bone, for example, we've talked about.  But there's also going to be little, tiny broken blood vessels, what they call petechial hemmorages in places like the eyeballs, conjuctivae, inside the eyelids.

You find these things in the linings of

18:23:51 1  the lungs and the pericardial membranes around the

18:23:56 2  heart and so on.  And so the death is basically -- the

18:24:00 3  findings are basically similar to those in a

18:24:00 4  strangulation.

18:24:04 5      Q.  So is a choke hold death -- is it a

18:24:07 6  strangulation death?

18:24:10 7      A.  Yes, sir.

18:24:10 8      Q.  Okay.  So a choke hold death equates to

18:24:13 9  strangulation death which to a layman indicates the

18:24:21 10  lack of air to the lungs.

18:24:26 11      A.  Yes, sir.

18:24:26 12      Q.  Among other things, correct?

18:24:28 13      A.  Yeah.  More than that.  It's the cutoff of the

18:24:30 14  return of the circulation from the brain.  It's the

18:24:32 15  stoppage of the circulation into the brain is, you

18:24:35 16  know, what a person dies of.

18:24:38 17      Q.  Okay.  At any rate, you wanted to rule that

18:24:41 18  out.

18:24:41 19      A.  Yes, sir.

18:24:41 20      Q.  And that's why you requested this additional

18:24:44 21  testing?

18:24:44 22      A.  Yes, sir.

18:24:45 23      Q.  And that's why you consulted with Dr. DiMaio;

18:24:50 24  am I correct?

18:24:51 25          MR. BERGER:  Objection, leading.

18:24:52 1          THE WITNESS:  That is why I consulted with

18:24:54 2   Dr. DiMaio.

18:24:56 3       Q.  Is Dr. DiMaio a denoted forensic pathologist?

18:24:59 4       A.  Yes, sir.

18:24:59 5       Q.  Have you periodically consulted with him from

18:25:01 6   time to time on occasion?

18:25:02 7       A.  Yes, sir, I have.

18:25:04 8       Q.  Now, Doctor, after getting back this test data,

18:25:09 9   this test information, would you tell us what you got

18:25:13 10  and what you would have -- would have received had you

18:25:16 11  had a choke hold death?

18:25:21 12      A.  All right.  What we would have had if this had

18:25:26 13  been a choke hold death, we would have seen the

18:25:28 14  petechial hemorrhages in the eyelids and on the

18:25:29 15  surfaces of the eyeballs.  We would have seen petechial

18:25:32 16  hemorrhages in the outer linings of the lung,

18:25:35 17  pleural --

18:25:36 18      Q.  Through the slides?  Is that what you're

18:25:38 19  saying?  Through the microscopic --

18:25:38 20      A.  Well, we would have seen them with the naked

18:25:40 21  eye examination too.

18:25:41 22      Q.  And didn't see that.

18:25:42 23          MR. BERGER:  Objection, leading.

18:25:43 24          THE WITNESS:  We did not.  And we would

18:25:47 25  have seen much -- a much greater degree of bruising in

18:25:51  1    the neck.  And we would have seen, more likely than

18:25:56  2    not, true fracturing of the hyoid bone as opposed to a

18:25:59  3    slight sprain of one of the intrahyoid ligaments.

18:26:05  4             And so, you know, the minimal nature of

18:26:10  5    the neck injuries is not compatible with something as

18:26:13  6    violent as a choke hold death.

18:26:16  7             MR. BERGER:  Counsel, we'll stipulate that

18:26:16  8    he didn't die of a choke hold to minimize this, the

18:26:20  9    doctor's time, if that's --

18:26:23  10            MR. VITTITOE:  I appreciate that.  It's

18:26:24  11   been alleged in the lawsuit.

18:26:26  12            MR. BERGER:  Well, we'll stipulate he did

18:26:27  13   not die of a choke hold.

18:26:29  14            MR. VITTITOE:  Okay.

18:26:30  15   Q.   But at any rate, you wanted to rule that out.

18:26:32  16   A.   Yes, sir.

18:26:33  17   Q.   And you did rule that out by the test data?

18:26:36  18   A.   Yes, sir.

18:26:36  19            MR. BERGER:  Objection, leading.

18:26:39  20            THE WITNESS:  I ruled it out with a

18:26:41  21   combination of the test data.

18:26:41  22            MR. BERGER:  I've already stipulated.  You

18:26:42  23   want to keep asking about it?

18:26:43  24            MR. VITTITOE:  Yes, sir.

18:26:44  25            MR. BERGER:  Okay.  Well, then, that's

18:26:45 1  your privilege, but I'm going to still object to your

18:26:51 2  leading.

18:26:51 3          MR. VITTITOE:  I think I do because you

18:26:52 4  asked about it so much, and it's alleged in the

18:26:53 5  lawsuit.

18:26:54 6          MR. BERGER:  Well, I know it, but we

18:26:55 7  stipulate now that he did not die of a choke hold.

18:27:01 8  Okay?  Now, I mean, if you want to go into it

18:27:17 9  further -- the doctor already give his opinion on my

18:27:17 10 examination of him that he didn't die of a choke hold.

18:27:17 11     Q.  Now, further, Dr. Dahm, my understanding is

18:27:20 12 your findings, based on the test data, the microscopic

18:27:26 13 slides ruled out any break to the hyoid bone.

18:27:28 14     A.  Yes, sir.

18:27:29 15     Q.  Although there was a tear to the ligamentous

18:27:32 16 tissue in relation to --

18:27:34 17     A.  Connected to it, yes, sir.

18:27:36 18          MR. BERGER:  Objection; asked and

18:27:37 19 answered, leading.

18:27:39 20     Q.  -- to the hyoid bone.

18:27:41 21          And the hyoid bone is typically broken in

18:27:42 22 a choke hold; am I correct?

18:27:44 23     A.  Yes, sir.

18:27:45 24     Q.  All right.

18:27:46 25          MR. BERGER:  Objection, leading.

18:27:47 1    Q.  Now, earlier you indicated that -- on direct

18:27:54 2    examination, that it is possible and likely, in many

18:27:59 3    circumstances, that the hyoid bone and/or the throat

18:28:03 4    tissues may be aggravated in the placement of the ETT

18:28:07 5    tube; am I correct?

18:28:08 6         MR. BERGER:  Objection, asked and answered

18:28:09 7    and leading.

18:28:10 8    Q.  Is that true?

18:28:11 9    A.  Yes, sir.

18:28:11 10        MR. VITTITOE:  All right.  Let me ask the

18:28:15 11   court reporter to mark as Exhibit -- Dahm -- Defense

18:28:19 12   Exhibit 6, the statement of Felipe Esquivel.

18:28:27 13        And while we're at it, mark as Defense

18:28:31 14   Exhibit 7 to the Dahm deposition the statement of Jesus

18:28:37 15   Eduardo Perez, who was the EMT technician.

18:30:17 16   Q.  Dr. Dahm, I'll hand you Exhibit 6 and 7 and ask

18:30:21 17   if you would first look at Exhibit 6.

18:31:42 18   A.  Okay.

18:31:43 19   Q.  First of all, Exhibit 6 is the affidavit of

18:31:48 20   Felipe Esquivel, who is a Cameron County Health

18:31:51 21   Department nurse that responded to this situation at

18:31:55 22   the jail.

18:31:56 23   A.  I gathered that from reading this.

18:31:58 24   Q.  And the time, is at about 12:42 a.m.  Do you

18:32:02 25   see that?

A.  Yes.

Q.  On the 12th.

Now, he commented that, in his opinion, rigor mortis was already setting in, the skin was rough and cold, and that he went back to the prisoner and began CPR and first aid.

A.  Yes.

Q.  And minutes later, EMS arrived and then they took over.

So I guess it would be -- in viewing this statement, would it be your impression that Nurse Esquivel was performing CPR compressions?

A.  Yes.  I mean, that's what that implies, although he doesn't specifically state it.

Q.  And what are CPR compressions?

A.  Well, that's where people usually with two hands, they lean on the chest and pump in and out on the chest of somebody lying on their back trying to get heart action, blood circulation.

Q.  And if we could, if you'd look at Exhibit 7, which is a shorter statement, but it's from the EMT who arrived on the scene at about 1:10 a.m.

A.  All right.

Q.  And in reading the Perez statement, the EMT, the ambulance attendant notes that when -- upon his

18:33:48 1   arrival at 1:10 a.m., the nurse and a man were

18:33:53 2   performing CPR compressions on the chest of the

18:33:57 3   prisoner.

18:33:57 4       A.  Yes.

18:33:58 5       Q.  And further, he says that it was his opinion,

18:34:04 6   after examining this individual, the individual was

18:34:07 7   already dead, correct?

18:34:08 8       A.  Yes.

18:34:09 9       Q.  But he commented that he continued the CPR; am

18:34:13 10  I correct?

18:34:14 11      A.  Yes.

18:34:15 12      Q.  So even though he -- in his opinion, this

18:34:19 13  gentleman was dead and had been dead about two hours --

18:34:23 14  that's what he says --

18:34:25 15      A.  Yeah.

18:34:25 16      Q.  -- he continued CPR.

18:34:27 17      A.  Well, they always give them the benefit of the

18:34:28 18  doubt.  I mean, you know, they --

18:34:29 19      Q.  Is that part of their training?

18:34:31 20      A.  Yea.  Part of their training.

18:34:32 21      Q.  He also comments that he placed the ET tube

18:34:35 22  into the prisoner's airway.

18:34:37 23      A.  Yes.

18:34:38 24      Q.  And then the prisoner was transported to

18:34:40 25  Brownsville Medical Center.

A.   Yes.  And I'm sure he was doing this in a hurry.

Q.   Okay.  So based on your autopsy, your test data, and in your professional opinion in looking at these -- both Exhibit 6 and 7, Longoria was dead when CPR was applied.

