

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA LONGORIA, and MARIA IDALIA GUTIERREZ, Individually and on behalf of the Estate of JUAN LONGORIA, Deceased | } } } } | CIVIL ACTION NO. B-01-062 |
| VS. | } } | |
| CAMERON COUNTY, TEXAS, THE CITY OF BROWNSVILLE, TEXAS, and JOHN DOES 1-10 | } } } | JURY DEMANDED |

## PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT

*A. R. Valdez*

**Alfred R. Valdez**
    **Federal ID 6389**
    **State Bar No. 20426200**
    **7520 Hillcroft**
    **Houston, Texas 77081**
    **(713) 271-0719**
    **(713) 270-8134 fax**

**Attorney for the Plaintiffs**

*Supplement to volume*

**VOLUME __1__ OF __3__** ✳

*✳ Some of the pages were missing on the response.*

*A. R. Valdez*

## TABLE OF CONTENTS

**Page:**

1. THE NATURE OF THE CASE. ............................................................... 1

2. ISSUES TO BE RESOLVED. ............................................................... 2

3. SUMMARY JUDGMENT EVIDENCE. ............................................... 3

4. FACTUAL BACKGROUND. ............................................................... 4

5. SUMMARY OF THE ARGUMENT. .................................................... 16

6. ARGUMENT AND AUTHORITIES. .................................................... 17

A. Summary Judgment Evidence Shows that the Defendant Cameron County, Texas, is liable under 42 U.S.C. section 1983. ............................................................... 17

B. Defendant, Cameron County, Texas is not entitled to Summary Judgment on the Texas law negligence claim. ............................................................... 23

7. CONCLUSION. ............................................................... 25

i

## TABLE OF AUTHORITIES

Page:

*Austin v. Johnson*, 328 F. 3d 204 (5th Cir. 2003) ................................................................. 22

*Dallas County Mental Health and Retardation v. Bossley*, 968 SW2d 339 (Texas. 1998) ... 23

*Texas Department of Public Safety v. Petta*, 44 S.W.3d 575 (Tex. 2001) .............................. 24

42 U.S.C. section 1983 ............................................................................................................. 17

37 Tex. Admin. Code, Part 9, Chapter 273 (Texas Commission on Jail Standards, Health Services) .......................................................................................................................... 24

TEX. CIV. PRAC. & REM. CODE ANN. section 101.021 (Vernon Supp. 1997) .............. 23

Texas Code of Criminal Procedure, Article 16.21 ................................................................ 24

Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN. ch. 101 (Vernon 1997) ................................................................................................................ 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA LONGORIA, and MARIA | | |
| IDALIA GUTIERREZ, Individually and | } | CIVIL ACTION NO. B-01-062 |
| on behalf of the Estate of | } | |
| JUAN LONGORIA, Deceased | } | |
| | } | |
| VS. | } | |
| | } | |
| CAMERON COUNTY, TEXAS, | } | JURY DEMANDED |
| THE CITY OF BROWNSVILLE, | } | |
| TEXAS, and JOHN DOES 1-10 | } | |

## PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

COMES NOW, Plaintiffs MARIA LONGORIA, and MARIA IDALIA GUTIERREZ, Individually and on behalf of the Estate of JUAN LONGORIA, deceased, and file this their response to Defendant CAMERON COUNTY, TEXAS' motion for summary judgment, and respectfully request that the Court deny the motion for summary judgment.

## 1. THE NATURE OF THE CASE.

The Plaintiffs assert claims against Cameron County, Texas for Constitutional violations and Texas State tort law claims.

## 2. ISSUES TO BE RESOLVED.

The Plaintiffs assert that the Defendant CAMERON COUNTY, TEXAS is not entitled to a summary judgment. The Plaintiffs assert that there are genuine issues of material fact on both the federal and Texas law claims. The Defendant asserts eight (8) issues that are to be

1

addressed, and said issues are noted as follows:

a.      The Defendant asserts that there is no evidence that a final policy maker for Cameron County adopted a policy with deliberate indifference to the risk of injury to a person in the place of Juan Longoria.

b.      The Defendant asserts that there is no evidence that a final policy maker for Cameron County tolerated any custom or practice of subordinates with deliberate indifference to the risk or injury to a person in the place of Juan Longoria.

c.      The Defendant asserts that there is no evidence that Juan Longoria's death was the result of or caused by any policy or custom of Cameron County.

d.      The Defendant asserts that there is no evidence that Cameron County employees or agents were deliberately indifferent to the medical needs or condition of Juan Longoria or acted with deliberate indifference towards him.

e.      The Defendant asserts that there is no evidence that Cameron County employees or agents engaged in conscience shocking behavior.

f.      The Defendant asserts that there is no evidence that Juan Longoria was choked or beat in the Cameron County jail because the sole support for such allegation is incompetent, unreliable expert opinion that has been withdrawn by the expert witness who tentatively gave such opinion.

g.      The Defendant asserts that there is no waiver of state law governmental/sovereign immunity regarding the state law tort claims because there is no evidence that Juan Longoria's death resulted from a use or condition of tangible property by County employees.

2

h.    The Defendant asserts that Cameron County is not liable for punitive

damages under federal or state law.

3.    <u>SUMMARY JUDGMENT EVIDENCE.</u>

In addition to the summary judgment evidence presented by the Defendant, the Plaintiffs

are requesting that the Court take into consideration the following additional evidence:

1.    Deposition of George Garcia

2.    Deposition of  Joe Elizarde

3.    Deposition of Robert Lopez

4.    Deposition of Sylvia Rivas

5.    Defendant Cameron County, Texas response to request for production

concerning *Shift Activities Log* and *Medical Log (Observation Checklist for Crisis*

*Management, Psychological Observation, Seclusion, Restraint or Medical).*

6.    Statement of Armando Guerrero

7.    Statement of Anthony Edward Cipollaro

8.    Deposition of Felipe Silva, Jr.

9.    Deposition of Jose Morales

10.    Deposition of Armando Tenorio

11.    Deposition of Xavier Lee Hernandez

12.    Statement of Michael Gene Baskin

13.    Deposition of Luis Alberto Mendieta

14.    Statement of Jorge Ibarra

15.    Statement of Felipe Esquivel

16.   Statement of Jesus Eduardo Perez

17.   Deposition of Lawrence J. Dahm, M.D.

18.   Report of Alvin Cohn.


4.   **FACTUAL BACKGROUND.**

Juan Longoria's death at the Cameron County, Texas jail facility resulted from the lack of proper medical attention and the failure of Cameron County, Texas employees to follow a doctor's order to keep Juan Longoria under close observation; see Defendant's Motion for Summary Judgment, Exhibit 4, which is the doctor's order to keep Juan Longoria under close observation.   According to expert witnesses Harvey Resnick, M.D. (Plaintiff's expert) and Robert C. Bux, M.D. (Defendant's expert), Juan Longoria suffered from delirium tremens ("DT's"); see Defendant's Motion for Summary Judgment, Exhibits 15 and 16.

On the morning of 11 April 2001, between 10:00 and 10:30 a.m., the Brownsville Police Department delivered Juan Longoria to the Cameron County Sheriff's Department jail.  At the time of delivery, the commitment order and the medical release from Brownsville Medical Center was provided;  see Defendant's Motion for Summary Judgment, page 6, and its Exhibits 4 and 5.   A Cameron County Health Department nurse, Sylvia Rivas,  initially saw Juan Longoria for some minor cuts and bruises, but there is no mention in her notes that she received the doctor's order to keep Juan Longoria under close observation; Defendant's Motion for Summary Judgment, Exhibit 6.

1.   **Deposition of George Garcia.**

At the time of the deposition (29 August 2003), George Garcia was employed with the

4

Cameron County Sheriff's department for 22 years.   In April of 2001, Mr. Garcia was a lieutenant at the Cameron County jail, and his job duties included being responsible for DC-I and making sure that procedures were followed.   He states that he was familiar with the procedures that were to be followed at the Cameron County jail concerning booking, classification, and the moving of prisoners to the various cell levels. George Garcia, pp. 4-6. Mr. Garcia states that if an inmate has a doctor's order to be kept under close observation, there should have been an activity log maintained by the detention officers and the medical staff should be notified. Mr. Garcia states that the inmate should be checked every 15 minutes. George Garcia, pp. 12-14.   George Garcia further states that this process or procedure concerning the maintaining of a log was to be done in April of 2001. George Garcia, p. 17. When someone is placed in the padded cell, the medical staff at the jail is to be notified and a log is to be maintained by the detention officers.  Also, the log is kept by the door of the cell so that a detention officer can make notations.   George Garcia, pp. 19-20.

George Garcia says that Juan Longoria should have been classified; however, he was never classified.  Also, there should have been a log maintained on Mr. Longoria, but that was not done. George Garcia, pp. 21-24.   On pages 29 and 30 of the deposition, Mr. Garcia states that the detention officers should have maintained 2 logs;  one log would show fluid intake and the other log would show behavior activity.   Furthermore, the nursing staff needs to monitor the inmate in the padded cell.  George Garcia, p. 30.

George Garcia says that the Cameron County jail is in compliance with Texas law.  Mr. Garcia also states that it was customary for logs to be maintained,  inmates to be classified, and nurses to be notified when someone is placed in the padded cell.  Mr. Garcia says that the failure of these things to be done on Juan Longoria was a failure of procedures by Cameron

5

County employees.   George Garcia, pp. 31-34.

As to Juan Longoria, George Garcia acknowledges that the Cameron County jail facility failed to book, classify, obtain a medical assessment, maintain a log when placed in the padded cell, and notify the nurse when he was placed in the padded cell.  George Garcia, pp. 39-41.

George Garcia acknowledges that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell,  is for the safety and well-being of an inmate.   George Garcia also acknowledges that the failure to do any of these procedures could lead to serious consequences concerning the inmate in the way of injury and death. George Garcia, pp. 41-43.

2.   Deposition of Joe Elizarde.

Joe Elizarde held a detention officer's certificate for 18 years, and he was employed at the Cameron County Jail in April 2001.  Elizarde, p. 7.  The Cameron County jail had an infirmary. Elizarde, p. 14.   Mr. Elizarde describes the padded cell in which Juan Longoria was housed as being approximately 6 feet wide and 8 feet long; the cell had a solid metal door with a 6 inch by 12 inch (maybe six by eight) viewing window and a food tray.  Elizarde, pp. 24-25, p. 28.   Mr. Elizarde states that a log pertaining to someone in the padded cell would be kept on the wall next to the cell door.  Elizarde, p. 31.   When a detention officer receives a doctor's order that states that the inmate is to be kept under close observation, the detention officer is to call a nurse.  Elizarde, p. 37-39.    Mr. Elizarde states that detention officers were not medically trained.  Elizarde, pp. 41-42.   Mr. Elizarde testifies that Sheriff Cantu did not have any policies or procedures in place to make sure that the detention officers were familiar

6

with the information that is noted in the *Cameron County Sheriff's Department Jail Division Operation Plan* shown as Elizarde Exhibit No. 2.    Elizarde, p. 50.   Mr. Elizarde testifies that from what he was told, Juan Longoria was delusional and irrational while he was at the Cameron County jail. Elizarde, pp. 53-55.   While Juan Longoria was in the padded cell, a log should have been kept; however, no log was maintained by the detention officers.  Elizarde, pp. 55-59.   Mr. Elizarde states that detention officers receive training at the academy, as well as on the job instruction and training of someone being in medical distress.  Elizarde, pp. 63-65. Mr. Elizarde acknowledges that Juan Longoria was not classified per jail procedures.  Mr. Elizarde acknowledges that Juan Longoria was not seen by a nurse per the jail procedures. Mr. Elizarde acknowledges that no activity log was maintained by the detention officers per the jail procedures.   Elizarde, pp. 76-78.   At the time that Juan Longoria was an inmate at the Cameron County jail in April 2001, the county jail was shorthanded in detention officers and this condition had existed for several years.  Elizarde, p. 80.   Looking at page 25 of Elizarde Exhibit 2 (*Cameron County Sheriff's Department Jail Division Operation Plan*), the detention officers failed to follow the provisions pertaining to supervision as noted on that page. Elizarde, p. 81.

3.  **Deposition of Robert Lopez.**

Robert Lopez was an employee of the Cameron County Sheriff's Department in April 2001;  his deposition is submitted primarily due to the exhibits that were attached to his deposition and the reference of those exhibits in other depositions.

4.  **Deposition of Sylvia Rivas.**

Sylvia Rivas was a Licensed Vocational Nurse with the Health Department of Cameron

County, and she was working at the Cameron County jail in April of 2001. Sylvia Rivas states that whenever the medical staff at the Cameron County jail receives a doctor's order that states that the inmate is to be kept under close observation such as the one noted in Defendant's Motion for Summary Judgment Exhibit 4, the medical staff is to begin an activity log and the detention officers would also keep a log concerning the inmate. Sylvia Rivas pp. 19-33. Sylvia Rivas states that there should have been a medical assessment done on Juan Longoria, and she does not have an explanation as to why a medical assessment on Juan Longoria was never performed. Sylvia Rivas pp. 36-37. This witness states that vital signs would have taken of Juan Longoria, and that the nurses at the Cameron County jail were experienced in noting an individual suffering from alcohol withdrawal. Sylvia Rivas pp. 37-39. Ms. Rivas also states that whenever an individual is placed in the padded cell, the detention officers are to immediately notify the medical staff at the Cameron County jail. At that time, the medical staff would make an assessment and take vital signs. Additionally, the medical staff and the detention officers would begin their own logs. Sylvia Rivas pp. 39-42.

5.    Defendant Cameron County, Texas response to request for production concerning *Shift Activities Log* and *Medical Log (Observation Checklist for Crisis Management, Psychological Observation, Seclusion, Restraint or Medical).*

These documents are discussed in Sylvia Rivas' deposition and reflect the type of information that was to be noted by the nurses and the type of sheet that the detention officers were to note their observations.

6.    **Statement of Armando Guerrero.**

Armando Guerrero was an inmate at the Cameron County, Texas jail, and he was in a small holding cell in front of the booking area.   He states he heard an inmate in the large holding cell.  Mr. Guerrero says that the inmate was yelling that someone was beating on him, and when Mr. Guerrero looked at him, no one was beating on him nor touching the inmate. Mr. Guerrero then states that two jailers eventually placed the inmate in a padded cell located right behind the small holding cell.   Mr. Guerrero did not see anybody beat on the inmate. According to Mr. Guerrero, the inmate continued to kick the door, and the inmate continued to yell for the next four to five hours, and nobody checked on the inmate.

7.    **Statement of Anthony Edward Cipollaro.**

Anthony Cipollaro was an inmate at the Cameron County jail, and he was passing the food trays to the other inmates during the noon hour.  He states that the guard opened the door of the padded cell and gave the inmate in the padded cell two sandwiches.  He states that the inmate did not appear to have an interest in food, and Mr. Cipollaro also stated that the inmate appeared scared.

8.    **Deposition of Felipe Silva, Jr.**

In April of 2001, Felipe Silva, Jr. was a detention officer sergeant with the Cameron County Sheriff's Department jail facility.  At the time of the incident, Mr. Silva was a booking officer.  Felipe Silva states that the infirmary had an open dorm with beds, and it also had six individual cells.  Additionally, the individual cells were open to view so that a nurse or an officer could see the inmates in the cells.   Silva, pp. 41-45.  In contrary to the padded cell in

which Mr. Longoria was housed, if a detention officer just walked by the padded cell and glanced in, the detention officer could not see the bottom portion of the padded cell. Silva, pp. 85-87.

9.    **Deposition of Jose Morales.**

Jose Morales was a booking officer with the Cameron County Sheriff's Department jail section from May 1999 to October 2001. He states that he had no medical training. Morales, p. 12. On 11 April 2001, Mr. Morales was working the 7 a.m. to 3 p.m. shift. Morales, p. 15. The doctor's order similar to Exhibit 2 would be attached to the commitment papers, and these papers would be given to the sergeant. Morales, pp. 27-28. Mr. Morales states that a log was suppose to be placed on the wall next to the cell door when someone is placed in the padded cell, and in Mr. Longoria's case, a log was not done. He states that he does not know whether a nurse was suppose to be called when someone is placed in the padded cell. Additionally, he does not know whether a medical log was suppose to begin. Morales, pp. 32-33. Before 11 April 2001, he was aware that a log was to be placed on the door of a padded cell. Mr. Morales states that he does not know how often Longoria was supposed to be checked. Morales, pp. 33-34. Jose Morales states that if Mr. Longoria was not booked, then he would not be classified. Morales, p. 37. After classification, the inmate would be seen by the medical staff. If a person does not get booked or classified, then the inmate may not see the medical staff. Morales, pp. 41-42.

10.   **Deposition of Armando Tenorio.**

Mr. Tenorio was a detention officer employed at the Cameron County jail on 11 April 2001. Tenorio, p. 6. In April of 2001, the old jailhouse had approximately 6 beds in the

infirmary.  Tenorio, pp. 8, 26-28.   Mr. Tenorio states that there is not as clear a view of someone in the padded cell as compared to the holding cell.  Tenorio, p. 29.   Mr. Tenorio acknowledges that if someone was going through alcohol withdrawal, a person would be able to see what was going on better in an open cell situation as opposed to a closed padded cell. Tenorio, p. 45.

11.  Deposition of Xavier Lee Hernandez.

On April 11, 2001, Mr. Hernandez was a detention officer at the Cameron County jail from 1989 until the date of the deposition (29 August 2003).  Hernandez, p. 5.   He was on the 3 p.m. to 11 p.m. shift.  No log was kept while Juan Longoria was in the padded cell. A log was required to be kept and placed on the cell door or the wall next to the cell door.  Hernandez, pp. 18-19.   The cell door of the padded cell  where Juan Longoria stayed had a small window that was approximately 8 inches by 8 inches.  Hernandez, p. 19.   Mr. Hernandez states that Juan Longoria was yelling for almost his entire shift.   While in the padded cell, Juan Longoria was yelling: "Leave me alone.   They're going to kill me. Jose, you know, tell them to leave me alone."  Hernandez, pp. 19-21.   Additionally, Juan Longoria was pounding on the cell wall throughout the 3 to 11 shift.  Hernandez, pp. 33-34.   Mr. Hernandez acknowledges that all officers present would be responsible for the safety of Juan Longoria.  Hernandez, p. 22.   Mr. Hernandez states that he has no medical training.  Hernandez, pp.  43-44.   He states that he knew that a log was supposed to be maintained on Juan Longoria.  Hernandez, p. 48.   Mr. Hernandez was aware of jail procedures and he was certified as a detention officer. Hernandez, pp. 53-55.  Mr. Hernandez states that Juan Longoria was not monitored according to jail procedures and that a log was not maintained according to jail procedures.  Hernandez,

pp. 58-60.

12.    Statement of Michael Gene Baskin.

Michael Gene Baskin was an inmate in the Cameron County jail, and he states the following:

I think it was Wednesday night on April 11, 2001.  I remember seeing a guy in the padded cell.  I do not know his name.  At around 5:30 p.m. that day I looked in the padded cell.  I seen this man look as if he was swimming.  He was in the prone position on his stomach with his arms stretched out over his head.  His feet apart going back and forth sort of like doing jumping jacks.  The reason I saw this inmate was because I was handing out the food to the inmates and I was going to give the inmate in the padded cell food.  I tried to call him but he would not respond.  I then told the guard.  He is a big guy by the name of XL.  He is the assistant sergeant who was on duty that day on the 3-11 p.m. shift.  XL then told me that the inmate was doing it for attention.  XL then opened the cell door because the inmate would not get up to take his food.  I then placed the plate on the small cement slab in the padded cell.  XL closed the door.  I then left and I came back later because I had to give out some sugar with water to a guy in the small holding cell and I looked inside again in the padded cell and the inmate was in the same position and looked as if he was like a fish out of water.  His body was like quivering.  to me it looked like if he was having a seizure.  I then told XL again that the inmate in the padded cell was still having the fit, which is what I referred to it as.  XL then told me that the inmate would get tired of it.  This was at around 5:45 p.m.  The inmate would not get his water.  XL then opened the door and I went inside and set the water down and he shut the door.  I told XL  again and XL said that he would get tired of it.  XL then shut the door.

At around 8:30 p.m. I went back to attend to an inmates needs for a sugar drink in the holding cell.  I then peeked inside the padded cell.  I saw  the inmate

in the same position face down.   The inmate was still quivering.   The man never changed positions.   I then told another guard but I do not know his name that the inmate in the padded cell was having a fit.   That officer did not say nothing when I told him.   I then went back to the kitchen and they then locked us down at around 8:45 p.m. for the night.

The next morning I heard somebody had died.  I made a comment to Ozzy who is an inmate and I told him that I would bet it was the guy in the padded cell.