A.   Correct.

Q.   Compressions were given.

A.   Correct.

Q.   In other words, CPR was given on this dead man.

A.   Yes.  Or attempted, I think would be a better way of describing it, but --

Q.   And a tube -- intubation tube was --

A.   Yes.

Q.   -- placed in his --

        MR. BERGER:  Objection, leading.

        THE WITNESS:  Well, all those things were done.  I mean, they say it in so many words in here, so --

Q.   All right.  Now, would you tell the jury or the judge what an ETT tube is?

A.   Endotracheal tube.

Q.   What is that?

A.   Well, it's a plastic tube with a plastic cuff, inflatable cuff near its end that's, you know, inserted

18:35:39  1   through the throat, through the larynx and into the

18:35:41  2   windpipe for the purpose of artificial respiration.

18:35:46  3        Q.   Would it -- can you -- based on your experience

18:35:51  4   and understanding, can trauma be induced in placing an

18:35:56  5   ETT tube?

18:35:59  6                MR. BERGER:   Objection, asked and

18:36:00  7   answered.

18:36:03  8                THE WITNESS:   Yes.

18:36:03  9        Q.   How about on somebody that's dead?

18:36:04  10               MR. BERGER:   Objection, asked and

18:36:04  11  answered.

18:36:08  12               THE WITNESS:   Yeah.  I mean, you know, you

18:36:11  13  can see injuries.

18:36:12  14       Q.   And placing the tube into the throat at that

18:36:18  15  time, 1:10 in the morning or there and about, could

18:36:21  16  cause irritation to the throat, tears to the hyoid bone

18:36:25  17  possibly?

18:36:26  18               MR. BERGER:   Objection; compound, leading,

18:36:30  19  and asked and answered.

18:36:32  20               THE WITNESS:   Yes.

18:36:39  21       Q.   Okay.  Dr. Dahm, in your medical opinion, do

18:36:43  22  you have any -- strike that question.

18:36:49  23               Dr. Dahm, in all reasonable medical

18:36:51  24  probability, did Mr. Longoria die at the Cameron County

18:36:55  25  Jail as a result of a severe beating?

A.  No, he did not.

Q.  In your opinion, Dr. Dahm, based on reasonable medical probability, did Mr. Longoria die as a consequence of suffocation of a choke hold?

A.  He did not.

Q.  In your opinion, Dr. Dahm, based on reasonable medical probability, did Mr. Longoria die as a consequence of end-stage liver disease?

A.  Yes, sir, he did.

Q.  In your opinion, Dr. Dahm, based on reasonable medical probability, whether or not Mr. Longoria was incarcerated in Cameron County Jail or the Brownsville City Jail for that matter, for whatever he was -- based on his condition in life, how long, based on reasonable medical probability, did he have to live because of the end-stage liver disease?

MR. BERGER:  Objection; compound, no foundation.

Go ahead.

THE WITNESS:  Based on the condition of that liver, as I said previously, his life expectancy was less than a week.

MR. VITTITOE:  Thank you, Doctor.

Pass the witness.

EXAMINATION

BY MR. BERGER:

Q.  Doctor, you -- when you looked at Exhibit 6 and 7, you see that there is a Nurse Esquivel, at 12:42 that rigor mortis had already set in, so that would be at least two hours?

A.  Thereabouts, yeah.

Q.  Did anybody show you a statement from an officer that someone had checked on him at 11:05 p.m., and he was -- Mr. Longoria was walking around?

A.  No, I haven't seen a statement like that.

Q.  Okay.  Assume with me that there is one, sir, and that the testimony has been that way.  Would a person that was -- had rigor mortis at the time that the nurse arrived at 12:42, would he be walking around at 11:05?

A.  No, I don't think so.

Q.  Okay.  You also see that there was a report by the -- in Exhibit No. 7 by the EMT that there was -- regards to a cardiac arrest.  Do you see that?

A.  Let me see.

Q.  The second paragraph of Mr. Claudio Ortiz's statement.

A.  Oh, in responding in regards to the cardiac arrest.

Q.  Okay.  Someone had called in that there was a cardiac arrest of Mr. Longoria.  Is that what you gather from that?

A.  I suppose.  Although the words of the person calling in, I have no idea.

Q.  Okay.

A.  You know, these medical professionals like this often kind of interpret, you know, put their own spin on things.

Q.  Well, I understand.  At least when he was there, they concluded that he was already dead for two hours, had been dead for at least two hours at 1:10 or by 11:10; is that correct?

A.  Yes.

Q.  Okay.  Would the person that was -- died about 11:10 from end-stage liver disease that may be compounded by alcohol withdrawal, would he be walking around at 11:05?

A.  Don't think so.

Q.  Would you think that a person in the condition of which you saw Mr. Longoria's liver when you did the autopsy, would he be walking around, trying to leave the jail -- the cell area where he was confined about 6:30 where he had to be pushed back into the jail?

A.  I don't know, sir.  I mean, I think disoriented

18:41:15  1   people do all kinds of strange things.

18:41:17  2       Q.  Well, I know that, but I mean, are you

18:41:20  3   disoriented when you want to leave a jail?

18:41:25  4       A.  Maybe yes and maybe no.

18:41:27  5       Q.  Okay.  Well, it's not necessarily being

18:41:28  6   disoriented if you want to leave an isolated cell,

18:41:31  7   would you?

18:41:33  8       A.  I suppose not.

18:41:42  9       Q.  Okay.  Now, what is the potential range of life

18:41:49 10   for end-stage liver disease?

18:41:50 11       A.  What is the potential range of life?

18:41:52 12       Q.  Yes, sir.  When you said -- before when you

18:41:54 13   were asked, you said one week or so.

18:42:00 14       A.  Well, now, from the time he started drinking

18:42:02 15   and damaging his liver, who knows how many years have

18:42:04 16   gone by, you know.  I think he's what?  41 or something

18:42:08 17   I think was his age.  He's probably been drinking

18:42:11 18   heavily for maybe 15, 20 years maybe.

18:42:14 19       Q.  Well, did he have end-stage liver disease for

18:42:15 20   15 or 20 years?

18:42:17 21       A.  No, he did not have.  But he began at some

18:42:20 22   point along his life to steadily damage his liver.

18:42:24 23   And, of course, the liver has tremendous reserve.  And

18:42:27 24   they go along and they do a little more damage and a

18:42:30 25   little more damage and a little more damage.

18:42:32  1     But at some point, the damage becomes so

18:42:33  2  severe some threshold is crossed where the liver can't

18:42:36  3  function normally.  Then they begin to get sick.

18:42:40  4     And then at that point, the liver disease

18:42:42  5  becomes self-perpetuating, even though he probably lost

18:42:45  6  his appetite and quit drinking, which is what

18:42:47  7  frequently happens in these cases.

18:42:48  8     Q.  You mean alcohol?

18:42:50  9     A.  Yeah.  They lose their appetite for alcohol.

18:42:52 10  They also lose their appetite for, you know, even food.

18:42:56 11  That's when they begin to get sick and then go over the

18:42:59 12  edge very quickly.

18:42:59 13     And so they can go from somebody seemingly

18:43:02 14  symptom free, in a week or two be slipping off into

18:43:10 15  hepatic coma.  And that's what it kind of sounds like

18:43:11 16  happened in this case.

18:43:12 17     Q.  Would that type of person --

18:43:14 18     A.  And once they slip off into hepatic coma,

18:43:17 19  keeping them alive more than a week or so is very

18:43:19 20  difficult.

18:43:20 21     Q.  Okay.  But he -- until at least sometime

18:43:21 22  between 12:30 and 11:00 p.m. at night, he didn't slip

18:43:28 23  into a hepatic coma until that time.

18:43:32 24     A.  Well, evidently, sometime over that period of

18:43:34 25  time he slipped into a coma and died.

Q.  Okay.  Between 10:30 and 11:00?

A.  Between 10:30 in the morning and 11:00 at night is what it sounds like.

Q.  Well, how about 10:30 p.m. and 11:00 at night?

A.  Well, you know, I don't know exactly what happened, although it sounds like he was brought in conscious and over the course of a 12-hour period he slipped into a coma and died.

And, you know, all kinds of people are saying all kinds of things.  And I wasn't there, and I don't know exactly what happened and -- but he did -- all I know is that he slipped into a coma and he died.

Q.  Okay.  But in medical -- reasonable medical probability, when did he slip into a coma?

A.  Well, I don't know.  I would say -- I would guesstimate in the last hour or two before he was discovered.

Q.  He was discovered at 11:10 by Officer Mendieta to be prone.

A.  Sitting there, leaning up.

Q.  Leaning.

Not prone but leaning up against the wall.

A.  Who knows how long he was sitting there. Somebody may have seen him sitting there and just presumed he was alive.  You know, maybe an hour or two

18:44:39  1  went by before somebody said, you know, "This guy

18:44:39  2  doesn't look right."

18:44:39  3  Q.  Well, assuming that somebody said that he was

18:44:42  4  walking around inside his jail cell at 11:05, he's not

18:44:46  5  in a coma then.

18:44:47  6  A.  Well, I don't know that he was walking around

18:44:49  7  at 11:05 if at 11:10 he was found dead.  That doesn't

18:44:52  8  make sense.

18:44:53  9  Q.  I don't know if he was found dead at 11:10.  He

18:44:56 10  was found sitting in the jail cell at 11:10.  And

18:44:59 11  according to -- assume with me that according to the

18:45:01 12  statements of witnesses, someone saw him walking

18:45:04 13  around, a officer, a police officer, sheriff, deputy

18:45:10 14  sheriff, detention officer said he saw him walking

18:45:12 15  around between -- at 11:05.