13.   **Deposition of Luis Alberto Mendieta.**

According to the affidavit of Luis Mendieta which is attached to Defendant's Motion for Summary Judgment, in April of 2001, Luis Alberto Mendieta was employed with the Cameron County Sheriff's Department, and he was assigned to the county jail as a detention sergeant. On 11 April 2001, Mr. Mendieta was on the 11:00 p.m. to 7:00 a.m. shift.   According to Luis Mendieta, Sergeant Galicia told him that they should check out the inmate in the single cell. Mr. Mendieta states that he started hitting the door to see if Juan Longoria would move.  Juan Longoria did not move.  Mr. Mendieta states that he could only see Mr. Longoria's legs, but he could not see Mr. Longoria's head.   Luis Mendieta continues to state that there was no response from the inmate, so Mendieta decided to open the cell door.   Defendant Exhibit 8L. In the deposition taken of Mr. Mendieta, he describes the configuration of the padded cell and the visibility by looking through the cell door window.  Mendieta, pp. 45-53.   In his deposition, Mr. Mendieta discusses the infirmary in the county jail and the beds that are available in the infirmary. Mendieta, pp. 76-77.

14.    **Statement of Jorge Ibarra.**

On April 11, 2001, Mr. Ibarra was a detention officer with the Cameron County Sheriff's

Department, and he arrived at work at 10:45 p.m.  When he arrived, Mr. Ibarra was informed that an inmate was being uncooperative, and that he was in the padded cell.  He was further informed that as soon as the inmate calmed down, he would be booked.  When the briefing was completed, Mr. Ibarra reported to his station at the infirmary room.  At around 12:15 a.m., Sgt. Mendieta instructed Mr. Ibarra to report to the second floor to assist officer Randy Dierlam.  About 15 minutes passed and Sergeant Mendieta advised Randy Dierham and Jorge Ibarra to report downstairs on the first floor.  When Jorge Ibarra arrived on the first floor, Sergeant Mendieta stated that the inmate in the padded cell was  uncooperative and was not responding.  Jorge Ibarra went in the cell first and checked  for a pulse on Juan Longoria's right wrist;  he did not feel a pulse.  Jorge Ibarra also noticed that Juan Longoria felt cold. At that time Jorge Ibarra believed that the detention officers needed to get medical attention for Mr. Longoria.   Felipe Esquivel, the County Jail nurse, eventually arrived about 10 minutes later and he began working on the inmate.

    15.    **Statement of Felipe Esquivel.**

Mr. Esquivel was a licensed vocational nurse with the Health Department of Cameron County.  On April 12, 2001, at approximately 12:42 a.m., Felipe Esquivel received a telephone call from Sergeant Mendietta of the Cameron County Jail.   Mr. Esquivel was informed that an inmate was not breathing.  Mr. Esquivel states that he arrived at the jail before EMS. When he saw Juan Longoria, Mr. Longoria was laying on the floor of the cell.  Mr. Esquivel checked Juan Longoria and noticed that there was no pulse nor respiration.  Additionally, Mr. Esquivel noticed that rigor mortis was already setting in.   Mr. Esquivel asked Sgt. Mendietta what had happened, and Sgt. Mendietta responded that Juan Longoria was placed in the

padded cell due to being violent and aggressive. Mr. Esquivel also stated the following: "I also asked the Sergeant if he notified the medical staff and if they had started a log on him every 15 minutes and he stated no that there was no log him and that they did not notify the medical staff."

16.    Statement of Jesus Eduardo Perez.

On April 12, 2001, Jesus Eduardo Perez was employed with the City of Brownsville as an EMT Intermediate.   At around 1:10 a.m. on 12 April 2001, he was responding to the Cameron County jail in regards to a cardiac arrest.   We he arrived, he saw a nurse doing CPR compressions on the chest of a prisoner.   When he took over, the prisoner was dead, and in the opinion of Jesus Perez, the prisoner had been dead for at least 2 hours.   According to Mr. Perez, "the prisoner was cyanotic from his chest area up to his face.   That means there was lack of oxygen and his pupils were fully dilated and non-reactive which means there is no brain activity."

17.    Deposition of Lawrence J. Dahm, M.D.

Doctor Dahm states that Mr. Longoria was in the process of alcohol withdrawal at the time he died. Dahm, pp. 54, 67.   Doctor Dahm states that at least the last 24 hours of Mr. Longoria's life, he was mentally disoriented. Doctor Dahm continues by stating that a person who suffers from DTs would normally receive a treatment of IV fluids to rehydrate them, tranquilizers to minimize and prevent seizures and minimize the agitation, and placed in a quiet space.   Dahm, pp.70-71.   The doctor states that contributory factors to Juan Longoria's death were delirium tremens or alcohol withdrawal.   Dahm, pp. 73-74. Doctor Dahm states that witness statements indicating that Mr. Longoria was acting normal the last few hours of

his life is not consistent with a person having end-stage liver disease. Dahm, pp. 73-81. Doctor Dahm states that a person can die from lack of care for alcohol withdrawal. Dahm, pp. 86-87.

18. **Report of Alvin W. Cohn.**

Mr. Cohn is a correctional facility expert, and he rendered an opinion Cameron County's failure to respond to Longoria's obvious distress and mental illness and the failure to communicate to health authorities what was known about his symptoms was a proximate cause of his death. Cohn, p. 5.

5. **SUMMARY OF THE ARGUMENT.**

As stated above, the Plaintiffs assert that the Defendant CAMERON COUNTY, TEXAS is not entitled to a summary judgment. The Plaintiffs assert that there are genuine issues of material fact on both the federal and Texas law claims. Of the eight points that the Defendant asserts are grounds for summary judgment, the Plaintiffs contend that the following matters still have genuine issues of material fact, and consequently, the Defendant CAMERON COUNTY, TEXAS is not entitled to a summary judgment:

> i. The Defendant asserts that there is no evidence that Cameron County employees or agents were deliberately indifferent to the medical needs or condition of Juan Longoria or acted with deliberate indifference towards him.

> ii. The Defendant asserts that there is no evidence that Cameron County employees or agents engaged in conscience shocking behavior.

> iii. The Defendant asserts that there is no waiver of state law governmental/sovereign immunity regarding the state law tort claims because there is no evidence that Juan Longoria's death resulted from a use or condition of tangible property by County employees.

16

## 6.  ARGUMENT AND AUTHORITIES.

**A.    Summary Judgment Evidence Shows that the Defendant Cameron County, Texas, is liable under 42 U.S.C. section 1983.**

A summary of the evidence is as follows:

1.    Juan Longoria is dead, and he died while in custody with the Cameron County jail.

2.    For a period of approximately 24 hours prior to his death, Juan Longoria suffered from alcohol withdrawal.

3.    At the time of Juan Longoria's arrival to the Cameron County jail, the Cameron County detention officers were aware that he was mentally impaired. The statement of Francisco Lerma, Jr. indicates that Joe Salinas of the Brownsville Police Department upon tendering Juan Longoria to the detention officers informed them that Mr. Longoria was a "96" or mentally ill. Defendant Exhibit 8A.

4.    Attached to the commitment papers transferring Juan Longoria from the City of Brownsville jail to the Cameron County jail was a doctor's order stating that Juan Longoria "may return to jail but should be kept under close observation." Defendant Exhibit 4.

5.    Prior to 11 April 2001, the detention officers at the Cameron County jail had the necessary certifications and they have attended various seminars concerning the housing of prisoners. Through the testimony of the detention officers at the Cameron County jail, these officers have held themselves out as being familiar with the policies and procedures that are noted in the *Cameron County Sheriff's Department Jail Division Operation Plan* (Defendant Exhibit 9); the familiarity with this information was prior to 11 April 2001.

6.    According to George Garcia, a lieutenant at the Cameron County jail, if an inmate has a doctor's order to be kept under close observation, there should

17

have been an activity log maintained by the detention officers and the medical staff should be notified. Mr. Garcia states that the inmate should be checked every 15 minutes. Additionally, when someone is placed in the padded cell, the medical staff at the jail is to be notified and a log is to be maintained by the detention officers. Also, the log is kept by the door of the cell so that a detention officer can make notations. Mr. Garcia states that it was customary for logs to be maintained, inmates to be classified, and nurses to be notified when someone is placed in the padded cell. Mr. Garcia says that the failure of these things to be done on Juan Longoria was a failure of procedures by Cameron County employees. As to Juan Longoria, George Garcia acknowledges that the Cameron County jail facility failed to book, classify, obtain a medical assessment, maintain a log when placed in the padded cell, and notify the nurse when he was placed in the padded cell. George Garcia acknowledges that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell, is for the safety and well-being of an inmate. George Garcia also acknowledges that the failure to do any of these procedures could lead to serious consequences concerning the inmate in the way of injury and death.

7. Per Joe Elizarde, who held a detention officer's certificate for 18 years, and was employed at the Cameron County Jail in April 2001, detention officers were not medically trained at the Cameron County jail. Mr. Elizarde testifies that from what he was told, Juan Longoria was delusional and irrational while he was at the Cameron County jail. Mr. Elizarde states that detention officers receive training at the academy, as well as on the job instruction and training of someone being in medical distress. Mr. Elizarde acknowledges that Juan Longoria was not classified per jail procedures. Mr. Elizarde acknowledges that Juan Longoria was not seen by a nurse per the jail procedures. Mr. Elizarde acknowledges that no activity log was maintained by the detention officers per the jail procedures. At the time that Juan Longoria was an inmate at the

Cameron County jail in April 2001, the county jail was shorthanded in detention officers and this condition had existed for several years.

8.      As noted above, Sylvia Rivas was a Licensed Vocational Nurse with the Health Department of Cameron County, and she was working at the Cameron County jail in April of 2001. Sylvia Rivas states that whenever the medical staff at the Cameron County jail receives a doctor's order that states that the inmate is to be kept under close observation such as the one noted in Defendant's Motion for Summary Judgment Exhibit 4, the medical staff is to begin an activity log and the detention officers would also keep a log concerning the inmate. Sylvia Rivas states that there should have been a medical assessment done on Juan Longoria, and she does not have an explanation as to why a medical assessment on Juan Longoria was never performed. This witness states that vital signs would have taken of Juan Longoria, and that the nurses at the Cameron County jail were experienced in noting an individual suffering from alcohol withdrawal. Ms. Rivas also states that whenever an individual is placed in the padded cell, the detention officers are to immediately notify the medical staff at the Cameron County jail. At that time, the medical staff would make an assessment and take vital signs. Additionally, the medical staff and the detention officers would begin their own logs.

9.   In April of 2001, Felipe Silva, Jr. was a detention officer sergeant with the Cameron County Sheriff's Department jail facility. At the time of the incident, Mr. Silva was a booking officer. Felipe Silva states that the infirmary had an open dorm with beds, and it also had six individual cells. Additionally, the individual cells were open to view so that a nurse or an officer could see the inmates in the cells. In contrary to the padded cell in which Mr. Longoria was housed, if a detention officer just walked by the padded cell and glanced in, the detention officer could not see the bottom portion of the padded cell.

19

10. Mr. Tenorio was a detention officer employed at the Cameron County jail on 11 April 2001.   In April of 2001, the old jailhouse had approximately 6 beds in the infirmary.  Mr. Tenorio states that there is not as clear a view of someone in the padded cell as compared to the holding cell.  Mr. Tenorio acknowledges that if someone was going through alcohol withdrawal, a person would be able to see what was going on better in an open cell situation as opposed to a closed padded cell.

11.   As stated earlier in this response, on April 11, 2001, Mr. Xavier Lee Hernandez was a detention officer at the Cameron County jail from 1989 until the date of the deposition (29 August 2003).   He was on the 3 p.m. to 11 p.m. shift.   No log was kept while Juan Longoria was in the padded cell. A log was required to be kept and placed on the cell door or the wall next to the cell door. The cell door of the padded cell  where Juan Longoria stayed had a small window that was approximately 8 inches by 8 inches.   Mr. Hernandez states that Juan Longoria was yelling for almost his entire shift.   While in the padded cell, Juan Longoria was yelling: "Leave me alone.   They're going to kill me. Jose, you know, tell them to leave me alone."   Additionally, Juan Longoria was pounding on the cell wall throughout the 3 to 11 shift.   He states that he knew that a log was supposed to be maintained on Juan Longoria.  Mr. Hernandez was aware of jail procedures and he was certified as a detention officer.   Mr. Hernandez states that Juan Longoria was not monitored according to jail procedures and that a log was not maintained according to jail procedures.

12.   According to Michael Gene Baskin, who was an inmate in the Cameron County jail,  he states that he saw Juan Longoria in the padded cell.  He states that he informed two detention officers that Juan Longoria did not appear well. Mr. Baskin says that Juan Longoria's  body was like quivering and he appeared to be having a seizure; Mr. Baskin told a detention officer about what he had seen.  Mr. Baskin states that the detention officers did not assist Mr. Longoria

after being informed of this information.

13.    According to the affidavit of Luis Mendieta which is attached to Defendant's Motion for Summary Judgment, in April of 2001, Luis Alberto Mendieta was employed with the Cameron County Sheriff's Department, and he was assigned to the county jail as a detention sergeant. On 11 April 2001, Mr. Mendieta was on the 11:00 p.m. to 7:00 a.m. shift.    According to Luis Mendieta, Sergeant Galicia told him that they should check out the inmate in the single cell.  Mr. Mendieta states that he started hitting the door to see if Juan Longoria would move.  Juan Longoria did not move.  Mr. Mendieta states that he could only see Mr. Longoria's legs, but he could not see Mr. Longoria's head.  Luis Mendieta continues to state that there was no response from the inmate, so Mendieta decided to open the cell door.

14.    On April 11, 2001, Mr. Jorge Ibarra was a detention officer with the Cameron County Sheriff's Department, and he arrived at work at 10:45 p.m. When he arrived, Mr. Ibarra was informed that an inmate was being uncooperative, and that he was in the padded cell.  He was further informed that as soon as the inmate calmed down, he would be booked.  When the briefing was completed,  Mr. Ibarra reported to his station at the infirmary room.  At around 12:15 a.m., Sgt. Mendieta instructed Mr. Ibarra to report to the second floor to assist officer Randy Dierlam.  About 15 minutes passed and Sergeant Mendieta advised Randy Dierham and Jorge Ibarra to report downstairs on the first floor.  When Jorge Ibarra arrived on the first floor, Sergeant Mendieta stated that the inmate in the padded cell was  uncooperative and was not responding. Jorge Ibarra went in the cell first and checked  for a pulse on Juan Longoria's right wrist;  he did not feel a pulse.  Jorge Ibarra also noticed that Juan Longoria felt cold.

15.    Mr. Felipe Esquivel was a licensed vocational nurse with the Health

Department of Cameron County.  On April 12, 2001, at approximately 12:42 a.m., Felipe Esquivel received a telephone call from Sergeant Mendietta of the Cameron County Jail.  Mr. Esquivel was informed that  an inmate was not breathing.  When he saw Juan Longoria, Mr. Longoria was laying on the floor of the cell.  Mr. Esquivel checked Juan Longoria and noticed that there was no pulse nor respiration.  Additionally, Mr. Esquivel noticed that rigor mortis was already setting in.  Mr. Esquivel asked Sgt. Mendietta what had happened, and Sgt. Mendietta responded that Juan Longoria was placed in the padded cell due to being violent and aggressive.  Mr. Esquivel also stated the following: "I also asked the Sergeant if he notified the medical staff and if they had started a log on him every 15 minutes and he stated no that there was no log him and that they did not notify the medical staff."

The Defendant asserts that there is <u>no evidence</u> that Cameron County employees or agents were deliberately indifferent to the medical needs or condition of Juan Longoria or acted with deliberate indifference towards him.  The Defendant also asserts that there is <u>no evidence</u> that Cameron County employees or agents engaged in conscience shocking behavior.  The Defendant claims that there is no evidence that the jail detention officers were subjectively aware that Juan Longoria had the DTs or in need of medical attention.  The plaintiffs disagree with this position.  Upon arrival to the Cameron County jail, the detention officers were informed of Juan Longoria's need for medical attention because the commitment papers had a doctor's order to keep him under close observation.  Secondly, the City of Brownsville jailer who brought Juan Longoria to the Cameron County jail informed the detention officers that Juan Longoria was mentally ill.  Third, the detention officers had to remove Juan Longoria from the other inmates and place him in a padded cell.  Forth, the testimony is that Juan Longoria had disordered thinking the entire time he was at the Cameron County jail.  Fifth, there is at least one inmate who informed two detention officers that Juan Longoria did not look well.  The detention officers were put on notice that Juan Longoria needed medical attention. *Austin v. Johnson*, 328 F. 3d 204,  210 (5th Cir. 2003).  With this information before them, how did these trained, certified detention officers  at the Cameron County jail respond

to Juan Longoria's condition?    The staff of three shifts at the Cameron County jail facility failed to book, classify, obtain a medical assessment, maintain a log when he was placed in the padded cell, and notify the nurse when he was placed in the padded cell.    These certified detention officers knew that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell,  is for the safety and well-being of an inmate. The Plaintiffs assert that there is evidence of deliberate indifference by Cameron County, Texas.

**B.    Defendant, Cameron County, Texas is not entitled to Summary Judgment on the Texas law negligence claim.**

**1.    The Plaintiffs have asserted a claim under the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE ANN. ch. 101 (Vernon 1997).**  The Defendant contend that the mere use of the jail cell does not raise to the level contemplated under the law as to tangible personal or real property that would make Cameron County, Texas liable were it a private person. TEX. CIV. PRAC. & REM. CODE ANN. section 101.021 (Vernon Supp. 1997).  The Defendant cites *Dallas County Mental Health and Retardation v. Bossley*, 968 SW2d 339 (Texas. 1998),  for the position that the use of the jail cell did no more than furnish the condition that made the injury possible.  In *Bossley*,  the unlocked doors permitted an escape that led to a series of events resulting in the death of a patient.  The Court stated that the unlocked doors were too removed from the incident that brought about the actual death of Roger Bossley. 968 SW2d at 343.  In the present case there is  testimony that the cell door had a small window that restricted the view of the detention officers from seeing the entire cell in which Juan Longoria was housed. It is the position of the Plaintiffs that the placing of Juan Longoria in the padded cell was a proximate cause of the death of Mr. Longoria because the restricted vision of the detention officers prevented the proper monitoring of Juan Longoria.    Additionally, the Cameron County jail had an infirmary with beds for the inmates.  The infirmary also had cell doors that were more open to view, and consequently, would allow better monitoring of inmates requiring medical attention.

23

2.     In *Texas Department of Public Safety v. Petta*, 44 S.W.3d 575 (Tex. 2001), the Texas Supreme Court states that "the Tort Claims Act waives sovereign immunity from suit for claims that an officer negligently implemented policy." *Petta*, 44 S.W.3d 575, 580.   The Plaintiffs' Third Amended Original Complaint at pages 30 through 35, sets out various failures by Cameron County as to handling of Juan Longoria, including the failure of the Cameron County Sheriff's Department to follow its health services plan.   Plaintiffs' Third Amended Original Complaint, 7.11 subpart i.   The evidence clearly shows that the Cameron County detention officers on three shifts fail to follow policy.

3.     Article 16.21 of the Texas Code of Criminal Procedure provides that "every sheriff shall keep safely a person committed to his custody."   The evidence presented before this Court shows that the Defendant failed to keep Juan Longoria safely in its custody.

4.     In 1975 the Texas Legislature created the Jail Standards Commission.   The Texas Commission on Jail Standards is required to establish rules and regulations governing, among other things, medical care in jails. See 37 Tex. Admin. Code, section 273.1 (Texas Commission on Jail Standards, Health Services).   Under rule 273.1, the County "shall provide medical, mental, and dental services in accordance with the approved health services plan.   These services may include, but shall not be limited to, the services of a licensed physician, professional and allied health personnel, hospital, or similar services."   Under Rule 273.2 of the Jail Standards, the County is required to put into force a written plan, approved by the Commission on Jail Standards, for inmate medical, mental, and dental services. See 37 Tex. Admin. Code, Part 9, Chapter 273, Rule section 273.2 (Texas Commission on Jail Standards, Health Services).   Under Rule 273.3 of the Jail Standards, "all medical instructions of designated physicians shall be  followed." See 37 Tex. Admin. Code, Part 9, Chapter 273, Rule section 273.3 (Texas Commission on Jail Standards, Health Services, Health Instructions). Under  Texas Local Government Code Annotated, section 351.001, the commissioners' court shall provide safe and suitable jails for the county. Tex.Loc.Gov't Code Ann. section 351.001.  Under Texas Local Government Code Annotated, section 351.001, "each county jail must comply with the minimum standards and rules and procedures of the Commission on Jail

24

Standards." The evidence shows that the Defendant Cameron County, Texas failed to follow the doctors order to keep Juan Longoria under close observation. The evidence shows that Juan Longoria was not booked per jail procedures. The evidence shows that Juan Longoria was not classified per jail procedures. The evidence shows that Juan Longoria was not seen by a nurse per the jail procedures. The evidence shows that no activity log was maintained by the detention officers per the jail procedures. The evidence shows that medical staff were not notified when Longoria was placed in a padded cell per jail procedures. The evidence shows that the classification process, the premedical assessment, the medical assessment, the maintaining of a log by detention officers, and the notification of the nursing staff when someone is placed in the padded cell, is for the safety and well-being of an inmate. The evidence shows that the failure to do any of these procedures could lead to serious consequences concerning the inmate in the way of injury and death.