18:45:16 16  A.  Yeah.  Well, I mean, I can't vouch for what

18:45:18 17  other people said when they saw and, you know, what

18:45:20 18  time they might have or might not have or whether

18:45:23 19  they're mistaken or not.

18:45:25 20  Q.  Okay.  I understand.

18:45:26 21  A.  I mean, by the time these two ambulance --

18:45:29 22  Q.  He was dead.

18:45:30 23  A.  -- drivers arrive, he's dead.  I mean, we know

18:45:31 24  he's dead at 1:10 and rigor mortis had set in.

18:45:34 25  Q.  Yeah.  We had three people before --

18:45:35  1      A.   It's not a big stretch to figure that he died

18:45:38  2   between about 10:00 and 11:00 at night.   I mean,

18:45:38  3   it's --

18:45:40  4      Q.   Okay.

18:45:41  5      A.   -- kind of what it looks like.

18:45:43  6      Q.   Do you know no one checked him from 6:35 to

18:45:48  7   11:00 at night in that isolation?

18:45:51  8      A.   Well, I thought you said they saw him walking

18:45:51  9   around at --

18:45:54 10      Q.   At 11:05, Doctor.

18:45:56 11      A.   So if somebody saw him, you know, how does that

18:45:58 12   square with nobody checking on him all this time?   It

18:46:01 13   doesn't make any sense.

18:46:02 14      Q.   Well, between 6:45 and 11:05 no one checked on

18:46:05 15   him.   Do you know that?

18:46:07 16      A.   Well, I don't know anything about that.

18:46:09 17           MR. VITTITOE:   Objection, misstates the

18:46:11 18   evidence.

18:46:12 19      Q.   Well, according to the testimony, that's what

18:46:13 20   it states.

18:46:15 21           MR. VITTITOE:   Objection, misstates the

18:46:16 22   evidence.

18:46:21 23      Q.   Doctor, have you ever been in that Harris

18:46:24 24   County Jail?

18:46:27 25      A.   I've never been in the Harris County Jail.

18:46:29  1    Q.   I'm sorry.  The Cameron County Jail.  I'm

18:46:29  2  sorry.

18:46:30  3    A.   Cameron County Jail either.

18:46:33  4    Q.   Have you been in the Cameron County Jail?

18:46:35  5    A.   No, sir.

18:46:36  6    Q.   Okay.  You know -- so you don't know that

18:46:38  7  Mr. Longoria was stuck for 12 hours in a padded cell,

18:46:45  8  roughly 12 hours in a padded isolated cell.

18:46:48  9    A.   Well, no, I don't know, you know, what the cell

18:46:51 10  looks like.  I have not seen the cell.

18:47:02 11    Q.   Okay.  Doctor, there's another document that's

18:47:03 12  part of your records that somebody else filled out,

18:47:09 13  forensic information authorization form.  Do you know

18:47:12 14  whose handwriting this is?

18:47:14 15    A.   No.  I'm going to have to look into this.

18:47:14 16    Q.   Okay.

18:47:20 17    A.   That's my writing.

18:47:21 18    Q.   Oh, that's your writing?

18:47:23 19    A.   Yes.  Of course, that was filled out on,

18:47:25 20  probably, the day or the day after I did the autopsy.

18:47:27 21  So I filled out whatever information I had on hand at

18:47:29 22  the time.

18:47:30 23    Q.   Well, you had on there that he was HIV

18:47:33 24  positive.

18:47:35 25    A.   No.

18:47:35 1    Q.  Well, that's what it says, doesn't it, at the

18:47:37 2 top?

18:47:38 3    A.  Well, maybe it does.  Yes, it does.  I guess --

18:47:40 4    Q.  Where did you get that information?

18:47:41 5    A.  Well, somebody told me they thought he was HIV

18:47:43 6 positive, so I'm alerting the laboratorians to be

18:47:46 7 careful.  And I think that proved not to be the case,

18:47:48 8 but nonetheless, it was something --

18:47:51 9    Q.  He was also -- you've also put on there that he

18:47:55 10 was a derelict?  Where did you get that information?

18:47:56 11    A.  Well, it was the information given at the time.

18:47:58 12    Q.  By whom?

18:47:59 13    A.  Well, probably the attending sheriff's officer.

18:48:04 14    Q.  Okay.  He was -- you put on here that he was at

18:48:09 15 the county jail in a solitary cell.  Do you know why he

18:48:13 16 was there or did you ask anybody?

18:48:15 17    A.  Well, I think it was because he was a -- they

18:48:17 18 thought he was acting strangely.

18:48:18 19    Q.  Oh, okay.  "Found dead on the floor of the

18:48:24 20 cell.  Had been acting goofy over last two or three

18:48:27 21 days."  Is that where you got that information from?

18:48:29 22    A.  Well, that's the sketchy information we had at

18:48:31 23 the beginning.  In other words, we sent this off right

18:48:33 24 away.

18:48:33 25    Q.  Yeah.  You have "multiple cutaneous bruises";

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

is that correct?

A.  Yes.

Q.  You have "fractured hyoid bone, liver cirrhosis and fatty degeneration, chronic pancreatitis."

A.  I mean, those were our preliminary impressions. You know, the ones we thought were important, we put on there.

Q.  Okay.  And manner, suspected homicide, question, choke hold.  That's still in your mind?

A.  Yes.  That's, you know, what we're trying to rule out at that point.

Q.  Okay.  Doctor, let me just show you --

MR. BERGER:  Let me mark -- what's the next exhibit?

Q.  -- show you what's been marked, and it's going to be marked as Dahm Exhibit 8.  And let me state to you, this is a -- subpoenaed from Brownsville hospital as Mr. Longoria's medical records of the emergency room.

Do you see what his complaints are at the time, at least when he was brought in?

A.  Diagnosis, contusions.

Q.  Okay.  What else?  Left elbow?

A.  Left elbow.

Q.  Yeah.  And from that --

A.   And Steri-Strips to lower leg.  He had an abrasion.  Clean all abrasions and to apply something.

Q.   Are you aware that Dr. Richardson believed that he was beaten to death?

A.   Am I aware?

No, I'm not aware of Dr. Richardson's opinion.

Q.   Are you aware that Dr. Richardson believed that there were considerable more bruising about his body than when he examined the day before?

A.   No, I'm not aware of that.

Q.   Okay.  So at least he had some of this bruising and stuff before he got to the point where he was about to die; is that right?

A.   Yes.

Q.   Left elbow and one to his leg.

A.   Yeah.  I mean, he kept accumulating bruising.

Q.   Okay.  Okay.  All right.

If somebody catches your leg in a car door, it's going to -- it's going to cause a laceration to it whether you've got end-stage liver disease or not, wouldn't it?

A.   Yes.

Q.   And if you were knocked to the floor on your elbow, would -- whether you've got-end stage liver

18:51:25  1   disease, it would cause a bruising to that portion of

18:51:32  2   your body too.

18:51:32  3       A.  Yeah.

18:51:35  4       Q.  Okay.  I take it you never saw his emergency

18:51:36  5   room records, did you?

18:51:37  6       A.  No.

18:51:43  7       Q.  Okay.  Doctor, even though it was a preliminary

18:51:47  8   report, you put your signature on here --

18:51:50  9       A.  Yes, I did.

18:51:50 10       Q.  -- that the manner of death is probably

18:51:51 11   homicide --

18:51:52 12       A.  Yes, I did.

18:51:53 13       Q.  -- most likely asphyxia from a choke hold.

18:51:55 14       A.  Yes, I did.

18:51:56 15       Q.  And that was based on reasonable medical

18:51:58 16   probability, wasn't it?

18:51:59 17       A.  It was based on the impressions that we had at

18:52:01 18   the time, yes, sir.

18:52:03 19       Q.  Okay.  And based on reasonable medical

18:52:04 20   probability that -- based on autopsy and a physical

18:52:09 21   exam.

18:52:10 22       A.  Yes, it was.

18:52:10 23       Q.  In other words, physical examination --

18:52:11 24       A.  Absolutely.  That was our impression at the

18:52:13 25   time.

18:52:14  1    Q.  And you were wrong.

18:52:15  2    A.  No question.  And I was wrong.  There can be no

18:52:17  3  question about that either.

18:52:18  4    Q.  And you could be wrong about whether he had

18:52:20  5  late stage or end-stage liver disease.  It was only --

18:52:24  6    A.  I could be, but I'm not.

18:52:26  7    Q.  Okay.  And you --

18:52:27  8    A.  Okay.

18:52:27  9    Q.  -- could be wrong also that he was going to

18:52:29  10  live about a week after this incident --

18:52:31  11    A.  I could be wrong on that too, but I'm not.

18:52:34  12    Q.  Well, you were wrong about this, sir, and you

18:52:35  13  based that on reasonable medical probability about the

18:52:40  14  statement, preliminary statement -- death is probably

18:52:43  15  homicide, most likely asphyxia from a choke hold.  And

18:52:47  16  then you didn't change your opinion until after you

18:52:50  17  talked to Dr. -- the doctor in San Antonio; is that

18:52:50  18  correct?

18:52:56  19    A.  That's correct.

18:52:58  20    Q.  Okay.  And after you got more information from

18:53:01  21  the sheriff's department and things like that -- what

18:53:04  22  went on in the history of Mr. Longoria over the

18:53:07  23  previous three days; is that correct?

18:53:10  24    A.  No, we did not base this on information from

18:53:12  25  the sheriff's department.  We based this on --

18:53:14 1      Q.  And the only --

18:53:14 2      A.  -- medical expertise and further testing.

18:53:17 3      Q.  And the only further testing you did was the

18:53:19 4   toxicology tests, which were negative for stomach

18:53:25 5   contents, drugs, alcohol or anything else.  Is that

18:53:25 6   correct?