7.    **CONCLUSION.**

The Plaintiffs assert that there is evidence to support their claims against Cameron County, Texas for Constitutional violations and Texas State law claims. Therefore, the Plaintiffs are requesting that the Court deny the Defendant Cameron County, Texas' motion for summary judgment. The Plaintiffs request any additional relief that they are justly entitled to receive.

Respectfully submitted,

By: _A. X. Valdez_

Alfred R. Valdez
     Federal ID 6389
     State Bar No. 20426200
     7520 Hillcroft
     Houston, Texas 77081
     (713) 271-0719
     (713) 270-8134 fax
     Attorney for the Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

I   certify   that   a   true   copy   of   the   above   was   served   on   the   opposing   party   on

ARV ~~15 March~~ 2004.

5 APRIL

**Alfred R. Valdez**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **MARIA LONGORIA, and MARIA IDALIA GUTIERREZ, Individually and on behalf of the Estate of JUAN LONGORIA, Deceased** | } } } } | **CIVIL ACTION NO. B-01-062** |
| **VS.** | } } | |
| **CAMERON COUNTY, TEXAS, THE CITY OF BROWNSVILLE, TEXAS, and JOHN DOES 1-10** | } } } | **JURY DEMANDED** |

## PLAINTIFFS' RESPONSE TO DEFENDANT CAMERON COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT

*A. R. Valdez*

**Alfred R. Valdez**
    **Federal ID 6389**
    **State Bar No. 20426200**
    **7520 Hillcroft**
    **Houston, Texas 77081**
    **(713) 271-0719**
    **(713) 270-8134 fax**

**Attorney for the Plaintiffs**

*Supplement to*
VOLUME __3__ OF __3__
*EXHIBIT 13* ✱

✱ *Some of the pages were missing on the previous*
*EXHIBIT 13. A. R. Valdez*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARIA LONGORIA AND MARIA    ) (
IDALIA GUTIERREZ,           ) (
INDIVIDUALLY AND ON BEHALF) (
OF THE ESTATE OF JUAN       ) (
LONGORIA, DECEASED          ) (
     Plaintiffs            ) (
                    ) (
VS.                         ) (    CIVIL ACTION NO. B-01-062
                    ) (
CAMERON COUNTY, TEXAS,      ) (
THE CITY OF BROWNSVILLE,    ) (    JURY DEMANDED
TEXAS AND JOHN DOES 1-10    ) (
     Defendants            ) (

---

ORAL DEPOSITION OF
LUIS ALBERTO MENDIETA
FEBRUARY 17, 2004



---

     ORAL DEPOSITION OF LUIS ALBERTO MENDIETA,

produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on FEBRUARY 17, 2004, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the offices of Adams & Graham, L.L.P., 222

East Van Buren, West Tower, Harlingen, Texas, pursuant

to the Federal Rules of Civil Procedure.

BRYANT & STINGLEY, INC.
McAllen         Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

APPEARANCES

COUNSEL FOR PLAINTIFFS:

    ALFRED R. VALDEZ
    LAW OFFICE OF ALFRED R. VALDEZ
    7520 Hillcroft
    Houston, Texas  77081

    BARRY S. BERGER
    LAW OFFICE OF BARRY S. BERGER, P.C.
    1863 Post Oak Park Drive
    Houston, Texas  77027

COUNSEL FOR DEFENDANTS:

    CRAIG VITTITOE
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren, West Tower
    Harlingen, Texas  78551

INDEX

|  | PAGE |
|---|---|
| Appearances ..................................... | 2 |
| LUIS ALBERTO MENDIETA | |
| Examination by Mr. Berger ...................... | 3 |
| Errata Sheet/Signature Page ................... | 86 |
| Reporter's Certificate ........................ | 88 |

Attached to the end of the transcript:  Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Statement ............................. | 34 |

11:59:10  1          MR. VITTITOE:  Just for the record, prior

11:59:12  2    to the commencement of this deposition, we -- the

11:59:15  3    witness provided his residential address, his phone

11:59:19  4    number, and his driver's license number to Counsel with

11:59:23  5    the understanding that such information will remain

11:59:25  6    confidential to this suit for purposes of the officer's

11:59:31  7    security, and that information will not appear in the

11:59:33  8    formal record of this deposition.

11:59:36  9          MR. BERGER:  That's correct.

11:59:36 10              LUIS ALBERTO MENDIETA,

11:59:36 11    having been duly sworn, testified as follows:

11:59:36 12                   EXAMINATION

11:59:36 13    BY MR. BERGER:

11:59:40 14       Q.  Okay.  The only thing we're going to ask you

11:59:41 15    for the formal record of this deposition is what your

11:59:48 16    real name is.  Okay?

11:59:51 17       A.  Yes, sir.

11:59:51 18       Q.  Could you tell us what your real name is.

11:59:53 19       A.  Luis Alberto Mendieta.

11:59:58 20       Q.  Okay.  Mendieta?

11:59:58 21       A.  Yes, sir.  Correct.

12:00:04 22       Q.  Okay.  Are you presently employed by the

12:00:06 23    Cameron County Sheriff's Department?

12:00:08 24       A.  Yes, sir, I am.

12:00:09 25       Q.  What's your present position?

12:00:11 1    A.  I'm currently an investigator for the auto

12:00:14 2    theft division.

12:00:16 3    Q.  So you're in the field now.

12:00:17 4    A.  Yes, sir.  Correct.

12:00:18 5    Q.  Okay.  That's why you're carrying a pistol?

12:00:20 6    A.  Yes, sir.  Correct.

12:00:21 7    Q.  And the badge.

12:00:23 8    A.  Yes, sir.

12:00:24 9    Q.  Okay.  The -- in April of 2001, were you

12:00:28 10   assigned to the detention department?

12:00:30 11   A.  Yes, sir, correct.

12:00:32 12   Q.  Okay.  Now, when did you start working for the

12:00:36 13   sheriff's department?

12:00:39 14   A.  June the 20th of 1996.

12:00:41 15   Q.  '96?

12:00:42 16   A.  Yes, sir, correct.

12:00:43 17   Q.  So now it's eight years.

12:00:45 18   A.  Correct.

12:00:46 19   Q.  Almost eight years.

12:00:47 20        Okay.  Have you ever had your deposition

12:00:50 21   taken before?

12:00:52 22   A.  No, sir.

12:00:53 23   Q.  Okay.  Have you testified in court?

12:00:55 24   A.  No, sir.

12:00:58 25   Q.  Okay.  Although we're taking your deposition

| | | |
|---|---|---|
| 12:01:00 | 1 | here today in informal circumstances, you realize that |
| 12:01:03 | 2 | you've been sworn to tell the truth just like you were |
| 12:01:06 | 3 | testifying in a court of law? |
| 12:01:08 | 4 | A.  Correct, yes, sir. |
| 12:01:09 | 5 | Q.  You're subject to the same penalties of |
| 12:01:11 | 6 | perjury, if it was determined later that you were |
| 12:01:13 | 7 | fibbing to us, as if you were testifying in a court of |
| 12:01:16 | 8 | law and fibbing.  You understand that? |
| 12:01:18 | 9 | A.  Yes, sir, I do. |
| 12:01:20 | 10 | Q.  Okay.  If you don't understand my question or |
| 12:01:22 | 11 | if you don't hear my question, ask me to repeat it or |
| 12:01:26 | 12 | rephrase it, because even though -- |
| 12:01:28 | 13 | MR. BERGER:  I take it he's reading and |
| 12:01:29 | 14 | signing; is that correct? |
| 12:01:36 | 15 | Q.  Okay.  That you're going to have an opportunity |
| 12:01:38 | 16 | to read and sign your deposition, that if you answer a |
| 12:01:40 | 17 | question, I'm going to assume that you both heard and |
| 12:01:43 | 18 | understood the question and responded appropriately. |
| 12:01:46 | 19 | Do you understand that? |
| 12:01:47 | 20 | A.  Yes, sir, I do. |
| 12:01:49 | 21 | Q.  Okay.  You need to wait until I finish my |
| 12:01:52 | 22 | question before you finish your answer because, one, |
| 12:01:54 | 23 | the court reporter has a hard time taking us talking at |
| 12:01:58 | 24 | the same time.  Do you understand that? |
| 12:02:01 | 25 | A.  Yes, sir. |

12:02:01 1    Q.  Okay.  And this is going to -- whatever you say

12:02:01 2    here today is going to appear in a typewritten booklet

12:02:04 3    type of thing, so it's got to be recorded that way.  Do

12:02:08 4    you understand that?

12:02:09 5    A.  Yes, sir, I do.

12:02:10 6    Q.  Okay.  And because it's going to appear in a

12:02:12 7    typewritten thing and not an oral or video recording,

12:02:18 8    you have to answer out loud to a question.  Do you

12:02:23 9    understand that?

12:02:23 10    A.  Yes, sir, I do.

12:02:24 11    Q.  Okay.  A shake of the head is not good enough.

12:02:27 12    You understand that?

12:02:28 13    A.  Yes, sir, I do.

12:02:29 14    Q.  I may see what you're doing and how you're

12:02:32 15    responding and the court reporter may see and put it

12:02:34 16    down on the typewritten page, but to be clear about

12:02:36 17    your answer, we need a verbal answer to a question.  Do

12:02:39 18    you understand that?

12:02:40 19    A.  I do.

12:02:41 20    Q.  If the answer calls for a "yes" or "no," then

12:02:43 21    say "yes" or "no," and don't say "uh-huh," "huh-uh,"

12:02:47 22    grunt, "yeah," or, you know, something that may be

12:02:50 23    misconstrued.  Do you understand?

12:02:52 24    A.  Yes, sir.

12:02:53 25    Q.  And if we correct you or I correct you or say

| | |
|---|---|
| 12:02:57 | 1 |
| 12:03:00 | 2 |
| 12:03:04 | 3 |
| 12:03:08 | 4 |
| 12:03:11 | 5 |
| 12:03:15 | 6 |
| 12:03:17 | 7 |
| 12:03:20 | 8 |
| 12:03:22 | 9 |
| 12:03:24 | 10 |
| 12:03:27 | 11 |
| 12:03:30 | 12 |
| 12:03:35 | 13 |
| 12:03:38 | 14 |
| 12:03:39 | 15 |
| 12:03:40 | 16 |
| 12:03:43 | 17 |
| 12:03:47 | 18 |
| 12:03:49 | 19 |
| 12:03:51 | 20 |
| 12:03:51 | 21 |
| 12:03:56 | 22 |
| 12:03:59 | 23 |
| 12:04:01 | 24 |
| 12:04:02 | 25 |

you shook your head or something like that, it's not to be critical of you, because even the most experienced person that gives his deposition or testifies from time to time forgets those things.   Okay?

A.   Yes, sir.

Q.   Okay.  And, also, another reason why we shouldn't talk over each other or you try to anticipate where I'm going with a question is because sometimes I change the question in midstream.

So you may anticipate where I'm going with a question, you kind of cut me off, answer a question, and then I actually change the question in midstream, unless your answer is not responsive to the question as it winds up.  Do you understand that?

A.   Yes, sir.

Q.   Okay.  And we'll try to work together, and I'll try not to step on your lines.  Okay?  Same reason, because the court reporter can't take us down talking at the same time.  Okay?

A.   Yes, sir.

Q.   Okay.  If you need to finish your answer, please tell me.  I may try to cut you off with the next question.  Say, "I'm not finished with my answer."  Okay?

A.   Yes, sir.

| | | |
|---|---|---|
| 12:04:02 | 1 | Q. If you need to go to the bathroom, you need to |
| 12:04:04 | 2 | call somebody, you get a call, you need to take a break |
| 12:04:07 | 3 | anytime, let us know, and we'll do so. Okay? |
| 12:04:12 | 4 | A. Yes, sir. |
| 12:04:14 | 5 | Q. Okay. Now, have you had any education beyond |
| 12:04:19 | 6 | high school? |
| 12:04:20 | 7 | A. Yes, sir. |
| 12:04:20 | 8 | Q. And could you tell us where and when? |
| 12:04:23 | 9 | A. Texas Southmost College. |
| 12:04:25 | 10 | Q. Texas what? |
| 12:04:26 | 11 | A. Southmost College. |
| 12:04:27 | 12 | Q. Southmost College? |
| 12:04:30 | 13 | And is that located in Brownsville? |
| 12:04:32 | 14 | A. Yes, sir, it is. |
| 12:04:33 | 15 | Q. And did you graduate? |
| 12:04:35 | 16 | A. Yes, sir, I did. |
| 12:04:36 | 17 | Q. You got a degree? |
| 12:04:37 | 18 | A. Not a degree, sir. I went through the police |
| 12:04:39 | 19 | academy through the college. |
| 12:04:41 | 20 | Q. Oh, police academy. |
| 12:04:42 | 21 | A. Yes, sir. Correct. |
| 12:04:43 | 22 | Q. Okay. You got a certificate there? |
| 12:04:44 | 23 | A. Correct. Yes, sir. |
| 12:04:45 | 24 | Q. How long did you go? |
| 12:04:48 | 25 | A. Approximately six months, sir. |

12:04:53 1      Q.   Did any of that police academy training include

12:04:56 2   medical information?

12:04:59 3      A.   Yes, sir.

12:05:08 4      Q.   How much of it?

12:05:08 5      A.   Honestly, I don't recall.

12:05:08 6      Q.   Okay.  Was it about eight years ago?

12:05:09 7      A.   I got my certificate in 1997.

12:05:12 8      Q.   '97?

12:05:13 9      A.   Yes, sir.

12:05:18 10     Q.   Okay.  Do you recall any information that they

12:05:21 11  gave you at all about what medical information?   From

12:05:27 12  that --

12:05:27 13     A.   What I remember is CPR, sir.

12:05:30 14     Q.   CPR?

12:05:31 15     A.   CPR, correct.

12:05:32 16     Q.   Okay.  Had you had any medical training since

12:05:34 17  that time either by a course or seminars or -- besides

12:05:40 18  CPR?

12:05:42 19     A.   Well, through the jail, I went, again, through

12:05:44 20  CPR as well -- once I became a deputy, almost two years

12:05:52 21  ago, I went through a course in the same college, Texas

12:05:55 22  Southmost College.  I went through what you call the --

12:06:07 23  it's like a machine that you use to start getting the

12:06:11 24  heart going back again.

12:06:11 25     Q.   Oh, the defibrillator?

| | | |
|---|---|---|
| 12:06:16 | 1 | A.  Correct. |
| 12:06:16 | 2 | Q.  Okay.  So you learned how to do that. |
| 12:06:18 | 3 | A.  Yes, sir. |
| 12:06:18 | 4 | Q.  Did you take any advanced CPR courses? |
| 12:06:22 | 5 | A.  I don't recall.  Possibly yes, but I've got to |
| 12:06:25 | 6 | go back to my files -- to my certificates. |
| 12:06:27 | 7 | Q.  Okay.  But you got -- you know you got a |
| 12:06:29 | 8 | certificate for at least beginning CPR? |
| 12:06:32 | 9 | A.  Yes, sir.  As well as one from the Red Cross. |
| 12:06:34 | 10 | Q.  The Red Cross.  Okay. |
| 12:06:35 | 11 | A.  Yes, sir. |
| 12:06:38 | 12 | Q.  Did you get any lessons in anatomy or |
| 12:06:42 | 13 | psychology or things like that? |
| 12:06:44 | 14 | A.  No, sir, not at all. |
| 12:06:46 | 15 | Q.  Okay.  When you -- when you became -- stop?  Is |
| 12:06:51 | 16 | there something? |
| 12:06:52 | 17 | A.  Yes, sir.  You said any psychology? |
| 12:06:56 | 18 | Q.  Yes. |
| 12:06:56 | 19 | A.  What I did go through was a course in the jail. |
| 12:07:00 | 20 | I believe it was a suicidal. |
| 12:07:02 | 21 | Q.  Suicidal tendencies? |
| 12:07:04 | 22 | A.  Yes, sir. |
| 12:07:04 | 23 | Q.  Okay.  So they taught you how to identify |
| 12:07:06 | 24 | suicidal tendencies? |
| 12:07:11 | 25 | A.  I don't recall too much whether going into what |

12:07:13  1   you just mentioned, and I don't recall a year either.

12:07:17  2       Q.  Okay.  Now, I take it you got some type of

12:07:21  3   certificate as -- for a jailer or detention officer in

12:07:26  4   the jail?

12:07:27  5       A.  Yes, sir, I did.

12:07:28  6       Q.  Okay.  Did you go -- when you first joined the

12:07:33  7   sheriff's office, did you go into the detention office,

12:07:37  8   or did you go as investigation or what?

12:07:40  9       A.  No, sir.  I started as jailer.

12:07:42  10      Q.  As a jailer?

12:07:43  11      A.  As a jailer.

12:07:44  12      Q.  Okay.  Prior to the experience as a detention

12:07:46  13  officer jailer with the sheriff's office, what did you

12:07:49  14  do?

12:07:49  15      A.  I worked at a store.  It was a fabric store

12:07:53  16  here in Brownsville.

12:07:54  17      Q.  A fabric store?

12:07:55  18      A.  Yes, sir.

12:07:55  19      Q.  Okay.  Did you cut fabric or sell it or what?

12:07:58  20      A.  I did in general, received orders, cut, yes,

12:08:01  21  sir.

12:08:02  22      Q.  You weren't a tailor, though?

12:08:04  23      A.  No, sir.

12:08:06  24      Q.  Okay.  My grandfather was a tailor so --

12:08:10  25           Then you became -- you took the -- you

| | |
|---|---|
| 12:08:13 | 1 |
| 12:08:16 | 2 |
| 12:08:18 | 3 |
| 12:08:20 | 4 |
| 12:08:25 | 5 |
| 12:08:28 | 6 |
| 12:08:31 | 7 |
| 12:08:35 | 8 |
| 12:08:37 | 9 |
| 12:08:38 | 10 |
| 12:08:40 | 11 |
| 12:08:47 | 12 |
| 12:08:50 | 13 |
| 12:08:52 | 14 |
| 12:08:55 | 15 |
| 12:08:58 | 16 |
| 12:08:59 | 17 |
| 12:09:01 | 18 |
| 12:09:03 | 19 |
| 12:09:07 | 20 |
| 12:09:09 | 21 |
| 12:09:10 | 22 |
| 12:09:11 | 23 |
| 12:09:13 | 24 |
| 12:09:14 | 25 |

1  joined the department, passed the physical, I guess,

2  whatever they give?

3      A.  Well, once I was working at the fabric store, I

4  started joining college, which was a police academy.

5  Once I was in the police academy, I overheard some

6  officers taking that training, that there were some

7  openings at the Cameron County Sheriff's Department

8  jail area, so I submitted an application.

9      Q.  Okay.  How long were you working there at the

10  jail before you actually -- they gave you the course

11  of -- for detention?

12      A.  I'd say about -- within five months.

13      Q.  Okay.  Do they give that course once a year?

14      A.  You have a year within that period.  Once you

15  get hired, you have a year to take that test.

16      Q.  Take it and pass it.

17      A.  Yes, sir.

18      Q.  I take it you took it and passed it on the

19  first try?

20      A.  No, sir.  It was on the second try.

21      Q.  Second try.

22      A.  Yes, sir.

23      Q.  Okay.  So I guess you took the course twice in

24  one year?

25      A.  I only took the course one time, failed the

12:09:16  1    first time, and then I took it upon myself to keep on

12:09:20  2    studying my books.  And I went -- actually drove up to

12:09:23  3    Austin and passed my test.

12:09:24  4        Q.  I see.  Okay.

12:09:29  5            What positions did you hold as a detention

12:09:31  6    officer there until the time you became an auto theft

12:09:31  7    investigator?

12:09:40  8        A.  Okay.  I started as a regular jailer working

12:09:43  9    the pod areas.

12:09:44 10        Q.  What's that?

12:09:45 11        A.  The pod areas where, basically -- we call them

12:09:47 12    pods.

12:09:48 13        Q.  Okay.

12:09:48 14        A.  It's like you have -- back then --

12:09:50 15        Q.  Is it a pod or a pot?  P-O-D or P-O-T?

12:09:54 16        A.  P-O-D.

12:09:55 17        Q.  Pod.  Okay.

12:09:58 18        A.  And back then in DC -- when I started in DC-1,

12:10:02 19    we had three pods.

12:10:03 20        Q.  Is DC-1 a minimum security place?

12:10:08 21        A.  Yes, sir.

12:10:08 22        Q.  Okay.

12:10:08 23        A.  And I started there, worked myself up to become

12:10:11 24    an assistant sergeant, once I passed my TCLEOSE exam,

12:10:18 25    and I went over to DC No. 2.

12:10:22 1    Q.   That's the medium security facility?