18:53:29 7      A.  No.  We did further examination, extensive

18:53:31 8   examination --

18:53:32 9      Q.  That's one of the things --

18:53:33 10     A.  -- of the hyoid bone.

18:53:34 11     Q.  Okay.  You examined microscopically the hyoid

18:53:36 12  bone.

18:53:37 13     A.  That's correct.  We x-rayed the hyoid bone too.

18:53:40 14     Q.  Okay.  And you x-rayed.

18:53:41 15          And that's the only other test that you

18:53:42 16  did before you changed your tune?

18:53:45 17     A.  And we sought additional medical opinion.

18:53:47 18     Q.  And you sought additional medical opinion.

18:53:47 19          But that's the only additional test --

18:53:50 20     A.  No.  We did microscopic examinations on the

18:53:51 21  other tissues also.

18:53:53 22     Q.  What other tissues?

18:53:55 23     A.  Things like the heart, the lung, the liver, the

18:53:56 24  brain, the spleen, the pancreas, the kidney, the

18:54:00 25  adrenal, the thyroid.

Q.   Okay.  But you didn't need -- that didn't

change your opinion as to the condition of his liver,

did it, the microscopic examination?

A.   It showed the microscopic examination of the

liver was probably even more severe then maybe our

gross impression gave.

Q.   Well, is that stated in your report?

A.   Yes, it is.

Q.   That it's more severe?

A.   Well, I mean, we decided that it was the

end-stage liver disease and not the, you know, possible

handling of the neck that did this.  So we -- you know,

we went to effort to rule out the homicide choke hold.

Q.   Yeah.  You went out an effort to rule out the

homicide from a choke hold, but -- and what you were

mistaken about in your initial impression, even though

you had a complete autopsy --

A.   Well, that's what it is was an initial

impression.  You know, it's not always the final

impression.

Q.   Well, you said probable, sir.

A.   Well, you know, probable doesn't mean absolute

certainly.

Q.   I know it, sir, but are you absolutely certain

now that that's what -- he didn't die of -- he died of

18:54:54 1   end-stage liver disease?

18:54:54 2       A.   I'm absolutely certain that he died of

18:54:56 3   end-stage liver disease.   There is no question about

18:54:58 4   what happened here.

18:54:59 5       Q.   Just as there was no question when you wrote

18:55:00 6   this preliminary report; is that correct?

18:55:03 7       A.   Well, I think the preliminary report says

18:55:04 8   "preliminary" and "probable" and other qualifiers.

18:55:07 9       Q.   Oh, well, probable, sir, is sufficient enough

18:55:10 10  to give a cause of death, I think, so I have no

18:55:14 11  further --

18:55:15 12      A.   Well, what you think and what I think may be

18:55:16 13  two different things, but that's okay.

18:55:18 14      Q.   Have you issued --

18:55:20 15      A.   I have issued a final opinion.   What I've

18:55:22 16  written before, I've written, and what I've written

18:55:24 17  now -- later I wrote, and I stand by it.

18:55:26 18      Q.   Okay.   Who else did you discuss that final

18:55:28 19  besides the doctor from San Antonio?

18:55:32 20      A.   Well, from a medical point of view, he's the

18:55:34 21  only one.

18:55:35 22      Q.   Okay.   From any point of view.

18:55:37 23      A.   I mean, I did not discuss it with other

18:55:40 24  attorneys.   I have not discussed it with sheriff's

18:55:42 25  deputies until we've issued a report.   I mean, you

know, we issued a report and then let the rest of it

stand.

        MR. BERGER:  Sir, I object to the

response.

Q.  I didn't ask you that question.  I asked you,

other than the doctor from San Antonio, who else have

you discussed Mr. Longoria with that's -- have you

discussed it with anyone else before you issued your

final report?

A.  No, sir.

Q.  Okay.  That's all I asked.

        And it's your testimony, it's typical,

when you consult with another forensic pathologist, you

get a oral opinion and nothing in writing from that

physician.

A.  That's correct.

Q.  And that's how you practice medicine here in

the hospital, that you get a oral consultation and

don't get a written consultation?

A.  No.  On living patients, they require a written

consultation.

Q.  All right.  Just on dead ones you don't need

written ones, right?

A.  That's correct.

Q.  Especially when it's a controversial question

18:56:41 1  of how he died; is that correct?

18:56:43 2      A.  No, sir.

18:56:45 3          MR. BERGER:  Okay.  No further questions.

18:56:45 4                      EXAMINATION

18:56:46 5  BY MR. VITTITOE:

18:56:46 6      Q.  Doctor, just to clarify something for the

18:56:49 7  record.  The additional testing information that you

18:56:52 8  obtained, that ruled out the choke hold death.

18:56:58 9      A.  Yes.

18:56:59 10         MR. BERGER:  We stipulate that.  That's no

18:57:01 11 question about it.

18:57:02 12         MR. VITTITOE:  Would you be quiet and let

18:57:04 13 me do my examination?

18:57:05 14         MR. BERGER:  No.  I mean, we already

18:57:05 15 stipulated to it.  Why should you sit there and waste

18:57:07 16 time, especially when we're paying for it?

18:57:11 17         THE WITNESS:  My meter is running here.

18:57:22 18         MR. BERGER:  I know it.  We stipulated to

18:57:22 19 it, and there's no question about it.  Now, why waste

18:57:22 20 time?

18:57:22 21         MR. VITTITOE:  The only time we're wasting

18:57:22 22 is you talking while I'm not asking the questions.

18:57:24 23         MR. BERGER:  That's because I'm objecting

18:57:25 24 to the questions because it's already asked and

18:57:27 25 answered, and it's been asked and answered, and we

18:57:30  1    stipulated to it.

18:57:32  2           MR. VITTITOE:  You just hold on.  You go

18:57:33  3    ahead and make your objection, but I don't want you

18:57:34  4    taking up any more time.

18:57:36  5           MR. BERGER:  I don't want you taking up

18:57:38  6    any more time.

18:57:43  7    Q.  Dr. Dahm, the additional testing data that you

18:57:49  8    received after your preliminary autopsy report of April

18:57:53  9    16th, did that rule out the choke hold death?

18:57:57 10    A.  Yes, sir.

18:57:58 11    Q.  Is that true whether or not you had the

18:58:01 12    additional consult with Dr. DiMaio?

18:58:06 13    A.  Yes, sir.

18:58:11 14    Q.  In your initial -- or your initial autopsy

18:58:16 15    report or your preliminary autopsy report of April

18:58:20 16    16th, did you make findings of advanced liver disease?

18:58:23 17    A.  Yes, I did.

18:58:27 18    Q.  And as I understand your testimony --

18:58:30 19           MR. BERGER:  Asked and answered.

18:58:34 20    Q.  My understanding is, your testimony is that

18:58:37 21    advanced and end-stage in your mind are the same thing.

18:58:39 22    A.  Yes, sir.

18:58:40 23    Q.  All right.

18:58:42 24           MR. BERGER:  Objection.  Asked and

18:58:42 25    answered.

18:58:48  1          MR. VITTITOE:  Thank you, Doctor.

18:58:50  2          MR. BERGER:  Or repetitive, as they say in

18:58:52  3   federal court.

4                  (Deposition concluded)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAWRENCE J. DAHM, M.D. - ERRATA SHEET

Reasons for changes:  (1) Clarify the record
                      (2) Conform to the facts
                      (3) Correct transcription errors

PAGE  LINE   CHANGE FROM/CHANGE TO                      REASON

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

___  ___   _____   ___

                      LAWRENCE J. DAHM, M.D.

1      <u>SIGNATURE OF LAWRENCE J. DAHM, M.D.</u>

2         I have read the foregoing transcript of my

3      deposition and it is a true and accurate record of my

4      testimony given on FEBRUARY 17, 2004, except as to any

5      corrections I have listed on page 131 herein.

6                                        _____

7                                        LAWRENCE J. DAHM, M.D.

8

9      THE STATE OF TEXAS

10     COUNTY OF CAMERON

11            SUBSCRIBED AND SWORN TO BEFORE ME, the

12     undersigned authority on this the _____ day of

13     _____, 2004.

14

15                                       _____

16                                       Notary Public in and for
                                         The State of Texas

17     My commission expires:

18     _____

19

20

21

22

23

24

25

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

3  MARIA LONGORIA AND MARIA  ) (
   IDALIA GUTIERREZ,         ) (
4  INDIVIDUALLY AND ON BEHALF) (
   OF THE ESTATE OF JUAN     ) (
5  LONGORIA, DECEASED        ) (
              Plaintiffs     ) (
6                            ) (
   VS.                       ) (   CIVIL ACTION NO. B-01-062
7                            ) (
   CAMERON COUNTY, TEXAS,    ) (
8  THE CITY OF BROWNSVILLE,  ) (   JURY DEMANDED
   TEXAS AND JOHN DOES 1-10  ) (
9             Defendants     ) (

10            REPORTER'S CERTIFICATE
        I, Donna McCown, Certified Court Reporter, certify
11  that the witness, LAWRENCE J. DAHM, M.D., was duly
    sworn by me, and that the deposition is a true and
12  correct record of the testimony given by the witness on
    FEBRUARY 17, 2004; that the deposition was reported by
13  me in stenograph and was subsequently transcribed under
    my supervision.

14
        I FURTHER CERTIFY that I am not a relative,
15  employee, attorney or counsel of any of the parties,
    nor a relative or employee of such attorney or counsel,
16  nor am I financially interested in the action.