12:10:24 2    A.   Yes, sir.

12:10:24 3    Q.   Okay.

12:10:24 4    A.   And I started there as an assistant supervisor

12:10:28 5    for Sergeant Esparza.

12:10:29 6    Q.   Okay.

12:10:34 7    A.   From there, it took me about -- say about six

12:10:39 8    more months, somewhere around that area, and then

12:10:41 9    became a supervisor, a sergeant, what we call

12:10:41 10   sergeant --

12:10:44 11   Q.   Okay.

12:10:44 12   A.   -- of DC No. -- went over to DC No. 1.

12:10:49 13   Q.   You went back to DC No. 1 as a supervisor?

12:10:53 14   A.   That's a supervisor.

12:10:53 15   Q.   Okay.  What was your position in April of 2001?

12:10:58 16   A.   I was a sergeant at the old Cameron County

12:11:00 17   Jail.

12:11:00 18   Q.   A sergeant.

12:11:01 19        Is that the maximum security --

12:11:03 20   A.   Yes, sir.  That is a maximum security.

12:11:06 21   Q.   Now, were you -- did you ever -- in your

12:11:09 22   capacity as a jailer, whatever rank that you held, did

12:11:14 23   you ever act as a booking officer?

12:11:17 24   A.   At no time, sir.

12:11:18 25   Q.   No time.

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755    (956) 542-1020

12:11:19  1          Did you ever act as classification

12:11:21  2    officer?

12:11:30  3          A.  At no time.

12:11:30  4          Q.  Did you ever act as an infirmary officer, in

12:11:30  5    other words, assigned to the infirmary?

12:11:30  6          A.  At no time, sir.

12:11:30  7          Q.  At no time.  Okay.

12:11:33  8              You did -- as a sergeant then, you were a

12:11:36  9    supervisory officer, though, for one or more different

12:11:40 10    detention facilities; is that correct?

12:11:44 11          A.  No, sir.  Once you get assigned to a facility,

12:11:46 12    to a detention, you are the only supervisor in that

12:11:48 13    area besides two more.  We have -- every facility --

12:11:53 14    every facility has three supervisors.  That's the A

12:11:56 15    shift, B shift, and the C shift.

12:11:57 16          Q.  I see.  When you got -- when did you get

12:12:00 17    assigned to the old county jail?

12:12:17 18          A.  I don't recall, but I would say in February,

12:12:21 19    beginning of February of 2001.

12:12:23 20          Q.  2001, sometime before April 2001, sometime in

12:12:29 21    that year.

12:12:29 22          A.  That is correct.

12:12:29 23          Q.  Okay.  And when you got assigned to that

12:12:31 24    position at the old county jail, the maximum security

12:12:36 25    and the intake -- would that be fair to classify it

12:12:40 1   both as an intake and the maximum security facility?

12:12:43 2       A.  Yes, sir.

12:12:45 3       Q.  Okay.  What was your position there?

12:12:48 4       A.  A supervisor for -- I believe I had, back then,

12:12:54 5   ten other detention officers at the time.

12:12:57 6       Q.  So you were a sergeant.

12:12:58 7       A.  Yes, sir, correct.

12:13:00 8       Q.  Okay.  And the -- being a supervisor, did you

12:13:04 9   also supervise a booking officer -- office -- officer?

12:13:09 10  I'm sorry.

12:13:11 11      A.  Yes, sir.  In a way, but they had their own

12:13:13 12  supervisor as well.

12:13:16 13      Q.  Okay.  Who -- on April 11th, 2001, who was

12:13:20 14  the -- on each shift, did they have a booking

12:13:24 15  supervisor on each shift for the booking office?

12:13:27 16      A.  No, sir.  They only have one.  And if I'm not

12:13:32 17  mistaken, I believe it was Kevin Crossly.

12:13:36 18      Q.  Was he a lieutenant or what rank?  Do you know?

12:13:42 19      A.  During that time, if I'm not mistaken, he was a

12:13:44 20  corporal.  And then at a later time, I believe he

12:13:49 21  became a lieutenant.  I'm not quite sure whether,

12:13:50 22  during that time, he was a lieutenant or a corporal.

12:13:52 23      Q.  Okay.  Well, I take it somewhere in between he

12:13:55 24  became a sergeant, right?

12:13:56 25      A.  In between, I believe.

12:13:59 1    Q.  Okay.  And was that person assigned to the

12:14:03 2   actual old county jail as a supervisor, whatever his

12:14:08 3   rank was?

12:14:09 4    A.  Are we talking about Kevin Crossly, correct?

12:14:14 5    Q.  Yes.

12:14:15 6    A.  He was assigned to the old Cameron County Jail.

12:14:17 7    Q.  Okay.  And where was his office?  Did he have

12:14:19 8   an office?

12:14:19 9    A.  Yes, sir, he did.

12:14:20 10    Q.  Where was his office?

12:14:24 11    A.  Near the single cell No. 1.  Okay.  First we

12:14:28 12   had -- right across was a lieutenant's office, okay,

12:14:33 13   that single cell No. 1.

12:14:33 14    Q.  Okay.

12:14:35 15    A.  It was a hallway, okay, coming in from the

12:14:38 16   booking area.  And then there was a wall, okay, right

12:14:42 17   in front of single cell No. 1.  Then we had Kevin

12:14:46 18   Crossly's office.  And I believe there was two more

12:14:49 19   other employees in the classification -- in his office

12:14:52 20   as well.

12:14:54 21    Q.  Was the booking officer in charge to supervise

12:14:58 22   the booking office, was he also a classification

12:15:01 23   officer?

12:15:03 24    A.  He had training as well in there.  He used to

12:15:06 25   be a booking officer as well.

| | |
|---|---|
| 12:15:07 1 | Q.  Oh, okay. |
| 12:15:08 2 | A.  Yes, sir. |
| 12:15:08 3 | Q.  But was he also -- who was classified on your |
| 12:15:11 4 | shift as a classification officer?  Do you recall? |
| 12:15:17 5 | A.  I don't recall, sir. |
| 12:15:18 6 | Q.  Do you recall any of the classification names |
| 12:15:21 7 | of any of the classification officers in April of 2001? |
| 12:15:31 8 | A.  I believe we had some changes, but I'm not |
| 12:15:36 9 | quite sure during that time whether we had Chris |
| 12:15:48 10 | Maldonado.  I don't know if Martha Gutierrez was there |
| 12:15:50 11 | at the time.  She's not with us no more. |
| 12:15:55 12 | Q.  Okay. |
| 12:16:00 13 | A.  I'm not quite sure whether Mario Vera as well. |
| 12:16:04 14 | Q.  Okay.  Did you -- did an officer have to have |
| 12:16:07 15 | special training to be a classification officer? |
| 12:16:10 16 | A.  Yes, sir. |
| 12:16:11 17 | Q.  Above and beyond being a normal detention? |
| 12:16:15 18 | A.  If you get assigned to the classification or |
| 12:16:17 19 | booking department -- |
| 12:16:18 20 | Q.  Yes, sir. |
| 12:16:19 21 | A.  -- you have to go through some training. |
| 12:16:21 22 | Q.  Further training. |
| 12:16:22 23 | A.  Yes, sir. |
| 12:16:24 24 | Q.  Okay.  Does a booking officer get further |
| 12:16:26 25 | training in any medical information, to your knowledge? |

12:16:30  1      A.   To my knowledge, I have no idea, sir.  I don't

12:16:32  2    know.

12:16:33  3      Q.   How about a classification officer?

12:16:35  4      A.   I don't know again, sir, on that area -- in

12:16:36  5    that area.

12:16:38  6      Q.   Okay.  Now, we have a -- let me show you what's

12:16:43  7    been marked as Silva No. 2 and No. 3.  And this is --

12:16:50  8    you knew Mr. Silva?

12:16:52  9      A.   Yes, sir.

12:16:52  10     Q.   He came in here, and we went out by his

12:16:55  11   motorcycle and looked at it, right?

12:16:57  12     A.   Yes, sir.

12:16:57  13     Q.   I take it you knew him from the jail.  Is that

12:17:00  14   also correct?

12:17:01  15     A.   Yes, sir.

12:17:01  16     Q.   Okay.  Let me show you some diagrams that he

12:17:05  17   drew.  And you take a look at it.  And if you see

12:17:07  18   anything that you recall any different, I want you to

12:17:10  19   draw it for me.  Okay?  Don't mark on those that I gave

12:17:14  20   you.

12:17:15  21     A.   No, sir.

12:17:15  22     Q.   But if you recall anything that's any

12:17:17  23   different -- people's memories change.

12:17:29  24          MR. VITTITOE:  Tell me about it.

12:17:33  25          MR. BERGER:  The older you get, the less

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366     (956)428-0755     (956)542-1020

12:17:35  1    you remember.

12:17:59  2                    THE WITNESS:  I don't recall a third

12:18:01  3    single cell.

12:18:02  4         Q.  Okay.

12:18:02  5         A.  Okay.  Possibly what he's trying to mention

12:18:05  6    here that -- well, the briefing area.

12:18:07  7                    MR. VITTITOE:  He couldn't remember, for

12:18:09  8    the record.

12:18:09  9         Q.  He couldn't remember if there were two or three

12:18:11 10    padded -- you call it a padded cell?

12:18:14 11         A.  Padded cell, single cells.

12:18:15 12         Q.  Single cells.

12:18:17 13         A.  Yes, sir.

12:18:17 14         Q.  He couldn't remember whether there were two or

12:18:19 15    three, and one was used for a storage area, or there

12:18:23 16    was two and one was used for storage.

12:18:25 17         A.  It was two.

12:18:26 18                    This is the offices I'm talking about.

12:18:28 19    The first one is the lieutenant's office.

12:18:38 20         Q.  You're pointing to where Sergeant Silva marked

12:18:38 21    with "office" on there.

12:18:38 22         A.  Yes, sir.  This is a lieutenant's office, and

12:18:38 23    back here is the classification department office.

12:18:39 24         Q.  Okay.  The classification is the blank office

12:18:43 25    where, on the diagram, it's on top of the -- where it

12:18:50 1    says "office."

12:18:53 2        A.  Correct.

12:18:54 3        Q.  Okay.  Where would the booking supervisor's

12:18:57 4    office be?

12:19:00 5        A.  Right above the lieutenant's office.

12:19:02 6        Q.  Okay.  Right above the lieutenant's office on

12:19:04 7    that diagram.

12:19:05 8        A.  Yes, sir.

12:19:06 9        Q.  Okay.  On Exhibit No. 2.

12:19:07 10       A.  Correct.

12:19:07 11       Q.  Silva No. 2.

12:19:09 12           And the classification officer would be

12:19:13 13   right above him?

12:19:16 14       A.  Right above the lieutenant's office?  That's

12:19:18 15   what you're trying to tell me?

12:19:19 16       Q.  Is it right above the booking supervisor or

12:19:22 17   right above the lieutenant's office also on that -- on

12:19:27 18   No. 2?

12:19:28 19       A.  Okay.  Can you repeat the question.  I'm sorry,

12:19:31 20   sir.

12:19:31 21       Q.  Okay.  As I understand it, there's a booking

12:19:33 22   officer who is in the booking area.

12:19:36 23       A.  Right here, yes, sir.

12:19:37 24       Q.  Okay.  What's marked "booking area" on the

12:19:39 25   diagram.

12:19:41 1       A.   Correct.

12:19:41 2       Q.   Okay.   On Silva No. 2.

12:19:43 3            You mentioned that there was a person that

12:19:46 4   was supervisor, specifically a supervisor over the

12:19:49 5   booking department that was either a corporal or a

12:19:55 6   lieutenant depending on the time period.

12:19:57 7       A.   Uh-huh.

12:19:57 8       Q.   Where would his office be?   The same area as

12:20:04 9   the classification office?

12:20:05 10      A.   Yes, sir.   In the same area.

12:20:06 11      Q.   Okay.   Would there be two separate offices or

12:20:07 12  just one office?

12:20:08 13      A.   It's a big office, sir, where the -- actually,

12:20:10 14  it had three desks in there.

12:20:10 15      Q.   Three desks.

12:20:12 16           Who would be the third person?   The

12:20:15 17  classification officer, the booking supervisor officer,

12:20:18 18  supervisor, and who would be the third, the third desk,

12:20:22 19  if you recall?

12:20:27 20      A.   Two desks would be for classification and one

12:20:31 21  for Lieutenant Crossly.

12:20:34 22      Q.   Okay.

12:20:35 23      A.   For -- I'm sorry.   For the supervisor of the

12:20:36 24  booking department.

12:20:37 25      Q.   Okay.

12:20:38  1      A.  Okay?

12:20:38  2      Q.  And then the lieutenant's office would be -- in

12:20:43  3  other words, the lieutenant would have overall

12:20:44  4  responsibility for that facility?

12:20:46  5      A.  Yes, sir.  For overall -- for the

12:20:48  6  classification and booking department.

12:20:50  7      Q.  Okay.  And detention?

12:20:52  8      A.  As well.  He would get involved, yes, sir.

12:20:54  9      Q.  Okay.  And he had a separate office where it's

12:21:01 10  marked "office" on there?

12:21:02 11      A.  The supervisor of the booking and

12:21:03 12  classification?

12:21:04 13      Q.  No.  The lieutenant.

12:21:05 14      A.  The lieutenant?

12:21:06 15              He would have his own office here.

12:21:09 16      Q.  Okay.

12:21:09 17      A.  For the whole facilities and the two other

12:21:11 18  facilities.

12:21:12 19      Q.  I see.  Okay.

12:21:13 20      A.  Yes, sir.

12:21:13 21      Q.  So he would be over the two other facilities

12:21:15 22  too?

12:21:16 23      A.  This would be the main office for the whole

12:21:17 24  lieutenants.

12:21:18 25      Q.  Is there -- was there a captain at the time

12:21:22 1    that was in charge of the jail?

12:21:23 2        A.   It was Joe Elizarde.  He was our captain at the

12:21:28 3    time.

12:21:28 4        Q.   Where would his office be?

12:21:30 5        A.   Where it says sheriff's office, it would be a

12:21:33 6    hallway.  We had a door there to the administration.

12:21:33 7        Q.   To administration.

12:21:35 8        A.   Yeah.  The captain would be in the

12:21:37 9    administration facility, the administration office.

12:21:39 10        Q.   Would he also be the chief jailer, the captain,

12:21:44 11    or considered chief jailer?

12:21:48 12        A.   Well, you can say that.  Yes, sir.

12:21:50 13        Q.   Okay.  And then the captain reported to the

12:21:53 14    sheriff?

12:21:54 15        A.   To Chief Mendoza, which was the chief in

12:21:57 16    general of patrol.

12:21:58 17        Q.   I see.  And then the chief reported to the

12:22:00 18    sheriff.

12:22:01 19        A.   To the sheriff.

12:22:01 20        Q.   I see.  Okay.  And they were all over in the

12:22:07 21    administration office, is that right, the captain, the

12:22:07 22    chief, and the sheriff?

12:22:08 23        A.   Yes, sir.

12:22:11 24        Q.   Okay.  And would the lieutenant supervise the

12:22:15 25    jails -- and it was actually located in the jails --

12:22:19  1    would he -- was his a 9:00-to-5:00 type of job, or did

12:22:23  2    he have a shift, or do they have different shifts for

12:22:27  3    lieutenants or what?

12:22:28  4         A.   The lieutenants, they would --

12:22:31  5         Q.   This is April 2001.  I know it may have changed

12:22:35  6    from time to time.

12:22:35  7         A.   Yes, sir, it did.  Back then, if not mistaken,

12:22:38  8    it was from 8:00 to 4:00, 8:00 in the morning until 4

12:22:42  9    p.m.

12:22:42 10         Q.   Okay.  Was there any other supervisory besides

12:22:46 11    sergeants on duty at other times, midnight shift,

12:22:52 12    besides being on call?

12:22:55 13         A.   Basically, at all times, whether it would be

12:22:58 14    the A, B, C shift, we would always be as supervisors,

12:23:02 15    and if the sergeant would not be there, we had an

12:23:06 16    assistant sergeant.

12:23:07 17         Q.   I understand.  I'm talking about, would there

12:23:08 18    be a lieutenant there at all times?

12:23:10 19         A.   At all times during midnight?  No, sir.  At

12:23:13 20    that time, no, sir.

12:23:19 21         Q.   Okay.  Any other thing that you see --

12:23:23 22         A.   No, sir.

12:23:24 23         Q.   -- on Silva No. 2, which is a diagram of the

12:23:27 24    first floor of the old county jail, or on Silva No. 3,

12:23:35 25    which is Sergeant Silva's diagram of the infirmary area

12:23:39 1    in the old county jail on April 2001?

12:23:57 2                Don't mark on that if you see anything.

12:23:59 3    A.  No, sir.  Where it says "inmates' shower area,"

12:24:02 4    it was divided in two shower areas.

12:24:05 5    Q.  Okay.

12:24:06 6    A.  That's the only --

12:24:07 7    Q.  Two -- one for what and one for what?

12:24:10 8    A.  For two inmates.

12:24:11 9    Q.  I see.  There were two shower stalls.

12:24:13 10   A.  With a wall in between.  Yes, sir.  Two shower

12:24:15 11   stalls.

12:24:18 12   Q.  Okay.  Was there a separate shower area for

12:24:20 13   women?

12:24:21 14   A.  In the infirmary, sir?

12:24:23 15   Q.  Yes, sir.

12:24:23 16   A.  There was no women.

12:24:25 17   Q.  No women in the infirmary?

12:24:29 18   A.  No, sir.

12:24:29 19   Q.  What happened to a woman that had a medical

12:24:30 20   problem?

12:24:33 21   A.  At the old county jail, if not mistaken, in the

12:24:36 22   second floor, we had females.  They would have -- I

12:24:42 23   have never went into those areas too much unless we had

12:24:45 24   an emergency in there.

12:24:47 25               I believe, as well, they had their own

12:24:48  1    single cells.  And I believe single cell No. 1, on both

12:24:54  2    sides they had a single cell No. 1.  I believe that's

12:24:56  3    where, by any chance, any medical problems, they would

12:25:00  4    take care of them as well there.  I might be wrong

12:25:03  5    again.

12:25:03  6         Q.  Okay.  That's fine.

12:25:04  7              And I noticed on Silva No. 2 that there

12:25:15  8    was a shower area apart from the infirmary.  Is that

12:25:15  9    where the general population that was still on floor

12:25:16 10    No. 1 went for their showers?

12:25:18 11         A.  Okay.  You're talking about Exhibit No. 2, the

12:25:21 12    showers area?

12:25:22 13         Q.  Yes.  Where it says "showers."

12:25:24 14         A.  Okay.  These showers here were used for the

12:25:27 15    intakes that we had.  Basically, that shower would be

12:25:31 16    used for that.

12:25:33 17         Q.  For people -- and I take it people who were on

12:25:35 18    floor No. 1 were either in holding cells for intakes,

12:25:39 19    for booking and classification purposes or for being in

12:25:46 20    the infirmary; is that right?

12:25:48 21         A.  Here in this floor, again, where I'm seeing

12:25:50 22    "shower," this one was never used for infirmary

12:25:53 23    purposes.

12:25:53 24         Q.  I understand that.  But I mean, whatever we see

12:25:57 25    on floor No. 1, floor No. 1 was used for intake,

12:26:01 1    administration of the jail, and for infirmaries, and

12:26:05 2    for the kitchen, cooking the food and stuff.

12:26:09 3        A.  Correct.  As -- well, this is the first floor

12:26:10 4    as well.

12:26:11 5        Q.  Yes.  Well, we just -- all he did was just draw

12:26:16 6    a bigger picture of what's in the infirmary, what's on

12:26:19 7    No. 3 than what's on No. 2.

12:26:21 8        A.  Uh-huh.

12:26:24 9        Q.  Now, since you -- if you were a supervisor,

12:26:28 10   would you ever get involved with the intake aspect of

12:26:33 11   taking a prisoner in?

12:26:37 12       A.  I did get involved once we had the prisoners

12:26:39 13   coming in, yes, sir.

12:26:41 14       Q.  Okay.  I mean, sometimes you had more than one

12:26:43 15   prisoner coming in, right?

12:26:44 16       A.  It was a rush, a rush in that old county jail.

12:26:47 17   Yes, sir.

12:26:47 18       Q.  Okay.  You've got people from the courthouse

12:26:49 19   that had been arraigned.  You've got people from the

12:26:53 20   federal.  You've got -- all over, right?

12:26:55 21       A.  Correct, sir.  Different agencies coming in.

12:26:58 22       Q.  Okay.  So you just -- you might have assisted

12:27:02 23   the booking officer as a supervisor on your shift when

12:27:06 24   you had a number of people coming in; is that right?

12:27:10 25       A.  The question again?  I'm sorry.

12:27:10  1     Q.   Yeah.

12:27:11  2          If you had a number -- a group of people

12:27:13  3     coming in, you might have assisted the booking officer

12:27:17  4     in asking these prisoners questions; is that right?