17                WITNESS MY HAND on this the 1st day of
    March                   , 2004.
18

19
    _____
20  DONNA McCOWN, CSR NO. 6625
    Expiration Date: 12/31/05
21  Bryant & Stingley, Inc., CRN No. 41
    2010 East Harrison
22  Harlingen, Texas  78550
    (956) 428-0755

23

24

25

BRYANT & STINGLEY, INC.
McAllen         Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

# STIPULATIONS

Deposition(s) of: _Lawrence Dahm    MD_

Cause No.: _B-01-0162_ Style: _maria longoria et al_

Date: _2-17_ Trial Date: _____ vs. _Cameron County texas et al_

1. This deposition is taken pursuant to:
   ___ A. Notice                    ___ C. Agreement
   _✓_ B. Notice and Subpoena       ___ D. Court Order

2. Objections:
   _✓_ A. Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
   ___ B. All objections are reserved.
   ___ C. All objections will be made at the time of taking the deposition.

3. Signature and Delivery:
   _✓_ A. The original transcript will be sent to ___ _mr Valdez_ ___,
   the Custodial Attorney, and the original signature page, along with a copy of the
   transcript(s), will be submitted to _✓_ the witness or ___ the witness' attorney,
   who will return the executed signature page, including any changes, to
   Bryant & Stingley, Inc., within ___ days of transmittal.

   ___ B. Signature is waived and the reporter will deliver the original transcript and
   exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1. Copy of Transcript: Yes _✓_ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes _✓_ No ___    E-mail Address: _C H Vittito@ Adamsgraham._
   _com_

   Signature: _____    Representing: _Cameron County, Texas_

2. Copy of Transcript: Yes ___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _____

3. Copy of Transcript: Yes ___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _____

4. Copy of Transcript: Yes _✓_ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)

   E-mail Yes ___ No ___    E-mail Address: _____

   Signature: _____    Representing: _Plaintiff_

## *Administration of Justice Services, Inc.*

15005 WESTBURY ROAD • ROCKVILLE, MARYLAND 20853

ALVIN W. COHN, D.Crim.                                   TEL. (301) 929-3224
PRESIDENT                                                FAX (301) 929-1828
                                                        EMAIL: ACOHN@EROLS.COM

May 27, 2003

Alfred R. Valdez
Attorney at Law
7520 Hillcroft
Houston, Texas 77081

> RE: Maria Longoria, et al. v. Cameron County, Texas, et al.
> United States District Court
> Southern District of Texas
> Brownsville Division
> Civil Action No. B-01-062

Dear Mr. Valdez:

This will serve as a report of my findings and conclusions as plaintiffs' corrections expert regarding the above-referenced case. My report flows from a review of a number of discovery materials, identified at the end of this report, as well as a review of appropriate standards of care as promulgated by the American Correctional Association and the National Commission on Correctional Health Care.

CASE BACKGROUND

Juan Longoria, who had a history of mental illness and who had previous arrests essentially for disturbing the peace, left his mother's home on April 10, 2001. He entered the Circle K store, where he had been a familiar customer, acted erratically, and was noticed by store employees to be bleeding. He also had in his possession a hammer. He entered the store's office without permission, began to ransack it, and subsequently barricaded himself in the office. Store employees called 911. Brownsville Police Department officers Rivera and Gutierrez responded to the 911 call, attempted to open the office door, then forcefully opened the door, and successfully gained access to the office. They noticed that Longoria was incoherent and yelling. In an attempt to subdue Longoria, who was resistant, and in order to handcuff him, he was struck with a baton in the lower torso and/or thigh by Officer Rivera. Thereafter, he successfully was handcuffed.

It is reported that Longoria went "limp, which necessitated the officers carrying him to the police car. It appears that Longoria's mother and her niece arrived on the scene and witnessed what the mother describes as the officers throwing Longoria into the car and shutting the door on one of his legs. Longoria continued to behave in an erratic and bizarre manner, claiming that there were

Alfred R. Valdez
May 27, 2003
Page Two

numerous men after him and that they were trying to kill him. Officer Rivera reportedly viewed
Longoria as being "spaced out."

He was transported to the Brownsville Jail Facility, at which time he reportedly offered no
resistance and walked into the facility, still handcuffed. Detention Officer Cheramie noticed that
Longoria had a cut on his knee and his elbow appeared to be swollen. EMS was contacted and upon
arrival asked Longoria if he wanted to go to the hospital. He refused and signed a waiver to that
effect. Because Longoria continued to act in a bizarre manner, repeating his belief that he was about
to be killed, he was placed in a padded cell at the Brownsville facility and was kept under close
observation through periodic cell checks. He was thought to be deteriorating mentally with
continuing hallucinations and delusions. As a consequence, Lt. Ramirez ordered Longoria be sent
to the Brownsville Medical Center for evaluation. There is no evidence that Longoria had been
booked by that time.

Longoria was examined by a physician, who cleaned his cut and x-rayed his elbow. Further, he
recommended that Longoria receive a mental evaluation by Texas Tropical. The records indicate
that Longoria was evaluated and that he did not need to be committed. He was cleared medically to
be incarcerated, and instructions were that he was to be kept alone and "under close supervision."
Longoria was then transported back to the Brownsville facility.

He was again placed in a padded cell, but was observed to continue to have hallucinations and
delusions. He reportedly was observed to roll around in his cell and repeatedly hit the wall with his
elbows and head. At that time, several detention officers restrained Longoria with three leather
straps. There is no evidence that this was authorized by senior staff or that he was monitored by
medical staff. He remained in restraints for approximately one hour.

Three hours later, as a result of Longoria continuing to jump in the air and land on his back, he was
again restrained. Again, there is no documentation that he was observed or monitored by medical
personnel at the facility. Somewhat later, he was observed to slide on the cell floor, where he hit his
head on the metal urinal. No medical personnel were summoned to examine him. He was then
placed on a mattress with restraining straps, the cell door was left open for clear observation, and he
was observed by detention staff who attempted to calm him down through conversation. The
records show that the restraints were removed approximately 45 minutes later, although Longoria
continued with his delusional statements.

Longoria was taken to municipal court for arraignment, but since he continued to act in a bizarre
fashion, he was returned to the jail, but thereafter was arraigned so that he could be transported to
the Cameron County Jail.

The records reveal that throughout his stay at the Brownsville jail, he was not observed nor
evaluated by any medical or psychiatric personnel at the facility.

He was transported to the Cameron County jail by Officers Lopez and Salinas. It is extremely

Alfred R. Valdez
May 27, 2003
Page Three

noteworthy that except for official court records, the Brownsville Police Department failed to provide Cameron jail staff with any written documentation regarding Longoria's mental condition other than the medical release for incarceration. Officer Salinas claims that he verbally reported to Cameron Officer Lerma that Longoria was a "10-96," a code used to indicate that the inmate was mentally ill. However, a review of Salina's memo regarding the arrest/transport of Longoria to the Cameron facility makes no mention of this verbal report to Lerma.

Approximately 12 hours after Longoria's arrival at the Cameron facility, he was observed to be unresponsive. Here, there is conflicting reports on the actual time he was discovered. The sheriff states that Longoria was alive at 10:30 pm on April 11th and found dead at 11:05 pm that same night. According to the NMS-Forensic Information Authorization Form, Longoria was last seen alive at 10:00 pm on April 11th and found dead at 12:45 am on April 12th.

The initial autopsy report indicated that the cause of death was homicide as a result of a choke-hold that led to asphyxia. For unknown reasons, a pathologist's consultation was obtained, which led to a change in the cause of death to "natural causes." The original cause of death, i.e., asphyxia due to a choke-hold, apparently was the result of neck bruises and contusions as well as broken neck bones. Although there is no doubt about the condition of Longoria's neck, there is no way to determine if this occurred while at the Brownsville Police Department or at the Cameron facility.

While the Brownsville arrest report indicates that Longoria resisted arrest, the arresting officers deny any use of excessive force, but do admit to using a baton on his torso/thigh in order to subdue him. It is his mother's observation and report that he was "thrown into the police car." It is also claimed that the cuts and bruises Longoria sustained and his bleeding occurred when Longoria fell on some gravel, according to reports of Longoria's own statements.

Longoria was placed in a single cell at the Cameron jail. Although the logs indicate that there were routine patrols and that Longoria was observed to be alive and able to communicate with detention staff, he was also observed to continue with his hallucinations and paranoid delusions.

FINDINGS AND CONCLUSIONS

It is not appropriate for me as a corrections expert to comment on the legality of Longoria's arrest for burglary, it is appropriate to suggest that the Brownsville police could have referred him immediately to a psychiatric facility instead of the arrest. Further, since his mother was quite aware of her son's mental illness and was on the scene at the Circle K incident, she could have been asked to arrange for his psychiatric commitment. Had this occurred, he would have been hospitalized and potentially he would be alive today.

Although Longoria declined to go to the hospital as a result of the cuts, bruises, and bleeding and eventually was referred to the Brownsville Medical Center by the Brownsville jail detention personnel as a consequence of his erratic and hallucinatory behavior, he was never observed nor screened medically at the facility, including while twice in restraints. It is also to be noted that while

Alfred R. Valdez
May 27, 2003
Page Four

Longoria continued to manifest serious mental illness symptoms, no effort was made to return him to the Center for additional observation and/or evaluation.

Both the American Correctional Association and the National Commission on Correctional Health Care have promulgated standards of care for inmates at detention facilities. Both require (1) health/mental health screening upon arrival at a facility, especially when there are obvious symptoms that should lead to immediate attention; (2) both require the transfer of health records from one facility to another; and (3) both require what is considered 'continuity of care.'

In this case situation, as described above, (1) the Brownsville facility did not provide any ongoing health care for Longoria subsequent to his evaluation at the Brownsville Medical Center, even while twice in restraints and, thus, there was no continuity of care; and (2) although there is a disputable indication that the transporting officer told the receiving officer at the Cameron jail that Longoria was a "10-96," there was, in my expert opinion, an unconscionable failure to share information about his mental illness, including records about his having been in restraints, that he had been evaluated at the Brownsville Medical Center, and that while he had been "medically cleared" to be incarcerated, there was a medical instruction to provide "close observation."