12:27:22  5     A.   No, sir.  I never got involved in the

12:27:24  6     classification of asking questions.

12:27:25  7     Q.   Or booking or classification?

12:27:28  8     A.   My only question when they were coming in,

12:27:29  9     whether it would be our agency or any other agency,

12:27:32 10     would be -- is medical.

12:27:35 11     Q.   Okay.

12:27:35 12     A.   "Do you have any medical problems?"

12:27:37 13          "Well, I have a scratch here," or etc.

12:27:41 14          But from there on, I wouldn't ask them no

12:27:44 15     questions whatsoever besides that medical deal.  My

12:27:47 16     concern was the medical deal there.

12:27:52 17     Q.   Okay.  Would you ever see the prisoner's file

12:27:58 18     when they came in that might have had some medical

12:28:00 19     information in it?  In other words, if they came from,

12:28:06 20     say, the city jail and they had some medical treatment

12:28:11 21     or information or whatever problems in that file,

12:28:15 22     whatever the papers that come along, would you ever see

12:28:18 23     those?

12:28:18 24     A.   The only deal that I would see would be where

12:28:22 25     they would bring them in with a -- basically, to commit

12:28:26  1    them back to jail, the medical clearance.

12:28:28  2        Q.   Medical clearance?   Okay.

12:28:29  3        A.   Any other files coming in a file, I would never

12:28:31  4    open that file.   That would be directly to the

12:28:34  5    infirmary.   Okay.   But the only thing that I would see,

12:28:37  6    from whether Brownsville PD or any other agency, would

12:28:40  7    come in with a medical clearance from a hospital.

12:28:43  8        Q.   Okay.   Where would you see that?   Where would

12:28:45  9    that be?

12:28:46 10        A.   The police officer would be carrying them with

12:28:49 11    him besides any probable cause or affidavits he had

12:28:55 12    with him.

12:28:55 13        Q.   Okay.   And would he -- would that officer

12:28:58 14    bringing the prisoner ·in, say, from the City of

12:29:03 15    Brownsville, would they -- he present that to the

12:29:06 16    booking officer or the receiving officer, or would he

12:29:08 17    give it to you as a supervisor?

12:29:10 18        A.   It would go through us first.   Okay?

12:29:12 19        Q.   When you say "us," who is us?

12:29:14 20        A.   Okay.   It would be the supervisors.

12:29:16 21        Q.   Okay.

12:29:17 22        A.   Correction.   Supervisors.

12:29:19 23             Again, not at all times we would actually

12:29:22 24    be there at the entrance receiving inmates.   I just

12:29:24 25    want to bring that for the record.   Okay?

12:29:28 1        And when I would be there, I would ask the
12:29:32 2   prisoner his medical, how was he doing medically, any
12:29:37 3   hepatitis, anything like that.
12:29:39 4        He would say, "No."
12:29:39 5        I would ask, again, the officer, "Any deal
12:29:42 6   that you have with this gentleman in the medical deal?"
12:29:45 7        "Well, he's cleared by the hospital."
12:29:47 8        "Can I see the receipt?"
12:29:48 9        He would show me the receipt.  I would
12:29:50 10  give it back to the officer, and his responsibility was
12:29:52 11  to take it to the booking officer.
12:29:58 12  Q.  Okay.  If you weren't there, who would do that
12:30:00 13  type of thing?
12:30:01 14  A.  What we call -- would be the runners.
12:30:05 15  Q.  The runners.
12:30:06 16       Okay.  But people under your supervision.
12:30:07 17  A.  The detention officers.  Correct.
12:30:09 18  Q.  Detention officers.  Okay.
12:30:10 19       So they would act like -- kind of like a
12:30:12 20  receiving officer.
12:30:14 21  A.  Correct.
12:30:15 22  Q.  Okay.  They received the file, look at it for
12:30:18 23  medical stuff, medical clearance, and then they -- if
12:30:23 24  it was medical clearance, they'd take it to the booking
12:30:25 25  officer.

12:30:26 1    A.  Correct.  Again --

12:30:27 2    Q.  The prisoner.

12:30:29 3    A.  Correct.

12:30:29 4         The officer would get back to the police

12:30:33 5    officer or any other agency for them to be responsible

12:30:35 6    to take it to the booking department.

12:30:38 7    Q.  Now, if you got some information about a

12:30:44 8    clearance slip that says you're clear to go back to

12:30:48 9    jail but keep under close observation, did you see any

12:30:53 10   such slip regarding Mr. Longoria?

12:30:59 11   A.  Well, true, honestly, no, sir.  I had never

12:31:11 12   seen one of those.

12:31:11 13   Q.  Okay.  Have you ever seen a slip like that?

12:31:11 14   A.  No, sir, not at all.

12:31:11 15   Q.  So you wouldn't know what you would do with

12:31:11 16   that type of thing?

12:31:11 17   A.  Not that I wouldn't know what to do.  I would

12:31:11 18   bring it up to the infirmary department for them to

12:31:15 19   take care of it.

12:31:16 20   Q.  Okay.  So you would inform the nurse, the

12:31:17 21   nurse's office to take care of that type of situation

12:31:22 22   where you said, "Okay, he's clear to go back to jail

12:31:25 23   but keep under close observation."  You would give it

12:31:28 24   to -- directly -- call the nurse or give it directly to

12:31:31 25   the infirmary?

12:31:33 1    A.  Correct.  Because, you see, what you're telling

12:31:35 2    me or what that slip would state is keep under close

12:31:38 3    observation.  And then you have this slip, basically,

12:31:40 4    coming in from a hospital.  I'm no medical expert or

12:31:44 5    know what's going on with this person.  I would refer

12:31:50 6    it to the infirmary department.

12:31:51 7    Q.  Okay.  For whatever --

12:31:52 8    A.  For whatever reason.

12:31:54 9    Q.  Okay.  If it came in to you.

12:31:56 10    A.  Correct.

12:31:58 11    Q.  Okay.  Assuming that that's what it said,

12:31:59 12    that's what you would do.  Is that -- you understand

12:32:03 13    the policy and procedure of the sheriff's office to

12:32:07 14    refer that type of situation to the infirmary?

12:32:10 15    A.  Yes, sir, I do.

12:32:11 16    Q.  Is there an infirmary box or place where that

12:32:16 17    type of information is placed, or would you call the

12:32:19 18    nurse on the telephone, assuming there's one available?

12:32:23 19    A.  Basically, in my deal, I would never put

12:32:26 20    anything in an infirmary box.  I would always bring it

12:32:28 21    up to the infirmary, especially when I was taking an

12:32:31 22    intake into our facility.

12:32:33 23    Q.  Okay.  You would make sure that that was --

12:32:36 24    there was no slip in the lip, so to speak.  You would

12:32:39 25    directly refer that.

12:32:41 1     A.   That is me, sir.

12:32:43 2     Q.   Okay.  Is that -- I know that's you, but is

12:32:46 3     that, do you understand, the policy and procedure of

12:32:48 4     the sheriff's department?

12:32:49 5     A.   Correct.  Yes, sir.

12:32:54 6     Q.   Okay.  Now, your shift was the -- at that time,

12:32:57 7     April 11th, 2001 -- you can refer to your statement if

12:33:01 8     you wish.  Your shift was the graveyard shift.  What do

12:33:05 9     you call that?  Shift C or --

12:33:07 10    A.   Yes, sir.  Correct.

12:33:08 11    Q.   You had the graveyard shift.

12:33:10 12         On the graveyard shift, how many -- or

12:33:13 13    were there any nurses in the -- or anybody in the --

12:33:17 14    medical personnel in the infirmary on duty at that

12:33:23 15    time?

12:33:24 16    A.   Not at the time, sir.

12:33:25 17    Q.   Okay.  Has that changed any since, for that

12:33:30 18    period of time, that time period, the graveyard shift,

12:33:34 19    to your knowledge, you know, either what you know

12:33:38 20    personally or what somebody told you?

12:33:40 21    A.   Again, now?

12:33:42 22         There's been changes.  I haven't worked

12:33:43 23    for the jail for about, actually, two years already.

12:33:46 24    Q.   Yeah.  At the time you left the jail.

12:33:48 25    A.   At the time, usually, nurses would leave.  The

12:33:51  1    latest would be somewhere around 10:30, 11:00, because

12:33:56  2    they would stay to pass out medications, check files,

12:34:00  3    check the intakes we had for the incoming morning shift

12:34:04  4    so they won't be backed up.  But the latest that I

12:34:07  5    remember would be somewhere around 10:30, 11:00 the

12:34:12  6    most that we had --

12:34:13  7        Q.   At night.

12:34:14  8        A.   -- a nurse.  Yes, at night.

12:34:15  9        Q.   Okay.  And then there would be a nurse on call;

12:34:16 10    is that correct?

12:34:17 11        A.   That is correct.

12:34:21 12        Q.   Okay.  Did you ever work any other shifts, A

12:34:23 13    and B shifts?

12:34:24 14        A.   Oh, yes, sir.

12:34:25 15        Q.   How many nurses would be on the -- A shift was

12:34:28 16    the morning shift?

12:34:29 17        A.   Correct.

12:34:29 18        Q.   How many nurses would there be on the morning

12:34:33 19    shift, if you recall, there present, not on call?

12:34:40 20        A.   Present.  We're talking, in general, the three

12:34:43 21    facilities now back then?

12:34:45 22        Q.   Old county jail.

12:34:46 23        A.   The old county jail?

12:34:48 24        Q.   At the old county jail.

12:34:49 25        A.   That would be the base of the other two jails.

| | |
|---|---|
| 12:34:54 1 | In that area, in that old county jail, approximately |
| 12:34:56 2 | about three nurses. |
| 12:34:58 3 | Q.  Okay.  And that would be on the B shift as |
| 12:35:00 4 | well? |
| 12:35:00 5 | A.  On the A shift and on the -- the B shift, |
| 12:35:11 6 | again, starting the B shift, some nurses would be -- |
| 12:35:14 7 | Q.  There may be some overlap. |
| 12:35:16 8 | A.  Yeah.  There would be some nurses leaving, and |
| 12:35:17 9 | we would have two nurses for all three facilities. |
| 12:35:21 10 | MR. VITTITOE:  Could we go off the record? |
| 12:35:21 11 | (Discussion off the record) |
| 12:35:57 12 | Q.  There's an A, B, C shift for the sheriff's |
| 12:36:01 13 | officers. |
| 12:36:02 14 | A.  That is correct. |
| 12:36:04 15 | Q.  Okay.  And as it was explained to us that the |
| 12:36:05 16 | nurses actually worked for the County Health |
| 12:36:09 17 | Department; is that correct? |
| 12:36:10 18 | A.  Yes, sir. |
| 12:36:10 19 | Q.  And there may be more than three shifts for the |
| 12:36:13 20 | nurses. |
| 12:36:15 21 | A.  Possibly. |
| 12:36:17 22 | MR. VITTITOE:  They have overlapping |
| 12:36:17 23 | shifts. |
| 12:36:18 24 | Q.  But whatever it was, there wasn't any nurses |
| 12:36:20 25 | there after 11:00 to what?  7:00 in the morning?  6:00 |

| | |
|---|---|
| 12:36:26 1 | in the morning? |
| 12:36:26 2 | A.  Correct. |
| 12:36:27 3 | Q.  Okay.  I mean, present, not on call. |
| 12:36:30 4 | Okay.  And -- but did you have -- from |
| 12:36:37 5 | 11:00 to 7:00 when you had the graveyard shift, did you |
| 12:36:41 6 | actually receive prisoners at that time? |
| 12:36:52 7 | A.  I don't recall getting any other prisoners |
| 12:36:55 8 | during this period of time. |
| 12:36:56 9 | Q.  No.  I mean just in an 11:00-to-7:00 period, |
| 12:37:00 10 | not on the time that -- |
| 12:37:01 11 | A.  That this incident happened? |
| 12:37:02 12 | Q.  -- this happened.  Anytime. |
| 12:37:04 13 | A.  Yes, sir. |
| 12:37:05 14 | Q.  You got prisoners in without a nurse being |
| 12:37:08 15 | present; is that right? |
| 12:37:09 16 | A.  Yes, sir. |
| 12:37:10 17 | Q.  If you thought or somebody thought the |
| 12:37:13 18 | person -- or if they said they had a medical problem, |
| 12:37:15 19 | you'd call the nurse up? |
| 12:37:17 20 | A.  Yes, sir. |
| 12:37:17 21 | Q.  "Come over and look at him"? |
| 12:37:18 22 | A.  Yes, sir. |
| 12:37:21 23 | Q.  Okay.  But there was no medical personnel in |
| 12:37:23 24 | the infirmary. |
| 12:37:24 25 | A.  No, sir. |

12:37:30 1     Q.  Okay.  Now, Sergeant -- looking at your

12:37:32 2     statement, the second paragraph, Sergeant Tenorio was

12:37:38 3     the second shift supervisor?

12:37:40 4     A.  Correct.  The B shift supervisor.

12:37:55 5     Q.  Okay.  And it says here, I didn't see Sergeant

12:37:55 6     Tenorio look inside the padded cell to check on the

12:37:55 7     inmate.

12:37:55 8          But you were told that there was somebody

12:37:55 9     in padded cell No. 1; is that correct?

12:37:57 10    A.  Yes, sir.  Upon being briefed by Sergeant

12:37:59 11    Tenorio.

12:38:00 12    Q.  Did you go check padded cell No. 1 at that

12:38:03 13    time?

12:38:03 14    A.  No, sir.

12:38:05 15    Q.  Okay.  Did you send anybody to go check on

12:38:07 16    padded cell No. 1 at that time when you came in?

12:38:12 17    A.  No, sir.

12:38:14 18    Q.  Okay.  Did you see whether or not there was a

12:38:16 19    log, a visual log on padded cell No. 1 at that time to

12:38:20 20    see if somebody was checking -- to see if there was a

12:38:24 21    log checking in on that prisoner in padded cell No. 1?

12:38:27 22    A.  No, sir.

12:38:28 23    Q.  What were you told by Sergeant Tenorio about

12:38:30 24    the -- that prisoner when you were briefed by him?

12:38:39 25    A.  That he was brought in by Brownsville Police

12:38:43  1    Department and that supposedly earlier on the A shift,

12:38:50  2    Sergeant Silva's shift, this person in single cell No.

12:38:56  3    1, I believe, had had some kind of problem in the large

12:38:59  4    holding cell with some other inmates that supposedly

12:39:04  5    wanted to beat him up.

12:39:06  6        Q.  Oh, okay.  So he was just -- he was being held

12:39:09  7    in the padded cell pending booking?

12:39:13  8        A.  Well, the reason -- what I heard -- when

12:39:17  9    Mr. Longoria was taken out of the large holding cell

12:39:20 10    was for his own safety and the safety of others.

12:39:23 11        Q.  I understand.  Somebody was threatening to beat

12:39:26 12    him up or something or he was complaining about

12:39:27 13    somebody threatening to beat him up or harm him

12:39:30 14    physically; is that right?

12:39:31 15        A.  Correct.

12:39:32 16        Q.  And so is what you understood, he was taken out

12:39:36 17    and put in padded cell No. 1 as kind of a holding cell

12:39:39 18    for him?

12:39:41 19        A.  Correct.

12:39:44 20        Q.  A segregated holding cell.

12:39:45 21        A.  Correct.  Because at the time, the drunk tank

12:39:47 22    was packed as well.

12:39:49 23        Q.  And the small holding cell was also packed?

12:39:50 24        A.  We had -- I'm not familiar, but if not

12:39:55 25    mistaken, we had about four or somewhere around there

| | | |
|---|---|---|
| 12:39:58 | 1 | other prisoners as well. |
| 12:39:59 | 2 | Q. In the small holding cell? |
| 12:40:00 | 3 | A. In the small holding cell right next to the |
| 12:40:02 | 4 | large holding cell. |
| 12:40:04 | 5 | Q. A large holding cell held about how much? |
| 12:40:10 | 6 | A. Gosh. I don't recall. |
| 12:40:11 | 7 | Q. Okay. |
| 12:40:11 | 8 | A. I can't tell you right off the number. |
| 12:40:14 | 9 | Q. We have -- |
| 12:40:15 | 10 | A. Somewhere -- |
| 12:40:19 | 11 | Q. More than 10? |
| 12:40:21 | 12 | A. Yes. |
| 12:40:22 | 13 | Q. Okay. Less than 15? |
| 12:40:24 | 14 | A. Somewhere 10, 15, around that area. |
| 12:40:27 | 15 | Q. Okay. How about the drunk tank, what says the |
| 12:40:29 | 16 | drunk tank? |
| 12:40:30 | 17 | A. That one would fit more than 20, I believe. |
| 12:40:37 | 18 | Q. 20 prisoner? |
| 12:40:38 | 19 | A. 20 prisoners. |
| 12:40:40 | 20 | Q. Okay. Had you ever placed any prisoner in the |
| 12:40:45 | 21 | holding cell, the padded holding cell No. 1, yourself |
| 12:40:52 | 22 | or under your supervision? |
| 12:40:55 | 23 | A. Well, under my supervision, yes. |
| 12:40:58 | 24 | Q. Okay. And what kind of -- what was the problem |
| 12:41:00 | 25 | with that prisoner? Was he suicidal? |

12:41:04 1      A.   In that case, yes, he was suicidal.  And this

12:41:09 2   was the -- I got an approval from the infirmary

12:41:13 3   department in this case because this gentleman, we had

12:41:20 4   a blue suit on this gentleman.

12:41:21 5      Q.   What's a blue suit?

12:41:23 6      A.   It's a paper suit, a blue suit, paper suit,

12:41:25 7   that only has a zipper.  Okay?  And it's a complete

12:41:29 8   uniform suit, paper suit.  And he kept on tearing this

12:41:35 9   uniform off.  Okay?  He tore up the zipper, little

12:41:42 10  metal zipper.

12:41:43 11     Q.   And he tried to cut his wrist with it?

12:41:44 12     A.   Cut himself, yes, sir.

12:41:49 13          And what else?  Another time we had other

12:41:51 14  prisoners in that small holding cell where we had a

12:41:55 15  log.  There was a log on this gentleman, a fluid log,

12:41:59 16  the whole deal.  And every -- if I'm not mistaken, we

12:42:08 17  were doing a log on this gentleman --

12:42:10 18     Q.   You're not talking about Mr. Longoria.  You're

12:42:11 19  talking about somebody else.

12:42:12 20     A.   Somebody else.  Yes, sir.  -- about every ten

12:42:15 21  minutes.

12:42:16 22     Q.   Okay.

12:42:16 23     A.   Or sometimes even lesser than ten minutes.  It

12:42:20 24  was critical.  And that was the only time.  He calmed

12:42:24 25  down after several hours.  He didn't have his uniform

12:42:28  1    on.  There was nothing inside the cell, the single cell

12:42:32  2    No. 1 for him to harm himself.  He was being fed.

12:42:38  3    Okay.  No spoon, just a paper plate.

12:42:44  4        Q.  Okay.

12:42:45  5        A.  And that same day -- I don't recall the hours.

12:42:48  6    It was before my shift ended, which my shift was eight

12:42:52  7    hours at the time.  We brought him out.  He was calm.

12:42:56  8    And we placed him back, still with a log, in the small

12:43:00  9    holding cell right in front of the booking area.

12:43:03 10        Q.  Okay.  As I understand it, the small holding

12:43:05 11    cell is -- has -- just has bars on it; is that right?

12:43:09 12        A.  It has bars and a cement bench.

12:43:12 13        Q.  Okay.  And you can -- somebody just walking

12:43:14 14    past can look in to see how the prisoners are doing in

12:43:17 15    there.

12:43:17 16        A.  Most definitely, yes.

12:43:19 17        Q.  Yeah.  And the large holding cell is the same

12:43:20 18    way; is that correct?

12:43:21 19        A.  That is correct.

12:43:22 20        Q.  With bars.

12:43:23 21            As I understand it, the drunk tank had a

12:43:26 22    steel door type thing, solid steel?

12:43:30 23        A.  Yes, sir.

12:43:30 24        Q.  Or did it have bars?

12:43:32 25        A.  No, sir.  It was a solid metal door with a

12:43:35  1   window on it and a lid for the trays to go in through

12:43:40  2   there.

12:43:40  3       Q.   Okay.   Is that like the holding cell No. 1, the

12:43:42  4   padded cell?

12:43:44  5       A.   That cell particular --

12:43:46  6       Q.   Except for larger.

12:43:47  7       A.   The drunk tank.   That name there was a drunk

12:43:50  8   tank, okay, what we call a drunk tank.   But it was --

12:43:55  9   to my understanding, I never heard anything saying,

12:43:59 10   "Okay.   This is cell No. 1 or No. 2."   We

12:44:02 11   always identified small holding cell, large holding

12:44:05 12   cell, drunk tank.

12:44:06 13       Q.   Okay.

12:44:06 14       A.   And then we had single cell 1.

12:44:09 15       Q.   Okay.   But so there were more -- there was not

12:44:12 16   just drunks in the drunk tank.