I find it interesting that in Commander Albert Rodriguez's extensive analysis of the situation insofar as the Brownsville Police Department is concerned and exoneration of the department as a defendant, he totally fails to mention in his affidavit the facts that (1) no health records and/or information about Longoria's psychiatric evaluation were provided to the Cameron jail staff when Longoria was transferred to that facility, (2) nor was any information shared of Brownsville's knowledge about Longoria's mental illness, (3) nor his having been evaluated at the Brownsville Medical Center, (4) nor any information about his having been restrained twice in order to avoid self-destructive behavior, (5) nor that his arraignment in municipal court had to be delayed due to his erratic behavior, (6) nor that although medically cleared, there was a medical instruction that Longoria was to have "close observation."

Although Longoria continued to act in a bizarre and delusional manner upon arrival at the Cameron jail, he was never screened for mental health, nor was he booked or classified. Further, he was never seen by any medical personnel nor was there any effort to refer him for a psychiatric evaluation when it was obvious, according to discovery materials, that he continued to manifest serious mental illness symptoms. According to responses to interrogatories, there are admissions that Cameron County detention staff clearly "failed" to follow jail policies and procedures in that (1) Longoria was not referred to the jail infirmary upon admission when his bizarre behavior required that such was needed, and (2) he was never classified during his entire stay at the Cameron facility in order to determine appropriate housing and a security level, and (3) he was placed in a padded cell without proper classification. Additionally, while Longoria was treated for the pain he had in his elbow, no effort was made by medical personnel to complete the health screening that was required by jail policy. This also suggests that correctional staff failed to share with medical staff what they had been observing with regard to Longoria's mental illness.

Alfred R. Valdez
May 27, 2003
Page Five

There is some dispute over the time Longoria was last observed alive and the time he was found dead in the cell in which he was the sole occupant. While his death occurred approximately 12 hours after his transfer from the Brownsville to the Cameron jail facility, it appears quite obvious that he was in distress during that entire period of time. Yet, there is no evidence that any Cameron staff attempted an intervention of any sort in an effort to reassure and/or calm him. This, in my expert opinion, is reflective of a high level of indifference to his needs and situation, especially since there was no effort to book him and/or otherwise complete all the paperwork normally required.

According to the autopsy report, rigor mortis had set in and at such a level suggestive that he was dead for a period longer than the patrol logs indicate. Thus, there is the suggestion that Longoria was not observed as often as policies and procedures dictated, which required observation of moderate risk inmates every 15 minutes and high risk inmates every five minutes. In fact, the "Mental Disabilities/Suicide Screening Form," which demands the need for such inmates to be closely monitored, was never administered, even though it was clearly known by Cameron staff that Longoria had mental disabilities. It is reported that Longoria's cell was in front of the booking area, across from the Lieutenant's office. Thus, in my expert opinion, it can be assumed that the booking officers were expected to provide routine observation of him on a regular basis, which would not have occurred if they were busy dealing with other incoming offenders and/or if they had paperwork to attend to.

Furthermore, Cameron facility policies and procedures state that inmates needing special medical attention are to be brought to the immediate attention of health personnel and/or a supervisor on duty. This was never done. If, for no other reason, it was suspected that Longoria was suffering from alcohol withdrawal, this should have led to his being evaluated for medical intervention.

It is also to be noted that when it appeared that Longoria was totally unresponsive, no CPR was administered by the first detention staff responder. In fact, no CPR was administered until a nurse had been summoned, which occurred minutes after he was first discovered. This, too, is a violation of American Correctional standards of care.

SUMMARY

In the final analysis, in my expert opinion, the failures on the part of both Brownsville Police Department (jail) and the Cameron County Jail to respond to Longoria's obvious distress and mental illness and the failure to communicate to health authorities what was known about his symptoms unquestionably were proximate factors that led to his death, the cause of which appears to be problematic. Even if it is correct that he died of "natural causes," it is clear that he received grossly inadequate attention by both of the facilities' correctional staffs and that while at the Cameron facility, he was significantly neglected and indifferently monitored.

Although I have explicated by findings and conclusions above, the following standards of care, in my expert opinion, were violated by the two facilities' defendants:

Alfred R. Valdez
May 27, 2003
Page Six

American Correctional Association Standards of Care for Adult Local Detention Facilities

| | |
|---|---|
| 3-ALDF-1E-02 | Transfer of Records |
| 3-ALDF-3A-11 | Patrols |
| 3-ALDF-3A-17 | Restraints |
| 3-ALDF-4E-32 | Restraints |
| 3-ALDF-4B-01 | Classification |
| 3-ALDF-4B-03 | Classification |
| 3-ALDF-3D-08 | Supervision |
| 3-ALDF-4A-01 | Reception |
| 3-ALDF-4E-05 | Continuity of Care |
| 3-ALDF-4E-11 | Mental Health Services |
| 3-ALDF-4E-19 | Health Screening |
| 3-ALDF-4E-20 | Transfers |
| 3-ALDF-4E-22 | Health Appraisal |
| 3-ALDF-4E-24 | Emergency Care |
| 3-ALDF-4E-37 | Severe Mental Illness |
| 3-ALDF-4E-38 | Severe Mental Illness |
| 3-ALDF-3A-17-1 | Restraints |

National Commission on Correctional Health Care Standards for Health Services in Jails

| | |
|---|---|
| J-07 | Special Needs Patients |
| J-23 | Training |
| J-31 | Receiving Screening |
| J-36 | Mental Health Evaluation |
| J-42 | Continuity of Care |
| J-50 | Special Needs Treatment Plans |
| J-62 | Transfer of Health Records |
| J-66 | Restraints |

To prepare this report, I reviewed the following materials:

Third Amended Original Complaint
Longoria's Medical Records and Autopsy Findings
Brownsville Medical Center Medical records
City of Brownsville Motion for Summary Judgment
Various Brownsville Police Department Offense and Incident Reports
Maria Longoria Deposition (Partial)
Affidavit of Albert Rodriguez
Albert Rodriguez Deposition
Brownsville Police Department Policy and Procedure Manual
Various Brownsville Police Department Logs (Security Checks)
Emergency Room Reports
Brownsville Police Department Answers and Objections to Plaintiffs' First Set of Interrogatories
Defendants' Responses and Objections to Plaintiffs' First Request for Production
Brownsville Police Department Inter-Departmental Communication to Chief of Police from Lt. Ethridge

Alfred R. Valdez
May 27, 2003
Page Seven

Cameron County's Response to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production
Cameron County's Health Records and Incident Reports
Health Services of Cameron County Jail – Protocols
Cameron County Sheriff's Department-Jail Division 8-31-97 Operation Plan

Please note, as my resume indicates, I have over 45 years of experience in the field of criminal justice administration, that I am frequently utilized as a consultant by the U.S. Department of Justice's National Institute of Corrections – Jails and Community Corrections Divisions, the Bureau of Justice Administration, and the Office of Juvenile Justice and Delinquency Prevention, as well as for other federal, state, and local units of government. I am the author or co-author of six books and over 75 journal articles and monographs covering numerous aspects of correctional management.

I am being paid at the rate of $145.00 per hour for routine case review and report preparation and $165.00 per hour for deposition and trial testimony.

This report, as discussed above, is based upon my review of the above-referenced materials. Should I be provided with additional materials related to this case, I reserve the right to amend my report as may be indicated and appropriate.

Very truly yours,


Alvin W. Cohn, D.Crim.

Attach: American Correctional Association Standards of Care
        National Commission on Correctional Health Care Standards of Care

# ALVIN W. COHN

15005 WESTBURY ROAD
ROCKVILLE, MARYLAND 20853
(301) 929-3224
FAX (301) 929-1828
E-MAIL: ACOHN@EROLS.COM

## EXPERIENCE SUMMARY

Dr. Cohn has had over 45 years of academic, professional, and administrative experience in the field of criminal justice administration and criminology. He has specialized in the development of management and training programs, focusing on organizational theory, behavior, and development. He has served on the full- or part-time faculties of five universities and has been a frequent guest lecturer at numerous others.

He has trained or taught over 40,000 persons in the fields of criminology and criminal justice. He served as the Director of Training for the National Council on Crime and Delinquency and was the Technical Director of the Executive Training Program in Advanced Criminal Justice Practices under the auspices of the Department of Justice. He has written numerous training curricula and has developed a number of training of trainers programs.

He served as Project Director for the National Assessment of Juvenile Justice Training Resources (for the National Institute of Juvenile Justice and Delinquency Prevention); Innovative Practices in Adult Probation (for the National Institute of Corrections); and Agency-Based, Self-Evaluation for Electronic Monitoring Programs (for the Office of Juvenile Justice and Delinquency Prevention).

Dr. Cohn has worked in community organization, mental health care, juvenile and adult institutions and probation, and juvenile aftercare. Dr. Cohn has served as a principal consultant and trainer throughout the field of criminal justice, including such organizations as LEAA, American Correctional Association, National Institute of Corrections, the National Council of Juvenile and Family Court Judges, the Bureau of Prisons, the American Jail Association, the Office of Juvenile Justice and Delinquency Prevention, American Bar Association, the Federal Judicial Center, the National Criminal Justice Reference Service, the Police Foundation, the International Association of Chiefs of Police, and the Community Policing Consortium. He has also done training in business and industry. He is frequently utilized as a corrections expert in civil litigation.

He is the author or co-author of six books, has published approximately 75 journal articles and monographs, and is the author of five correspondence courses. He is the president-elect of the National Juvenile Court Services Association and a member of the board of the International Community Corrections Association.