12:44:13 17       A.   Oh, no.   No, no, no, no, no.

12:44:17 18       Q.   Okay.   It was just a type of a holding cell.

12:44:21 19       A.   Correct.   Because Cameron County holds a lot of

12:44:31 20   prisoners.   I mean, a lot of agencies work under us.

12:44:31 21   Yes.

12:44:31 22       Q.   Sure.   Federal, border --

12:44:31 23       A.   Yes, sir.

12:44:31 24       Q.   -- customs, all kinds -- immigration, all kinds

12:44:33 25   of stuff probably; is that correct?

| | |
|---|---|
| 12:44:34 1 | A. That is correct, sir. |
| 12:44:38 2 | Q. Okay. The -- so you understood, at least from |
| 12:44:48 3 | Sergeant Tenorio, that the -- there was an inmate in |
| 12:44:53 4 | the padded holding cell No. 1, single cell No. 1, and |
| 12:45:06 5 | you then did a security check; is that right? |
| 12:45:11 6 | A. That is correct, sir. |
| 12:45:12 7 | Q. And Sylvia Santillana -- |
| 12:45:15 8 | A. Santillana. |
| 12:45:16 9 | Q. Santillana. -- was your booking officer? |
| 12:45:18 10 | A. During that night, yes, sir. |
| 12:45:24 11 | Q. And you found out that two of them were going |
| 12:45:24 12 | to leave, and you did a head count. Did that include |
| 12:45:28 13 | checking on Mr. Longoria in padded cell No. 1? |
| 12:45:36 14 | A. When checking the doors? |
| 12:45:38 15 | Q. No. When you checked head count. |
| 12:45:41 16 | A. The head count -- |
| 12:45:42 17 | Q. A head count was then conducted at 11:30 p.m.? |
| 12:45:45 18 | A. Correct. At around 11:30. |
| 12:45:49 19 | Q. Okay. Did you actually count Mr. Longoria's |
| 12:45:53 20 | head? |
| 12:45:53 21 | A. The head count always started from the top. |
| 12:45:55 22 | Q. I see. |
| 12:45:56 23 | A. The third floor towards the bottom. |
| 12:45:57 24 | Q. Okay. |
| 12:45:58 25 | A. Okay? |

12:46:03  1      Q.  Then you decided to clean out your locker.
12:46:05  2  Where was your locker area?
12:46:07  3      A.  I'm going to use Exhibit No. 2.
12:46:10  4      Q.  Silva's Exhibit No. 2?
12:46:11  5      A.  Yes, sir.
12:46:12  6          It was in the briefing area.  My locker
12:46:14  7  was in the briefing area.
12:46:17  8      Q.  Okay.  So you had to pass by padded cell --
12:46:21  9  single cell No. 1.
12:46:22 10      A.  That is correct, sir.
12:46:23 11      Q.  And you -- was the -- I understand there was a
12:46:28 12  steel door over the glass, is that correct, to padded
12:46:32 13  cell No. 1?
12:46:33 14      A.  Yes, sir.  Correct.
12:46:34 15      Q.  Was that door open when you passed by, or did
12:46:38 16  you open it?
12:46:39 17      A.  It was open.
12:46:40 18      Q.  Okay.
12:46:40 19      A.  Yes, sir.
12:46:40 20      Q.  Is it always kept open?
12:46:42 21      A.  Yes, sir.
12:46:43 22      Q.  Okay.  Even when you've got a prisoner that's
12:46:46 23  suicidal?
12:46:47 24      A.  Yes, sir.
12:46:47 25      Q.  Is it a practice or procedure to keep that

12:46:51 1    steel door open so that there's some visibility into

12:46:54 2    there at all times?

12:46:55 3        A.  That is correct, sir.  In my experience there

12:46:58 4    working, which was not too much at the old county jail,

12:47:02 5    I always saw that window open.

12:47:04 6        Q.  Okay.  It would be against procedures and

12:47:05 7    policies to close it?

12:47:07 8                MR. VITTITOE:  Objection, speculation.

12:47:10 9        Q.  Do you know?

12:47:15 10       A.  Being open or closed?

12:47:17 11       Q.  Yes, sir.  If you had -- I mean, if you had a

12:47:21 12   prisoner for whatever reason, would it be against

12:47:26 13   policies or procedures of the sheriff's department,

12:47:29 14   detention, to have it closed, if you know?

12:47:32 15               MR. VITTITOE:  Objection, speculation.

12:47:38 16               THE WITNESS:  True honestly?

12:47:41 17       Q.  Yes.

12:47:42 18       A.  I don't recall seeing it in the book, the

12:47:44 19   policy.

12:47:49 20       Q.  Okay.  So as you passed by, you knew there was

12:47:51 21   an inmate inside, but -- and you stopped.  You didn't

12:48:00 22   just walk past it.  Your assistant Sergeant Galicia

12:48:08 23   stopped at the single cell.  "And he told me that he

12:48:11 24   was going to check out the inmate inside."

12:48:12 25               This was -- was this -- what time was

12:48:14 1    this?  It was after 11:00, right?

12:48:21 2        A.  Yes, sir.  Correct.

12:48:22 3        Q.  And the head count started at 11:30.  It was

12:48:24 4    sometime between 11:00 and 11:30?

12:48:26 5        A.  At around that area, yeah.  The head count

12:48:28 6    actually had started.  It was called out that it been

12:48:31 7    started.  And from there, I decided to go back there

12:48:34 8    and fix my locker, correct.

12:48:40 9        Q.  Okay.  And Assistant Sergeant Galicia told you

12:48:42 10    that he couldn't see any movement, while he was looking

12:48:44 11    inside the window, of the inmate?

12:48:50 12        A.  He didn't actually see -- told me that -- like,

12:48:54 13    that he didn't see no movement.  We were passing by.  I

12:48:56 14    was the first one.  He was in back of me.  I stopped.

12:49:00 15    Okay?

12:49:01 16        Q.  Yes, sir.

12:49:02 17        A.  And then Galicia stopped.  And, like, he

12:49:04 18    reacted saying, you know, "Let's check this guy."

12:49:07 19        Q.  Okay.

12:49:07 20        A.  Okay.  Like at the same time I did.

12:49:09 21        Q.  There was no activity log on the --

12:49:10 22        A.  No, sir.

12:49:11 23        Q.  -- on the door?

12:49:12 24        A.  No, sir.

12:49:12 25        Q.  Okay.

12:49:12  1        A.   I didn't see one.

12:49:13  2             So we glanced in there and started

12:49:15  3   knocking.  And Galicia actually started knocking as

12:49:18  4   well and to no avail.  There was no movement

12:49:21  5   whatsoever.

12:49:21  6        Q.   Okay.  And you told him --

12:49:24  7        A.   To open up single cell No. 1 --

12:49:24  8        Q.   Okay.

12:49:27  9        A.   -- with caution as well.

12:49:29 10        Q.   Yeah.

12:49:29 11        A.   Okay.  Since, at the time, his legs -- I could

12:49:33 12   only visualize his legs, okay, and, like, half of his

12:49:36 13   body from the window.  Okay?

12:49:38 14        Q.   To the floor?

12:49:39 15        A.   To the floor, correct.  Okay?

12:49:41 16             I told him, "Open up carefully," because

12:49:44 17   of his head, you see, obviously, if the body is

12:49:46 18   pointing this way, I believe it's west --

12:49:49 19        Q.   Towards the door?

12:49:50 20        A.   No, not towards the door.  The door is on his

12:49:52 21   head.  That was my deal, that his head was on the door,

12:49:55 22   and once we opened it, he would fall down and wake up

12:49:59 23   and etc.

12:49:59 24        Q.   Okay.

12:50:02 25        A.   But his head was actually leaning, like, near

| | |
|---|---|
| 12:50:02 1 | the door with the door open.  He was kneeling.  His |
| 12:50:05 2 | head was leaning against the small portion of the wall |
| 12:50:08 3 | before, you know, once the door opens.  Okay?  So his |
| 12:50:12 4 | head was leaning -- |
| 12:50:14 5 | Q.  By the door. |
| 12:50:15 6 | A.  -- by the door. |
| 12:50:16 7 | Q.  Okay. |
| 12:50:16 8 | A.  Once he opened it -- |
| 12:50:21 9 | Q.  Okay.  How large is that cell?  Estimate it. |
| 12:50:29 10 | A.  Gosh.  I can't just estimate -- |
| 12:50:32 11 | Q.  Okay. |
| 12:50:32 12 | A.  -- the measurements of that cell. |
| 12:50:35 13 | Q.  Okay.  If there's only a bench inside? |
| 12:50:38 14 | A.  A bench inside? |
| 12:50:40 15 | Q.  Yeah.  Is there a bench inside? |
| 12:50:41 16 | A.  There is a small, like, a bed.  It's not a |
| 12:50:46 17 | bench bench.  It's a small bed cushion bed from the |
| 12:50:49 18 | floor, I'd say, about 8 inches high from the floor. |
| 12:50:57 19 | Q.  Okay.  And that's away from the door so if |
| 12:51:00 20 | somebody is on the bed, you could see them? |
| 12:51:02 21 | A.  Oh, yes, sir. |
| 12:51:03 22 | Q.  Okay.  And there's a recessed urinal in there |
| 12:51:05 23 | or some type of -- |
| 12:51:15 24 | A.  There is a -- |
| 12:51:15 25 | Q.  -- a hole? |

12:51:15  1       A.  Yes, sir.  There is hole there and -- where
12:51:15  2  they could urinate through that area.
12:51:15  3       Q.  Okay.  Now, if you went -- if you went to
12:51:17  4  the -- if you went to the window itself, could you see
12:51:23  5  all parts of that -- and look into the window, could
12:51:26  6  you see all parts of that -- inside of the cell?
12:51:34  7       A.  All parts?
12:51:36  8            I would only see the front portion of the
12:51:38  9  cell, the bed that I was talking about, and that would
12:51:47 10  be -- that would be it.
12:51:48 11       Q.  That would be it.
12:51:49 12       A.  From herein on, okay, if you would be laying
12:51:52 13  down the way Mr. Longoria would be, I wouldn't have
12:51:55 14  access to see, like, from your chest.
12:51:57 15       Q.  Up.
12:51:58 16       A.  Correct.
12:51:59 17       Q.  What you did, you saw his feet, but you
12:52:01 18  couldn't see the rest of him.
12:52:02 19       A.  I couldn't see, like, from his chest up.
12:52:04 20       Q.  Okay.  Mr. Longoria was behind -- all that
12:52:08 21  door, feet and head.  You couldn't see him at all.
12:52:12 22       A.  No.  I could see his feet.
12:52:14 23       Q.  I know, at the time.  But I'm saying if --
12:52:18 24  well, suppose he was standing up behind that door and
12:52:23 25  you looked in the window, could you see him standing up

12:52:26  1    there?

12:52:26  2        A.  Yes.

12:52:29  3                Right behind door?

12:52:31  4        Q.  No.  Beside the door.

12:52:34  5        A.  Away from the door on the sides, yes.

12:52:36  6        Q.  Okay.

12:52:36  7        A.  Yes.

12:52:37  8        Q.  But because his head was laying down, you

12:52:40  9    couldn't see his head.

12:52:42 10        A.  That is correct.

12:52:42 11        Q.  Okay.  If he was laying on the floor away from

12:52:46 12    the door but close to the door, could you see him at

12:52:49 13    all?  Or sitting?  Laying or sitting?

12:52:53 14        A.  Yes.  I would -- unless he would be near the

12:52:56 15    door, sitting down near the door or next to the door, I

12:52:59 16    wouldn't have access to see him.

12:53:39 17        Q.  Okay.  If you were just passing by, a runner or

12:53:43 18    whatever was just passing by with the open -- the

12:53:46 19    window, could you see -- in other words, if you didn't

12:53:51 20    stop to look specifically but were just passing by,

12:53:55 21    could you -- while you're passing, could you visualize

12:53:58 22    the whole interior of the cell?

12:54:01 23        A.  You would have to turn to your right in order

12:54:02 24    to see the cell.

12:54:03 25        Q.  So you'd have to actually look into it.

52

12:54:05  1        A.   Like -- yeah.

12:54:06  2        Q.   Okay.

12:54:06  3        A.   Well, it all depends the way your height is as

12:54:10  4    well.

12:54:10  5        Q.   Sure.  How high off the ground was the window?

12:54:14  6        A.   It wasn't too high and not too low, but we had

12:54:17  7    some guys --

12:54:18  8        Q.   Average height?

12:54:19  9        A.   Yeah.

12:54:22 10        Q.   So then you called for -- you saw him laying --

12:54:29 11    Mr. Longoria was laying face up.  Was his eyes closed?

12:54:36 12    Partially open?

12:54:37 13        A.   When I opened the first time the cell, with

12:54:39 14    Officer Galicia, I saw a complete body with his face

12:54:46 15    up, okay, his chin, actually, somewhere touching his

12:54:51 16    chest.

12:54:51 17        Q.   Yeah.

12:54:52 18        A.   Okay?  And I couldn't see his eyes, whether

12:54:55 19    open or closed.  I had to kneel down a bit.  Okay?

12:54:58 20        Q.   Did he appear -- from the chest down, did he

12:55:00 21    appear gray and ashen?

12:55:02 22        A.   He had his uniform on, sir.

12:55:04 23        Q.   Okay.  How about from the head?  Did his head

12:55:06 24    appear to be gray and ashen?

12:55:13 25        A.   To me, it was the color or the way the light we

12:55:18  1   had in there, stuff like that --

12:55:20  2       Q.  You couldn't tell?

12:55:21  3       A.  -- I couldn't say whether gray or whatever the

12:55:23  4   colors you're mentioning there.

12:55:24  5       Q.  Okay.  I mean, when you first looked at him, he

12:55:26  6   didn't look dead?

12:55:27  7       A.  Excuse me?

12:55:28  8       Q.  When you first looked at him, you couldn't tell

12:55:31  9   whether he looked dead or not?

12:55:33 10       A.  Correct.  Or faking it.

12:55:35 11       Q.  Or faking.

12:55:36 12       A.  Yeah.

12:55:37 13       Q.  Or asleep?

12:55:38 14       A.  Yeah.  Incidents I've had before, encounters.

12:55:41 15       Q.  You've seen faking.

12:55:43 16       A.  Not him, but other inmates.

12:55:46 17       Q.  Yeah.  Did you -- when you came on -- did you

12:55:50 18   ask Officer Tenorio, Sergeant Tenorio, why this inmate

12:55:58 19   in padded cell No. 1 had not been booked and classified

12:56:02 20   yet?

12:56:03 21       A.  No, sir.  That question wasn't -- didn't -- was

12:56:06 22   not brought up by me.

12:56:08 23       Q.  Did anybody tell you what time he had come in?

12:56:11 24   Mr. Longoria?

12:56:13 25       A.  Not at the time.  They just told me in Sergeant

12:56:16 1    Silva's shift.  They didn't specify a time.

12:56:19 2        Q.  Okay.  I mean, normally, what -- how long does

12:56:20 3    it take to book a prisoner?

12:56:27 4        A.  Again, I wouldn't -- not to answer this

12:56:31 5    question, but I wouldn't know because the booking

12:56:34 6    officers, they know the way they come in and the many

12:56:39 7    prisoners they have, they go, you know, the way they

12:56:42 8    come.  They start doing the process with the booking

12:56:45 9    department.

12:56:45 10       Q.  Okay.  And as I -- do you know if -- in other

12:56:50 11   words, you testified what you would do if somebody --

12:56:53 12   you saw that medical slip that I talked about --

12:56:56 13       A.  Correct.

12:56:57 14       Q.  -- you would directly inform the infirmary or

12:57:01 15   the nursing staff about it, but is it typical that once

12:57:10 16   it goes through booking and then classification, then

12:57:13 17   they're seen by the nurse to see if there's any other

12:57:15 18   problems that the nurse may need to take care of to

12:57:17 19   decide where to put the prisoner?

12:57:19 20       A.  It doesn't have to actually work that way, like

12:57:22 21   the way you mentioned, by going through that, unless,

12:57:27 22   again, if that slip pops up or any medical slips, the

12:57:29 23   nurse has to come over to the booking department and

12:57:31 24   see this person, this prisoner.

12:57:34 25       Q.  Okay.  Suppose somehow the slip didn't get

12:57:36  1    there for some reason, it got lost or you wouldn't be

12:57:43  2    there to receive the prisoner.  Would the process be

12:57:49  3    that you go to the booking classification and then the

12:57:52  4    nurse for a normal prisoner?

12:57:58  5        A.  For normal?

12:58:00  6            I believe the nurse gets involved as well,

12:58:03  7    I believe.  I might be mistaken.  Again, I've never

12:58:06  8    worked in that area.  I believe they have to work with

12:58:15  9    classification.

12:58:15 10        Q.  Classification.  Okay.

12:58:15 11            So you have to be booked before you get to

12:58:15 12    classification.

12:58:15 13        A.  Correct.

12:58:15 14        Q.  Okay.  And I take it the booking officer, from

12:58:17 15    what you recognize, is that the prisoner is put into

12:58:20 16    the computer so they know information about the

12:58:24 17    prisoner, what he's charged with.

12:58:25 18            And I take it once they're clear, the

12:58:30 19    classification officer does his thing or her thing,

12:58:33 20    that that's put in the computer also so you can find

12:58:36 21    the prisoner if you have to find him or her; is that

12:58:36 22    right?

12:58:40 23        A.  Correct.

12:58:47 24        Q.  Okay.  So this -- your statement sets out what

12:58:51 25    you did.  And when you found Mr. Longoria, you tried to

12:58:58 1    wake him up. You said you only tapped him a couple of

12:59:01 2    times. Where did you tap him?

12:59:05 3        A. In this area, sir. He was, like -- on his

12:59:10 4    right upper arm, near his shoulders.

12:59:13 5        Q. Near his shoulder?

12:59:14 6        A. Yes, sir.

12:59:14 7        Q. You never put your hand around his neck or

12:59:17 8    anything?

12:59:17 9        A. None whatsoever. And what I hit him was with

12:59:19 10   the back of my palm, my hands. I was tapping.

12:59:22 11       Q. Try to get his -- light tap, trying to get his

12:59:24 12   attention?

12:59:24 13       A. Yes, sir.

12:59:25 14       Q. Okay. Did Officer Galicia put his hand around

12:59:30 15   Mr. Longoria's neck?

12:59:33 16       A. No, sir.

12:59:33 17       Q. Or -- to see if he was faking or anything like

12:59:35 18   that?

12:59:35 19       A. No, sir.

12:59:35 20       Q. Try to get his attention?

12:59:37 21       A. No, sir, not at all.

12:59:38 22       Q. Okay. Did you notice any bruising or

12:59:41 23   discoloration around Mr. Longoria's neck when you saw

12:59:44 24   him?

12:59:45 25       A. No, sir.

12:59:47  1    Q.  Was he in a paper uniform or a cloth uniform?

12:59:52  2    A.  He was in a cloth uniform.

12:59:55  3    Q.  The regular prisoner population uniform?

12:59:58  4    A.  That is correct.  During that night, when I

12:59:59  5  found Mr. Longoria, he was wearing an orange uniform.

13:00:02  6    Q.  An orange uniform.

13:00:04  7    A.  Cloth.

13:00:05  8    Q.  Okay.  Was his -- the neck -- I mean, the

13:00:10  9  uniform open so you could look at the neck?

13:00:14 10    A.  I don't recall whether how many buttons that

13:00:16 11  were tied up, okay, all the way to his neck.  So I

13:00:19 12  can't say whether it was all the way up to his neck.

13:00:22 13    Q.  Okay.  So you don't recall seeing any type of

13:00:24 14  markings on his throat or anything?

13:00:27 15    A.  No, sir.

13:00:28 16    Q.  Okay.  Could you -- did you see the markings on

13:00:29 17  any other part of his body -- bruises, discolorations,

13:00:34 18  anything else?

13:00:35 19    A.  No, sir, not at all.

13:00:37 20    Q.  Okay.  This was a short-sleeve uniform?

13:00:41 21    A.  Yes, sir.  Correct.  Up to his elbow.

13:00:46 22    Q.  Okay.  One thing that's not in your statement,

13:00:47 23  and I want to see if you remember it.  Could you see if

13:00:50 24  there was any food plates in there, food or water, when

13:00:54 25  you went inside that -- opened the door?

13:00:58 1    A.  I don't recall.  The only thing that I do

13:01:00 2  remember was some sandals.

13:01:04 3    Q.  Sandals?

13:01:04 4    A.  Yes, sir.  Some sandals.

13:01:05 5    Q.  So he was barefooted when you found his body?

13:01:08 6    A.  Again, I don't remember whether he had a sandal

13:01:10 7  on or both of them, but I remember -- do seeing one

13:01:13 8  sandal off.

13:01:14 9    Q.  Off.  Okay.

13:01:16 10        But you don't remember seeing any food?

13:01:19 11    A.  I don't recall seeing any food.