## AREAS OF SPECIAL COMPETENCE

| | |
|---|---|
| Supervision Strategies | Case Classification |
| Jail Overcrowding | Adult and Juvenile Institutions |
| Program Evaluation | Inmate Suicides/Assaults |
| Intensive Supervision | Juvenile Justice Administration |
| Electronic Monitoring/House Arrest | Design of Training Programs |
| Case Management | Training of Trainers |
| Probation and Parole/Aftercare | Organizational Development |
| Privatization in Corrections | Strategic Planning and Policy Development |
| Administration and Management | Performance Appraisal |

**ALVIN W. COHN**
**Page 2**

<u>EDUCATION-DEGREES</u>

Doctor of Criminology (D.Crim.), University of California-Berkeley, 1972, (NIMH Fellowship).

M.A., Psychiatric Social Work, Indiana University, 1960, (NIMH Fellowship).

B.A., Sociology, University of Cincinnati, 1956.

<u>EXPERIENCE</u>

<u>2003-Present</u>: President, National Juvenile Court Services Association.

<u>2002-Present</u>: Board Member, International Community Corrections Association.

<u>1997-Present</u>: Columnist on electronic monitoring for the <u>Journal of Offender Monitoring</u>.

<u>1995-1996</u>:    Project Director, Electronic Monitoring, Agency-Based Self Evaluation Project, funded by the Office of Juvenile Justice and Delinquency Prevention.  This project is designed to assist correctional agencies in evaluating their electronic monitoring programs.

<u>1995-Present</u>: Columnist on juvenile justice, <u>Federal Probation</u>.

<u>1994-2001</u>: Editor, <u>Rapport</u>, newsletter of the National Juvenile Court Services Association.

<u>1991-1994</u>:    Senior Associate, Scarlett Carp & Associates, Washington, DC, a private firm concerned with criminal justice and mental health pre-construction planning.

<u>1973-Present</u>:    Founder and President, Administration of Justice Services, Inc., a consulting firm which specializes in the development and implementation of training, management, and research programs in criminal justice administration and business and industry.  AJS has had numerous contracts and grants to develop management and training programs and, through Dr. Cohn, has provided consultation to numerous federal, state and local agencies and organizations.

<u>1982-Present</u>: Consultant and trainer for the National Institute of Corrections.  Dr. Cohn is frequently utilized as a consultant for technical assistance to state and local correctional and law enforcement agencies and has designed and served as a trainer for the basic and advanced Training of Trainers program.

<u>1988-Present</u>:    President and Partner of Correctional Monitors, Inc, a private group concerned with the development of juvenile and adult halfway houses, residential treatment centers, and electronic surveillance programs.

<u>1980-1983</u>:    Visiting Associate Professor, Institute of Criminal Justice and Criminology, University of Maryland, College Park. Courses taught include Introduction to Criminology, Criminal Justice Administration, Police-Community Relations, and Community-Based Corrections.

<u>1980-1981</u>:    Project Director, National Assessment of Juvenile Justice Training Resources, funded by the National Institute of Juvenile Justice and Delinquency Prevention, and administered by AJS.  This was a project

**ALVIN W. COHN**
**Page 3**

designed to assess on-going training programs in juvenile justice administration throughout the U.S., and to develop an on-going data and information system for NIJJDP.

<u>1978-1979</u>:  Project Director, Innovative Practices in Adult Probation, funded by the National Institute of Corrections, and administered by AJS.  This was a project designed to identify and assess various innovative management and administrative practices in adult probation.

<u>1976-1978</u>:  Consultant, Senior Associate, and Technical Director for the Executive Training Program in Advanced Criminal Justice Practices, University Research Corporation.  With URC, Dr. Cohn helped to develop and served as a principal trainer for a series of workshops on correctional evaluation strategies.  As Technical Director for the $3.5 million NILECJ training programs for executives in criminal justice administration, Dr. Cohn was responsible for the development of content materials and design strategies for almost 120 training events over a two-year period.

<u>1975-1976</u>:  Associate Professor, Department of Criminal Justice, Virginia Commonwealth University.  Dr. Cohn taught courses in criminal justice administration, including management, supervision, and training strategies and theory.

<u>1972-1975</u>:  Principal, Planning Research Corporation.  With the Public Management Services of PRC, Dr. Cohn worked on numerous projects, including the development of a criminal justice budget for the Governor of Michigan, establishment of a training center in Virginia, evaluation of LEAA funded projects in Virginia, and an assessment of the potential for
a consolidated correctional program in Fulton County (Atlanta), Georgia.  He  also worked on several law enforcement projects.

<u>1970-1972</u>:  Assistant Professor and Director of Correctional Programs, Center for Administration of Justice, The American University.  Dr. Cohn helped direct, design, and implementa a new graduate curriculum for the Master of Science in Administration of Justice degree and worked on the revision of the undergraduate curriculum.  He served as chairman of the Admissions Committee, was a member of the Center's Educational Policy Board, and was its representative to the College's Rank and Tenure Committee.

<u>1967-1970</u>:  Director of Probation Management Institutes and Director of Training, National Council on Crime and Delinquency.  Dr. Cohn designed and implemented nine regional LEAA training programs for probation executives and produced over 30 other management programs for key officials in law enforcement, probation, parole, and judicial personnel.  He assisted in the development of a staff training program, provided consultation to staff personnel, and authored six publications for NCCD.

<u>1967-1987</u>:  Professor and author of two correspondence courses in criminology for the University of California Extension Service.

<u>1965-1967</u>:  Administrative Secretary, Chancellor's Committee on the Work-Study Program; Research Assistant; Teaching Assistant, University of California-Berkeley, School of Criminology.  Supervised, placed, and maintained paperwork on 1,200 students in the work-study program; developed and supervised several research projects; taught introductory courses in criminology; and advised undergraduate students.  Served as a member of the staff for the Police-Community Relations project for the 1967 President's Commission on Law Enforcement and the Administration of Justice (President's Crime Commission).

<u>1964-1965</u>:  Executive Director, Jewish Community Relations Council for Alameda and Contra Costa

## ALVIN W. COHN
### Page 4

Counties (California). Responsible for the development of community relations programs for the Jewish community, including liaison with all minority, ethnic, and religious groups. Developed the "Negro-Jewish Dialogue," which was recognized as an outstanding program by the National Community Relations Council.

1961-1964: Psychiatric Social Worker and Administrator, Municipal Court Psychiatric Clinic, Alcoholism Clinic, and Probation Department, City of Cincinnati. Provided diagnostic and casework services to misdemeanant offenders and probationers; supervised adult probationers; and provided intake and screening services for the city's Alcoholism Clinic. Maintained all statistical records and assisted in the preparation of budgets and annual reports. Was a member of the team that screened all candidates for the Cincinnati Police Department. Also provided counseling to incarcerated misdemeanants and worked as a probation officer.

1960-1961: Caseworker, Aftercare Worker, and Supervisor, Juvenile Placement Bureau and Juvenile Diagnostic Center, State of Ohio. Was responsible for the development of casework and diagnostic programs for committed juveniles; served as director of treatment teams; served as an aftercare worker for juveniles released from institutions; and supervised staff aftercare workers. Also served as an assistant to several administrators of the program.

1957-1959: Psychiatric Social Worker, U.S. Army. Assigned to the Mental Hygiene Consultation Service, Post Stockade, and Neuro-Psychiatric Clinic, Martin Army Hospital, Ft. Benning, Georgia. Responsible for developing social histories on soldiers and prisoners, provided casework services, and developed a group counseling program for prisoners scheduled for release.

### AMERICAN SOCIETY OF CRIMINOLOGY

Dr. Cohn has been an active member of ASC for over 30 years. He has twice served on the Executive Board, once by appointment and once as a result of a national election. He has served as chair of the finance and membership committees; was Program Chair for the 1979 Annual Program (with over 600 speakers and 1,000 registrants); served as co-chair of the local arrangements committee for the 1981 Annual Program; served as the founder and editor of the Society's official newsletter, THE CRIMINOLOGIST, from 1976 to 1983; and was awarded the Herbert Bloch Award for outstanding contributions to ASC and the field of criminology, 1980.

### NATIONAL JUVENILE COURT SERVICES ASSOCIATION

Dr. Cohn has been active in this organization, which is an affiliate of the National Council of Juvenile and Family Court Judges. He was the founder and editor of the Association's official newsletters, RAPPORT and RAPPORT-BULLETIN for five years, and currently is the President, having taken office in 2003.

### SIGMA ALPHA MU FRATERNITY

Dr. Cohn has remained active in his college social fraternity, having served on its national board of directors for 12 years, as its national Vice President, and its national President for three terms. For 25 years, he was the organizer and developer of a national leadership conference for its undergraduate members, instructing them in leadership and management.

In 1979, Dr. Cohn was awarded the fraternity's highest accolade, the Distinguished Service Award, which is presented for outstanding and continuing contributions to the organization. He currently serves on the board on the SAM Foundation, a charitable and educational arm of the fraternity, and served as a Trustee of the SAM Endowment Fund for nine years.

**ALVIN W. COHN**
**Page 5**

## PUBLICATIONS AND PAPERS

### BOOKS AND MONOGRAPHS

Cohn, A.W., Biondi, L., Flaim, L.C., Paskowski, M., and Cohn, S. Development of an Agency-Based Self-Evaluation Instrument for Electronic Monitoring Programs, Office of Juvenile Justice and Delinquency Prevention, Washington, DC, 1996.

Cohn, A.W., Advanced Correctional Supervision, Laurel, MD: American Correctional Association, 1989.

Cohn, A.W., Basic Correctional Management, Laurel, MD: American Correctional Association, 1994.
Cohn, A.W. and Araujo, Observing and Understanding Inmate Behavior, Washington, DC: National Institute of Corrections, 1983.