13:01:23 12    Q.  I take it that even though -- even, like you

13:01:26 13  said, even a prisoner who's put in there for whatever

13:01:31 14  reason and whether he's suicidal or not, you described

13:01:35 15  the procedure for suicidal is to put paper plates,

13:01:39 16  right?

13:01:39 17    A.  Correct.

13:01:40 18    Q.  But if he's not suicidal or voiced being

13:01:43 19  suicidal, you would have a -- the prisoner is supposed

13:01:47 20  to be fed at normal times; is that right?

13:01:50 21    A.  Okay.  Again, on normal plates or --

13:01:53 22    Q.  Any plate.  Any plate.

13:01:55 23    A.  Okay.  In general, down in the first floor --

13:01:57 24    Q.  Yeah.

13:01:57 25    A.  -- what we call the drunk tank, single cell,

13:02:00  1   large holding cell, small, they all get fed with a

13:02:00  2   paper plate.

13:02:00  3      Q.   Okay.

13:02:05  4      A.   A foam plate, correct.

13:02:05  5      Q.   A foam plate.

13:02:06  6      A.   A foam plate.

13:02:07  7      Q.   Okay.  And although -- if he's not suicidal, he

13:02:09  8   may have some plastic forks or knives or something?

13:02:13  9      A.   If he --

13:02:15  10     Q.   Plastic fork?

13:02:16  11     A.   We don't use any forks.  What they use is a

13:02:19  12  plastic spoon.

13:02:21  13     Q.   A plastic spoon.

13:02:22  14     A.   A plastic spoon.

13:02:23  15     Q.   Okay.  And if they got any water or something

13:02:26  16  to drink, is it in a plastic foam type of cup like the

13:02:29  17  one we're -- have in front of us?

13:02:31  18     A.   That is correct, sir.  It's a foam cup.

13:02:39  19     Q.   Okay.  If the person is suicidal or -- do you

13:02:43  20  give him any eating utensils?

13:02:46  21     A.   No, sir.

13:02:47  22     Q.   None at all?

13:02:48  23     A.   No.

13:02:48  24     Q.   Not even a plastic spoon?

13:02:50  25     A.   Not even a plastic spoon.

13:02:55  1      Q.  Okay.  Are those prisoners, whatever they are,

13:02:58  2    are they supposed to be fed at a certain time like

13:03:04  3    other prisoners?

13:03:05  4      A.  Yes.  Like any other prisoner.

13:03:06  5      Q.  Okay.  What are the feeding times?

13:03:08  6      A.  The same time.  We had one before 7:00 in the

13:03:14  7    morning, then we had one starting at 11:30 in the

13:03:20  8    morning, and then the dinner would be starting at 4:30

13:03:24  9    in the afternoon.

13:03:25 10      Q.  Okay.  And it would end at what time?

13:03:28 11      A.  The dinner would end, in general, say about

13:03:37 12    close to 6:00.

13:03:41 13      Q.  Okay.  Now, a person that's on suicide watch,

13:03:45 14    say he's suicidal, is somebody supposed to go in and

13:03:49 15    check to see whether they're actually eating as part of

13:03:53 16    the activity log?

13:03:54 17      A.  Yes, sir.  All suicidals we have a log, an

13:03:59 18    intake fluid log.  Once they get fed, the officer,

13:04:02 19    detention officer, or anyone that's passing out the

13:04:04 20    plates, which includes sometimes myself as a

13:04:07 21    supervisor, write down in the log what time, the amount

13:04:11 22    of fluid, okay, and what would they be feeding, you

13:04:15 23    know, whether it would be ground beef, what the plate

13:04:18 24    was, the portion of the plate would be containing.

13:04:20 25      Q.  Okay.  Would anybody check to see -- I know you

13:04:23  1    would have what they were given, but was anybody

13:04:25  2    checking to see if they were eating or fluid was

13:04:38  3    actually taken by the prisoner?

13:04:38  4        A.  Yes, sir.

13:04:38  5        Q.  Okay.  How would you do that?

13:04:38  6        A.  When the plates are being picked up.

13:04:38  7        Q.  Okay.  So you actually see -- well, you

13:04:40  8    wouldn't know if the water was poured down the urinal

13:04:42  9    or not then, or the food, would you?  You wouldn't go

13:04:48 10    in the cell?

13:04:50 11        A.  You see, if we would pass this plate at so time

13:04:52 12    with water, a foam cup, okay, log it in.  Okay.

13:04:57 13    Between those ten minutes, okay, I wouldn't actually be

13:05:00 14    there seeing him eat the whole portion or the water,

13:05:03 15    drink his water.  I wouldn't be actually just there.

13:05:08 16        Q.  That's what I'm trying to find out.

13:05:09 17        A.  So I couldn't say whether he would put it down

13:05:12 18    the hole, the water, or anything like that.  And if

13:05:17 19    they did, it would in between that time when I would

13:05:21 20    come back.

13:05:22 21        Q.  Okay.  But at least you would check to see if

13:05:23 22    the plate was empty and the cup was empty.

13:05:25 23        A.  Yes, sir, because I have to put it down in my

13:05:28 24    log.

13:05:30 25        Q.  Okay.  Did you see any plates or anything

| | |
|---|---|
| 13:05:32 | 1 |
| 13:05:36 | 2 |
| 13:05:38 | 3 |
| 13:05:41 | 4 |
| 13:05:44 | 5 |
| 13:05:49 | 6 |
| 13:05:54 | 7 |
| 13:05:57 | 8 |
| 13:06:01 | 9 |
| 13:06:03 | 10 |
| 13:06:05 | 11 |
| 13:06:07 | 12 |
| 13:06:09 | 13 |
| 13:06:11 | 14 |
| 13:06:11 | 15 |
| 13:06:12 | 16 |
| 13:06:15 | 17 |
| 13:06:16 | 18 |
| 13:06:20 | 19 |
| 13:06:28 | 20 |
| 13:06:30 | 21 |
| 13:06:35 | 22 |
| 13:06:36 | 23 |
| 13:06:38 | 24 |
| 13:06:39 | 25 |

1  outside the jail cell that Mr. Longoria was in?

2      A.  No, sir.  Yeah.  By that time, basically, all

3  plates would be picked up, be cleaned up.

4      Q.  Okay.  If they picked up plates that were full,

5  would anybody log that in somewhere?  In other words,

6  the plates went in full, the plates came out full,

7  unless he was on a medical watch, would they --

8      A.  Yes, sir.  That's when we check, basically --

9      Q.  Okay.  Whoever, the trustee or whoever picks up

10  the plates or anything like that, would they go notify

11  him, "Hey, this -- nobody touched anything in this

12  food"?

13      A.  In general?  With general population?

14      Q.  Yeah.

15      A.  No.

16      Q.  Okay.  They would if it was on suicide watch?

17      A.  That is correct, sir.

18      Q.  Okay.  But that would be at the intake log.

19      A.  That is correct, sir.

20      Q.  Okay.  Now, what's the difference between a 95

21  and a 96?  Do you know the difference?

22      A.  Meaning the number?

23      Q.  Somebody says, "He's a 96."

24          MR. VITTITOE:  10 codes.

25          THE WITNESS:  Oh, the 10 codes?

13:06:40 1      Q.  Yeah.  10 codes.

13:06:42 2      A.  95 being a suspect, subject being under arrest.

13:06:46 3  Okay.  That's when you call it in.  Or a 95 being

13:06:48 4  inside the jail, as well.  That's what we call inmates.

13:06:52 5      Q.  Okay.

13:06:52 6      A.  Prisoners, 95s.

13:06:53 7      Q.  What's a 96?

13:06:54 8      A.  96, what it is, a 96 is, possibly, okay,

13:07:01 9  whether he's mental ill, okay, but we're not

13:07:05 10  specifying, okay, he is a mental ill.

13:07:08 11     Q.  Okay.  So possible mental ill person.

13:07:10 12     A.  Possible.  Be cautious.

13:07:13 13     Q.  Okay.  Were you told that Mr. Longoria was a 96

13:07:17 14  during his briefing?

13:07:18 15     A.  Not at all, sir.

13:07:22 16     Q.  Okay.  Were you told he was a 95?  I mean,

13:07:24 17  everybody's a 95 that's in there, isn't it?

13:07:26 18     A.  That we had a 95 in single cell No. 1.

13:07:29 19     Q.  Okay.  I mean, 95 meaning there's a body in

13:07:31 20  there.

13:07:31 21     A.  Correct.

13:07:31 22     Q.  A live body, hopefully, right?

13:07:34 23     A.  Correct.

13:07:37 24     Q.  Okay.  You then had a dispatch.  You call EMS?

13:07:41 25  You dispatch for EMS?

13:07:43 1    A.  I contacted our dispatch department to contact

13:07:45 2    EMS, yes, sir.

13:07:47 3    Q.  And then you asked your booking officer to call

13:07:51 4    the nurse on call; is that right?

13:07:54 5    A.  That is correct.  The first one I made contact

13:07:56 6    with was to call -- for medical, was Sylvia Santillana.

13:08:02 7    Due to that, I had to go through her first, okay, into

13:08:05 8    the booking area.  She was standing on my left side

13:08:08 9    inside the booking area and told her, "Contact the

13:08:11 10   nurse on call," which we had a schedule.

13:08:13 11           More than likely, we still have a

13:08:14 12   schedule, who's the nurse on call.  I ran towards the

13:08:17 13   back on extension 331, contacted dispatch advising

13:08:20 14   them, you know -- what -- this is what I have right

13:08:22 15   now.

13:08:23 16   Q.  How much time did this take?  A minute?  Couple

13:08:27 17   of minutes?

13:08:28 18   A.  It was so quick.  I mean, I'd just say a minute

13:08:29 19   or less than a minute where, boom, boom, and I did it,

13:08:32 20   and that was -- it was fast.

13:08:33 21   Q.  You never logged in exactly when you discovered

13:08:36 22   the body or went into the cell, discovered Mr. Longoria

13:08:42 23   lying on the floor, did you?

13:08:45 24   A.  In the statement, no, sir.  But it happened

13:08:47 25   around 11:30.

13:08:47 1       Q.   Okay.

13:08:49 2       A.   Somewhere around 11:30 p.m.  I won't say 12:00.

13:08:54 3   It was way before 12:00.  It was in that period, 11:30,

13:08:57 4   11:40, somewhere around that area.

13:09:00 5       Q.   You then contacted your lieutenant; is that

13:09:01 6   right?

13:09:01 7       A.   Yes, sir.  My lieutenant Frank Gonzalez right

13:09:04 8   after I finished with dispatch.

13:09:06 9       Q.   And you secured the area; is that correct?

13:09:07 10       A.   That was the first thing I did, sir.

13:09:11 11       Q.   Okay.  Were there any other detention officers

13:09:16 12   inside the cell besides you and Assistant Sergeant

13:09:21 13   Galicia?

13:09:22 14       A.   Yes, sir.  The second time -- the first time me

13:09:24 15   and Galicia checked, we closed the door, and I called

13:09:27 16   in for backup.  That's when my other officers, Randy

13:09:32 17   Dierlam and this other detention officer that's not

13:09:36 18   working with us no more by the name of Ibarra, Jorge

13:09:40 19   Ibarra, who stopped with the head count to respond

13:09:44 20   downstairs.

13:09:45 21       Q.   Okay.  So you call up on the second floor?

13:09:46 22       A.   Via portable.  Yes, sir.  I don't know what

13:09:49 23   floor they were on.  "Get down here ASAP."

13:09:52 24       Q.   Okay.  Why did you call for backup?

13:09:54 25       A.   Since incidents and encounters that I've had

13:09:57 1    before with other prisoners when we go into the cells,

13:10:00 2    single cells, that they'll pop up and possibly surprise

13:10:04 3    you.

13:10:05 4        Q.  Oh, okay.

13:10:06 5        A.  You know.

13:10:06 6        Q.  You hadn't determined that he was -- he was

13:10:10 7    probably dead by that time.

13:10:12 8        A.  I'm not saying that, sir.  No, sir.  Not at

13:10:14 9    all.

13:10:15 10       Q.  Okay.  Well, had you determined that he was

13:10:16 11   probably dead?

13:10:17 12       A.  There was no determination whatsoever the first

13:10:19 13   time I saw him, sir.

13:10:20 14       Q.  Okay.  So that's when you called for backup.

13:10:22 15       A.  Yes, sir.  I closed the door, called for

13:10:32 16   backup, they came down, and I -- small brief, "This is

13:10:32 17   what we're going to do.  You go in first.  You're

13:10:32 18   second.  I'm third."

13:10:32 19            And then Mr. Dierlam was the one near the

13:10:34 20   head area standing up.

13:10:35 21       Q.  Okay.  Well, at least you noticed that you

13:10:37 22   could only see the white -- his eyes had rolled up.

13:10:39 23       A.  That was the second time, sir, that I went in

13:10:40 24   there that --

13:10:40 25       Q.  Oh, okay.

13:10:41  1      A.  Yes, sir.

13:10:43  2      Q.  So he was either unconscious or -- did you

13:10:46  3  interpret that to mean he was unconscious or something

13:10:49  4  worse, that his eyes were rolled up in his head?

13:10:53  5              MR. VITTITOE:  Or faking.

13:10:54  6      Q.  If you know.

13:10:55  7      A.  Yes, sir.  Faking it.

13:10:56  8      Q.  Or faking?

13:10:58  9      A.  Or faking.

13:10:59 10      Q.  Okay.  You've seen faking like that?

13:11:01 11      A.  That was the second time.

13:11:07 12      Q.  Okay.  Did you try to take his pulse,

13:11:10 13  Mr. Longoria's pulse?

13:11:13 14      A.  No, sir.  What I did was grabbed ahold of his

13:11:16 15  right arm, forearm, for my safety.

13:11:16 16      Q.  Okay.

13:11:21 17      A.  And kneeled down a bit, not completely, my

13:11:25 18  knees not touching the ground.  When I glanced to his

13:11:28 19  eye, his right eye was slightly open.  That's when I

13:11:31 20  noticed a white portion of the eye.

13:11:34 21      Q.  Okay.

13:11:34 22      A.  That's when, actually, I just let go of the

13:11:37 23  arm.  And I said, "Guys, don't move anything.  Let's

13:11:39 24  just go out."

13:11:40 25      Q.  Okay.  When you touched him, was he cold?

13:11:42  1      A.   I was wearing gloves, sir.

13:11:44  2      Q.   Okay.  That was part of your security detail to

13:11:47  3  wear gloves?

13:11:48  4      A.   Whether we had any fights or anything like

13:11:50  5  that.

13:11:50  6      Q.   To wear gloves?

13:11:51  7      A.   Wear gloves.  Yes, sir.

13:11:53  8      Q.   For your self-protection?

13:11:54  9      A.   Yes, sir.  Correct.

13:11:55 10            MR. VITTITOE:  Just to clarify, I think

13:12:01 11  these are latex gloves.

13:12:03 12      Q.   Yes.  I understand.

13:12:04 13      A.   Correction.  That I used to carry them in my

13:12:06 14  duty belt.

13:12:07 15      Q.   Were you able to feel whether or not, to the

13:12:09 16  touch, that Mr. Longoria was firm or not?  In other

13:12:14 17  words, when you touched him, did he feel like he was

13:12:16 18  stiff or not stiff or normal to you?

13:12:20 19      A.   Honestly, I didn't even pay attention on that

13:12:23 20  area where you hold someone's arm and -- okay, you're

13:12:26 21  normal or not normal, or you're stiff, you know.

13:12:29 22      Q.   Okay.  That's fine.  That's fair.

13:12:34 23            So you told the dispatcher that you had a

13:12:37 24  inmate that was not responding; is that right?

13:12:39 25      A.   That is correct, sir.

13:12:43 1     Q.  Okay.  Were you always inside the cell while

13:12:49 2  these other detention officers were there, or were you

13:12:54 3  outside the cell at times where the other detention

13:12:58 4  officers were in the cell?

13:13:00 5     A.  The first time?

13:13:01 6     Q.  Yes, sir.

13:13:02 7     A.  It was me and Galicia.

13:13:03 8          The second time, the officers went inside

13:13:04 9  the cell with me.  Once I told them to retreat, to go

13:13:07 10  out, they all went completely out with me.  I

13:13:10 11  personally locked the door.

13:13:11 12     Q.  Okay.  So they were never alone with the

13:13:13 13  prisoner?

13:13:14 14     A.  No, sir.  And I took the key.  I had the key

13:13:16 15  with me.

13:13:16 16     Q.  Okay.  Without your presence.

13:13:17 17     A.  Yes, sir.

13:13:22 18     Q.  Okay.  You called Lieutenant Gonzalez?

13:13:25 19     A.  Correct.

13:13:26 20     Q.  And you told Santillana to write down who comes

13:13:31 21  in and out for security purposes I take it; is that

13:13:31 22  correct?

13:13:35 23     A.  That is correct, sir, because, as well, I do

13:13:36 24  have a log that I do during my eight hours.  So

13:13:41 25  everything that she would put into this log that she

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366  (956) 428-0755  (956) 542-1020

70

13:13:44  1    was doing, I would submit it as well to my log.

13:13:48  2            Since it was happening so fast, I didn't

13:13:49  3    want to miss anything.  I wanted to write who came in,

13:13:52  4    who came out, and what happened during that time.

13:13:54  5        Q.  All right.  How long did it take Felipe

13:13:58  6    Esquivel, the nurse, to get there?

13:13:59  7        A.  Honestly, I was amazed.  It was so quick that I

13:14:04  8    can't tell you.  I looked at my watch, and it would be

13:14:06  9    five minutes.  It was so fast that it happened.  I

13:14:10 10    don't know whether he lived nearby the area of the old

13:14:14 11    county jail or what.  Right after Esquivel came in, I

13:14:17 12    mean, EMS was there.  It was so quick.

13:14:20 13        Q.  Was the EMS there ten minutes or dispatch or --

13:14:24 14        A.  Again, I don't just recall looking at my watch

13:14:28 15    saying, okay, it was ten minutes.  It was fast.

13:14:31 16        Q.  Okay.

13:14:31 17        A.  It was real fast.

13:14:32 18        Q.  Less than half an hour, I take it.

13:14:35 19        A.  Oh, definitely.  Definitely less than half an

13:14:38 20    hour.

13:14:40 21        Q.  Okay.  Then you had Randy Dierlam, who was one

13:14:51 22    of your detention officers, then went with the EMS

13:14:56 23    people out -- escorted Mr. Longoria out with the EMS

13:15:02 24    people to the ambulance; is that correct?

13:15:03 25        A.  That is correct.  I assigned Mr. Dierlam to go,

71

13:15:06 1    actually, in the ambulance and to the hospital.

13:15:08 2        Q.   Hospital.

13:15:09 3        A.   Yes, sir.

13:15:11 4        Q.   Did any of the EMS people tell you that

13:15:13 5    Mr. Longoria was already dead?

13:15:16 6        A.   No, sir, not at all.  The only thing that I

13:15:18 7    would be hearing, because I let them do what they

13:15:20 8    wanted to do, that he wasn't responding.

13:15:21 9        Q.   Okay.  How about Mr. Esquivel?  Did he say that

13:15:24 10   he was already dead?

13:15:25 11       A.   I didn't speak to him whatsoever, sir.  In that

13:15:26 12   area right there, you know, you tell me, so it's just

13:15:29 13   medical deal.  I didn't get involved.

13:15:31 14       Q.   Okay.  You then had lieutenants begin to arrive

13:15:34 15   as well as Captain Elizarde?  And that's the

13:15:40 16   administrative captain?

13:15:43 17       A.   That is correct, sir.

13:15:43 18       Q.   Okay.  How many lieutenants came?

13:15:59 19       A.   If not mistaken, I believe there were four.

13:16:02 20   And it was Lieutenant Frank Gonzalez; Abel Garcia, that

13:16:06 21   is not working with us no more.

13:16:09 22       Q.   Okay.

13:16:12 23       A.   Joe Villarreal.

13:16:15 24            MR. VITTITOE:  Joe who?

13:16:16 25            THE WITNESS:  Villarreal.

72

13:16:19 1      Q.  Lieutenant Gonzalez?

13:16:20 2      A.  Yes, sir.  He was the first one.  Yes, sir.

13:16:31 3            And I don't recall, but possibly George

13:16:36 4 Garcia, Lieutenant George Garcia.

13:16:38 5      Q.  Okay.  Are they lieutenants at different

13:16:40 6 facilities or what?

13:16:41 7      A.  Yes, sir.  Correct.  Correct.

13:16:45 8      Q.  Okay.  Then it says, "At around 1:20 a.m., I

13:16:48 9 had a call from a Dr. Richardson from Brownsville

13:16:51 10 Medical Center.  He told me the body of the inmate had

13:17:03 11 rigor mortis."  Do you know what rigor mortis is?

13:17:03 12      A.  It's -- not in medical medical terms, but what

13:17:03 13 I do know is where the blood sits for a period of time.

13:17:06 14 Okay?