Cohn, A.W., Emergency Procedures (In Prisons and Jails), Washington, DC: National Institute of Corrections, 1983.

Cohn, A.W., Tier Management, Washington, DC: National Institute of Corrections, 1983.

Cohn, A.W., Report Writing, Washington, DC: National Institute of Corrections, 1983.

Cohn, A.W., National Assessment of Juvenile Justice Training Resources, National Institute of Juvenile Justice and Delinquency Prevention, Washington, DC, 1981.

Cohn, A.W., Improving Management in Criminal Justice, Beverly Hills: Sage Publications, 1980 (co-author).

Cohn, A. W., Innovative Practices in Adult Probation, National Institute of Corrections, Washington, DC, 1979.

Cohn, A.W., The Future of Policing, Beverly Hills: Sage Publications, 1978.

Cohn, A.W., Criminal Justice Planning and Development, Beverly Hills: Sage Publications, 1977.

Cohn, A.W., Crime and Justice Administration, Philadelphia: Lippincott, 1976.

Cohn, A.W., Police-Community Relations, Philadelphia: Lippincott, 1976 (co-author).

Cohn, A.W., Social Problems in Criminal Justice, Chicago: Nelson-Hall, 1975 (co-author).

Cohn, A.W., E. Viano, and J. Wildeman, Decision-Making in the Administration of Probation Services, New York: National Council on Crime and Delinquency, 1970.

Cohn, A.W., Problems, Thoughts, and Processes in Criminal Justice Administration, New York: National Council on Crime and Delinquency, 1969.

Cohn, A.W., E. Viano, and J. Wildeman, Management of Probation Services: A Supplementary Bibliography, New York: National Council on Crime and Delinquency, 1969.

**ALVIN W. COHN**
**Page 6**


Cohn, A.W., E. Viano, and J. Wildeman, <u>Management of Probation Services: A Bibliography</u>, New York: National Council on Crime and Delinquency, 1968.

Venezia, P.S. and A. W. Cohn, <u>Uniform Probation Reports: A Feasibility Study</u>, New York: National Council on Crime and Delinquency, 1968.

<u>PROFESSIONAL ARTICLES</u>

Cohn, Alvin W., Guest Editor of special issue on "What Works?" for <u>Federal Probation</u> and author of "Managing the Correctional Enterprise: The Quest for What Works," <u>Federal Probation</u> LXVI (Sept. 2002)2:4-9.

Cohn, Alvin W., "Juvenile Justice in Transition: Is There A Future?" <u>Federal Probation</u> LXIII(Dec. 1999)2: 61-67.

Cohn, Alvin W., "The Failure of Correctional Management: Rhetoric Versus the Reality of Leadership," <u>Federal Probation</u> 62(June 1998)1:26-31.

Cohn, Alvin W., "Electronic Monitoring - An Evaluation," <u>Juvenile Justice</u> 2(March-April 1998)1: 8-10.

Cohn, Alvin W., "Public Relations, Program Evaluation, and Community Corrections," <u>Journal of Offender Monitoring</u> 11(Summer 1998)3: 30-31.

Cohn, Alvin W., "Do EM-Serving Agencies Always Act Responsibly?" <u>Journal of Offender Monitoring</u> 11(Spring 1998)2: 25, 28.

Cohn, Alvin W., "Reducing Opportunities for Civil Litigation," <u>American Jails</u> 12 (May-June 1998)2: 31-36.

Cohn, Alvin W., "How Do We Know if EM Programs Really Work?" <u>Journal of Offender Monitoring</u>, 2(Winter 1998)1:7-8.

Cohn, Alvin W., "The Arming of Probation and Parole Officers May Not Be Necessary: Options May Be Available," <u>Corrections Management Quarterly</u> 1(1997)4:44-54.

Cohn, Alvin W., Louis G. Biondi, and Lesley Chickering Flaim, "Evaluating Electronic Monitoring Programs," <u>Alternatives to Incarceration</u>, 3(1997)1:16, 22-24.

Cohn, Alvin W., "Weapons and Probation and Parole Officers: Do They Mix?" <u>Journal of Offender Monitoring</u>, 10(Summer 1997)3:1-9.

Cohn, Alvin W., Louis G. Biondi, and Lesley Chickering Flaim, "The Evaluation of Electronic Monitoring Programs," <u>Perspectives</u>, American Probation and Parole Association, Fall 1996.

Cohn, Alvin W., "Recruiting Expert Witnesses: A Team-Building Process," <u>New York Law Journal</u>, February 13, 1996.

Cohn, Alvin W., "The Failure of Correctional Management: Recycling the Middle Manager," <u>Federal</u>

**ALVIN W. COHN**
**Page 7**

Probation 59(1995)3.

Cohn, Alvin W., "The Future of Juvenile Justice Administration: Evolution v. Revolution," Journal of the National Council of Juvenile and Family Court Judges, 45(August 1994)3.

Cohn, Alvin W., "History of Probation and Parole," in Field Officer Resource Guide, Laurel, MD: American Correctional Association, 1994.

Cohn, Alvin W., "Electronic Monitoring: Innovation in Criminal Justice Administration," Washington Law Enforcement Executive Journal 11(1992)1.

Cohn, Alvin W., "The Failure of Correctional Management - Reviewed: Present and Future Dimensions," Federal Probation 55(1991)2; and "Introduction" to the issue as Guest Editor.

Cohn, A.W. and Michael M. Ferriter, "The Presentence Investigation: An Old Saw With New Teeth," Federal Probation 54(1990)3.

Cohn, A.W., "The Failure of Correctional Management - The Potential for Reversal," Federal Probation 51(1987)4.

Cohn, A.W., "Drugs, Crime, and Criminal Justice: State-of-the-Art and Future Directions," Federal Probation, 48(1984)3.

Cohn, A.W., "Behavioral Objectives in Probation and Parole: A New Approach to Staff Accountability," Federal Probation 46(1982)4. Reprinted in Federal Probation, "Special Anniversary Issue," 51(1987)2.

Cohn, A.W., "The Failure of Correctional Management - Reconsidered," Criminal Justice Review 6(1981)2.

Cohn, A.W., "The Failure of Correctional Management - Revisited," Federal Probation 43(1979)1.

Cohn, A.W., National Assessment of Juvenile Justice Training Resources, Washington, D.C.: National Institute of Juvenile Justice and Delinquency Prevention, 1981 (co-author).

Cohn, A.W., Innovative Practices in Adult Probation, Washington, D.C.: National Institute of Corrections, 1979.

Cohn, A.W., "Case Classification: Panacea or Palliative," Massachusetts Probation 11(1976)1.

Cohn, A.W., "Footnotes on the Future of Corrections," Keynote Address presented before the Ohio Correctional and Court Services Association, Cleveland, March, 1974 (unpublished).

Cohn, A.W., "Restructuring Management Patterns of Existing Probation Departments," presented at the National Institute on Crime and Delinquency, Boston, June, 1974 (unpublished).

Cohn, A.W., "Training in the Criminal Justice Nonsystem," Federal Probation 38(1974)2.

**ALVIN W. COHN**
**Page 8**

Cohn, A.W., "The Failure of Correctional Management," Crime and Delinquency 19(1973)3.  Reprinted in Probation and Parole, Issue No. 5, Summer, 1973; in E. Sagarin & D. MacNamara (eds.), Corrections: Problems of Punishment and Rehabilitation, New York: Praeger, 1973; in W. Amos & C. Newman (eds.), Parole: Legal Issues, Decision-Making, Research, New York: Federal Legal Publications, 1975; and in H.W. More, Jr. (ed.), Criminal Justice Management, St. Paul: West Publishing Co., 1977.

Cohn, A.W., Survey of Programs and Procedures of the New Hampshire Department of Probation and Recommendations for Future Change, Washington, D.C.: LEAA, 1972.
Cohn, A.W., "We've Got the Whole Caseload in Our Hands," Popular Government 36(1970)8.

Cohn, A.W., "Contemporary Correctional Practice: Science or Art," Federal Probation 34(1970)3.

Cohn, A.W., "Dilemma Management," Banta's Greek Exchange, April, 1969.

Cohn, A.W., "Managing Change in Correction," Crime and Delinquency 15(1969)2.

Cohn, A.W., "Metacorrection: State of the Art," in A. W. Cohn (ed.), Problems, Thoughts, and Processes in Criminal Justice Administration, New York: National Council on Crime and Delinquency, 1969.

Cohn, A.W., "The Police and the Community," Vols. 1 and 2, for the President's Commission on Law Enforcement and the Administration of Justice, Berkeley: School of Criminology, University of California, 1966. (staff report)

Cohn, A.W., "Attitudes Toward the Police," Berkeley: School of Criminology, University of California, 1965 (unpublished).

Cohn, A.W., "A Demographic Review of Municipal Court Psychiatric Clinic Population (Cincinnati) as Compared to the Municipal (Police) Court Population," 1962 (unpublished).

## THESES

Doctor of Criminology: Decision-Making in the Administration of Probation Services: A Descriptive Study of the Probation Manager, 1972.

Master of Arts: Housing Situations, Needs and Desires of A Selected Group of Persons of Retirement Age, Marion County, Indiana, 1960.

Bachelor of Arts: The Causation of Juvenile Delinquency, 1956.

## PROFESSIONAL AFFILIATIONS

American Probation and Parole Association
American Correctional Association

**ALVIN W. COHN**
**Page 9**

American Society of Criminology
International Association of Chiefs of Police
National Council of Juvenile and Family Court Judges
Fraternal Order of Police
National Juvenile Detention Association
National Pretrial Services Association
American Jail Association
National Juvenile Court Services Association
International Community Corrections Association

1-15-03