13:17:08 15      Q.  Okay.  So it was --

13:17:11 16      A.  It was bruised up.

13:17:11 17      Q.  Bruised up.

13:17:12 18            That's how you interpret it?

13:17:14 19      A.  It had some bruising.

13:17:21 20      Q.  Okay.  And he asked you what you knew about the

13:17:24 21 roommate -- I mean, the inmate.  You told him what

13:17:30 22 you -- in a way, he's a roommate.  He was in the same

13:17:32 23 facility as you, but he's in a different capacity.

13:17:35 24      A.  That's correct.

13:17:41 25      Q.  Okay.  And you told Dr. Richardson that the

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

13:17:44  1  only thing you knew, he was cleared by Brownsville

13:17:47  2  Medical Center earlier in the day.  Did you know that

13:17:49  3  it was Dr. Richardson who had apparently cleared him

13:17:53  4  and wrote the note to keep him under close observation?

13:17:54  5      A.  No, sir, not at all.

13:17:56  6      Q.  Did he tell you that?

13:17:57  7      A.  No, sir, not at all.

13:18:03  8      Q.  Okay.  Did he tell you that the prisoner had

13:18:06  9  some more bruising about his body than what he had

13:18:09 10  found when he first examined Mr. Longoria on the 10th?

13:18:18 11      A.  None whatsoever, sir.

13:18:22 12      Q.  Okay.  Did you have any further conversation

13:18:24 13  with Dr. Richardson regarding this man --

13:18:28 14      A.  No, sir.

13:18:28 15      Q.  -- after that time as stated in your statement?

13:18:32 16      A.  No, sir.

13:18:32 17      Q.  Did you have any further conversation with any

13:18:36 18  pathologist?  Dr. Dahm?

13:18:41 19      A.  No, sir.

13:18:43 20      Q.  Regarding Mr. Longoria.

13:18:44 21      A.  No, sir.

13:18:44 22      Q.  Did you have any conversation with any other

13:18:46 23  detention officer regarding Mr. Longoria's conduct

13:18:52 24  during the course of his time he was brought in the

13:18:55 25  jail to the time that you found him in the condition as

13:18:59 1   you stated about 11:30 p.m. at night on the same night

13:19:05 2   he was brought in at -- assume with me he was brought

13:19:10 3   in about 10:30 in the morning.

13:19:13 4       A.  No, sir.  Once this was going on and it

13:19:17 5   finished and provided my statement, which is right in

13:19:21 6   front of me --

13:19:22 7       Q.  Yes, sir.

13:19:23 8       A.  -- I would have -- in any other case, I don't

13:19:28 9   like to start anything else, speaking to someone else

13:19:32 10  or asking any questions or anything like that that

13:19:34 11  would jeopardize any investigations.

13:19:36 12      Q.  I see.  Okay.

13:19:37 13      A.  Okay?  In this case, this is what I did.  I

13:19:40 14  would rather not know too much since I was basically

13:19:44 15  the one that found the body of Mr. Longoria.  I didn't

13:19:49 16  want anything else crossing my mind --

13:19:51 17      Q.  Okay.

13:19:51 18      A.  -- besides what I knew, what I had just found.

13:19:55 19  I didn't want to get involved.

13:19:57 20      Q.  So you didn't know whether he died on your

13:19:58 21  watch or the previous watch, is that right, well, for

13:20:05 22  one thing, right?

13:20:07 23      A.  Yes, sir.

13:20:08 24      Q.  Okay.  You don't know why he stayed there

13:20:10 25  all -- in that cell all day; is that correct?

13:20:13 1    A.  That is correct, sir.

13:20:15 2    Q.  Okay.  As far as you know, no one expressed to

13:20:18 3  you that he was suicidal; is that correct?

13:20:21 4    A.  No, sir.

13:20:22 5    Q.  Did anybody express to you that he had a mental

13:20:26 6  problem or he was showing some delusions or things like

13:20:29 7  that?

13:20:30 8    A.  No, sir.

13:20:34 9    Q.  Okay.  Did anyone ever tell you that he had a

13:20:37 10  medical problem?

13:20:43 11    A.  No, sir.

13:20:49 12    Q.  You can look at your statement.  Besides

13:20:52 13  Dr. Richardson.

13:20:56 14    A.  The only thing that I knew is like I explained

13:20:58 15  that to the doctor, as well, was that he was medically

13:21:00 16  cleared.

13:21:00 17    Q.  Okay.  And --

13:21:05 18    A.  I just --

13:21:05 19    Q.  Go ahead.

13:21:05 20    A.  Right now, that I just state what your question

13:21:09 21  was, you see, I'm trying, like you said, like, I was

13:21:13 22  sworn in that I don't want to lie in this case, so --

13:21:15 23    Q.  Sure.

13:21:16 24    A.  -- I was backing myself up trying to see if by

13:21:18 25  any chance anyone just basically told me --

13:21:21  1      Q.  Yeah.

13:21:21  2      A.  -- in this case --

13:21:21  3      Q.  That's what I'm trying to get you -- if you

13:21:23  4  recall.  I mean, if you don't recall, I don't want you

13:21:25  5  to guess.

13:21:27  6      A.  Yeah.  The only thing that I recalled was when

13:21:28  7  we got briefed that this gentleman came in by

13:21:31  8  Brownsville PD and the incident that Sergeant Felipe

13:21:34  9  Silva had with this particular person, Mr. Longoria,

13:21:39 10  which was that fight, if they didn't take him out --

13:21:43 11      Q.  Argument?

13:21:44 12      A.  -- if it occurred, argument --

13:21:44 13      Q.  Was it a fight or an argument?

13:21:45 14      A.  An argument.

13:21:45 15      Q.  Okay.

13:21:46 16      A.  I'm sorry.  An argument between him or other

13:21:49 17  prisoners in the area.

13:21:52 18      Q.  Okay.  Now, you came on your shift.  Even after

13:21:59 19  you found Mr. Longoria in the condition that you found

13:22:03 20  him in in that holding cell or padded cell No. 1, did

13:22:08 21  you happen to go into the infirmary before or after?

13:22:15 22  In other words, sometime during your shift, did you go

13:22:17 23  into the infirmary that night and morning?

13:22:21 24      A.  No, sir, I didn't.

13:22:23 25      Q.  Do you know one way or the other whether the

13:22:25  1    infirmary was full or not full when -- on your shift?

13:22:36  2        A.  Again, I don't want to speculate.

13:22:38  3        Q.  I don't want you to speculate.

13:22:40  4        A.  No, sir.  I don't recall whether it was full or

13:22:42  5    not, or if there was any space or not.

13:22:44  6        Q.  Okay.  Do you recall whether or not, as a

13:22:47  7    diagram of -- that Sergeant Silva put on the infirmary

13:22:54  8    that there were six single cells with beds in there in

13:22:57  9    that infirmary?

13:22:59 10        A.  Both -- all six had beds.  Yes, sir.

13:23:01 11        Q.  Okay.  And were there more than two beds in the

13:23:05 12    dormitory put in there?

13:23:09 13        A.  Yes, sir.  In there, we called them bunks.

13:23:12 14        Q.  Bunks.

13:23:12 15        A.  Yes, sir.

13:23:14 16        Q.  Okay.  So there was a holding area for -- or

13:23:20 17    whatever for at least six to eight to ten prisoners; is

13:23:20 18    that right?

13:23:25 19        A.  Correct.

13:23:26 20        Q.  Who had medical problems.

13:23:28 21        A.  Correct.

13:23:30 22        Q.  Okay.  And the examining room was in the

13:23:31 23    nurse's station office?

13:23:34 24        A.  That is correct, sir.

13:23:38 25        Q.  I take it the medical supplies were there also?

13:23:42  1      A.  If they did --

13:23:43  2      Q.  If you know.

13:23:44  3      A.  If they did have them, I would never have

13:23:47  4  access to them or look into -- that I remember, they

13:23:49  5  did have some kind of door.  I don't know whether it

13:23:53  6  was a closet for medical supplies.  I have no idea.  I

13:23:55  7  never went in there.

13:23:56  8      Q.  Okay.  And you never asked the nurse.

13:23:58  9      A.  No, sir.

13:23:58 10      Q.  Okay.

13:24:31 11      A.  No, sir.

13:24:31 12      Q.  When you relieved the previous shift, did they

13:24:31 13  give you a briefing on the status of anything that's

13:24:33 14  going on?

13:24:34 15      A.  What went on during the day, yes.

13:24:35 16      Q.  Okay.  And besides the fact that there was a 95

13:24:39 17  in the holding cell, the small holding cell, padded

13:24:44 18  cell No. 1, were you given any other information about

13:24:47 19  him, and the fact that he had an argument and that's

13:24:49 20  why he was there?

13:24:53 21              MR. VITTITOE:  You mean a 95 as opposed to

13:24:55 22  a 96?  I want to clarify that you're talking about just

13:25:00 23  that there was an inmate in there.

13:25:01 24      Q.  There was inmate in there.  Did anybody ever

13:25:04 25  tell you he was a 96?

13:25:07 1    A.  No, sir.

13:25:07 2    Q.  Okay.  Did anybody tell you, besides the

13:25:10 3  argument, there was anything unusual about the inmate

13:25:13 4  in the padded cell --

13:25:22 5    A.  No, sir.

13:25:22 6    Q.  -- when you were briefed?

13:25:25 7    A.  (Moving head side to side)

13:25:26 8    Q.  Okay.  Afterwards, did anybody tell you there

13:25:29 9  was anything unusual about him?

13:25:32 10    A.  No, sir.

13:25:33 11    Q.  Okay.  So as far as you know, he wasn't crazy,

13:25:37 12  suicidal -- or suicidal, is that correct, as far as you

13:25:42 13  know?

13:25:43 14    A.  Well, again, suicidal, mental, a deal like

13:25:47 15  that, I had no idea whether we had one in there or

13:25:49 16  whether he was mental ill or any suicidal deal.

13:25:53 17    Q.  As far as you know, you never talked to him, is

13:25:56 18  that correct, one way or the other?

13:25:57 19    A.  No, sir.

13:25:58 20    Q.  Okay.  You only know what somebody told you,

13:26:00 21  and you told us what that -- what you were briefed

13:26:03 22  about; is that correct?

13:26:03 23    A.  That we had a 95 in there, yes, sir.

13:26:07 24    Q.  Okay.  You were never told he was a 96.

13:26:09 25    A.  Not at all, sir.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

13:26:11  1          MR. VITTITOE:  Or a 97.

13:26:13  2      Q.  Or a 97, right.

13:26:28  3          Okay.  Do each shift, A, B, C in shifts,

13:26:31  4  for the detention and the old county jail, were they --

13:26:36  5  each shift capable of booking, classifying -- and

13:26:38  6  classifying a prisoner?

13:26:42  7      A.  Would any?

13:26:43  8      Q.  Any shift, including your shift.

13:26:46  9      A.  Any of my detention officers?

13:26:47 10      Q.  No.  If a prisoner came in -- let's say you

13:26:53 11  were the C shift -- was your shift capable of booking

13:27:01 12  and classifying a prisoner?

13:27:10 13      A.  Again, it would be up to the booking officer

13:27:13 14  could do it.  Okay.  How much people he had pending.

13:27:17 15  Again, my booking officer --

13:27:19 16      Q.  No.  No.  Not whether you were -- he had the --

13:27:25 17  you know, time to do it.  Were you capable of doing it?

13:27:29 18  In other words, could you book -- say only one prisoner

13:27:34 19  came in.  Okay.

13:27:37 20          Could your shift both book and classify a

13:27:41 21  prisoner, or would a classification of a prisoner have

13:27:53 22  to be done in conjunction with a nurse that had to be

13:27:56 23  there?

13:28:03 24      A.  It could happen, yes.

13:28:05 25      Q.  Okay.

13:28:05  1        A.  It all depends, again, on the -- on this

13:28:10  2   prisoner himself.

13:28:11  3        Q.  Medical --

13:28:12  4        A.  Medical condition, mental stage.  It would have

13:28:16  5   to be -- if it was on the C shift, a nurse would have

13:28:19  6   to be called in, or the nurse would specify, "You know

13:28:23  7   what?  You brief me."

13:28:25  8             Okay.  "This is what's going on with this

13:28:28  9   prisoner.  He doesn't want to answer.  He's stuttering

13:28:31 10   too much," etc., etc.

13:28:31 11        Q.  Okay.

13:28:32 12        A.  She would tell you, "You know what?  Send him

13:28:34 13   to the hospital," okay, "to get medical clearance from

13:28:37 14   the hospital."

13:28:40 15        Q.  If a prisoner came in with a medical clearance,

13:28:43 16   some type of clearance, would your shift then -- if you

13:28:51 17   experienced some problem with the prisoner, would you

13:28:54 18   then call the nurse and the nurse may tell you to send

13:28:56 19   them back to the hospital?

13:28:57 20        A.  Yes, sir.  Correct.

13:28:58 21        Q.  Even if he had clearance.

13:29:00 22        A.  Even if he had clearance and --

13:29:02 23        Q.  Okay.  And can you think of any reason in the

13:29:11 24   world why a prisoner should be held in a holding cell

13:29:17 25   for 12 hours without being booked?

13:29:27 1    A.  I can't comment on that because I wasn't there

13:29:30 2 during the day shift, whether how many prisoners they

13:29:34 3 had had intake or released or the B shift.

13:29:37 4    Q.  So there's a possible reason why he could be

13:29:40 5 held for 12 hours without being booked?

13:29:45 6    A.  Honestly, I don't know whether --

13:29:47 7    Q.  Okay.  That's fair.

13:29:47 8    A.  -- it was 12 hours or not.

13:29:52 9    Q.  You've had, in your experience as a detention

13:29:54 10 officer, people that came in that looked mentally ill

13:30:00 11 to you; is that correct?

13:30:02 12    A.  I can't say mentally ill because I'm not an

13:30:04 13 expert on just detecting someone that would be mentally

13:30:07 14 ill.

13:30:08 15    Q.  Well -- but I mean, from your experience,

13:30:09 16 acting kind of crazy.

13:30:11 17    A.  It has happened, you know --

13:30:13 18    Q.  Okay.

13:30:14 19    A.  -- where you can have a 95, a prisoner, coming

13:30:17 20 in from an agency during midnight, and this gentleman

13:30:21 21 is actually speaking to himself.

13:30:23 22    Once he comes into the jail, I mean, right

13:30:25 23 off the bat you're, you know, like, something's not

13:30:28 24 right here, whether he's on drugs or possibly mental

13:30:31 25 ill.  I won't take him in.  I would have to have a

13:30:34  1    medical clearance.

13:30:37  2        Q.  So you would call the nurse.

13:30:38  3        A.  No.  I would actually tell the agency there,

13:30:39  4    the agency himself, whether it would be any other

13:30:42  5    agency under us, I'd tell him, "You know what, sir?

13:30:44  6    I'm not going to take this prisoner."

13:30:46  7            Well -- you -- right off the bat you would

13:30:46  8    tell an officer, You know what?  No.  Come on.  That --

13:30:49  9    you would have to.  It was us, we would have to.  They

13:30:53 10    would tell us, when I started, anyone that comes or

13:30:56 11    anything, you have to send them out to get medical

13:30:58 12    clearance.

13:30:58 13        Q.  Okay.  I mean, when they told you, that was

13:30:59 14    part of your training; is that right?

13:31:01 15        A.  Correct.

13:31:03 16        Q.  Okay.  And I take it in the course of your

13:31:07 17    actions as a detention officer, whether you worked the

13:31:09 18    C shift, A shift, or B shift, I don't know -- we

13:31:12 19    haven't gone in to whether you worked the other shifts.

13:31:14 20        A.  Yes, I have.

13:31:15 21        Q.  But you've seen persons that would come in that

13:31:17 22    would be talking to themselves.

13:31:19 23        A.  Uh-huh.

13:31:20 24        Q.  Is that correct?

13:31:20 25        A.  Correct.

13:31:29  1      Q.   That you refused to take in without getting

13:31:29  2   medical clearance?

13:31:29  3      A.   That is correct, sir.

13:31:29  4      Q.   You've seen people that were complaining about

13:31:29  5   somebody was about to shoot them or that the stars were

13:31:34  6   falling around in your head or things like that, making

13:31:38  7   types of crazy claims?

13:31:42  8      A.   Yes, sir.

13:31:42  9      Q.   And would you again ask that that person not be

13:31:45 10   taken in and get a medical clearance?

13:31:48 11      A.   Yes, sir.

13:31:50 12      Q.   Okay.  You've seen people -- I imagine you've

13:31:54 13   seen a lot of people that come in that were paranoid

13:31:56 14   coming into the jail or somebody was after them?

13:32:00 15      A.   I mean, because we have what we call the

13:32:02 16   "first-timers," meaning young guys coming in for the

13:32:05 17   first time.

13:32:05 18      Q.   Yeah.  They would be scared.

13:32:08 19      A.   Well, I'd say, yes, scared, of course.  I would

13:32:12 20   be scared.  Yeah.

13:32:16 21      Q.   Have you ever had anybody that, in your

13:32:18 22   experience, would come in and tell the police, the

13:32:21 23   detention officer, "I've been shot, and you probably

13:32:25 24   saw it on the news the night before," and there's no

13:32:28 25   evidence of anybody -- him being shot?  Would you think

13:32:32 1    that's strange?

13:32:35 2        A.  I never had a case like that.

13:32:38 3        Q.  Okay.  I mean, from your -- tell me now, would

13:32:40 4    you think that's kind of strange?

13:32:43 5        A.  Telling him being shot?

13:32:45 6        Q.  No.  He says, "I came in" -- he comes in and

13:32:49 7    somebody asked him, "What happened?"

13:32:50 8            And he says, "I've been shot.  And not

13:32:56 9    only I've been shot, but you probably saw it on TV the

13:32:58 10   night before."

13:32:59 11           And you looked at him, and there's no

13:33:00 12   evidence of gunshot wounds, either physical evidence of

13:33:05 13   it or any medical papers that come in about a gunshot

13:33:09 14   wound.

13:33:09 15       A.  I wouldn't take him.  I would get medical

13:33:12 16   clearance.

13:33:13 17           MR. BERGER:  Thank you, sir.  That's -- I

13:33:13 18   don't have any further questions.

13:33:15 19           MR. VITTITOE:  We'll reserve our

13:33:15 20   questions.

21            (Deposition concluded)

22

23

24

25

LUIS ALBERTO MENDIETA - ERRATA SHEET

Reasons for changes:   (1) Clarify the record
                       (2) Conform to the facts
                       (3) Correct transcription errors

PAGE  LINE   CHANGE FROM/CHANGE TO                    REASON

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

____  ____   _____       ____

                     LUIS ALBERTO MENDIETA

<u>SIGNATURE OF LUIS ALBERTO MENDIETA</u>

1

2      I have read the foregoing transcript of my

3  deposition and it is a true and accurate record of my

4  testimony given on FEBRUARY 17, 2004, except as to any

5  corrections I have listed on page 86 herein.

6                                    _____

7                                    LUIS ALBERTO MENDIETA

8

9  THE STATE OF TEXAS

10  COUNTY OF CAMERON

11               SUBSCRIBED AND SWORN TO BEFORE ME, the

12  undersigned authority on this the _____ day of

13  _____, 2004.

14

15                                    _____

16                                    Notary Public in and for
                                     The State of Texas

17  My commission expires:

18  _____

19

20

21

22

23

24

25

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

```
1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
2                          BROWNSVILLE DIVISION

3    MARIA LONGORIA AND MARIA    ) (
     IDALIA GUTIERREZ,           ) (
4    INDIVIDUALLY AND ON BEHALF) (
     OF THE ESTATE OF JUAN       ) (
5    LONGORIA, DECEASED          ) (
             Plaintiffs          ) (
6                                ) (
     VS.                         ) (     CIVIL ACTION NO. B-01-062
7                                ) (
     CAMERON COUNTY, TEXAS,      ) (
8    THE CITY OF BROWNSVILLE,    ) (     JURY DEMANDED
     TEXAS AND JOHN DOES 1-10    ) (
9            Defendants          ) (

10                       REPORTER'S CERTIFICATE
         I, Donna McCown, Certified Court Reporter, certify
11   that the witness, LUIS ALBERTO MENDIETA, was duly sworn
     by me, and that the deposition is a true and correct
12   record of the testimony given by the witness on
     FEBRUARY 17, 2004; that the deposition was reported by
13   me in stenograph and was subsequently transcribed under
     my supervision.

14
         I FURTHER CERTIFY that I am not a relative,
15   employee, attorney or counsel of any of the parties,
     nor a relative or employee of such attorney or counsel,
16   nor am I financially interested in the action.

17                      WITNESS MY HAND on this the  1st  day of
     March                , 2004.
18

19
                        DONNA McCOWN, CSR NO. 6625
20                      Expiration Date: 12/31/05
                        Bryant & Stingley, Inc., CRN No. 41
21                      2010 East Harrison
                        Harlingen, Texas  78550
22

23

24

25
```